UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
UNITED STATES OF AMERICA,     :          NOTICE OF PRETRIAL MOTIONS

                                        :

         - against -                    :             10 Cr. 553 (SHS)

                                        :

MONDHER BEJAOUI,             :

                  Defendant.      :
----------------------------------------------------x

PLEASE TAKE NOTICE, that upon the accompanying memorandum of law, and all prior papers and proceedings heretofore had herein, the defendant, Mondher Bejaoui, by and through his attorney, Jean D. Barrett, Esq., will move before the Honorable Sidney H. Stein, United States District Judge, at the United States Courthouse located at 500 Pearl Street, New York, New York, at a date and time convenient to this Court, for the following relief:

1.     An order suppressing Mr. Bejaoui's statement made to government agents because it resulted from questioning in violation of the Fifth Amendment of the United States Constitution;

2.     An order that the Government provide a bill of particulars regarding the nature and amount of any losses which may have occurred and the identities of the alleged victims;

3.     An order dismissing the Indictment because it is duplicitous;

4.     An order for the Government to provide particularized disclosure of the Fed. R. Evid. 404(b) material and for a hearing regarding its admissibility;

5.     An order for disclosure of the Government's list of witnesses and any pretrial statements of those witnesses, as well as a list of marked exhibits;

6.     An order that the Government disclose, immediately, exculpatory material in

its possession;

7.    An order that the Government produce pretrial statements and reports of government agents or other witnesses who will provide "expert" testimony in accordance with the requirements of Fed. R. Crim. Pro. 16(a)(1)(E);

8.    An order dismissing the indictment because of prejudicial preaccusation delay;

9.    An order releasing a copies of the grand jury minutes and exhibits presented to the grand jury;

10.    An order permitting Mr. Bejaoui to file additional motions if necessary; and

11.    An order granting such other relief as this Court deems necessary and proper.


Dated:       Montclair, New Jersey
            November 26, 2010

                                    */s/ Jean D. Barrett*

                                      JEAN D. BARRETT
                                      Attorney for Mondher Bejaoui

TO:   CLERK OF THE COURT
       RACHEL KOVNER, A.U.S.A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,              :

                                       :          MEMORANDUM OF LAW
          - against -
                                       :          10 Cr. 553 (SHS)

MONDHER BEJAOUI,                       :

              Defendant.               :
------------------------------------------------------x

     This memorandum is respectfully submitted in support of Mondher Bejaoui's Pretrial Motions.

<u>STATEMENT OF THE CASE</u>

     Mondher Bejaoui was indicted on June 22, 2010 and charged with six counts of mail fraud in violation 18 U.S.C. § 1341. [A 1-6.] The indictment alleges that Mr. Bejaoui fraudulently applied for and obtained insurance on limousines by falsely stating in the applications that the vehicles were garaged in communities outside the City of New York. As a result, according to the indictment, the insurance companies issued policies at lower rates than they would have charged for vehicles garaged and operated in New York City. Discovery in the case to date consists of approximately six thousand pages of documents.

ARGUMENT

POINT I

MR. BEJAOUI'S STATEMENT TO GOVERNMENT
AGENTS MUST BE SUPPRESSED BECAUSE IT
RESULTED FROM QUESTIONING IN VIOLATION OF
THE FIFTH AMENDMENT TO THE UNITED STATES
CONSTITUTION.

Mr. Bejaoui was questioned by government agents on October 16, 2007 at the FBI

Brooklyn-Queens Resident Agency in Kew Gardens. [A 7-11.] At the time, he was living in

an apartment on Fifth Avenue in Brooklyn.  He received a call from an agent who identified

himself as "John" of the FBI.  "John" said he needed to speak to him about his former

partner, a lawyer named Ihab Tatir.  They made an appointment at the agent's office for a

date about a week later.  Several days later "John" called to cancel the appointment and gave

Mr. Bejaoui a new date. [A 12-14.]

About two days later, Mr. Bejaoui called "John" and said he was not interested in

coming to the office and answering questions.  "John" responded that he would come to Mr.

Bejaoui's office to take him to the meeting.  Mr. Bejaoui viewed this statement as a threat

to arrest him and agreed to go to the meeting which occurred a few days later at the FBI

Queens Resident Agency in Kew Gardens.

When Mr. Bejaoui first arrived at the agency, he identified himself to reception.  He

showed his driver's license and received a visitors badge and was directed to the sixth floor.

At the sixth floor, he was confronted with a large locked door with an intercom.  He buzzed

the intercom and identified himself.  After a few minutes, "John" admitted Mr. Bejaoui

2

through the door.  "John" wore an official-looking badge and carried a firearm in a holster.

Once inside, Mr. Bejaoui was directed to a windowless room with a table and several chairs, where he was instructed to wait.  After about five minutes "John" returned and escorted Mr. Bejaoui through a hallway to another room with what appeared to be a one-way glass window, a table and several chairs.  Two of the chairs were occupied by large men who were introduced by "John" as FBI agents.  "John" directed Mr. Bejaoui to sit in a chair at the end of the table furthest from the door.  The two seated men were at the opposite end of the table.  "John" seated himself in the middle of the table.

"John" began by questioning Mr. Bejaoui about Tatir's business, but at some point the questioning turned to Mr. Bejaoui's business.  He was shown a mugshot of himself by one of the other agents and "John" questioned him about the pending harassment charges in state court.  Mr. Bejaoui replied that he was not there for that, but to give them information about Ihab Tatir and he asked to leave.  "John" responded that he was not allowed to leave. When Mr. Bejaoui got up and reached for the door, one of the two other men stood next to the door.  Mr. Bejaoui asked if he were in custody and "John" responded that he couldn't leave.  The questioning continued and Mr. Bejaoui answered the questions.

When they finished the questioning, the agents left the room for at least a half hour. Mr. Bejaoui tried to open the door but it was locked.  When the men returned, "John" escorted him to the elevator and he left.  At no time during the process was he ever advised of his Fifth and Sixth Amendment rights.

In *Miranda v. Arizona*, the Supreme Court adopted a prophylactic procedural

3

mechanism to ensure, by way of an explicit warning, that custodial interrogations do not undermine the Fifth Amendment privilege against self-incrimination. 384 U.S. 436, 448-50 (1966). In the absence of such a warning, the Court held that any statements elicited during the interrogation would be inadmissible at a subsequent trial. *Id.* at 492. *Miranda* warnings must be given when a subject is in custody and about to be subject to questioning. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990). A person is in custody if, under the totality of the circumstances, a reasonable person would not feel free to leave. *Yarborough v. Alvarado*, 541 U.S. 652, 663-65 (2004); *United States v. Newton*, 369 F.3d 659, 676-77 (2d Cir. 2004).

Furthermore, statements which are coerced from a defendant are inadmissible at the defendant's trial. *Chavez v. Martinez*, 538 U.S. 760, 770 (2003). A statement is involuntary if it was obtained by overbearing the will of the accused. *See Haynes v. Washington*, 373 U.S. 503, 513-14 (1963). To determine whether an accused's will has been overborne, courts must assess the totality of the circumstances, including the character of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In so doing, courts consider the location of the questioning, *see Miranda*, 384 U.S. at 457-58, whether *Miranda* warnings were given, *see United States v. Odeh*, 552 F.3d 177, 215-16 (2d Cir. 2008), and whether the accused initiated the contact with law enforcement. *See United States v. Lopez*, 380 F.3d 538, 542-43, 545-46 (1st Cir. 2004). Personal characteristics of the accused, such as youth, *Fare v. Michael C.*, 442 U.S. 707, 725-26 (1979), drug problems, *United States v. Palmer*, 203 F.3d 55, 60-61 (1st Cir. 2000), physical condition, *Pagan v. Keene*, 984 F.2d 61, 63 (2d Cir. 1993) and experience with the criminal justice system.

4

*United States v. Anderson*, 929 F.2d 96, 97-99, 102 (2d Cir. 1991).

Upon a defendant's request, the trial court must conduct a hearing to determine whether a statement was voluntary. *Sims v. Georgia*, 385 U.S. 538, 543-44 (1967). The Government bears the burden of proving, by a preponderance of the evidence, that a defendant's statement was voluntary and the accuracy of the statements is irrelevant to this determination. *See Colorado v. Connolly*, 479 U.S. 157, 168 (1986).

Here, no *Miranda* warnings were given and the questioning was conducted under circumstances that a reasonable person would find to be coercive. When Mr. Bejaoui was alone, he was held in a locked room. When others were present in that room, he asked to leave and was told he could not. He was outnumbered by law enforcement officers by three to one and was positioned by them so that his access to the door was blocked. At least one of the officers was armed. Any reasonable person under these circumstances would be of the belief that he was not free to go until he had answered all questions.

## POINT II

### THE GOVERNMENT SHOULD PROVIDE A BILL OF PARTICULARS REGARDING THE NATURE AND AMOUNT OF LOSSES WHICH MAY HAVE OCCURRED AND THE IDENTITIES OF THE ALLEGED VICTIMS.

Mr. Bejaoui moves this Court pursuant to Fed. R. Crim. P. 7(f) for an order compelling the Government to particularize the nature and the amount of the loss or losses in this case and who suffered the loss or losses. Counsel communicated this request by email to the Government on October 13, 2010. [A 15-16.] To date, the Government has not provided this material. The requested information is necessary for counsel to properly prepare the case, provide strategic advice to Mr. Bejaoui and avoid prejudicial surprise at trial.

The decision whether to order the Government to produce a bill of particulars rests within the sound discretion of the trial court. *United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984). The information regarding the actual losses suffered is necessary because proof of loss is an element of fraudulent intent. *Cf., United States v. Naiman*, 211 F.3d 40, 49 (2d Cir. 2000).

## POINT III

### THE INDICTMENT IS DUPLICITOUS.

Counts One through Five of the indictment each charge Mr. Bejaoui with filing a distinct application for insurance in a particular month of either 2005 or 2006. Count Six, on the other hand, charges not only the filing of an application on behalf of Heather

Limousine Corp. in May, 2006 stating that vehicles were garaged or located in Endwell, New York in order to defraud the NYAIP [New York Automobile Insurance Plan] and a private insurer, but it also alleges "Forged or Fraudulent Department of State Filings." [A 5.] There is no mention of the Department of State in the preamble to the Counts and the NYAIP is administered by the Department of Insurance, not the Department of State.

An indictment is duplicitous if it charges more than one offense in a single count. *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). Duplicitous indictments obscure particular charges causing confusion as to the nature of jury decision-making, depriving the defendant of proper notice of the charges against him and impairing his ability to assert double jeopardy in a subsequent prosecution. *United States v. Moloney*, 287 F.3d 236, 239 (2d Cir. 2002). It can also lead to erroneous evidentiary rulings, *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997), and may prevent appropriate sentencing because the basis of the conviction is uncertain. *United States v. Sturdivant*, 244 F.3d at 77.

Count Six appears to charge more than one offense. The fact that this is an uncertainty demonstrates the harm, since it is clearly inadequate notice of the charges against Mr. Bejaoui. The Government should be compelled to cure the defect or the indictment should be dismissed.

POINT IV

THE COURT SHOULD ORDER PARTICULARIZED
DISCLOSURE OF FED. R. EVID. 404(b) MATERIAL AND
HOLD A HEARING REGARDING ITS ADMISSIBILITY.

Mr. Bejaoui moves for particularized pretrial disclosure of evidence of other crimes, wrongs or acts.  Fed. R. Evid. 404(b) requires "reasonable notice in advance of trial . . . of the general nature of any such evidence [the Government] intends to introduce at trial." Obviously, the purpose for the advance notice is to provide the Court the opportunity to rule on the admissibility of this evidence.

Proof of uncharged crimes or bad acts "is not admissible to prove the character of a person in order to show action in conformity therewith."  Fed. R. Evid. 404(b).  However, uncharged misconduct evidence is admissible for other purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *Id*.  However, even if the Court deems the evidence admissible for a relevant purpose, it must, nevertheless, scrutinize such evidence to determine whether or not its probative value is substantially outweighed by the potential for unfair prejudice.  *See* Fed. R. Evid. 403; *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. Gilan*, 967 F.2d 776, 782 (2d Cir. 1992).  While the Second Circuit takes an inclusionary approach to this type of evidence, that "does not obviate the need to identify the fact or issue to which the evidence is relevant."  *United States v. Figueroa*, 618 F.2d 934, 939 n.2 (2d Cir. 1980).  Particularly when the Government offers such evidence to show knowledge or intent, it "must identify a similarity or connection between the two acts that makes the prior act

relevant" to a permissible purpose.  *See United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002).  *See also, United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993).

Courts should exercise particular care in admitting such evidence." *See United States v. Murray*, 103 F.3d 310, 316 (3d Cir. 1997).  In *Murray*, now-Justice Alito noted at least two reasons for the requirement of extreme caution:

> First, the line between what is permitted and what is prohibited under Rule 404(b) is sometimes quite subtle.  Second, Rule 404(b) evidence sometimes carries a substantial danger of unfair prejudice and thus raises serious questions under Fed. R. Evid. 403.

*Id*.  As a result, Justice Alito advised trial judges to require a party offering Rule 404(b) evidence "to place on the record a clear explanation of the chain of inferences leading from the evidence in question to a fact 'that is of consequence to the determination of the action.'" *Id*.

Evaluation of the evidence requires this Court to determine whether "(1) it [is] offered for a proper purpose; (2) it [is] relevant to a disputed trial issue; [and] (3) its probative value is substantially outweighed by its possible prejudice." *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003).  Furthermore, if such evidence is deemed admissible, upon admission, the trial court must administer an instruction limiting the jury's consideration of the evidence to the purpose for which it has been deemed admissible." *Id*.

Because of the nature of this material, any investigation of Rule 404(b) matters is likely to be time-consuming and difficult.  Furthermore, Mr. Bejaoui should have a fair opportunity to challenge the admissibility of this material well in advance of trial.

Consequently, in order to provide defense counsel with an adequate opportunity to investigate and to fairly present to the Court the issues regarding admissibility for a ruling prior to trial, it is submitted that the Government should be ordered to disclose immediately proposed 404(b) evidence.

The Government bears the burden of demonstrating that the evidence is admissible. Mr. Bejaoui notes that the prosecutor made an allegation of uncharged misconduct during the hearing on his bail motion. Consequently, this Court should order that the Government's 404(b) notice set forth against whom it claims this evidence is admissible, the manner and method of proof (necessary to evaluate its admissibility under Rule 403) and a precise statement of the basis for admission, including the chain of inferences which the Government alleges leads from the evidence to a material fact in issue. The Court should then make a pretrial determination of its admissibility pursuant to Rule 404(b) and Rule 403.

POINT V

THE COURT SHOULD ORDER DISCLOSURE OF THE GOVERNMENT'S LIST OF WITNESSES AND ANY PRETRIAL STATEMENTS OF THOSE WITNESSES, AS WELL AS A LIST OF MARKED EXHIBITS TO BE INTRODUCED AT TRIAL.

The Jencks Act requires that after a witness has testified at trial, the Government must produce to the defense any statement(s) by that witness relating to the subject matter of his or her testimony. 18 U.S.C. § 3500(b). Nevertheless, the Court may order early disclosure of Jencks Act material pursuant to its inherent supervisory power to control discovery. *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). Early disclosure can result in the

10

avoidance of trial interruptions and unnecessary delays inherent in the last-minute disclosures. Furthermore, pretrial disclosure enables the Court to resolve evidentiary issues in advance. Last-minute disclosure of voluminous Jencks materials may well necessitate repeated mid-trial delays. Consequently, it is respectfully requested that the Court order the Government to disclose Jencks Act material 30 days in advance of trial.

Likewise, the orderly progress of the trial will be facilitated by disclosure of the Government's witness list and marked trial exhibits. This Court is empowered to order the Government to make pretrial disclosure of its list of witnesses if "disclosure [is] both material to the preparation of the defense and reasonable in light of the circumstances surrounding [the] case." *United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975). Here, the volume of material is enormous and it is clear that the Government has no intention of offering it all into evidence. Witness and exhibit lists will allow defense counsel the ability to focus her trial preparation time and avoid wasting her efforts upon material which the Government is fully aware it will not be using at trial. For the reasons delineated above, the Court should exercise its discretion to order the Government to disclose its witness list 30 days before trial. *Cf., United States v. Stroop*, 121 F.R.D. 269, 274-75 (D.N.C. 1988).

11

POINT VI

THIS COURT SHOULD ORDER THE GOVERNMENT TO
DISCLOSE, IMMEDIATELY, EXCULPATORY MATERIAL
IN ITS POSSESSION.

The Fifth Amendment requires the Government to disclose evidence favorable to the accused.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Regardless of whether requested, favorable evidence which is material must be disclosed.  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  The prosecutor's duty does not end with the material actually contained in her file. As the Supreme Court has noted:

> Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." Id. at 438. In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles, 514 U.S. at 437.

*Strickler v. Greene*, 527 U.S. 263, 280-281 (U.S. 1999).

Here, it appears that a number of governmental agencies were involved in this investigation over a period of many years.  It is respectfully requested that this Court order the Government to review all of the agency files to determine if they contain exculpatory material.  It is also requested that the Government identify any material in the 6,000 pages already disclosed which it is aware contains exculpatory.

12

## POINT VII

### THE GOVERNMENT SHOULD PRODUCE PRETRIAL STATEMENTS AND REPORTS OF GOVERNMENT AGENTS OR OTHER WITNESSES WHO WILL PROVIDE "EXPERT" TESTIMONY IN ACCORDANCE WITH THE REQUIREMENTS OF FED. R. CRIM. PRO. 16(a)(1)(E).

The Government may be required to produce as witnesses investigators and/or agents at trial.  In the course of their testimony, these witnesses may be called upon to explain technical terms and render interpretations generally provided by experts.  To the extent that the testimony is of this nature, the Government must provide the appropriate discovery pursuant to Fed. R. Crim. Pro. 16(a)(1)(E).  The Government should also be ordered to provide its expert reports and resumes forthwith.

## POINT VIII

### THE INDICTMENT SHOULD BE DISMISSED BECAUSE OF PREJUDICIAL PREACCUSATION DELAY.

The indictment against Mr. Bejaoui alleges conduct which ended over four years ago.  Mr. Bejaoui was questioned more than three years ago by federal agents.  Most of the documents provided in discovery appear to have been colleted by state investigators before federal involvement.  Nonetheless, Mr. Bejaoui was not charged in this matter until late June, 2010.  In the interim, Mr. Bejaoui's business associate, who was a licensed insurance broker and was responsible for the automobile insurance policies, has fled and cannot be located.  Furthermore, Mr. Bejaoui has been incarcerated for two and a half years, for most of the time facing state charges that have been dismissed, a circumstance which, combined with the

13

passage of time, has had an effect on his memory and concentration.

The Due Process Clause protects defendants from prejudicial preaccusation delay. The Clause may be violated by preaccusation delay even if an indictment is brought within the statute of limitations. *United States v. Lovasco*, 431 U.S. 783, 789 (1977). A defendant must show that the Government's delay was intentional to gain a tactical advantage and that the delay resulted in actual harm. *Id.* at 789-90.

Here, the Government delayed its case long enough so that a critical witness is no longer available. Furthermore, Mr. Bejaoui's lengthy incarceration has caused him to be at a tactical disadvantage in challenging the Government's case against him. Consequently, the indictment should be dismissed.

POINT XIX

> THE COURT SHOULD ORDER DISCLOSURE OF THE GRAND JURY MINUTES AND ORDER THE GOVERNMENT TO IDENTIFY THE EXHIBITS OFFERED IN THE GRAND JURY.

As has already been noted, the massive amount of paper the Government has disclosed to counsel in no way assists in determining what the case is actually about. Mr. Bejaoui asserts that, in order for this indictment to have been returned, the grand jurors must have been misinformed about his role in connection with the businesses identified in the indictment. He also claims that the grand jurors could not have been informed of the role played by his some-time business partner in apply for and obtaining the insurance policies in question. Consequently, he seeks disclosure of the grand jury minutes and a list of the

14

exhibits offered for the grand jury's consideration.

A district court has wide discretion in balancing the need for grand jury secrecy against a defendant's need for disclosure.  Ordinarily, once a grand jury is no longer empaneled, the need for secrecy is no longer paramount.  *See, e.g.*, *United States v. Claudio*, 44 F.3d 10, 14-15 (1st Cir. 1995) (abuse of discretion to refuse to order disclosure of grand jury transcript to defendant).  This Court should exercise its discretion to order disclosure of the minutes and a list of exhibits.

POINT X

MR. BEJAOUI REQUESTS LEAVE TO FILE ADDITIONAL
MOTIONS IF NECESSARY.

In light of the fact that discovery is ongoing, combined with the volume of material to be reviewed and the likelihood that additional discovery will be forthcoming, Mr. Bejaoui requests that he be permitted to file additional motions if necessary as these events unfold.

15

## CONCLUSION

For the reasons stated above, it is respectfully requested that the Court grant the relief sought in these motions.

Dated:      Montclair, New Jersey
              November 26, 2010

Respectfully submitted,

*/s/ Jean D. Barrett*

JEAN D. BARRETT
Attorney for Mondher Bejaoui

C:\CASE FOLDERS\Bejaoui\Motions\Omnibus Pretrial motions.wpd



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :      INDICTMENT

        -v.-                  :

MONDHER BEJAOUI,                      10 Cr.

                                     10 CRIM 553

        Defendant.            :

- - - - - - - - - - - - - - - - - x

COUNTS ONE THROUGH SIX

(Mail Fraud)

Background

The Grand Jury charges:

1.   In New York State, vehicle owners who are unable to
secure either personal or commercial auto liability and physical
damage insurance coverage through a willing insurance agent in
the voluntary market can get insurance through the New York
Automobile Insurance Plan (the "NYAIP"), an entity established
pursuant to New York State Insurance Law.  Brokers certified by
the NYAIP can submit policy applications to the NYAIP on behalf
of applicants.  The NYAIP then assigns the application to an
insurance carrier doing business in New York State and forwards
the assigned carrier the policy application by mail.  The carrier
to which NYAIP assigns the application is required to provide
insurance coverage to the applicant.

2.   The assigned carrier determines the policy premium

A 1

based, in part, on where the vehicles to be insured are garaged and operated. Vehicles whose principal garaging location is in New York City are charged a substantially higher insurance premium than vehicles that are principally garaged or operated in locations outside of New York City, including Glen Cove, New York; Binghamton, New York; Vestal, New York; Endwell, New York; and Southampton, New York.

Overview of the Scheme

3. In order to defraud insurance companies of money, MONDHER BEJAOUI, the defendant, caused to be mailed to the NYAIP and to private insurers insurance applications for livery vehicles in which the true locations at which the vehicles were garaged and operated was misrepresented, and deliberately caused to be added to policies additional vehicles whose true garaging locations were misrepresented, and caused the mailing of insurance certificates, in order to obtain insurance for the vehicles at much lower rates than the vehicles were eligible for based on their true locations of garaging and operation. In particular, BEJAOUI represented that vehicles for which he sought insurance were garaged within Broome, Suffolk, or Nassau Counties, and operated within the rate areas for those counties, in order to obtain insurance at rates substantially lower than those applicable to vehicles garaged and operated in New York City. Once the policies were issued, BEJAOUI added to the policies additional livery vehicles operating in New York City,

2

A 2

and defrauded the policy issuers of funds by falsely representing that the additional vehicles were principally garaged in the same location outside New York City as listed in the initial application for the policy in question. BEJAOUI thereby sought to obtain, and did obtain, insurance at substantially lower rates than would have been charged based on the vehicles' true locations of garaging and operation.

### Statutory Allegations

4. In or about the months stated below, in the Southern District of New York and elsewhere, MONDHER BEJAOUI, the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and did receive therefrom, and did cause to be delivered by mail and such carriers according to the direction thereon and at the place at which it was directed to be delivered by the person to whom it was addressed, such matters and things, and did aid, abet, counsel, command, induce, and procure the commission of the same offense, to wit, BEJAOUI

3

A 3

sent and delivered, caused to be sent and delivered, and aided and abetted the sending and delivery of applications for insurance to the NYAIP and from the NYAIP to insurance companies, for the purpose of defrauding insurance companies through false and fraudulent pretenses and representations concerning the areas in which the vehicles to be insured were garaged and were operated, as set forth below:

| COUNT | Company Identified As Policy Applicant | Month of Application Mailing(s) | Recipients of Application Mailing(s) | False Matters in Application Mailings |
|-------|------------------------------|-----------------------------|----------------------------------|---------------------------------|
| ONE | Hamton Luxury Cars, Inc. | July 2005 | NYAIP and Private Insurer | Purported Location of Garaging and/or Operation in Binghamton, New York |
| TWO | Vestal Limousine Corp. | November 2005 | Private Insurer | Purported Location of Garaging and/or Operation in Vestal, New York |
| THREE | Hampton Luxury Cars, Inc. | March 2006 | NYAIP and Private Insurer | Purported Location of Garaging and/or Operation in Vestal, New York |
| FOUR | Pedro Limousine Corp. | May 2006 | NYAIP and Private Insurer | Purported Location of Garaging and/or Operation in Endwell, New York |
| FIVE | Bejaoui Express, Inc. | May 2006 | NYAIP and Private Insurer | Purported Location of Garaging and/or Operation in Southampton, New York |

4

A 4

| SIX | Heather Limousine Corp. | May 2006 | NYAIP and Private Insurer | Purported Location of Garaging and/or Operation in Endwell, New York; Forged or Fraudulent Department of State Filings |

(Title 18, United States Code, Sections 1341 and 2(a)).

FOREPERSON

PREET BHARARA
United States Attorney

5

A 5

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### MONDHER BEJAOUI,

**Defendant.**

### INDICTMENT

10 Cr.

(18 U.S.C. §§ 1341 and 2.)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

Foreperson.

4/22/10  Assigned to J. Stein
Su's                         M3 MWB

A 6

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription   10/16/2007

    MONDHER M. BEJAOUI, date of birth 09/01/1973, SSAN 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, residential address 9229 5th Avenue, Apartment 3R, Brooklyn, New York 11209, NY Driver's License ID 598 020 455, cellular number (917) 217-1933, was interviewed by Special Agents of the Federal Bureau of Investigation ("FBI") at the FBI Brooklyn-Queens Resident Agency 80-02 Kew Gardens Road, Kew Gardens, NY 11415. Also present during the interview was ███████████████ ████████████████████████████████████████. After providing BEJAOUI with the identity of the interviewing agents BEJAOUI provided the following information:

    BEJAOUI is an accountant, he received his license from H&R BLOCK. BEJAOUI worked as a tax preparer at IHAB TARTIR's office from October 2004 until approximately December 2005. He shared and rented office space from TARTIR. The office was located at 305 Atlantic Avenue, Brooklyn, NY.

    TARTIR purchased a laundromat located at 178 Hoyt Street, Brooklyn, NY. TARTIR asked BEJAOUI to manage the business and BEJAOUI agreed. TARTIR eventually sold the laundromat and told BEJAOUI he was going to give him $60,000.00 from the sale. BEJAOUI only received $25,000.00.

    BEJAOUI opened a business named BROOKLYN VILLAGE during January 2006. The business was located at 99 Smith Street, Brooklyn, NY. BROOKLYN VILLAGE was a tax preparation business. BEJAOUI hoped to expand into other services such as insurance and travel. A lot of BEJAOUI's clients were livery vehicle drivers. BEJAOUI rented the office space located at 99 Smith Street from COSTAS LNU (Last Name Unknown). TARTIR sent HOSSAM ALGED to BEJAOUI. ALGED is TARTIR's brother-in-law. ALGED obtained his insurance license and worked for BEJAOUI selling insurance to the community. ALGED was sent to BEJAOUI during December 2005. ALGED stayed with BROOKLYN VILLAGE/BEJAOUI until November 2006. ALGED then opened a business named CONTINENTAL INSURANCE ("CONTINENTAL"). CONTINENTAL's office was located at 111 Livingston Street, Brooklyn, NY. ALGED and CONTINENTAL are currently located at 95 Smith Street, 2nd Floor, Brooklyn, NY. TARTIR purchased the property located at 99 Smith Street after BEJAOUI moved his business. ALGED is currently using BEJAOUI's office equipment. BEJAOUI asked TARTIR and ALGED for his office equipment and they

---

Investigation on   10/11/2007   at   Kew Gardens, New York

File #   ████████████████████████

Date dictated   10/16/2007

by   ████████████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

6866

A 7

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of   Mondher M. Bejaoui                    , On 10/11/2007 , Page   2

have not returned it.  BEJAOUI is planning on filing a complaint with the local police precinct.

Money (insurance premium) collected from livery vehicle drivers was deposited into the BROOKLYN VILLAGE Citibank account. The branch location was Citibank 316 Court Street, Brooklyn, NY. The livery vehicle drivers usually paid the secretaries.  The secretaries gave the money to BEJAOUI and he deposited it into the Citibank account.  LAURA HUSSEIN was a secretary.  She was also ALGED's girlfriend.  The insurance premiums were paid either in cash or by check.  All of the money went into the BROOKLYN VILLAGE account, there were no other accounts.  After the money was deposited it was then used to pay the insurance companies.

ALGED stole money from the business (BROOKLYN VILLAGE). ALGED completed insurance applications for customers.  He collected money (premiums) from the livery vehicle drivers and never gave it to BEJAOUI or deposited it into the business account.

BEJAOUI owned a limo company named BEJAOUI EXPRESS ("EXPRESS").  He purchased livery vehicles and rented them to drivers.  BEJAOUI paid for the TLC license.  He had over 15 cars. There was no physical location for EXPRESS.  EXPRESS' address was 5 Brewster Street, Glen Cove, NY.  The address was a mailbox. BEJAOUI filed the corporation papers himself.  The filing cost was a couple hundred dollars.  He also paid for the mailbox.  BEJAOUI purchased insurance from GHEITH INSURANCE AGENCY and AMERICAN TRANSIT was assigned as the carrier.  During the first year BEJAOUI insured seven or eight vehicles.  During the second year he insured fourteen or fifteen vehicles.  BEJAOUI understands the limo business because he used to be a dispatcher.

TARTIR assists his clients with attaining legal immigration status under the new labor law.  TARTIR charges each client $6000.00 for his service.  TARTIR places his clients as employees in "non-legitimate businesses."  TARTIR then represents to the immigration authorities that his clients are legitimately employed with that particular business enabling them to attain legal immigration status.  One of the "non-legitimate" businesses TARTIR used was PYRAMID PIZZA.

HEATHER LIMO ("HEATHER") is ALGED's company.  TARTIR obtained corporation papers for HEATHER through Servico.  A social security number was needed to start the corporation and TARTIR used someone else's social security number.  ALGED collected all the

6867

A 8

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of   Mondher M. Bejaoui                              , On  10/11/2007 , Page   3

money (insurance premium) for HEATHER.  TARTIR and ALGED made
BEJAOUI sign papers.  BEJAOUI did not know what the papers were
for.  ALGED opened the mailbox upstate to get a cheaper insurance
rate.  ALGED never told BEJAOUI about the upstate mailbox.

TARTIR and ZIAD KSOURI owned a limo company named HAMPTON
LUXURY CARS ("HAMPTON").  They made BEJAOUI incorporate the
company.  The company used KSOURI's address in Binghampton, NY.
KSOURI used to live in Binghampton with his girlfriend.  BEJAOUI
purchased insurance for the HAMPTON vehicles from GHEITH INSURANCE
AGENCY.  The Binghampton address was used so they could get a
cheaper insurance rate.

VESTAL LIMO is not BEJAOUI's company.  BEJAOUI did not
incorporate PEDRO LIMO and he has never heard of it.

YOUSEF LNU (Last Name Unknown) and TARTIR purchased the
property located at 111 Livingston Street, Brooklyn, NY.  The
property is under TARTIR's name because he has a good credit score.
YOUSEF is a Palestinian who is also known as "Joe."  He works at a
furniture store located on 5th Avenue, Bay Ridge, Brooklyn.
YOUSEF's brother is someone called NASH.  BEJAOUI heard that TARTIR
and YOUSEF were involved with credit card fraud.  While BEJAOUI was
at 305 Atlantic Avenue, he overheard YOUSEF talking about burning
down a house for the insurance money.  The property was located on
Douglas Street, Brooklyn, NY.  YOUSEF collected $250,000.00 from
the insurance company.

TARTIR cheats his clients by not telling them when their
immigration interviews are scheduled.  His clients miss the
interviews and TARTIR then has to make additional filings to re-
schedule the interviews.  TARTIR charges for the additional
filings.  The case becomes longer and more expensive.  BEJAOUI has
seen TARTIR throw away the notices for the interviews.  KSOURI has
also thrown the notices away.  TARTIR handled BEJAOUI's marriage
and immigration case.  BEJAOUI never received his notice and was
charged more to have the interview re-scheduled.  BEJAOUI passed
his immigration interview and is still living with his wife.

KAWSAW MANSEY was ALGED's secretary.  MANSEY filed a
harassment complaint against BEJAOUI and received an order of
protection.  ALGED forced MANSEY to file the complaint and the
allegations were not true.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    Mondher M. Bejaoui                        , On 10/11/2007 , Page    4

During the interview BEJAOUI presented checks to the interviewing agents.  The checks were from the BROOKLYN VILLAGE account.  BEJAOUI explained the signatures on the checks were not his.  The signatures were not forgeries, they were signed by unauthorized signatories.  ALGED signed some of the checks in his own name.  ALGED was not an authorized signatory on the account. The checks presented to the interviewing agents were made payable to HUDSON INSURANCE COMPANY and FIRST ADV ADR.  The check numbers were 1181, 1275, 1311, and 1331.

(Agent's Note: the interviewing agents did not take possession of the checks.)

ALGED was deported and brought back into the country illegally.  BEJAOUI believes that ALGED has two different identification documents.  One of the documents is a Pennsylvania identification and the other is a New York identification.  One of the documents is under the name "HOSSAM ALGED" and the other is under "HOSSAM EL-DEAN ALGED."  ALGED drives a brand new Mercedes that is registered in TARTIR's name.

NATALY LNU is a secretary who works at TARTIR's office. NATALY entered into a fraudulent marriage with an Italian guy (who is a U.S. Citizen) to get her green card.  NATALY lives with her boyfriend, an Egyptian guy named TAREK.  TAREK is a livery vehicle driver who purchased cheap insurance from ALGED.

KSOURI was arrested for bad checks.  He spent eight months in jail.  INS did not deport him because he got asylum. KSOURI claimed that if he went back to his native country he would not be safe.

ALGED made IDIRA LOPEZ take a loan for $10,000.00.  LOPEZ gave the money to ALGED and he never paid her back.

TARTIR had a brother in Jordan who passed away.  His brother was a lawyer.  BEJAOUI said that TARTIR took his brother's law license and he may not really be a lawyer.

BEJAOUI is currently in consideration for employment with State Farm Insurance as a sales agent.  He is planning to attend a "career understanding" seminar on October 19, 2007.

6869

A 10

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Mondher M. Bejaoui___ , On _10/11/2007_ , Page ___5___

6870

A 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,       :             DECLARATION

                             :

       - against -              :         10 Cr. 553 (SHS)

MONDHER BEJAOUI,        :

          Defendant.     :
------------------------------------------------------x

      Mondher Bejaoui declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

      1.      I am the defendant in the above-captioned criminal case.  In October, 2007 I was living in an apartment on Fifth Avenue in Brooklyn.  I received a call from an agent who identified himself as "John" of the FBI.  "John" said he needed to speak to me about my former partner, a lawyer named Ihab Tatir.  We made an appointment at the agent's office for a date about a week later.  Several days later "John" called to cancel the appointment and gave me a new date.

      2.      About two days later, I called "John" and said I was not interested in coming to the office and answering questions.  "John" responded that he would come to my office to take me to the meeting.  I viewed this statement as a threat to arrest me if I did not do as I was asked and agreed to go to the meeting which occurred a few days later at the FBI Queens Resident Agency in Kew Gardens.

      3.      When I first arrived at the agency, I identified myself to reception.  I showed

my driver's license and received a visitors badge and was directed to the sixth floor.  At the sixth floor, I was confronted with a large locked door with an intercom.  I buzzed the intercom and identified myself.  After a few minutes, "John" admitted me through the door. "John" wore an official-looking badge and carried a firearm in a holster.

4.       Once inside, I was directed to a windowless room with a table and several chairs.  "John" instructed me to wait so I sat down.  After about five minutes "John" returned and escorted me through a hallway to another room with what appeared to be a one-way glass window, a table and several chairs.  Two of the chairs were occupied by large men who were introduced by "John" as FBI agents.  "John" directed me to sit in a chair at the end of the table furthest from the door.  The two seated men were at the opposite end of the table. "John" seated himself in the middle of the table.

5.       "John" began by questioning me  about Tatir's business, but at some point the questioning turned to my business.  I was shown a mugshot of myself by one of the other agents and "John" questioned me about the pending harassment charges in state court.  I replied that I was not there for that, but to give them information about Ihab Tatir and I asked to leave.  "John" responded that I was not allowed to leave.  When I got up and reached for the door, one of the two other men stood next to the door.

6.       I asked if I was in custody and "John" responded that I couldn't leave.  The questioning continued and I answered the questions.

7.       When they finished the questioning, the agents left the room for at least a half hour.  I tried to open the door but it was locked.  When the men returned, "John" escorted me to the elevator and I left.  At no time during the process was I ever advised of my Fifth

to the elevator and I left.  At no time during the process was I ever advised of my Fifth
Amendment rights.

       8.     I make this declaration only for the purpose of supporting my motion.  It does
not contain all of the information I have about these matters.

Dated:      New York, New York
              November 26, 2010


                                                     _____
                                              Mondher Bejaoui

C:\CASE FOLDERS\Bejaoui\Motions\Bejaoui declaration.wpd

**Jean D. Barrett**

---

| | |
|---|---|
| **From:** | Jean D. Barrett <jeanbarrett@ruhnkeandbarrett.com> |
| **Sent:** | Wednesday, October 13, 2010 11:46 AM |
| **To:** | 'Kovner, Rachel (USANYS)' |
| **Subject:** | RE: Bejaoui |

May I see those calculations?  Also, the state case against client has been dismissed.  Does that change your view as to bond?

Jean D Barrett

Ruhnke & Barrett

47 Park Street

Montclair, NJ 07042

(973)744-1000

(973)746-1490 (fax)

2 Wall Street, 3d Fl

New York, NY 10005

(212)608-7949

(212)571-3792(fax)

jeanbarrett@ruhnkeandbarrett.com

PLEASE NOTE:  This communication originated from a law office and may be privileged and confidential.  If you received this communication in error, please delete the message.  We would also appreciate an email back to let us know the message did not reach its intended recipient.  Thank you.

**From:** Kovner, Rachel (USANYS) [mailto:Rachel.Kovner@usdoj.gov]
**Sent:** Wednesday, October 13, 2010 9:22 AM
**To:** Jean Barrett
**Subject:** RE: Bejaoui

Our estimate of the loss amount is over $600,000 but less than $1,000,000, based on the insurance companies' calculation of loss involving the rate differential for the insured cars.

**From:** Jean D. Barrett [mailto:jeanbarrett@ruhnkeandbarrett.com]
**Sent:** Tuesday, October 12, 2010 7:02 PM
**To:** Kovner, Rachel (USANYS)
**Subject:** Bejaoui

Could you please tell me what the government estimates the loss to be in this case?  Is there something relevant to loss calculation in the 6000+ pages of discovery?

Jean D Barrett

Ruhnke & Barrett

47 Park Street

Montclair, NJ 07042

(973)744-1000

(973)746-1490 (fax)

2 Wall Street, 3d Fl

A 15

New York, NY 10005
(212)608-7949
(212)571-3792(fax)
jeanbarrett@ruhnkeandbarrett.com

PLEASE NOTE:  This communication originated from a law office and may be privileged and confidential.  If you received this communication in error, please delete the message.  We would also appreciate an email back to let us know the message did not reach its intended recipient.  Thank you.