C8DAABEJH                          Hearing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              10 CR 553 (SHS)

5    MONDHER BEJAOUI,

6                   Defendant.

7    ------------------------------x

8                                             New York, N.Y.
                                              August 13, 2012
9                                             10:15 a.m.

10

     Before:
11
                        HON. SIDNEY H. STEIN,
12
                                              District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     ALEXANDER WILSON
17   RACHEL KOVNER
          Assistant United States Attorney
18
     JOSHUA L. DRATEL
19        Attorney for Defendant Bejaoui

20

21

22

23

24

25

C8DAABEJH                        Hearing

1              (Case called)

2              MS. KOVNER:  Good morning, your Honor.

3              Rachel Kovner and Alex Wilson, for the government and

4    we're joined by a paralegal.

5              THE COURT:  Good morning.

6              MR. DRATEL:  Joshua Dratel and Mr. Bejaoui is seated.

7              THE COURT:  All right.  Good morning.  Please be

8    seated.

9              Move the computer monitor away from Mr. Bejaoui's face

10   so I could see him.

11             All right.  Thank you.  This is a hearing to determine

12   whether Mr. Bejaoui is competent to proceed pursuant to 18

13   U.S.C. 4247(D).  The defendant has moved for a hearing to

14   determine the competency of the defendant.  And the question is

15   whether or not the defendant may presently, whether or not the

16   defendant is presently suffering of the mental disease or

17   defect rendering him mentally incompetent to the extent that he

18   is unable to determine, unable to understand the nature and

19   consequences of the proceedings against him or to assist

20   properly in his defense.

21             Mr. Dratel, do you agree that's the issue before the

22   Court?

23             MR. DRATEL:  Correct, your Honor.

24             THE COURT:  Government?

25             MS. KOVNER:  Yes.

C8DAABEJH                          Hearing

```
1              THE COURT:  All right.  Who are the witnesses for the

2    government?

3              MS. KOVNER:  Your Honor, the government anticipates

4    calling one witness and that's Dr. Robert Cochrane.  We've

5    discussed with Mr. Dratel the order of the witnesses and it's

6    our expectation because it's the defendant's burden in this

7    case that the first defense witness will be testifying first.

8              THE COURT:  All right.  Mr. Dratel, who are the

9    defense witnesses?

10             MR. DRATEL:  Dr. Michael First and Jean Barrett.

11             THE COURT:  I've received the faxed letter of the

12   government dated August 10 and faxed at 13 minutes before

13   midnight on August 11.

14             Mr. Dratel, how long do you think the

15   direct-examination of Dr. First is going to be?

16             MR. DRATEL:  My guess would be an hour, maybe a little

17   longer, maybe a little less.

18             THE COURT:  I am not holding you to it.  I am just

19   trying to get the sense.  And of Ms. Barrett?

20             MR. DRATEL:  Probably 15 minutes is my guess.

21             THE COURT:  All right.  And, government, how long do

22   you think the direct of Dr. Cochrane is going to be?

23             MR. WILSON:  Probably about an hour and a half, your

24   Honor.

25             THE COURT:  All right.  Now, I want both Dr. First and
```

1   Dr. Cochrane in the courtroom now.

2              MR. DRATEL:  They are, your Honor.

3              THE COURT:  I'd appreciate it if both of them stay

4   throughout this proceeding.  I want each to hear the testimony

5   of the other.

6              MR. DRATEL:  We've agreed on that, your Honor, the

7   government and the defense as well.

8              THE COURT:  All right.  And the parties themselves

9   have agreed that it's the defense that has the burden here?

10             MR. DRATEL:  Yes, your Honor.  I couldn't really find

11  anything to the contrary in that regard.  So we do have a

12  burden of establishing his competency.

13             THE COURT:  Well, you have the burden to establish

14  incompetency.  Is that what you said?

15             MR. DRATEL:  Well, I think it's our motion that he is

16  not competent.

17             THE COURT:  All right.  I am informed that the Supreme

18  Court agrees with you Cooper v. Oklahoma.  I'll take a look at

19  it because I am not, particularly, familiar with that case but

20  everyone agrees that defense has the burden on this motion and

21  the motion is that to prove by a preponderance that he suffers

22  from a mental disease or defect rendering him mentally

23  incompetent to the extent he is unable to understand the nature

24  and consequences of the proceedings against him or to assist

25  properly in his defense.  We are all agreed.

C8DAABEJH                        Hearing

1              All right.  Put your first witness on please.

2              MR. DRATEL:  Your Honor, just one issue.  I guess we

3      can do it at the time Ms. Barrett comes to discuss --

4              THE COURT:  You are talking about the attorney/client

5      issue?

6              MR. DRATEL:  Yes.

7              THE COURT:  All right.  We'll wait.

8       DR. MICHAEL B. FIRST,

9           called as a witness by the Defendant,

10          having been duly sworn, testified as follows:

11     DIRECT EXAMINATION

12     BY MR. DRATEL:

13     Q.  Dr. First, could you tell us what you do professionally?

14     A.  I am a psychiatrist.  I am a professor of clinical

15     psychiatry at Columbia University.  I am also employed as a

16     research psychiatrist at the New York State Psychiatric

17     institute.  I also maintain a private practice in Manhattan.

18     Q.  And how long have you been practicing?

19     A.  I have been practicing -- I finished my residency in 1987

20     and I have been practicing since then.  So a little shy of 30

21     years.

22     Q.  And have you regularly had a hospital position during the

23     course of your practice?

24     A.  Yes.  I have an appointment at Presbyterian Hospital which

25     is connected to Columbia University Medical Center.

C8DAABEJH                              Dr. First - Direct

1   Q.  Do you remember when that began?

2   A.  I started with my residency and now I am an attending but

3   it began as a resident and it continued all the way through.

4   It's also the same period of time.

5   Q.  Have you been involved in psychiatric diagnoses in the

6   context of any kind of --

7           MR. DRATEL:  Your Honor, may I lead a little in this

8   context?

9           THE COURT:  The answer to that is it depends.  Let's

10  hear the question.

11  Q.  Are you involved in editing any manuals?

12  A.  Yeah.  Let me clarify.  My entire research career since I

13  finished my residency was in the area of psychiatric diagnosis

14  and assessment.

15          THE COURT:  And assessment?

16  A.  The manual that is used for diagnosing mental disorders in

17  the United States and around the world is called the DSM, the

18  Diagnostic and Statistical Manual.  And a manual was developed

19  at Columbia University by my mentor, Robert Spitzer.  So I

20  specifically came to Columbia to work on that manual when I

21  finished my residency in 1987 and I have been working on issues

22  of diagnosis and assessment as my main research area ever

23  sense.  And as part of that I am also the lead author of an

24  instrument called the SCID, S-C-I-D, which is the structured

25  clinical interview for DSM diagnoses which is the most widely

C8DAABEJH                      Dr. First - Direct

1   used clinical instrument and research instrument for making a

2   research diagnosis in the United States and around the world.

3   And in the context of that I've done training on how to do

4   psychiatric diagnosis to thousands of clinicians and

5   researchers.  So it has been my area of research and expertise

6   for, basically, the past 30 years.

7            THE COURT:  Now, you said you developed a SCID, is

8   that correct?

9            THE WITNESS:  That's correct.

10           THE COURT:  That is an instrument to diagnose people

11  psychiatrically?

12           THE WITNESS:  Right.  It's used -- it's a structured

13  interview.  So it has specific questions which have been

14  developed to guide the user to make, to apply to the criteria

15  in the DSM manual.

16           THE COURT:  Did you use that instrument in connection

17  with your work evaluating this defendant's competence?

18           THE WITNESS:  No.  In this case I made my psychiatric

19  diagnosis because I have, basically, wrote the SCID and the

20  SCID's essentially has been internalized.  I can formally

21  use -- went through the entire SCID.  I went through the

22  depression section as well as the entire clinical interview.

23  It's not a psychological test in the normal sense.  It is

24  something which is used to guide a clinical interview with

25  specific types of questions.  The questions I used are the

C8DAABEJH                          Dr. First - Direct

1    questions in the SCID.

2              THE COURT:  Then what's the difference between what

3    you did in employing the SCID in the course of the interview?

4    Is there any difference?

5              THE WITNESS:  It's only one part.

6              THE COURT:  In other words, I have no psychiatric

7    medical background.  So to the extent you can be as jargon free

8    as possible.  If you have to use jargon, explain it in layman's

9    terms.  As I understand what you've said, you didn't use every

10   part of the SCID.  You just used a certain part, is that

11   correct?

12             THE WITNESS:  I used the general structure.

13   Mr. Bejaoui as, it's been an extremely difficult challenge to

14   interview him.  Much of my interactions with him were simply to

15   trying to develop rapport in trying to elicit psychopathology.

16   When you actually use this SCID on a psychotic individual or an

17   individual that is very impaired you, actually -- and this is

18   true for when you use it on patients with severe mental

19   disorders like schizophrenia and bipolar disorders, you often

20   can't actually use this SCID interview because most of these

21   patients are able to follow through with the sequence of

22   questions.

23             So the SCID in that context is used as a structure to

24   allow you to apply the DSM criteria.  So in that context I use

25   the SCID the way I would use it on patients with severe

C8DAABEJH                        Dr. First - Direct

1    schizophrenia which is to cover the overview sections which is

2    to cover the individual's background and life and then apply

3    the algorithm of using the historical information I've

4    collected to the individual.

5              So I've used the SCID the way it's usually used.  I

6    didn't use it the way it would be used when I use it in a case

7    of post traumatic stress disorder or depression when an

8    individual isn't able to be a good historian --

9              THE COURT:  If I understand, in certain instances,

10   that is instances where the patient is a good historian of

11   what's happened in the past, you use it in full.

12             THE WITNESS:  Correct.

13             THE COURT:  When you can't get a good history you

14   don't use it in full but just use it to as a guidelines.

15             THE WITNESS:  You are guided by the structure of the

16   algorithm of the SCID.

17             THE COURT:  Go ahead.

18   BY MR. DRATEL:

19   Q.  With respect to the DSM, we're now up to DSM4, is that

20   correct?

21   A.  That's correct.

22   Q.  What is your position with respect to the DSM?

23   A.  The DSM4 the -- actually, the current one is the DSM4 TR

24   Text Revision and that came out in the year 2000 and I was the

25   editor and the co-chair of the Revision Task Force, so I was in

C8DAABEJH                    Dr. First - Direct

1   charge of that project.

2   Q.  And do you have any teaching positions?

3   A.  Yes.  I am the professor of clinical psychiatry at Columbia

4   University.

5   Q.  How long have you held that position?

6   A.  I have had been at that level for, I guess, about seven or

7   eight years.  I have had some academic position at Columbia

8   since I finished my residency in 1988.

9   Q.  And in the context of your practice, your private practice

10  what kind of variety of patients do you see?

11  A.  It's an outpatient practice on the Upper West Side of

12  Manhattan, so it's a relatively high functioning practice of

13  depression, anxiety personality disorders, bipolar disorder and

14  the occasional individual with schizophrenia.

15          THE COURT:  High functioning, meaning the clients are

16  high functioning, their judges, lawyers and psychiatrists?

17          THE WITNESS:  Right.

18          THE COURT:  All right.

19  Q.  Thank you, your Honor.  Have you testified previously?

20  A.  Yes, I have.

21  Q.  Have you testified for the government?

22  A.  Yes, I have.

23  Q.  Have you testified for the United States government, for

24  the federal government?

25  A.  Yes, I have.

C8DAABEJH                          Dr. First - Direct

1   Q.  Can you tell us about the case just generally?

2   A.  Yeah.  I testified on behalf of the U.S. Government in a

3   case U.S. versus Pimentel and it was, actually, a Daubert

4   hearing.  Essentially, the defendant in that case made a claim

5   that he had a condition called pseudologia fantastica which is

6   a very jargondy term which is, basically, pathological lying.

7   They had wiretapped his telephone and recorded extensive

8   conversations of him arranging drug deals and a defense, they

9   claimed that he had this mental disorder and this entire thing

10  was a fabrication that is due to this mental disorder which is

11  not a wide -- not accepted at all.  So I was testifying on

12  behalf of the government to make it clear that this was not an

13  accepted diagnosis under Daubert standards and the government

14  prevailed in that case.

15  Q.  You testified for New York State?

16  A.  Yes.  I testified for New York State in a case again.

17  There was an individual who was trying to get released from a

18  mental hospital and we were trying, the state was trying to

19  block that release.  So I testified on behalf of the state in

20  that case as well.

21  Q.  Have you testified on behalf of the Canadian government?

22  A.  Yes.  It was a case with Omar Carter who was an individual

23  who was when he -- a Canadian citizen who was in Afghanistan

24  and he was arrested upon entry to the United States after

25  having been in a prison in Pakistan and he had upon -- I am

12

C8DAABEJH                          Dr. First - Direct

1    sorry -- was upon entry to Canada and he had participated in

2    some Royal Canadian Mounted Police and FBI interrogations in a

3    hotel room, then after the fact they tried to have the

4    interrogations dismissed on the grounds that he suffered

5    posttraumatic stress disorder in the Pakistani prison.  And I

6    was testifying on behalf of the Canadian government in

7    conjunction with the U.S. Government who had an interest in his

8    case to the effect that he did not have posttraumatic stress

9    disorder and that his statements should be accepted.

10   Q.  You said Omar Carter was his brother Abdul Carter?

11   A.  Yes.

12   Q.  You've testified in civil cases?

13   A.  Yes.  I've testified in a number of civil case on both for

14   the plaintiff and for the defendant.

15   Q.  And in the context of the defense it's to -- can you

16   explain --

17   A.  Yes.  Generally, in the way many civil cases work an

18   individual is injured in some way through an accident or sexual

19   harassment or some other tort action.  And an individual suit

20   claiming that they've developed some mental disorder as a

21   result of this injury and when you testified for the defense

22   usually what you are trying to establish is that the individual

23   is either malingering or exaggerating or does not have the

24   claimed mental disorder.  So I have been involved in both the

25   defense side as well as the plaintiff's side in such cases.

C8DAABEJH                      Dr. First - Direct

1          THE COURT:  The defense's side you are saying is

2     traditional.  The defendant is malingering.  The individual is

3     malingering and when you are testifying for the plaintiff it's

4     essentially what?

5          THE WITNESS:  The individual has a genuine mental

6     disorder.  So malingering is a question on both sides.  But

7     when I have been on the side of the defense I have been

8     involved in several cases for the New York State Department of

9     Corrections.  There have been not insignificant number of

10    lawsuits brought against the Department of Corrections for a

11    variety of reasons with many claims of posttraumatic stress

12    disorder.  And malingering, of course, is a big issue there.

13    So when I have been on the side of New York State I've

14    testified on behalf of the claim that the individual is

15    malingering and that they do not have a legitimate claim.

16          THE COURT:  Against the Department of Corrections?

17          THE WITNESS:  Yes.

18          THE COURT:  And can you -- how many times apart from

19    the testimony in the federal criminal case, New York State

20    criminal case, the Canadian government case how many times have

21    you testified to this, civil cases?

22          THE WITNESS:  For the side of the defense?

23          THE COURT:  All together.

24          THE WITNESS:  All together?  In court relatively

25    rarely because those cases usually get settled.  I've actually

C8DAABEJH                          Dr. First - Direct

1   only gone to court on one of these civil cases twice.  They

2   almost always.

3            THE COURT:  The two that you've testified to which

4   side?

5            THE WITNESS:  I was both sides.

6            THE COURT:  And in general in terms of your being

7   retained which side -- well, I guess that's not the question.

8   Can you estimate how many times have you been retained by the

9   plaintiffs and how many times by the defense?

10           THE WITNESS:  At this point it's roughly in the civil

11  cases, it's roughly even.  It's probably -- it is -- I think

12  it's even, maybe slightly more on the defense side than the

13  plaintiff's side but it's relatively -- this is only -- I only

14  do this, something on the side so that the cases come sort of

15  through word of mouth or whatever they just come in, so they

16  ended up falling down relatively towards 50/50.

17           THE COURT:  Go ahead.

18  BY MR. DRATEL:

19  Q.  Have you testified on behalf of a criminal defendant before

20  or been retained by or acted even if it's court appointment?

21  A.  Yes, I have on several cases.

22  Q.  In federal court?

23  A.  Yes.  I testified on behalf the Zacarias Moussaoui several

24  years ago in Virginia in that case in the penalty phase of his

25  death penalty, the litigation aspect of the trial.

C8DAABEJH                        Dr. First - Direct

1          THE COURT:  What was the substance of your testimony?

2          THE WITNESS:  The -- essentially, the substance of my

3    testimony was that Zacarias Moussaoui was suffering from

4    schizophrenia and that because of the schizophrenia -- Well,

5    that was the essence of my testimony.

6          THE COURT:  All right.  Thank you.

7          MR. DRATEL:  Your Honor, I would move Dr. First as an

8    expert in psychiatry and diagnosis.

9          THE COURT:  I am going to allow his opinion testimony

10   in regard to the competency of the defendant.

11         Proceed.

12         MR. DRATEL:  May I approach, your Honor?

13         THE COURT:  Yes, sir.

14   Q.  Dr. First, I am going to show you what's been marked as

15   defendant's -- well, first let me show you what's marked as

16   Defendant's F.  Can you tell us if you recognize that?

17         THE COURT:  Is that your curriculum vitae?

18         THE WITNESS:  Yes, it is.

19         THE COURT:  Is that your report in this case?

20         THE WITNESS:  Yes, it is.

21         MR. DRATEL:  I move it into evidence.

22         THE COURT:  Admitted.  Next.

23         (Defendant's Exhibit F received in evidence)

24         MR. DRATEL:  Thank you, your Honor.

25   Q.  In preparing your report can you tell us what you reviewed

C8DAABEJH                         Dr. First - Direct

1    for purposes of making your report?

2    A.  Yes.  I reviewed the medical records from --

3          THE COURT:  Did you review the sources of information

4    listed on Exhibit A?

5          THE WITNESS:  Yes.

6          THE COURT:  First page and second page?

7          THE WITNESS:  Yes.

8          THE COURT:  Anything else?

9          THE WITNESS:  I only reviewed -- I reviewed what was

10   in the report, yes.  So the answer is everything that I

11   reviewed, everything when I wrote this report what was in that

12   list of, was the complete list of all the sources of

13   information.

14         MR. DRATEL:  Very good, your Honor.  Try to streamline

15   that, that's fine.

16   BY MR. DRATEL:

17   Q.  After the report was completed did you have an opportunity

18   to review other materials?

19   A.  Yes.

20   Q.  Hospital records?

21   A.  Since this report was completed the only additional

22   materials that came to me were number one, the recent

23   yesterday, in fact, I was sent the audio recordings of 12

24   telephone calls which I did have an opportunity to review.  I

25   don't believe there were any additional hospital records.  One

C8DAABEJH                         Dr. First - Direct

1    of the gaps in the record the records from Rikers Island which

2    remained inaccessible I was hoping I would see them.  I also

3    reviewed a request for records from Lutheran Hospital that had

4    come back indicating that Mr. Bejaoui was, in fact, a patient

5    at Lutheran Hospital in 1999 but that the records had been

6    destroyed so that was something that I had reviewed since the

7    time of this report.

8              THE COURT:  You mean not the records but the

9    statements.

10             THE WITNESS:  The statements that the record existed

11   cause there was a question about whether or not originally

12   there was a question that the hospital claimed that Mr. Bejaoui

13   was never a patient there.  So since then --

14             THE COURT:  I understand.

15   BY MR. DRATEL:

16   Q.  You interviewed Mrs.~Bejaoui?

17   A.  Yes, I interviewed Mrs.~Bejaoui as well.

18   Q.  And you, obviously, interviewed Mr. Bejaoui?

19   A.  Yes.

20   Q.  At MDC?

21   A.  At MDC, correct.

22   Q.  How many times did you see him?

23   A.  Five occasions.

24   Q.  And what was roughly in terms of timeframe, how much time

25   did you spend with him for each?

C8DAABEJH                          Dr. First - Direct

1   A.   There are variable amounts of time.  I think there are

2   generally in the order of an hour 15 minutes.

3          THE COURT:  You have it listed here in your first

4   source of information?

5          THE WITNESS:  Right.

6          THE COURT:  Next.

7   BY MR. DRATEL:

8   Q.   Now, you obtained some history about Mr. Bejaoui from

9   Mrs.~Bejaoui?

10  A.   Yes.

11  Q.   How is that relevant to your report?

12  A.   Well, it was quite relevant.  Mr. Bejaoui is very poor

13  historian, so Mrs.~Bejaoui filled in many gaps, most

14  particularly, what his function was like prior to his

15  incarceration at Rikers.  She basically established a fairly

16  convincing history, premorbid phobias, anxiety depression which

17  had come out before but most interestingly, fairly significant

18  history of paranoid ideation and behavior that possibly

19  bordered on psychosis.

20         THE COURT:  What does all that mean?  What's premorbid

21  phobia?  What does that mean?

22         THE WITNESS:  Premorbid basically means before he

23  became ill, since he was in the prison system what he was like

24  before that.

25         THE COURT:  All right.

C8DAABEJH                        Dr. First - Direct

1            THE WITNESS:  I'll avoid the jargon.

2            THE COURT:  I don't mind you using the jargon.  You

3    just have to say what it means.  Just a moment.

4            Possibly bordering on psychosis, what does that mean?

5            THE WITNESS:  Well, what was reported to me was that

6    Mrs.~Bejaoui said that Mr. Bejaoui felt that he was being

7    watched and sometimes would stay in his house because of

8    feelings that people were watching him and spying on him.  So

9    that's clear strong paranoid ideation with strong enough,

10   actually, to affect his behavior.  So when you are actually

11   interviewing an individual to determine whether they actually

12   truly psychotic, you'd want to know how convinced he was that

13   he was being followed or spied on.

14           THE COURT:  All right.  So you learned from her --

15   and, again, it's in the report -- that before he entered the

16   criminal justice system he was anxious at times.  I believe

17   they didn't have many social friends.  He thought people were

18   following him and watching him.  Sometimes he wouldn't leave

19   the house because of this.  That's what you she told, right?

20           THE WITNESS:  Yes.

21           THE COURT:  Next.

22   BY MR. DRATEL:

23   Q.  Did he also tell you that he had anxiety from stress prior

24   to his incarceration?

25   A.  Yes.

C8DAABEJH                         Dr. First - Direct

```
 1    Q.  And he was claustrophobic?

 2    A.  Yes.

 3    Q.  And that he had taken medication for depression?

 4    A.  Yes.

 5              THE COURT:  All right.  So far you know we'll take

 6    this bit by bit so that I understand.  I don't mean to slow you

 7    down except to the extent that I need to make sure I understand

 8    it.

 9              THE WITNESS:  Sure.

10              THE COURT:  Before he entered the prison system he was

11    an anxious person who thought people were following him?

12              THE WITNESS:  Yeah.  And also socially isolated.  So

13    he is not a high functioning well person and if that was the

14    point --

15              THE COURT:  But that doesn't mean he is suffering from

16    or does it mean he is suffering from a mental disease or

17    defect?

18              THE WITNESS:  That in and of itself doesn't indicate

19    that he was suffering from it now.  It provides basis for

20    understanding how someone with a long history of --

21              THE COURT:  All right.  It sorts of background

22    information but, certainly, there are a lot of people who are

23    paranoid and anxious and not terribly social who are able to

24    understand the nature and consequences of criminal proceedings,

25    correct?
```

1          THE WITNESS:  Absolutely.

2          THE COURT:  All right.

3    BY MR. DRATEL:

4    Q.  Is that background relevant to your ability to make a

5    diagnosis as to what someone might be?  Let's leave Mr. Bejaoui

6    out of it and talk generally -- is relevant to determining what

7    a person might be suffering from currently?

8    A.  Yes.  With respect to trying to make a current diagnosis

9    and longitudinal history that background provides a basis for

10   understanding how someone may be predisposed to a stressful

11   situation like being incarcerated, for example.

12   Q.  Does it also -- is it also relevant in the context of

13   trying to make a determination of whether one's malingering

14   when you have that history at your disposal?

15   A.  Yes.  For example of an individual prior to presenting with

16   symptoms that raise the question of malingering as an absence

17   of any psychiatric symptomatology that would raise the

18   suspicion of malingering because it would suggest that the

19   entire picture of psychiatric suffering existed almost

20   entirely, the context of the setting in which there would be

21   secondary gain.

22   Q.  Is it also relevant in the context of helping you determine

23   which aspects of a person's psychology or personality might

24   become more acute in a stressful situation?

25   A.  Yes, yes.

C8DAABEJH                          Dr. First - Direct

1              THE COURT:  I don't understand what you said.  It

2      would suggest the entire picture of psychiatric suffering

3      existed almost entirely in the context of the setting in which

4      there would be gain?

5              MR. DRATEL:  Secondary gain.

6              THE COURT:  What does that mean?

7              THE WITNESS:  What I mean basically is if someone, if

8      you have somebody who is arrested and goes into prison and

9      develops psychiatric symptoms for the first time the moment

10     they enter prison, been psychiatrically healthy with no

11     evidence of a psychopathology prior to entering the prison

12     system, when one enters the prison system immediately increases

13     the likelihood that a psychiatric presentation might be used to

14     get something --

15             THE COURT:  That I understand.

16             THE WITNESS:  The absence of any previous

17     psychopathology would be much more highly suspicious than

18     malingering in the presence of a significant long-standing

19     history of psychopathology doesn't rule out malingering is

20     helpful in suggesting that there is a basis of the existence of

21     psychiatric symptomatology in the absence of context in

22     which --

23             THE COURT:  In my terms, let's see if you can accept

24     this.  If somebody's had psychiatric problems prior to entering

25     a criminal system it suggests that the person is less likely to

C8DAABEJH                        Dr. First - Direct

1    be malingering than someone who had an absence of psychiatric

2    problems prior to entering the prison system.

3    A.  Yes.  And also those particular problems that they had

4    before are also less likely to be malingering.

5           THE COURT:  I understand.

6    BY MR. DRATEL:

7    Q.  You also reviewed medical records from MCC and MDC?

8    A.  That's correct.

9    Q.  And were those relevant to you making your diagnosis and

10   conclusions?

11   A.  Yes.

12   Q.  And in what way, just generally?  I know it's in the

13   report, so if you just give us sort of a summary answer in that

14   regard.

15   A.  Well, the records at MDC and MCC provided a trajectory of

16   development of his symptoms.  It actually showed the onset

17   started out with basically symptoms of depression and anxiety

18   and pain and escalated to the point where Mr. Bejaoui became

19   nonfunctioning.  So the psychiatric diagnosis, of course,

20   depends pretty much on symptoms, you know, documentation of

21   symptomatology in trying to understand.  And put those

22   symptomatology together in a picture.  So the records of MCC

23   and MDC provide an important piece of being able to track the

24   symptoms as they developed and how he presented.

25   Q.  And at both places, MCC and MDC, he was diagnosed with a

C8DAABEJH                        Dr. First - Direct

1   major depressive disorder?

2   A.   That's correct.

3           THE COURT:   Is a major depressive disorder that that

4   means the person is depressed, is that what a major depressive

5   disorder is?

6           THE WITNESS:   Right.   It means that depressed, plus a

7   number of accompanying symptoms.   So, it's a term which refers

8   to a particularly severe form of pathological depression.   So

9   when someone is depressed colloquially that could be normal to

10  be depressed that you are in a difficult situation.

11          THE COURT:   At some level.   Again, just help me.   At

12  some level any right thinking person incarcerated would be

13  depressed.   So what is this?

14          THE WITNESS:   The term -- that's why we use words like

15  "major depression".   It refers, specifically, to answer

16  entitled in the diagnostic statistical manual which is a type

17  of depression characterized by persistent depressed mood and

18  total five out of nine symptoms like diminished interest or

19  pleasure in activities, insomnia, difficulty in cognitive

20  function, inability to concentrate, suicidal ideation, fatigue.

21          THE COURT:   That's depression?

22          THE WITNESS:   That is the syndrome of a major

23  depression.

24          THE COURT:   Is that by itself -- I take it that by

25  itself does not mean somebody is unable to understand the

C8DAABEJH                          Dr. First - Direct

1   nature and consequences of criminal proceeding.

2              THE WITNESS:  That's correct.  No diagnosis by itself

3   is not one -- one relationship between one diagnosis as

4   competency, maybe the exception the severe depression but all

5   the psychiatric diagnosis provide a framework for saying in the

6   case of many, many people with that diagnosis of a major

7   depression especially severe with psychotic features could be

8   incompetent in many people with major depression or not.

9              THE COURT:  All right.

10  BY MR. DRATEL:

11  Q.  He was also medicated at MDC and MCC?

12  A.  Yes, he was.

13  Q.  With antidepressant?

14  A.  Yes.

15  Q.  Anticonvulsive medication?

16  A.  Yes.

17  Q.  Pain medication?

18  A.  Yes.

19  Q.  Antipsychotic medications?

20  A.  Yes.

21  Q.  Just to clarify, someone with a major depressive disorder

22  could be incompetent depending on the other factors, just not

23  the diagnosis itself as an automatic?

24  A.  Correct.

25  Q.  There's a wide range of depression, correct, in terms of

C8DAABEJH                          Dr. First - Direct

1   some people are depressed and internalizes.  Some people can't

2   get out of bed?

3   A.  Correct exactly.

4   Q.  Can't get out of bed for an extended period of time?

5   A.  Could be totally disabled, right.

6   Q.  Let's talk about your sessions with Mr. Bejaoui.  How did

7   you find him in terms of grooming and presentation, physical

8   presentation?

9   A.  Well, Mr. Bejaoui from a physical presentation was always

10  very disheveled, very poor really, poor hygiene.

11  Q.  That's what this report says?

12  A.  Right.

13          THE COURT:  Go ahead.

14  BY MR. DRATEL:

15  Q.  If he could just give us some detail.  I don't know if it's

16  detailed in the report.  If you could just give us some detail

17  on how he presented to you physically.

18  A.  Poor hygiene, hair was disheveled, an odor that showed that

19  he had not showered.  He was often dressed poorly.  There was

20  sometimes mucous on his clothes.  The kind of thing you would,

21  can see in an institutionalized person with either

22  schizophrenia or major depression.

23          THE COURT:  Or malingering?

24          THE WITNESS:  Or malingering, of course.

25          THE COURT:  I remember from one of the reports,

C8DAABEJH                         Dr. First - Direct

1  strands of mucous would trip from his nose and he would wipe it

2  on his sleeve.  Is that something you observed?

3             THE WITNESS:  Yes.

4             THE COURT:  That doesn't tell you malingering or not

5  malingering, correct?

6             THE WITNESS:  No, not at all.

7  BY MR. DRATEL:

8  Q.  Would it be relevant if this kind of behavior occurred for

9  a year?

10  A.  Yes, if it occurred --

11  Q.  A year and a half?

12  A.  It's -- mayor depression can be chronic especially if

13  untreated or inadequately treated.  So that that is, would fit

14  in with this level of severity.

15  Q.  And did you administer some tests to him during the course

16  of your sessions with him?

17  A.  Only -- most of the sessions were characterized primarily

18  by just attempting to get history, interview and establish

19  rapport.  And there was only one session where I did some

20  testing which was mini mental status exam which is a rough

21  assessment of cognitive function and the Georgia competency

22  test.  As well as, I also wanted to get a more quantified

23  assessment of the level of his depression.  I had already made

24  a determination that diagnostically that he had met the

25  criteria for mayor depressive episode.  But that doesn't give

C8DAABEJH                      Dr. First - Direct

1    you a -- find a really good sense of the logical of severity.

2    So I used a scale called the quick inventory for depressed

3    symptomatology.  So I also admitted, that was also administered

4    at the same meeting I administered the other tests.

5    Q.  Had that test been administered in of the other facilities?

6    A.  I don't believe I saw any assessment, any depression scale

7    used at any point during any assessment of him other than that

8    time.

9    Q.  And can you describe your interaction with him?  In other

10   words, your efforts to interview Mr. Bejaoui and how that --

11   what impact that this had on your ability to make a diagnosis?

12   A.  Very difficult.  I routinely when I see people for

13   psychiatric evaluation and forensic settings I try to see them

14   for several hours, minimum of three or four hours at a time.

15   That was impossible.  That is one reason why I had to see him

16   over five sessions because after about an hour or so, there

17   were a couple of peoples where he wanted to stop and after 30

18   minutes and I had to coax him to even get my hour and 15

19   minutes.  So it was very, very difficult.  There were long

20   periods of silence, pauses, and a lot of difficulty getting any

21   kind of coherent history.

22            THE COURT:  I take it those are signs of major

23   depressive disorder?

24            THE WITNESS:  I think in this case it was that plus I

25   believe that there is, as what I -- became the conclusion over

C8DAABEJH                          Dr. First - Direct

1   time it was that his paranoia and delusional thinking seemed to

2   be playing a role in his unwillingness to speak to me.  He was

3   very, very paranoid about me, paranoid about any doctor.  He is

4   convinced that at one point in time he was convinced that I was

5   trying to collect information, that he was a child molester.

6   And he noted I was writing down and was convinced I was writing

7   this material down because I was trying to collect information

8   for him being a child molester.  So I don't see his

9   presentation as typical of the interaction of somebody who is

10  depressed.  It was a combination of his depression and paranoia

11  which made him very reluctant and, basically, refusing to be

12  cooperative at some level.

13           THE COURT:  How do you decide -- and I realize I may

14  be unfairly breaking everything down into the segments but

15  that's the easiest way for me to approach it.  How do you

16  decide whether his, not his uncooperativeness that is his

17  questioning what you are doing, his not wanting to talk for

18  long periods of time, his inability or unwillingness to go on

19  for the length of time you wanted?  How do you decide whether

20  those symptoms are the result of paranoia and delusion or

21  malingering?

22           THE WITNESS:  Import of it is the -- part of it is

23  that clinical judgment of the interaction with him in the room.

24  He is -- either you'd have to be -- it's one thing to say sit

25  there and just say I am hearing voices.  Anyone could say that.

C8DAABEJH                         Dr. First - Direct

1    There are certain factual statements are easy to malinger which

2    is a statement.  There's another thing to malinger.  I mean, if

3    you are Meryl Streep and you could act at a level of reality

4    that creates an emotion.  I could feel the paranoia, the

5    anxiety that was very, very intense in the interactions.  So he

6    would have to be -- it's not just saying something of his

7    history.  There's bits of conclusion about the history.  It's

8    actual interaction.  It's the -- so, it's not simply a

9    statement of something.  The level of --

10          THE COURT:  In other words, you found it credible that

11   he thought you were obtaining information about his being a

12   child molester.  Is that what you are saying?

13          THE WITNESS:  Not only that.  The only other thing is

14   if he were malingering he would have offered that.  What,

15   actually, happened it was a very tortured interaction.  It took

16   three or four sessions.  I finally felt that I was beginning to

17   get enough of a rapport that the interview started going better

18   after the third time and which is one of the reasons why I had

19   formed this hypothesis.  The paranoia was largely a huge factor

20   in his poor performance in the interviews.  And my hypothesis

21   was that if that was the case it would make since that as some

22   level of trust developed the interview would, the abilities to

23   interact would improve over time.  That was another reason why

24   I made the decision to go so, sometimes rather than just once

25   or twice being the more often the -- when at one point I was

C8DAABEJH                        Dr. First - Direct

1    going almost every week, week and a half to try and develop

2    some sense of facility that he knew who I was.  And as that was

3    going on over time, I clearly felt some improvement and he was

4    able and willing to interact with me.

5           But even in its best there was -- that's why where

6    that interaction happened with that child molester -- I had

7    heard right before that interview I had listened to the tapes,

8    the recorded phone conversations that I was really struck about

9    the huge difference between how he sounds on the telephone --

10          THE COURT:  That's just what I was thinking about

11   the -- he sounds like you are -- I don't know.  It's building a

12   case is probably the wrong word.  I was thinking that indeed is

13   your response to the government's position of ah-ha we caught

14   you, being normal in your telephone conversations with your

15   wife and friends.  So it sounds like your position is, no, it's

16   because he had trust in those people, so he didn't have the

17   high level of anxiety that he had when talking with me and the

18   others.  Is that it?

19          THE WITNESS:  When I heard the tapes for the first

20   time I was very skeptical myself.  I had seen him once or twice

21   and saw how tortured the interactions were.  Then I heard the

22   telephone conversations.  I was struck about sounds like a

23   different way the guy on the telephone as someone I was seeing

24   in person and I was very perplexed about that, what that could

25   be malingering would be very reasonable thing to suspect in

1    that case.

2            So one of the things that I had done was when I saw

3    him the next time I actually told him, I said I had an

4    opportunity to listen to -- so when I actually asked him

5    directly, I said, Mr. Bejaoui, I listened to these

6    conversations and you sound like when you speak to your wife

7    and to Riatt you sound like a completely different person.  I

8    don't understand this at all.  Could you explain this to me.

9    And he said that's because when I speak to doctors, I am scared

10   and when I am speaking to my wife and Riatt I am happy and I

11   feel comfortable.  I said, well, what are you scared of with

12   me?  And he said, well, you don't have a club so you are not

13   going to hit me.  I said, so what you are scared about?  And

14   that's what he said about "I see you writing".  I said okay.

15   So he didn't immediately say -- again, if he were malingering

16   he would come up with something right off the bat.  Well, who

17   knows what he would have said?  But, again, it was the process,

18   he said you are writing stuff down, okay.  So what does that

19   mean?  I think you are documenting I am a child molester.  And

20   right before that the session the themes of this paranoia

21   shifts from session to session.  You know, come in there and

22   one time the whole thing was about the fact that he believed

23   that people were calling him a child molester.  That was the

24   theme.  Everybody thinks I'm a child molester.  Voices are

25   telling me I am a child molester.  That is what was on his

C8DAABEJH                          Dr. First - Direct

1    mind.  So that fit in with his paranoia about me fitting in the

2    picture of his being a child molester.

3          Here is what I am getting at is it fits to me a sense

4    of clinical reality, the story, fit and experience of

5    interviewing him fit what I felt the paranoia, it fit into the

6    context of what he was talking about earlier, that meeting and

7    the previous meetings about being a child molester.  And so I

8    felt that it was credible that his extreme fear and paranoia

9    and I could see it in the room.  It -- his interaction with me

10   as a physician was really very, very difficult and I could feel

11   the sense of and it also fit the -- I -- I could see the

12   interaction with the doctors, both the medical doctors as well

13   as the physical therapists.  Every healthcare professional he

14   interacted with there was this element of whether it was not

15   cooperativeness or some negative interaction almost across the

16   board, including people not just Dr. Cochrane and people who

17   were in the position to evaluate malingering.  He was like this

18   with virtually everyone.  A lot of it had to do with a

19   combination of paranoia as well as he also had elements of

20   personality disorder.

21         He is very demanding and he wants to be -- demands

22   being taken care of, demands attention.  There are lots of

23   things.  This is a complicated case.  There's elements of his

24   demanding style, his exaggeration and telling stories is to get

25   attention.  I think that there's -- he is not a completely

C8DAABEJH                    Dr. First - Direct

1    truthful person.  That is what makes it such a complicated

2    case.

3              THE COURT:  But in a way, in a sort of odd way doesn't

4    all of that suggest that the criminal case should go forward,

5    guilt or not guilt adjudicated?  And the man then goes out in

6    society where he'd be a paranoid difficult person which is a

7    totally demanding person but he won't have -- he won't be in an

8    institution where he is constantly being questioned by people

9    he thinks are adverse to his interests and he is not somebody

10   with mental competency issues, just a paranoid, difficult,

11   demanding human being?

12             THE WITNESS:  The key question is, does he

13   understand -- I guess, I am not -- my understanding is the

14   issue is there is an interaction about, can this guy, is he

15   competent even to plead guilty?

16             THE COURT:  Absolutely.

17             THE WITNESS:  That's been presented to him.  I think I

18   have a quote of this in my, from the telephone conversation

19   with his wife or where his wife is basically saying, why don't

20   you just leave already.  And he is like, plead to what?  I

21   don't know what I am pleading to.  And I can't see how that

22   statement to his wife on a telephone call that he is not aware

23   of being recorded is malingering.  I think he honestly doesn't

24   understand what the situation is, what he would be pleading to.

25   He really is fixated on this old charge of harassment.  And he

C8DAABEJH                          Dr. First - Direct

1    still he doesn't really have any kind of understanding of what

2    the charges are and he has no ability to work with his

3    attorneys about that.

4              So I agree with you.  It would be -- he needs to be

5    treated in a facility.  And I have to admit I felt after my

6    five sessions with him, optimistic that the proper setting

7    could make -- he could get -- improve the -- how he did

8    function at some point in years ago whether this experience in

9    the prison system was permanently affected him is unclear.  But

10   I do believe that with psycho therapy and medication and a lot

11   of work he can do better.  But right now he is untreated and

12   not able to appreciate his situation and not able to work with

13   his attorneys.  So that is why I felt in my opinion he was

14   incompetent because he is simply not able to and I don't

15   believe he is malingering, his lack of understanding of his

16   situation.

17             THE COURT:  Thank you.

18   BY MR. DRATEL:

19   Q.  Now, you've reached some conclusions in your report.  I am

20   just going to reed them and then ask you some questions about

21   them.  Access one major depressive disorder with psychotic

22   features and rule out schizo effective disorder, rule out

23   psychotic disorder.  Can you explain to me what rule out in

24   that --

25             THE COURT:  What page?

C8DAABEJH                    Dr. First - Direct

1           MR. DRATEL:  15, your Honor?

2   A.  When I write reports I don't like having to use "rule out".

3   "Rule out" is a phrase that we use in psychiatric diagnosis

4   when we don't know, we're not confident in our diagnosis enough

5   to say it's definitely this.  Rule out is a way of saying the

6   picture remains unclear and this other diagnosis that I listed

7   after the word "rule out" remains given the information that I

8   have a significant possibility.  But given the information

9   that's available to me now, there's no way in the world I could

10  differentiate between the two.

11          Let me just explain that first major depressive

12  disorder with psychotic features.  I gave that diagnosis to

13  describe the fact that he has severe depression and he is

14  suffering from hallucinations and delusions that occur in the

15  context of depression.  So when people get very severe

16  depression some people become psychotic.  They hear voices.

17  They have -- they become delusional and that's what that

18  diagnosis means.  Schizo effective disorder is what happens

19  when delusion and hallucinations occur even when the person is

20  not depressed.  It's down -- it's getting to be down the line

21  towards schizophrenia.  And because the only way to make that

22  differentiation is to have enough of the history to be able to

23  find out what the relationship is between the psychosis and the

24  mood.  And Mr. Bejaoui is completely unable to provide that

25  information.  So that remains inconclusive.  So that's

C8DAABEJH                        Dr. First - Direct

basically just saying that, yes, it is in this ballpark.  I'm

betting more on major depressive disorder with psychotic

features but I can't rule out the other.  That's what that

construct means.

Q.  Second, you don't differentiate the somatoform disorder.

Can you explain that?

          THE COURT:  That's psychotic disorder.

          THE WITNESS:  Psychotic disorder NOS, I'm even leaving

open the possibly that these voices are completely disconnected

from the mood.  So psychotic NOS, "NOS" stands for "not

otherwise specified".  Which is included in the diagnostic

manual.  The situation is so unclear all you can simply say is

this person has a psychotic disorder.  And I can't be more

specific.  I think it again applies to a case like Mr. Bejaoui

where the history, the ability to collect a decent history

remains so problematic that I am competent to say that he has

psychotic symptomatology but the relationship of those symptoms

to anything else are potentially questionable.  So that's how

you would express that.

Q.  Undifferentiated somatoform disorder?

A.  Also know question the significant part of Mr. Bejaoui's

picture is his pain and not just pain.  If you actually look

through the record even though pain is by far the symptom which

has preoccupied him the most, he's had on and off during his

stay gastric problems, numbness and all kinds of other physical

symptomatology.  So this is a section in the diagnostic manual.

Those are when people present to doctors with physical symptoms

for which a medical explanation can't be found and they often

end up getting sent to the shrink to be treated.  That's what

we call somatoform disorder.

        So Mr. Bejaoui, his primary presentation when this

whole thing got started going in the wheelchair was the

somatoform symptoms.  So undifferentiated somatoform is a

category that basically says that he has multiple somatic

symptoms that are medically unexplained.  And there's another

diagnosis in the DSM called somatization disorder for people

that have had symptoms for eight or more different areas.  He

doesn't have those problems to that extent.  Plus that

diagnosis requires an onset basically in young adulthood.  So

that diagnosis didn't fit.  So that basically is a descriptive

term to cover the fact that he has multiple physical symptoms

for which no medical basis can be discover.  And that's been

much of the work of the -- established that there's no medical

basis for his physical symptoms

Q.  Would that mean though that someone doesn't feel pain just

because there's no physical correlation on a test or some other

diagnostic tool?

A.  Right.  It's accepted when people are suffering from

somatoform disorder.  It's -- subjectively these people have

the physical symptoms.  The fact that they can't be documented,

C8DAABEJH                              Dr. First - Direct

1    pain is a good example.  Pain is in your head.  It's a

2    neurological phenomena.  There is no way to objectively

3    demonstrate that someone is in pain.  You could look at markers

4    of that, facial grimacing or things that would be correlated

5    with how one might express pain.  But pain is essentially a

6    subjective phenomenon.  So you are always stuck with the person

7    has pain complaint.  Pain's always been a challenge for

8    physicians to treat because of the fact that there's very

9    little objective evidence.

10          Mr. Bejaoui's case there is certainly inconsistent

11   timings that raise the question about that there is something

12   that's -- but, again, it's consistent to somatoform disorder.

13   It shows the psychological rather than purely physical.  It,

14   again, is doesn't rule out malingering.  People with

15   malingering pain can look the same as people with real pain.

16   But the fact that somebody is experiencing pain is not -- for

17   which there's no medical explanation that in and of itself is

18   sufficient.

19   Q.  Doesn't mean they are not in pain?

20   A.  Doesn't mean they're not in pain.

21   Q.  The inconsistencies of the type with respect to Mr. Bejaoui

22   feeling certain types of pain and without a clinical diagnostic

23   verification is that something that you see typically in other

24   somatoform disorders that you've seen?

25   A.  Yeah.  If Mr. Bejaoui were on the outside and presented

C8DAABEJH                              Dr. First - Direct

1    exactly the way he did, it would be kind of the same story.  He

2    would go to a neurologist, go to pain doctors and they would

3    evaluate him.  They would become, scratch their heads and after

4    a while say, you know, this doesn't quite -- I think it's a

5    psychiatric thing going on here.  And he would be sent to a

6    psychiatrist who specializes in somatoform disorders, not a

7    malingering specialist.  This is consistent with people who

8    have chronic pain who are preoccupied with it and exaggerate at

9    sometimes get more help.  It's very typical of that, in that

10   way Mr. Bejaoui's case is unusual in a lot of respects but the

11   pain, chronic pain and how it's exaggerated and doesn't fit

12   typical medical presentations is, unfortunately, not that

13   unusual in regular medical practice.

14   Q.  And also are these types --

15            THE COURT:  Is this somatoform disorder subject to

16   being relieved when the anxiety is relieved?

17            THE WITNESS:  It's worse under anxiety.  There is a

18   huge co-occurrence of depression, anxiety and somatoform

19   disorder.  And the way we understand that is certain people

20   express psychiatric symptoms in physical ways.  I think I would

21   understand in Mr. Bejaoui's case that his long-standing

22   depression and anxiety at some point and especially now because

23   of the prison, who knows why now, but it's gotten expressed in

24   terms of his pain.  I think it's just another expression of his

25   long-standing psychiatric problems.  But this time it's coming

C8DAABEJH                          Dr. First - Direct

1    out in terms of his complaints of pain.  But he is still

2    experiencing pain.  It just doesn't fit the pattern of somebody

3    who experienced pain of cancer or something of a more typical

4    medical type.

5    Q.  Just in terms of competency you've concluded that he does

6    not, is not capable of understanding the proceedings or

7    assisting his counsel?

8    A.  Yes.

9    Q.  And with respect to the competency part that concurred with

10   the report done at Devens by Dr. Channel who found the same?

11   A.  That's correct.

12   Q.  And Dr. Krueger as well?

13   A.  Correct.

14   Q.  Now, you also --

15           THE COURT:  Is he a danger in any way to himself or

16   others?

17           THE WITNESS:  Not to others.  He says he has suicidal

18   thoughts.  I would say probably not.  He seems too frightened.

19   I don't really get a sense of him being the kind of person that

20   actually attempts suicidal or anything.  It's always a tough

21   call to predict how dangerous he is but I would say he is no

22   risk of suicide or being a danger to other people.

23           THE COURT:  Put aside the legality of the lawyers and

24   myself.  If he is unable to understand the nature and

25   consequences of the proceedings against him or to assist

C8DAABEJH                         Dr. First - Direct

1    properly in his defense and part of his symptoms are brought

2    about by being in a prison setting, does that make sense to

3    relieve him from the prison setting and would that help make

4    him able to understand the nature and consequences of the

5    proceedings against him and help him be able to assist in his

6    defense?

7              THE WITNESS:  In a sense it would.  I think if he

8    could be treated in a non prison setting he probably could be

9    restored to competency.  It's a is little bit of a catch 22,

10   sort of like the process of being in the prison seems to be

11   maintaining this condition.

12             THE COURT:  Or worsening.

13             THE WITNESS:  Right.  If he could somehow be

14   transported to another setting I think that he could be treated

15   and supported to an ability to understand what his situation in

16   the past two years understanding what is going on.

17             THE COURT:  Is it your, within a reasonable degree of

18   medical certainty is that more likely to occur in a non prison

19   setting than in a prison setting?

20             THE WITNESS:  It depends on the non prison setting.

21   If he was put in the back ward of a psychiatric hospital and no

22   one --

23             THE COURT:  If he is not a danger to himself or to

24   others to releasing him to his home?

25             THE WITNESS:  The only problem with releasing him am

C8DAABEJH                        Dr. First - Direct

1    him to his home would, it's almost like he seems like the kind

2    of guy who might need a nursing home.  He's certainly from a

3    danger perspective I don't see any reason why he couldn't go

4    home.  Whether that's the proper setting, he needs therapy.  He

5    needs a lot.  He is seriously mentally ill and I am concerned

6    that especially having listened to the phone calls and the wife

7    and the whole setting, I am not confident that he could get

8    brought to the proper treatment.  The only way I would feel

9    confident that he could get the treatment is that if he is in a

10   setting where the treatment is there.

11             THE COURT:  What are those settings?

12             THE WITNESS:  Psychiatric hospital.  I believe a

13   psychiatric hospital where the goal is to treat him.

14             THE COURT:  Well, presumably, there is no -- I

15   shouldn't say this.  I don't know.  Is there a difference

16   between a psychiatric hospital that you think would be ideal

17   for him and the psychiatric hospitals that are run by the

18   Bureau of Prisons for purposes of restoring people to

19   competency?

20             THE WITNESS:  I've never been to either Butner or

21   Devens reading through the chart it didn't -- all I could say

22   is the interactions between him and staff at Devens and Butner

23   because it was the prison system, because of the constraints

24   and the rules and I assume the fact that restoring to

25   competency, I don't know how touchy/feely and I don't know what

C8DAABEJH                        Dr. First - Direct

1    the interactions between the staff and the inmates are with

2    respect to -- I guess not having ever been there and reading

3    through the chart would be that there was a sense of these had

4    to reserve compensatory were it there to make this person

5    better.  I think he is extra sensitive.

6            THE COURT:  I don't know if there's a difference

7    between those two.  Restore you to competency to me --

8            THE WITNESS:  I said that wrong.  I guess the sense of

9    the context in which it occurs, the person is being treated

10   because you want out of caring for that, it's a sense of

11   caring.  I don't know.  Maybe it's possible that Butner or

12   Devens, the inmates there who are treated do feel, I as a

13   clinician in the outside world when I treat my patients they

14   feel that I am there for the sole purpose of helping them and

15   that forms the entire therapy.  When you work in an in-patient

16   hospital the entire thing resolves around the treatment.  In

17   the in-patient facility there is all this activity and this new

18   setting of caring and that I presume not saying been to Butner

19   or Devens, it's not the feeling of what it's like to be there.

20   My sense is -- I may be mistaken -- that's not what it's like

21   and that he responds to that lack of sense that this is a

22   caring environment.  I think he would respond very well to a

23   caring environment.  It even happened with me and very

24   interesting when I was listening to last night the tape of a

25   phone call after I stopped coming to see him between the time I

C8DAABEJH                           Dr. First - Direct

1    brought my report up to now there's a conversation with his

2    wife where he became very upset that I wasn't visiting him any

3    more.  He seemed to get confused that I was there in the

4    context of competency.  He somehow must have thought I was his

5    treating doctor.  He was talking about nobody's here helping

6    me.  Even the doctor who is there he is not coming any more.

7    Maybe he is lying to me too.  I was able to get to the point

8    where I think if I were there as his treating doctor I think I

9    could have gotten somewhere with him.  And I think as soon as

10   that got pulled away he sort up of went back to being paranoid.

11   So if he could be treated in a setting where he could

12   appreciate the caring of what it would be like in a private

13   setting as opposed to the way it works in a prison setting, the

14   kinds of resources, obviously, mental healthcare in the prison

15   setting is very, very limited because of the resources and huge

16   need of Mr. Bejaoui can't really survive in the kind of

17   resources available in a prison setting.  I think that's the

18   problem.

19          THE COURT:  What's the alternative?  This is not

20   somebody who is going to pay for, extensive amounts of money

21   for -- he doesn't have the resources of private care.

22          THE WITNESS:  Right.  But I don't know.  I assume he

23   could qualify for Medicaid and be treated in a one of the

24   hospitals.

25          THE COURT:  Why should anyone think there's a

C8DAABEJH                          Dr. First - Direct

1    different ambiance in state psychiatric hospitals than from

2    Devens and Butner?

3            THE WITNESS:  Part of the difference is even though

4    you are in a state psychiatric facility -- I worked at a state

5    facility.  They're not like -- the hospitals that are left now,

6    the people and the staff that work there they're really,

7    generally, the care is very good as opposed to Butner and

8    Devens there's a feeling about everybody is -- people get jaded

9    working in a facility like that.  I believe that that being

10   jaded and expectation that everybody is malingering and

11   everybody is not being honest as opposed to when you go to a

12   state facility or hospital there's, nobody expecting

13   malingering and I think the difference in attitude informs the

14   treatment.

15           THE COURT:  All right.  Thank you.

16   BY MR. DRATEL:

17   Q.  Something in Dr. Channel's report from Devens, if you can

18   define for us conversion disorder?

19   A.  Yes.  Conversion disorder is a type of somatoform disorder

20   in which somebody presents with a neurological symptom that is

21   medically unexplained and what -- the reason that's

22   particularly relevant here is just that the way you actually

23   make a diagnosis of a conversion disorder somebody walks in and

24   they come in saying I can't move my leg or I can't move my arm.

25   The way that diagnosis is made is exactly the way it was made

C8DAABEJH                          Dr. First - Direct

1    at Butner as you do a careful medical examination.  You find

2    inconsistencies with the examination.  You find a lack of

3    objective evidence to support the examination.  And that's your

4    conclusion of conversion disorder.  Again, people with that

5    conversion disorder are presenting with something which is

6    inconsistent but it's not considered to be malingering.

7    Q.  Because it's not intentional?

8    A.  Exactly.  The person is not consciously doing.  Somebody

9    walks into a neurologist and says my foot is paralyzed.  They

10   really feel that they can't move their foot even though the

11   neurologist knows that at some level he could if it weren't for

12   the psychological block.

13   Q.  You've obviously reviewed the report from Butner and

14   disagree with their conclusions in that report?

15   A.  Yes, that's correct.

16   Q.  And just want to go through so many of the reasons why and

17   there they are in your report.  But Butner didn't administer a

18   standardized evaluation competency?

19   A.  That's correct.

20           THE COURT:  Did you?

21           THE WITNESS:  Yes, I did the Georgia competency test.

22   BY MR. DRATEL:

23   Q.  By the way, did you administer any tests with respect to

24   malingering?

25   A.  No, I didn't.

C8DAABEJH                          Dr. First - Direct

1   Q.  Why not?

2   A.  Mainly because of -- I was sort of following the lead of

3   Butner.  Butner isn't -- neither Butner or Devens gave any

4   tests malingering well and they had come to the conclusion that

5   he wasn't being cooperative and I was basically doing,

6   following my evaluation to assess both his in my clinical

7   judgment his inability to understand, work with the lawyers,

8   understanding, appreciate the situation and the basis of their

9   diagnosis of malingering was laid out in their report fairly

10  clearly.  It was inconsistencies in his story and the recorded

11  telephone conversations that I felt that I could address those

12  directly.

13  Q.  And with respect to, let's start with the telephone

14  conversations first.  You've listen to them, correct?

15  A.  Yes.

16  Q.  And you've also listened to another dozen or so over the

17  weekend, calls that have been made since he was returned to

18  MDC?

19  A.  That's correct.

20  Q.  And so in terms of in the context of the Butner report, if

21  you could tell us why you don't find those telephone

22  conversations determinative with respect to malingering?

23  A.  I mean part of the -- I guess one of the big questions is

24  when we talk about malingering what we're talking about what's

25  being -- what the range of symptoms my diagnosis which is major

C8DAABEJH                        Dr. First - Direct

1    depression with psychotic features is what the question is.  Is

2    there evidence in the telephone?  If this is a malingered case

3    you'd expect there to be no evidence of any psychopathology on

4    the telephone calls.  And it is true and I think what happened

5    with Butner is that there is a striking discordance between the

6    cognitive functioning that he presents during his examinations

7    in the hospital both with Butner staff as well as with me and

8    how he sounds on the telephone.

9             And but also if you actually go through the calls very

10   carefully and look at the content there are many, many examples

11   of paranoia going to pure disorganized psychotic thinking that

12   is -- so if he were -- usually, if he were malingering in the

13   phone call were going to document that there was a normal

14   person that presenting himself in a malingered way you'd expect

15   consistency in that presentation, meaning that he would talk to

16   his wife and to his friend without any evidence of

17   psychopathology at all with the possible exception of some

18   depression and anxiety which is what he has all had.  But the

19   key thing which is paranoia there's a whole section in there

20   about him feeling that over and over again.  They're trying to

21   kill him.  This whole thing about the idea that the MRIs is a

22   ruse to give him ECT many examples where --

23             THE COURT:  Ruse to give him?

24             THE WITNESS:  Electric convulsive therapy.  Two

25   different phone calls where he became extremely agitated about

C8DAABEJH                          Dr. First - Direct

1    the idea that when they wanted to -- I assume he is referring

2    to the fact the MRI was to check out his pain, I believe.  And

3    he also, those are unclear because sometimes the timing of that

4    was unclear but paranoid idea, the idea that they're purposely

5    trying to --

6              THE COURT:  All right.  So if I understand what you

7    are saying that you are saying that the difference between the

8    way he was speaking to the doctors on one hand, to his wife and

9    best friend on the other is indeed striking.  Nonetheless, and

10   you can understand how that would suggest malingering.

11   Nonetheless, you say if you listen carefully to those calls

12   you'll see a presence of psychotic features and if he were

13   malingering you wouldn't.  And the features that you are

14   specifically referring to are suggestions of paranoia.  That

15   is, they're doing this in order to give me electroconvulsive

16   therapy.  Is that right so far?

17             THE WITNESS:  Yes.

18             THE COURT:  Now, how do you get from there to unable

19   to understand the nature and consequence of proceedings against

20   him and/or to assist in his defense.

21             THE WITNESS:  Also discernible on telephone

22   conversations is his lack of understanding of his situation.

23   On the most recent telephone calls he insists that his wife

24   come to court with him because he says, I don't understand

25   what's going on.  I am not going to understand what's going on.

C8DAABEJH                          Dr. First - Direct

1     It is true that the level of, in Butner the psychologists at

2     Butner make a very good point that the level of -- there's lots

3     of inconsistencies and the level of cognitive impairment that

4     he presents in his examination as compared to how he just talks

5     on the phone.  Obviously, he says he can't remember something

6     at all.  Somebody with a mini mal score of nine couldn't be

7     having these conversations.  It's completely inconsistent.  Yet

8     all through the calls there is over and over again, I don't

9     understand what's going on.  I don't know what that means.  He

10    doesn't remember things.

11         At one point he remembers the name of his lawyers.

12    Two phone calls later is back to calling them "lady lawyers"

13    and "guy lawyers".  I saw him five times.  Every time I made it

14    very, very clear what my name was and the best he could call me

15    on the phone calls was "that man doctor".  He couldn't even

16    relate to his wife that I was a psychiatrist.  So there is, you

17    know there is clear evidence of cognitive impairment, clear

18    evidence of psychosis.  It's not to the extent that it appears

19    when you see him in person but I think that the big question is

20    his gross poor performance intentionally produced in order to

21    make some malingering point for some unclear secondary gain or

22    is it a function of his paranoia?  And I believe that, A, I

23    don't understand at this point what the guideline is for him to

24    be.

25         THE COURT:  Well, that's a whole separate issue.

C8DAABEJH                         Dr. First - Direct

1            THE WITNESS:  I think it's an important issue.

2    Actually, the diagnosis malingering, at least according to

3    diagnostic manual requires the secondary gain.  There has to be

4    so many obvious -- there's another diagnosis that's in my

5    report.

6            THE COURT:  No continue on that thought.  "Secondary

7    gain".  Go ahead.

8            THE WITNESS:  There has to be a reason because there's

9    another diagnosis that I threw out in my report called

10   factitious disorder also known as Munchausen where people also

11   feign or exaggerate symptoms.  That's considered to be a

12   psychiatric disorder and not malingering.  The difference

13   between the two is the person's motivation.  In Munchausen

14   people go too hospitals.  They say they're ill they even do

15   things to make pretend they are ill and they get admitted to

16   the hospital.  The difference is their motivation for doing

17   that is they want to be taken care of.  But I think actually

18   there's a lot of strong evidence in Mr. Bejaoui that there's an

19   element of that.  This constant nobody's taking care of me.  I

20   want to be taken care of.  The whole business about the

21   wheelchair, the motivation for being in a wheelchair and all is

22   that he needs attention and caring and this is his way of

23   getting it.  So I think it's, yes, he is exaggerating but

24   that's not malingering.  There is something wrong with him if

25   he resorts to doing this behavior in order to get attention.

C8DAABEJH                              Dr. First - Direct

1    So that's why that diagnosis factitious disorder is a

2    psychiatric diagnosis covers much of this picture as well.

3             Malingering is diagnosed as a situation that's made

4    sort of by exclusion except that there's an obvious thing.

5    Somebody is suing somebody for a million dollars.  There is

6    answer obvious gain.  Somebody is on trial for murder and they

7    say, I am hearing voices.  On an MGRI it's obvious, again, what

8    the secondary gain is in this particular case at this moment in

9    time and even from the beginning, the secondary gain that is

10   central to the diagnosis of malingering, the idea that somebody

11   may be feigning or exaggerating I think it's another big

12   difference in our report.

13             I think the Butner report is saying, well, if somebody

14   is feigning then the malingering may completely downplay their

15   really didn't have, not really addressed their report the

16   central question about why would he be feigning.  And one of

17   the other reasons why Mr. Bejaoui might be exaggerating his

18   symptoms other than malingering.

19             Normally, when you do, at least from my perspective,

20   when you are trying to figure out among different diagnostic

21   cases you consider each one and say I've considered this

22   diagnosis and I am not making this diagnosis for this reason.

23             And I think Butner has clearly made a good case for

24   exaggeration of symptoms to the point of even outright lying

25   and they caught him in multiple inconsistencies but then their

C8DAABEJH                         Dr. First - Direct

1   conclusion that therefore he's malingering and he is competent

2   is a huge jump there and I don't see the connect the dots.

3          THE COURT:  There have been suggestions and I don't

4   know what the immigration law is here but there have been

5   suggestions throughout this case that what he is trying to do

6   is avoid removal from the United States because I believe he is

7   not a United States citizen which I am told is more likely upon

8   a conviction than not.  That may be a secondary gain.

9          THE WITNESS:  I guess if that's possible though he did

10  say to me in a previous interview that he wanted to -- in order

11  to get treated for his intractable back pain he was claiming to

12  go to Tunizia.  He wanted to leave the country.  He was -- he

13  said this over and over again.  He is so upset and desperate

14  about the fact that his life has been ruined by his back pain

15  and loss of memory, he'll do anything to get treated.

16         Two visits ago he started this business about, I

17  really want to go to Tunizia.  A friend there has a doctor

18  there and I am all ready to go.  I'll do anything to get

19  better.  So the idea that this is all being motivated by a

20  desire to stay in the United States I think is, all of this I

21  find a little hard to --

22         THE COURT:  All right.  I understand.  You started to

23  go down this road already under questioning from Mr. Dratel.

24  But essentially in your mind, your view, you as a psychiatrist,

25  what did Dr. Cochrane do?  In other words, what led --

C8DAABEJH                        Dr. First - Direct

1   obviously, you assume good faith on the part of everybody.

2   What led to the conclusion of Dr. Cochrane that there is

3   malingering here that you think was in error?

4            THE WITNESS:  My analysis is in general I think

5   there's no question that there's evidence of exaggeration and

6   feigning and certain aspects of this presentation I think we

7   both agree on that.  And I think that the -- my reading of it

8   is the generalization, if he is lying about this then

9   everything is lying.

10           But the psychosis in particular as far as I could tell

11  from reading from the Butner reports, the entire idea that

12  Mr. Bejaoui has any psychotic symptoms was even that Dr.

13  Channel -- I don't find that he is credible without any

14  explanation of why.  And there are just basically dismissed.

15  In fact, he was pulled off of his antipsychotic medication and

16  shortly after since he's been pulled off his antipsychotic

17  medication he remains paranoid and psychotic.

18           THE COURT:  Again, help me.  What are psychotic

19  symptoms?  You talk about that throughout.  Is that different

20  than paranoia?

21           THE WITNESS:  Paranoia is a favorite of psychiatrists.

22  Psychotic symptoms is a general case.  So if somebody is out of

23  touch with reality they don't know.  They are miss -- like for

24  example, he believes that I am writing down -- my writing means

25  that I am trying to accuse him of being a child molester.

C8DAABEJH                        Dr. First - Direct

1    That's taking something in reality and he is given a wrong

2    belief, out of touch with the reality of the situation.

3              So I think that that whole aspect, I think that the

4    Butner work-up really focused a lot on the pain and the

5    misrepresentation of the physical symptoms and sort of gave

6    the -- and the cognitive.  On those two aspects and the

7    depression and the psychotic symptoms which are from my

8    perspective are the main psychiatric diagnosis were hardly

9    addressed in their work-up and then sort of said, well, if he

10   is malingering, if this picture doesn't fit I think that is

11   from my perspective one of the mistakes, is an

12   overgeneralization that he is malingering on this one bit

13   there.

14             THE COURT:  What tells you that the psychotic part of

15   it is not malingering as well?

16             THE WITNESS:  Well, part of it is since their, one of

17   their main tools for proving the malingering was the

18   discrepancy between the recorded conversation and the

19   presentation in the unit.

20             THE COURT:  You find the psychotic aspects in these

21   telephone calls as well?

22             THE WITNESS:  Exactly.  And the depression as well.

23             THE COURT:  What else, if anything?  The general

24   thrust of what you are saying is where Butner went wrong was

25   they are dismissing the "out of touch with reality" aspect that

C8DAABEJH                         Dr. First - Direct

1   you find as genuine.  They find as part and parcel of the

2   malingering.  Is that fair?

3             THE WITNESS:  Also the depression.  I think they -- I

4   think he has major depression.  I got a score of 21 out of 27

5   on the quiz which is the bottom end of very severe.  Their

6   diagnosis was -- I believe it was adjustive disorder with a

7   depression given to show that people in prison get depressed

8   and anxious because it's a bad situation.  I think there's also

9   a sense that Mr. Bejaoui suffered from severe depression and

10  malingering as well.  So those major diagnoses are their

11  opinion, not real, without -- again, I think they've sort of

12  got generalized.  I don't think they present any evidence one

13  way or another.  They sort of assume it's not there.

14            One last point about -- in addition, what my clinical

15  evaluation after five sessions I found that his presentation to

16  me is consistent with somebody who has major depression of

17  psychotic features, a combination of both.  I feel that they

18  are dismissing of that diagnosis because of their assertion of

19  malingering.  Plus on the positive side, I felt that the

20  picture fit indeed someone who did not major depression of

21  psychotic features.  On top of everything else he has

22  personality disorder, paranoia and somatoform.  That picture

23  fit together and a Butner decision that it could be dismissed

24  based on those discrepancies, I felt was over generalize.

25            THE COURT:  All right.  That's helpful.  Thank you

1    sir.

2    BY MR. DRATEL:

3    Q.  Just talking about more specifically about your issues with

4    the Butner report in terms of selectivity how they viewed the

5    evidence in the sense.  Let's talk about, for example -- well,

6    you want to talk about the phone calls, right, that he used the

7    phone calls for one purpose and yet ignored the evidence that

8    was contrary to that.  Is that a fair statement?

9              THE COURT:  Ignored the evidence in the phone calls?

10             MR. DRATEL:  Yes.

11   Q.  Sorry.  Ignored evidence that was supported --

12   A.  They didn't use the evidence.  "Ignored" is a stronger

13   word.

14             THE COURT:  Gentlemen, I prefer the conversation that

15   you are having but unfortunately we can't do it that way

16   because of the requirements of the records.  So try to give

17   each other a little breathing room.  I get that you are both

18   New Yorkers when you speak.

19             MR. DRATEL:  I'm sorry, your Honor.

20   Q.  In terms of how they analyzed the telephone calls, also in

21   your report you discussed the incident with the MRI.  If you

22   could just give us a summary of that.  It's page 167 of your

23   report.

24   A.  Thank you.  Yes.  I think it's another example of how -- I

25   guess part of what I am implying there is once the idea of --

C8DAABEJH                          Dr. First - Direct

1     this is a very common phenomenon.  One of the reasons we

2     developed the SCID interview is to prevent people from doing

3     what they always do which is to very quickly come up with an

4     initial gut feeling and then whatever information that you see,

5     the stuff that supports that gut feeling get's elevated and

6     stuff that goes against it gets discounted like a huge bias.

7     And there's several examples.  One of the better examples, he

8     has been noted to be uncooperative.  Here is Mr. Bejaoui in a

9     lot of page --

10             THE COURT:  What page are you on now?

11             MR. DRATEL:  I think it was 17.

12             THE WITNESS:  No.  Actually -- yeah, it's 17.  There's

13    many examples of so-called evidence.

14             THE COURT:  All right.  I have it.  Go ahead.

15    A.  So the example we're discussing, there was the idea that

16    they were pointing out that his refusal to get an MRI was

17    evidence of malingering.  The idea it kind of makes sense if

18    somebody is in severe pain and they refuse treatment you have

19    to wonder is the reason they're refusing treatment is they

20    don't want a doctor to look too carefully at it because they

21    don't want to discover the malingering.  That's, certainly,

22    among the reasons you would expect, you would be worried

23    somebody is refusing treatment is if they're distressed.  If

24    you, actually, look carefully it turns out -- here it is.  So,

25    basically, the neurologist came.  Basically, what happened was

C8DAABEJH                           Dr. First - Direct

1    he is in severe pain.  They called the neurologist to see him.

2    Mr. Bejaoui is completely uncooperative and, basically, refused

3    to allow him to examine him and that happened on more than one

4    occasion where he would be screaming out for pain and then when

5    they finally would come to help him he would be uncooperative.

6    And one of the ways that was presented was this is the kind of

7    thing that somebody was malingering would do.  But if you

8    actually read more carefully the neurologist noted -- the

9    neurologist pointed out that Mr. Bejaoui was worried that he

10   was going to -- the neurologist was going to find out his home

11   address in order to take away -- take his ten year old daughter

12   away from him.  So he is paranoid.  So his refusal for

13   treatment was motivated by the paranoid ideation and delusions

14   that he's been plaguing him and not by malingering.

15            So, again, it is an example of a certain behavior than

16   on the surface could be used to support a diagnosis of diagnose

17   of malingering.  And if you are trying to build a picture like,

18   I think this person is malingering and this -- the pieces of

19   the puzzle start falling in.  And if you look at it and say,

20   okay, I'm file this away under malingering, when in fact the

21   same behavior, if you look a little for deeply all you'll see

22   it is not feeling of malingering but, actually, supports,

23   explanation, the reasons why he has poor interactions with

24   healthcare professionals is his paranoia.

25   Q.  And was there also in that same context with respect to the

C8DAABEJH                         Dr. First - Direct

1    tapering of antipsychotic medication and then the reappearance

2    of some psychotic symptoms?

3    A.   Right.   He was stopped -- the medication was stopped again

4    because of a decision that he was not ever psychotic.   There

5    was a whole -- all through the report there were just

6    statements, yeah, it seemed to be clinical judgment on the part

7    of the staff at Butner that this didn't seem real to them.   I

8    think it's, at least in my experience, having treated a number

9    of patients with psychosis, I almost never dismiss a psychotic

10   symptom based solely on how bizarre it is.   There are some

11   questions -- and it's possible that Mr. Bejaoui in his certain

12   circumstances, at certain times he is, when he talked about a

13   couple fantastic examples, it is possible they're exaggerated.

14   But, again, it doesn't mean that the fundamental, there are so

15   many examples of paranoid ideation.   The fact of his behavior

16   that there is an underlying psychosis there.   The whole issue

17   of hearing voices was dismissed by the staff at Butner simply

18   saying that we don't think they're credible.

19          But I found the opposite.   I found his getting him to

20   admit that he was hearing voice was actually very, very

21   difficult.   I found that usually people who are malingering or

22   volunteering the voices as an excuse, I had to fight with him

23   to get the voices.

24          MR. DRATEL:   If I, your Honor, in the streamlined way

25   that the Court did, I have the reports from Dr. Cochrane which

C8DAABEJH                          Dr. First - Direct

1   is Defendant's B as in "boy", the report from Devens from Dr.

2   Channel, Defendant's C as in "Charles" and the report from

3   Butner as Defendant's D as in "David" and if I might move those

4   in evidence I think without objection, your Honor.

5              THE COURT:  Admitted without objection.

6              (Defendant's Exhibits B, C and D received in evidence)

7              MR. DRATEL:  Does anybody need copies?

8              THE COURT:  How much longer do you have?

9              MR. DRATEL:  Probably ten minutes or so, I think.

10             THE COURT:  All right.

11  BY MR. DRATEL:

12  Q.  With respect to the Butner report, I just wanted you to

13  look at page 14.  I have it here for you.  It's page 14.

14             This is at a time right after his antipsychotic

15  medication is tapered off or discontinued.  And if you look at

16  the last paragraph then he's seen.  And is it fair to say that

17  this sort of demonstrates that without any antipsychotic

18  medication he is going to be have to more outlandish and

19  outrageous episodes?

20  A.  Yeah.  It would appear that, certainly, from his

21  sequence-wise we have just to be clear risperidol is the

22  antipsychotic medication used to treat symptoms like delusions

23  and hallucinations.  So after the medication is decreased we

24  see a resurgence of this symptom.  He was talking about this

25  entire delusional account of --

C8DAABEJH                          Dr. First - Direct

1   Q.  Goes on to page 15?

2              THE COURT:  Is this the paragraph that begins "when

3   assessed by the psychiatrist on 2/13/12"?

4              MR. DRATEL:  Yes, your Honor.

5              THE COURT:  I'm reading it.

6              THE WITNESS:  The top of page 15 is where you really

7   see the delusions coming out.  And this is, again, it

8   certainly -- normally when you cause and effect in psychiatry

9   is very difficult but temporal relationship is usually one of

10  the stronger indicators of cause and effect.  Give somebody

11  medicine, they get better.  You take them off, they get worse.

12  It's about as good as you can get with respect to the cause and

13  effect.  So in this case it's a strong presumption here that he

14  goes off the medication and psychotic symptoms get worse, at

15  least his willingness to discuss it with the staff.  Now,

16  that -- which is often his psychotic symptoms get more intense.

17  People are often more willing to talk about it.

18  Q.  Can you describe a term "malingering well"?

19  A.  Yes.  "Malingering well" malingering means, basically,

20  deceiving the clinician about one's presentation.  The kind of

21  malingering that is most commonly talked about malingering ill

22  which is that you are deceiving the clinician to look more ill

23  than you actually are.  The opposite, which we see a lot and I

24  have had personal experience on, the Moussaoui case when

25  somebody is a malingering well which is denying the presence of

1     the psychiatric symptoms to look healthy when in fact they're

2     ill.

3                  Now, in Mr. Bejaoui's case he -- it took a -- the

4     whole issue about hearing voices was something that I had to

5     pry out of him after a couple of sessions of establishing trust

6     where, that I had known from the chart that hearing voices was

7     an issue and I had them originally, my first couple sessions

8     about hearing vices and he denied it.  But eventually I got --

9     I questioned him again and discovered that, yes, he was hearing

10    voices.  Why aren't you telling me this?  And he said A, I

11    don't want you to think I am crazy; b, I don't want you to put

12    me on the risperidol because it affects my memory an C, this is

13    where I discovered something which came out in the history that

14    I hadn't seen before or anywhere else, that his brother who

15    died of diabetes, actually, developed diabetes as a side effect

16    of antipsychotic medication and he died.  And Mr. Bejaoui was

17    frightened of taking the antipsychotic medication because of

18    that.  So that is another reason why he was covering up the

19    fact that he was experiencing voices at least during this

20    interaction with me.  So I think --

21                  THE COURT:  Is the fact that his brother died due to

22    antipsychotic medication, is that a delusion?

23                  THE WITNESS:  That's a good question.  I have no way

24    of tracking down the truth of that statement.  But it

25    explains -- it's an explanation of why he would not want to

C8DAABEJH                         Dr. First - Direct

take any antipsychotic medication.  It's been reported in the

chart over and over again for virtually every evaluation of

whether his brother was deceased of diabetes at a very young

age and this is the first time it came out that his brother,

actually, was in a mental hospital and had received

antipsychotic medication and developed diabetes from that that

happens.

BY MR. DRATEL:

Q.  Just to be clear, that a side effect of risperidol is

diabetes?

A.  Can be, yes.

Q.  Okay.  So that's not delusional?

A.  Right.

Q.  That's a pretty specific statement in terms of it's not one

of general knowledge necessary to the public?

A.  No.  No.  Probably not.  It's not a secret but it's

probably not something the average person would know.

Q.  Also, did he deny seizures as well at one point in the

course of reviewing the medical records did he deny also that

at one point they also thought he had seizures and he later

denied that?

A.  Yes.  At one point there was a claim of seizures that he

had seizure and it looked like here is another example of him

feigning a symptom.  But in the record he actually said that

the -- I was slumped over and the guard thought I had a seizure

C8DAABEJH                          Dr. First - Direct

1    and that's how I ended up in the hospital.  So, again, he is

2    denying a symptom rather than overreporting.  So this seems to

3    be the opposite where he is actually giving less information

4    and trying to make himself look healthy than he may actually

5    be.

6    Q.  Now, in terms of exaggeration just for sake of arguments,

7    saying, lying about severity of a particular condition, what

8    one of your diagnoses I think is personality disorder NOS with

9    histrionic and schizo typal features?

10   A.  Yes.

11   Q.  Can you explain that in the context of that particular part

12   of his presentation?

13   A.  The personality disorder NOS is what's used when someone

14   has a personality disorder that doesn't conform to one of the

15   full syndromes in the DSM.  What you do, it turns out that most

16   patients actually have a mix of features from several different

17   disorders.  So the term "personality disorder NOS" reflects the

18   fact that he has a combination of histrionics.  And histrionic

19   features cover as a style of exaggeration, so people -- for

20   attention seeking.  And I think there is lots of evidence in

21   the chart, not so much during my interactions but the chart

22   both the Devens, at Butner and also at MDC of him being

23   dramatic in his presentation about his pain and other, just

24   dramatic in general, throwing temper tantrums and other

25   behavior like that that appear to be part of his general

C8DAABEJH                        Dr. First - Direct

 1    personality style.  And I give a schizo typal partly to cover

 2    his social isolation and sort of general paranoid demeanor

 3    which I think may be part of his personality.  In addition to

 4    him becoming delusional in a paranoid way I think he probably

 5    is as paranoid as part of his personality as well.

 6              THE COURT:  Just a moment.  Schizo typal is

 7    S-C-H-I-Z-O-T-Y-P-A-L?

 8              THE WITNESS:  Yes.

 9              THE COURT:  How would you spell risperidol?

10              THE WITNESS:  R-I-S-P-E-R-I-D-O-L.

11    BY MR. DRATEL:

12    Q.  And with that, the personality type that you just discussed

13    in that particular diagnosis would that negate the diagnosis of

14    major depression that you made?

15    A.  No.  They often -- personality disorders often occur with

16    other disorders.

17    Q.  Does it indicate a psychotic features part of that?

18    A.  No.  No.

19    Q.  And in addressing the type of disorder that you diagnosed

20    with respect to Mr. Bejaoui, would a five week period that he

21    spent at Butner be sufficient to restore him to competency in

22    your opinion?

23    A.  Almost never.  Through some miracle it has -- he has severe

24    complicated case of severe depression with psychotic features.

25    This is the kind of thing that would require generally very,

C8DAABEJH                        Dr. First - Direct

1    very aggressive treatment.  It's possible the five weeks but he

2    didn't actually get, he didn't got any treatment, virtually, no

3    treatment at all.  So I wouldn't -- five weeks of aggressive

4    treatment might be able to -- five weeks of evaluation without

5    any treatment would not restore competency.

6              MR. DRATEL:  Thank you very much, doctor all.

7              THE COURT:  All right.  Let's take ten minutes.

8              (Recess)

9              THE COURT:  Cross-examination.

10             MR. DRATEL:  Your Honor, Ms. Barrett is here.  I don't

11   know if the government wanted exclusion on that.

12             MS. KOVNER:  It must be a reason for her to be here.

13             THE COURT:  It's also a separate issue.  If you want,

14   we can take her out of order.  It's up to you.

15             MR. DRATEL:  No.  It may affect my decision.

16             THE COURT:  All right.  Let's go forward and we'll

17   break at one o'clock, just five before.

18   CROSS-EXAMINATION

19   BY MS. KOVNER:

20   Q.  Good afternoon, Dr. First.

21   A.  Afternoon.

22   Q.  Can you explain the difference between a general

23   psychiatric inpatient unit and the forensics psychiatric

24   inpatient unit?

25   A.  The biggest difference is that the -- in a forensic unit

C8DAABEJH                          Dr. First

1  the individuals in the forensic unit are under some kind of

2  forensic context, arrested or already incarcerated for some

3  reason as opposed to general unit where they're not.

4  Q.  Now, you've done several internships as part of your --

5  Sorry.  You've done an internship as part of your medical

6  training?

7  A.  Yes, that's right.

8  Q.  But you never interned on a forensic unit?

9  A.  That's correct.

10  Q.  Since completing your training you've done hospital, you

11  have had a hospital position, right?

12  A.  Correct.

13  Q.  But you've never worked on a forensic hospital unit?

14  A.  That is correct.

15  Q.  Now, can you explain what aboard certification is?

16  A.  In general board certification is the process by which you

17  are part of an organization that specializes in a certain area.

18  Q.  You were board certified in psychiatry?

19  A.  That's correct.

20  Q.  There are board certifications in forensics as well?

21  A.  Yes.

22  Q.  You are not board certified in forensics?

23  A.  That's correct.

24  Q.  Now, one of the issues in a forensic analysis is whether a

25  defendant is malingering?

C8DAABEJH                          Dr. First

1    A.   Yes.

2    Q.   And defendants in criminal cases often have incentive to

3    malingering that other psychiatric patients do not?

4    A.   Correct.

5    Q.   Do you know what the psychological literature says about

6    the percentage of people malingering in competency and

7    responsibility cases?

8    A.   I don't know precisely what it's -- I assume it's high.

9            THE COURT:   I think I read somewhere that it's eight

10   to 17 percent.  Does that sound reasonable?

11           THE WITNESS:   Yes.

12           THE COURT:   All right.

13   BY MS. KOVNER:

14   Q.   How many defendants have you evaluated for competency to

15   stand trial?

16   A.   Two.

17   Q.   You've testified on your direct about cases in which you've

18   testified as a government witness before.  None of those were

19   competency cases?

20   A.   That's right.

21           THE COURT:   Is it two in addition to Mr. Bejaoui?

22           THE WITNESS:   Yes.

23   Q.   Have you ever testified in a competency case before?

24   A.   No.  Incorrect.  Yes.  It was a state case, yes.

25   Q.   Now you've published more than 50 articles in your work as

C8DAABEJH                          Dr. First

1   a psychiatrist, right?

2   A.   Correct.

3   Q.   Were you ever published in the area of competency to stand

4   trial?

5   A.   No.

6   Q.   Ever published and subject of malingering?

7   A.   Yes.

8   Q.   Which publication was that?

9   A.   PTSD and malingering.

10  Q.   Can you explain the difference between a clinical

11  psychiatric evaluation and forensic evaluation?

12  A.   There are many differences.  One is a lack of

13  confidentiality and the forensics evaluation as compared with

14  the clinical evaluation.  The goals are different too.  The

15  goals of a forensic evaluation are usually specific to answer a

16  specific question that's been posed as opposed to a clinical

17  psychiatric evaluation.

18  Q.   In a forensic evaluation your role is to serve as neutral

19  evaluator?

20  A.   That's correct.

21  Q.   You understand that the judge is going to make a

22  determination of competency or incompetency based in part on

23  the observations that you put in your report, right?

24  A.   Yes.

25  Q.   And there's as objective evaluator you should present both

C8DAABEJH                        Dr. First

1   the evidence that supports the conclusion that you ultimately

2   drew and the evidence, isn't that right?

3   A.  Yes.

4   Q.  Now, one of the tools that you used in this case to

5   diagnose Mr. Bejaoui was in-person observations?

6   A.  Right.  Yes.

7   Q.  You said you tried to see people for a substantial period

8   of time before you make a diagnosis, right?

9   A.  Correct.

10  Q.  It was hard to evaluate Mr. Bejaoui in your in-person

11  sessions, correct?

12  A.  Yes.

13  Q.  Would you concede that observing a patient on multiple

14  occasions more rather than fewer is useful in reaching a

15  correct diagnosis?

16  A.  Yes.

17  Q.  And it's useful in detecting malingering, correct?

18  A.  Yes.

19  Q.  And observing a patient who doesn't know that he is being

20  observed is also useful in assessing malingering, correct?

21  A.  Yes.

22  Q.  Now, the defendant's responses to your meetings with him

23  contributed in your findings that he was not competent,

24  correct?

25  A.  Correct.

C8DAABEJH                         Dr. First

1   Q.  And to take one example, you said that you visited him five

2   times and you wrote in your report that it was only by the

3   third visit that Mr. Bejaoui acknowledged he had seen me

4   before, right?

5   A.  Correct.

6   Q.  And it was only by the fourth visit that he could recall

7   you were a doctor, is that right?

8   A.  Correct.

9   Q.  And you wrote that he was never able to remember that you

10  were a psychiatrist?

11  A.  Correct.

12  Q.  And he was never able to remember your name, is that right?

13  A.  That's correct.

14  Q.  Now, you've diagnosed many patients with major depressive

15  disorder with psychotic features, right?

16  A.  Yes.

17  Q.  And in general, what percentage of those patients would you

18  say are unable to recall that you are a doctor or psychiatrist?

19  A.  In the context in which I've seen them would be zero

20  because I've seen them privately or in a hospital setting where

21  I was -- In fact, I am -- it's complicated.  I've made the

22  diagnosis in research settings often where the issue of what

23  where a name would be didn't come up, but it's complicated.  I

24  guess I've seen repeatedly -- I've never had a situation where

25  they haven't remembered my name.

C8DAABEJH                         Dr. First

1   Q.  Okay.  Let's turn for a moment to the prison calls.  You

2   indicated that you listened to those calls in reaching your

3   diagnosis?

4   A.  That is correct.

5   Q.  And, in fact, you indicated on direct that when you first

6   heard those calls you thought a suggestion raised by those

7   calls was malingering, correct?

8   A.  Absolutely.

9   Q.  And you testified on direct that you asked Mr. Bejaoui for

10  an explanation of that, right?

11  A.  Yes.

12  Q.  And he gave an explanation in substance that he is

13  comfortable with his friends and family but that he didn't

14  trust doctors?

15  A.  In substance, right.

16  Q.  That's an explanation that Mr. Bejaoui gave you?

17  A.  That's right.

18  Q.  And I'd like to play a few brief clips from the phone

19  calls.  If we could start with the call on March 3rd at 5:41

20  p.m.  I'd like to play a section of that clip.  And if you are

21  following there are transcripts for convenience.  And the

22  transcript of this call is Government Exhibit 19.  The section

23  that we're going to play is on page 3 line 31.

24          MR. DRATEL:  Your Honor, it's not in yet.  You want to

25  put the calls in?

C8DAABEJH                          Dr. First

 1          THE COURT:  Government?

 2          MS. KOVNER:  Your Honor, there's a stipulation between

 3  the parties.  I'm not sure under the circumstances we need to

 4  read it into the record.

 5          THE COURT:  Let me see it.

 6          (Pause)

 7          THE COURT:  All right.  Why don't you give this

 8  stipulation a government number.  Does it have one?

 9          MS. KOVNER:  It does not, your Honor.

10          THE COURT:  Just give it a number and we'll put it on

11  there.

12          MS. KOVNER:  Government Exhibit 40.

13          THE COURT:  Four-zero.

14          MS. KOVNER:  Yes.

15          THE COURT:  We'll make this stipulation Government

16  Exhibit 40 and I am admitting the exhibits set forth in this

17  stipulation, specifically, Exhibit 5, 25 to 29, 6 to 24.  In

18  other words, it's Government Exhibits 5 to 29 are admitted.

19          (Government's Exhibits 5 - 40 received in evidence)

20          MR. WILSON:  Your Honor, it may be that there is a

21  typo in the stipulation it should be to 39 and I apologize if

22  that's our error.

23          THE COURT:  Well, it's some typo but Paragraph Two now

24  says Government Exhibits 25 to 29.  You want that to be 39?

25          MR. WILSON:  Yes, your Honor, I do.

C8DAABEJH                           Dr. First

```
 1              THE COURT:  I'll do it right here, Mr. Dratel.

 2              MR. DRATEL:  No problem.

 3              MR. WILSON:  I apologize, your Honor.

 4              (Pause)

 5              THE COURT:  Being generous we'll call it a typo.  All

 6    right.

 7              MS. KOVNER:  Could you play March 3, 5:41 p.m. that

 8    first clip.

 9              THE COURT:  Does it have a number?

10              MS. KOVNER:  The calls are simply one CD Government

11    Exhibit 5.

12              THE COURT:  All right.

13              MS. KOVNER:  But the transcript is a Government

14    Exhibit 19 and the excerpt we're going to play begins on page

15    3, line 31.

16              (Audiotape played)

17    BY MS. KOVNER:

18    Q.  Just to be clear, Dr. First, do you know who Dr. Herbel is?

19    A.  Yes.

20    Q.  One of the --

21    A.  Psychiatrists.

22              MS. KOVNER:  If we could play a second clip.  This is

23    March 12th at 5:26 p.m.  The transcript is Government Exhibit

24    23.  And the section that we're going to play begins on page 2

25    at line 11.
```

C8DAABEJH                          Dr. First

1          (Audiotape played)

2          MS. KOVNER:  And if we could play one final clip.

3    This is also March 12, 5:26 call and this is the section

4    starting on page 4 at line 7.

5          (Audiotape played)

6    BY MS. KOVNER:

7    Q.  To be clear, Dr. Cochrane who is referenced in that report

8    is the evaluator at Butner, correct?

9    A.  Correct, yeah.

10   Q.  Is the level of understanding of who his doctors are that

11   the defendant displayed in his call, these several calls

12   consistent with the lack of understanding of doctor identity he

13   showed in his interviews with you?

14   A.  It's hard to say because I don't know how he was introduced

15   to those two doctors, how often that was reinforced or the fact

16   that he had the name of Herbel down, I'm not sure that I

17   could -- if somebody asked me without ever meeting Dr. Herbel,

18   had ever seen his name written down requested or asked me to

19   spell it, I presume I wouldn't be able to do it.  I actually

20   don't know what's going on, whether that was inconsistent.

21   It's hard to say.

22   Q.  You listened to those calls in making your evaluation of

23   defendant?

24   A.  Yes.

25   Q.  And you concluded that there was not much significance to

C8DAABEJH                          Dr. First

1    his recollection of the doctor's names because he could have

2    met them in a different context because you don't know enough

3    about the context?

4    A.  Right and/or the fact that he couldn't remember my name, I

5    wasn't -- that's a small crumb of information.  My report and

6    conclusion did not depend upon the fact that after five times

7    he couldn't remember my name.  He continued on the tapes that

8    were sent.

9    Q.  Okay.  So let me move on.

10              MR. DRATEL:  Could he be permitted to finish?

11   A.  I was going to simply say that the tapes that I heard,

12   since he met me he continues not to remember my name.  So maybe

13   hear it, I don't know.  I am not making much of it at all.  I

14   was just commenting on the fact that he did.

15   Q.  Let's move on to some of other things the defendant said in

16   his interviews with you and his interviews with the other

17   doctors.  You are aware that the defendant had told the

18   evaluators that he was 50 years old?

19   A.  Yes.

20   Q.  And you are aware that the defendant was in fact 58 years

21   old?

22   A.  Yes.

23   Q.  And you are aware that the defendant told one of the people

24   evaluating him he couldn't recall his own first name?

25   A.  I am aware of that.

C8DAABEJH                          Dr. First

1   Q.  As you indicated, you've treated many people with major

2   depressive disorder and psychotic features?

3   A.  Yes.

4   Q.  What percentage of patients would you say give a wrong

5   answer for what their age is?

6              MR. DRATEL:  I would object to that question, your

7   Honor.

8              THE COURT:  I'll allow it.  You mean in general or

9   those he's --

10             MS. KOVNER:  Those you have treated.

11  A.  I've never had somebody who I've asked their age give a

12  wrong age, at least not by that much.

13  Q.  Are you aware of the ability to remember your name and your

14  age and your date of birth are relatively preserved in, even in

15  patients with amnesia?

16  A.  Yes.

17             THE COURT:  How do you account for his response?

18             THE WITNESS:  As being uncooperative or frightened,

19  paranoid, I agree it's inconsistent.  I am not arguing that

20  there are a lot of things said that appear to be inconsistent

21  and not truthful and so these examples are good examples.  You

22  are right.  These are not credible.  For somebody to get these

23  wrong due to major depression, they would be almost moot.  So I

24  agree.  These wrong answers I think are not really explainable

25  simply by the kind of cognitive appearance one sees in major

C8DAABEJH                         Dr. First

1   depression.  I agree with that.

2   Q.  Are you familiar with forensic tests designed to assess

3   malingering?

4   A.  Yes.

5   Q.  Can you give examples of some of the most common

6   malingering tests?

7   A.  The MMPI, the PAI are two that I FIND helpful.  The

8   certificates and the TOMM, T-O-M-M.

9   Q.  There are some of these tests that patients with depression

10  do quite well on, right?

11  A.  They can, yeah.

12  Q.  And some tests that patients with psychosis have been

13  documented to do well on, right?

14  A.  Yes.

15  Q.  Now, for purposes of your evaluation of the defendant you

16  gave three tests, right?

17  A.  Yes.

18  Q.  You gave the mini mental status exam?

19  A.  Right.

20  Q.  And the Georgia core competency test?

21  A.  Yes.

22  Q.  And you gave the quick inventory of the --

23  A.  That's right.

24  Q.  You rely in part on the defendant's responses to these

25  tests in making your diagnosis, right?

C8DAABEJH                          Dr. First

1    A.  In part yes.

2    Q.  In make your conclusion about competency?

3    A.  In part, yes.

4    Q.  So let's start by talking about these tests.  And I'd like

5    to start with the mini mental status exam?

6    A.  Yes.

7    Q.  On this test a person is asked questions and get points for

8    correct answers, right?

9    A.  Yes.

10   Q.  And if a person says "I don't know", he gets zero points,

11   right?

12   A.  That's right.

13   Q.  And if a person purposefully gives a wrong answer he gets

14   zero points, right?

15   A.  Correct.

16   Q.  So if he gets lots of he zeros he gets a bad score on the

17   test, right?

18   A.  That's correct.

19   Q.  And the test does not include a measure for malingering,

20   right?

21   A.  Not at all.

22   Q.  So for instance, one of the questions is what year is it,

23   right?

24   A.  Right.

25   Q.  And a person who says "I don't know" gets no point, rights?

C8DAABEJH                          Dr. First

1   A.  That's correct.

2   Q.  And the person who says 1920 when it's 2012 gets zero

3   points, right?

4   A.  That's correct.

5   Q.  Another question is "what state are we in"?

6   A.  Right.

7   Q.  A person who says "I don't know" gets no points?

8   A.  Right.

9   Q.  You say the wrong state you get no points?

10  A.  Right.

11  Q.  So a defendant who wants to appear cognitively impaired or

12  mentally ill can purposely giving wrong answers?

13  A.  Absolutely.

14  Q.  Then he would get a low score.

15  A.  That's right.

16  Q.  Let's talk about some of the defendant's specific

17  responses.  You asked the defendant questions about where he

18  was at the time of the interview, right?

19  A.  Yes.

20  Q.  And in response he indicated he could not give the name of

21  the prison facility, right?

22  A.  Yes, that's right.

23  Q.  And he indicated did not know New York City was in New York

24  state, right?

25  A.  Right.

C8DAABEJH                          Dr. First

1   Q.  He indicated he had no idea he was in the United States,

2   right?

3   A.  Not exactly.  I think I gave the actual quote.  He was

4   confused about whether New York was in -- he started talking

5   about being in England and then I was -- he then got confused

6   about whether New York was in the -- I said, well, you said you

7   are in New York and New York is in the United States.  He said

8   no, no.  I am -- we're in England.  I said, how could we be in

9   England if New York is in the United States?  And he just

10  got -- he said I don't know, whatever.  He stopped answering at

11  that point and he didn't actually say.  I may have

12  mischaracterized in my report.  He didn't actually say we

13  are -- oh, we are in England as an answer to where New York

14  was.

15  Q.  Okay.  In your treating many patients with major depressive

16  disorder with psychotic features, is it common for patients not

17  to be able to identify whether or not New York is in England?

18  A.  Absolutely, right.  It would be completely unusual.

19  Q.  Okay.  So I'd like to play a few phone calls, if we may.

20  If we could go to January 29 at 6:16.  And the transcript of

21  this call is Government Exhibit 27 and the excerpt that I'd

22  like to play starts on page 4 at line 33.  This is also a call

23  between the defendant and his wife.

24          (Audiotape played)

25  BY MS. KOVNER:

C8DAABEJH                        Dr. First

1   Q.  By the way, do you know if North Carolina is about ten

2   hours away from New York?

3   A.  Do I know that?

4   Q.  Yeah.

5   A.  Sounds about right.

6           MS. KOVNER:  If we could play another excerpt from

7   this call, page 5 line 7.

8           (Audiotape played)

9           MS. KOVNER:  If I could play one more excerpt.  This

10  is February 7 at 10:16 a.m. the transcript is Government

11  Exhibit 9 and the excerpt I am going to play begins on page

12  two, line 17 and this call is not with his wife.  It's with a

13  person named Joseph.

14          THE COURT:  Is it Government Exhibit 9?

15          MS. KOVNER:  Yes.

16          THE COURT:  Page two?

17          MS. KOVNER:  Yes.  Begins at line 17.

18          (Audiotape played)

19  BY MS. KOVNER:

20  Q.  Fair to say that the awareness of the defendant's location

21  that he displayed in those calls is not consistent with a level

22  of awareness he displayed of his location in his interviews

23  with you?

24  A.  Well, the call with Joseph he seemed to be reading his

25  address.  So it wasn't clear.  I agree with the first one

C8DAABEJH                         Dr. First

1    though, the ten hours North Carolina was.

2    Q.  You reviewed some of the defendant's Arabic language calls?

3    A.  Yes, the translations, yes.

4    Q.  If I could approach, I am handing you a copy of Government

5    Exhibit 26 and let me just direct you to page 3 of this

6    exhibit, to the last two responses from Mr. Bejaoui on that

7    page.  And then going over to the additional discussion of

8    Mr. Bejaoui's location on the next page.  Fair to say in that

9    call, again, he knows where he is?

10   A.  No.  It's fair to stay that he has a card with the address.

11   He is reading his friend his name.  It does not indicate that

12   he knows where he is.

13   Q.  Okay.  Well, then let's look at one more Arabic

14   translation.  This is Government Exhibit 27 and if you could

15   start with maybe the last two paragraphs on that first page of

16   the call second page of the exhibit.

17   A.  Okay.

18   Q.  Fair to say that in this exchange Mr. Bejaoui appeared to

19   know where he is in and when he got there?

20   A.  About being in North Carolina again?

21   Q.  Yes.

22   A.  Yeah, it looks like that, yeah.

23   Q.  Now, on the mini mental status exam you asked the defendant

24   the season, right?

25   A.  Right.

C8DAABEJH                    Dr. First

1   Q.  And what was his response?

2   A.  The way that exchange worked was, is that he wouldn't tell

3   me the month.  In fact, I said, well, could you give me -- I

4   said, I kept saying "come on guess".  No.  I refuse.  I am not.

5   I don't know.  I have no idea.  How about the season?  And it

6   took a long, please, I am just trying to when -- I kept saying

7   to him, I am just trying to do this assessment.  I am trying to

8   get some understanding.  It's okay if you get it wrong.  I had

9   to prompt him tremendously and try to get through what I felt

10  to be whether it was paranoia and anxiety to finally he got it

11  wrong.  He said it was I guess winter.  It was totally wrong.

12  It was March I think he said.

13  Q.  So he told us it was winter when it was spring?

14  A.  That's right.

15  Q.  And --

16  A.  My only other point was it was simple that he just --

17  somebody might have said, he might have come out with the wrong

18  season.  It was like pulling teeth to get him to volunteer

19  something which ended up being the wrong season.  This is a way

20  to characterize.  So this is one of the reasons why I think

21  that a lot of these interchanges -- it's not simply there is

22  something going on here whether it's paranoia, whether it's

23  embarrassment, whether it's something that colors the

24  interactions that I think has something to do with the way he

25  is reporting.  And you are right.  This is not consistent with

C8DAABEJH                    Dr. First

1   a pure cognitive impairment that you would get by just giving

2   the mini mental status exam to someone.  So I am agreeing that

3   those are not consistent but these interactions show there is

4   something else going on.

5   Q.  In fact on page thirteen of your report you wrote that the

6   defendant was unable or unwilling to state either the year or

7   the season or date, right?

8   A.  That's correct.

9   Q.  And the distinction of whether he is unable or unwilling to

10  do those things is an important one, right?

11  A.  Absolutely.

12  Q.  Important as to whether he is competent to stand trial,

13  right?

14  A.  That's right.

15  Q.  To be clear, on this exam, on the mini mental status exam

16  he got zero points for all his answers?

17  A.  For a section.

18  Q.  Zero points for month and the day of week?

19  A.  Right.

20  Q.  And the season?

21  A.  Yeah.

22          MS. KOVNER:  If we could play February 10, 5:47 p.m.

23  and that transcript a Government Exhibit 1A and we'll play on

24  page 4 line 19.

25          (Audiotape played)

88

C8DAABEJH                        Dr. First

1   BY MS. KOVNER:

2   Q.  Now, when the defendant talks about having been

3   incarcerated for four years in May, in that call are you aware

4   of whether that's correct or not?

5   A.  I don't know if it's exactly correct, so it's probably in

6   the right ballpark.

7            MS. KOVNER:  If we could play one more excerpt.  This

8   is February 17, 2012.

9            THE COURT:  How do you account for his precise

10  knowledge?  He doesn't have an address in front of him or date

11  or calendar in front of him.  How do you account for his very

12  specific knowledge of day of how long he's been incarcerated?

13  If you can't, you can't.

14           THE WITNESS:  I can't.  He knows it.  I mean I don't

15  know.  I also don't -- I didn't ask him.  I don't have a

16  comparison, meaning I didn't say how long have you been

17  incarcerate?  I don't know how long he would have given.  I

18  don't know what to make of that.  But you are right.  He

19  clearly appears to know that.

20           MS. KOVNER:  If we could play --

21           MR. DRATEL:  Give us the dates.

22           MS. KOVNER:  Sure.  That call was February 10 at 5:47

23  p.m. and this next call is going to be February 17 at 7:55 p.m.

24           MR. DRATEL:  Exhibit?

25           MS. KOVNER:  Government Exhibit 15, the one we're

C8DAABEJH                    Dr. First

 1    going to play, the prior, was Government Exhibit 12.  The part

 2    we are going to play is page 5 starting at line 29.

 3                (Audiotape played)

 4    BY MS. KOVNER:

 5    Q.  In that call he references the month of February not being

 6    over yet and this a call on February 17?

 7    A.  Yes.  He seems to know the time of year that time.

 8    Q.  So the understanding of time that he displays in the call

 9    is not consistent with the understanding he shows you?

10    A.  Correct.

11                THE COURT:  Again, what is your explanation or --

12                THE WITNESS:  My explanation for much of this is the

13    context.  That being in an exam where I am trying to test him

14    as a doctor who he has ideas about why I am there and he is

15    uncooperative for some reason whether he is holding back

16    because he has some delusional reason to do that or, again, I

17    understand why malingering has to be a possibility.  But I

18    think there are other possibilities, whether it's anxiety or

19    delusionality or whatever but what it shows is that when

20    doctors ask him these questions he does very poorly.  It's been

21    true for every single health doctor or mental care professional

22    who's done any evaluation with him at any of the facilities

23    have all had exactly the same interactions, type of

24    interactions.  But it is true that in these phone calls when it

25    is someone he trusts like his wife or Riatt he clearly is able

C8DAABEJH                    Dr. First

1    to show that he knows what is going on.  That is true.

2    Q.  One or two more questions about this exam.  So you

3    requested the defendant to write a sentence with a subject and

4    a verb, right?

5    A.  That's right.

6    Q.  And how did the defendant respond when he is asked to do

7    this?

8    A.  I think he had -- it took three or four tries for him to be

9    able but he eventually did.

10   Q.  You were sort of -- sentence that, ultimately, didn't make

11   sense, right?

12   A.  It had something to do with his, I am in a lot of pain or

13   something like that but not written that well.

14   Q.  Do you know how many points you gave the defendant for his

15   response?

16   A.  I think I gave him the full amount.  I don't remember.

17   It's in my report.

18   Q.  It's all right.  Don't worry about it?

19   A.  Okay.

20   Q.  You know the defendant speaks four languages, right?

21   A.  I've heard that.  I haven't seen it.  I know I've heard him

22   speak Arabic and I know he speaks English so.

23   Q.  You've also read that he graduated from college?

24   A.  Yes.

25   Q.  Are you aware that the defendant regularly sent letters to

C8DAABEJH                          Dr. First

1   his wife?

2   A.  In addition to the phone calls, yes.

3   Q.  And are you aware that he executed a power of attorney

4   while he was in jail?

5   A.  Yes.

6   Q.  The mini mental status exam also tests a defendant's

7   ability to follow simple commands, right?

8   A.  Yes.

9   Q.  And I told the defendant to raise his hand as part of the

10  exam, right?

11  A.  Well, first I told him to actually close his eyes which is

12  the standard instruction and, actually, I thought that as I

13  think I pointed out in my report it's very notable that he

14  refused to do that because he felt if he closed his eyes I

15  might attack him.  So, again, I think that was a very apt

16  demonstration of how his paranoia and other psychopathology is

17  distorting the mini mal.  I ended up having to use, raise your

18  hand, I made that one up off the top of my head.  I've never,

19  never had a patient when I've said "close our eyes" refused to

20  do that.

21  Q.  So both of those responses, fair to say, unusual for

22  somebody with major depressive disorder with psychotic

23  features, right?

24  A.  Right.

25  Q.  And you mentioned a moment ago that the first command you

C8DAABEJH                          Dr. First

1   gave him was to close your eyes, right?

2   A.   That's right.

3   Q.   And your said he wouldn't do it.  You said in substance he

4   wouldn't do it because he was afraid of doctors, right?

5   A.   He was afraid of me.

6   Q.   Afraid of you, right.  And you attributed that to fear of

7   doctors?

8   A.   I don't know exactly why he is afraid.  Again, it's very

9   difficult to get him to describe the details about what's going

10  on in his head.  I do -- first of all, he just -- I said close

11  your eyes.  He kept shaking his head.  No.  I don't know.  It

12  took a while just to figure out.  I said would you tell me why

13  and while the silence, tell me why, just being very patient and

14  eventually he shared with me it's because he was afraid I would

15  hurt him and I say, okay.  Let's try it.  Somewhere arm that

16  point he wanted to stop the interview and --

17  Q.   The reason that you believed the defendant refused to close

18  his eyes is because he was afraid of you because that's the

19  explanation the defendant gave, right?

20  A.   And also my clinical impression, my interaction and the way

21  his affect looked and the way his facial expressions looked.

22  It was not simply based on what he said.  It was a clinical

23  judgment and my interactions.

24  Q.   Based on your observation of him you found his explanation

25  credible?

C8DAABEJH                    Dr. First

A.   Right.  But I also -- I already had a hunch of that before
he gave his explanation.  I felt that that's what was going on.
That's the explanation simply.

THE COURT:  Is this a logical time to break for lunch?

MS. KOVNER:  Yes, your Honor.

THE COURT:  We'll pick it up again at 2:30.  Thank
you.

(Luncheon Recess)

AFTERNOON SESSION

2:30 p.m.

THE COURT:  Please be seated.

We'll continue with the cross-examination of this
witness.

My clerk as informed me that one of the lawyers called
to ask if we were going over to tomorrow.  That certainly was
my intention if we don't finish today.  If anyone can't do it,
let me know.  Obviously, I prefer that we finish today.  I
realize I did a fair amount of the questioning which probably
extended the time from what was estimated but let's continue to
be as efficient as or start being as efficient as we can.

MS. KOVNER:  Thank you, your Honor.
BY MS. KOVNER:
Q.   So, when we left off we were talking about some of the
exams that you gave.  I want to move now to the Georgia core
competency test.

C8DAABEJH                        Dr. First

1   A.  Yes.

2   Q.  This test consists of a series of questions about court

3   procedure?

4   A.  Yes.

5   Q.  And if a defendant purposely gives wrong answers on this

6   test he gets a low score, right?

7   A.  Correct.

8   Q.  And in a sense he flunks the test, right?

9   A.  Correct.

10  Q.  When you administered this test you asked the defendant,

11  for example, what the judge does during a trial, right?

12  A.  That's right.

13  Q.  And how did he respond?

14  A.  How did he respond?  He responded he didn't know.

15  Q.  And you asked what the jury does in the trial, right?

16  A.  Right.

17  Q.  And how did he respond, right?

18  A.  He didn't know.

19  Q.  Now, this test does not include a measure for malingering,

20  right?

21  A.  That's correct.

22  Q.  Do you know whether there are tests of core competence it

23  that have no malingering component?

24  A.  No, I don't know that.

25  Q.  Let's talk about some of the specific answers that

C8DAABEJH                          Dr. First

1    Mr. Bejaoui gave on this test.

2    A.   Sure.

3    Q.   You wrote in your report when you gave the test the

4    defendant had trouble identifying his attorneys, right?

5    A.   Who their names were, you mean?

6    Q.   Yes.

7    A.   Yes.

8    Q.   For instance, he gave the wrong name for Mr. Dratel, then

9    you wrote that after much effort he triumphantly recalled the

10   first name of his other attorney?

11   A.   That's right.

12        MS. KOVNER:  I'd like to play a couple calls.  The

13   first call is February 22nd at 1:03 p.m. and it's Government

14   Exhibit 16.  And the excerpt that I am going to play starts on

15   page two, line 38.

16        (Audiotape played)

17        MS. KOVNER:  If I could play one more excerpt, this

18   call is March 12, 2012 it's at 5:26 p.m. and the transcript is

19   Government Exhibit 23.  The excerpt is on page five, starting

20   at line 18.  I think this excerpt, a little -- the audio volume

21   is not great.

22        (Audiotape played)

23   Q.   Fair to say that in those calls Mr. Bejaoui is correctly

24   giving the name of his, first name of his lawyer Lindsey?

25   A.   Yes.

C8DAABEJH                          Dr. First

1   Q.  And he's referring to a power that the lawyers actually

2   have, the power to compel witnesses to court in that last call?

3   A.  Yes.

4   Q.  And by the way you asked the defendant when you interviewed

5   him about how he could contact his attorneys, right?

6   A.  Right.

7   Q.  And you said the defendant told you he now depends on

8   lawyers coming to visit him in response, right?

9   A.  Cause he had lost their -- he had a piece of paper with

10  their number on it and he said he had lost it, yes.

11  Q.  He indicated to you that you now depend on the lawyers

12  coming to visit him, right?

13  A.  That is what he said, yes.

14  Q.  Now, as part of Georgia core competency test you asked the

15  defendant about the charges against him?

16  A.  Yes.

17  Q.  You wrote in your report with respect to the understanding

18  of the charges against him he has no understanding of the

19  charges, right?

20  A.  That's correct.

21  Q.  And you wrote that when asked about his charges all he can

22  discuss are the charges of sexual harassment?

23  A.  Correct.

24  Q.  And after you explained the charges in this case you said

25  he had no recollection, whatsoever, of being charged with

C8DAABEJH                          Dr. First

1    insurance fraud, right?

2    A.   That's correct.

3              MS. KOVNER:  If we could play February 9th at 7:48

4    p.m. and the transcript is Government Exhibit 11 and the

5    excerpt is going to be from page 6, line 22.

6              THE COURT:  Just a moment.

7              (Pause)

8              THE COURT:  Go ahead.

9              (Audiotape played)

10   BY MS. KOVNER:

11   Q.   Now, the defendant use the word "fraud."

12             MR. DRATEL:  Can we go to the next paragraph?

13             THE COURT:  Yes.

14             MS. KOVNER:  Your Honor, I'd ask that he do it on

15   cross.

16             THE COURT:  I take it your argument is that it's

17   incomplete without that paragraph, sir.  Mr. Dratel, is that

18   your argument?

19             MR. DRATEL:  Yes.  Most of the stuff I'll do on cross

20   because they appear on different pages.  This one is the next

21   paragraph.

22             MS. KOVNER:  It may take us a moment to queue that up.

23             THE COURT:  I understand.  Just let me look at it

24   before I rule on it.

25             (Pause)

C8DAABEJH                          Dr. First

1          THE COURT:  All right.  Mr. Dratel, you've read that

2    paragraph, the one as on page 4, line 7?

3          MR. DRATEL:  Yes.

4          THE COURT:  Is there anything in particular I need to

5    hear about the tone?

6          MR. DRATEL:  No, your Honor.

7          THE COURT:  All right.  I've read that.

8          Proceed, Ms. Kovner.

9    BY MS. KOVNER:

10   Q.  Dr. First, the defendant used the word "fraud" in this

11   conversation with his being moved to a federal place.  When you

12   asked him about the charges against him he didn't use that

13   word, right?

14   A.  No.

15   Q.  In fact, he talked about sexual harassment, right?

16   A.  That's correct.

17   Q.  Did you confront him with that inconsistency?

18         MR. DRATEL:  Objection, your Honor, as to form.

19         THE COURT:  I'll sustain it as to form.

20         But did you point that out to him?

21         THE WITNESS:  My -- when I discussed the charges I

22   always discussed it in terms of "insurance fraud", not just the

23   word "fraud".  So I guess, technically, you could say that they

24   used the word "fraud" out of context of what -- in fact, it's a

25   complicated issue of the insurance law.  Whenever I talked to

C8DAABEJH                        Dr. First

1    him about insurance he talks to me about, yes, I've brought

2    insurance.  I have car insurance.  I have auto insurance.  When

3    you put the word "insurance" fraud which is the actual charge

4    he doesn't understand that.  I've never independently said, oh,

5    well, on the one phone call you use the word "fraud".  I've

6    never actually said that.  But whenever I've discussed the

7    charge of insurance fraud he says he has no idea what I'm

8    talking about.  I don't remember that.

9    Q.  You didn't regard this call as creating a discrepancy or an

10   inconsistency that was worth addressing with him?

11   A.  No.

12   Q.  Let's talk about the third test that you gave.  Was it

13   impression screening test?

14   A.  It's not a screening test.  It's a test of symptoms for

15   depression.

16   Q.  Let me hand you what's been marked as Government Exhibit 41

17   for identification.  Is that the test you filled out?

18   A.  Yes, it is.

19              MS. KOVNER:  Your Honor, the government offers Exhibit

20   41.

21              MR. DRATEL:  No objection, your Honor.

22              THE COURT:  41 admitted.  Could you give me a copy of

23   it.  The book I think only goes up to 39.

24              (Government's Exhibit 41 received in evidence)

25              MS. KOVNER:  Your Honor, I think we got this last

C8DAABEJH                              Dr. First

1   night, so it wasn't included in the material.

2            THE COURT:  I don't mind.  I just need a copy.  41

3   admitted.

4   BY MS. KOVNER:

5   Q.  This is two pages, right?

6   A.  That's right.

7   Q.  And it does not include a malingering screening mechanism,

8   right?

9   A.  That's correct.

10  Q.  So the score that you calculate in this it's based on the

11  defendant's self-reporting, right?

12  A.  No.  It's not a self-report test at all.  It's a clinician

13  administered test, so it's based upon my clinical judgment of

14  the presence of, absence of the symptoms based on his

15  self-report and my observation.

16  Q.  So --

17           MS. KOVNER:  Excuse me one moment.

18           (Pause)

19  BY MS. KOVNER:

20  Q.  If you could just help to understand then, for instance, on

21  the first question which refers to sleep and onset of insomnia?

22  A.  Yes.

23  Q.  You gave the defendant two points on that question because

24  he takes at least 30 minutes to fall asleep more than -- and I

25  apologize -- more than some proportion of the time?

C8DAABEJH                        Dr. First

1   A.  That's right.

2   Q.  Hard for me to read exactly what proportion.  When you

3   scored that as two points was that based on the defendant's

4   self-report to you or based on something else?

5   A.  That was based upon his description of his sleep pattern

6   which I interpreted as that score.  It does not come from any

7   observation by anyone else, that is correct.

8   Q.  Are there other questions here that you answered based on

9   something other than his self-report?

10  A.  The psychomotor retardation.

11  Q.  Any others?

12  A.  The item about depressed mood is also based on how he

13  looked and his demeanor during the exam.

14  Q.  Did you credit all of the defendant's responses when he

15  answered the screening questions you asked with respect to this

16  test?

17  A.  Did I what?

18  Q.  Did you credit them?  Did you believe them?

19  A.  Yes.

20  Q.  Let me direct your attention to the 12 questions of

21  suicidal ideation.

22  A.  Yes.

23  Q.  And you gave the defendant three points for thinking about

24  suicide and death several times a day, is that right?

25  A.  That's right.

C8DAABEJH                     Dr. First

1    Q.  But you didn't recommend that the defendant be placed on

2    suicide watch, right?

3    A.  That is correct.

4    Q.  On your direct you described the defendant as not suicidal,

5    correct?

6    A.  That's correct.

7    Q.  You testified that you developed a, I think more detailed

8    screening test, the SCID test, correct?

9    A.  It's a test -- it's an interview which covers all

10   psychiatric diagnosis, that's correct.  That's correct, the

11   many or most of the major psychiatric diagnosis contained in

12   the diagnostic manual.

13   Q.  And you didn't formally go through that test with

14   Mr. Bejaoui?

15   A.  That's correct.

16   Q.  But you said you asked many questions parallel to the SCID

17   that he'd internalized?

18   A.  Also used the structure of the diagnostic logic in the

19   SCID.

20   Q.  Did you write in your notes of your meetings with

21   Mr. Bejaoui the meaning of the questions that you asked?

22   A.  No.  My notes were his answers.

23   Q.  Did you write all of his answers in your notes?

24   A.  As best as I could while paying attention to him and

25   writing things down.

C8DAABEJH                         Dr. First

1   Q.  The fact that you didn't write the questions that elicited

2   those responses makes it harder for somebody else to assess the

3   data that you produced, right?

4   A.  Yes, that's true.

5   Q.  You were aware in this case that malingering was a

6   significant diagnostic issue, right?

7   A.  Right.  Yes.

8   Q.  You were aware that a prior evaluator had concluded the

9   defendant's malingering at Butner?

10  A.  Yes.

11  Q.  Are you aware that Dr. Channel had concluded that and ruled

12  out diagnosis?

13  A.  Yes.

14  Q.  You were aware that the three tests we just described are

15  tests the defendant could deliberately flunk, right?

16  A.  Yes, I am aware of that.

17  Q.  Now you testified on your direct that you are aware of

18  tests for malingering, right?

19  A.  That's right.

20  Q.  And you said you didn't give those tests because you were

21  following the lead of Butner, right?

22  A.  Yes.

23  Q.  Are you aware of whether or not the defendant was willing

24  to cooperate with evaluators at his prior facilities when they

25  tried to give him tests?

C8DAABEJH                        Dr. First

1  A.  According to the notes at Butner that said he is not

2  cooperative.

3  Q.  Now, let's turn to some other ways of detecting

4  malingering.  You testified -- well, let me -- not certain but

5  would you agree that differences in how an individual presents

6  when he notices he is being observed versus when he doesn't

7  know are relevant to whether the defendant is malingering?

8  A.  Yes.

9  Q.  And when you listen to the defendant's prison calls in this

10  case you thought they provided evidence he was not malingering,

11  right?

12  A.  It provided mixed evidence.  I think it provided evidence

13  that his presentation during the mini exam was exaggerated and

14  also provided that he is not malingering psychotic episodes

15  that someone can have psychotic symptoms and be competent.

16  Q.  Right?

17  A.  Yes.

18  Q.  One of the calls you relied on in concluding that

19  malingering did not explain all of the defendant's symptoms was

20  a call where the defendant talked about his wife coming to

21  court, right?

22  A.  Yes.

23  Q.  Saying that he couldn't understand what was going on in

24  court, right?

25  A.  Right.

C8DAABEJH                        Dr. First

1   Q.  Are you aware that the defendant made a call after he had

2   been advised that he sounded different on his phone calls?

3   A.  He made that call about two months afterwards, so yes.

4   Q.  Are you aware that the defendant by the time of his phone

5   call --

6        MR. DRATEL:  Object to "aware" in the sense of

7   generally aware.  Did he -- did Dr. First inform him of that?

8        THE COURT:  No, I'll allow that.  "Did you know",

9   that's fine.

10  Q.  In fact you specifically informed him that he sounded fine

11  on his phone calls, right?

12  A.  During one session with him I pointed that out to him, yes?

13       THE COURT:  That's prior to the phone call that

14  Ms. Kovner is referring to now?

15       THE WITNESS:  During my direct I did -- I talked about

16  a phone call that is made, just a few in July.  There were

17  other -- I mean if you want, there are other, many other times

18  during, before, during the calls from Butner and Devens where

19  he said over and over again, I don't understand things.  He

20  didn't understand to -- he needed explanation.  Before I --

21  Q.  You mentioned this call on your direct?

22  A.  Yes.  Based upon that call, that call did occur after my

23  interaction with him in which I pointed out the interactions

24  with him, that's correct.

25  Q.  You pointed out in rejecting the diagnosis of malingering

C8DAABEJH                     Dr. First

1    from Butner that the defendant expressed delusions on some

2    calls, right?

3    A.  Yes.

4    Q.  And in other words, you believe he displayed genuine mental

5    illness on those calls?

6    A.  That is correct.

7    Q.  Fair to say that genuinely mental ill defendants can feign

8    incompetence?

9    A.  They can.

10   Q.  I am going to turn to some of the other considerations you

11   relied on in making your diagnosis.  In diagnosing Mr. Bejaoui

12   you relied in part on information about his past mental health

13   history that was provided by his wife, correct?

14   A.  That's correct.

15   Q.  And I think on your direct this morning you testified that

16   Mrs.~Bejaoui provided a fairly convincing history with regards

17   to her husband, correct?

18   A.  I was convinced, yes.

19   Q.  And you said on your direct that the most interesting part

20   of that history she provided was his history of paranoid --

21   writing a little hard to read but -- idealization?

22   A.  Ideation.

23        THE COURT:  Ideation.

24   Q.  And in your report you described it as quote, particularly

25   noteworthy, unquote, that the defendant had a premorbid history

C8DAABEJH                        Dr. First

1   reported by his wife of episodes of paranoia in which he felt

2   that people were watching him and following him, correct?

3   A.  Yes.

4   Q.  You knew that Mrs. Bejaoui had been interviewed on multiple

5   occasions before you interviewed her, right?

6   A.  Yes.

7   Q.  Are you aware that Mrs.~Bejaoui had told Dr. Channel her

8   husband had never had a significant history of mental health

9   problems?

10  A.  I don't know what -- I didn't see the notes of her phone

11  call with Dr. Channel, so I don't know what questions he asked

12  her.

13  Q.  Were you aware that that was what Dr. Channel reported in

14  his report?

15  A.  I am aware that Dr. Channel said that, yes.

16  Q.  Are you aware that she wrote a letter to the Court -- let

17  me --Are you aware that she wrote a letter to the Court in

18  which she said that Mondher entered the prison perfectly

19  healthy and now requires 11 narcotic medications?

20  A.  Yes.

21  Q.  Did you ask Ms. Bejaoui about why she had not apparently

22  reported these problems to the prior evaluators?

23  A.  I'll have to look through the record.  It is my impression

24  in the Butner record there was an acknowledgment that he had

25  treatment for depression and anxiety.  I am not the first

C8DAABEJH                          Dr. First

1    person that uncovered that, so I am sure of that.  I don't know

2    if it was Dr. Channel's report or in the Butner report but when

3    I spoke to her the part that I found from her that I had not

4    seen else where was the psychotic symptoms.  But the issues of

5    his depression anxiety and phobias, I read that in a couple

6    reports done by other people.  So I'm not the first person to

7    come up with that.

8    Q.  Yes, but focusing a moment on the paranoid symptom that

9    wasn't reported elsewhere, right?

10   A.  That's true.

11   Q.  And you didn't confront her with that lack of prior

12   reporting, right?

13   A.  No, I did not.

14   Q.  Did you identify in your review of material in this case

15   any evidence that Mr. Bejaoui had coached Mrs.~Bejaoui on what

16   to say?

17   A.  Coached her what to say to whom?

18   Q.  To evaluators.

19   A.  I am sure you'll show me what -- there's something --

20           THE COURT:  Don't worry about what's next.  The

21   question is simply --

22           THE WITNESS:  I do remember there's some statement

23   where he told her to be -- I don't know what he said.  He did

24   talk to her about "when you speak to doctors" or something.  I

25   don't remember what the content was.  But I do remember in all

C8DAABEJH                        Dr. First

1    of the review of all the case there was some interchange

2    between her and him about when you are speaking to the doctors

3    for Butner or Devens but I don't remember what it was.

4    Q.  Now, another factor that you placed some emphasis on in

5    your report is the fact that a reported fact that the defendant

6    had a schizophrenic brother, right?

7    A.  Tiny evidence, tiny emphasis but, yes, I feel that

8    noteworthy but I agree we have no corroborating information on

9    that.

10   Q.  I'll be specific about it.  On page 16 you say that the

11   history of symptoms -- do you have your report?

12   A.  Yes.

13   Q.  It's at the very top and the sentence starts on the prior

14   page but you are discussing how he would begin to have this

15   condition and you say, the history of such symptoms is that the

16   wife was reporting coupled with the reported family history of

17   a -- relative i.e. his brother's schizophrenia might explain

18   why Mr. Bejaoui would have developed psychotic symptoms in a

19   stressful environment such as incarceration.

20   A.  Correct.

21   Q.  But you testified about that evidence as contributing to

22   your diagnosis on direct as well, right?

23   A.  Exactly.

24   Q.  Now, the evidence supporting the conclusion that

25   Mr. Bejaoui had a schizophrenic brother is Mr. Bejaoui's own

C8DAABEJH                          Dr. First

1  statements, right?

2  A.  That's right.

3  Q.  And those statements are summarized on page two of your

4  report in the first full paragraph on page two?

5  A.  Yes.

6         THE COURT:  Is there any correlation in the medical

7  evidence between a sibling with schizophrenia and a sibling

8  with major depressive disorder with psychotic aspects?

9         THE WITNESS:  Yes.  There is -- it's turned out that

10  even though people with schizophrenic relative are at higher

11  risk of developing a major depressive disorder with psychotic

12  features as well as the other rule out diagnosis which is

13  schizo effect disorder and as well as bipolar disorder.  So

14  there is some risk when you have a schizophrenic relative.

15         THE COURT:  In siblings?

16         THE WITNESS:  Yes.

17         THE COURT:  But it's only his report.  You don't have

18  any independent knowledge about his brother's situation?

19         THE WITNESS:  No.

20  Q.  Are you aware that you only one of four evaluators who

21  interviewed Mr. Bejaoui to whom he reported that his brother

22  had schizophrenia?

23  A.  I believe there was another report that said he had a

24  brother, a sibling with I thought major mental illness.  There

25  was some question of a sibling being hospital -- I was the

C8DAABEJH                          Dr. First

1    first person who was able to actually get this specific report

2    of the story with the medication and he was institutionalized

3    back in Tunizia.  But I believe there's another report

4    somewhere that came up as a suggestion to when I saw it I said,

5    ah-hah this actually fits with what I had read before.  I

6    remember what I saw which is like oh, it isn't the first time

7    I'd seen this.  This echoes something so that some other

8    evaluator got in a different form that was less detailed.

9    Q.  It was your impression in this report that what Mr. Bejaoui

10   gave you was consistent?

11   A.  At least a report made to one other person.

12   Q.  You knew that Mr. Bejaoui told lies about his family,

13   correct?

14   A.  Yes.  Lot of confusion, so I assume some of it's lies, yes.

15   Q.  For instance, when you -- we can take a specific example in

16   this paragraph where you recounted the brother had

17   schizophrenia.  In the sentence before that one you recounted

18   the defendant as saying his mother had died in childbirth,

19   right?

20   A.  Right.

21   Q.  And you were aware that Mrs.~Bejaoui had explained that the

22   defendant had been married to her when his mother died, right?

23   A.  Actually, when I spoke to her she was confused.  She said

24   she's confused about whether this person who raised him for,

25   the aunt or the mother, so there's confusion on her part.  She

C8DAABEJH                        Dr. First

1   says, well, this is what I know and I don't know what the real

2   truth is.  So she -- there's confusion about that.

3   Q.  Were you aware that according to the Butner report she had

4   told the Butner evaluator that the defendant's mother had died

5   during the period they were married?

6   A.  I don't recall that.

7   Q.  The next sentence in this family history paragraph

8   describes the defendant having experienced repeated physical

9   abuse at the hands of his father, right?

10  A.  According to him, yes.

11  Q.  Were you aware that at least some of the reports of his

12  abuse were made up, right?

13          MR. DRATEL:  Objection.

14          THE WITNESS:  No, I am not aware of that.

15          THE COURT:  Just a moment.

16          THE WITNESS:  Are you referring --

17          THE COURT:  Just a moment, sir.  I will allow that.

18  The answer is he is not aware of it.  Next question.

19  Q.  Some of the things the defendant said to evaluators that

20  were not true included convincing details, right?

21  A.  Including what?

22  Q.  Convincing details, right?

23  A.  I am not sure what you are referring to.

24  Q.  Let me give a specific example.  The defendant described

25  under ECT, right?

C8DAABEJH                           Dr. First

1   A.  In the phone calls, yes.

2           MR. DRATEL:  Objection.  In what context on the phone.

3           THE WITNESS:  Actually, no, I don't know.

4           THE COURT:  I'll allow it.  Did the defendant ever

5   describe undergoing electroconvulsive therapy.

6           THE WITNESS:  Not exactly what he was talking about

7   the idea about -- okay.  He said, no, he did -- at one point he

8   said in Manhattan he had gotten another -- he implied a Devens

9   ECT.  That's true.

10  Q.  The account of ECT that he gave was so detailed that it ma

11  made you think that, perhaps, it happened at Butner, correct?

12  A.  No.  He actually was -- I believe he was implying that it

13  happened at Devens.  And another point to another person on the

14  phone calls he said it happened in Manhattan.  So what I,

15  actually, thought was he was confused that it may have happened

16  at Rikers.  But since we didn't have the records at Rikers it

17  was an open question.  But I thought it was more than possibly

18  that ECT because we know that there's a psychiatric history at

19  Rikers for which the records weren't available.

20  Q.  Let me break this up a little bit.  You found the account

21  of ECT sufficiently compelling that you thought he may have

22  received a ECT?

23  A.  Absolutely.

24  Q.  Did you see any evidence in the medical records you

25  reviewed that he had received ECT?

C8DAABEJH                       Dr. First

1    A.  No.  Neither Butner or Devens, none, no.

2              THE COURT:  And you had none for Rikers?

3              THE WITNESS:  None for Rikers.

4    Q.  Now, one of the reasons that you rejected the conclusion of

5    malingering that the evaluators at Butner drew was that you

6    found that there wasn't an external motive that would explain

7    the malingering, right?

8    A.  Certainly.  Again, the word "malingering" is confusing

9    because apparently the claim at Butner is he has malingered in

10   many different things, including the wheelchair use, the pain,

11   the disability, so --

12   Q.  Let me then -- let me narrow it.  One reason you rejected

13   the conclusion that he was, in fact, competent to stand trial

14   but was pretending not to be was that you couldn't find

15   external motives that was plausible and could explain it,

16   right?

17   A.  Exactly.  It would explain this specific aspect of the

18   malingering.

19   Q.  For example, you were on page 17 in the evaluation from FMC

20   Butner, no evidence or even hypotheses are offered to see what

21   possible motivation Mr. Bejaoui might have had or feigning his

22   physical, psychological symptoms to the point where he would be

23   rendered indefinitely incompetent for trial and sent to a

24   facility hundreds of miles away from his friends and family for

25   months on end in order to be evaluated and restored to

C8DAABEJH                          Dr. First

1   competency.  He has already served more time in detention than

2   he would face in sentencing, a fact that his attorneys and his

3   wife have attempted to communicate with Mr. Bejaoui but to no

4   avail, right?

5   A.  Yes.

6   Q.  If the defendant did have an external motive to malinger

7   and to malinger in this particular way, that would be a

8   relevant analysis of whether Butner conclusion was correct,

9   right?

10  A.  There was a clear motive that would be clearly relevant.

11  Q.  That motive would make it more likely that the defendant's

12  pain -- and generally being incompetent?

13  A.  Depends on the clarity of the motive, yes.

14  Q.  Sufficiently clear motive?

15  A.  If there was like, for instance, let's say a hypothetically

16  I discovered that there was evidence he had killed somebody and

17  he was running from the law and it was safer to be in the

18  prison, something like that, I could imagine a circumstance

19  where you could concoct a scenario where it might have made

20  sense for him to be malingering.  It would be better for him to

21  be where he is now than to be out.

22  Q.  But didn't see motive like that in this case?

23  A.  No.

24  Q.  And that was a factor?

25  A.  That is correct.

C8DAABEJH                        Dr. First

1            MS. KOVNER:  No further questions.

2            THE COURT:  Thank you.  Any redirect?

3            MR. DRATEL:  Thank you, your Honor.

4            THE COURT:  Is the government postulating a motive for

5    malingering?  What's the government's theory for a motive for a

6    malingering?

7            MS. KOVNER:  Your Honor, I think there are several.  I

8    think the immigration motive is present here.  The defendant

9    has been told in court in proceedings during which he appeared

10   fully engaged that deportation is a likely consequence of a

11   felony conviction.

12           THE COURT:  When was that?  In this case?  In U.S.

13   versus Bejaoui here?

14           MS. KOVNER:  Yes, your Honor.  We had a bail

15   proceeding before you.  This was early on in the case when

16   Mr. Bejaoui was quite engaged.  And one of our principle

17   arguments for detaining the defendant was this is a defendant

18   who's likely to be deported upon completion of his sentence.

19   And he discusses immigration in phone calls both with his wife

20   and with others.  This is something that's on his mind, I think

21   for a good reason if he is a person who's been here for a long

22   time and will be deported to Tunizia.  So I think that's the

23   principle motive.  I also think the --

24           THE COURT:  Although, one can question whether

25   somebody in that mine would rather be in a federal medical

C8DAABEJH                            Dr. First

1   facility than opposing deportation.

2              MS. KOVNER:  I imagine it would differ from individual

3   to individual depending where you are going back to what your

4   relationship is to that country.

5              THE COURT:  Is there anything else?

6              MS. KOVNER:  Yes, your Honor.  The defendant is

7   charged with a serious fraud.  The loss amount in this case is

8   significant.  I think the idea that the defendant will

9   inevitably receive a sentence of time-served were he to go to

10  trial and be convicted or enter a plea of guilty.  I don't

11  think that's inevitable.  It's certainly something that there

12  is no promise about up front.  So I do think a defendant could

13  reasonably be afraid of what sentence he would receive.

14             MR. WILSON:  If I could just add one point?

15             THE COURT:  I don't know about double teaming, but go

16  ahead.

17             MR. WILSON:  Just because we were so far apart.  The

18  one point I would just add is the defendant may very well not

19  expect to be in a prison hospital forever.  He will hope that

20  this case will ultimately be dismissed on a number of grounds

21  available.  Then he will spend a short time in federal prison

22  versus a lifetime in Tunizia.

23             THE COURT:  All right.  Thank you.  Redirect?

24  REDIRECT EXAMINATION

25  BY MR. DRATEL:

C8DAABEJH                    Dr. First - Redirect

Q.  Doctor, given your expertise go back to the beginning in
terms of forensics, do you feel that -- do you feel qualified
that make a diagnosis and report in this case?
A.  Yes, I do.

        THE COURT:  Your report concludes, if I remember
correctly, that within a reasonable degree of medical
certainty -- let me get the exact words -- that Mr. Bejaoui's
disorder, mental disorder, namely, his major depressive
disorder with psychotic features grossly interferes with his
ability to understand the nature and consequences of legal
proceedings before him or to properly assist in his defense,
using the definition that we start off with and thus he is not
currently competent to stand trial.  Can you give a number to
the percentage to the reasonable degree of medal certainty with
which you've reached your conclusion.

        THE WITNESS:  First of all, with respect to the actual
statement itself there are two components, the ability to
understand the nature and consequence of legal proceedings and
to properly --

        THE COURT:  "Or".

        THE WITNESS:  Or to properly assist.  My belief all
along is that to properly assist in the defense which has been
that's the reason why his attorneys sought the help of a
psychiatrist in the first place.  It became impossible to work
and completely impossible to provide any assistance in his

C8DAABEJH                         Dr. First - Redirect

1    defense and I believe that that is a direct result of his

2    mental disorder.  So I would say that -- I would say within 70,

3    80 percent, certainly, that this is true with that component.

4              THE COURT:  Properly assist in his defense?

5              THE WITNESS:  Yes.

6              THE COURT:  What about the other --

7              THE WITNESS:  The ability to understand is, I feel, a

8    little less confident because of the -- that's where the

9    confusion about the phone calls makes a little bit more

10   unclear.  And I agree that some of the statements in which he

11   talked he seems to understand some aspects of legal

12   proceedings.  At least in the phone calls at that moment in

13   time it does raise a question about what his understanding is

14   at other times.  One can, certainly, have his in the same way

15   he does not do well dealing with physicians and other

16   healthcare professionals, he doesn't interact well with the

17   lawyers either.  I have a suspicion.  We have that actually on

18   the tapes where he feels that his lawyers are lying to him.  I

19   think some of the paranoia that applies to the doctors also

20   apply to those lawyers.  So I think there's similar

21   interactional problem and he seems to fall apart in dealing

22   with the lawyers.

23             So whether it's -- how much of it's an inability to

24   understand the proceeding versus that gets played out when he

25   deals with his lawyers more so than when he speaks to his wife

1    or his friend on the telephone but -- so it's a little cloudy

2    to what he actually understands given to the confusion.  But I

3    have very little doubt about his inability to properly assist

4    in his defense

5              THE COURT:  Thank you.

6              MR. DRATEL:  Thank you, your Honor.

7    Q.  With respect to the tests you went through and Ms. Kovner

8    took you through some of the test and with respect to the

9    malingering you pointed out earlier that Butner didn't do any

10   malingering tests, right?

11   A.  That's right.

12   Q.  And they didn't do any of the other tests that you did

13   perform, right?

14   A.  That's right.

15   Q.  I want to talk to you about some of these telephone calls

16   that were -- if you -- do you have it in front of you?

17   A.  I don't have any copy.  I don't have page numbers on it.

18   Q.  I'll try to -- do you have my Government Exhibit number?

19   A.  I have my own copy.  I have the one that I just got from

20   the state yesterday.

21   Q.  Let's try March 3rd at 5:41.

22             THE COURT:  Do you have a Government Exhibit?

23             MR. DRATEL:  I think it's Government Exhibit 19, I

24   believe.

25             THE WITNESS:  March 3, 5:41, what page?

C8DAABEJH                          Dr. First - Redirect

1   BY MR. DRATEL:

2   Q.  Okay.  You were asked, this is where he spells Dr. Herbel's

3   name.

4   A.  I see that, yes.

5   Q.  At pages two?

6   A.  Three and four.

7   Q.  You were asked about that and that was played for you.

8   Let's look at page three, in that large paragraph in the middle

9   of the page.

10  A.  Yes.

11  Q.  And could you read that one for us?  We'll save time if you

12  could read that one for us.

13  A.  Sure.  One, two, three, four, five.  That way you can save

14  it.  You know what to do with the paper that has --

15          THE COURT:  Where are you?

16          THE WITNESS:  Line 11.

17          THE COURT:  Yes, I see.

18          THE WITNESS:  It has everything from the day they lie

19  about me but I can't read them Maria.  I don't know how to

20  concentrate any more.  I can't think and I think they are going

21  to do something to me.  The other thing I want tell you about

22  and I want you to please remember it.  They are trying to

23  take -- they claim they are going to take me to MRI.  They were

24  not taking me to MRI.  I know what they are going to do.  They

25  are going to drug me like they did in Manhattan and they are

C8DAABEJH                          Dr. First - Redirect

1   going to give me something called electrical current,

2   electrical current.  Okay.  I am it now, electrical compulsive

3   shocks.  They are going to try to agitate my brain so they are

4   going to make me like the other one they did in Manhattan.  One

5   week and I couldn't even remember my name.  One week and I

6   couldn't remember my own name they.  Were trying to do it here.

7   The doctors speak to you.  He lied to me.  He told me no.  You

8   go for MRI.  Bullshit.  He's not taking me MRI.  They are

9   taking me for something call ECT.  They are going to shock my

10  brain with electrodes.  This is going to happen to me sometime.

11  I am going to refuse but in case they drug me or anything like

12  that, if you don't hear from me this is what happened to me.

13  Q.  Now, can you look at one part of that conversation without

14  looking at this part of the conversation before you drew a

15  conclusion about whether someone is suffering from a mental

16  disorder or whether they're malingering?

17  A.  Right.  That is -- my feeling is you have to put the two

18  together.

19  Q.  You can't look at one just select one and draw a conclusion

20  from that without looking at the whole?

21  A.  Yes.

22  Q.  And by the way, this is the conversation and the passage

23  that you talked about earlier in a much later cross about his

24  reference to Manhattan in the context of electro convulsive

25  therapy?

C8DAABEJH                      Dr. First - Redirect

1    A.  Right.

2    Q.  Is this an indication of paranoia?

3    A.  Absolutely.

4    Q.  And he is talking to his wife, right?

5    A.  That's right.

6    Q.  This is pretty heavy duty paranoia?

7    A.  I'd say he's delusional and he is convinced this is going

8    happen and he's frightened.

9    Q.  Next, let's look at Government Exhibit 23.  That's March

10   12th at 5:26 p.m.

11              THE COURT:  Is this before you --

12              THE WITNESS:  These are all before the time I told

13   him.

14              MR. DRATEL:  These are all Butner calls, your Honor.

15              THE COURT:  It was after he left Butner?

16              THE WITNESS:  Yes.

17              THE COURT:  You didn't see him down at Butner.  It was

18   only after he was transferred from Devens to Butner down here?

19              THE WITNESS:  Yes.  March 1.

20   Q.  Yes.  You were asked about the immigration, right, on page

21   two about Dr. Herbel calling about immigration status, the

22   first paragraph?

23   A.  Yes, I see it.

24   Q.  OK.  Look at page three, line 14.  If you could read that

25   paragraph.  This is Mr. Bejaoui with his wife, right?

C8DAABEJH                         Dr. First - Redirect

1   A.  Right.  I am not taking the medicine any more, not taking

2   their medicine.  They are going to poison me.  I am not eating

3   their food because they are going to poison me.  The doctor

4   said he is going to railroad me.  I am scared to be here,

5   Maria.  I am scared.

6   Q.  Can you look at one section of this call without looking at

7   the other section and drawing a conclusion about whether

8   Mr. Bejaoui suffers from the disorders that you diagnosed?

9   A.  No, you can't.

10  Q.  Then in the sense by choosing one and ignoring the other --

11  by choosing one and not addressing the other is kind of

12  replicating what Butner did in its report?

13           MS. KOVNER:  Objection.

14           THE COURT:  Sustained.

15  Q.  Now, let's look at Government Exhibit 7 which is January

16  29.  There are two calls on the 29th.  This is the second one

17  at 6:16.

18  A.  Okay.

19  Q.  Now on page 5 that first large paragraph starting at line

20  7.

21  A.  Yes.

22  Q.  He's talking about me, right, he is talking about his

23  lawyer visiting him?

24  A.  Yes, that's right.

25  Q.  He's relating a conversation that he says that we had,

1   right?

2   A.   Yes.

3   Q.   That have some elements of paranoia in it?

4   A.   What line are we on?

5   Q.   Line 7, on page 5 nothing, absolutely, nothing?

6   A.   Nothing, absolutely, nothing.

7   Q.   Is there some distrust of the lawyer in that paragraph?

8   A.   Only his concern about, yes, his distrust of the lawyer.

9   Q.   Okay.  And the page before starting at line 33 where it

10  says, I know because you know me from way, way before these

11  people get into my life and ruin my life and now they're

12  sitting there laughing at me.  You are not better than me to

13  sit there laughing at me knowing that you ruined my life.  How

14  would you interpret that in terms of his -- what does that say

15  to you as a diagnosis?

16  A.   Elements of paranoia also very typical.  If it were my

17  diagnosis about the psychotic features and depression with this

18  idea you are being made fun of and laughed at has been a -- of

19  what he talked about being laughed at and being called names.

20  Q.   Would this exist whether or not he's actually called names

21  or being laughed at?

22  A.   Right.  There is still no reason to believe he is being

23  called names.

24  Q.   February 10, 2012, I don't have the Government's Exhibit

25  number, unfortunately, on this one.

1    MR. WILSON:  I think it's 12.

2    Q.  Okay.  You were asked about on page 4, if you look at line

3    21 you were asked about May 15th that he knew the date that

4    he -- that that date is the date that marks his first day in

5    prison, right?  You were asked about that?

6    A.  Exactly.

7    Q.  Let's look at page 3.  I am sorry, page two line 19.

8    A.  Right.

9    Q.  I'll read.  This is Mr. Bejaoui speaking to his wife again.

10   I am really convinced that these people -- they wanted to kill

11   me because of the things I know and the mathematical algorism

12   and all that stuff.  But, hey, I'll tell you, the point is a

13   lady when she gets the phone call Monday thinks that she can

14   tell you her husband that she doesn't understand him any more.

15   You understand the handwriting is different.  Things are very

16   different.  You follow me?  Maria.  No.

17          Now, can you separate that part of the call from

18   another part of the call in making your evaluation as to

19   whether or not Mr. Bejaoui suffers from some mental disorder?

20   A.  Absolutely not.  This quote here is one of the more cogent

21   ones.  Well, what he is referring to is the whole delusional

22   system had come up around that time about mathematical

23   algorithms.  The fact that he is saying this to his wife and

24   she has no clue what he's talking about.  And this is -- he had

25   mentioned some of this to his evaluator.  And this was

C8DAABEJH                        Dr. First - Redirect

1    dismissed as malingered psychosis because it would seem to be

2    too bizarre and yet he is mentioning the same thing to her and

3    she is totally perplexed about what's going on which would be

4    very typical for somebody with a psychotic symptom to talk

5    about it with anyone because there is really -- on his mind.

6    So I think this is a classic example of the psychosis being

7    recorded in a sitting where he is unaware that it's being

8    recorded to his wife for no other possible reason that this is

9    an experience that he is experiencing and he is having it with

10   his wife.

11   Q.  Okay.  Now, this is before you ever met, right?

12   A.  Yes.

13   Q.  This is before the Butner report was ever completed, right

14   this is February of 2012?

15   A.  Correct.

16   Q.  This is within roughly ten to 12 days of him arriving at

17   Butner?

18   A.  Yes.

19   Q.  This is already around the time that if you need to

20   reference on June 14 of the Butner report, this also around the

21   time that he was discontinued on risperidol?

22   A.  Right.

23   Q.  Let's look also at same call on page 5 line 14 the last

24   sentence, Mr. Bejaoui, talking to his wife February 10, 2012.

25   I was taking pain medicine because I've always suffered from it

C8DAABEJH                    Dr. First - Redirect

1    and I don't want people to ask me about my pain because it

2    reminds me of my childhood.  Can you look at those kinds of

3    statements -- rather, can you look at any of the other parts

4    without looking at the whole of the conversation?

5    A.  No.  That's a very relevant statement to understand how he

6    thinks.

7    Q.  Let's look at Government Exhibit 15 which is February 17 at

8    7:55 I think it must be p.m.

9          Okay.  You were asked about this conversation on

10   cross-examination, right?  This is one of the ones.  But if you

11   look at page 2 line 34 and he says to his wife again at Butner.

12   She says, how are you feeling?  Line 32, line 34, his answer,

13   so-so, not very good but it's okay because the medication makes

14   me sometimes forget things.  So I brought you an information

15   but I wanted to confirm it.  Again, can you look at a

16   conversation in its entirety -- rather, can you look at

17   conversation in isolation without looking at the other elements

18   of the conversation to form a diagnostic opinion?

19   A.  No.

20   Q.  And does that statement to his wife support some sort of

21   cognitive impairment?

22   A.  Absolutely.  It may be a question of it's to the extent

23   that shows up on the mini mal test status but that, certainly,

24   and conditions where he is not aware of being observed as

25   evidence of a reported cognitive impairment.

1    Q.  Now, when you do a diagnosis, when you interview a patient

2    are you able to read his or her mind?

3    A.  I, certainly, wish I could but I can't.

4    Q.  Move on to Government Exhibit 16.  That's February 22.

5    Okay.  You were asked about the -- that he knew it was Lindsey

6    was his lawyer, right, or one of hits lawyers?

7    A.  Yes.

8    Q.  He doesn't mention that there's another lawyer as well,

9    does he?

10   A.  No.

11   Q.  Primary lawyer, right?

12   A.  Right.

13   Q.  And I am not going to go through them with you but you

14   mentioned in your direct and just there are other -- there are

15   many other instances in these phone calls where he says the

16   lady lawyer or he is unable to name her?

17   A.  That's right.  The majority of time that's the case.

18   Q.  There are other times they call her Linda and Laura.  They

19   have a different "L" names for her.  Do you recall that?

20   A.  No.  I -- actually, I'm not sure about that.

21   Q.  Also Mrs.~Bejaoui is in contact with Lindsey, correct?

22   A.  Yes.

23   Q.  So she is mentioning the name as they go through these

24   conversations as well?

25   A.  Repeatedly, yes.

C8DAABEJH                          Dr. First - Redirect

1    Q.  Government Exhibit -- February 9, 7:48.  I don't know the

2    precise exhibit number.

3               MR. WILSON:  11.

4               MR. DRATEL:  Thank you.

5    Q.  That's the one about the fraud that he mentions fraud.  We

6    know from the Butner report that he is confronted with that by

7    the people at Butner who said you are indicted for fraud,

8    right?

9    A.  Right.

10   Q.  So he is just essentially repeating what he was told by

11   them?

12              THE COURT:  Try not to lead quite so much.

13              MR. DRATEL:  All right, your Honor.

14   Q.  Is it --

15   A.  He certainly heard people have brought up the idea of

16   insurance fraud many, many times.  So it's possible he could

17   be -- it back.  So it's possible they said fraud.  There's

18   still no indication that he actually understands what that

19   means.

20   Q.  Also is it -- does that -- well, you answered that question

21   with that.  It doesn't -- I'll withdraw that question.

22              By the way, is there anything else in the

23   conversations where he suggests that he does understand what

24   that means from your recollection?

25   A.  No, never.

C8DAABEJH                      Dr. First - Redirect

1   Q.  All right.  In that same conversation where he mentioned

2   the word fraud, let's look at page 4, line 16.  He says they

3   want to kill me, yeah, they want to kill me over here.  That's

4   what they planning to do but it's okay.  You tell them whatever

5   you now know.  Whatever you know just tell them.  Remember that

6   people are not fair, you know.  Then -- well, you were read

7   that cover up and then if you look before that cover up

8   paragraph right page 22 that was played -- I'm sorry.  Page 6

9   line 22.

10  A.  Yeah.

11  Q.  That was played for you, right, they want to cover up,

12  Maria, they want to cover up.

13          THE COURT:  Yes, that was played.

14  Q.  But if you look above that on line 14 there's a paragraph.

15  And if you look at the last sentence of that Mr. Bejaoui

16  telling his wife, I don't remember what's going on any more.  I

17  have memory issues right now that's stopping me from protecting

18  myself.  Can you look at the conversation one piece without

19  looking at that as well?

20  A.  No, not at all.

21  Q.  Now your conclusions in your report and your testimony

22  today based on two tests, the MME and the Georgia competency

23  test.

24  A.  Those were used in my conclusions.

25  Q.  Is that what your conclusions are based on?

1    A.   In part.

2    Q.   What else are your conclusions based on?

3    A.   Based on the clinical evaluation over five interviews, a

4    review of all the records and among the most important elements

5    was the tapes.  I agree with the government that the tapes are

6    very valuable as a way of being able to parcel out what, how

7    else one presents when they are not aware of they are being

8    looked at where shall I find the tapes very important.

9    Q.   But would you base your conclusions solely on those tests?

10   A.   No, not at all.

11   Q.   And you factor into your conclusion that those tests are

12   not malingering?

13   A.   Exactly, yes.  When I got them the MME status I, certainly,

14   didn't believe that this was an accurate reflection of his

15   cognitive function at the time of my interaction.

16   Q.   Now, you were asked about looking at the Butner report and

17   that it concluded that Mr. Bejaoui was malingering.  But you

18   also had other reports all of which were --

19   A.   Independently --

20   Q.   They all reached conclusions that is the same as yours?

21   A.   That's right.

22   Q.   Now, was there anything in the conversation since his

23   return to MDC that changes your conclusions?

24   A.   You mean in the more recent?

25   Q.   Yes.

C8DAABEJH                     Dr. First - Redirect

1    A.  Material that I just got, the tapes.

2    Q.  Yes.

3    A.  No.

4    Q.  Is it pretty much the same?

5    A.  It is, yes.  I think on both sides it shows that he

6    continues to sound different on the telephone than he does to

7    me in person and it continues to show evidence of paranoia and

8    psychosis in the content of the calls.

9    Q.  And you -- it's still the same two people, his wife and

10   friend Riatt?

11   A.  Actually, the calls are in Arabic but I assume that it

12   is -- that's who it was.

13   Q.  Now, is there any evidence in anything you've seen that

14   suggests that Mr. Bejaoui coached Mrs.~Bejaoui on describing

15   his medical history or his mental health history?

16   A.  No.  I've seen absolutely no evidence to support that

17   contention.

18   Q.  And if he were malingering -- withdraw that and rephrase it

19   another way.  He has been in this shape, in this condition for

20   about 18 months now, right?

21   A.  Yes.

22   Q.  And about six or eight months into it, maybe even more

23   interview by Devens she doesn't mention paranoia and being

24   followed, right?

25   A.  That's correct.

1    Q.  And if she'd been coached to help with his malingering

2    wouldn't it be logical that she would have volunteered that?

3    A.  Yes.

4              MS. KOVNER:  Objection.

5              THE COURT:  Sustained.  I'll disregard the answer.

6    Q.  If someone was coaching someone to help them malinger, in

7    your experience don't they volunteer information --

8              MS. KOVNER:  Objection.

9    Q.  -- at the first opportunity?

10             THE COURT:  Just a moment.  I don't know how he is

11   capable of answering.

12             You may answer.

13             THE WITNESS:  Could you repeat the question?

14             MR. DRATEL:  Could I have it read back?

15             THE COURT:  Yes.

16             (Question read back)

17   Q.  The person who is being coached?

18   A.  Yes, I would think so.  Yes, that would be the most helpful

19   way to do it.

20   Q.  To --

21   A.  To volunteer.

22   Q.  Do you have the Devens report in front of you?

23   A.  No, I don't.

24             MR. DRATEL:  May I approach, your Honor?

25             THE COURT:  Yes.

C8DAABEJH                      Dr. First - Redirect

1    Q.  Page 4 --

2              THE COURT:  How much longer do you have?

3              MR. DRATEL:  Not much, couple minutes.  May I ask from

4    here, your Honor?

5              THE COURT:  Yes.

6    Q.  On page 4 at the top of the paragraph that continues from

7    page three we can look at page three to the bottom and see that

8    it's an interview with Maria Bejaoui.  And it says that she

9    reported he was reportedly participating in treatment.  I am

10   sorry.  Let me start again.  Really covers from the previous

11   page.  However, when they met he was reportedly participating

12   in treatment with medication and therapy for anxiety,

13   claustrophobia, and difficulty sleeping.  So that's where you

14   got that?

15   A.  Thank you for pointing that out.  That's exactly where I

16   got this from.

17   Q.  Now, we talked on direct about malingering as well?

18   A.  Yes.

19   Q.  Is it your experience that sometimes family members,

20   immediate family members malinger well along with the patient?

21   A.  Absolutely.  It's very stigmatizing to have a family member

22   with mental illness to admit to that.  People are often in

23   denial about the presence of mental illness in themselves and

24   their family.  So malingering well, it can be a conspiracy of

25   malingering well.

C8DAABEJH                        Dr. First - Redirect

1   Q.  And is it also why you ask more questions and probe history

2   because people don't volunteer these things?

3            THE COURT:  Sustained.

4   Q.  In your experience is it necessary to ask questions and

5   probe to get a accurate and complete history from family

6   members who might otherwise be in denial?

7   A.  Absolutely, yes.

8   Q.  Now, you were asked about the brother, Mr. Bejaoui's

9   brother and whether there's any evidence about the fact that

10  that might independently corroborate what he told you?

11  A.  That's right.

12  Q.  Now, again, he mentioned that his brother -- he said that

13  his brother had died from diabetes because of taking

14  antipsychotic medication, risperidol, correct?

15  A.  That's what he told me.

16  Q.  That is one of the side effects, potentially?

17           THE COURT:  Diabetes, not dying.

18           MR. DRATEL:  Right, diabetes.

19           THE WITNESS:  Diabetes.

20  Q.  And if some one were malingering would the first time -- in

21  your opinion professionally, in your experience would someone

22  who is malingering raise this for the first time only upon

23  being probed by the fifth or sixth or seventh or eight doctors

24  who examined him?

25           MS. KOVNER:  Objection.

C8DAABEJH                           Dr. First - Redirect

1          THE COURT:  I'll allow it.

2          THE WITNESS:  Doesn't make sense.  For it to come out

3   at this point in time if somebody was willfully trying to paint

4   a picture for themselves, that would be the kind of thing he

5   would be consistently saying from the very beginning.  As I had

6   mentioned, to get that piece of history required a real effort

7   on my part to try to find out why he was so reluctant to share

8   his hearing voices and his fear of taking medication.  So it

9   was an effort to get that out.  If somebody were malingering

10  that would have been volunteered a long time ago if he was

11  saying that simply for the purpose trying to make it look like

12  he had an illness as well.

13         MR. DRATEL:  Thank you.  Nothing further, your Honor.

14         MS. KOVNER:  Briefly, your Honor.

15  RECROSS EXAMINATION

16  BY MS. KOVNER:

17  Q.  Mr. Dratel asked you a few questions about coaching.  Do

18  you recall that?

19  A.  Yes.

20  Q.  If there were evidence of coaching, that is, evidence that

21  Mr. Bejaoui was coaching his wife about what answers to give to

22  evaluators would that be relevant to an analysis of whether

23  he's malingering?

24  A.  Because as I mentioned earlier I have some recollection

25  that he said something to her about when she spoke to the

1    doctors.  I don't believe it was coaching but I guess I am

2    willing to enter.  Yes, if there was someone that was clearly

3    coaching it could be definitely relevant.

4    Q.  And there was back and forth between you and Mr. Dratel

5    about risperidol.  The defendant was taking risperidol,

6    correct?

7    A.  Yes.

8    Q.  I'm not going to go through all of the calls but I do want

9    to hit a theme, perhaps.  And let me use Government Exhibit 12.

10   Do you have that?  It's the February 10 call.  It's at 5:47.

11   And Mr. Dratel went over two passages with you.

12          The first passage is on page two and it starts out, I

13   am really convinced these people, they want to kill me because

14   of things that I know and mathematical algorithm and all that

15   stuff.  Then it goes on, the point is the lady when she gets

16   the phone call thinks he can tell her husband she don't

17   understand him any more.  The handwriting is very different in

18   that passage?

19   A.  Yes.

20   Q.  And you thought this passage as significant and some of

21   other passages Mr. Dratel read because it showed Mr. Bejaoui

22   was having delusions or articulating delusions, not just with

23   evaluators but also with his wife, right?

24   A.  That's right.

25   Q.  You saw sort of lack of external motivation for him to

C8DAABEJH                           Dr. First - Recross

1   articulate those calls with his wife, right?

2   A.  Certainly, this one in particular, yes.

3   Q.  No reason why he would say that?

4   A.  Start being gibberish to her in this call.  I don't see any

5   possibility.

6   Q.  This call was before you told Mr. Bejaoui you had listened

7   to his calls, right?

8   A.  That is correct.

9   Q.  And that was significant in, as to whether Mr. Bejaoui

10  would have had a reason to malinger on this call, right?

11  A.  That's true.

12  Q.  Do you know if Mr. Bejaoui had been told previously that

13  his calls were monitored?

14  A.  I assumed that when people go to the prison they must get a

15  sheet of paper they're explains that.  I can't imagine the

16  government would keep that a secret to the inmates.  So assume

17  in that context probably, yes.

18  Q.  Do you know if signs are posted in the area where calls

19  made indicating that calls are monitored?

20  A.  I've never been in that area but I would not be surprised

21  if that were true.

22  Q.  One feature of this passage that pointed out is significant

23  is that Mr. Bejaoui is making these statements and his wife is

24  indicating that she can't understand them, right?

25          MR. DRATEL:  Objection, your Honor.  I am not sure

C8DAABEJH                           Dr. First - Recross

1   which passage I'd like just to -- if Ms. Kovner could

2   identified.

3           THE COURT:  We've seen a couple of ones.  Go ahead.

4   BY MS. KOVNER:

5   Q.  That was significant to your interpretation of what's going

6   on here.  And talking, specifically, about page two line 19 I

7   guess through the bottom of the page.

8   A.  I am sorry.  I got sidetracked.  What was the question

9   again?

10  Q.  Sure.  Is this is February 10?  It's page two.  And one of

11  the features you commented on was that Mr. Bejaoui's wife does

12  not understand what he is saying and that that was significant

13  in your interpretation of how he is manifesting, generally,

14  psychotic symptoms?

15  A.  It appears to, yes.  I don't understand what you are saying

16  either.  Neither does she actually hear the call.  It is like

17  what are you talking about is the tone of voice.

18  Q.  That was significant that you couldn't understand and she

19  couldn't understand it?

20  A.  Right.  I can't understand why he would say this to her

21  other than because he needed to communicate something that made

22  no sense.

23  Q.  Okay.  And let me go to the page five which is the other

24  passage in this call that Mr. Dratel pointed out where he says,

25  I am a stupid man but you know you can't blame me.  I was

C8DAABEJH                        Dr. First - Recross

1  taking pain medication.  I did not tell you bout it.  I was

2  taking pain medicine because I've always suffered from it and I

3  don't want people to ask me about my pain because it reminds me

4  of my childhood.

5  A.  I see that.

6  Q.  That passage was significant because Mr. Bejaoui was

7  reporting this pain complaint in a context where you didn't see

8  an incentive for him to make it up, right?

9  A.  Actually, Mr. Dratel -- I am not sure.  I wouldn't come

10  that conclusion.  I didn't find that that particularly

11  significantly other than the fact that it illustrated the fact

12  that he doesn't -- it's almost like malinger well.  He likes

13  not to talk about.  I assume the point Mr. Dratel is making

14  that this was an example of how he actually doesn't like to

15  talk about his pain rather than like to go talk about it all

16  the time.  I didn't see this as having anything to do with

17  whether that recorded phone call or not.  To be honest, I want

18  sure he when he did that, I hadn't highlighted a lot of these

19  things that I felt were evidence of psychosis on the phone

20  call.  That wasn't one of the ones I had highlighted.  So I

21  wouldn't take that as evidence to fit into that hypothesis that

22  I had been making.

23  Q.  The significance of this passage you see that's been

24  evidence of malingering well, that is pretending to feel --

25  A.  It shows that he doesn't always, his style that sometimes

C8DAABEJH                        Dr. First - Recross

1  he would like to not tell people about.  That was my

2  understanding.

3              MS. KOVNER:  Nothing further.

4              THE COURT:  All right.  Thank you.  You may step down.

5              Next witness for the government.

6              MS. KOVNER:  Your Honor, we discussed briefly with

7  Mr. Dratel at the break because Mr. Cochrane has a plane flight

8  we were hoping that it would be possible, and I think

9  Mr. Dratel has no objection, to put on Dr. Cochrane before the

10  second defense witness or the possible second defense witness.

11              THE COURT:  All right.  You want to take him out of

12  order?

13              MR. DRATEL:  Yes.  Fine.

14              MR. WILSON:  The government calls Dr. Robert Cochrane.

15              THE COURT:  First witness was the witness for the

16  defense.  The second is a witness for the government.

17              MR. WILSON:  Your Honor, at the witness' request we

18  could take a two minute break for the restroom.

19              THE COURT:  Of course.  Let's take five minutes.

20              (Recess)

21   DR. ROBERT EARL. COCHRANE,

22       called as a witness by the Government,

23       having been duly sworn, testified as follows:

24  DIRECT EXAMINATION

25  BY MR. WILSON:

C8DAABEJH                          Dr. Cochrane - Direct

1   Q.  Good afternoon, doctor.

2   A.  Good afternoon.

3   Q.  What do you do for a living?

4   A.  I am a forensic psychologist and the director of clinical

5   training at the federal medical center in Butner, North

6   Carolina.

7   Q.  How long have you been a forensic psychologist?

8   A.  14 years.

9   Q.  Are you license to practice?

10  A.  I am, in the state of North Carolina.

11  Q.  Do you specialize in any particular area?

12  A.  I do.  While my degree is in clinical psychology I went on

13  to specialize in forensic psychology.

14  Q.  Are you board certified?

15  A.  Yes, I am, by the American Board of Forensic Psychologists.

16  Q.  What additional training do you need to receive to become a

17  board certified forensic psychologist?

18  A.  You need a certain number of years of experience, training

19  and supervision.  It typically a requirement or expectation is

20  you complete a forensic fellowship which I did in a

21  Massachusetts medical school.  And you have submitted -- well,

22  it was a lengthy process, takes about a year or more to

23  complete.  But you have to have certain credentials, degree and

24  experience as I mentioned.  You then need to pass a written

25  examination.  After which you need to submit what are called

C8DAABEJH                          Dr. Cochrane - Direct

1   work samples or basically reports and examination that you

2   actually completed to the board.  And the board reviews those

3   work samples to see if they're sufficient quality to continue

4   to the next and final stage.  If you do pass at that stage you

5   move on the oral examination where it's a three hour

6   examination where you defend your practice, basically, in front

7   of an examination committee.  And then if you succeed you

8   obtain your board certification.

9            MR. WILSON:  May I approach, your Honor?

10           THE COURT:  Yes.

11  BY MR. WILSON:

12  Q.  Handing you what has been marked as Government Exhibit 1A.

13  A.  Yes.  That's my curriculum vitae.

14  Q.  Is that your current CV?

15  A.  It appears to be.

16  Q.  Is that the CV you provided the government as the most

17  current?  And you can take a look to make sure it's the same.

18  A.  It looks like the one that I forwarded to your office,

19  that's right.

20           MR. WILSON:  The government offers Government Exhibit

21  1A.

22           THE COURT:  1A admitted.

23           (Government's Exhibit 1A received in evidence)

24  Q.  In an effort to move through this as fast as possible,

25  doctor, I'm not going to have you describe everything that's

C8DAABEJH                         Dr. Cochrane - Direct

1    part of your credentials and your background.  But in terms of

2    your educational background, are there any particular forensic

3    training or experience?

4              THE WITNESS:  Significant amount of forensic training,

5    both with seminars, workshops, continuing education, in

6    addition to formal course work during my graduate school

7    training and then finally practical experience both at the

8    practical, what's called a practical level as well as

9    internship, then, of course, my fellowship that I mentioned.

10             THE COURT:  What does a forensic psychologist do and

11   what is forensic training?

12             THE WITNESS:  Forensic training typically includes

13   having certain experience, practical experiences in clinical

14   and forensic settings.  So that you can get exposure and

15   practice to professionals in the assessment diagnosis of

16   individual variety of medical disorders.

17             THE COURT:  How does forensic psychology different

18   from clinical?

19             THE WITNESS:  Typically clinical psychology, there is

20   overlap.  Clinical psychology involves assessment and diagnosis

21   of medical disorders and typically also the treatment of

22   various disorders through different types of individual and

23   group psychotherapy for example.

24             Forensic psychology is primarily focused on the

25   evaluation component and the evaluation and diagnostic and not

C8DAABEJH                         Dr. Cochrane - Direct

1   so much on treatment, per se.  And it's the application of

2   scientific principles of psychology and the mental health arena

3   to answer certain legal questions posed to you.

4   Q.  Are there any --

5          THE COURT:  I am sorry.  I need to understand.

6   Clinical psychologist diagnosis disorder.

7          THE WITNESS:  Correct.

8          THE COURT:  Like psychiatric disorder, psychological

9   disorders?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  What does a forensic psychologist do?

12          THE WITNESS:  They also do what a clinical

13   psychologist would do with the additional training and

14   expertise in assessing criminal defendants, civil plaintiffs to

15   determine if the mental disorder has some relationship to the

16   legal question that's posed or entered in the matter such as

17   competent to stand trial.  If the individual suffered in a

18   civil case some kind of a personal injury that resulted in a

19   mental or emotional damages.  So that's the application of that

20   clinical knowledge to the legal setting.

21          THE COURT:  Thank you.

22   BY MR. WILSON:

23   Q.  As long as we're discussing the subject, doctor, are there

24   any significant differences in how you approach the evaluation

25   of a subject in a forensic setting versus the evaluation of a

C8DAABEJH                       Dr. Cochrane - Direct

1   patient in a clinical setting?

2   A.  Yes, there are.

3   Q.  What would some of those differences be?

4   A.  Well, in a forensic setting you are going to bring a unique

5   set of skills and procedures to play.  In a clinical setting,

6   for example, you oftentimes will have the patient come into

7   your office and you make assumptions about the voracity of what

8   they're telling you because they're coming for help.  There is

9   not the external pressure, so to speak, of a legal matter as

10  present.

11          You also would utilize -- well, let me back up.  The

12  goals of assessing and treating someone in a clinical setting

13  versus a forensic setting are also different, such as in this

14  matter.  I am not hired by this defense or the prosecution but

15  as a forensic psychologist you train to be as object and

16  neutral as possible anyway, to understand the patient but not

17  to help them per se, nor to help them but to answer questions

18  for the judge or whoever it is that's making the referral.  So

19  the approach is different.  The goals are different.  And the

20  procedures as I mentioned are also different.

21  Q.  What are some of the differences in the procedures?

22  A.  Procedures, generally, in forensic settings or forensic

23  matters will be more exhaustive and comprehensive given the

24  importance of truth finding.  So for example, utilizing

25  multiple sources of information, not just what a patient tells

C8DAABEJH                         Dr. Cochrane - Direct

1    is critical.  And that is a source of the information we've

2    already I think brought those up today, clinical review of

3    documents, talking to collateral informants, interviews over

4    multiple periods of time, sometimes psychological testing and

5    so on.  So it's basically more comprehensive.

6    Q.  And, doctor, you obviously have testified that you work at

7    MC Butner, correct?

8    A.  Yes.

9    Q.  And just because some issues has been raised about what

10   type of facility that is, can you describe for us the facility

11   that you have at Butner?

12   A.  Sure.  First of all, Butner is a complex that has five

13   institutions, one of which is a federal medical center where I

14   work.  It is a 900 bed hospital for psychiatric and medical

15   patients.  We serve federal courts from throughout the country

16   and the territories of the United States by evaluating and

17   treating defendants pretrial nature.  As well as treating

18   sentenced inmates in our system who is sent for in maybe care.

19   Approximately 300 beds ever hospital are devoted to the

20   psychiatric or mental health mission, the majority of those

21   again are pretrial defendants.  So at our hospital which is a

22   Jayco credit as the Joint Commission or credited, a hospital

23   for this country.  We're Jayco credited from facility that had

24   a number of different specialties beyond psychology and

25   psychiatry but we have oncology, dialysis.  We have a surgery

1    unit, an emergency urgent care units.  We have physical

2    therapists, our pharmacy.  So, we're basically a medium sized

3    hospital that also serves as a prison with a variety of

4    specialists like I mentioned.

5    Q.  Is it fair to say that you are a full treating hospital?

6    A.  Yes.  And we're also a teaching hospital as well.  There

7    are a number of professions including psychology at which I

8    head where we're training students, training people who are

9    going to be professionals in that those areas outside

10   psychology that would include social work, psychiatry of

11   fellowship, physical therapy.  Nursing students come all the

12   time.  There's a variety of others I know I am forgetting but

13   we do a lot of teaching.

14   Q.  And what you just testified that you are in charge of the

15   training program for forensic psychology at Butner?

16   A.  For the doctoral psychology students.

17   Q.  What does that job entail?

18   A.  It encompasses about 50 percent of my activities now and it

19   entails the supervision of the internals and the responsibility

20   of coordinating their training while they're with us for a year

21   long full-time internship.  So I do a number of things.  I

22   teach seminars, supervise them, individual group settings.  I

23   coordinate the supervision with other professionals on staff

24   and a number of other administrative things.

25   Q.  Now, do you have any other teaching experience or teaching

C8DAABEJH                        Dr. Cochrane - Direct

1    role?

2    A.  Teaching role currently?

3    Q.  Yes.

4    A.  I am also an adjunct faculty at the University North

5    Carolina at Chapel Hill.  I have taught select courses at Duke

6    University.

7    Q.  Are you a member of any forensic professional

8    organizations?

9    A.  Yes, I am.

10   Q.  What would be the most notable so as not to drag it out?

11   A.  I am in, I guess, the most notably and I'll try to be

12   brief, is the American Academy of Forensic Psychology and

13   American Board of Professional Psychology.  I'm a member of

14   both of those.  In addition, I am now on the examination

15   faculty of the American Board of Forensic Psychology.  So I,

16   basically, help and select and determine those who are applying

17   to become board certified whether they meet the requirements.

18   Q.  And have you published any articles in the area of

19   competency and malingering?

20   A.  A couple.  I'm primarily a clinician, so I don't have much

21   time for research given my administrative duties and clinical

22   duties but I have published a handful of articles.

23   Q.  Now, you testified that about 50 percent of your time now

24   involves the training mission at Butner.  What's the rest of

25   your time spent doing?

C8DAABEJH                        Dr. Cochrane - Direct

1   A.  Doing pretrial court ordered evaluations.

2   Q.  What type of evaluations do you do?

3   A.  Primarily competency to stand trial.  But I also answer

4   other questions at the Court's behest such as mental state at

5   the time of the offense and whether the individual meets

6   criteria for civil commitments or dangers due to mental disease

7   or defect and then a handful of other things.

8   Q.  As part of those responsibilities what types of patients do

9   you personally deal with?

10  A.  Given we're an inpatient facility we have a wide variety of

11  patients.  And, in fact, I'd be willing to guess every

12  diagnoses listed in the DSM I've seen at our facility.  We have

13  very impaired individuals.  I have several on my caseload now

14  with brain injuries due to gunshot wound.  Many individuals

15  with psychotic disorders such as schizophrenia schizo effective

16  disorder, mood disorders like bipolar disorder, major

17  depression, substance abuse problems and personality disorder

18  and the goes on and on.  But we see quite a variety and, again,

19  because we're inpatient we see some of the worst of the worst.

20  Q.  And do you treat significant numbers of people who have

21  been found incompetent to stand trial?

22  A.  A large percentage of our time is treating individuals with

23  serious mental illness to restore them to competency.

24  Q.  Approximately, how much competency to stand trial

25  evaluations have you personally performed?

C8DAABEJH                    Dr. Cochrane - Direct

1   A.  Just competency, about eight or nine hundred, that

2   ballpark.

3   Q.  Have you previously testified in court as an expert in

4   forensic psychology?

5   A.  Yes, I have.

6   Q.  About how many times?

7   A.  I can tell you precisely this would be the 98th time I've

8   testified.

9           THE COURT:  As all or essentially all on the issue of

10  competency.

11          THE WITNESS:  Your Honor, I'd say about 80 percent are

12  competency.

13          MR. WILSON:  Your Honor, to the extent necessary I'd

14  offer Dr. Cochrane as an expert in forensics psychology.

15          THE COURT:  I'll allow him to answer opinion questions

16  in regard to the defendant's competence.

17  BY MR. WILSON:

18  Q.  Now, when you conduct these competency evaluation at Butner

19  can you tell what the standard evaluative tools you use are?

20  A.  Well, as I mentioned, it's important to use a variety of

21  tools or information in doing these kinds of evaluations.  So

22  it is typical that in addition to interviews and ongoing

23  observations, not just by myself or but other staffer members

24  at our facility are very important, as well as reviewing

25  collateral documents such as medical records, criminal records,

C8DAABEJH                      Dr. Cochrane - Direct

1     school records, whatever is pertinent.  If it's appropriate and

2     indicated we often administer psychological tests to assist in

3     answering questions and talking to collateral source

4     information.  Sometimes the attorneys, sometimes it's important

5     to talk to family members, perhaps, witnesses and things like

6     that.  And then after gathering all that information and

7     analyzing all that information, of course, generating a report

8     about our findings.

9               THE COURT:  Dr. Cochrane, you said you testified my

10    extension of here remarks that you testified about 80 times in

11    court in regard to the question of whether or not a defendant

12    was competent to stand trial, is that correct?

13              THE WITNESS:  I would say that's, yeah, roughly.

14    Don't hold me to the exact number but that's a rough estimate,

15    yes.

16              THE COURT:  Do you have an estimate as to what your

17    conclusions were as to how many patients?  In other words, do

18    you know if in all of those 80 patients, give or take a few,

19    you reached the conclusion that a patient was competent or is

20    it 50/50?  Do you have a sense?

21              THE WITNESS:  Of the 80 patients I testified on or the

22    800?

23              THE COURT:  80 you've testified on.

24              THE WITNESS:  Well --

25              THE COURT:  I'll take it both ways, actually.  Let's

C8DAABEJH                         Dr. Cochrane - Direct

1    start with the 80 you've testified about.

2                THE WITNESS:  On the 80 I've testified it's hard to

3    answer, your Honor, but I'll see if I can figure it out.

4                THE COURT:  I don't want to guess but if you have the

5    basis --

6                THE WITNESS:  I might be able to give you a decent

7    estimate.  The majority of the patients that come to us have

8    already been found incompetent.  Eight or nine times out of ten

9    I agree with that finding, so I initially concur or believe

10   they're incompetent to stand trial.  Following treatment,

11   however, we have found and it's consistent with the broader

12   literature that, approximately, 80 to 85 percent of those

13   individuals, their competency is restored.  So at the end of

14   the evaluation period quite often probably 80 to 85 percent of

15   time I am then declaring them competent.

16               THE COURT:  After restoration?

17               THE WITNESS:  Yes.

18               THE COURT:  Mr. Bejaoui came to you from FMC Devens,

19   correct?

20               THE WITNESS:  Correct.

21               THE COURT:  Was it for the purposes of determining

22   whether or not he could be restored to competence?

23               THE WITNESS:  It was to restore him to competency and

24   then determine whether or not those efforts were successful.

25   But in many cases, as I am sure you can understand, we have

C8DAABEJH                    Dr. Cochrane - Direct

1  individuals come to us and when we perform our own independent

2  assessment we sometimes disagree with the prior assessment.  So

3  we have to reach our own determination.  For example, I have

4  had patients where a prior examiner may have concluded that he

5  suffer from schizophrenia.  I may have concluded, you know

6  what, he was malingering symptomatologies of schizophrenia,

7  therefore, we can't treat him for schizophrenia.  That wouldn't

8  he be appropriate to do.  So we offer our opinion to the court.

9            THE COURT:  So this case restore them to competency,

10  correct?

11            THE WITNESS:  Yes, that is my understanding under

12  Section 42D he was sent by that court, so I was under the

13  assumption that we would --

14            THE COURT:  So, no, he first went to Devens.  What was

15  your --

16            THE WITNESS:  He was found incompetent to stand trial.

17            THE COURT:  And sent to you to restore competency.

18            THE WITNESS:  Correct.

19            THE COURT:  Your conclusion was that --

20            THE WITNESS:  My conclusion was that he did not suffer

21  from the problems that were described at Devens and I believed

22  he was competent to stand trial.

23            THE COURT:  In fact, your primary diagnosis is of

24  malingering.

25            THE WITNESS:  Correct.

C8DAABEJH                          Dr. Cochrane - Direct

1            THE COURT:  You've heard Dr. First's testimony that

2    the primary diagnosis, essentially, was major depressive

3    disorder with psychotic aspects, correct?

4            THE WITNESS:  Correct.

5            THE COURT:  Okay.  Why do you disagree with Dr. First?

6            THE WITNESS:  I disagree for a few reasons.  One, I

7    don't believe he suffers from major depression and to have

8    major depression with psychotic features you first have to have

9    a very serious major depression because there's gradation as

10   you can imagine.  There's mild, moderate, severe.  As the DSM

11   indicates it's only with the most severe depressed individuals,

12   even among those not many have psychotic symptoms but some in

13   fact do, it's only that category that suffers from psychosis.

14   I simply disagree with the fact that I don't believe

15   Mr. Bejaoui has five of the requisite nine symptoms to qualify

16   for a major depressed disorder.

17           People who are suffering from major depression they

18   have recurrent thoughts of death wanting to die.  They won't

19   don't want to get out of bed quite often.  They, certainly,

20   aren't interested in what happens to them.  They don't talk to

21   family members.  They sort of shut people out.  They don't

22   sleep well.  They don't eat well.  They lose a lot of weight or

23   they gain a lot of weigh.  They can't concentrate.  Their mood

24   and affect is consistently depressed.  They've lost all

25   interest in activities that they've previously enjoyed and a

C8DAABEJH                        Dr. Cochrane - Direct

1   few other symptoms.

2            Now, I did believe that Mr. Bejaoui had some dysphoria

3   and depressed and anxious mood and he may have had some trouble

4   concentrating.  But for the two months he was with us I did not

5   identify sleep disturbance, daytime fatigue.  He only very

6   intermittently and I think it was -- perhaps, it was on a phone

7   call he mentioned suicidal ideation but he made no suicidal

8   gestures, no notes, no behaviors, whatsoever, that were

9   consistent with that and he ate and he slept.  Like I said, I

10  think I mentioned he slept well.

11           So, I wasn't seeing again the requisite symptoms to

12  even diagnose a major depression but be that as it may, let's

13  assume he did suffer from a major depression.  These psychotic

14  symptoms he reported I believe were very consistent and very,

15  very atypical.  For example, he wasn't just reporting

16  hallucinations or delusions of a depressive type or persecutory

17  affect.  In fact, if you look at the DSM typically people have

18  transient auditory hallucinations, he was reporting not only

19  ongoing auditory hallucinations but visual hallucinations and

20  tactile hallucinations, the latter an example of which is the

21  fact that he believed terrorists were coming through his walls

22  he reported and were hitting him on the back, head and back and

23  physically hurting him causing him pain which against suggest a

24  tactile hallucination which is extremely rare even among others

25  with more primary psychotic disorders.  And it's certainly not

1    even mentioned in the major depressive disorder of psychosis

2    section of the DSM.  Furthermore, he not only again was

3    reporting persecutory delusions, he reported grandiose

4    delusions, again, inconsistent with that diagnosis.  So those

5    are a couple or a few of the reasons why I respectfully

6    disagreed with Dr. First's opinion.

7              MR. WILSON:  Your Honor, if I could ask a quick

8    clarification question?

9    BY THE COURT:  Sure.

10   BY MR. WILSON:

11   Q.  You mentioned grandiose delusions.  Can you explain what

12   those are?

13             THE COURT:  He thought he would have an impact in the

14   peace process in the Middle East.

15             THE WITNESS:  Yes.  That he alone had had mathematical

16   formulas that people were trying to obtain and he had answers

17   that is no one else had.

18   BY MR. WILSON:

19   Q.  Why is that inconsistent with --

20   A.  You don't see it with mayor depression.  Is it

21   theoretically possible?  Sure.  But we're talking about

22   probably.  Then it would be -- I've never seen it in my career

23   and nor is it even mentioned in the DSM.

24   Q.  What disorders would you have to have in order to present

25   the symptoms that the defendant presents here?

C8DAABEJH                         Dr. Cochrane - Direct

A.  Well, he presented a lot of symptoms but both physical and
psychiatric.  Are you assuming that if you were to accept
everything he's reported on face value?
Q.  Assuming that his presentations and his reports entirely
accurate and there is no malingering or any form of feigning or
what have you, what would he have to have to show these types
of impairments?
A.  He would have to have or he could have the following:  A
somatoform disorder, a major depression, probably a separate
psychotic disorder, a schizophrenia and, certainly, have to
have dementia and a perhaps an anxiety disorder.  Since he is
reporting symptoms across those various categories, most
notably, the cognitive problem that he reported were -- I was
going to say consistent but they're really inconsistent even
with individuals who have Alzheimers dementia, and they are not
perfectly fine one day, then no intervening event unless
they're shot in the head, that would explain them being
amnestic and not knowing their name, not knowing how many
fingers someone is holding up, not knowing their date of birth.
I have patients with those legitimate problems, dementia and
TDA all the time.  And I'm sure other doctors could attest to
those individuals, in fact, can clearly recall that basic
overlearn, what we call overlearned information.  But sorry I
may have got a little are afield.  The bottom line is you'd
have to have dementia, psychosis, a mood disorder and perhaps

C8DAABEJH                        Dr. Cochrane - Direct

1   some type of somatoform.

2   Q.  Doctor, in your experience with the almost one thousand

3   comp evaluations you done have you ever seen anyone presenting

4   that variety of severe disorders occurring within one year or

5   one and a half years without prior history?

6            THE COURT:  What variety of severe disorder?

7            MR. WILSON:  I'll withdraw.

8   Q.  You describe the types of disorders that the defendant

9   would have to have in conjunction with each other to explain

10  all his symptom, correct?  And that would be -- maybe we should

11  clarify even further.  How many of the disorders you just

12  described would the defendant have to be simultaneously

13  suffering from to explain all the symptoms he's reporting?

14  A.  Well, again, the four that I mentioned, assuming it wasn't

15  malingering, if you are assuming it's all true and it's not a

16  malingered presentation what did I say?  Somatoform disorder, a

17  mood disorder, psychotic disorder and dementia, one could

18  argue, well, the mood and the psychotic disorder could be one

19  in the same.  Sometimes people with bipolar may -- we clearly

20  have to have at least three or four major mental illness.

21  Q.  Have you ever seen someone present with all those illnesses

22  at once to this degree?

23  A.  Maybe not to this degree but I have seen patients who have

24  reported these symptoms.  I've never seen a patient who

25  actually suffered from all three or four of those

C8DAABEJH                         Dr. Cochrane - Direct

1   simultaneously.

2   Q.  Going back to a point that you were making a moment ago

3   about the degree of dementia the defendant would have to be

4   suffering from.  You mentioned some particular example that you

5   found to require that degree of dementia.  Just want to go

6   through a few to make sure we are on the same page that's been

7   discussed a bit before.  And in your report which is in front

8   of you, for the record it's Defendant's Exhibit D, page 11 to

9   talk about the initial admission.

10  A.  Yes.

11  Q.  One of the statements he made at that time was he didn't

12  know his date of birth?

13  A.  Yes.

14  Q.  And that he said that he was age 50?

15  A.  Correct.

16  Q.  How old is he in fact?

17  A.  38, at least the time of that report I believe he still is.

18  Q.  What type of cognitive disorder could explain that if it

19  was actually an accurate presentation?

20  A.  Couple different things, actually, could explain it.

21  Dementia as I mentioned, severe dementia could explain it, a

22  delirium could explain it which could be due to a medical

23  illness or a substance that the person was taking could cause

24  them to be very confused and report an grossly inaccurate

25  information.  Those are the two that come to mind delirium or

C8DAABEJH                          Dr. Cochrane - Direct

1   dementia or traumatic brain injury, sorry, but again it's of

2   the cognitive.

3   Q.  Let me ask you one by one, does the defendant have a

4   traumatic brain injury?

5   A.  No.  He reported that he suffered from one.  I was not able

6   to obtain any records of such and in talking with his wife who

7   has known him for 14 or 15 years, she has not aware of any such

8   accident, that coupled with the fact he was functioning

9   relatively well, running his own business and working.  So even

10  if he were to have suffered some kind of accident that we don't

11  have the records for, it, obviously, wasn't debilitating enough

12  to interfere with his financials.  He had some problems before

13  incarceration but nothing like this until he was arrested.

14  Q.  Well, to be clear, could you suffer a traumatic brain

15  injury and 15 years later have an onset of this type of --

16  withdrawn.

17        Could a traumatic injury 15 years ago explain these

18  types of symptomatology occurring all at once now?

19  A.  No, it could not.

20  Q.  And speaking of dementia now, does the defendant have the

21  requisite symptoms to be diagnosed with dementia?

22  A.  No, none of the doctors have suggested that.

23  Q.  Would that also be true of the third possibility that you

24  mentioned which is now escaping me?

25  A.  Delirium?

C8DAABEJH                          Dr. Cochrane - Direct

1   Q.  Yes.

2   A.  He doesn't have any kind of infection, nor was any

3   substance detected in his system at the time of this interview

4   would suggest delirium was the cause.

5   Q.  Now, your ultimate diagnosis in this case, the primary one

6   was lingering, correct?

7   A.  That's the primary, yes.

8   Q.  That's malingering as to both his physical symptoms,

9   physical reported symptoms and his mental symptoms, correct?

10  A.  Yes.  There was inconsistencies on both grounds.  That

11  doesn't mean however every piece of inaccurate information he

12  provided I attributed to malingering.  Some of it is part of

13  his histrionic dramatic way of presenting information.  So

14  taken in whole I think there were medical and psychiatric

15  symptoms, certainly, that led to the conclusion of malingering.

16  But each and every incident isn't necessarily indicative of

17  malingering.  Could be to some degree anxiety and histrionic

18  personality and features.

19          THE COURT:  To change the subject slightly, got to let

20  the lawyer come back is the defendant's affect today is part

21  and parcel of the malingering?

22          THE WITNESS:  Do you mean his -- the way he is right

23  now?

24          THE COURT:  Yes.

25          THE WITNESS:  As part of malingering?  I don't know

C8DAABEJH                        Dr. Cochrane - Direct

1   how to answer that.  He looks to be unattentive to the

2   proceedings.

3            THE COURT:  Yes.

4            THE WITNESS:  I couldn't explain why that would be

5   other than that's an intentional behavior.

6            THE COURT:  It could be part of depression?

7            THE WITNESS:  Part of depression?  It could be if he

8   is so sleep deprived recently.  Let me add, I don't know if

9   there's been medical changes, problems since he left our

10  facility.  That could possibly be an explanation for his

11  behavior today.  I am not aware of that.

12           THE COURT:  Is this how he presented at Butner?

13           THE WITNESS:  No, not at all.

14  BY MR. WILSON:

15  Q.  Could you just explain that as long as we're talking about

16  it.  What is different about his presentation now versus at

17  Butner?

18  A.  At Butner he was very animated most of the time.  He was,

19  as Dr. First had testified and others have reported, very

20  difficult to interview.  Asking him questions and getting a

21  direct answer was not easy.  He often focused on certain

22  complaints or issues he wanted to talk about and it was

23  difficult to address other matters.  He was very dramatic and

24  panting and like I said very animated in his behavior and

25  energetic on most occasions when I met with him and not at all

C8DAABEJH                    Dr. Cochrane - Direct

1   like with sedate position he is in now.

2   Q.  You mentioned just a moment ago histrionic personality

3   features.

4            THE COURT:  I am sorry.  In the course of the past few

5   years that he's been a defendant here his affect has changed

6   dramatically.  He started off, to my observation, being very

7   involved with the first of his several lawyers, the first two

8   of his several lawyers, actually, having heated disagreements

9   with them in court.  I don't know what they were about but it

10  was clear there were disagreements very animated and even loud

11  and agitated.  In general then his affect, I described it as

12  going downhill.  I don't know how that translated in medical

13  terms but he became less involved and then not involved at all.

14  And at one point he was then in a wheelchair and this is all in

15  the records.  In fact, at one conference was he not only in a

16  wheelchair but was slumped over with his head down for the

17  entire thing almost lining like a rag doll.  His affect now is

18  substantially better than that but you can see how it's gone

19  through a whole series of changes.

20            THE WITNESS:  True.

21            THE COURT:  Is that something that you only saw a

22  section of that because it was after?

23            THE WITNESS:  That's all I am reporting to is that two

24  month section.  I would agree with you in looking at the bigger

25  picture as I reviewed records, he has fluctuated, absolutely.

C8DAABEJH                         Dr. Cochrane - Direct

1    And some of those inconsistencies are actually in the

2    presentation are noteworthy.  But, no, I would agree that he is

3    a sensitive sort of labile, moody guy who one minute will be

4    angry and demanding, next minute -- not minute, but shortly

5    after that he'll be crying and wanting people to help him and

6    soliciting assistance but it's very dramatic in that sense but

7    it does change over time, absolutely.

8            THE COURT:  What does that tell you about malingering

9    versus any of the diagnoses made by Dr. First.

10           THE WITNESS:  Well, I am not sure other than we both

11   agree he's got histrionic features of a personality disorder

12   and that his --

13           THE COURT:  That's your access two.

14           THE WITNESS:  That's his personality.  That is his

15   character.  That's just how he carries himself.  He might be

16   happy with his lawyer one minute, then cursing him out the

17   next.  It wouldn't shock me.  So I am not sure if I answered

18   your question, your Honor.

19           THE COURT:  Well, what I've described suggests is that

20   one part of malingering or is that one part of massive

21   depression or is that not telling us anything?

22           THE WITNESS:  It could be.  I don't think it says very

23   much.  It could be depression.  People who are chronically

24   depressed anyway as he's reported, you wouldn't expect that

25   fluctuation.  But then again he's got histrionic personality,

1   so it's difficult to answer that. I didn't put to much stock in

2   that in my analysis or my determination of malingering, that is

3   his mood fluctuations.  I didn't use that to say, oh, look he's

4   malingering, his mood and affect changed.  There was plenty of

5   other information that led to my conclusion and that wasn't

6   significant.

7              THE COURT:   Thank you.

8   BY MR. WILSON:

9   Q.  Just to be clear, could the type of histrionic personality

10  features you've diagnosed the defendant with cause him to be

11  incompetent to stand trial?

12  A.  No, I haven't come across anyone whose personality has

13  gotten in the way or even been considered mental illness or

14  mental disease that would get in the way of his behavior.  It

15  could make interactions difficult with counsel but it's sought

16  to be to a large extent volitional and within one's control.

17  It's like someone who's got a bad temper, that bad temper gets

18  in the way of relationships at times but you wouldn't say that

19  the person was incompetent to understand the charges or to work

20  with someone if they were motivated to do so.

21  Q.  Then to turn back to malingering, starting at 22 in your

22  report, can you briefly summarize what, obviously, is in the

23  report the factors that led you to conclude that the defendant

24  was faking his symptoms or at least the majority?

25  A.  Sorry.  There's something on page 22.

1    Q.  That's where the report starts.

2    A.  You want me to discuss the reasons I felt he was

3    malingering?

4    Q.  Yes.

5    A.  Well, see if I could summarize this.  There were

6    inconsistencies in his report to different people at different

7    times.  There was also inconsistencies in his symptoms with

8    known psychiatric problems.  And there was inconsistencies

9    within his own account to the same individual.  So there were

10   different categories of inconsistencies.  We've mentioned some

11   of those in court.  I don't know if you want me to, obviously,

12   inaccurate information he's given about having cancer in his

13   chest or having traumatic brain injury and being unconscious

14   for several weeks.

15   Q.  Let's stop there.  You mentioned that the inaccurate or

16   inconsistent reporting is one of the issues, correct?

17   A.  True.

18   Q.  I won't go through the examples since they're in the report

19   but what is the relevance of that to your determination that he

20   is malingering?

21   A.  It shows that you have to be cautious.  And if you don't

22   have a credible historian in front of you not to take what he

23   says at first value and be cautious about attempts to deceive.

24   So I would try to be cautious of that.  I am not sure if this

25   is also what you are asking but you also need to determine the

C8DAABEJH                    Dr. Cochrane - Direct

1   motivation, as Dr. First said, because it's not always

2   malingering.  As I mentioned in the report I believe, I tried

3   to rule out other explanations such as somatoform disorder or

4   factitious disorder.  I can't remember if I mentioned

5   factitious specifically but you have to determine what the

6   motivation is.  That is often a very difficult thing to do.  I

7   can explain why I ruled those out but I don't believe that

8   those our other conditions.

9   Q.  Since you raised it let's be clear, those go to his

10  physical conditions, correct?

11  A.  Somatization can include psychiatric and neuropsychiatric

12  symptoms but in case largely physical symptoms.

13  Q.  Okay.  And the physical symptoms that the defendant's

14  described here are not the basis for anyone's conclusion that

15  he is not competent to stand trial?

16  A.  No.  Well, whether he has legitimate physical symptoms,

17  some degree of pain, again that's subjective, it's hard to say

18  or whether he has somatoform disorder, I can't imagine that

19  having any impact on his competence to stand trial.

20  Q.  So the relevance of your determining he was malingering

21  rather than having somatoform would be what as to competence?

22  A.  Can you repeat that?

23  Q.  You determined that the physical complaints that defendant

24  suffered were a result of malingering rather than somatoform,

25  is that right?

1   A.  Correct.

2   Q.  That does not go directly to the question of whether he's

3   competent, right?

4   A.  Not directly, no.

5   Q.  Did you find it relevant indirectly?

6   A.  Did I find it relevant indirectly?

7   Q.  Yeah.

8   A.  It's relevant in the sense that if someone is malingering

9   and also doesn't have a legitimate problem then that's

10  pertinent because that's the first problem with the test.

11  Q.  Which test?

12  A.  I'm sorry.  The standard under 4241D you have to have a

13  mental disease or defect.  If determined the person doesn't

14  have a mental disease or defect then it's a moot point as to

15  other issues.

16  Q.  Would it be fair to say that one who reports physical and

17  mental symptoms and is feigning the physical symptoms, would

18  that person be more or less likely to be feigning the mental

19  symptoms as well?

20  A.  Well, again it's a credibility issue.  If someone you know

21  is being deceitful on certain issues it doesn't mean they're

22  being deceitful in this other category, but concerning what you

23  are going to believe or not believe can be difficult.  If

24  someone you know is deceitful in some area then, yes, you have

25  to have serious concerns about being deceitful in their

C8DAABEJH                          Dr. Cochrane - Direct

1    presentation as a whole.  But, again, it doesn't necessarily

2    mean someone couldn't be feigning one disorder but legitimately

3    have another.

4    Q.  Let me just ask a couple of specific questions about some

5    of the history that you got from the defendant and from his

6    wife.  Do you ever ask the defendant about mental health

7    problems in his family?

8    A.  Attempted to, yes.  I don't believe he gave me a direct

9    answer.

10   Q.  He didn't tell you or -- withdrawn.  Did he tell you

11   whether he had a brother with schizophrenia?

12   A.  He never mentioned that to me or other staff, no.

13   Q.  He ever mentioned he had a brother who was in a mental

14   hospital in Tunizia?

15   A.  No, he did not.

16   Q.  Is there anything in the record that indicates that he had

17   a brother with schizophrenia?

18   A.  Anything in the record I reviewed?  Not -- the time of this

19   report or after?

20   Q.  With the ex --

21   A.  With the exception of Dr. First's report, no.

22   Q.  Anything that indicated he had a brother in a mental

23   hospital?

24   A.  Again, no.

25   Q.  Now, did you interview Mr. Bejaoui?

C8DAABEJH                      Dr. Cochrane - Direct

1   A.  Yes.

2   Q.  You, personally?

3   A.  Yes.

4           THE COURT:  You were his main or treating

5   psychologist, correct?

6           THE WITNESS:  I was the main or primary evaluator.

7   Dr. Herbel was the treating.  We work as a team.

8   BY MR. WILSON:

9   Q.  Did you interview the defendant's wife, Marie Bejaoui?

10  A.  No.  Dr. Herbel did that.

11  Q.  Do you know what the content of their conversation was?

12  A.  Yes.  Dr. Herbel shared that with me.

13  Q.  Did defendant's wife tell Dr. Herbel that he had had

14  frequent bouts of paranoia?

15          MR. DRATEL:  Objection.  It should be stated --

16          MR. WILSON:  Withdrawn.

17  Q.  Did Dr. Herbel tell you that, whether Ms. Bejaoui had

18  stated that her husband had had frequent bouts of paranoia?

19  A.  He indicated the only problem she reported were of an

20  anxiety and depressive nature.

21  Q.  And you reviewed the report of Dr. Channel from Devens,

22  correct?

23  A.  Yes.

24  Q.  Do you remember whether he interviewed Ms. Bejaoui?

25  A.  In the record it indicates he did.

C8DAABEJH                    Dr. Cochrane - Direct

1    Q.  And did he report that Ms. Bejaoui had told him that the

2    defendant had bouts of paranoia?

3    A.  No, that is not mentioned in the record.

4    Q.  Now, what is the relevance of the absence of a credible

5    family history of these types of ailments to your diagnosis?

6    A.  Well, it carries some but not much weight.  It is important

7    to ask about family history because some disorders do have a

8    high genetic load.  That is, if their immediate family members

9    who have that condition that increases the chance that the

10   individual might develop that disorder.  However, even among

11   the most genetically tied psychiatric condition it's not even

12   over 50 percent.  I mean and with schizophrenia the number's

13   significant below that.  There is, it's certainly a genetic

14   link for biological immediate relatives with schizophrenia, for

15   example, but more times than not, if the sibling has

16   schizophrenia the other sibling or other siblings will not.

17   So, again, it carries some weight in the overall analysis but

18   not a great deal.

19          THE COURT:  That's an artifact, as it were, of your

20   below 50 percent number, right?  In other words, if it's less

21   than 50 percent likely that immediate family member will have

22   this, that means that it's more likely than not that they

23   won't?

24          THE WITNESS:  Correct.  But, again, if someone had

25   five family members with schizophrenia --

C8DAABEJH                    Dr. Cochrane - Direct

1            THE COURT:  It's still going to be the same analysis

2    for each and every one?

3            THE WITNESS:  Correct.

4            THE COURT:  All right.

5    BY MR. WILSON:

6    Q.  What about the defendant's personal medical history?  What

7    did you find relevant about that in terms of your diagnosis?

8    A.  His personal medical history.

9    Q.  His mental health history?

10   A.  Mental health history, okay.  What did you learn about

11   that?

12   Q.  What about it did you find relevant in reaching your

13   diagnosis?

14   A.  That he had been treated for -- supposedly, been treated

15   for problems related to anxiety and depression, never been

16   treated for any psychotic symptoms or problems and never

17   psychiatrically hospitalized which suggested to me he was

18   never -- or diagnosed with a psychotic disorder before entering

19   the prison system recently.  I don't know if that answers your

20   question.

21   Q.  What, if anything, any conclusions did you draw from that?

22   A.  That it would be unlikely at the age of 38 that he would

23   develop severe debilitating psychiatric conditions as such

24   dementia, schizophrenia or psychosis related to a major

25   depression.  The likelihood of that would be way, way down.

1          THE COURT:  What's the likelihood that living with his

2     wife it would go undetected as a debilitating psychiatric

3     condition?  Or put another way, assume there are lots of people

4     out there on the streets of New York with a severe debilitating

5     psychiatric condition.

6          THE WITNESS:  Correct, your Honor.  They're homeless

7     and I'm sure you've seen several of them.  He had a loving

8     wife.  It appears he was able to function and work adequately

9     to help support his family and I would suspect that if he were

10    suffering from psychosis that she would have helped do

11    something about that.

12         THE COURT:  Is it possible that as a layperson she

13    would be characterizing what you characterize as psychosis

14    instead using whatever the words she did were -- I don't know

15    what it was "difficult", "paranoid", I don't know the words she

16    used.

17         THE WITNESS:  She didn't use those words with me but

18    later I understand she did.

19         THE COURT:  Isn't that entirely possible?  In other

20    words, you would say he was exhibiting psychosis.  A layperson,

21    loving wife would describe it in the terms she described it in.

22         THE WITNESS:  Certainly, in fact, that's what's more

23    important.  I am not concerned what label a family member gives

24    it.  I want them to describe the behavior they see in their

25    loved one.  So if they're describing what I would consider more

1    of the psychotic behavior, that is oh, my God, he thought

2    people were going to kill him.  He got a firearm, was carrying

3    it around to defend himself, I've got patients where they've

4    painted their windows all black or put shades up and will stay

5    in their house for weeks and weeks at a time because they're

6    extremely fearful they're going to be killed by a mafia or some

7    other groups, it's those kinds of behavior that I want to hear

8    from a family member that would help me determine the proper

9    label.

10            THE COURT:  And the record does not reflect those as

11   coming from Ms. Bejaoui, is that correct?

12            THE WITNESS:  Correct.  It was only until I read Dr.

13   First's report where she had indicated some level of either

14   claustrophobia or fear which, again, I don't know if it was

15   legitimate fear because he didn't make or made enemies or it

16   was a paranoid fears, there's not enough detail to make that

17   determination.  But it was only at that last evaluation that I

18   read anything about that.

19   BY MR. WILSON:

20   Q.  Just to clarify one thing, doctor, if you look at page four

21   of your report in the first full paragraph probably about ten

22   lines down there's a list of prescriptions that Ms. Bejaoui

23   reported to -- withdrawn.  There's a list of prescriptions that

24   Mr. Bejaoui reported to Dr. Herbel that the defendant had been

25   on?

C8DAABEJH                    Dr. Cochrane - Direct

1    A.  That's right.

2    Q.  Prozac, Lexapro and Clonipin?

3    A.  Yes.

4    Q.  Are you any of those antipsychotic medications?

5    A.  No.

6    Q.  Would any of them be appropriate for someone suffering from

7    severe hallucinations or persecutory delusions?

8    A.  No.  I would presume that the person who prescribed those

9    if they thought he was delusional or suffering from psychosis,

10   it is would be practically malpractice not to prescribe the

11   appropriate treatment.

12   Q.  One of the things you mentioned earlier that was a factor

13   in the malingering diagnosis was defendant's inconsistent

14   behavior with people.  There's some examples of that from

15   Butner that are in the report and his interactions with the

16   staff.  Can you explain any of those that are particularly

17   notable?

18   A.  Well, for the majority of the time he presented again, he

19   is very impaired, unable to follow and answer questions and

20   what not, histrionics as I mentioned and very confused.  Like

21   he didn't know his name and how old he was and all of that.

22   However, there were a few incidents where he was very lucid and

23   organized.  One in particular has to do with his wanting to and

24   eventually obtaining a notarization by one of our notaries for

25   a power of attorney form so his wife could be power of attorney

C8DAABEJH                          Dr. Cochrane - Direct

1    over his affairs.  I could explain that interaction or move on.

2    Q.  What did you find -- withdrawn.  Did you find anything

3    significant about that?

4    A.  Yes.  That was one example of, again, him seemingly being

5    able to when he had a goal in mind, something he wanted to

6    accomplish he was able to organize his thoughts and behavior

7    such as he could accomplish that quasi legal that --

8    Q.  What interactions did he have with your staff in order to

9    obtain the documents that he wanted?

10   A.  He first contacted staff on his unit to find out if there

11   was a notary.  Then that staff member contacted a notary who

12   was located in a different location and so he had to make the

13   request.  She then went to his unit and spoke with him about

14   the document and getting it notarized and, ultimately,

15   notarized that document for him.

16   Q.  And look at page thirteen of your report, the bottom, the

17   first full paragraph indicates that Mr. Bejaoui actually

18   directed the staff member where to sign the document and

19   pointed out the power of attorney only pertained to his

20   financial affairs?

21   A.  Yes.

22   Q.  Is that consistent with his presentation with you when he

23   was being evaluated?

24   A.  This was striking to me when I heard about this and I poke

25   to Ms. Kelly Forbes who was the notary who worked closely with

C8DAABEJH                        Dr. Cochrane - Direct

1    him because given how impaired he was presenting, it wouldn't

2    be at all consistent with someone who sort of was, again,

3    organized and able to speak to someone in a very coherent and

4    clear fashion.  And she is not a psychology or psychiatrist but

5    is around at lot of severe mentally ill people but when she --

6    when I talked to her about the interactions she said, I didn't

7    think anything was wrong with him.  He spoke normal.  He even

8    corrected me or pointed out where to sign.  So she saw nothing

9    unusual.  So, again, completing that exchange and appearing to

10   be as it was described to me fairly organized.

11             THE COURT:  But isn't that consistent with --

12   rephrasing.  Is that consistent with Dr. First's view that when

13   he is dealing with his wife or good friends or people he trusts

14   he is not impaired by this psychoses, that is the fear,

15   paranoia?  And when he is talking to his wife he seems to agree

16   with you as to how different phone calls are but he has an

17   answer for that.  That is, it's his wife, the defendant's

18   defenses as it were down.  No.  More than his defenses, his

19   paranoia and fear isn't present.  So he is ordinary and can

20   deal with them.  And then he goes the next step and says,

21   ah-hah, even when he is talking with his wife you see this

22   craziness for want of a better word, he's talking about ECT as

23   talking about people poisoning him.  So he uses that in support

24   of his position.  What do you do with that?  And I am

25   suggesting that the power of attorney and search for one is an

C8DAABEJH                        Dr. Cochrane - Direct

1    extension for his feelings with a loved one who he trusts.

2                THE WITNESS:  I don't know if he would trust the

3    notary or staff member, however, I hear you.  My reaction to

4    the first part of your question is that his psychiatric

5    disorder would not explain that kind of inability to organize

6    and remember how old you are, remember how to count, remember

7    to how to spell your first name.  If you look under the DSM

8    definition explanation of major depressions, anxiety disorders,

9    even schizophrenia you will not find anything about amnesia or

10   severe cognitive -- So the fact that, I don't find that a

11   credible explanation to say, well, he's comfortable with family

12   so he is not demented but when he is with people who he is

13   afraid of he is.

14               THE COURT:  I think that Dr. First's response to that

15   line of inquiry by Ms. Kovner was, you are right, I can't

16   account for that.  I mean I think he was saying, yes, I don't

17   understand how he could not know his name or his first name or

18   the year.  So I think Mr. Dratel would tell me if I'm wrong so

19   I think he concedes that anomaly something would be anomalous

20   but still be a valid hypothesis.

21               THE WITNESS:  Well, I don't find that to be a valid

22   hypothesis that you could be so incredibly impaired you don't

23   have dementia, so incredibly fearful, cause you work with a lot

24   of very fearful people.  First of all, they don't answer your

25   questions.  They don't talk to you.  He was engaged with us.

1    He ate our food.  He took our medicine.  He saw other physical

2    therapists.  Yes, he was anxious.

3             THE COURT:  But I read all of these reports.  And your

4    people were -- maybe it was Devens.  I am not sure -- actually,

5    having a greet deal of trouble getting him to engage and he

6    was, he only trusted somebody who, I think the Asian woman, he

7    was trusting, I think that was his phrase and he wasn't

8    cooperating with a lot of the professionals.

9             THE WITNESS:  I agree.  But I don't think that's

10   paranoia.  Because he was wanting help, wanting help and then

11   rejecting that help and being demanding, I don't think that is

12   paranoia at all.  Yes, he might have been afraid of people,

13   maybe anxious but, again, anxiety and fear and even -- paranoia

14   and schizophrenia could not explain how he doesn't understand

15   the charge, how he lost that memory.  He had that ability, as

16   you had mentioned in court, what has happened in the interim

17   that would explain that.  Major depression could not explain

18   that, nor could a somatoform disorder or histrionic

19   personality.  So I don't think that is a credible explanation

20   for why it turns on and off that he is somehow afraid.  If he

21   was so afraid he would not be engaging at all.  And he did sit

22   down with us.  Like I said, he did take medicine, although, he

23   claimed to being poison.  He did eat the food.  So I don't see

24   his behavior at all as being severely paranoid.  And even if it

25   was, it would not explain that kind of memory impairment or

1    loss.

2          THE COURT:  All right.  Obviously, if the

3    determination of the Court is that the diagnosis is malingering

4    then this case proceeds and he goes to trial.  What happens if

5    the conclusion of the Court is that he does have a mental

6    disease or defect that cannot -- where he can't assist in his

7    defense, what happens then, as you understand it?

8          THE WITNESS:  As I understand it a couple thing could

9    happen.  If the Court believes he is not restored to competence

10   no treatment would be effective, then he would proceed to 4246

11   of the Title 18.  If however the Court believes that he might

12   still be able to be restored he would either get sent back to

13   our facility or another federal prison hospital such as Devens

14   or Springfield, Massachusetts.

15         It probably wouldn't be in the best interest in my

16   opinion to send him back to Butner where we've concluded he

17   doesn't have that problem because it wouldn't be appropriate

18   for us to be treating him for something we don't believe he

19   doesn't have.  But another facility would re-exam the issue and

20   determine whether he does, in fact, need some kind of treatment

21   to restore.

22         So I guess it depends on what the Court concludes that

23   he is still not competent but is potentially restorable, he

24   would be return to a federal medical center if they determined

25   that he, it's not possible to restore him but he is incompetent

C8DAABEJH                         Dr. Cochrane - Direct

1    then he would be, again, as I understand the statutes, he would

2    be referred back to what's called a dangerous assessment and

3    4246.

4             THE COURT:  You did hear Dr. First's testimony in

5    regard to the clinical setting in which he found himself which

6    is that view that Butner, he was never there would be prison

7    facility and that's different than a state psychiatric

8    hospital.  As you understand the statutes under provisions if

9    he is restorable to undergo that process in the state rather

10   than the federal facility?

11            THE WITNESS:  My understanding, there is no such

12   mechanism and the state would not be obligated to accept him as

13   a patient.  So, again, anything is I suppose possible.  I've

14   never seen that happen.

15            THE COURT:  I think the statute, specifically, talks

16   about under the control of the attorney general.

17            THE WITNESS:  Yeah.  So that's where I think the

18   dilemma is in sending him to a state psychiatric facility.  I

19   would dispute that's a better more conducive environment.  I

20   guess we could debate that depending on the state facility.

21   I've seen lot of state facilities that I am proud to say we

22   serve our patients much better in my humble opinion.  It

23   depends where the place is whether they would accept him.

24            THE COURT:  What federal facilities have the ability

25   to restore somebody to competence, certainly, Butner, is Devens

C8DAABEJH                      Dr. Cochrane - Direct

1   one?

2          THE WITNESS:  I understand now they have not been

3   involved in that process until recently.  I understand now they

4   finally have the resources and staff to do that.

5          THE COURT:  Does that differ from when he was there?

6          THE WITNESS:  Correct, it is different.  In fact, he

7   would have been returned to Devens it is my understanding, had

8   they had the resources to undergo or have him undergo the

9   restorative process.

10         THE COURT:  Well, they said they didn't.

11         THE WITNESS:  Yes, that my understanding.

12         THE COURT:  Is there a third facility?

13         THE WITNESS:  There is at the United States Medical

14  Center for federal prisoners in Springfield, Missouri.

15         THE COURT:  Thank you.

16         THE WITNESS:  There is one more in Rochester

17  Minnesota.  However, they not taking those kinds of patients

18  but they are a prison hospital as well.

19  BY MR. WILSON:

20  Q.  We talked about one instance the power of attorney where

21  the defendant's behavior was consistent when he is dealing with

22  your staff.  Is there any other notable incidents with your

23  staff where the defendant behaved in an inconsistent way?

24  A.  There were two other incidents where he presented as very

25  lucid and organized and they were both where he became angry

about something.  One incident was when Dr. Herbel towards the

end of the evaluation began to challenge some of his discrepant

statements.  As I understand it Mr. Bejaoui became very angry

and accused Dr. Herbel of being a number things, throwing

insults and profanities his way about being unprofessional and

not caring about his patients and so on and so forth.  And as

Dr. Herbel explained to me, during that exchange he was struck

by, again, how organize and together and lucid and clear he

was, not confused at all but, again, seemed much more together

than other interviews and other times he had met with him

during that episode.

Q.  In your view is that consistent with Dr. First's theory

that the defendant was so terrified by his doctors that he

can't even provide his own name?

A.  No, I don't think that is consistent with that.

Q.  You said there is one other incident.

A.  With me actually.  On March, I think it was the 8th is when

I had my last interview with him after which he refused to

speak to me any longer, it was during that incident that or

during that interview, excuse me, that I approached him and

indicated to him I'd like today for us to talk about your legal

situation because that's an important part of why you are here.

And to make a long story short he became angry when I tried to

have a discussion about the indictment and I mentioned, well,

your name's on the indictment.  So it's going to be important

1   that you work with your attorney and try to defend yourself and

2   it's important you understand your rights so the government

3   doesn't railroad you.  I was trying to elicit his interest in

4   talking about the case and he got real upset about the

5   indictment.  He said he didn't have any federal charges at all.

6   He wasn't aware of that or didn't have any and became very

7   angry.  He says I have been railroaded my whole life and made a

8   lot of our comments but more organized, more fluid in his

9   speech than I had ever seen.  At other times he was stumbling

10  over his words, drooling, presenting completely different.  But

11  during that episode I saw a different side.

12  Q.  Again, consistent with the degree of paranoia that Dr.

13  First explains is his behavior?

14  A.  I don't think so, no.

15  Q.  There's one other incident referred to in your report which

16  involves an occasion after that meeting just described where

17  the defendant begins to refuse medication and then, ultimately,

18  resumes medication.  Just explain what happened there.

19  A.  Sorry.  What page are you on?

20  Q.  I believe it's 18 and 19 where it is described.

21  A.  What essentially -- yes, after my interview he got upset.

22  He said he was going to refuse his medicine.  He may have said

23  that he was going on a hunger strike.  He was clearly upset.

24  And there was concern because some of the medicine -- well, in

25  particular, his high blood pressure medicine there's concern

1   about abruptly discontinuing that medication.  Certain

2   medications it's safe to discontinue quickly, others it's not.

3   And he was informed -- let me get it right.  He was informed

4   that if he was going to refuse that medicine we needed to have

5   closer observations of him, again, for any kind of risk of

6   medical problems from abrupt discontinuation.  And he would

7   have to be moved closer to the nurses' station where he would

8   have a roommate in his room.  At the time he was single celled.

9   In fact, I think he had a room to himself through the entirety

10  of his admission.  He made it clear he did not want that to

11  happen and subsequently continued resuming with the treatment

12  for the high blood pressure medication, I think one other so as

13  to avoid having a roommate.  And he said he wasn't able to --

14  he was in too much pain to go to pill line I think it was.  And

15  when he realized he had to do that he was capable of, again,

16  overcoming that reported problem of pain and went to the pill

17  line on the unit.

18  Q.  Doctor, in your experience if a patient had a legitimate

19  delusion that their medicine was being poisoned by their

20  doctors, would he take the medicine any way in order to avoid

21  having a roommate?

22  A.  If he is legitimately paranoid?

23  Q.  Yes.

24  A.  In my experience, no.  Those who are legitimately paranoid

25  they don't take any medicine.  They have to be to the point

C8DAABEJH                        Dr. Cochrane - Direct

1   where we have to force that on them if it's legitimately

2   appropriate to do so.

3   Q.  So what is the defendant's behavior in this set of

4   incidents indicate to you about your diagnose?

5   A.  It strikes me as volitional as another example of when he

6   has -- when there's something that he wants or he has a goal or

7   wants to avoid, he is capable of organizing himself and

8   behaving appropriately.

9   Q.  And how does that inform your diagnosis of malingering?

10  A.  Again, it was another inconsistency.  I wouldn't expect

11  that of a extremely paranoid psychotic person or someone who is

12  suffering from the problems that he reports.

13  Q.  You listen to prison calls in the course of making your

14  diagnosis, correct?

15  A.  Yes.

16  Q.  Why do you review prison calls in this type of case?

17  A.  Well, any time there is question about the voracity of

18  someone's claims it's sometimes helpful to review the phone

19  calls.  Now, inmates or defendants know that the calls are

20  being monitored but you'd be surprised how sometimes people let

21  down their guard or say things or behave in a certain way that

22  can have useful information.  Sometimes it's very consistent

23  with their presentation on the unit and it confirms or

24  disconfirms hypotheses.  And other times you find

25  inconsistencies and the you have to figure out why that is.  So

C8DAABEJH                          Dr. Cochrane - Direct

1    that was my purpose of listening to Mr. Bejaoui's calls because

2    it had already been indicated in reports that there was some

3    question of truthfulness in his reports.

4    Q.   Did you review all the calls that he made from Butner when

5    you were preparing your report?

6    A.   No, I typical don't especially if they make numerous phone

7    calls.  I try to make a random sample of phone calls.  For one,

8    I don't have the time to listen to every phone call if they're

9    hours and hours.  Plus too, there's usually a point of

10   administering returns, listen to even eight calls versus 14

11   calls.  Usually in my experience anyway doesn't yield much if

12   anything.  Sometimes it could.

13   Q.   In the calls that you reviewed prior to producing your

14   report what, if anything, did you find significant?

15   A.   Well, as Dr. First having testified it was remarkable in

16   terms of the, not the content of his speech.  A lot of times I

17   am not such concerned about what they say but how they say it

18   and how they come across.  And he came across, it couldn't have

19   been more night and day with how he came across with us versus

20   the family members.  That legitimate hypothesis to say maybe

21   he's afraid of us and behaves differently than people he is

22   comfortable with.  But just looking at a pure behavioral

23   observation, he was very organized.  He did make a periodic

24   statement in which if you take it at face value would be a

25   concern for delusions.  But if you take the totality of the

C8DAABEJH                    Dr. Cochrane - Direct

1   calls he was organized.  He remembered information.  He

2   communicated, regular dialogue question and answer with his

3   wife.  You wouldn't know from the phone calls that he was an

4   impaired individual necessarily except for some smattering of

5   paranoid statements.

6   Q.  Well, Dr. First has two theories that can be broken apart

7   about these calls and you've mostly discussed one already which

8   is the notion that he is comfortable with his wife and friend

9   but terrified of you.  Is there anything else that can explain

10  why you don't agree with that theory besides what you talked

11  about a few moments ago?

12  A.  Well, one, I don't think he is terrified of us but be that

13  as it may --

14  Q.  Is anything else that you hadn't already explained to the

15  Court that you'd like to explain why you don't agree with that

16  assessment by Dr. First?  I want to make sure I haven't left

17  anything out that you'd like share.

18  A.  If you were to take at face value some of the statements

19  that he made they sound paranoid.  However, what struck me is

20  if you listen or review all the calls and I didn't until

21  reading the transcripts.

22  Q.  Let me ask you stop there.  I am going to ask you some

23  questions about the paranoid statements in a moment.  I'm just

24  focusing now on Dr. First I believe -- and correct me if you

25  have a different impression -- has expressed the view that the

C8DAABEJH                         Dr. Cochrane - Direct

1    reason that he is fully coherent when talking to his family and

2    friends and completely impaired when talking to you and to the

3    other staff at Butner is because of a paranoid delusion which

4    renders him essentially so scared that he can't function

5    outside of the context?

6    A.  No.  I understand.

7    Q.  Why do you disagree?

8    A.  I dispute that because if he was so impaired because of

9    fear with us he wouldn't talk to us at all.  He wouldn't

10   participate tot he degree with the procedures, taking the

11   medicine, eating the food and so on.  So -- and I have had

12   patients like that who are so incredibly frightened and it is

13   not that they can't remember their names, they won't talk to

14   you.  They won't even engage at all.  They won't take medicine.

15   They wouldn't do anything if they are that fearful.  And even

16   among those who are so fearful you don't see some of the --

17   such a drastic ability and disability between how they are with

18   you and how they are with people they trust in terms of the

19   cognitive impairment being so grossly impaired.  You just don't

20   see that with paranoid people.

21   Q.  Do you paranoid people feign dementia when he interact in

22   evaluations?

23   A.  Legitimately?

24   Q.  Yes.

25   A.  No, not typically.  I can't think of a case where they've

1   feigned dementia.

2   Q.  The way that the defendant did here.  Withdrawn.  Let me

3   start from block one.  The defendant here gave responses to you

4   which indicated serious dementia in your evaluation, right?

5   A.  Again, if you were to accept it at face value that would

6   have been on the forefront of your mind that there's something

7   serious going on, medically, a dementia delirium.

8   Q.  Would it be possible if the defendant or -- withdrawn.  Is

9   it consistent with your experience that a legitimately

10  extremely paranoid patient would feign dementia the way the

11  defendant did?

12  A.  No.

13  Q.  I think the second point that Dr. First has made about

14  these calls is as you alluded that there is paranoid or

15  delusional statements within the calls.  Do you believe that

16  that indicates that he is actually delusional?

17  A.  It was a consideration.  I ultimately concluded no.  In the

18  context of everything including the fact that again, what's

19  atypical is that people who are very paranoid, that's all they

20  can talk about.  They're consumed with it.  They share it with

21  everybody.  If people were trying to kill them that's all they

22  talk about on the phone with their family.  So, the fact that

23  he had four or five incidents where he would make that paranoid

24  comment and go right back to the regular conversation and in

25  the scheme of things was such a small part of that

C8DAABEJH                         Dr. Cochrane - Direct

1    communication, if he was so fearful we were trying to kill him

2    and we're trying to harm him, like I have had many patients

3    before in the past, again, they are consumed with.  That's all

4    they can talk about.  And that wasn't the case.  So that struck

5    me but it was a hypothesis I certainly entertained is that oh,

6    maybe there's a consistency here between his self-report and

7    some paranoid statements on the phone but I ruled that out.

8    Q.  Why would someone who was not legitimately suffering from

9    paranoid or from delusions make these type of statements in

10   your experience to friends and family?

11   A.  In order to elicit their cooperation in the ruse of

12   malingering symptoms.

13   Q.  Since completing your report have you reviewed other calls

14   beyond the ones you reviewed at the time?

15   A.  Yes.  I've reviewed transcripts after all the calls that

16   you provided several days ago.

17   Q.  Those are just the calls made up until the time the

18   defendant left Butner, correct?

19   A.  I believe so.

20   Q.  Having reviewed those were though generally similar to the

21   calls that you've previously reviewed?

22   A.  Yes.  Yes.  I mean there were other examples that I hadn't

23   reviewed before, you know a couple paranoid statements and a

24   couple phone calls and a few other things that, again, I did

25   not review the first go round but the general gist was similar,

1    yes.

2    Q.  I'd like to play a couple calls.  First, when did the

3    defendant arrive at Butner?

4    A.  I believe it was January 27.  Yes.

5    Q.  Could we play January 29 at 6:16 p.m. which is a transcript

6    is Government Exhibit 7 and it's the call between the defendant

7    and his wife.  Are you ready, Dr. Cochrane?

8    A.  Yes.  Go ahead.

9              THE COURT:  What page and what line?

10             MR. WILSON:  From the beginning -- to be clear, I am

11   going to play the entire call when it is, the first call that's

12   made to defendant's wife, I believe, from Butner.  I apologize.

13   It is the second call.  The first is a very brief call that's

14   terminated quickly.

15             (Audiotape played)

16   BY MR. WILSON:

17   Q.  So, doctor, that was January 29th.  Do you recall how long

18   after that you first interviewed the defendant?

19   A.  Yes.  Me personally?

20   Q.  Yes.

21   A.  I believe it was February the 3rd.

22   Q.  About four days?

23   A.  Yeah, sounds right.

24   Q.  Just to be clear, how did his presentation in that

25   interview with you compare to what you just heard on the phone?

C8DAABEJH                    Dr. Cochrane - Direct

1    A.  Well, as I described in the report he is grossly impaired,

2    didn't know where he was located, didn't know his age.  I

3    believe he didn't know his first name or how to spell his first

4    name, so on and so forth.  So he was severely impaired, not at

5    all as, obviously, is recorded here.

6    Q.  Let me point you to a couple of particular spots.  First,

7    on the bottom of page 4 we've already listened to this while

8    you were in court, but just to confirm your understanding the

9    reference to being in North Carolina.

10   A.  At the very bottom, this, yes.

11   Q.  Is that consistent with what you were hearing from him when

12   you were evaluating?

13   A.  No.  During my interview he didn't know where he was

14   located, the state or the facility.

15   Q.  And if you turn to page five and look at line 25 through

16   30, really referring back a little bit but you just heard it.

17   Defendant indicates that he thinks it's been about sevens month

18   since he was moved from New York.  And then actually counts

19   them out to include June through January.

20            MR. DRATEL:  Objection.  That's not what it says.

21            MR. WILSON:  Withdrawn.

22   Q.  Maybe more or maybe seven if you count from all June, July

23   and August, I don't even remember the months, is what he says.

24   This took place in January, correct?

25   A.  The phone call, yes.

C8DAABEJH                    Dr. Cochrane - Direct

1   Q.  How many months is it between June and January?

2   A.  My calculation it would be seven months.

3   Q.  Is that consistent with what he was telling you in the

4   interviews that he had with you?

5   A.  No.  It shows he was fairly oriented at the time.

6   Q.  Now, looking a little bit further up the page at line five

7   to 15 or so, there's a conversation about a meeting with a

8   lawyer, correct?

9   A.  Yes.

10  Q.  What does it indicate to you about his understanding of who

11  his lawyer is and his role?

12  A.  Seems to clearly indicate that he understands what the role

13  of his attorney is.  He expresses his frustration and, of

14  course, his desire to be sent back to the New York area.  But

15  it, certainly, suggests that he understands his attorney

16  represents him.

17  Q.  And this portion, the last two sentences in which defendant

18  states that the further you are getting me, the more you are

19  getting me not willing to work with him or to talk to him.

20  That is referring to the lawyer?

21  A.  That's my standing, yes.

22  Q.  What does that indicate to you, if anything, about his

23  ability or inability to work with a lawyer?

24  A.  Well, he is stating that he might not be willing do so.

25  Q.  And that would not be an inability to do so, correct?

1   A.  No, not necessarily.  I mean, I suppose you could be unable

2   and say that you are not unwilling but it seems to suggest that

3   he understands what willing to cooperate means and he is saying

4   he might not.

5   Q.  Now, go back to page two please and starting at line 31,

6   want to look down there and through to the next page, page

7   eight.  Excuse me.  Page three, line eight.  Do you draw any

8   conclusions from that about what type of information Maria

9   Bejaoui was providing to counsel?

10  A.  I am sorry.

11  Q.  Well, sorry.  Let me break it down more.  The first line

12  here is Mondher at line 31 of page two you know what they did

13  to me, Maria?  They moved me to another place.  You know I am

14  not over there any more.  Maria says, I know.  I know.  You

15  know I get your mail I called them.  What do you understand

16  that to mean?

17  A.  I understand that to mean that when she gets correspondence

18  from him she contacts the attorney.

19  Q.  And then if you go to page three, line one Maria says, you

20  know, but I am letting them know I haven't heard from you, you

21  understand.  I put it in that form because I want them to

22  understand that you are not capable of writing.

23       Do you draw any conclusions about the reliability of

24  Maria Bejaoui's statements from what I just read here?

25       MR. DRATEL:  Objection, your Honor, as to form.

C8DAABEJH                          Dr. Cochrane - Direct

1           THE COURT:  Rephrase it.

2     BY MR. WILSON:

3     Q.  Doctor, in evaluating the information you received from

4     Maria Bejaoui in making your evaluation, does what I just read

5     to you have any relevance to the weight that you give it?

6     A.  Well, does this statement have weight to her credibility?

7           THE COURT:  Are you inclined to believe the

8     truthfulness of what she told you more or less after having

9     read this?

10          THE WITNESS:  I'd be inclined to say less, your Honor.

11          MR. WILSON:  I'd now like to play a series of clips

12    from calls between the defendant and his wife taking place

13    between February 9, 2012 and February 13, 2012, some of which

14    we've seen a little bit of in the past.  That's going to be

15    transcripts, will be grand jury -- Withdrawn.  The first will

16    be Government Exhibit 11 will be the transcript that February 9

17    to the 12th at 7:48 p.m.  I need you to listen to all of these

18    in sequence and I am going to ask you some questions about them

19    considering the whole chain of conversations.

20          THE WITNESS:  I don't have Government Exhibit 11 or if

21    I do it's out of order.

22          THE COURT:  Are we doing 11 and 12?

23          MR. WILSON:  11 and 12 and 13.

24          THE WITNESS:  I have 13.  I do not have 11 or 12.

25          MR. WILSON:  Hold on one moment and we'll get you

 1  those copies.

 2           (Pause)

 3           MR. WILSON:  If we could have the February 9th call.

 4           (Audiotape played)

 5           MR. WILSON:  Next we're going to February 10 at 5 p.m.

 6  2012, goes to about the end of page three and that's Government

 7  Exhibit 12.

 8           (Audiotape played)

 9           MR. WILSON:  And last we could do a call on --

10           MR. DRATEL:  Could we just have the next line.

11           MR. WILSON:  I can read it aloud if that works for the

12  judge.  Maria says, right.  And then Mr. Bejaoui says, I am

13  sure they want to kill me, Maria.  I'm telling you they are not

14  treating my pain they just want to -- God knows what they want.

15           We can do the rest of the call if you'd like.

16           MR. DRATEL:  This is fine.

17           MR. WILSON:  We can do Exhibit 13 transcript and

18  that's a call on February 13, 2012 at 1:29 p.m. again, this is

19  defendant and his wife.

20           (Audiotape played)

21  BY MR. WILSON:

22  Q.  Doctor, in that first call Mrs.~Bejaoui states that a

23  doctor called her from Butner.

24  A.  Yes.

25  Q.  And then in the next two calls there's some considerable

C8DAABEJH                        Dr. Cochrane – Direct

1  discussion by Mr. Bejaoui about a man and al lady and we heard

2  some of that earlier today with Dr. First, correct?

3  A.   Yes.

4  Q.   And Dr. First stated that he thought that that was sort of

5  incoherent and delusional statements?

6              MR. DRATEL:   Objection, your Honor.

7              MR. WILSON:   Withdrawn.

8              MR. DRATEL:   Objection to characterization.

9  Previously said the first call.  You are talking about the

10  first call you just played.  There is nothing about a doctor in

11  that, right?

12              MR. WILSON:   Fair enough.  On line 15 of Government

13  Exhibit 11 Maria says, all right.  The doctor or psychologist

14  called me from there.

15  Q.   Where do you understand "there" to be in the context of

16  this call?

17  A.   I believe she was referring to us the doctors at Butner.

18              MR. DRATEL:   Where?  What page are you on?

19              MR. WILSON:   Government Exhibit 11, page two, line 15.

20  The first one we played is Government Exhibit 11 on February 9.

21  BY MR. WILSON:

22  Q.   Do you recall Dr. First's testimony about the lady and the

23  man in that portion of the call that was played?

24  A.   Yes, I do.

25  Q.   In your own words, what would you say that his explanation

C8DAABEJH                     Dr. Cochrane - Direct

1    for that was?

2              THE COURT:  His explanation for what?

3              MR. WILSON:  What it indicated about the defendant's

4    mental state.

5              THE WITNESS:  I don't want to mischaracterize but my

6    general recollection is that he wasn't certain what the man and

7    lady that was being referred to who that is and that it seemed

8    to suggest confusion or possible paranoia.

9    Q.  Is that your interpretation?

10   A.  No, it's not.

11   Q.  What is your interpretation?

12   A.  My interpretation in looking at all three of the phone

13   calls put together is that Mr. Bejaoui was coaching his wife as

14   to what to say and stressing to her in a coded covert way about

15   how the letters he'd been writing her are weird.  He's been

16   talking about killing you all the time and instructing her on

17   how to inform the doctors.

18   Q.  I want to point you to Government Exhibit 12, in particular

19   on page two, line 21 which is the first reference I believe to

20   the lady when she gets the phone call.

21   A.  Yes.

22   Q.  If you then go down there's a series of back and forth on

23   line 36.  We ultimately get to Maria, yeah, the people that's

24   supposed to call me.

25   A.  Yes.

C8DAABEJH                        Dr. Cochrane - Direct

1   Q.  And that one of the elements of this call that indicates to

2   you that that's what is going on here?

3   A.  That's one of the elements, yes.

4   Q.  I won't go through the others.  Are there other instances

5   where Mr. and Mrs.~Bejaoui switch back and forth between the

6   lady and the man and personal pronouns referring to themselves?

7   A.  Yes, there are.

8   Q.  Now, let me point you in particular on page three of that

9   document.

10        THE COURT:  Is that consistent with the sense of

11  paranoia on his part that he doesn't want anyone to know who

12  the lady and the man are?

13        THE WITNESS:  No, I would not find that consistent

14  with general paranoia.

15        THE COURT:  Why.

16        THE WITNESS:  Because someone who is paranoid I don't

17  believe they would have need to tell their wife to communicate

18  their paranoia and their fear and their strange writings to

19  evaluators.  I've never experienced that.

20  Q.  Speaking of the strange writing, point you to page three

21  and line nine and ten, what is Mr. Bejaoui saying there?

22  A.  Starting on page, or excuse me on line nine?

23  Q.  Yes.

24  A.  He says, letters you don't understand any more, writing the

25  letters, the handwriting is different.

C8DAABEJH                    Dr. Cochrane - Direct

1    Q.  And then if you look down to line 26, the full sentence

2    there, what does that state?

3    A.  You know and then his letters are very, um, his letters are

4    weird, the talking is very weird.  There's big changes, you

5    know, so much being away, you know things of that nature.

6    Q.  Now, you reviewed Dr. Channel's report from Devens?

7    A.  Yes, I did.

8    Q.  Do you have a copy in front of you?

9    A.  Give me a moment.

10   Q.  That would be Defense Exhibit C, I believe.  If you look on

11   page 4 of that report down to the third paragraph or the second

12   full paragraph.

13   A.  Page four.

14   Q.  Yes.

15   A.  Okay.

16   Q.  And if you go down to the third line from the bottom there

17   there's a sentence that begins "since that time".

18   A.  Yes.

19   Q.  Just read that.

20   A.  Since that time she has not visited him but has

21   corresponded with him through letters.  She reported she "can't

22   understand the letters sent by her husband describing them as,

23   quote, like and that at least something a little kid would

24   write, unquote.

25   Q.  Are there any other references in the course of the calls

1   you've reviewed to letters being received by Ms. Bejaoui?

2   A.  Sorry.  I have is there other --

3   Q.  Is other correspondence referenced in the calls?

4   A.  Yes, I do recall.  I don't remember precisely which calls

5   but there was reference to sending and receiving letters

6   between the two of them, yes.

7   Q.  And at any time does Ms. Bejaoui in those indicated that

8   she doesn't understand something that her husband wrote to her?

9   A.  Well, during the phone call with Dr. Herbel when he

10  interviewed her she did not, nor did she contact us

11  subsequently or any of the remainder of time he was with us to

12  report that.

13  Q.  In the calls there is discussion about letters that she

14  received from him, correct?

15  A.  In the recorded phone calls, yes.

16  Q.  Aside -- withdrawn.

17          In any of those calls does she suggest that she

18  doesn't understand the contents of the letter she receives?

19  A.  No.  Actually, her response seems to suggest she understood

20  what he was requesting.  She was going to fax things on.  There

21  was nothing in there that suggested, hey, what are you talking

22  about?  I don't understand letters.  What are you trying to

23  say?  There was nothing like that.

24  Q.  Going back to page three of Government Exhibit 12.  Right

25  after where we were looking at before, an outline 14 there's a

C8DAABEJH                        Dr. Cochrane - Direct

1   series of statements by Mr. Bejaoui.

2   A.  Page three, what line?

3   Q.  Says the thing he didn't want to speak about on Rikers

4   Island because it must be very hard for him because he doesn't

5   want to disclose and makes him cry and stuff like that.  And

6   what else have you noticed?  I mean what else she have noticed,

7   paranoid always talking about killing and stuff like that and

8   afraid, you know because the things they have done this him.

9            THE COURT:  What's your question?

10  Q.  What significance do you attribute to that in making your

11  diagnosis?

12  A.  In the context, again, of each of those that you've shown

13  me I think that buttresses the argument that he's malingering

14  psychiatric symptom.

15           THE COURT:  That coaching, right?

16           THE WITNESS:  That's the conclusion I draw, your

17  Honor.

18           THE COURT:  All right.  Let's go off the record.

19           (Discussion held)

20           THE COURT:  Let's pick it up tomorrow.  Did you want

21  to conclude?

22  BY MR. WILSON:

23  Q.  Mr. Dratel asked me to read to portion of that transcript

24  we were just looking at which is slightly farther down.  Just

25  give me one moment to find it again.  Line 32, Mr. Bejaoui just

C8DAABEJH                    Dr. Cochrane - Direct

1    after that statement about -- to his wife about suggesting that

2    always talking about killing and stuff like that he then says,

3    I am sure they want to kill me, Marie.  I am telling you they

4    are not treating my pain.  They just want to diagnose what they

5    want.  In light of the rest of the call how would you interpret

6    that statement?

7    A.  Again, in the context of the call I would be highly

8    suspect.  In fact, I don't give it much weight that that is an

9    actual paranoid statement.

10   Q.  Would you expect to see someone coach a loved one to say

11   that they're paranoid and then immediately fall into a paranoid

12   delusion?

13          MR. DRATEL:  Objection.

14          THE COURT:  Yes, sustained.  Leading.

15   Q.  In your experience treating paranoid individuals, would

16   this sort of coaching be considered unusual?

17          MR. DRATEL:  Objection.

18          THE COURT:  Sustained.

19          MR. WILSON:  I apologize, your Honor.

20   Q.  Have you seen this type of behavior from seriously paranoid

21   patients that you've treated?

22   A.  No, I've not.

23          MR. WILSON:  I think that's a good stopping point.

24          THE COURT:  All right.  We'll pick it up again at ten

25   tomorrow.

C8DAABEJH                         Dr. Cochrane – Direct

1              (Adjourned to Tuesday, August 14, 2012 at ten a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

DR. MICHAEL B. FIRST

Direct By Mr. Dratel . . . . . . . . . . . . . 6

Cross By Ms. Kovner  . . . . . . . . . . . . . .69

Redirect By Mr. Dratel . . . . . . . . . . . 118

Recross By Ms. Kovner  . . . . . . . . . . . 138

DR. ROBERT EARL. COCHRANE

Direct By Mr. Wilson . . . . . . . . . . . . . 143

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

  5 – 40   . . . . . . . . . . . . . . . . . .76

  41    . . . . . . . . . . . . . . . . . . 100

  1A    . . . . . . . . . . . . . . . . . . 145

                    DEFENDANT EXHIBITS

Exhibit No.                                    Received

  F   . . . . . . . . . . . . . . . . . . . .16

  B, C and D   . . . . . . . . . . . . . . . .63