C8EAABEJH                       Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              10 CR 553 (SHS)

5   MONDHER BEJAOUI,

6                  Defendant.

7   ------------------------------x

8                                             New York, N.Y.
                                              August 14, 2012
9                                             10:10 a.m.

10
    Before:
11
                      HON. SIDNEY H. STEIN,
12
                                              District Judge
13

14                            APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    ALEXANDER WILSON
17  RACHEL KOVNER
         Assistant United States Attorney
18
    JOSHUA L. DRATEL
19       Attorney for Defendant Bejaoui

20

21

22

23

24

25

C8EAABEJH                         Hearing

1          (Hearing resumed)

2          THE COURT:  All right.  Put Dr. Cochrane on the stand.

3    He is here.  Please be seated.  Apparently, the marshals had a

4    delay in bringing the defendant in.

5          Good morning, Dr. Cochrane.  You remain under oath,

6    you understand that.

7          All right.  Let's continue with the

8    direct-examination.

9          How much longer do you think you are going to have?

10         MR. WILSON:  Hoping for 45 minutes, your Honor.

11   DR. ROBERT E. COCHRANE,

12        called as a witness by the Government,

13        having been PREVIOUSLY duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MR. WILSON:

16   Q.  Dr. Cochrane, when we left off yesterday we were talking

17   about some of the prison calls you reviewed.  One final

18   question on that topic.  Are patients at Butner made aware that

19   their calls are being record?

20   A.  Yes, they are.

21   Q.  How?

22   A.  In two ways.  When they enter the institution they are

23   given what's called an inmate handbook that has information

24   about that.  And secondly posted above every telephone in the

25   institution that inmates use in English and Spanish it's posted

C8EAABEJH                           Dr. Cochrane - Direct

1   that all of these calls are monitored.

2   Q.  Now, you mentioned yesterday that you often use

3   psychological testing when you are performing competency

4   evaluations.  Did you conduct any such tests on Mr. Bejaoui?

5   A.  No, I did not.

6   Q.  Why not?

7   A.  I did not because he initially had indicated that he was

8   unable to do so because of his pain and inability to

9   concentrate and that then it became apparent as time went on

10   during the evaluation he was presenting as too impaired and

11   unable or unwilling to do so.  And then, again, as I think I

12   mentioned the other day, after the March 8 interview he wasn't

13   even speaking to me at all.  So it had become apparent that I

14   was not going to be able to administered a battery of tests to

15   Mr. Bejaoui.

16   Q.  Do you have Dr. Channel's report from Devens?

17   A.  I do.

18   Q.  Defendant's Exhibit C for the record and page 10, paragraph

19   labeled "psychological test results".

20   A.  Yes.

21   Q.  What does that indicate?

22   A.  Would you like me to read it?

23   Q.  Yes.

24   A.  Attempts to complete psychological testing with Mr. Bejaoui

25   were met with repeated complaints of pain and a total lack of

1  cooperation.  As a result, no psychological testing was

2  completed.

3  Q.  You can set that one aside for the moment, sir.  You

4  reviewed Dr. Krueger's report as well, correct?

5  A.  Yes, I did.

6  Q.  Did Dr. Krueger perform any psychological tests?

7  A.  I believe he gave a couple of tests, yes.

8  Q.  Why don't you pull that out.  It's Exhibit B and look at

9  page 5.  If you look at the bottom paragraph on that page --

10  A.  Sorry.  Page five?

11  Q.  Yes, sir.

12  A.  Yes.

13  Q.  That paragraph is entitled a mini mental status examines?

14  A.  Correct.

15  Q.  What does that paragraph indicate about that type of

16  examination?

17  A.  This is a cognitive screening test, of course, and I

18  believe it was given on two occasions and on both occasions,

19  especially the second occasion in April, he received an

20  extremely low score.

21  Q.  What impact did those results have on your diagnosis of the

22  defendant?

23  A.  Again, it was another what I believe is an inconsistency

24  that would suggest a score of four, for example, out of 30

25  would suggest someone is incredibly impaired, late stages

C8EAABEJH                    Dr. Cochrane - Direct

1  dementia, unable to get hardly any of the items correct that

2  was consistent with the numerous other pieces of data that he

3  was cognitively intact.

4  Q.  Turning to the next paragraph on page 6, it's number two,

5  the Georgia Core Competency Test 1992 Revision.

6  A.  Yes.

7  Q.  What does that indicate about the test Dr. Krueger

8  administered?

9  A.  Essentially, he performed extremely poorly on that test as

10  well.

11  Q.  And what impact, if any, does that have on your diagnosis?

12  A.  Again, very unusual you don't typically see scores that

13  low.  So I guess, again, it was another factor to suggest this

14  seems inconsistent with this individual's level of intellect

15  and knowledge.

16  Q.  And looking one more paragraph down to the Mid Hudson

17  Forensic Psychiatric Center Fitness Assessment Instrument, are

18  you familiar what that test?

19  A.  I am not.

20  Q.  What is the results that are reported on that test?

21  A.  On this instrument which appears to be a local instrument I

22  don't believe it's published in the literature but it appears

23  to be a local instrument, so all I can tell you is that they

24  indicate he failed 14 or 15 indicators of competence on this

25  test which I guess would suggest to anyone that's a very poor

1    score for performance.

2    Q.  Just to point you to the line below where it indicates 14

3    or 15 indicators some items that are identified, can you state

4    what those are?

5    A.  Includes what are called 7 critical items such as

6    orientation, including time, place and person, any one of which

7    would result in failure on this instrument.

8    Q.  And what impact, if any, does that have on your diagnosis?

9    A.  On my diagnosis?

10   Q.  Yes.

11   A.  Well, I am not sure I understand your question.  What do

12   these critical items --

13   Q.  No.  What does the defendant's reported performance on this

14   exam, what impact does that have any, if any, on your

15   diagnosis?

16   A.  Again, it was consistent with his other performance on

17   these questionnaires or tests in which he did extremely poorly,

18   much lower than you'd expect given or even if he had the

19   reported diagnosis that others have reported.

20   Q.  And what about Dr. First, did he perform any psychological

21   tests?

22   A.  I believe so, yes.

23   Q.  If you look at his report at page thirteen and that defense

24   Exhibit A.

25   A.  Page 13?

1   Q.  13, yes.

2   A.  Yes, I am there.

3   Q.  And there's a paragraph titled "mini mental status

4   examination, MME"?

5   A.  That's right.

6   Q.  What does that paragraph indicate?

7   A.  I believe -- give me a moment here.  He scored a total of

8   nine points on the mini mental status on this occasion.  Again,

9   as I think was, perhaps, testified by Dr. First, he didn't know

10  he was in New York.  He was disoriented.  He performed

11  essentially extremely poorly on this measure as well.

12  Q.  And again, same question as before, what impact, if any,

13  does that have on your diagnosis?

14  A.  Well, initially, again, I would expect a severe dementia or

15  malingering was a possibility and I ultimately concluded as you

16  know, that this was so inconsistent to the other data I

17  concluded it was an indicator of malingering.

18  Q.  Turn to the next page, to page 14 the section entitled

19  Georgia Core Competency Test.

20  A.  Yes.

21  Q.  That's same test as Dr. Krueger administered?

22  A.  Correct.

23  Q.  What does this paragraph indicate about defendant's

24  performance?

25  A.  There's no score but Dr. First documents that he performed

C8EAABEJH                    Dr. Cochrane - Direct

1    extremely poorly on this measure.  Again, not knowing who his

2    attorneys were, what the judge, attorney and some factual

3    things about court, having an extremely poor understanding of

4    this kind of information.

5    Q.  And what impact does that have on your diagnosis, if any?

6    A.  Well, again, it was inconsistent with a number of things.

7    So I didn't give it much weight as to the credibility of his

8    accounts during this instrument during the administration of

9    that instrument.

10   Q.  Do any of the tests administered by Dr. Krueger or Dr.

11   First address malingering?

12   A.  No, they do not.

13         THE COURT:  Well, when you say "addressed

14   malingering", malingering isn't the conclusion you either draw

15   or don't draw on the basis of other tests.  What type of tests

16   directly, are there tests that directly address malingering?

17         THE WITNESS:  Correct.  That was my understanding of

18   the question.  The tests does not address malingering with

19   indices or built-in scales to attest.

20         THE COURT:  You didn't apply such tests either?

21         THE WITNESS:  No, I was not able to give any tests

22   with Mr. Bejaoui.  But none of these tests have these embedded

23   validity indicators as how I was understanding the question.

24   BY MR. WILSON:

25   Q.  Are there any competency tests that try to account for

1    malingering?

2    A.   Yes.

3    Q.   Could you give an example?

4    A.   Most notable is the most now widely used and validated test

5    called the Evaluation of Competence to Stand Trial revised by

6    Richard Rogers, the author of that instrument.  And on that

7    competency measure there is scales that screen for feigning of

8    symptoms and feign of incompetence.

9    Q.   Are there any tests that are designs just to determine

10   whether a patient is malingering?

11   A.   Several incompetent measures.  You have a number of tests

12   now that are on the market that assess for both malingering of

13   cognitive symptoms and psychiatric symptoms.  Some tests have

14   what are called am embedded measures, like Dr. First testified

15   to the MMPAI that have what are called embedded validity

16   measures that look for exaggerated symptoms primarily.

17   However, there are other tests designed, specifically, to test

18   for exaggeration of psychiatric symptoms, memory impairment and

19   cognitive disturbances.

20   Q.   If the defendant had been willing or able to be tested at

21   Butner would you have performed tests like those with him?

22   A.   Yeah, I typically do and had I been able to with him I am

23   sure I would have.

24   Q.   You diagnosed the defendant as malingering, however,

25   without having been able to give those tests?

C8EAABEJH                        Dr. Cochrane - Direct

1   A.  That's correct.

2   Q.  Why were you comfortable doing that?

3   A.  Because I believed there was multiple sources of data to

4   support that opinion irrespective of psychological testing.

5   Q.  Is it unusual for you to diagnose someone as malingering

6   without being able to give them a malingering test?

7   A.  No.  Malingering tests can be useful, certainly, and it's

8   a, again, one data point but you are looking at the

9   accumulative weight of the evidence from a variety of sources

10  of information.  So there have been main occasions which I have

11  firmly concluded that an individual is malingering without

12  administering psychological tests.

13  Q.  In light of all the evidence you have regarding this

14  particular defendant are you confident in your diagnosis of

15  malingering?

16  A.  I am.

17          THE COURT:  Well, I asked the question I think of Dr.

18  First, your opinion of malingering is within a reasonable

19  degree of medical certainty?

20          THE WITNESS:  Reasonable degree of scientific

21  certainty.  I am not a medical doctor, so we have a slight

22  variation of terms.

23          THE COURT:  Is it possible to put a degree of

24  confidence on that?

25          THE WITNESS:  Yes.  I am reluctant to give a number,

C8EAABEJH                    Dr. Cochrane - Direct

1   some kind of probability number fearing it might be misleading.

2   I prefer to use adjectives and I am extremely confident in my

3   diagnosis of malingering, very confident.  I would use words

4   like that to describe the level of confidence I have.

5           THE COURT:  All right.  Thank you.

6   BY MR. WILSON:

7   Q.  Just to be clear are you also extremely confident in your

8   diagnosis of your competency determination?

9   A.  I am very confident in my competency determine as well.

10  Q.  Yesterday we discussed some disagreements.

11          THE COURT:  Excuse me.  Proceed.

12  BY MR. WILSON:

13  Q.  Turning to another subject, doctor.  Yesterday we discussed

14  some disagreements between yourself and Dr. First in your

15  analysis.  Like to just do a couple more now.  Dr. First had

16  talked about the defendant's psychotic symptoms increasing at

17  Butner when his risperidol began to be withdrawn.  Do you

18  remember him talking about that?

19  A.  Yes I do.

20  Q.  If you look at your report which is Defense Exhibit D on

21  page 14, the first full paragraph and just take moment to

22  review all that.

23  A.  Where it begins "during a mental".

24  Q.  Yes, correct.  And my reading of that is that the

25  defendant's dose of risperidol was reduced starting on February

1    9, 2012.  Let me know if that's right.

2    A.  Yes.  On February 9, following that meeting his dose of

3    risperidol was reduced and ultimately discontinued.

4    Q.  Now, had the defendant presented with psychotic symptoms

5    prior to this a date or only afterwards?

6    A.  Prior.  Not only at our institution, of course, with Dr.

7    Krueger and he presented that way with Dr. Channel at Devens.

8    Q.  How much was his risperidol reduced at this time?

9    A.  His risperidol was reduced from four milligrams to two

10   milligrams for one week and then discontinued entirely after

11   that.  He was tapered, in other words.

12   Q.  And just to be clear for anyone who may not be fully

13   familiar with the report, the original dosage of risperidol I

14   believe is on page 12 in the bottom paragraph about halfway

15   down?

16   A.  Yes.  Risperidol two milligrams twice a day, so that's four

17   milligrams a day.

18   Q.  Going back to page 14 and looking at the next paragraph

19   which is quite long and, perhaps, you can skim it.  It appears

20   to indicate the defendant was reporting psychotic symptoms

21   starting on or on February 13, 2012, is that correct?

22   A.  Yes.  He was reporting psychotic symptoms.

23   Q.  Now, in your experience is it common for patients with

24   actual psychosis to experience a significant increase in

25   psychotic behavior within four days of this sort of partial

1   reduction in dosage of risperidol?

2   A.  With just a partial reduction?

3   Q.  The type of reduction we've just discussed.

4   A.  That would be possible but unusual.

5   Q.  And was the defendant told that the risperidol was being

6   discontinued?

7   A.  He was told that, yes.

8   Q.  When was he told that?

9   A.  He was told on the 9th, the day that that taper began.

10  Q.  Have you ever evaluated any malingering patients who

11  exaggerated their symptoms even more after their medication was

12  changed?

13  A.  Yes, I have.

14  Q.  I believe Dr. First suggested yesterday that if the

15  defendant had been malingering Dr. First would have expected

16  him to more readily volunteer information about his psychotic

17  symptoms based on your experience with malingering patients.

18  Do you agree with that?

19  A.  No, because I've seen a wide range of different types of

20  people who malinger.  Some will spontaneously discuss symptoms.

21  Some will act like they're afraid and only report them when

22  directly asked.  I've seen the gamut.  Some report more

23  symptoms over time, especially when they think doctors aren't

24  believing what they're saying.  I've seen such a wide

25  variability that, no, I would concur.

C8EAABEJH                          Dr. Cochrane - Direct

1   Q.  I think your last point there, I believe Dr. First had

2   expressed some doubt that if the defendant was actually

3   malingering he wouldn't have waited so long to tell evaluators

4   about his supposedly schizophrenic brother.  Do you disagree

5   with that based on what you just said?

6   A.  Well, again, I've seen many people up the anti, so to

7   speak, or embellish even further, again, once it's becoming

8   apparent that people are doubting them or questioning the

9   voracity of their claim.  So, no, I don't find that unusual at

10  all.

11  Q.  Now, Dr. First has also argued that your diagnosis is

12  incorrect because there is no secondary gain for the defendant

13  to malinger.  Do you believe that's accurate?

14  A.  No.  It appears that there very well may be secondary gain

15  in this case.

16  Q.  What type of secondary gain do you think may be present

17  here?

18  A.  Well, most notably the possibility of deportation and

19  immigration, continued immigration problems in Mr. Bejaoui's

20  case.

21  Q.  How did you become aware of that?

22  A.  How did I become aware of the deportation issue?  I recall

23  his wife had conveyed to Dr. Herbel about the immigration

24  problem.  In fact, he was pulled over I believe by a police

25  officer at one point she conveyed, gotten into some trouble

C8EAABEJH                        Dr. Cochrane - Direct

1    because he wasn't supposed to be out of state or something

2    along those lines and she had indicated that the immigration

3    issue not resolved.  So that was the first time that I was sort

4    of clued into that.

5            And then Ms. Kovner had conveyed to me that

6    deportation may very well be an issue, especially, if there's a

7    conviction in this case.

8    Q.  Have you had other patients who malingered in order to

9    avoid potential deportation?

10   A.  Yes, I have.

11   Q.  Now, in addition to malingering --

12           THE COURT:  The costs of malingering to avoid

13   immigration are spectacularly high.  It involved spending years

14   in the federal medical institution.

15           THE WITNESS:  I am not sure.

16           THE COURT:  And separation from family.  The only

17   evidence in this record is that he loves his wife.  What would

18   be his reason to doubt that?  In references to his children.

19   He's an extraordinarily perverse calculation it seems to me to

20   trade off on the one hand years in a mental institution,

21   federal medical facility versus if and when it happens fighting

22   removal from the United States on the merits and whatever legal

23   arena is available.  I don't think that's a rational trade-off.

24           THE WITNESS:  I would respectfully disagree, your

25   Honor.  I believe people often have the assumption they'll be

C8EAABEJH                          Dr. Cochrane - Direct

1   released from custody if the case goes away and in fact I don't

2   believe Mr. Bejaoui in all likelihood would remain if he's

3   found to be not restorable there is a good chance he will not

4   able to be civilly committed because he not, from my

5   understanding, his history doesn't reflect any dangerous

6   behavior towards others.

7           So my understanding and the assumption, again, of the

8   defendant is the most important thing, is that there's a good

9   likelihood that he would be released and not confined for years

10  in a mental health institution

11          THE COURT:  Would be released and not face the

12  criminal charge here if they're found not restorable.

13          THE WITNESS:  If they are found not restorable.  In

14  fact, I've seen plenty of such cases and we've done the

15  assessment of dangerous under 4246 and found the person not

16  dangerous.  Those people are released to the community.

17          THE COURT:  All right.  Are there observations in

18  report because I don't recall seeing them, but they may be

19  there of his behavior in your institution or for that matter in

20  Devens if you have the Devens report, when he is not undergoing

21  tests?  In other words, does he have the same affect on a

22  day-to-day basis in Butner that he has here?

23          THE WITNESS:  In Butner and in Devens there was

24  relative consistency as very impaired, animated and lots of

25  complaints.  There were times again that his mood would shift

C8EAABEJH                        Dr. Cochrane - Direct

1   and he'd be quiet sullen and refused to talk to us which is

2   somewhat similar to his appearance today.  So while there's

3   fluctuation there is general consistency of a quite an impaired

4   individual with numerous complaints and numerous, presenting

5   with numerous problems.  He was very vocal about that.

6          THE COURT:  Well, did you or your staff observe what's

7   present here?  I mean a sense of vacancy, a sense of

8   nonparticipation, a sense of complete withdrawal?

9          THE WITNESS:  Not on a consistent basis.  I mean

10  sometimes, for example, I recall Dr. Herbel noting he went to

11  his room one day and he was just kind of sitting there quietly

12  much like he is now but not on a consistent basis, no.

13         THE COURT:  All right.  Thank you.

14         MR. WILSON:  Can I just have one moment, your Honor?

15  There may be a call that should shed some light on this.

16         THE COURT:  Yes.

17         (Pause)

18         MR. WILSON:  I am not sure if really does.  If we find

19  it we'll come back but at lease for the moment.

20  Q.  Doctor, I want to turn to your other diagnosis of the

21  defendant as to a mental disorder which was adjustment

22  disorder, correct?

23  A.  Yes.

24  Q.  Now, are the symptoms of his adjustment disorder the type

25  that would render someone incompetent to stand trial?

C8EAABEJH                    Dr. Cochrane - Direct

1   A.  I've never seen that to be the case, no.

2   Q.  Did you form an opinion as to whether the defendant is able

3   to understand the nature and consequences of proceedings

4   against him and to assist properly in his defense?

5   A.  Yes, I reached such a conclusion.

6   Q.  What conclusion did you reach?

7   A.  I've reached the conclusion that, yes, he did have the

8   capability, maybe not the willingness but the capability of

9   demonstrating the understanding of the nature of the case, the

10  consequences and what takes place during the proceedings and to

11  assist counsel, yes.

12  Q.  Could you summarize the basis for that opinion?

13  A.  Let's see.  First, while I do believe he suffers from

14  distress and some problems he does not suffer from a

15  significant mental illness that would -- symptoms of which

16  would interfere with his competency.  That's one aspect.

17       Secondly, he demonstrated both in comments he made

18  casually during conversations as well as on the phone and to

19  other individuals in other settings, he made several statements

20  of a legal nature that suggest that he understands at least

21  basic, some basic legal proceedings.  Of course, no one was

22  able to elicit what is the role of a judge and things like

23  that.  But there is lots of indirect evidence about his

24  comments of a legal nature coupled with the fact he used very

25  sophisticated terms, lots of analogies, metaphors.  He was able

C8EAABEJH                        Dr. Cochrane – Direct

1   to demonstrate his intellectual level sufficiently to give me

2   confidence, yes, he has a factual understanding and he

3   understands what's going on in court from a cognitive

4   standpoint.

5           Also he, as the Court and others have pointed out, had

6   that ability to communicate here in court and to work with his

7   attorney to the some point in time and there's been no

8   significant intervening event or illness that would explain how

9   he is now amnestic for that.  Even if the major depression of

10  his psychosis were true those, certainly, would not explain how

11  he lost all of his memory for those pieces of information.

12          MR. WILSON:  I want to play one small clip on this

13  topic.  Could we play February 15, 2012.  The transcript is a

14  Government Exhibit 14.  It's six p.m. between the defendant and

15  his wife.

16          THE COURT:  Government Exhibit 14?

17          MR. WILSON:  Yes.

18          THE COURT:  What page?

19          MR. WILSON:  It'll be page 4, your Honor.

20          (Audiotape played)

21  BY MR. WILSON:

22  Q.  Doctor, you find that clip to be relevant in any way to the

23  question of the defendant's competence?

24  A.  Yes.

25  Q.  Doctor, how do you -- what relevance do you find in that

C8EAABEJH                        Dr. Cochrane - Direct

1   clip?

2   A.   Well, he clearly understands what a court of law is.   He's

3   indicating he did not directly receive the dismissal on the

4   state charge.   He understands what that word means too,

5   apparently, based on his responses.   So he demonstrates that he

6   understands how certain things operate in a court of law which

7   again is completely contrary to his reported inability to

8   understand hardly anything in the court.

9   Q.   I am going to show you what's Government Exhibit 11 which

10  is a transcript of a call that we heard yesterday.   I am just

11  going to point you to a particular place.   And this is

12  something we looked at yesterday, although I don't believe with

13  you, sir, but just want to point it out so you can comment on

14  it.   And it's on page 6.   The date of this is February 9 and

15  it's Government Exhibit 11 and it's page 6 line 34 to 37.   You

16  may want to go back up to 28 for a little context, perhaps.

17  A.   Okay.

18  Q.   See the reference to 34.   Oh, we're going to take you to a

19  federal place so we can help you.   Now they're telling me there

20  is a fraud.

21       is that relevant to in your view to defendant's

22  competence?

23  A.   It seems to suggest he understands he's charged with a

24  fraud.

25  Q.   Now, let me show you Government Exhibit 23 you'll be

C8EAABEJH                        Dr. Cochrane - Direct

1   looking at page five, lines 28 to 38.

2   A.  Sorry.  What page?

3   Q.  Page five, lines 28 to 38.  Just take a minute to look at

4   that.

5            MR. DRATEL:  What's the date?

6            MR. WILSON:  The date is the 12th of March.  The call

7   is at 5:26 p.m.

8            MR. DRATEL:  What page?

9            MR. WILSON:  Page 5, lines 28 to 37.

10  Q.  Again, this is a call that we heard yesterday.  Do you find

11  that portion you just read relevant to the defendant's

12  competency?

13  A.  Well, what that shows me or demonstrates to me is that he

14  understands the power of a subpoena to have information

15  presented that might be in some way useful to his case through

16  the use of his attorney.

17  Q.  Why would that be relevant to the competency determination?

18  A.  Again, this is one of the indirect pieces of evidence that

19  I thought there were several of which which demonstrated he

20  does have -- despite how he did on the George core test and

21  during interviews with everyone he does have that

22  understanding.  He has that cognitive ability.

23  Q.  I am going to show you Government Exhibit 17.  I'd like you

24  to look at page two around line 16.  The date is February 22 at

25  6:37 p.m. again February 17, this is the defendant and his

C8EAABEJH                        Dr. Cochrane - Direct

1    wife.

2            MR. DRATEL:  Page two?

3            MR. WILSON:  Page two, line 16.  And then I would go

4    and read through page three down to call it 17 for

5    completeness.

6            (Pause)

7            THE WITNESS:  Yes.

8    Q.  Apologize.  Having read that and this is going back to the

9    earlier question about the motivation and the results of an

10   incompetency finding, do you draw any conclusions from this

11   about the defendant's awareness of the possibilities if he's

12   found incompetent?

13   A.  Yes.  I failed to mention that earlier that he appeared

14   quite motivated to be released from custody and, perhaps,

15   released to home or to some residential facility closer to home

16   that that seemed to be one of his motivations.

17   Q.  Now, I am going show you Government Exhibit 31.  Now this

18   is a translation of a February 7 call at 7:07 p.m.  It's

19   between the defendant and an individual named Riatt.

20           THE COURT:  What exhibit?

21           MR. WILSON:  31, your Honor.

22   Q.  I am going to point you to a portion of the transcript

23   which begins in the middle of page four.

24           MR. DRATEL:  What is the date?

25           MR. WILSON:  February 7th.

C8EAABEJH                    Dr. Cochrane - Direct

1   Q.  That portion of the transcript three statements by

2   Mr. Bejaoui from the bottom and it begins, what did you do

3   about the documents, Riatt?

4   A.  Yes.

5   Q.  If you could read from there over to page five until -- he

6   says until the first statement by Mr. Bejaoui on page five.

7   Just let me know when you have had a chance to read that.

8   A.  Okay.

9   Q.  Do you find that conversation that they're having relevant

10  to the issue of competence?

11  A.  Yeah.  Again, indirectly I think it shows well a couple

12  things.  One, he seems to be coherent, organized and can

13  communicate relevant information to his friend.  It also is of

14  a quasi legal nature.  It sounds to me as if it has to do with

15  this other gentleman's immigration issue.  And Mr. Bejaoui

16  seems to be trying to assist him in pointing out certain

17  documents.  I don't know what those documents are.  But

18  pointing out certain documents to make sure he gets those filed

19  or completed as part of his application.

20  Q.  Why would that be relevant to the question of competence?

21  A.  It's relevant, I guess, for the reasons I stated.  It shows

22  he's organized, coherent, can communicate information.  Can

23  assist someone else in a very rational sensible manner which is

24  relevant to his ability to do such related things with his

25  attorney and the Court.

C8EAABEJH                        Dr. Cochrane – Direct

1          THE COURT:  But isn't that also consistent with Dr.

2     First's theory because here he is talking with somebody he is

3     comfortable with so he doesn't have the tensions and the fear

4     and the paranoia that he has had dealing with the lawyers?

5          THE WITNESS:  Yes.  And I guess what I disputed when

6     he has tension or even to explore paranoia, those patients

7     don't have amnesia.  They don't forget their cognitive

8     impairment or lack of memory.  There's no clinical explanation

9     for why -- yes, if someone's nervous you might not be

10    comfortable talking with someone or not as focused as well as

11    perhaps you once were, but you are, certainly, not going to

12    forget or be amnestic again for some of this information.

13          Also, it shows that it is up there in his head.  He

14    has it.  He has the knowledge and the requisite abilities that

15    relate to competence.

16          MR. WILSON:  Your Honor, do you have any other

17    questions?

18          THE COURT:  No.

19    BY MR. WILSON:

20    Q.  Let me show you what's been marked for identification as

21    Government Exhibits 42, 43 and 44.  I am going to start with

22    42.  What is that document?

23    A.  It's titled I-765 Application for Employment Authorization

24    by the U.S. looks like Department of Homeland Security U.S.

25    Citizenship and Immigration Services.

C8EAABEJH                         Dr. Cochrane - Direct

1    Q.  Looking back at Government Exhibit 31, the transcript on

2    page 5, that first statement by Mr. Bejaoui.  He says, why

3    didn't he submit for you the 765 application, the one for the

4    work permit?

5    A.  Yes.

6    Q.  Looking at Government Exhibit 42 did you reach any

7    conclusions about this statement in the transcript?

8    A.  It appears to indicate that he is accurately identifying

9    that document.

10   Q.  And I'll ask you to just look now at 43 and 44 and just

11   tell us what the titles of those documents are?

12   A.  Exhibit 43 is titled, again, from the immigration services

13   form says form I-485 Application to Register Permanent

14   Residence or Adjust Status.  And Exhibit 44 says I-130 Petition

15   for Alien Relative.

16   Q.  And looking at page 4 of the transcript you were just

17   looking at Mr. Bejaoui says, did you fill out the 130 or the

18   485 application.

19   A.  Yes.

20   Q.  Again, does that indicate to you that he was accurately

21   identifying relevant immigration documents?

22   A.  It does appear so, yes.

23   Q.  Does that add any significance to this conversation in your

24   mind?

25   A.  He is accurate.  He is not misremembering.  He is again

C8EAABEJH                        Dr. Cochrane - Direct

1   trying to help his friend and is conveying at least correct

2   information from the phone call to the -- yeah, to his friend.

3               MR. WILSON:  Your Honor, the government would offer

4   Government Exhibits 42 through 44.

5               MR. DRATEL:  No objection.

6               THE COURT:  All three are admitted.

7   BY MR. WILSON:

8   Q.  You can set them aside.  Now, I want to point you --

9               THE COURT:  Dr. First, if you'll remember I want to

10  ask you about this issue all right when you come back on.

11              DR. FIRST:  Sure.

12  BY MR. WILSON:

13  Q.  Looking at Government Exhibit 7 which is a transcript of a

14  call from January 29.  Look at page five, line 7 to 15.

15  A.  Page five where?

16  Q.  7 to 15.

17  A.  7 to 15.

18  Q.  Now, this is a call that we've looked at and heard on

19  several occasions.  I don't want to go through again what's

20  happening.  But as to the issue of competency does this have

21  any significance?

22  A.  Much like the other statements, it's significant in the

23  sense that he recalls having a conversation with his attorney.

24  He's frustrated.  He thinks the attorney should be doing his

25  job better by getting him returned to Brooklyn or Manhattan and

C8EAABEJH                          Dr. Cochrane - Direct

1   he's saying towards the end that he may not be willing to work

2   or talk further with counsel.

3   Q.  And does that have any relevance to his abilities to

4   understand the proceedings against him or to work with his

5   defense counsel?

6   A.  Yeah.  It suggests that despite his frustration he is even

7   expressing that he may or may not be willing to continue

8   working with him and knows what his attorney is supposed to be

9   doing or wants his attorney to do but does know the attorney is

10  representing him and that's his role, the attorney's role.

11  Q.  Does this call indicate to you whether or not the defendant

12  is scared of his lawyers?

13  A.  When I listened to the call?

14  Q.  And when you listened to the call and the contact either.

15  A.  I didn't sense any fear of his attorney, no.

16  Q.  In the other calls that he reviewed across the whole sweep

17  of the time did you hear or see any indication of the

18  defendant --

19  A.  I don't recall reading in the transcripts of the calls or

20  any of the calls I listened to any indication of fear towards

21  his attorney, no.

22  Q.  In your experience the defendant's work, in fact, competent

23  to stand trial ever refuse to work with their attorney?

24  A.  Certainly.

25          MR. WILSON:  One moment, your Honor.

C8EAABEJH                    Dr. Cochrane - Direct

1   BY MR. WILSON:

2   Q.  Based on all the evidence and I think you may have said

3   this before, how confident are you that Mr. Bejaoui is

4   competent to stand trial at this time?

5   A.  I am very confident.

6            MR. WILSON:  No further questions.

7            THE COURT:  All right.  Thank you.

8            Mr. Dratel.

9            MR. DRATEL:  Thank you, your Honor.

10           THE COURT:  Do you have a sense of how long, sir?

11           MR. DRATEL:  An hour, hour and 15, I guess.

12  CROSS-EXAMINATION

13  BY MR. DRATEL:

14  Q.  Good morning, doctor.

15  A.  Good morning.

16  Q.  Yesterday you talked about your credentials, right, and

17  essentially you've spent your entire professional career with

18  the Bureau of Prisons?

19  A.  Not exactly.  The last 12 years I have been with the Bureau

20  of Prisons.  Before that in graduate school during my training

21  I worked at a variety of different settings.

22  Q.  Including mostly jail clinics?

23  A.  No, I did work at a court clinic.  I've worked at a state

24  psychiatric hospital, an outpatient crisis center, a community

25  mental health center and private practice.

C8EAABEJH                        DR. COCHRANE - CROSS

1   Q.  Those were all parts -- how long were you in private

2   practice before you came full-time at Bureau of Prisons?

3   A.  I did private -- I worked in another person's private

4   practice during my training.

5   Q.  But as a professional?

6   A.  The past six or seven years I have been taking private

7   cases outside of my work with the Bureau of Prisons.

8   Q.  But your entire career has been with the Bureau of Prisons

9   at some point or another?

10  A.  After my license, yes.

11  Q.  After your license?

12  A.  Correct.  Once -- let's see, I got my license, yes and then

13  after that I began working at the medical center, yes.

14  Q.  And your 97 and 98 court appearances for testimony all on

15  behalf of the government, right?

16  A.  I've testified for both the defense and the government.

17  Q.  You have been called by the defense in this case?

18  A.  Well, sometimes I am technically subpoenaed by the

19  prosecutors because procedurally they do that, although, my

20  opinion was and I was a witness with for the defense and

21  prepped with the defense.

22  Q.  And you said yesterday and I am quoting that forensic

23  psychology is primarily evaluation and not treatment, right?

24  A.  Primarily, not exclusively, yes.

25  Q.  You said that it's not to really help anyone but really

C8EAABEJH                          DR. COCHRANE - CROSS

1   answer questions for the Court?

2   A.  It's to help the Court but, yes.  It's not the usual

3   doctor/patient relationship.

4   Q.  But did you not testify yesterday it is not for helping

5   people in the ordinary sense?

6   A.  Yes, I mean true, yes, we want to want to help people.

7   Q.  Did you testify to that yesterday?

8   A.  What I am trying to say is --

9   Q.  I am asking you a simple question.  When did you testified

10  yesterday on direct that's it is not to help people but rather

11  to answer questions for the Court?

12  A.  That's not exactly what I said, no.

13  Q.  Well, the record will reflect --

14  A.  Correct, it will.

15  Q.  Now, Mr. Bejaoui arrived --

16          THE COURT:  Doctor, try not to joust.  Just answer the

17  questions.

18          THE WITNESS:  I am sorry, your Honor.

19  Q.  Mr. Bejaoui arrived January 7, 2012 in Butner?

20  A.  That sounds correct.

21  Q.  The first assessment by you was February 3rd, right?

22  A.  That was first date I interviewed him, yes.

23  Q.  And the last clinical evaluation was March 8?

24  A.  The last clinical interview I had with him was March 8,

25  yes.

C8EAABEJH                    DR. COCHRANE - CROSS

1    Q.  Last interview you had with him and that's about 35 days,

2    right, less -- that's about 32 days?

3    A.  Yes, I saw him after that but that sounds about right.

4    Q.  In fact, your report was dated March 23rd, right?

5    A.  Yes.  Well, I finished the report on the 16th.  It gets

6    routed internally and all of that and signed ultimately on the

7    23rd.

8    Q.  But the time between the first assessment that you made

9    your first interview with him and the last clinical session 32

10   days, right?

11   A.  That sounds right.

12   Q.  Mandate from the Court was restore to competency, right?

13   A.  Correct.

14   Q.  And you knew you had a short time window?

15   A.  I knew I had a short time.

16   Q.  Till March 16 you were asked by the Court --

17   A.  Yes.  The judge specifically contacted me about that issue

18   and asked how long it would be before we complete the

19   assessment phase of the restoration period.  So we'll know what

20   treatment he would or would not need to restore, yes.

21            THE COURT:  That telephone contact with the head of

22   your of the hospital, I think --

23            THE WITNESS:  Chief psychiatrist.

24            THE COURT:  -- and you would set forth on your report,

25   right?

1        THE WITNESS:  Yes, your Honor.

2    BY MR. DRATEL:

3    Q.  Let's talk about the time that you spent interviewing

4    Mr. Bejaoui.  Was that February 3rd, right?

5    A.  Yes.  Yeah.  That date I recall as the first date.

6    Q.  Do you have your notes by any chance?

7    A.  I do.  Which notes are you referring to?

8    Q.  The clinical notes?

9    A.  I don't have the medical records with me, no.

10        MR. DRATEL:  May I approach, your Honor?

11        THE COURT:  Yes.

12   Q.  Those are essentially the medical records, right?  May not

13   be all the medical records but you've previewed all the ones

14   that you offered, right?

15   A.  Yes.  In the medical records that I believe we all have

16   copies of, my notes would have been one part, this section

17   appears to be just my notes.

18   Q.  Well --

19   A.  Not the entire.

20        MR. WILSON:  Can we make sure we identify which?

21        MR. DRATEL:  Sorry.  3501 -- no.  It's further on

22   3501-H.

23   Q.  So that has the February 3rd, right?

24   A.  Yes.

25   Q.  And then there's a notation for February 6th.  Actually,

C8EAABEJH                        DR. COCHRANE – CROSS

1   there's another one February 3rd but that's also for collateral

2   documents.  It's not about interviewing Mr. Bejaoui.  That's

3   not about materials you were looking for?

4   A.  Yes.

5   Q.  February 6, that's from staff, right?

6   A.  February the 6th.

7   Q.  Says staff about notarization?

8   A.  I don't see that in my --

9   Q.  Look at 7112.  I am sorry.  Maybe that's 216, not 26?

10  A.  216 is the note that I wrote.

11  Q.  Yes.  Says a staff note about notarization, right?

12  A.  Staff noted patient had documents noted -- notarized

13  yesterday, yes.

14  Q.  But no other change in behavior, correct?

15  A.  Yeah.

16  Q.  Now is that based on your observation or staff observation?

17  A.  That was a staff observation.  I was not present when that

18  document as notarized.

19  Q.  Still the only time you interview him was February 3rd?

20  A.  No, I was making a note of that but I also interviewed him.

21  In fact, I quote him here during that 216.

22  Q.  So that's from you?

23  A.  Yeah.  Yeah.

24  Q.  OK.  Now the next one is the 23rd, right?

25  A.  Correct.

C8EAABEJH                          DR. COCHRANE - CROSS

1    Q.  And that's another staff note, correct?

2    A.  That's my note.

3    Q.  But I mean a staff report to you?

4    A.  Sorry.  Go ahead.

5    Q.  Says CO Lipscomb, C-O, L-I-P-S-C-O-M-B this is 7113, the

6    page number, the bottom right.  The Bates stamp noted patient

7    went to dental, right?

8    A.  Yes.

9    Q.  Okay.  And there's no -- is this your interview of him or

10   is this just CO Lipscomb's observations?

11   A.  These are the observations of the officer, the staff and

12   also includes some other things like the release of

13   information.

14   Q.  Right.  But not an interview with him?

15   A.  Correct.

16   Q.  31, 7114 and then it says, if you look it says, patient

17   noted by staff to exhibit tremor in right hand intermittently

18   right at the top of it 7114?

19   A.  Correct.

20   Q.  For March 1st?

21   A.  Yeah, that's my interview with him as well as that

22   additional data.

23   Q.  Note by staff but it also includes an additional interview

24   by you?

25   A.  Correct.  It continues on the next page.

C8EAABEJH                        DR. COCHRANE - CROSS

1    Q.  Okay.  And then March 8?

2    A.  Correct.

3    Q.  Is the railroad conversation, right?

4    A.  Yes.

5    Q.  That's essentially the last time you speak to him?

6    A.  Yes.

7    Q.  So that's four?

8    A.  Four what.

9    Q.  Four sessions?

10   A.  This doesn't include the treatment team meeting where I and

11   others were present for that.

12   Q.  You don't take notes?

13   A.  I don't take notes.

14   Q.  At those sessions?

15   A.  The document is produced.  The treatment plan and there is

16   a note referencing the treatment plan that we reviewed with the

17   question.

18   Q.  That's not my question.  Do you take notes?  Please answer

19   my.  Questions?

20           MR. WILSON:  Objection.

21           THE COURT:  Sustained.  Do you take notes?

22           THE WITNESS:  Of course.

23           THE COURT:  All right.

24   Q.  You don't have those notes?

25   A.  What notes are you referring to?

C8EAABEJH                      DR. COCHRANE - CROSS

1    Q.  You said about other sessions and I asked if you take notes

2    at those other sessions.  The Court asked if you take notes and

3    you said yes.

4    A.  I believe there is a note about the treatment team meeting,

5    yes.

6    Q.  A treatment team meeting?

7    A.  Where I was present and we interviewed.

8    Q.  Okay.  One other meeting, right?

9    A.  Right.

10   Q.  Okay.  So the total of --

11          MR. WILSON:  Objection, your Honor.  There is no

12   answer to that question and then he cut him off.

13          MR. DRATEL:  Sorry.  I thought he --

14          THE COURT:  I think we have an answer.  Next question.

15   Q.  You spent time preparing for your testimony here today,

16   right?

17   A.  Of course.

18   Q.  By the way, you also spent a fair amount of time listening

19   to the telephone conversations either initially before your

20   report and certainly since your report, right?

21   A.  Before the report I listened to random samples of calls,

22   yes.  Subsequent to my report I reviewed the transcripts of all

23   the calls and listened to some calls presented to me by the

24   prosecution.

25   Q.  If you look --

C8EAABEJH                    DR. COCHRANE - CROSS

1          THE COURT:  In connection with your preparation for

2   appearing today?

3          THE WITNESS:  Yes, it is, your Honor.

4   BY MR. DRATEL:

5   Q.  And if you look at 3501-A, if you go a few pages in.

6   A.  Exhibit 35.

7   Q.  3501-A in the front it's the first document probably.

8   A.  Thank you.  I don't see an "A" 3501-I?

9          THE COURT:  In your book, sir, first document.

10          THE WITNESS:  Oh, thank you.  I am sorry.  I am with

11   you now.

12   Q.  Okay.  There are full four pages of your notes of the

13   telephone calls, right, of your listening to transcripts?

14   A.  The first one is blocked out for some reason.

15   Q.  No.  No.  Just go about a few pages in.  If you go -- it

16   starts with the heading on the top call monitored.  Do you see

17   that?

18   A.  Yes.

19   Q.  And there are four pages of notes of the calls, right?

20   A.  Looks like it goes to the fifth page.

21   Q.  Okay.  And then if you look at 3501-B you have notes on Dr.

22   First's report, right?  You have two pages of the notes on

23   that, right?

24   A.  3501-B.

25   Q.  About three pages in?

C8EAABEJH                         DR. COCHRANE - CROSS

1   A.  Oh, thank you.  I do, yes.

2              MR. DRATEL:  Your Honor, I'd move in 3501-H, the

3   clinical records that we talked about earlier.

4              MR. WILSON:  No objection.

5              THE COURT:  3501-H admitted.

6              MR. DRATEL:  Thank you, your Honor.

7              (Defendant's Exhibit 3501-H received in evidence)

8   BY MR. DRATEL:

9   Q.  You assisted the prosecutors in preparing for the

10  cross-examination of Dr. First?

11  A.  Yes, requested that I review his report and provide --

12  Q.  Say "yes" or "no", did you assist hem?

13  A.  Yes.  I don't want to be misleading by the word "assist".

14  Q.  Did they talk to you about what types of questions might be

15  useful to ask on cross-examination?

16  A.  Yes, I believe we did.

17  Q.  Do you think that's assistance?

18  A.  That's one aspect of assistance, yes.

19  Q.  Did you also concentrate a little bit on forensics in that

20  issue, that forensic qualifications?

21  A.  I'm not sure I follow.

22  Q.  Talking about how to cross-examine Dr. First, did you

23  address or discuss with the prosecution the question about

24  forensic qualifications?

25  A.  I believe I noted when they showed me his curriculum vitae

C8EAABEJH                        DR. COCHRANE - CROSS

1   that I didn't identify that he had much background in

2   forensics, yes.

3   Q.  So that's a yes?  Is that a convoluted way of saying yes?

4   A.  You thought it was a clear way.

5            MR. WILSON:  Objection.

6            THE COURT:  Sustained.  Next question.  Move on

7   gentlemen.

8   Q.  Now, you say you looked at collateral documents, right, to

9   the try to make determinations to assist you in your evaluation

10  and your diagnosis and your conclusion, correct?

11  A.  Correct.

12  Q.  So one would be the MCC records, right?

13  A.  Yes, I believe I had those or some of those.

14  Q.  And you know that Mr. Bejaoui was diagnosed with a major

15  depressive disorder by MCC as early as January 2011, right?

16  A.  Yes, I believe so.

17  Q.  And he was at MCC from June 2010 until February 3, 2011,

18  right?

19  A.  I'd have to take your word for it or look it up.  I don't

20  recall.

21  Q.  Well, it's in the variety of reports that are admitted in

22  evidence, so I won't have to establish that further.  And so

23  that's about nine months at MCC, right?

24  A.  I guess so.

25  Q.  Eight months, I guess.  Eight months at MCC.  He was at MDC

C8EAABEJH                         DR. COCHRANE - CROSS

1    starting in February 24, 2011, right?

2    A.   MDC.

3    Q.   In Brooklyn?

4    A.   Yeah.  I believe he is there.  Again, I don't recall the

5    timeframes.

6    Q.   They'd also diagnosed him with major depressive disorder?

7    A.   I believe so.

8    Q.   In May of 20 -- sorry in February of 2011.  And he is there

9    February 4, 2011 till June 23, 2011, right?

10   A.   I believe so.

11   Q.   That's February, March, April, May, June.  That's the five

12   months, right?

13   A.   That would be five months, right.

14   Q.   And you had him for 30, 35 days before the report, right?

15   A.   Before the report we had him a little longer than that.  My

16   interviews expanded over 35 days as you pointed out.

17   Q.   MDC also diagnosed him in March of 2011 with panic disorder

18   with agoraphobia, right?

19   A.   I don't believe Dr. Channel ultimately diagnosed that.

20   Q.   I didn't say Dr. Channel.  I said MDC.

21   A.   Who do you mean, sir?

22   Q.   MDC Brooklyn.

23   A.   Which doctor diagnosed him with that.

24   Q.   I don't know which doctor but it's in the report.  Do you

25   want to look at the report?

C8EAABEJH                      DR. COCHRANE - CROSS

1   A.  That would help me identify and help me recall that.  I

2   appreciate it.

3   Q.  It's in Dr. Krueger's report.  Have you seen it?

4   A.  I have.

5   Q.  By the way, Dr. Krueger is a forensic psychiatrist?

6   A.  I believe so.

7   Q.  Well, his CV is in the record.  I don't think we have to

8   move it in evidence here.

9           MR. DRATEL:  May I approach, your Honor?

10          (Pause)

11          MR. DRATEL:  I'll move on right now.

12          THE COURT:  All right.

13  BY MR. DRATEL:

14  Q.  Devens report page six, do you have the Devens report

15  there?

16  A.  Give me a moment.  I do somewhere.

17          THE COURT:  Is that Defense C?

18          MR. DRATEL:  Yes, your Honor.

19  Q.  Okay.  If you look at the first full paragraph begins on

20  April 6, 2011, page six.

21  A.  Yes.

22  Q.  And do you see in the middle of the page it says he is seen

23  for follow-up by Dr. McLean?

24  A.  Yes.

25  Q.  He was prescribed the -- and then two sentences later he

C8EAABEJH                        DR. COCHRANE – CROSS

1  was described the antidepressant remron and given the diagnosis

2  panic disorder?

3  A.  Correct.

4  Q.  And the Devens report, obviously, is another collateral

5  document that you reviewed, right?

6  A.  The Devens report, yes.

7  Q.  Dr. Channel's conclusions we know, right?

8  A.  Correct.

9  Q.  And he's a forensic psychologist as well?

10  A.  He is.

11  Q.  And he was at Devens?

12         THE COURT:  Sir, just so I have it correct, it's not

13  the MDC that did the panic disorder?

14         MR. DRATEL:  No, it is.

15         THE COURT:  I thought it was Devens.

16         MR. DRATEL:  No.  It was in the Devens report but the

17  Devens report is recounting his Bureau of Prisons history.

18         THE COURT:  All right.

19         MR. DRATEL:  So it was a doctor at MDC in April of

20  2011.

21         THE COURT:  All right.  Thank you.

22         MR. DRATEL:  It's in the medical records as well, your

23  Honor.

24  Q.  Dr. Channel is a forensic psychologist, right?

25  A.  Yes, I believe so.

C8EAABEJH                    DR. COCHRANE - CROSS

1   Q.  And he was not -- Mr. Bejaoui was at Devens from June 24,

2   2011 until January 26, 2012, right?

3   A.  That sounds right.

4   Q.  So that's seven months, right?

5   A.  It appears to be.

6   Q.  That was the independent diagnosis we talked about, Dr.

7   Krueger and Dr. First, all reaching the same conclusion, major

8   depressive disorder?

9   A.  I believe they did, yes.

10  Q.  Now, you had a conversation where you describe the

11  conversation with Ms. Kovner when you were preparing your

12  report, correct?

13  A.  Yes.

14  Q.  And that's actually in your report.  There's a section,

15  page three, right?

16  A.  I think so.

17  Q.  And -- you want to look?

18  A.  Sure.  Yes.

19          THE COURT:  I'll take the Devens report back.

20          THE WITNESS:  Yes.

21  Q.  Now, in that paragraph it says if you look towards the

22  bottom, State of New York eventually dropped that case, right?

23  A.  Yes.

24  Q.  Do you see where this sentence is?  It says because he

25  would have been sentenced to time served any way and there were

C8EAABEJH                        DR. COCHRANE - CROSS

1    concerns about his mental status.  Do you see that?

2    A.  Yes, I do.

3    Q.  What was the basis for her information, do you know?

4    A.  I don't.

5    Q.  Did you ask her?

6    A.  I did not.

7    Q.  Did you ask her for the documents?

8    A.  Document as to.

9    Q.  His mental status in his state case?

10   A.  No, I didn't.

11   Q.  Did you pursue that in any way?  Did you ask for

12   information from Rikers Island or New York State to see if he

13   had an examination or any other mental evaluation?

14   A.  I did not.

15   Q.  You didn't think it was important?

16   A.  I don't recall if I didn't believe it was important or the

17   data wasn't available.

18   Q.  Did you check, is there anything in your notes and I'd like

19   to see it where you contacted Rikers Island or anyone from the

20   Bureau of Prisons contacted Rikers Island or New York State to

21   get information about his case?

22            MR. WILSON:  Objection, your Honor.

23            THE COURT:  The question is simply did you contact --

24            THE WITNESS:  No, I did not.

25   Q.  Did you ask Ms. Kovner if she had documents?

C8EAABEJH                        DR. COCHRANE – CROSS

1   A.  I don't believe so.  I did request, as we routinely do, of

2   both defense and prosecution should have received a letter at

3   the outset of his admission which I am sure is in our records

4   requesting all medical records and helpful information.  So I

5   assume that if there was something additional I did not obtain,

6   your office or the prosecution would have forwarded it.

7   Q.  You assumed that.  That's why you went to the Lutheran

8   Hospital.  You specifically asked for the Lutheran Hospital

9   records?

10  A.  Correct.  But I don't know that you are aware of the

11  Lutheran Hospital records.

12  Q.  Well, maybe I am not aware of the New York State records at

13  either.  Do you know whether I was his attorney in New York

14  state?

15  A.  I don't.  Again, I made the assumption you were aware of

16  the situation at Rikers, that he was there.

17  Q.  But did you know whether we had any records from Rikers?

18  A.  I don't know.

19  Q.  But when you are talking about someone's mental health

20  history and you have something from the prosecutor that says a

21  state case was disposed of in part because of concerns about

22  his mental status you took no steps, whatsoever, to inquire or

23  investigate what that meant?

24  A.  Correct.

25          MR. DRATEL:  Your Honor, may –– before I forget, if

C8EAABEJH                          DR. COCHRANE - CROSS

1    the government has any documents in that regard or any source

2    of information.

3              THE COURT:  Wait.  You are talking about Rikers

4    medical records?

5              MR. DRATEL:  No.  No.  I am talking about the basis of

6    that communication from Ms. Kovner to Dr. Cochrane because the

7    first I ever heard of it was in this report.

8              THE COURT:  There's no question.  Next?

9              THE WITNESS:  Got you.

10   BY MR. DRATEL:

11   Q.  In fact, one of the bases for your conclusions about the

12   malingering is that these symptoms seemed to just appear all of

13   a sudden a year before, right?

14   A.  I am sorry.  Could you repeat that?

15   Q.  Sure.  One of the bases for your finding of malingering is

16   that Mr. Bejaoui's symptoms appeared suddenly a year before he

17   saw you and that that was unusual that that wouldn't be the

18   kind of thing that would be authentic?

19   A.  No.  It wouldn't be unusual to have symptoms or problems to

20   have such severity with no history given that his wife also

21   indicated seeing him at Rikers and noted to troubles or

22   difficulties.  Then it was only after that then that the

23   troubles seemed to emerge is my understanding.

24   Q.  But you had evidence there that his state case from the

25   prosecutor, you had evidence that you had information that his

C8EAABEJH                         DR. COCHRANE - CROSS

1   state case was disposed of because of his mental status.  That

2   did not tell you that potentially there was antecedent problems

3   that could be just exacerbated by what happened?

4   A.  I can see it and believed that he had prior treatment with

5   antidepressant and antianxiety medication, as I noted in the

6   report.

7   Q.  Is that something that's going to dispose of a state case

8   because of someone's mental status in your opinion just being

9   on anti depressant is going to dispose of a case?

10  A.  I honestly don't know.

11  Q.  Have you ever found someone incompetent in a case disposed

12  of because of someone's mental status merely because they're on

13  antidepressants?  You as a doctor have you ever done that?

14          MR. WILSON:  Objection, your Honor.  I don't think I

15  understand the question as to him having a case disposed of.

16          MR. DRATEL:  Okay.

17  Q.  Has anyone ever been found incompetent to stand trial on

18  your opinion?  In other words, have you ever rendered an

19  opinion that someone is incompetent to stand trial because

20  they're prescribed antidepressant?  Just that.

21  A.  Well, it's hard to answer.  I don't know how to answer that

22  question.

23  Q.  Just the fact that someone is on antidepressants?

24  A.  Well, if they're so depressed they might be incompetent,

25  sure.

C8EAABEJH                          DR. COCHRANE - CROSS

1    Q.  Well, isn't that what this says?

2    A.  But not necessarily.  I mean in some cases people are on

3    antidepressants and they're actually doing quite well.

4    Q.  So the antidepressants alone is not enough to make someone

5    incompetent?

6    A.  No, it would not be enough.  I mean in and of itself, if

7    that's all the information you have, you wouldn't know

8    basically.

9    Q.  Okay.  If you look at 3501-H that's in evidence 7110.

10   A.  3501-H.

11   Q.  Yes.

12   A.  Yes.

13   Q.  7110.

14   A.  I am not sure what you mean by --

15   Q.  Look at the bottom right that Bates stamp.

16   A.  7108, 7109.

17   Q.  7110.

18   A.  7110.  Thank you.

19   Q.  If you look about two thirds down the page there's H/P

20   perhaps?

21   A.  Yes, it is.

22   Q.  Patient presentation suggests exaggerated or somatoform

23   symptoms, right?

24   A.  Yes.

25   Q.  Is that what that says?

C8EAABEJH                         DR. COCHRANE - CROSS

1    A.  Correct.

2    Q.  Seems strange that significant paranoia would have onset

3    one year ago while in custody, right?

4    A.  Correct.  That was my thinking at the time.

5    Q.  But when you heard from Ms. Kovner that his state case was

6    disposed in part because of concerns about his mental status,

7    did that not tell you something different about onset or,

8    potentially, tell you something different about the onset of

9    symptoms and when they occurred?

10   A.  Well, maybe.  Again, all I recall is that he had a history

11   of anxiety and depression.  Again, I don't know anything about

12   the state case or whether there was or wasn't any mental health

13   concern, nor do I know that paranoia was involved in that

14   situation.

15   Q.  Yesterday in your testimony you said that one of the reason

16   first your findings and your conclusions was that you said

17   there were four diagnoses to cover the spectrum of

18   Mr. Bejaoui's complaints, right?

19   A.  I recall saying that if he were to take it face value all

20   of the complaints it, certainly, would suggest a number of

21   diagnosis and I think I listed about four.

22   Q.  Right.  And one of them was dementia, right?

23   A.  Yes.

24   Q.  And in fact, none of the other doctors diagnosed him with

25   that?

C8EAABEJH                        DR. COCHRANE - CROSS

1    A.  Right.

2    Q.  They made their findings major depressive disorder without

3    dementia?

4    A.  Correct.

5    Q.  And it doesn't require dementia, correct?

6    A.  No.  They're separate disorders.

7    Q.  And in fact, mood, psychosis, cognition can all be elements

8    of major depressive disorder and not dementia?

9    A.  Not to the severity that was reported here, no.

10   Q.  In your opinion?

11   A.  In my opinion, no.

12   Q.  Correct.  Dr. Channel disagreed?

13   A.  No, I don't think he believed he had severe cognitive that

14   I recall.  He reported a depression of psychosis, yes.

15   Q.  Could somatoform disorder could account for all of that as

16   well?

17   A.  For what?

18   Q.  Mood, cognition?

19   A.  No.  Let me --

20   Q.  You've never, never heard of --

21   A.  Let me rephrase that.  Are you asking because somatoform

22   disorder or a type of somatoform disorder account for all of

23   these reported symptoms?

24   Q.  Not all of them but the ones I am talking about mood,

25   psychosis, cognition?

C8EAABEJH                    DR. COCHRANE - CROSS

1  A.  Yes.  Someone could with somatoform disorder report pseudo

2  neurological symptoms, yes, psychiatric symptoms.

3  Q.  Pseudo hallucinations?

4  A.  Yes.  It would be possible, yes.

5  Q.  You talked yesterday about markers for depression and you

6  need five of the nine, right, for a major depression?

7  A.  Yes.

8  Q.  Depressed mood is one, right?

9  A.  That's one of the symptoms, right.

10 Q.  Do you think he has a depressed mood?

11 A.  Yes.

12 Q.  Diminished interest or pleasure?

13 A.  Is there a question?

14 Q.  Do you think he satisfies that problem?

15 A.  I don't think so.  That one's difficult to tell.  Was some

16 evidence that he again was still very connected with his family

17 with doing, helping his friend and engaging in sort of

18 transactions in his case and wanting his attorney to do things.

19 So it was somewhat difficult to assess but there was clear

20 indication that he had an interest in certainly some things.

21 Q.  But diminished interest or pleasure is the question, not

22 that you have some left, right?

23 A.  Sure.

24 Q.  Now to a core --

25 A.  I didn't see any evidence of that.

C8EAABEJH                    DR. COCHRANE - CROSS

1   Q.  Did you see any evidence of interest in anything while he

2   was at Butner?

3   A.  Such as?

4   Q.  Any activity that he did?

5   A.  Writing letters and talking on the phone like a lot of

6   inmates do.

7   Q.  To his family and his close friends, anything else he

8   did --

9            MR. WILSON:  Objection, your Honor.  That is not a

10  question.  That's testimony.

11  Q.  Is there anything else he did at Butner besides writing

12  letters to his family?

13           THE COURT:  You may answer.

14           THE WITNESS:  He did a number of things.  He ate.  He

15  slept.  He had a number of appointments, like many other of the

16  other inmates do.

17  Q.  Diminished concentration.  Did he exhibit -- let's take it

18  at face value.

19  A.  If you believed his account then I would probably argue it

20  was diminished to some degree.

21  Q.  Psychomotor retardation.  Tell us what that means.

22  A.  Yes.  It's excessive slowing down of your motor movements

23  because you are so depressed because you have little physical

24  activity.

25  Q.  Did he present that as well?

C8EAABEJH                        DR. COCHRANE - CROSS

1    A.  At intervals but not consistently.

2    Q.  Feelings of worthlessness.

3    A.  He never reported to that to me.

4    Q.  Did you listen to his telephone calls?

5    A.  Yes.

6    Q.  You don't find that there?

7    A.  Don't find what?

8    Q.  Feelings of worthlessness.

9    A.  He occasionally made sympathetic pleas that he was

10   miserable and people were just going to kill him and things

11   like that, so it depends on your interpretation of the data.

12   But I didn't see consistent reports of feeling worthless or

13   suicidal.

14   Q.  He did have some suicidal ideation, right?

15   A.  He reported on at least three occasions to us he did not

16   have suicidal ideation.

17   Q.  That was not my question.  He did have --

18   A.  I don't know that he did, no.

19   Q.  You see that in the other reports?

20   A.  I see he reported it to one or more doctors before, yes.

21   Q.  So it's another prong at face value?

22   A.  At face value.

23   Q.  You said sleep problems too.  He did complain of sleep

24   problems, right?

25   A.  He complained of it but there was no evidence from

C8EAABEJH                       DR. COCHRANE - CROSS

1   observation of the staff who worked 24 hours a day there.

2   Q.  Also noted is weight loss or gain?

3   A.  Yes.  Another symptom, another criteria.

4   Q.  You ever see photos of him before he got to Butner?

5   A.  Photos?

6   Q.  Of Mr. Bejaoui before he got to Butner.

7   A.  I don't recall if I did or not to be honest.

8          MR. DRATEL:  If I may, your Honor, this is Defendant's

9   G which is defendant's rap sheet.  May I approach and I'd like

10  to move it in.

11         MR. WILSON:  No objection.

12         THE COURT:  "G" admitted.

13         (Defendant's Exhibit G received in evidence)

14  Q.  You see the photo on the first page, right?

15  A.  Yes.

16  Q.  That's Mr. Bejaoui and that's when he is taken into federal

17  custody.  In June of 2010.  Does he appear the same to you now

18  as he did?

19  A.  Could I see the photo?

20  Q.  Yes.

21  A.  Actually, it doesn't even look quite like him cause his

22  hair is so much puffier and the picture quality is very poor.

23  I'm sorry.  You question was?

24  Q.  Does he look the same?  Does that look like the same person

25  to you in effect?

C8EAABEJH                    DR. COCHRANE - CROSS

1    A.  It's hard to tell given again how bad the quality of the

2    photo is and he is now wearing glasses and his air cut is

3    different, it's hard for me to answer that.

4    Q.  Let's look then at page 3 which says page one of eight but

5    it's 6849 at the bottom right, the Bates stamp number.  Let's

6    look at this photograph when he was taken into state custody in

7    July 3rd of 2007.  Does that look like the same person to you?

8            THE COURT:  Same person as is here in the court?

9            THE WITNESS:  The same person as in court?  There's

10   resemblance.  Again, it is hard to tell with the photo being

11   poor and haircut being different but there's a resemblance.

12   Q.  That's your answer.  When I asked you, I am not asking

13   whether it's identify as him.  We know that is Mr. Bejaoui.

14   The question is, is that the same person to you in the total

15   affect.  In other words, what we are looking at here versus

16   this person who is making eye contact with the camera?

17   A.  Well, that's a snapshot in time.  I don't know how to

18   answer that.

19   Q.  Okay.  All right.

20   A.  I look different in ten different photographs you take of

21   me.  It's hard to --

22   Q.  They also said that 38 would be too old to start having

23   mood disorders.  Isn't it a fact that mood disorders get worse

24   with age?

25   A.  I am sorry.

C8EAABEJH                         DR. COCHRANE - CROSS

1              THE COURT:  Do mood disorders get worse with age?

2              THE WITNESS:  They can, yes.

3   Q.  Now, there's something called factitious disorder?

4   A.  Correct.

5   Q.  It's actually in your differential report but not in your

6   report, right?

7   A.  Yeah.  I don't believe I put it in the report, correct.

8   But of course I considered that and the other somatoform

9   disorder.

10  Q.  It involves intentionally exaggerating or feigning symptoms

11  basically for attention, care, getting on the sick role so to

12  speak, is that a fair assessment?

13  A.  Yes.

14  Q.  And it's not for secondary gain as we described it here in

15  the sense of what we're talking about, right?

16  A.  Correct.

17  Q.  And would you agree that Mr. Bejaoui was clearly interested

18  in being taken care of?

19  A.  I think to some degree, yes, and to obtain sympathy and

20  support from others, not just doctors and being a patient role

21  but from family and friends too.

22  Q.  He is demanding in that regard in some respects?

23  A.  Yes.

24  Q.  That could account for the wheelchair?

25  A.  What.

1   Q.  A factitious?

2   A.  That's one hypothesis, yes.

3   Q.  Now, on direct -- are you familiar with the DSM source

4   book?

5   A.  Yes, I am familiar with.  I haven't looked at it recently

6   but, yes.

7   Q.  You had -- on direct you said that the psychotic features

8   associated -- would only be associated with severe depression,

9   right?  That's what I think you testified to.

10  A.  That's how it's listed in the DSM.

11  Q.  But in the source book doesn't it say that it can be

12  associated with less severe depression?

13  A.  Perhaps in the sourcebook but the guide that we use for

14  diagnosis is the DSM4 two.  That's what I was referencing.

15          MR. DRATEL:  May we mark this as "I".  Could I

16  approach?

17          MS. KOVNER:  Can we see?

18  Q.  Can you explain what the DSM sourcebook is?

19  A.  I think it's just a helpful guide.  It's not a definitive

20  text for diagnosing individuals but it can be a helpful guide

21  for clinicians.  But, again, I haven't looked at it for some

22  time.  Is this one page of the document?

23  Q.  Yes.  Page 1026 and I should just -- that sentence that

24  says "that is"?

25  A.  You want me to read it?

C8EAABEJH                    DR. COCHRANE - CROSS

1   Q.  Yes.

2   A.  That is some less severe depressions do present with

3   psychotic symptoms on the other hand.  You want me to go on?

4   Q.  Yes.

5   A.  On the other hand, potential disruption involved in

6   removing psychosis from the severity coding system as thought

7   to far outweigh -- change sounds like some discussion about

8   whether to keep it in or whether or not.

9   Q.  But it does say that some of the severe depressions do

10  present with?

11  A.  Some researchers believe that.

12  Q.  Some less severe depressions.  Now, on the Devens report if

13  you could look at that.  That's C, Defendant's C I think that

14  is the one I don't --

15          THE COURT:  Here you go.

16          THE WITNESS:  Thank you again.

17  Q.  Look at the bottom of page one.  Page one, that paragraph

18  that begins at the bottom.  During his time at the facility the

19  defendant was routinely observed by his housing unit by both

20  clinical and correctional staff and these observations were

21  incorporated into the findings of this report, correct?

22  A.  Correct.

23  Q.  So he was there before the report for July, August,

24  September, some of June and some of October of 2011, right?

25  A.  I believe, yes.

C8EAABEJH                          DR. COCHRANE – CROSS

1    Q.  That's almost four months?

2    A.  I believe, yes.

3    Q.  He was there for another four months before his transfer to

4    Butner, right, till the end of January?

5    A.  I don't know whether he was held at that point.  I guess

6    so.  I'd have to look that up.

7    Q.  Okay.  But you didn't get anything subsequent from Devens

8    to that report saying oh, things have changed.  We found he was

9    malingering or we found inconsistencies that were in the report

10   or anything like that that changed its conclusions?

11   A.  No.  Dr. Channel had a rule-out of malingering that still

12   needed to be uncovered.

13   Q.  My question was at a time between October did anybody call

14   you or provide information to Butner saying since we did that

15   report in October we've discovered new things?

16   A.  No, no one did.

17   Q.  And on page two, if you look at background information, the

18   last sentence on that first paragraph talking about Mr. Bejaoui

19   he was also a very poor historian and provided a good deal of

20   contradictory information which is noted below.

21   A.  Yes.

22   Q.  So that was incorporated into Dr. Channel's findings,

23   right?

24   A.  Yes, it appears so.

25   Q.  The initial observations page seven.

C8EAABEJH                    DR. COCHRANE - CROSS

 1    A.  Of that same report?

 2    Q.  Yes.  Evaluation findings.

 3    A.  Sorry.  Yes.  Okay.

 4    Q.  Okay.  Page 7 if you look at the paragraph, the second

 5    paragraph from the bottom that begins Mr. Bejaoui was initially

 6    housed, right?

 7    A.  Yes.

 8    Q.  Do you see there's a sentence in the middle that says he

 9    was also noted to exhibit loose associations and "marked

10    paranoid ideation", correct?

11    A.  Yes.

12    Q.  And look at page eight, the paragraph that begins on August

13    5th, right?

14    A.  Yes.

15    Q.  And at the last sentence says given his agitated and

16    paranoid presentation Mr. Bejaoui was transferred to the locked

17    mental health unit, right?

18    A.  That's right.

19    Q.  And all that is incorporated in this report in Dr.

20    Channel's findings and conclusions, right?

21    A.  That's right.

22    Q.  If you look at the bottom of that page in the last sentence

23    it talks about, essentially, orientation examination given by a

24    Dr. Channel, correct?

25    A.  Yes.

C8EAABEJH                    DR. COCHRANE - CROSS

1    Q.   The last sentence reads Dr. Kennedy noted Mr. Bejaoui

2    appeared to be trying to answer the questions and became very

3    frustrated when he could not get the answer, correct?

4    A.   Yes.

5    Q.   Now, if we look at 11, page 11 if you look at the paragraph

6    in the middle of the page, based on history and presentation of

7    Mr. Bejaoui does meet diagnostic criteria and major depressive

8    disorder.  He is experiencing severe depressive episodes

9    characterized by psychotic features including delusions and

10   auditory hallucinations and Dr. Channel reached that conclusion

11   despite the fact that he knew there were inconsistencies in

12   Mr. Bejaoui's presentation, right?

13   A.   It appears so, yes.

14   Q.   And despite the fact that Mr. Bejaoui was a poor historian,

15   right?

16   A.   It appears that's his conclusion, yes.

17   Q.   And that's after three to four months of observation?

18   A.   Three or four months he was at that institution.

19   Q.   Yes.  Well, do you know why he was sent there?

20   A.   Do I know why he was sent there?

21   Q.   Yes.

22   A.   I believe because he was initially evaluated by Dr. Krueger

23   and was found to be incompetent.  I could have the sequence

24   wrong.  I apologize.  He was sent there initially.

25   Q.   It's not like he was sitting around for two months not

C8EAABEJH                    DR. COCHRANE - CROSS

1   being observed and evaluated, right?

2   A.  Oh, I don't believe so.

3   Q.  Now, Dr. Channel also talks about the report, the Devens

4   report from Dr. Channel, two other possibilities malingering

5   and conversion disorder?

6   A.  Yes.

7   Q.  The conversion disorder, the symptoms or deficits are not

8   intentional as they are with malingering?

9   A.  Yes.

10  Q.  You can present the same way.

11  A.  Say that again.

12  Q.  You could present the same things in conversion disorder

13  and if it's not intentional, it's not malingering.  In other

14  words, conversion disorder can present the same types of things

15  that would lead to finding of malingering but could --

16  A.  It could be but it doesn't necessarily have to, no.

17  Q.  Doesn't have to be but it could be.  You could have two

18  people presenting the exact same thing, right?  One could be

19  conversion disorder, one could be malingering?

20  A.  You could, theoretically, yes.

21  Q.  Now, yesterday you described, I think you used the term but

22  we don't have the transcript, Mr. Bejaoui had energy?

23  A.  At times he was quite energetic.

24  Q.  At times, okay.  That was when he was upset, right?

25  A.  That was the most notable time, yes, when he was upset.

C8EAABEJH                        DR. COCHRANE - CROSS

1   Q.  The rest of the time he is in a wheelchair?

2   A.  Well, he's always in a wheelchair.

3   Q.  You said he was cooperative yesterday too, I think at one

4   point?

5   A.  At times he --

6   Q.  You said that yesterday he was cooperative?

7   A.  In what context?

8   Q.  When you were saying why you thought that some of the

9   inconsistencies and also with respect to -- that led to the

10  conclusion that he was energetic and cooperative.

11          MR. WILSON:  Objection.

12          THE WITNESS:  I don't know if I said that.

13  Q.  So he wasn't cooperative.  You testified today you couldn't

14  even administer a psychological test on him?

15  A.  He was cooperative in some sense and uncooperative in

16  others.

17  Q.  Testing, not cooperative?

18  A.  Testing, he was not cooperative.

19  Q.  Lumbar spine MRI, not cooperative?

20  A.  Correct, not cooperative.

21  Q.  Not cooperative when asked about legal proceedings?

22  A.  Correct.

23  Q.  Refused to eat at one point?

24  A.  Yes.  That's what he said and he missed at least one meal.

25  Q.  Refused to take medication at one point?

C8EAABEJH                         DR. COCHRANE - CROSS

1   A.  For a few days, yes.

2   Q.  That's all a period of a month basically?

3   A.  I am not -- was all over a period.

4   Q.  All while he was at Butner, all of these instances are --

5   A.  Over the course of about two months, yes.

6   Q.  Was not cooperative all the time with his physical

7   therapist too?

8   A.  Sometimes he was -- later.

9   Q.  He was resistant at times?

10  A.  Correct.

11  Q.  And following that railroad conversation, in fact, he

12  refused to speak to you at all?

13  A.  After that, yes.

14  Q.  And other people too would go in, right?  It's all in that

15  3001-H right?  You want to go through it, basically, people

16  come to him.  Him he would sit there or lie there on the bed,

17  look the other way, look out of the window, refused to respond?

18  A.  At that point, yeah, he was completely uncooperative.

19  Q.  That's basically from March 8 on, right?

20  A.  Yes.  I believe that is the date.

21  Q.  Now, preparing either your report or your testimony I don't

22  know, perhaps, you could tell us maybe there is a date.  Oh,

23  yes for preparing of your testimony in May of 2012 you made a

24  list of in consistencies?

25  A.  Sorry.  In preparation of my testimony in May?

1    Q.  No.  No.  I am saying in May of -- withdrawn.

2            In May of 2012 you made a list of inconsistencies,

3    right?

4    A.  Yeah.  Those were some initial thoughts I had.

5    Q.  Look at 3501-B.

6    A.  Okay.  Yes.

7    Q.  The first one says head injury CT wife report?

8    A.  Yes.

9    Q.  And it's basically about the Lutheran Hospital claim that

10   you couldn't corroborate?

11   A.  That referencing that, yeah, the CT of his head was

12   negative and his wife reported no knowledge of head injury.

13   Q.  And then you found out subsequently that in fact he had

14   been at Lutheran Hospital but they didn't have records,

15   correct.

16   A.  I was told that yesterday during Dr. First's testimony.  I

17   don't have first and knowledge of that.

18   Q.  You weren't told about that before?  You weren't told about

19   that before yesterday?  No one told you that?

20   A.  I was not --

21   Q.  The prosecutors never told you that?

22   A.  No, they did not.

23           MR. DRATEL:  Your Honor, I would like to move in as

24   Defendant's E the subpoena response that came to your Honor

25   from Lutheran Hospital.

C8EAABEJH                        DR. COCHRANE - CROSS

1          MS. KOVNER:  By the way, I've never seen this document

2     that Mr --

3          MR. DRATEL:  I'm sorry.  I thought everybody had.

4     Okay.

5          (Pause)

6          THE COURT:  All right.  If the request is to move in

7     the subpoena response from Lutheran Hospital --

8          MR. WILSON:  No objection.

9          THE COURT:  Admitted.  But I need a copy of it also.

10         MR. DRATEL:  Yes.  Sorry.

11         (Pause)

12         MR. DRATEL:  And I am going to provide a copy.

13         THE COURT:  Defendant's E.

14         MR. DRATEL:  Yes.

15         THE COURT:  Admitted.

16         (Defendant's Exhibit E received in evidence)

17         MR. DRATEL:  Thank you.

18    Q.  It says on the front page that he was, in fact, a patient

19    there in 1999, in September of 1999 about six seven days,

20    right?

21    A.  That's what this document says, yep.

22    Q.  And your report points out that there were no records from

23    Lutheran Hospital.  That's one of the inconsistencies in his

24    representation, right?

25    A.  I spoke to the representative there.

C8EAABEJH                    DR. COCHRANE - CROSS

1   Q.  No.  That's not my question.  My question is, does your

2   report make a point of saying that he represented that and

3   there was no verification of that hospitalization?

4   A.  The report, yes, indicates that they had no records.

5   Q.  Right.  And you listed it as your first inconsistency when

6   you were preparing it.

7   A.  I listed it that the CT and the wife report -- is that what

8   you are referring to?

9   Q.  Yeah.  It's inconsistencies that he reported that because

10  it basically didn't exist?

11  A.  I had no evidence that he suffered a severe brain injury or

12  head injury, yes.

13  Q.  Those records were devoid, right?  That's what this says?

14  A.  Yes.

15  Q.  So, we'll never know, will we?

16  A.  We'll never know what?

17  Q.  What that hospitalization involve.

18  A.  I don't know if it had to do with an accident, a disease,

19  dental work, who knows?  I have no idea.

20  Q.  You think he spent the week in the hospital for dental

21  work?

22  A.  No.  That's not what I was trying to say.

23          THE COURT:  Next question.

24          THE WITNESS:  I was just saying we have no idea what

25  it's about.

C8EAABEJH                    DR. COCHRANE - CROSS

1  Q.  Another inconsistency you said also about his hand, right

2  about his reports, about his hand in your report, you make

3  quite a bit of that, isn't that correct?

4  A.  He reported various reasons for the injury.

5  Q.  But on page three of the report --

6  A.  Which report?

7  Q.  Your report says Dr. Channel noted that Mr. Bejaoui claims

8  his father cut off the fingers of his left hand.  He later

9  stated this was the result of a farming accident.  However, as

10 noted later in the report, medical examination revealed this is

11 a congenital condition, right?  That incorrect, right?

12 A.  I could have been more clear.  The last sentence --

13 Q.  I am asking you is that correct?

14 A.  I can't answer that.

15        THE COURT:  Gentlemen, one at a time.  Are you asking

16 whether it's correct that medical examination revealed it to be

17 a congenital condition?  Is that your question?

18        MR. DRATEL:  I'll start with that one.

19 Q.  Is that correct?  Medical examination revealed it to be a

20 congenital condition?

21 A.  In part, yes.  They say revealed that at least in part it's

22 congenital.  That's where I could have been more clear.

23 Q.  You left it out, right?  You left it out?

24 A.  That sentence -- but if you look later in the report --

25 Q.  But that sentence, you left it out.

C8EAABEJH                         DR. COCHRANE – CROSS

1   A.  In that sentence I did, yes.

2   Q.  In fact, the examination by the radiologist said that it

3   could be both, that there were evidence of both, that it was

4   traumatic amputation as well as congenital?

5   A.  There wasn't evidence as both.  He said he couldn't rule

6   out that it was both and that the main point that I was trying

7   to convey was the inconsistencies of whether as he reported

8   it's congenital, farm accident.

9   Q.  Well, didn't he tell the Dr. Hoss at Devens it was

10  congenital?

11  A.  At one point.

12            MR. WILSON:  Objection.

13            THE COURT:  Mr. Dratel, you have to allow the witness

14  to answer and then one question, all right.

15            MR. DRATEL:  I am trying to fashion these as yes or no

16  questions, your Honor.

17            THE COURT:  I understand.  But when you get a response

18  you are asking multiple questions.

19            MR. DRATEL:  I am sorry.

20            THE COURT:  That's fair.  Thank you.

21  BY MR. DRATEL:

22  Q.  You don't have that he said that it was congenital in that

23  paragraph, right?

24  A.  Correct.  In that paragraph I do not.

25  Q.  Right.  In fact, he told Dr. Hoss both he told her that it

C8EAABEJH                    DR. COCHRANE - CROSS

1   was as a result of something that happened to him as well as

2   congenital, right?

3   A.  He gave three explanations for why it happened.

4   Q.  In fact, Devens lists the deformity as congenital in its

5   report, right?

6   A.  I believe so.

7   Q.  When you confronted him --

8          THE COURT:  This is consistent with your view and Dr.

9   First's view that he is a poor historian?

10         THE WITNESS:  Exactly.

11  Q.  But for you that's an important inconsistency that you put

12  in your report on page three in that fashion, right?

13  A.  It was an important inconsistency.  It was one of many,

14  yeah, I guess important inconsistencies.  It led -- I am sorry.

15  Q.  By the way, when Dr. Herbel confronted him with the

16  findings of the radiologist he said it was both, right?

17  A.  The first time he acknowledged that it was congenital, yes.

18  Q.  Now, he told Dr. Hoss at Devens, didn't he?

19  A.  With us.

20  Q.  He said it was both, right?

21  A.  He said that it was both to Dr. Herbel.

22  Q.  That was my question.

23  A.  The answer is "yes".

24  Q.  Now, the Devens report you also said there's back pain was

25  inconsistent, right?  His reports of back pain you didn't

C8EAABEJH                          DR. COCHRANE - CROSS

1    believe it?

2    A.  I don't recall that I said I don't believe his back pain.

3    I believe the medical evaluations revealed that there was no

4    explanation for why he couldn't walk but, again, pain is

5    subjective.  He may have legitimate pain.

6    Q.  Well, isn't there a whole section in your report about how

7    the MRI only revealed a lumbar problem L4/L5, right, would

8    account for that?

9    A.  That what?

10   Q.  It wouldn't account for his condition as he presented it in

11   his report?

12   A.  That was only one of the examinations.  There was lab work

13   to look for inflammatory disease.  There was MRI of feet.

14   There were a series of things done that led the medical staff

15   to conclude that there's no basis for why he cannot walk.

16   Q.  You know the Devens report at page six also reported that

17   when he was taken to the hospital for the MRI of his back and

18   it showed some problems with the L4/L5 -- withdrawn.  Did you

19   ever have back pain?

20   A.  Sorry.

21            MR. WILSON:  Objection, your Honor.

22            THE COURT:  Sustained.

23   Q.  At page six of the report is after a dramatic decrease in

24   pain killing medication, his back pain got worse?

25   A.  I'm sorry.  Where are you at, sir?

C8EAABEJH                          DR. COCHRANE - CROSS

1    Q.   On page six of the Devens report?

2    A.   Could you point me to?

3    Q.   Yeah.  Yeah.  I'll point you to the exact spot.  No.  I

4    think that your report actually -- yeah, it's your report.

5    A.   Which page?

6    Q.   Page 6.  Two of Mr. Bejaoui's previous assessment do you

7    see that?

8    A.   Yes.

9    Q.   It says with him reporting his pain increased dramatically

10   after codeine and oxycodone had been discontinued.  Right, that

11   would be logical for someone with back pain, right?

12   A.   That would be illogical.

13   Q.   In other words, that when you decrease pain medication

14   their pain increases?

15   A.   No.  No.  He is saying here he reported him reporting his

16   pain increase when those medications were stopped.

17   Q.   That's what I am saying.  I'm sorry.  You are right.

18   Wouldn't be logical that after pain medication is discontinued

19   that someone suffering from back pain would then report

20   increased pain?

21   A.   That would be "yes".

22   Q.   And then they gave him dilaudid and then the following

23   sentence is his back pain improved?

24   A.   Correct.

25   Q.   That would be another logical reaction when you get

C8EAABEJH                         DR. COCHRANE - CROSS

1    happened at Devens as a pseudo?

2    A.  Pseudo is clinical term that's used so, yeah, I chose to or

3    I don't know if I or Dr. Herbel wrote this section but we chose

4    to use the clinical term as often referred as pseudo and pseudo

5    neurological.

6    Q.  Neither of you were there for any of that that occurred at

7    Devens, right, but you thought that you should use that term in

8    the report?

9    A.  Our interpretation of his behavior, yes.

10   Q.  At Devens?

11   A.  Led us to believe, not just at Devens but with led us to

12   believe that, yes, that is an appropriate way to describe it.

13   Q.  Now, they want to take him out of his wheelchair because it

14   would devote resources.  You assigned his physical therapist to

15   him in his wheelchair.  That was the alternative solution?

16   A.  Well, he had frequent --

17   Q.  I am asking the question.  The question is, you assigned a

18   physical therapist to him as a solution, correct?

19   A.  Solution to what?

20   Q.  To not taking him out of the wheelchair because you didn't

21   want to devote the unnecessary resources?

22   A.  That was one potential solution.

23   Q.  And that's not a valuable resource?

24   A.  It's one resource, yes, that's valuable.

25   Q.  If he was faking as you suggest who cares whether you take

1    his wheelchair away and he lies on the floor?

2    A.   Because -- that's a good question and, actually, we had

3    several of the medical staff in several discussions about that

4    and oftentimes when there are patients who can -- we have to

5    manage their behavior and you have to make tough decisions

6    about what to give, what to let them have access, like some

7    people you not sure if they need crutches or not.  Well,

8    crutches can be a dangerous thing in the prison.  So whether

9    they're give an individual crutches who may or may not need

10   them, those are difficult management decisions to make and

11   ultimately the medical staff decided in this case they didn't

12   want to have to deal with more exaggerated or more difficult

13   behaviors by Mr. Bejaoui.  They thought that the lesser of two

14   evils or the easiest thing would be is to let him maintain the

15   wheelchair.

16   Q.   If you took away the wheelchair would be a good test of

17   somatoform disorder?

18   A.   Not necessarily because if he falls on the floor like he

19   did at Devens, if he acts very dramatic like he has, it doesn't

20   tell you it's somatoform disorder or malingering.  That

21   wouldn't be very helpful.

22   Q.   You leave him for a day or two and not eating and he gets

23   up and goes and gets food?

24   A.   I don't think that would be appropriate to do.  So I don't

25   know if that would again be an appropriate test of somatization

C8EAABEJH                          DR. COCHRANE — CROSS

1    or malingering.

2    Q.   Now, yesterday you testified about something that you

3    described as volitional because he resumed medication instead

4    of getting a roommate.  That was your interpretation of what

5    happened, right?

6    A.   I don't recall my word was volitional.  I may have said

7    that.

8    Q.   But, in fact, is that what the import of your testimony

9    was?

10   A.   That he was capable of doing things when he had a goal in

11   mind, yes.

12   Q.   Okay.  Now isn't it a fact as you testified yesterday that

13   he was told in addition that he would get a roommate, he was

14   also told that stopping some of those medications would be

15   dangerous to his health?

16   A.   I believe he was told there could be potential danger, yes.

17   Q.   And, in fact, he only resumed the two that you told -- not

18   you but the staff whether it was you or a staff person, you

19   only resume the two that, in fact, would have been dangerous to

20   stop, high blood pressure medication and the anticonvulsive

21   medication?

22   A.   Not entirely.  He resumed all of them a few days later but,

23   yes, initially he only resumed those two.

24   Q.   And he didn't resume the antipsychotic pain medication

25   which would not have been dangerous to continue, correct?

C8EAABEJH                    DR. COCHRANE - CROSS

1    A.  I don't think he was on a antipsychotic at that point.  I

2    think it was antidepressant.  I could check to be sure.  Your

3    question again?  I am sorry.

4    Q.  I think you answered it.

5    A.  Okay.

6              THE COURT:  Mr. Dratel, I don't understand the thrust

7    of that last series.  What are you trying to show in that last

8    series of questions?

9              MR. DRATEL:  That there was another explanation rather

10   than it being choosing between oh, I don't want a roommate so

11   I'll go back on the medication.  He went back on the medication

12   because he only went to two that were a threat and he didn't

13   resume the other two.

14             THE COURT:  All right.

15   BY MR. DRATEL:

16   Q.  Talking about hearing voices.  Your report at 12 --

17   A.  Page 12, okay.

18   Q.  Let's look at the last sentence of that paragraph, not the

19   full paragraph the paragraph that continues from the prior

20   page.

21   A.  Yes.

22   Q.  Let me read it.  The voracity of this -- this is the about

23   him hearing voices, right?

24   A.  Yes, it is.

25   Q.  The voracity of this was considered questionable as the

C8EAABEJH                    DR. COCHRANE - CROSS

1   account in Dr. Channel's report of him talking to the voices --

2   voices in quotes during the interview sounded contrived and he

3   is not noted to appear preoccupied by internal stimuli, right?

4   A.  That's what it says, yes.

5   Q.  In fact, "contrived" is your word, right?

6   A.  Yeah, that's my sentence.

7   Q.  Not in Dr. Channel's report at all not in the Devens'

8   report at all when they talk about that?

9   A.  Correct.  It's my --

10  Q.  But one could read it as if it's from Dr. Channel.  One who

11  hadn't look at both reports, right?

12  A.  I suppose to --

13  Q.  And you didn't there, right?

14  A.  In Devens, no.

15  Q.  But you decided it was contrived?

16  A.  The way it was described to me, him responding to the

17  interview to a voice sounded contrived.

18  Q.  No.  No.  The Devens, you aren't there.  You decided it was

19  contrived in your interview with --

20  A.  I didn't firmly decide it.  I said it sounded as if and it

21  was considered questionable.  So I had doubts, yes, but --

22  Q.  They don't say it's your doubts, right?

23  A.  Sorry?

24  Q.  Doesn't say that it's your doubts?

25  A.  I wrote this report, so it is my sentence.  I am not

1   quoting Dr. Channel.

2   Q.  You are substituting your opinion?

3   A.  I don't think that's what I was trying to do.  I was trying

4   to describe past behavior.

5   Q.  You wrote that from the very first time you saw him, right?

6   A.  Wrote what?

7   Q.  On February 3rd your initial interview you wrote that was

8   contrived?

9   A.  That was earlier on.  That might have been the first

10  interview, yes.

11  Q.  In fact, you made up your mind from the start he was

12  malingering and he was feigning?

13  A.  No, I did not.

14  Q.  Let me show you what's been marked as 3501-F and I'll bring

15  you a copy or you have it there?

16  A.  Yes.

17  Q.  Look at 3501-F.

18          MR. DRATEL:  Do you have a copy, your Honor?

19          THE COURT:  Yes.

20  Q.  Do you have that in front of you?

21  A.  Yes.

22  Q.  That is from Dr. Herbel?

23  A.  Herbel.

24  Q.  And that's a report from him, right?

25  A.  Yes.

C8EAABEJH                    DR. COCHRANE — CROSS

1   Q.  And if you look at the second paragraph where it says Dr.

2   Cochrane assess, Dr. Cochrane assessed him on Friday, February

3   3, 2012 and concluded he was an unreliable historian, was

4   somatizing and or malingering other clinical presentations and

5   was feigning psychosis.  So from -- right, it says that?

6   A.  That's what Dr. Herbel we wrote, yeah.

7   Q.  He got that from you, right, from Dr. Cochrane?

8   A.  Yeah.  He knew from my encounter with Mr. Bejaoui I had

9   doubts.

10  Q.  It says you concluded he is feigning psychosis.  That's

11  what it says, right?  From the very first time you saw him,

12  right, one interview?

13  A.  Can I answer now?  I did not reach a firm conclusion as in

14  all initial meetings.  You have a preliminary hypothesis and I

15  believed after reviewing the records and my initial meeting

16  with Mr. Bejaoui that, yes, he was likely somatizing and/or

17  malingering symptoms.

18  Q.  It says "and feigning his psychosis".

19  A.  That's what Dr. Herbel wrote.

20  Q.  He is a poor historian?

21  A.  No.  I am just saying those are his words, not mine.

22  Q.  Are you saying that in a report like this he got it wrong?

23  A.  That's not what I am saying at all.

24          THE COURT:  But the point is that Herbel --

25          THE WITNESS:  Yes.

C8EAABEJH                    DR. COCHRANE - CROSS

1         THE COURT:  -- is saying here that you, Cochrane,

2    concluded as a result of the February 3 initial meeting.

3         THE WITNESS:  That would have been my first meeting.

4         THE COURT:  That the defendant was feigning psychosis.

5    Is that true?

6         THE WITNESS:  Yes, it's true that Dr. Herbel,

7    apparently, believed --

8         THE COURT:  He clearly did say that you reached that

9    conclusion.

10        THE WITNESS:  He said I reached that conclusion.  Now

11   it's a little misleading to say it's only because of the

12   February 3rd interview because at that point I had reviewed all

13   of the prior reports and some other information.  But Dr.

14   Herbel did say that I concluded, I personally, wouldn't have

15   chosen such a strong term because I had serious doubts but he

16   used the word "conclude".

17        THE COURT:  What Mr. Dratel is inquiring into is

18   whether your colleague who presumably you know and you have

19   confidence in, you believe and indicated a moment ago was a

20   reliable historian.  He Herbel concluded that you, Cochrane,

21   had concluded that he is, the defendant was feigning psychosis.

22        THE WITNESS:  Apparently, yes.

23   Q.  And Dr. Herbel also signed the report, yes?

24   A.  Correct.

25   Q.  Just to look back at 3501-F, you look at the top left

C8EAABEJH                    DR. COCHRANE - CROSS

1    corner under Mondher Bejaoui and then that there's a date of

2    birth then there's the at date of the note which is February 6,

3    2012, three days after your initial assessment.

4    A.  Correct.

5            THE COURT:  All right.  Let's break for lunch.  Can

6    you conclude relatively shortly after lunch?

7            MR. DRATEL:  I'll you'll try to streamline it a little

8    bit.  I can get it done within a half hour to 40 minutes.  I

9    can do that, all right.  Well, we'll pick it up at 2:30 today.

10   All right 2:30.  Try to get you home tonight, Dr. Cochrane.

11           THE WITNESS:  Thank you.

12           (Luncheon recess)

13                          AFTERNOON SESSION

14                             2:35 p.m.

15           THE COURT:  Take the stand again.

16           Be seated in the courtroom.

17           Bring the defendant out.

18           (Pause)

19           THE COURT:  Let's continue with the cross-examination

20   and conclude the cross-examination of Dr. Cochrane.

21           MR. DRATEL:  Yes, your Honor.

22           THE COURT:  You've not moved 3501-H and 3501-F into

23   evidence.  Do you intend to do so?

24           MR. DRATEL:  I thought I did 01-H, your Honor.

25           MR. WILSON:  That's my recollection as well, your

C8EAABEJH                         DR. COCHRANE - CROSS

1    Honor.

2              THE COURT:  Granted.  It is now admitted and 3501-F.

3              MR. DRATEL:  Yes, I would move that into evidence.

4              THE COURT:  Okay.  50-F admitted as well.

5              (Defendant's Exhibits 3501-F, 3501-H received in

6    evidence)

7              MR. DRATEL:  Thank you, your Honor.

8              THE COURT:  Received.

9    BY MR. DRATEL:

10   Q.  Before earlier today during your cross-examination you

11   talked about when we talked about the -- you described

12   Mr. Bejaoui's hearing voices as described in the Devens report

13   as contrived, right?

14   A.  Yes, it sounded contrived.

15   Q.  And, in fact, you reached that conclusion the very first

16   day you saw him, right, on February 3rd?

17   A.  Before I saw him when I read the report I had a suspicion.

18   Q.  And now I want to move to March 8th.  And that's the day

19   you had the conversation with him where the term "railroad"

20   came up, right?

21   A.  Yes.

22   Q.  And you've decided that he deliberately distorted what you

23   said, right?

24   A.  I believe so.

25   Q.  And there's no evidence that he deliberately did that,

1    right, but there is -- withdrawn.

2            He could have just simply misapprehended that remark,

3    correct?

4    A.  "Misapprehended"?

5    Q.  Correct, misunderstood you.

6    A.  I don't believe so.

7    Q.  That is not my question.  You don't believe there is a

8    chance he could have misunderstood you?

9    A.  I believe there could be an incredibly small chance.

10   Q.  That's why you believe he intentionally a distorted that?

11   A.  I believe he intentionally distorted that conversation.

12   Q.  The evidence that he did so intentionally is what?

13   A.  Couple things.  One, I don't believe he suffers from

14   dementia or serious cognitive problems that would interfere

15   with his ability to comprehend the conversation.

16           Secondly, he had used the term "railroad" previously.

17   And even during my discussion with him said I have been

18   railroaded my whole life, suggesting to me at the time he

19   understood the context quite clearly what I was talking about.

20   Q.  But he never said that he didn't understand what railroad

21   meant.  His problem was he said he interpreted you saying that

22   you were going to railroad him or that he was going to be

23   railroaded, right?

24           MR. WILSON:  Objection, your Honor.  Could we get a

25   cleaner question?

C8EAABEJH                    DR. COCHRANE - CROSS

1          MR. DRATEL:  Sure.

2    Q.  From the nature of his conversations with his wife which

3    you've now read, right?

4    A.  Yes, I've read some before but I have read all --

5    Q.  Could you please listen to the question?

6          THE COURT:  Gentlemen, we know he read the

7    conversations.  There's been a great deal of testimony about

8    it.  So you don't even need that question.  I understand why

9    you are doing it but ask the question and invite a fulsome

10   answer.  Try to if you can answer questions yes or not, please

11   do so.

12         THE WITNESS:  I'll try, your Honor.

13         THE COURT:  Next question.

14   BY MR. DRATEL:

15   Q.  In the conversations with his wife it's clear he knows what

16   the term "railroad" means, right?

17   A.  It appears so.

18   Q.  It's just a question of how he is going to be railroaded

19   that is of concern to him, correct?  Are they going to poison

20   me?  Are they going to -- what are they going do to me?  How

21   are they going to railroad me?  Isn't that what it says?

22   A.  He says he doesn't understand the word "railroad" but he

23   also stated as well, yes.

24   Q.  So you think that someone has to have a majoring cognitive

25   disorder to misunderstand a conversation?

C8EAABEJH                    DR. COCHRANE - CROSS

1    A.  No.  There's misunderstandings all the time.

2    Q.  But you decide -- withdrawn.

3         In the conversations with his wife, right, he never

4    says that he intentionally is distorting your conversation,

5    right?

6    A.  Correct.

7    Q.  He says they told me they were going to railroad me.  I am

8    afraid of this guy.  Either they are going to railroad me or

9    going to poison me.  Something to that effect?

10   A.  Yes.

11   Q.  And that's consistent.  He never says, listen, he told me I

12   was going to get railroaded but I am turning it into something

13   where he is going to railroad me?

14   A.  No, he didn't acknowledge that.

15   Q.  On the collage, the same thing, right?  The collage taken

16   off his wall it is in your report, same thing, right?  He

17   doesn't say Dr. Cochrane told me that I was going to be

18   railroaded but now I am going to say that Dr. Cochrane is going

19   to railroad me.  There's no sign of intentional distortion

20   there, right?

21   A.  You lost me.  I am not sure where the pictures --

22   Q.  It's in the collage.  There's text in the collage about

23   this, is there not?

24   A.  This is text in the collage about it. I believe some of

25   that --

C8EAABEJH                        DR. COCHRANE - CROSS

1    Q.  But it's consistent with him thinking you were going to

2    railroad him, correct?

3    A.  I guess so.

4    Q.  And is it fair to say that paranoia might have an impact on

5    how he received your information?

6    A.  Paranoia could impact how someone receives that

7    information.

8    Q.  In fact, in your report you said that he turned himself

9    into the victim.

10   A.  I believe I said something to that effect.

11   Q.  And, in fact, he told you that there was a conspiracy

12   against him, right?

13   A.  Yes, he said that.

14   Q.  Now, I want to talk about the telephone calls.  Do you know

15   what he sounded like before January 7, 2011?

16   A.  I'd have to look at the dates.

17   Q.  The calls are all from 2011.  I am saying before January

18   2011.

19   A.  2011, okay.

20   Q.  Do you know what he sounded like?  Have you ever heard a

21   recording of him?

22   A.  No, I have not.

23   Q.  Now, you were monitoring and listening to his recordings as

24   early as February 23, which is the first note we see in, I

25   think it's 3501-H?

1   A.  I'll accept that that's accurate.  I'd have to look it up

2   to be sure, yeah.

3   Q.  And by the way, you know you had a during the questioning

4   on direct the question was, you were asked whether he fears the

5   attorneys, right?  That's not the only element of paranoia,

6   right?  It's trust too, right?

7   A.  Correct.

8   Q.  And there's evidence that he didn't trust the attorneys?

9   A.  There's evidence he doesn't like them.

10  Q.  There's evidence he doesn't trust the attorneys?

11  A.  Yeah, I would agree with that.

12  Q.  And, in fact, on Government Exhibit 7 which is that January

13  29 call at page five towards the top, there's a paragraph where

14  he describes this is one that you went over with Mr. Wilson

15  where you described a visit?

16  A.  Yeah.

17  Q.  Have you any idea whether that's an accurate depiction of

18  what occurred at that meeting or not, right?

19  A.  No.  I wasn't privy to that conversation.

20  Q.  So that could be a paranoid version of what occurred at

21  that meeting?

22  A.  Which part?  I'm sorry.  Which part is the paranoid?

23  Q.  Well, when he talks about if -- that he asked me do I

24  understand, do I not understand?  And I said the following to

25  him.  Not I, but he says that he said something to me and that

C8EAABEJH                    DR. COCHRANE – CROSS

 1  he left the room?

 2  A.  I am sorry.  I might be on the wrong page or part.

 3  Q.  I think it's page five.

 4  A.  Page five, okay.  I am on page two.  That explains it.  I'm

 5  sorry.  Your question again?

 6  Q.  Just that I'll leave it at just that, you weren't there so

 7  you don't know what happened in that meeting between him and

 8  me, right?

 9  A.  That's correct.

10  Q.  Now, let's look at your report on page 22, please.

11  Starting with that first sentence you are talking about the

12  recordings, right?

13  A.  Yes, that's true.

14  Q.  Okay.  Now, he engaged in routine conversations with his

15  wife and a friend on several occasions speaking clearly, calmly

16  and coherently on each occasion, right?

17  A.  Yes.

18  Q.  In fact, you hadn't to listen to all the calls at that

19  point?

20  A.  As I said I've listened to a random sample.

21  Q.  So you don't know about each occasion?

22  A.  Only the occasions I listened to.

23  Q.  Well, you don't say that here, do you?

24  A.  Well, I am not sure.  I don't say what.

25          THE COURT:  You indicate in –– that you had not

1   listened to all the calls.

2          THE WITNESS:  I don't believe I indicated either way

3   whether I listened to all the calls or a certain number, no,

4   your Honor.

5          MR. DRATEL:  The witness has the book.  I was

6   wondering if the government has an additional binder by any

7   chance of the exhibits.  No?  Okay.  But if you could help me

8   with the exhibit numbers.

9          MR. WILSON:  Sure.  What do you need?

10          MR. DRATEL:  January 29, not the first call but the

11   second call, January 29.  Government Six.  We'll skip that one

12   and go straight to February 6.

13          MR. WILSON:  That's government 8.

14   Q.  If you could look at page -- go to page 6 and 7.  Let's

15   look at page 6, line 33.

16   A.  Yes.

17   Q.  Where it says they doing hate crime on me right now, right?

18   A.  Yes.

19   Q.  Then page 7, line 7:  I have proof, Maria, they took a

20   picture with a camera and everything where they hit me in my

21   hands and hit me in my head.  I don't know the officer's name

22   but they made a complaint.

23          Then if you go down to 24:  They lied.  They did it,

24   Maria, by, did it on purpose because they don't like me.  They

25   just did it by purpose.

C8EAABEJH                         DR. COCHRANE - CROSS

 1          So now let's go to 27.  27 is Government Exhibit 9, I

 2   guess.

 3          THE COURT:  Yes.

 4   Q.  We'll go to two-nine which is Government Exhibit 11.  Let's

 5   go to page four, line 16.  They want to kill me.  Yeah, they

 6   want to kill me over here.  That's what they planning to do.

 7   But it's okay.  You tell them whatever you know whatever you do

 8   you just tell them.  Remember that people are not fair, you

 9   know.  Then some of these we've seen already.  Go over to page

10   six.  There's a whole paragraph about a cover-up.  Do you see

11   that on line 22?

12   A.  On page 6.

13   Q.  Yes.

14   A.  Yes.

15   Q.  And if you look at page 7, the paragraph starting at line

16   4.

17   A.  I am sorry.  Page 7.

18   Q.  Line 4 where it says I am going to say something.  I don't

19   even know what it is.  So you are saying that he is coherent on

20   all of those recordings on each occasion.  Is that still your

21   conclusion?

22   A.  Yes, I understand each statement that he makes here.

23   Q.  No.  No.  I said is he coherent?

24   A.  Yes.

25   Q.  So that coherent when he says they're going to kill me.  So

C8EAABEJH                         DR. COCHRANE - CROSS

1    you can understand what he is saying that's coherent, that's

2    how you define coherent, if you could understand it?

3    A.   Right.   His speech is coherent.

4    Q.   Okay.   Let's look then at the next one, February 10, page

5    two.

6    A.   Which exhibit is it?

7    Q.   I think it's 12, Government Exhibit 12.

8    A.   Page two?

9    Q.   Line 19 I.  Am really convinced that these people they

10   wanted to kill me because the things that I know or the

11   mathematical algorithm and all that stuff.

12          MR. WILSON:   Could we have the rest for completeness?

13   Q.   But I'll tell the point the lady when she gets the phone

14   call on Monday thinks that she can tell you or her husband that

15   she doesn't understand them any more, you understand.   And

16   write something different.   Things are very different.   You

17   follow me?  Government has already done this, the part about

18   the algorithm, you understand?

19   A.   Yes.

20   Q.   Is it coherent?  So in other words, if I say I am a space

21   alien, I am?

22   A.   It's delusional but it's a coherent speech.

23   Q.   That's what you were intending to convey when you said he

24   was coherent in all of it?

25   A.   Yes.   If you would like me to explain I will.

C8EAABEJH                    DR. COCHRANE - CROSS

1   Q.  No.  You've explained it.

2   A.  Okay.

3   Q.  We've said some time now that I know what you mean.

4           MR. WILSON:  Objection.

5           THE COURT:  Well, you've just spent the time that you

6   would have saved and we can continue but I suggest you just ask

7   another question.

8           MR. DRATEL:  Thank you, your Honor.

9   Q.  Now, with his friend Riatt there were instances where he

10  was slurring, right?

11  A.  I believe so.

12  Q.  Slightly incoherent?

13  A.  I'd have to see the exact statements to make that

14  determination.

15  Q.  That he is crying during six or seven of those calls,

16  right, at least?

17  A.  I don't know the number but I do recall he was crying on

18  some phone calls.

19  Q.  The transcripts in the record.  Now, yesterday during your

20  direct testimony there were those calls at the end of the day

21  where you said it was evidence of coaching, right?

22  A.  Correct.

23  Q.  And by the way, you were asked about the Devens report and

24  the notation in the Devens report where Mr. Bejaoui said he is

25  writing like a little kid, right?

C8EAABEJH                    DR. COCHRANE - CROSS

1    A.  Yeah.  I vaguely recall something like that.

2    Q.  You were asked about that, right?

3    A.  I believe so.

4    Q.  And, in fact, the Devens report was written, I guess, about

5    six months before that conversation on the telephone, right?

6    A.  I'd have to look at the dates.

7    Q.  Well, how is October 6 versus February where it says

8    February 10, how is that?

9    A.  About four months counting October or not counting.

10             THE COURT:  No, February through October.

11             THE WITNESS:  February to October, yeah, I guess that

12   would be about eight months.

13   Q.  No.  No.  October to February, October 6 is the date of the

14   Devens report?

15   A.  October.  So it is October to February.

16   Q.  But has the date of the report she, obviously, spoke to

17   Devens before the report was written?

18   A.  You got me confused.

19             THE COURT:  Sir, are you going October to February or

20   February to October?

21             MR. DRATEL:  October to February.

22             THE COURT:  How many months is that?

23             THE WITNESS:  If you don't count October I count four

24   months.

25   Q.  You do count October?

1   A.  Five months.

2   Q.  October?

3   A.  That would be five months.

4   Q.  She'd obviously been spoken to before the report was

5   written, right, Mrs.~Bejaoui?

6   A.  Yes.

7   Q.  So four to five months, maybe more before this telephone

8   conversation she's reporting that the letters, not the

9   handwriting she says the letters are like from a little kid,

10  right?

11  A.  Right.

12  Q.  In the Devens report, correct, the description?

13  A.  That's in the Devens report, yes.

14  Q.  Now, Dr. Herbel spoke to Mrs.~Bejaoui, right?

15  A.  That's correct.

16  Q.  Now, there's a whole section of your report that includes

17  an account of that interview, right?

18  A.  Yeah, that interview was summarized in the report.

19  Q.  Right.  And that's at page four, correct?

20  A.  Correct.

21  Q.  It's two paragraphs that consume most of the page, right?

22  A.  Yes.

23  Q.  Now, if you need to see the transcripts of the

24  conversations again, by all means look at them.  It would be

25  Government Exhibit 11, 12 and 13, is that right?  February 10,

C8EAABEJH                          DR. COCHRANE - CROSS

1   11 and 12 the conversations that we're talking about the

2   coaching conversations, right?

3   A.  Okay.

4   Q.  Is there anything in those, in that -- is there anything in

5   the conversations that Mr. Bejaoui has with his wife that is

6   supposedly about coaching that's any of it show up in this

7   interview?

8   A.  I don't know.  I'd have to look carefully.

9   Q.  Anything about Rikers Island in there?

10  A.  In the?

11  Q.  In the interview with Dr. Herbel?

12  A.  Let me review.  Yes, there is.

13  Q.  Where would that be?

14  A.  The second paragraph, the two paragraphs you are referring,

15  toward the bottom.

16  Q.  He spent a year in Rikers Island and was tossed out.  Then

17  the feds picked him up.  I am talking about how he reacted,

18  about all the things in that coaching paragraph that you saw is

19  coaching, not in there about Rikers Island, right?

20  A.  I don't see anything, no.

21  Q.  Nothing about paranoia, right?

22  A.  I don't believe so.  Let me finish skimming this section.

23  Q.  Don't skim.  Read it carefully.

24  A.  Okay.

25          (Pause)

1   A.  No, there's nothing about paranoia.

2   Q.  Is there anything about talked about him about killing?

3   A.  No.

4   Q.  Is there any talk about weird letters?

5   A.  No.

6   Q.  Is there any talk about handwriting being different?

7   A.  No.

8   Q.  Is there anything about religion?

9   A.  No.

10  Q.  Now, in an earlier conversation I think we just actually

11  saw one of them.  In Government Exhibit 11 he tells her to tell

12  the truth, right, at page two?

13  A.  Page two -- I'm sorry -- of 11, Government 11.

14  Q.  Sorry.  Not page 2.  Hang on.  But do you recall that?

15  It's actually February 9.  What is February 9?  Is that 11?

16          MR. WILSON:  Government Exhibit 11.

17          MR. DRATEL:  I am sorry I got confused.

18          THE COURT:  Government Exhibit 11, what page?

19          MR. DRATEL:  Page three, line 13.

20          THE WITNESS:  Yes, I am sorry.  Could you repeat the

21  question please?

22  Q.  Yeah.  Doesn't he tell her it's okay, just give them the

23  truth?

24  A.  At that line, yes, he does.

25  Q.  And the next page, page 4 starting with line 16 just tell

1    them whatever you know, right?

2    A.  Yes, he makes that statement, yes.

3    Q.  Now, let's assume for a minute there that the conversations

4    are coaching conversations, the Government Exhibits 12 and 13

5    and we're 11 -- allegation at 11 itself has any coaching in it.

6    What in that that he says to that Mr. Bejaoui says to his wife

7    what part of that is untrue?

8    A.  What part of these two phone calls?

9    Q.  Yes, I am saying -- what I am saying is what part of what

10    he tells her that the lady should say, what part of that is

11    untrue about him?

12    A.  About writing weird letters and not understanding things

13    and killing, killing that.

14    Q.  Talk about killing and paranoid and that he doesn't like to

15    talk about Rikers Island, what of that is untrue?

16    A.  What of it is untrue?

17    Q.  Yes, that you can prove.

18    A.  I don't understand.

19    Q.  What is untrue?  What is demonstratively false about what

20    he told her to say?  Do you know whether he likes to talk about

21    Rikers Island with her?

22    A.  I do.  I know what --

23    Q.  Whether he likes to talk about Rikers Island with her?

24    A.  I don't know.  All I know is he informed her about things

25    to say to the doctors about Rikers Island and about other

1    events.

2    Q.  You've testified 100 times, right?

3    A.  No.  This will be the 98th time, 98 times.  Well, I know

4    you'd criticize me --

5            THE COURT:  All right.  Let's move forward.

6    Q.  Isn't it true every time in advance of testimony you have

7    reviewed your testimony with the lawyers before you took an

8    oath to testify truthfully?

9            MR. WILSON:  Objection.

10           THE COURT:  Well, just like every other witness.

11   Proceed.  Next question.

12   Q.  Isn't it true that you've prepared with lawyers?

13   A.  In many cases, yes.

14   Q.  And they've sometimes they tell you what they expect in

15   terms of testimony based on your report, based on documents

16   they'll go over with you questions and answers?

17   A.  They will go over questions and answers.  They don't tell

18   me what to say.

19   Q.  Have they ever given you an expectation of what they expect

20   to elicit in from you on the stand?

21   A.  I don't recall anyone ever giving me an expectation.

22   However, I do make it clear that I don't work for you.  I'll be

23   happy to answer any questions you have and prepare for so my

24   testimony will be clear but it's my opinion and, again, I can't

25   alter my opinion based on their desire.

C8EAABEJH                         DR. COCHRANE - CROSS

1  Q.  So, in other words, no one's ever said to you, doctor, in

2  your report it says X, Y and Z, so I am going to ask you X, Y

3  and Z and that's the answer we're looking for because it comes

4  from your report.  No one's ever said that to you?

5  A.  Not that like that, no.

6            THE COURT:  Just a minute.  I'll allow.

7  Q.  How they said --

8  A.  They said I'd like to ask you questions about what you have

9  in your report.  If I asked you this question what would your

10 truthful answer be?

11 Q.  Have they ever added to it if you left something out?

12 A.  What do you mean?

13 Q.  Like if you said, let's say for example you're being

14 interviewed by a defense attorney and you've found someone not

15 competent based on major depressive disorder and somatoform

16 disorder, right?  And they ask you a question about the report

17 and you only discussed something major depressive disorder and

18 no one has ever said to you -- you also talk about somatoform

19 disorder and that would be something that would be relevant as

20 well for you to put in your answer.  Never had that

21 conversation like that?

22 A.  Well, sometimes attorneys have leading questions and want

23 me to, perhaps, say things a certain way and I tell them what I

24 can and what I cannot say truthfully.

25 Q.  Right.  Truthfully?

1          MR. WILSON:  Objection.

2          THE COURT:  Let's move on.  I have no reason to think

3   his preparation was different than any other witness.  Proceed.

4          MR. DRATEL:  Thank you.

5   Q.  Even with coaching, how does that explain the other aspects

6   of the calls?  Withdrawn.

7          In your mind that explains all other aspects of the

8   calls that are unusual?

9   A.  Not all.  In fact, I wasn't aware of the coaching at the

10  time I wrote my report.

11  Q.  Now, I'd like to play a call that we actually heard

12  yesterday.  I'd like to play it again.  February 9, I don't

13  know if we have it queued up to the particular page but I am

14  interested in page six.

15  A.  I am sorry.  Which?

16  Q.  This is government's 11, page six, starting at line 14.

17  Just It set it up on the transcript he is talking about his

18  background and he is giving information to his wife about his

19  mother's family and their name, right?

20  A.  What page?  I am sorry.

21  Q.  Six.

22  A.  Yes.

23  Q.  Okay.  Could we just play that section.

24          (Audiotape played)

25  Q.  Just a little.  Earlier?

1    A.  I was going to say I am lost.

2    Q.  We're about a page and a half early.

3         THE COURT:  Where do you intend to start, sir?  Page

4    six, what line?

5         MR. DRATEL:  Line 14.

6         THE COURT:  All right.

7         (Audiotape played)

8         THE COURT:  That was the middle of page five.  I think

9    you should just run it and find it right now.

10        (Audiotape played)

11   Q.  Now that statement in that call, in that pause, you heard

12   the pause?

13   A.  Yes.

14   Q.  Feigned?

15   A.  Well, I don't know if that pause was feigned.

16   Q.  But the memory failure, that's part of it, feigned?

17   A.  I am not sure what you are asking.

18        THE COURT:  He says I have the memory issues, right?

19   Now the question is, do you believe the defendant was feigning

20   having memory issues right now?

21        THE WITNESS:  With this one statement, no.  I would

22   have to again look at the context of all the calls but it's

23   either his perception of not remembering things real well at

24   the moment or it's feigned.  I don't know which.

25   Q.  You don't know?

C8EAABEJH                          DR. COCHRANE - CROSS

1   A.  Correct.

2          MR. DRATEL:  Could we play March 19 please.

3   Government's 4 please.  Thank you.

4          (Audiotape played)

5   BY MR. DRATEL:

6   Q.  Mr. Bejaoui's affect during that call, real or fake?

7   A.  I think it's very dramatic.

8          THE COURT:  "Dramatic" or "traumatic"?

9          THE WITNESS:  Dramatic, your Honor, an exaggeration of

10  a dramatic presentation, yes.

11  Q.  But real or fake?

12  A.  Is what real, the whole conversation?

13  Q.  Your opinion of his affect during the call?

14  A.  His affect seemed, he seemed legitimately distressed.

15  Q.  And you didn't order anybody to assault him, right?

16  A.  No.  In fact, no one did assault him.

17  Q.  So that was somewhat delusional in that call?

18  A.  That was a distortion.  I would not call it a delusion.  I

19  would call it a distortion of a plea or sympathy, perhaps, but

20  I don't believe he was delusional as you've heard me testify

21  before.

22          THE COURT:  Mr. Dratel, do you happen to remember what

23  the record reflects as to the approximate date that Dr. First

24  told the defendant that the calls were being monitored and he

25  had listened to them?

C8EAABEJH                      DR. COCHRANE - CROSS

1              MR. DRATEL:  This is a call from Butner.  It's well

2      after this time.

3              THE COURT:  It's well after?

4              MR. DRATEL:  Yes.  He is already back at MDC.

5              THE COURT:  That only Dr. First sees him first when he

6      is at MDC.

7              MR. DRATEL:  Correct.

8              THE COURT:  After Butner.  Thank you.

9      BY MR. DRATEL:

10     Q.  Paranoid?

11     A.  What?

12     Q.  Is there paranoia in the call?

13     A.  He made statements that on the surface would sound

14     paranoid, yes.

15     Q.  And going back to page 22 of your report where you say that

16     he engaged in routine conversations with his wife and friend on

17     several occasions speaking calmly and clearly on each occasion.

18     Would you characterize that call that way?

19     A.  No.  I didn't listen to this call when I wrote the report

20     I'd characterize this as he is much more distraught.  He

21     conveys the points that he wants to convey.  You understand

22     what he is trying to convey but it's different, certainly, in

23     tone and affect.

24     Q.  Is there secondary gain in that call?

25     A.  Perhaps primary gain is how I would put it.

C8EAABEJH                      DR. COCHRANE - CROSS

1    Q.  But is there secondary gain in the call?

2    A.  Maybe.

3    Q.  What's the secondary gain for his affect or his distraught

4    conversation there?

5    A.  I would say that the gain I believe like many other times

6    he's engaged in is to elicit sympathy and support from loved

7    ones.

8    Q.  Which is part of the disorder, right?

9    A.  Part of what disorder?

10   Q.  Munchausen?

11   A.  Munchausen.  Well, that's a somatoform disorder.  Are you

12   saying that that's part of Munchausen?

13   Q.  I am saying as somatoform what we talked about before

14   factitious disorder, right, when he talked about wanting to get

15   on the sick role --

16   A.  That could be interpreted that way, sure.

17   Q.  Any secondary gain that you could see from that other

18   conversation where he has that discernible pause and then he

19   says I can't remember when he is in a conversation talking

20   about something completely unrelated to anything we've talked

21   about that's the substance of this case, the one we just

22   listened to before, that little snippet.  What's the eight

23   secondary gain?

24   A.  He doesn't remember, if he doesn't remember?  I don't know

25   if there's secondary gain.  I mean we're all forgetful and,

C8EAABEJH                    DR. COCHRANE - CROSS

1    perhaps, this is a legitimate memory, something he doesn't

2    remember or, again, he's eliciting sympathy or he does remember

3    and he is trying to reiterate with her, see how impaired I am.

4    See how impaired I am.

5    Q.  Okay.  Now, when you, in preparation for your testimony you

6    talked about secondary gain being to avoid prosecution and

7    deportation, right?

8    A.  Yes.

9    Q.  And earlier you only talked about deportation, right, in

10   your direct testimony at the end there?

11   A.  Earlier today.

12   Q.  Yes.

13   A.  I only talked about deportation.

14   Q.  Right.

15   A.  I believe I talked about deportation and desire to get back

16   to Brooklyn or Manhattan.

17   Q.  Okay.  Now you heard at the end of that call that his wife

18   is telling him if he pleads guilty he gets time-served, right?

19   A.  Which call?

20   Q.  The most recent one, the one where he is crying throughout?

21            THE COURT:  The March 19th call?

22            MR. DRATEL:  Government's 27.

23            THE WITNESS:  Can you point me to the page?  I am

24   sorry.

25   Q.  Sure.  Page 7, line 27.

1   A.  When he decided to plead?

2   Q.  Keep going down.

3   A.  Let's say -- you mean where he says, let's say if he

4   changes his plea?

5   Q.  Yes.  The entry that starts with Maria on line 27, page 7.

6   A.  Okay.  And your question again?  I'm sorry.

7              THE COURT:  Is she telling him that if he pleads he's

8   going to get time-served.  And the next question is going to

9   be, well, doesn't he -- can't he gain -- doesn't he have

10  something to gain by doing that?  Start with the first

11  question.

12             THE WITNESS:  She is conveying that that's what -- a

13  person named Laura, yes, conveyed.

14  Q.  You don't think she means "Lindsey"?

15  A.  Perhaps.  I am not sure who she was referring to.

16  Q.  Now, so -- and that plea offer was communicated in

17  December, December 6th of 2011?

18  A.  I don't know.

19  Q.  Well, I do need to --

20             MS. KOVNER:  I am not sure what you asked him.

21             MR. DRATEL:  Oh, that the plea offer was communicated

22  December 6, 2011.

23             THE COURT:  What was the question?

24  BY MR. DRATEL:

25  Q.  I am saying that in terms of secondary gain, knowing that

1    he could get out of prison it's been communicated to him in

2    this call and, perhaps, in other ways that he could get -- that

3    he has a shot a realistic shot at time-served and here she's

4    telling him time-served.  If he pleads guilty and what's the

5    secondary gain of continuing to say he doesn't remember and not

6    doing that?

7    A.  Because --

8    Q.  In the context of the prosecution let's separate them out

9    prosecution and deportation.  In terms of the prosecution, is

10   there any secondary gain in reducing that offer?

11   A.  In terms of prosecution, no, it wouldn't appear.  It's just

12   the prosecution.  No, I would agree with you.

13   Q.  And you also mentioned the deportation, right?

14   A.  His fear of being deported, right.

15   Q.  And you say that -- one of the reporters by the way, from

16   whom you learned about deportation, in fact, probably more

17   Ms. Kovner talked to you about -- withdrawn.

18          Ms. Kovner talked to you in your interview with her

19   before you got the report that fear of deportation could be a

20   motive, right?

21   A.  That was not a conversation she had with me.  It was with

22   Dr. Herbel.

23   Q.  In addition, Dr. Herbel also spoke with Ms. Bejaoui, right?

24   A.  Correct.

25   Q.  And Mrs.~Bejaoui provided a lot more information about the

1   deportation aspect, right?

2   A.  I don't know about "a lot more" but she conveyed the

3   immigration problem he had, yes.

4   Q.  Well, I mean any detail comes from her and not from the

5   government, right, from --

6   A.  I don't know the level of detail that Ms. Kovner gave Dr.

7   Herbel.

8   Q.  Well, in the report it says she was under the impression he

9   might be very fearful of deportation.  That's it.  Okay.  Then

10  you have in the other one we -- actually, you went over that

11  before.  I don't want to waste time going over it again but

12  this is about a pending immigration case and lot more, a few

13  sentences and half a paragraph more from Ms. Bejaoui herself,

14  right?

15  A.  I don't know.

16  Q.  Look at page four.

17  A.  Thanks.  There's a few sentences that she provides about

18  the deportation, yes.

19  Q.  Including that he has a pending immigration case already,

20  right?

21  A.  Yeah, I believe so.

22  Q.  And doesn't have a green card?

23  A.  That's right.  She --

24  Q.  This you learned from his wife, right?

25  A.  Correct.

1   Q.  The woman who is supposed to be coached to assist him,

2   right?

3   A.  Correct.

4   Q.  And you know that -- well, do you know that you don't have

5   to be convicted of a crime to be deported, right?

6   A.  I don't know the legalities of that in terms of the

7   frequency.  I hesitate to answer that.

8   Q.  In fact, he could be deported based on the immigration case

9   he's got right now without a green card, right?

10  A.  I don't know.

11  Q.  Did you check that out to see whether there was any real

12  secondary gain in him persisting with feigning, as you say, and

13  possibly get additional time in a psychiatric hospital

14  indefinitely for purposes of this?

15          MR. WILSON:  Objection.

16          MR. DRATEL:  Withdrawn.

17  Q.  Did you do any research as to whether or not it would be a

18  realistic second gain as to the immigration situation he

19  already faces as to whether avoiding a conviction would be

20  worth it for him to persist in this conduct if it's feigned?

21  A.  Did I do any research?  No.

22  Q.  Okay.  You just assumed that the deportation was an issue

23  for him?

24  A.  I assumed based on her comments and what the government

25  said that it would be an issue, again, his perceptions is

1    what's important, not the reality of the legal technicalities.

2    But, yes, I accepted both of those things as accurate.

3    Q.  You think that him being declared incompetent to stand

4    trial and spending trial in a variety of psychiatric facilities

5    in a wheelchair the way he is now would somehow help his

6    immigration case?

7    A.  That's not what I said.

8              THE COURT:  Let's move on.  I understand what you

9    are --

10             THE WITNESS:  No, I don't.

11             THE COURT:  Move on.

12   Q.  Before on direct you talked about you didn't put a

13   percentage terms but you put it in terms of adjective that you

14   were in a high level of very confident in your diagnosis of

15   malingering, right?

16   A.  Correct.

17   Q.  In light of the diagnosis and really multiple diagnosis at

18   MCC of a major depression after he spent nine months there, in

19   light of the diagnosis at MDC that he suffered from a major

20   depression and panic disorder and after spending four months

21   there, the diagnosis at Devens which concurred with major

22   depressive disorder after he spent seven months there, what's

23   your level of confidence that he does not suffer from a major

24   depression with psychotic features or major depression?

25   A.  I am still very confident.

C8EAABEJH                    DR. COCHRANE - CROSS

1    Q.  Despite all of that?

2    A.  Yes.  And I can explain if you'd like but, yes.

3    Q.  No, that's fine.

4           MR. DRATEL:  No further questions.

5           THE COURT:  All right.  Thank you.  Anything on

6    redirect?

7           MR. WILSON:  Yes, your Honor.  Hopefully, relatively

8    brief.

9    REDIRECT EXAMINATION

10   BY MR. WILSON:

11   Q.  Dr. Cochrane, let me start here.  You were asked some

12   questions about how many times you interviewed the defendant,

13   correct?

14   A.  That's right.

15   Q.  And you testified that there were four times when you

16   conducted full interviews, is that correct?

17   A.  Yes, that sounds right.

18   Q.  And one time when you were part of a treatment team meeting

19   with him?

20   A.  Yes.

21   Q.  Were there any other times you attempted to interview him?

22   A.  Four other times.

23   Q.  Now, do you work with any other people in Butner in the

24   course of an evaluation who will interview a subject?

25   A.  Yes.

1   Q.   Who would that be?

2   A.   The primary person would be Dr. Herbel.  Other people

3   interview him as well, not for the direct issues related to

4   this case but Dr. Herbel would have had a number of the

5   contacts with him.

6   Q.   Just because I'm not sure that it's really been made clear,

7   what is the working relationship between yourself and Dr.

8   Herbel in the evaluation?

9   A.   We work in tandem on all evaluations.  One of us will be

10  assigned as cases come will be assigned as the primary point

11  person while the other one serves as a consultant.  So we'll

12  frequently be talking about the case, adding our different

13  expertises to the case to reach a diagnostic conclusion.  The

14  primary person is typically responsible for reaching the

15  opinion on the legal matter on the legal issue since they're

16  the one who reviews all the documents and gathers all the

17  information.

18  Q.   Is Dr. Herbel in agreement with your conclusions in this

19  case?

20  A.   He does not have an opinion on competency cause he didn't

21  look into that issue.  But we do have an agreement on the

22  diagnoses and, yes, he is in full agreement.

23  Q.   That would be the malingering and the adjustment disorder?

24  A.   And histrionic analysis.

25  Q.   Do you know how many times Dr. Herbel interviewed the

1    defendant?

2    A.  I believe there were thirteen notes.  There are a couple of

3    those, maybe two, three, maybe four, somewhere.  A few of them

4    I know he refused to see them as well but he interviewed them a

5    number of other times.

6    Q.  You testified that some other people had at least meetings

7    with him.  About how many times did that take place?

8    A.  Oh, I know the social worker would have met with him once.

9    The physical therapist met with him.  The nurses to do -- they

10   have to have brief interviews or contacts with him.  There

11   might be some others that I just don't recall but a number of

12   people.

13   Q.  And did Dr. Herbel tell you what happened in all the

14   interviews he did?

15   A.  Pardon me?  Yeah.  Yeah.  He conveyed to me and I read his

16   notes.

17   Q.  And did you receive reports from any of other people who

18   had interviewed him about what happened in those interviews?

19   A.  I believe like the physical therapist and I believe I

20   skimmed or reviewed the social workers' assessment or notes and

21   the physical therapists.  Let's see I reviewed the whole

22   medical records.  So anyone who would have made a contact in

23   there I read their -- the laboratory and things like that.

24   Q.  Did you rely on that information in reaching your

25   diagnosis?

1   A.  Yeah.  I relied on all of them.

2   Q.  Now, there's a question early to touch on the sleep

3   problems that defendant reported.  So just to be clear, the

4   defendant said he had trouble sleeping, was unable to sleep?

5   A.  He reported that, yes.

6   Q.  Is that true, according to observations made by your staff?

7        THE COURT:  You've already testified that the staff

8   didn't observe he had difficulty sleeping, correct?

9        THE WITNESS:  Yes.

10  Q.  Did you draw any conclusion from that?

11  A.  Well, it was inconsistent.  Now, sometimes people do have a

12  misunderstanding or miscalculate how much they sleep.  In fact,

13  there's some studies that show that people consistently

14  underestimate how much sleep they get.  So some of it could be

15  that, mind you.  But he is just miscalculating how much he

16  sleeps and some of it could be, again, you know I am really

17  impaired.  I can't sleep.  Look at all these medicines I am on.

18  In the context of that you could interpret it as an

19  inconsistency for the reasons I stated before.

20  Q.  Could you look at Government Exhibit 9 in front of you and

21  that's a transcript of a call from February 7 at 10:16 between

22  the defendant and someone named Joseph.

23  A.  Yes.

24  Q.  I think best, perhaps, if you could start at 219 and just

25  skim down through 327.  This was played very early on

1   yesterday.  You recall it?  No need to read it.

2   A.  I do recall it, yeah.

3   Q.  Then looking at 27 on page three, line 27, the defendant

4   states:  Thank you so much.  Something unintelligible, will

5   wait to receive the lectures.

6          Do you understand what he is saying there in the

7   context of the call?

8          THE COURT:  Where are you, sir?

9          MR. WILSON:  I'm sorry.  Line three, page three, line

10  27.

11         THE COURT:  What exhibit?

12         MR. WILSON:  Government Exhibit 9.

13         THE COURT:  Government 9, page three, line 27, all

14  right.

15         THE WITNESS:  And I do understand what he means by

16  "lectures"?

17  Q.  Yes.  When he says he'll wait to receive the lectures based

18  on call do you have an understanding what that means?

19  A.  I'm not exactly sure what lectures, what the application is

20  all about.  What I take this to mean --

21         MR. DRATEL:  Objection.

22         THE COURT:  He says he doesn't know what -- he doesn't

23  fully understand.  Go ahead.

24         THE WITNESS:  I don't fully understand it but it

25  appears that Mr. Bejaoui is requesting an application and

C8EAABEJH                         Dr. Cochrane - Redirect

1   there's some lectures or things that he probably has to review

2   as part of the application process for assistance of this

3   organization.

4   BY MR. WILSON:

5   Q.  He is receiving lectures from some organization while at

6   Butner?

7                MR. DRATEL:  Objection.

8                THE COURT:  L I understand the objection.

9                You don't know that, right?

10               THE WITNESS:  No.

11               THE COURT:  You don't know if there actually are

12  lectures?

13               THE WITNESS:  No.

14               THE COURT:  All right.

15  BY MR. WILSON:

16  Q.  Let me ask you this.  The defense counsel if asked you

17  asked you a number of questions about whether Mr. Bejaoui had

18  any interests while at Butner?

19  A.  Yes.

20  Q.  If assuming that were true the defendant was applying for

21  and receiving lectures that would be interests, right?

22  A.  That would be, I would consider an interest.

23  Q.  Overall looking at the big picture again, can the

24  defendant's symptoms that he represented throughout his time at

25  Butner be explained by major depressive disorder?

1  A.  I don't believe so on that.

2  Q.  You also got some questions about a factitious disorder.

3  Just to be clear, why didn't you rule out factitious disorder

4  in this case?

5  A.  Because people with factitious disorder they want to assume

6  the sick role and they'll make themselves sick, and what not,

7  to gain the attention of doctors and be, and certainly some

8  elements that suggest that that could be the case.  However,

9  the number of inconsistencies in his reported medical history,

10  having cancer, making things up about going out to do hospital

11  well work, it just didn't fit with the pattern that you

12  typically see with factitious disorder.  So, again, while there

13  are some elements that could arguably be made, I don't believe

14  it's consistent with that condition, that's why I ruled that

15  out.

16  Q.  Assuming that he did have fictitious disorder would that

17  render him incompetent to stand trial?

18  A.  Whether he had somatoform disorder, factitious disorder or

19  malingering, no, I wouldn't expect any of those conditions to

20  have any impact on his competence.

21  Q.  Why is that?

22  A.  Well, because the people are, generally, it's about medical

23  issues, not legal matters that they're focused on.  I guess,

24  let me put one exception.  If someone had a pain disorder for

25  example and were so preoccupied with that, which he doesn't

1   have in this case as everyone agrees but then I suppose you

2   might be -- there's a theoretical possibility they would be

3   preoccupied during proceedings with that pain and wouldn't

4   focus on what's going on in court.  Aside from that though I

5   don't see the connection between these conditions and this

6   desire to report whether it's unconscious or conscious

7   inaccurate medical information as relating to a person's

8   competence to stand trial.

9   Q.  Do you still have Defense Exhibit E in front of you?  It

10  would be in the binder.

11  A.  "E" is in "echo".

12          THE COURT:  The Lutheran Medical Center.

13          THE WITNESS:  I think I have it.  It's not labeled

14  but --

15  Q.  Could you just look at the second page of that document?

16  A.  The Lutheran Medical Center, right?

17  Q.  Yes.

18  A.  All right.

19  Q.  That's the one that down at the bottom describes the last

20  visit, that page?

21  A.  Second.

22  Q.  Thank you very much.

23  A.  Sorry.

24  Q.  Says requests for additional data at the top?

25  A.  That's the first page for me.  Sorry.

C8EAABEJH                    Dr. Cochrane - Redirect

1          THE COURT:  The last entry on that page and read it to

2    yourself.

3          Next question?

4    BY MR. WILSON:

5    Q.  Does that entry indicate that the defendant was

6    hospitalized for six days at Lutheran Hospital at that time?

7    A.  It doesn't specify that, no.

8    Q.  Says the visit was between those periods, is that correct?

9    A.  Correct.

10   Q.  Based on your knowledge, if you have any, about how

11   hospitals work, is it possible that that is just a period of

12   time that their records reflect a visit?

13         MR. DRATEL:  I am going to object, your Honor.  This

14   hospital, particular, hospital in Brooklyn whether he as any

15   idea.

16         THE WITNESS:  Well, he may.  I don't know any

17   particular hospital.

18         THE COURT:  All right.

19   Q.  Is that possible?

20   A.  Is what possible?

21   Q.  Well, defense counsel asked, asserted in a question that he

22   had spent six days in the hospital.

23         THE COURT:  Do you have any knowledge of hospital

24   record keeping?

25         THE WITNESS:  Not other than when we request records

1   on a regular basis and I get them and sometimes we contact

2   people that send things.  I have a working understanding but

3   not a detailed understanding.

4           MR. WILSON:  I'll move on, your Honor.

5           THE COURT:  All right.

6   Q.  Defendant asked you some questions about an incident that

7   we discussed also on direct where the defendant had refused to

8   take drugs for a period of time and then he greed to take them

9   again.  Do you remember that?

10  A.  Yes, I remember that exchange.

11  Q.  And the defendant suggested that one explanation for this

12  was that the defendant had been -- withdrawn.

13          Defense counsel suggested that an explanation was that

14  the defendant had been told that not taking these drugs would

15  be dangerous.  Do you remember that?

16  A.  Yes, I remember it.

17  Q.  Would it be consistent with lorid paranoia of the type the

18  defendant represents to be showing to trust the hospital

19  staff's statement about what drugs are dangerous and take it on

20  that basis?

21  A.  If they're loridly paranoid that people are trying to kill

22  you at our facility that would seem unusual.

23  Q.  Just to be clear on one other point, if you look at page 21

24  of your report there is a question about what you said about

25  what's in the calls that you reviewed.  If you look at the very

1    bottom of 21 and just read that first sentence of that bottom

2    paragraph to yourself, did you indicate in your report how many

3    of the calls you reviewed?

4    A.  No, I just said several.

5    Q.  That's the answer.  Now, let's talk about this incident

6    where the defendant complained of being beaten by a hospital

7    staff.  Do you know what incident he is referring to?

8    A.  I do.

9    Q.  Is that an actual incident that took place at the hospital

10   of some kind?

11   A.  It's an incident of some kind, yes.

12   Q.  Do you remember what happened in that incident?

13   A.  I was not there.  I read the notes about it.

14   Q.  Based on your review of the notes, the hospital records?

15   A.  Yes.

16   Q.  What happened in that incident?

17           MR. DRATEL:  I am going to object to the form of the

18   question.

19           THE COURT:  What do the notes reflect occurred on that

20   day?

21           MR. WILSON:  Your Honor, let me show Government

22   Exhibit 45 and maybe that will make this much easier.

23           (Pause)

24   Q.  Take a minute to review it and let me know when you are

25   finished.

1          (Pause)

2    A.   Okay.

3    Q.   What is this document?

4    A.   This is one of the few notes, not all of them but one of a

5    few notes about that incident and documented by Nurse Collins,

6    one of the regular nurses on his unit.

7    Q.   What does it indicate happened on this occasion?

8    A.   It indicates that Mr. Bejaoui became very upset with the

9    officer who is telling him he needed to take a shower.  He then

10   put up his hands towards the officer and she indicates was

11   taunting him and tried to swing at the officer, fell out of his

12   wheelchair.  That's when assistance was called to the unit.

13   Other officers and maybe nurses too who were, there several

14   nurses on the unit, responded and tried to get him to stand up

15   and that she noted that he stiffened his legs in resistance

16   trying to avoid being placed back in the wheelchair.

17   Q.   And says he was taken to the 1E unit?

18   A.   I am sorry.  He was then take to the 1E unit which is a

19   more secure unit.

20   Q.   And that's consistent with what he indicates in the call

21   about being taken to the secure unit?

22   A.   Yes, that's true.

23   Q.   So why do you believe that Mr. Bejaoui tells this story

24   that he tells to his wife about this incident?

25   A.   He tells it in very dramatic fashion on many occasions he

C8EAABEJH                        Dr. Cochrane - Redirect

1   tells what on the surface seems like very convincing stories.

2   In fact, if you just read it you would think there was blood

3   every where and people were beating him up when, in fact, none

4   of that happened.  He was never struck by an officer and, in

5   fact, he did have some abrasions and a bruise on, I think, one

6   of his temples maybe from falling out of the chair.  He was

7   immediately assessed by the physician assistant and there was

8   no bleeding, whatsoever.  So his account, he is accurate about

9   the gist but the details I think were self-serving

10  solicitations for sympathy in my opinion.

11  Q.  Would that kind of exaggeration of actual incidents is the

12  type of thing you would expect to see in someone who's

13  delusional or paranoid?

14  A.  I am sorry.  Could you rephrase it?

15  Q.  In someone who's having paranoid delusions, would you

16  expect to see this type of exaggeration of an actual incident?

17  Is this consistent in your view?

18  A.  Not in this dramatic particular sort of fashion.  Now, you

19  do have people who are paranoid who will distort things that

20  have occurred but not -- again, if you look at the whole

21  presentation and all of the distortions it seemed strikingly

22  unusual for a paranoid person.  What paranoid people do

23  sometimes distort elements of things.

24  Q.  Let me ask you this.  Would a paranoid person misreport or

25  misremember whether there's blood all over the room in this

C8EAABEJH                     Dr. Cochrane - Redirect

1   type of incident?

2   A.  No.  I can't imagine that.

3   Q.  I want to point you to Government Exhibit 24 which is the

4   call that we heard about this particular incident.  And look at

5   page five, starting at line 23 and --

6            MR. DRATEL:  What's the date?

7            MR. WILSON:  March 19 at 11:15 a.m. a call between

8   Mr. Bejaoui and his wife.

9            MR. DRATEL:  I thought that was 27.

10           MR. WILSON:  24.

11           THE WITNESS:  What line?

12  Q.  Page five, line 23 and if you would read down to three on

13  line six.

14           (Pause)

15  A.  I am sorry.  What line again?

16  Q.  Very top of six through line --

17  A.  I am there.

18  Q.  Looking back at the very beginning of what I asked you to

19  read, defendant refers to -- the defendant's wife refers to

20  talking to her and telling her things, right?

21  A.  Correct.

22  Q.  Now, based on the context of this call "her" would be his

23  counsel, Ms. Lewis, correct?

24  A.  I believe is it Lindsey.

25  Q.  Yes.

1   A.  That is the name I remember this person by.

2   Q.  Now, starting at line 30 Mr. Bejaoui in substance tells his

3   wife that, yes, tell her about this, "her" being Lindsey or

4   Ms. Lewis.  Tell them to come see, right?

5   A.  Yes.

6   Q.  And then down on 38 he says tell her, tell her go and see

7   him.  Fair to assume that "him" would be Mr. Dratel?

8   A.  That would be my assumption.  I don't know.

9   Q.  Does that suggest to you that the defendant has some sort

10  of fear or mistrust of Mr. Dratel and Ms. Lewis based on mental

11  illness?

12  A.  Not some kind of paranoid fear.

13  Q.  Does it indicate he is seeking their assistance?

14  A.  It does seem to suggest that, yes.

15  Q.  Now, if you go to page 7 and just refer me from -- well,

16  let's say, let's start just line 18.  I'll read it to you.  It

17  is his wife speaking.  Says, yeah, the thing is when you

18  decided to plead what you pled, and then there was a pause,

19  when you decided to let them know you wasn't stable and this

20  and that you should have known they were going to put you

21  through this.  Does that indicate to you that the defendant's

22  wife thinks that he is making a decision to act unstable?

23            MR. DRATEL:  Objection.

24            THE COURT:  I'll allow it.

25            THE WITNESS:  Say again.  Does it mean?

C8EAABEJH                      Dr. Cochrane - Redirect

1  Q.  Does it indicate to you that his wife believes that this is

2  a decision he is making to act unstable?

3  A.  Well, she seems to believe that it was a decision on his

4  part to let them know he was unstable as she states.

5  Q.  Okay.  And just to confirm on line 7, line 27 of page 7,

6  again, she says when you decided to plead you know what you

7  did.  Again, that indicates that there is an element of

8  volition in what he is doing, right?

9  A.  It indicates that she believes it was an element of

10 volition.

11        MR. DRATEL:  Objection, your Honor.

12        THE COURT:  I will allow it but it's what she believed

13 according to this witness.

14        MR. DRATEL:  Right.

15        THE COURT:  His belief as to what she believed.

16        MR. DRATEL:  Right.  Based on that statement.

17 BY MR. WILSON:

18 Q.  And she then suggests in this statement that he change his

19 plea as she puts it, correct?

20 A.  Yes.

21 Q.  Does that suggest to you that his wife is under the

22 impression that he is incapable of changing his plea?

23        MR. DRATEL:  I am going to object, your Honor.

24        THE COURT:  Let's move on.

25 Q.  If you turn to Dr. Channel's report which I think is

C8EAABEJH                    Dr. Cochrane - Redirect

1    Defense Exhibit C, a few questions since you were asked

2    about --

3           MR. DRATEL:  Your Honor, could we just -- there's a

4    scheduling issue with Dr. First.  He has to leave about four

5    something.  I just want to know where we are.

6           THE COURT:  All right.  Let's hear.

7           MR. WILSON:  I literally -- I have a few matters to

8    point to, your Honor, then I am done.

9           THE COURT:  Let's move on.

10          MR. WILSON:  If you would turn to page 11 of the

11   Channel report and look to the fourth full paragraph.

12          THE WITNESS:  Yes.

13   Q.  Just look at those first two sentences.

14   A.  Yes.

15   Q.  All right.  I'll even read a portion here.

16          THE COURT:  Just a moment.  You want to find it?

17   That's Devens, right?

18          MR. WILSON:  Devens report, Defense C.

19          THE COURT:  I have it.  What page?

20          MR. WILSON:  Sorry.  Page 11 and it is the fourth full

21   paragraph.

22          THE COURT:  Yes.

23   Q.  Why don't you read just those first full sentence.  Read

24   them aloud.

25   A.  While Mr. Bejaoui has been given a diagnosis of major

1    depressive disorder providing an accurate diagnose for the

2    defendant is compromised by his lack of cooperation and the

3    fact he is a very poor historian.  Whether his inconsistent

4    self-report is a result of deliberate deceit or due to overall

5    disorganized thinking is unclear, however, it is clear his

6    self-report is not reliable.

7    Q.  So Dr. Channel was not sure that the defendant was not

8    being deliberately deceptive at the time of his report?

9    A.  Correct.

10   Q.  If you look down to the next paragraph and you can read the

11   first sentence aloud.

12   A.  While at MCC New York clinicians had significant concerns

13   about the legitimacy of Mr. Bejaoui's presentation based on

14   rapid onset of his physical problems, his general refusal to

15   participate in evaluations and the observation of his him

16   behaving inconsistently over time.  Continue?

17   Q.  Yes.

18   A.  Given concerns about the legitimacy of some of

19   Mr. Bejaoui's reported symptoms especially as they apply to his

20   report of chronic pain, two differential diagnoses should be

21   ruled out.

22   Q.  So that indicates that both Dr. Channel at Devens and the

23   doctors at MCC still had concerns about whether the defendant

24   was malingering?

25   A.  Yes, it appears so, yes.

C8EAABEJH                    Dr. Cochrane - Redirect

1   Q.  Turn to the next page of the diagnosis.  All malingering is

2   listed under Access One.  What does that mean?

3   A.  "Rule out".  The condition still needs to be ruled out.

4   Q.  What does it mean that the condition still needs --

5   A.  I'm sorry.  That more information is needed to determine

6   whether or not that particular condition is present.

7   Q.  And in the prognosis and recommendation section which is

8   just below the second to last line states it is also

9   recommended he be evaluated further to rule out the

10  differential diagnoses noted above.  That means to rule out

11  malingering?

12  A.  Yes that's precisely what that means.

13  Q.  Did Dr. Channel in preparing his report review the

14  defendant's prison calls?

15  A.  I don't believe so.  Let me check.  No, he did not.

16  Q.  And do you know whether Dr. Channel still has the same

17  opinion in light of the new information contained in your

18  report in the prison calls in Dr. First's report?

19  A.  I have no idea.

20          MR. WILSON:  No further questions, your Honor.

21          MR. DRATEL:  Just a couple, your Honor.

22          THE COURT:  Go ahead.

23  RECROSS EXAMINATION

24  BY MR. DRATEL:

25  Q.  In fact you wrote your report before you heard most of the

1   calls?

2   A.  I did not write the report until after I reviewed all the

3   calls.

4   Q.  Oh, so you reviewed all the calls and you still wrote that

5   they were clear, coherent and -- didn't you just say before you

6   when you wrote the report you didn't listen to all the calls?

7   A.  Let me before be clear.  All the calls, meaning all the

8   calls I listen to I listen to them all before writing my

9   report.

10  Q.  All the cause that are in existence that we have transfers

11  for, did you listen to all of them before you wrote the report?

12  A.  I did not.

13  Q.  So just like Dr. Channel.  In fact, you -- it says for

14  further evaluation more information is needed to rule out,

15  right?

16  A.  According to Dr. Channel's report?

17  Q.  Yeah.  And you ruled it out the first day you met Mr.

18  Bejaoui?

19  A.  I did not do that.

20  Q.  You said he is feigning psychosis, right?

21  A.  I'm sorry?

22  Q.  Dr. Herbel said you said --

23  A.  That's how Dr. Herbel characterized it, yes.

24  Q.  In fact, you told us before this afternoon on cross even

25  before you met Mr. Bejaoui you thought he was contrived because

1   you read it in a report before you even met him?

2              MR. WILSON:  Objection.

3              THE WITNESS:  I did not say it like that.

4   Q.  You didn't say that the contrive was something that you

5   concluded before you ever met him just from reading the report?

6              MR. WILSON:  Objection to vagueness.  Can he define

7   the contrived?

8              MR. DRATEL:  The contrived voices.

9              THE WITNESS:  I suspected and I was developing

10  hypothesis as we all do before someone even enters our facility

11  and I suspected based on that comment that that may have been

12  contrived.

13  Q.  You confirm him the first day you met him?

14  A.  I did not.

15             THE COURT:  All right.  Thank you.  All right.  You

16  may step down, your Honor.

17             I take it this is the only witness for the government,

18  correct?

19             MR. WILSON:  Yes, your Honor.

20             THE COURT:  All right.

21             MR. WILSON:  One thing I would just like to proffer

22  given that it's come up.  The government did not call Dr.

23  Channel today because we felt his testimony would be largely

24  duplicative.  I have spoken to him.  He has reviewed the first

25  report.  He has reviewed Dr. Cochrane's report.  He has now

C8EAABEJH                    Dr. Cochrane - Recross

1    reviewed the prison calls.  He now concurs in Dr. Cochrane's

2    view that this is malingering and would say the defendant is

3    incompetent.  If that is something that your Honor finds

4    relevant or interesting, we're happy to bring him down in the

5    future.

6             THE COURT:  You are saying he would be duplicative of

7    what Dr. Cochrane has said?

8             MR. WILSON:  Correct.

9             THE COURT:  Okay.

10            MR. WILSON:  I just don't want to leave a

11   misimpression that Dr. Channel who has now reviewed all this

12   still believes the defendant is incompetent because he does

13   not.

14            MR. DRATEL:  Well, your Honor, I object to that.  I'll

15   make my own report about why I didn't call Jean Barrett.  I am

16   not going to start waiving the privilege.

17            THE COURT:  Just a moment.  I think the appropriate

18   response for me, sir, is you can call him or not as you see

19   fit.  I understand your position is that it would be largely

20   duplicative but you don't want me to have the impression that

21   he is maintaining his position.  I understand that.  I am not

22   sure how it could be largely duplicative if he is not.  Oh,

23   it's duplicative.  He has changed his position and therefore

24   he'd be saying essentially the same thing as Dr. Cochrane.

25            MR. WILSON:  He would just concur with Dr. Cochrane's

1    diagnosis.

2              THE COURT:  It's up to you as to whether you want to

3    call him.  I understand what you've said.

4              MR. WILSON:  Thank you.

5              THE COURT:  You rest?

6              MR. WILSON:  Oh, I think in theory the defense is

7    still up since --

8              THE COURT:  Defense case is still up but you had one

9    witness.  That witness is now --

10             MR. WILSON:  And we would rest, yes.

11             THE COURT:  All right.  Fine.  And I take it given

12   what you just said, sir, that your only witness is Dr. First?

13             MR. DRATEL:  Correct.

14             THE COURT:  And for some reason you wanted to put on

15   the record why you are not calling somebody else.  I don't

16   think that's necessary.

17             MR. DRATEL:  No, it is not.  If we are going to start

18   proffering things that are not -- that we can all --

19             THE COURT:  Everybody decides, each side decides who

20   they want to call.  The government has decided to call Dr.

21   Cochrane.  They called him.  You, apparently, have decided to

22   call only Dr. First.  You have called him.  Okay.

23             MR. DRATEL:  I just was reacting to the notion that

24   you can say why you call someone but he would have helped us

25   anyway.

1               THE COURT:  Okay.

2               MR. DRATEL:  She would have helped us too, your Honor.

3               THE COURT:  Okay.  Dr. First, I have some questions

4    for you, sir, okay.  We can go through the formalities if you

5    want to take the stand.  That's up to you.  It's probably

6    easiest to take the stand.  Formalities are worthwhile.  You

7    remain under oath you understand.

8     DR. MICHAEL B. FIRST,

9          called as a witness by the The Court,

10         having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY THE COURT:

13   Q.  Some of these phone calls sure sound like coaching to me,

14   sir.  You know, Maria, the man, the woman, you know and this is

15   what you ought to be saying and she said do you understand and

16   she says no.  So it even makes it more explicit.  What's your

17   reaction to those coaching, what I characterize as coaching

18   phone calls?  You can tell me they're not.

19              THE WITNESS:  I don't know what they are exactly.  I

20   have to admit when I actually listen to the tapes without the

21   benefit of a transcript I played those two, three calls three

22   or four times.  I have no idea what he is talking about so.

23              THE COURT:  Well, if the man is Dratel and the woman

24   is Lindsey then they make sense.

25              THE WITNESS:  I thought the man is -- I thought was

C8EAABEJH                    Dr. First

1   trying to refer to him and his wife in the third person, no.

2            THE COURT:  Oh, all right.  I am sorry.  That may be

3   another one, yes, yes.

4            THE WITNESS:  I am not a hundred percent sure when you

5   go over it.

6            THE COURT:  Sometimes he is talking about Dratel.

7   Other times the man is the defendant and the woman is Maria.

8            THE WITNESS:  Apparently, the claim is that's the

9   coaching that somehow he is now talking in the third person is

10  a way of communicating information.  And what's notable is the

11  information he's communicating, A, as if it was pointed out

12  during -- if he did attempt to coach her she didn't even

13  understand it or wasn't clear coaching because she didn't in

14  fact in -- apparently, if it, in fact, was coaching, the

15  motivation, it did occur right before the phone call with Dr.

16  Herbel.  That very clear, in the context of Herbel tried to

17  call her.  She's put off the call, said she was busy and that

18  he clearly arranged the call, making the call again.  He said

19  he's going to call me at 9:30.  So it looks like this entire

20  thing had something to do, specifically, about her reaction

21  with Herbel.  So all we know after this interchange was there's

22  no evidence that any of that supposed coaching showed up in the

23  actual interview with Herbel.  So it's --

24            THE COURT:  Her interview with Herbel?

25            THE WITNESS:  Yes.  It looks like this claim appears

C8EAABEJH                    Dr. First

1    to be that she was being coached, specifically, about the

2    interview with Dr. Herbel.  And, in fact, as was pointed out

3    during the previous testimony that none of the information,

4    none of the information that he elicited from her contained any

5    of the information that supposedly she was coached to say.

6            THE COURT:  But whether the coaching was effective or

7    not --

8            THE WITNESS:  -- understand whether it was actually

9    coaching.  We are assuming that that's what -- I don't know

10   what that still means.

11           THE COURT:  Let's go here.  I'll read you Government

12   Exhibit 12, he' talking to her.  I'll tell you.  I'll tell you.

13   The point is the lady she gets the phone call Monday, thinks

14   she can tell you, you know her husband that's the defendant

15   that she doesn't understand the defendant any more.  You

16   understand?  Handwriting is different.  Things are very

17   different.  And then I think in this later one the handwriting

18   is very different, talking about the handwriting there.  You

19   follow me?  She doesn't because he's being obscure.  You've got

20   to follow me.  The lady, she's going to have a phone call

21   Monday.  You forget that's Herbel.  The witness:  Yes.  She

22   still didn't get it.  Who?  Who are you talking about?  The

23   defendant:  The lady, you know, they're going to call her.

24   They are going to ask her what's going on.  Then Maria gets it.

25   Yeah, the people that's supposed to call me, right.  Right.

C8EAABEJH                        Dr. First

1    Then he continues, oh, okay.  Okay.  He continues the coaching.

2    Letters you don't understand any more.  He's dropping a little

3    of the pretense cause he is having trouble getting through to

4    her what he means.  Writing the letters, the handwriting is

5    different.  The things he doesn't want to speak about on Rikers

6    because it must be very hard for him.  And I am not reading

7    everything because he doesn't want to disclose.  It makes him

8    cry and stuff like that.  What else you have noticed?  I mean

9    what else she have noticed?  Paranoid, talking about killing

10   and stuff like that, afraid, the things they've done.  He is

11   giving her a script.  Whether or not she gets it is a separate

12   issue.  God knows what they've done to him on Rikers.  Rikers

13   is dangerous.

14        THE WITNESS:  I guess I understand it.  I think

15   whether it was effective enough, he is clearly communicating to

16   her what he want her to say.

17        THE COURT:  Or he is trying to in a rational,

18   dispassionate method that that, apparently, has nothing to do

19   with the paranoia and has everything to do with purposeful

20   attempt to be declared incompetent.

21        THE WITNESS:  Much of the information, the thing about

22   the Rikers is an interesting example.  What he seems to be

23   communicating to her is one way to look at it he's communicate

24   to her to say -- cause he also says later on in the phone call

25   before to tell the truth.  A couple of times he says that

C8EAABEJH                          Dr. First

1    directly.

2            THE COURT:  Any witness whenever I've heard

3    transcripts you'd be very surprised -- maybe you wouldn't be --

4    of what people say who are inmate at MCC after they've read the

5    big notice that says "every call is monitored" and in other

6    cases -- I am not suggesting this case is -- they say get out

7    of town.  The government's going to subpoena you.  Torch the

8    car and there's the sign.  So that part of it doesn't surprise

9    me at all.  So we're still dealing --

10           THE WITNESS:  I guess ultimately I don't know what was

11   going on in his mind and I agree it does sound like he is

12   trying to make sure that she is consistent -- the records --

13   his fear of what happened in to him at Rikers because we don't

14   know exactly what happened.  He appears to be claiming to have

15   been sexually assaulted at Rikers.  He is very shameful.  He's

16   told her that many, many times.

17           THE COURT:  Right.  And he's cried.

18           THE WITNESS:  It appears at this point he is reminding

19   her that that's something that's important and he is sort of

20   coaching her to say things that he's been saying all along that

21   sounds completely truthful.  It's not -- it doesn't sound like

22   the --

23           THE COURT:  But he is telling her things that are not

24   truthful.  You don't understand the letters any more.  The

25   writing is different.  We have no reason to think that is true.

C8EAABEJH                           Dr. First

1         THE WITNESS:  Well, that's true.

2         THE COURT:  Is there any -- can you give any

3    explanation?  I mean you gained some credibility by saying some

4    other things to me but at some point the number of inexplicable

5    things mean maybe the hypothesis has to be rethought.

6         THE WITNESS:  I guess my opinion and I guess, I think

7    he exaggerates and is manipulative and also psychotic.  I think

8    there's a mix as many, many patients who are mentally ill also

9    are, I believe he is manipulative, conniving person who is also

10   mentally ill.  Part of the problem with that phone call -- and

11   there's no question that huge inconsistencies in this

12   cognitive -- when you asked him cognitive questions when he

13   says he doesn't know the date when he, obviously, does, I think

14   that a lot of the material that came out during the discussions

15   shows that his -- the difference between the -- you ask him

16   like the Georgia test, you asked him lots of questions and he

17   acted like he didn't know.  And I agree, in his head it appears

18   that he must know because of some of the things he said to --

19   about the legal system is completely inconsistent with the way

20   he came across during the exam.  I agree with that.  And I

21   think that -- but mixed in it with that I believe there is a

22   true disfunctional paranoia and depression.  I, actually, when

23   I heard that phone call that was played in court it sounds in

24   distress and the desperation and the --

25        THE COURT:  Which one?  The most recent one where he

C8EAABEJH                        Dr. First

1   is talking about the assault?

2              THE WITNESS:  The whole assault.  Even though the

3   story is totally distorted, perhaps, he is playing up the facts

4   but the level of distress and fear would sound completely real

5   to me.

6              THE COURT:  But that goes and, again, I am playing

7   nice here because I am a lawyer, not a doctor but that sounds

8   like an aspect of histrionic personality and not something

9   that's disqualifying in terms of competence.

10             THE WITNESS:  No.  The aspect of the competency is the

11  ability to work with his attorneys.  I think it -- I think I

12  made that point yesterday at the end of my testimony, that the

13  point of it, the issue about being aware of his surroundings

14  and being aware of the legal system, that part seems

15  questionable with the idea that he really does it.

16             THE COURT:  It's questionable that he doesn't.

17             THE WITNESS:  I agree.  I do -- I happen to believe

18  that the aspect of his ability to work with his attorneys in

19  any reasonable way, that's compromised due to his paranoia, his

20  depression and his personality.  So I think the two pieces to

21  where the competency-wise and I think that most of the -- the

22  things that seemed to be dissembled are on the level of

23  cognitive impairment does seem to be intentional at some level.

24  And the debate whether that to be taken care of or part of the

25  problem I still have is I still don't get the secondary gain.

C8EAABEJH                      Dr. First

1    There's clearly a dissembly element on cognitive side.  There's
2    absolutely no question about that.
3            And I still believe that he has a serious mental
4    illness.  And the nature of depression and psychotic features I
5    still believe is the proper diagnosis.  But on top of that the
6    cognitive impairment aspect of the case -- I skip the two
7    together and I think the major depressive with psychotic
8    features are not -- not the idea.
9            THE COURT:  Say that again.
10           THE WITNESS:  I believe because of his severe
11   depression which I do believe is real and his ongoing paranoid
12   and his tendency under stress to go into paranoid delusions,
13   that makes it -- even his reactions with his attorneys, at some
14   point he's able to go to his attorneys for help and at other
15   points there was a phone call that, the last phone call I
16   listen to which we don't have a transcript of that was given to
17   me Sunday night, the very end of the call he says that he
18   thinks that the lawyer and I are lying to him.
19           So he becomes paranoid very quickly cause he has a
20   paranoid core and he becomes convinced so that element of his
21   psychopathology that's rendering incompetent, not the cognitive
22   point.
23           What makes this case --
24           THE COURT:  Just a moment.  Go ahead.
25           THE WITNESS:  I think what has made this case so

C8EAABEJH                    Dr. First

1    incredibly challenging is that the confusion that if somebody's

2    malingering about one thing, we malinger about everything.  I

3    guess that's where I think we, I and Dr. Cochrane differ in our

4    opinions most fundamentally.  I think Dr. Cochrane has come to

5    the conclusion because he feels solid that Mr. Bejaoui's

6    malingering about this cognitive impairment and everything that

7    comes out of his mouth is malingering.  I am saying, yes, I

8    agree that he is feigning certain aspects of the

9    psychopathology.  In my clinical judgment I believe that the

10   main core diagnosis, the major depression of psychotic features

11   is real and that that's impairing his ability to be able to

12   function and be competent.

13           THE COURT:  Now, that I think allows you to fit into

14   that framework a couple of my other questions but tell me if I

15   am wrong.  That is instructing his wife how to obtain the

16   document from the state court to prove that the state case was

17   dismissed, is that right?  Because is that part of your

18   position that he as malingering in terms of the cognitive

19   impairment that he understands the functioning of the state

20   court system and is malingering to the extent that he's not,

21   that at other times he says he doesn't know how it works?

22           THE WITNESS:  Exactly.

23           THE COURT:  And that goes for sometimes seeking the

24   help of Lindsey or Laura and Dratel and other times not even

25   knowing their names, is that right?  Fits in there, okay.  And

C8EAABEJH                         Dr. First

1   that also is consistent with Dr. Cochrane's position that you

2   just don't -- I think you first ruled it an amnesiac.  You

3   don't have amnesia about things you knew.  He knew his name.

4   You just don't forget.

5         THE WITNESS:  Right.  That's extremely rare.  I agree.

6   And that's kind of the -- there's certain aspects of this which

7   just so complete on the face of it just not believable like

8   that and --

9         THE COURT:  That goes for his helping his friend with

10   the very specifics about forms 130, form 485, form 765,

11   correct?

12         THE WITNESS:  Yes.

13         THE COURT:  Dr. Cochrane's position was, I think it's

14   such he had such a poor score on the mini mental exam that he

15   had to have be faking.  I think that's his position.

16         THE WITNESS:  Right.  I think there's a general --

17   there's a correlation between the theory when you talk to

18   somebody or you listen to the tapes, you can often -- when you

19   speak to somebody you have to guess of what MM exam has to be.

20   Dr. Cochrane is correct that when he had a mini mental status

21   three what can you say that is that can't possibly reflect --

22   the word faking is another question about what's going on.  But

23   there's no question that those numbers do not reflect the

24   actual cognitive function.  That's absolutely true.  He would

25   not be functioning this way with a score that low.  Basically,

1      for some reason he is performing very poorly when you actually

2      ask him these questions.

3              THE COURT:  That is consistent with your view of

4      malingering in terms of the cognitive issues.

5              THE WITNESS:  Or feigning.  I mean other possibility

6      he is lying.  He is dissembling.  He is clearly not being

7      honest.  Is he doing it because he thinks that somehow this is

8      going to have some secondary gain which I find hard to see or

9      is he doing it because I like to get help?  One theme that runs

10     through the tapes and in the hospital, nobody is helping me.

11     Everybody i's ignoring me.  The doctors don't come to see me.

12     Even though when they comes to see him he gives them a hard

13     time.  This whole issue about wanting to look ill and take care

14     of.

15              The whole wheelchair story I think it, you know,

16     psychologically what in God's name is the possible gain for him

17     to be insisting to be in the wheelchair?  There's some driving

18     need to look ill and it's hard to see how -- he was going up

19     for Social Security Disability, the wheelchair as a malingering

20     angle would make sense.  People do things like that to be bon

21     disability.  Him, he had to be carried from to the line and it

22     was ridiculous.  The gain to go from being carried to be in a

23     wheelchair, I don't understand.  Now, if he is faking it which

24     I think is quite possible, he is pretending or exaggerating,

25     the motivation has to be something like a desperate need in

C8EAABEJH                         Dr. First

1     this very harsh, difficult setting of prison to be treating

2     like a little kid, I guess or something like that and I think

3     that could be generalized.

4          So I am still a little caution about the -- I agree

5     that he is not being honest in how he performs when you do

6     cognitive testing.  That's complete clear and it's complete how

7     he, actually, performs on the telephone calls.  It's completely

8     inconsistent with the way he performs during the evaluations.

9     The why remains to me and that's why I think the factitious

10    disorder comment that was or issued or floating around, that is

11    an alternative hypothesis which to me is more consistent with

12    the actual picture and his desperate need to be taken care of

13    by everybody, his wife, his doctors, the hospital.  I expect

14    the question is why now?  Has he always been like this?  I

15    think he's always been a needy buy but I think that being in

16    the prison has caused him psychologically to sort of fall apart

17    to desperately have to resort to those dramatic ploys to get

18    taken care of to get attention.  That's how I understand it.

19         THE COURT:  But going back to -- that's very helpful.

20    That's not what's making him incompetent.

21         THE WITNESS:  I agree with Dr. Cochrane.  His --

22    disorder making is making him incompetent.  His desire to be

23    sick isn't making him incompetent.  That's where the major

24    depression with psychotic features which I still opine is a

25    real condition and the paranoia, that is what's making him

C8EAABEJH                         Dr. First

1    incompetent, not the cognitive stuff.

2           THE COURT:  But the test is whether he's suffering

3    from a mental disease or defect rendering him mentally

4    incompetent and you have said, yes, it's major depressive

5    disorder with psychotic features.  That's the disease or defect

6    that renders him incompetent but to the extent that he is

7    unable to understand the nature and consequences of the

8    proceedings against him or to assist properly in his defense

9    and to the extent you've said he is faking, exaggerating,

10   malingering in regard to the cognitive impairment, doesn't that

11   say that he is able to assist in his defense and understands

12   the nature and consequences of the proceedings against him.

13   That, is -- I realize I am being as convoluted as some of the

14   questions you got from lawyers -- if he can deal with form 130

15   and 485 and 765 and tell his wife how to get the statement from

16   the state courts that's been done in the state case and tell

17   her to reach Dratel and Lindsey or Laura when he needs to,

18   isn't that evidence that he understands the consequence of

19   proceedings against him and can assist properly in his defense

20   and it's the faking on the cognitive impairment that's the only

21   thing that means he can't.

22          THE WITNESS:  He, in fact, has not been assisting in

23   his defense at all.  I guess that's part of -- his interaction

24   what the lawyers has been impossible.  The lawyers have had

25   absolutely no assistance all the way down the line.

C8EAABEJH                          Dr. First

1          THE COURT:  I don't doubt that but it's unable to

2     assist just because he hasn't doesn't mean he is unable.  And

3     in fact, I am pointing to testimony here that suggests he is

4     able, just as he could tell his friend about 130, 485 and 765

5     presumably he could deal with Mr. Dratel and Ms. Lewis.

6          THE WITNESS:  Or hasn't been able to deal with them,

7     the specifics of anything about the insurance fraud case.  I

8     mean that's been part of the problem.  They have been unable to

9     work with him to deal with the actual charges from the very

10    beginning.

11         THE COURT:  And I am trying to understand.  I'm not

12    giving you a hard time.  I'm trying to understand that but that

13    simply suggests that he has made a conscious decision for the

14    secondary gain which I don't understand either but it's

15    theoretically out there in terms of immigration.  I think it's

16    a tremendously high cost to pay but it's theoretically there

17    that he's made a conscious decision that secondary gain to act

18    as if he is unable to assist properly in his defense.

19         THE WITNESS:  Let me offer in between.  I think part

20    of the problem is that we're assuming that if it weren't for

21    his lying he would be cognitively totally in tact.  Look at all

22    the phone calls.  There are multiple times during the phone

23    calls where he talks about things he can't remember, things he

24    can't concentrate.  When he -- clearly I think the end of that

25    plea, how can I plea if I don't remember?  I think he has some

C8EAABEJH                        Dr. First

1    real cognitive impairment due to the depression.  And then on

2    top of it he has this absurd cognitive impairment when you

3    actually try to test it and there's no way to figure out how

4    much of the cognitive impairment is real because when you -- if

5    we were to go do a neurocyte test on him he would probably

6    perform at the same level he does when we do the mini mental

7    status.

8              THE COURT:  But --

9              THE WITNESS:  In spite of that there is a real

10   cognitive impairment.  That's what you see on telephone calls

11   as was pointed out, the pauses, the memory problems, how can I

12   plead to something I don't remember?  I believe that he does

13   have depression.  The depression is impairing him to truly

14   understand and remember and appreciate the details of the case

15   enough to be able to assist his attorneys.

16             THE COURT:  So in theory if the depression can be

17   lifted --

18             THE WITNESS:  Absolutely.

19             THE COURT:  -- that would take care of that but it

20   doesn't take care of the malingering on the cognitive

21   impairment but all we would have left then is the malingering

22   or lying on the cognitive impairment issue.

23             THE WITNESS:  That's right.  And that's -- the

24   question is that would the malingering if the case moved

25   forward with its intentional cognitive impairment, I don't know

C8EAABEJH                         Dr. First

1    what's maintaining it still.  But it get's back to the issue

2    about you know if he got a lot of attention would he stop doing

3    it?  But since it is -- we're agreeing that it's intentional I

4    believe there should be a way for some amount of work, again,

5    to stop doing it, whether it's working with his wife, whether

6    it's working, finding a therapist who could work with him,

7    whatever it is.  I don't believe that the -- as I said myself,

8    when I was visiting with him in the prison I did have a feeling

9    that over time my work, if I was assigned to him as a patient

10   and he was my patient, I would -- he is extremely difficult to

11   work with.  Over time I had the feeling this was somebody who I

12   would be able to get somewhere with.

13        So I do you believe and what's probably going to

14   happen is if we accept the fact that there's these malingering

15   miss aspect his cognitive function would slowly improve over

16   time with me and he would just drop that, the severe cognitive

17   impairment aspect and get the real work with me treating the

18   depression, treating the paranoia and getting him to work with

19   his attorneys.

20        That is why I do believe the restoration -- there is a

21   question of incompetence and the restoration of competence is

22   possible.  I think in a way this malingering of looking this

23   cognitively is a bit of a red herring, it's real.  It's right

24   in your face.  But that's actually kind of holding the whole

25   thing up.

1          THE COURT:  All right.  Do either of any of the

2     lawyers have any further issue questions?

3          MR. DRATEL:  No, your Honor.

4          MS. KOVNER:  No, your Honor.

5          THE COURT:  All right.  Thank you, sir.  Do I get any

6     credit for first year psychiatry?

7          THE WITNESS:  Very good.  Well done.

8          THE COURT:  Thank you very much, sir.  You are

9     excused.  All right.  We're off.

10                         (Adjourned)