```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4             v.                        10C553 (SHS)

 5   MONDHER BEJAOUI,
                                         Decision
 6                   Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         October 3, 2012
 9                                       2:35 p.m.
     Before:
10
             HON. SIDNEY H. STEIN
11
                                         District Judge
12

13           APPEARANCES

14
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   RACHEL P. KOVNER
     ALEXANDER WILSON
17        Assistant United States Attorneys

18
     JOSHUA L. DRATEL
19   LINDSAY LEWIS
          Attorneys for Defendant
20

21

22

23

24

25
```

```
 1                    (Case called)

 2               THE CLERK:  Counsel, please state your names for the

 3     record.

 4               MS. KOVNER:  Good afternoon, your Honor.  Rachel

 5     Kovner and Alexander Wilson for the government.

 6               MR. DRATEL:  Good afternoon, your Honor.  Joshua

 7     Dratel and Lindsay Lewis for the defendant.

 8               THE COURT:  Good afternoon.  The defendant is present.

 9     Please be seated in the courtroom.

10               I have called you in for a decision on the pending

11     motion to determine the mental competency of the defendant to

12     stand trial.  We had a two-day fact hearing on this, and I have

13     thought long and hard about it and analyzed all the information

14     that I have on the hearing, including the reports and

15     transcript.

16               I have come to the conclusion that Mr. Bejaoui is

17     competent to stand trial, he can understand the nature and

18     consequences of the proceeding against him, and has the ability

19     to assist properly in his defense.  I am going to read a

20     decision into the record so you will have that in full measure.

21     My decision is as follows.

22               On January 24, 2011, Bejaoui's counsel requested that

23     the Court appoint a psychologist or psychiatrist to evaluate

24     his mental competence to stand trial on the grounds that there

25     was reasonable cause to believe, in defense counsel's opinion,
```

1     that the defendant was suffering from a mental disease or

2     defect that rendered him mentally incompetent to the extent

3     that he was unable to understand the nature and consequences of

4     the proceedings against him or to assist properly in his

5     defense pursuant to 18 U.S.C. 4241(a).

6         Richard Krueger, MD, evaluated the defendant's

7     competence for the defense.  Sean J. Hannell, a Ph.D, evaluated

8     his competence for the government on the basis of those

9     experts' opinions.  I concluded on October 7, 2011, that the

10    defendant suffered from such a mental disease or defect, and I

11    committed him to the custody of the Bureau of Prisons for that

12    entity to assess whether the defendant was likely to be

13    restored to competence, which is the procedure under 18 U.S.C.

14        The Bureau of Prisons transferred Mr. Bejaoui from

15    federal medical center at Devens to federal medical center in

16    Butner, North Carolina, for purposes of determining whether he

17    was likely to be restored to competency.  In March the board

18    certified forensic psychologist Robert E. Cochrane, director of

19    psychology training at Butner, and board certified forensic

20    psychiatrist Byron Herbel concluded that the defendant was in

21    fact competent and had been malingering, that is, intentionally

22    displaying or exaggerating symptoms of mental illness.

23        Following the Butner report, the defense had the

24    defendant examined by his own expert, board certified

25    psychiatrist Michael First, professor of clinical Columbia

1    College of Physicians and Surgeons.  Dr. First concluded that

2    the professionals at Butner had misjudged Bejaoui's condition

3    and that Bejaoui did in fact lack the competence to stand

4    trial.  He concluded that the defendant had major depression

5    with psychotic features and that this impaired his ability to

6    be competent.  That is, he concluded he was not competent to

7    stand trial.

8         On August 13 and 14 of this year, the Court held a

9    fact hearing pursuant to 18 U.S.C. 4247(d) at which Dr.

10   Cochrane testified for the prosecution and Dr. First testified

11   for the defense.  Each doctor was cross-examined extensively by

12   the opposing party's attorney.

13        I received in evidence each expert report and all

14   prior psychological and psychiatric evaluations of the

15   defendant as well as transcripts and recordings of phonecalls

16   that Mr. Bejaoui made while incarcerated.  You will see that

17   those phonecalls do play a not insignificant role in my

18   thinking on this matter.

19        The standard for my determination is rather

20   straightforward:  That whether or not a defendant is competent

21   to stand trial is a matter of constitutional importance.  See

22   Cooper v. Oklahoma, 517 U.S. 348, 354 (1996).

23        "A defendant may not be put to trial unless he has

24   sufficient present ability to consult with his lawyer with a

25   reasonable degree of rational understanding and a rational as

1   well as factual understanding of the proceedings against him."

2   That is from Cooper at 354.

3        Nonetheless, "It is well established that some degree

4   of mental illness cannot be equated with incompetence to stand

5   trial." United States v. Vamos, 797 F.2d 1146-1150 (2d Cir.

6   1998).

7        Before declaring the defendant incompetent to stand

8   trial, the test is that I must find "by a preponderance of the

9   evidence that the defendant is presently suffering from a

10  mental disease or defect rendering him mentally incompetent to

11  the extent that he is unable to understand the nature and

12  consequences of the proceedings against him or to assist

13  properly in his defense."  That is section 4241(d). See also

14  United States v. Nichols, 56 F.3d 403 (2d Cir. 1995).  I have

15  already told the parties that the preponderance of the evidence

16  does not support the conclusion that Mr. Bejaoui is incompetent

17  to stand trial.

18       Both the government expert Cochrane and the defense

19  expert First diagnosed Bejaoui with mental disorders, Cochrane

20  implying that he had adjustment disorder with depressed and

21  anxious mood as well as histrionic personality features.

22  That's the Cochrane report Government Exhibit 122.

23       Dr. First agreed to a certain extent insofar as he

24  opined that the defendant suffered from major depressive

25  disorder with psychotic features and undifferentiated

somatoform disorder as well as personality disorder NOS with

histrionic and schizotypal features.  Those are quotes from the

First report, which is Government Exhibit 4 at page 15.

My task is not to determine whether or not the

defendant is a picture of mental health.  It is to determine

whether he is presently suffering from a mental disease or

defect that renders him incompetent insofar as he could not

understand the nature and consequences of the proceeding or to

assist in his defense within the constraints of 4241(d).  I

conclude, as I have said, that Bejaoui is not thus disabled.

The hearing focused on the apparent disconnect between

the symptoms of psychosis, paranoia, and dementia at times

demonstrated by the defendant in the presence of his physicians

and his attorneys on the one hand and, on the other hand, what

both sides concede is a markedly improved mental capacity when

he speaks with his wife or friend by telephone on the other

hand.

Dr. First agreed that Bejaoui had displayed "striking

discordance" in cognitive function depending on the setting.

Hearing transcript of August 13th at 49.  The government

expert, Cochrane, phrased it that Bejaoui had intentionally

misled his examiners by "malingering symptomatologies of

schizophrenia."  August 13 transcript at 155.

Both experts appear to agree that the defendant

misrepresented the extent of his symptoms, but they do disagree

1    over whether Bejaoui's conduct lies within his control or is

2    beyond it.  The government expert felt, obviously, it was

3    within his control and he was malingering, and the defense

4    expert thought that it was not within his control and was part

5    of a major depressive disorder with psychotic features.

6          Based on those experts' opinions and on the recordings

7    of the phonecalls and the other evidence, as I said, I conclude

8    that he is not incompetent to stand trial, that is, he is

9    competent to stand trial.

10         Dr. First's analysis was well articulated, it was

11   thoughtful.  The bona fides of any of these experts is not at

12   all at issue.  But the First analysis, in the view of the

13   Court, does not satisfactorily account for the demonstrated

14   behavior of the defendant on all occasions, and in fact First

15   conceded that that was true.  August 14 transcript 139 to 140.

16         The preponderance of the evidence does not support

17   First's view that Bejaoui is unable to understand these

18   proceedings or to assist his attorney.  The preponderance of

19   the evidence does indicate that Bejaoui does understand the

20   proceedings but is unwilling to assist his attorneys, in part

21   an expression of what both sides view as a histrionic difficult

22   personality.  That is described by both of the expert

23   witnesses.

24         As I have said, both parties agree that the defendant

25   displays manifestly inconsistent behavior depending upon the

setting.   These inconsistencies include the physical.   The

staff at Butner observed that "he was able to ambulate and did

not need a wheelchair," Government Exhibit 1 at 8, "but he

nevertheless insists on using one."

Bejaoui appeared almost catatonic -- that is my term

as a layman, I don't purport to use that term as an expert --

in the courtroom during the competency hearing.   He simply

stared ahead.   He wasn't immobile, but he would stare either

straight ahead or down.   To my knowledge, he was not saying

anything during that hearing and he did not appear to be

focusing on what the testimony was.   Nonetheless, it is

uncontradicted in the record that at Butner he was "very

animated most of the time."   August 13 transcript at 164.

Those are physical inconsistencies.

The inconsistencies also include the mental.   The

defendant reports that he does not remember his birth date and

incorrectly estimates his own age.   That's in the tests that

were done by the expert.   But neither expert states that these

symptoms have a medical explanation.   August 13 transcript at

79-80, 160-163, and 180-181.   Bejaoui erred widely when Dr.

First asked him what the current date was, but he made no such

error when he was speaking to his wife on the telephone.

August 13 transcript at 89.

Bejaoui expressed strikingly disorganized thoughts to

his examiners, but when he wanted something from the medical

personnel, such as access to a notary, he became intelligible
to such a degree that he dealt directly with a notary, told him
where to sign the document at, and even pointed out to her that
the power of attorney granted the power solely over his
financial affairs.  Hearing transcript of August 13th at 178.
For whatever it's worth, the notary, who did not testify, did
not notice anything that was "wrong" with him and thought he
was "fairly organized."  August 13 transcript at 179.

        The list of differences in what he was doing that I
just gave is not exhaustive.  The hearing showed other
inconsistent and medically inexplicable behavior, such as
reporting debilitating back pain but at the same time refusing
diagnostic imaging that might aid in his relief.  Government
Exhibit A at 16.

        Similarly, he had an "exaggerated" hand tremor in the
view of the medical observer when he was talking with the
Butner staff, but he had no tremor when he did not deal with
the staff.  Government Exhibit A at 17.  Similarly, he
professed fears that the staff at Butner would poison him, but
he accepted food, drink, and medicines from the staff.  August
13 hearing at 181.

        Thus, the Court concludes that the defendant has a
much greater capacity in private than he demonstrates in
public.  Even Dr. First acknowledged that "when it is someone
Bejaoui trusts, like his wife or his friend Riatt, he clearly

1   is able to show that he knows what is going on," August 13 at

2   89 to 90, and that Bejaoui "is not being honest in how he

3   performs when you do diagnostic testing."  August 14 transcript

4   at 146.

5          His phonecalls from Butner which were recorded reveal

6   that he is able to digest complex issues.  For example, he

7   discussed immigration paperwork with his friend and even

8   referred to particular government forms by their form number.

9   August 14 transcript at 22 to 23 and Government Exhibit 31.  He

10  and his friend discussed then-current events in Libya, Tunisia,

11  and Syria.  That is the same transcript reference.  His ability

12  to navigate these topics in a relaxed setting reflects the

13  capacity for higher-order thinking that can just as readily be

14  utilized to assist his attorneys in his defense.

15         Dr. First does contend that "there is a real cognitive

16  impairment" lurking beneath his symptoms, that is, Bejaoui's

17  symptoms, which the doctor concedes are exaggerated.  August 14

18  transcript at 149.  Dr. First centers his conclusion on, among

19  other things, Bejaoui's "pauses" and "memory problems" that

20  occurred even during conversations with his wife.

21         The Court accepts that Bejaoui exhibits some degree of

22  paranoia -- again, that is a layman's use of the term -- as

23  well as confusion.  The symptoms, however, did not permit me to

24  conclude that Bejaoui is "unable to understand the nature and

25  consequences of the proceedings against him."  This is

especially true in light of high functioning behavior the

defendant demonstrates on his telephone calls.

          The Court agrees with Dr. Cochrane that the phonecalls

reveal that Bejaoui "can be organized, coherent, and can

communicate information."  August 14th at 23.  I credit the

Cochrane conclusion that the defendant "suffers from

distress" -- again, nobody seems to dispute that -- but that

"he does not suffer from significant mental illness, symptoms

of which would interfere with his competency."  August 14 at

18.

          I do not mean to state that I accept Dr. Cochrane's

opinions without reservation.  I do not.  For example, the

record note made by one of Dr. Cochrane's colleagues shortly

after the defendant's arrival at FMC Butner states that

Cochrane had already "concluded Bejaoui was an unreliable

historian, was somatizing and/or malingering other clinical

presentations and was feigning psychosis."  August 14

transcript at 80.  Dr. Cochrane's rapidly developed conclusion

certainly suggests that he had a preconceived view regarding

Bejaoui's condition.

          But Cochrane explained on the stand that he had not at

that time reached a "firm conclusion" about Bejaoui's

condition, that the notes reflected his preliminary hypothesis.

August 14 transcript at 80.  I accept that explanation.  And

the evidence at the hearing revealed that in fact Cochrane and

1    others conducted further evaluation of Bejaoui, that he did not

2    base his conclusion solely on his earliest impressions.

3          He also incorporated the views of professional staff

4    members that were assisting.  In fact, the final report that

5    concludes that Mr. Bejaoui was competent and was malingering

6    was co-signed by Dr. Herbal, not only by Dr. Cochrane.

7          So I do conclude that he is able to understand the

8    nature and consequences of the proceedings against him.  I also

9    believe that he is able to assist in his defense.

10         The experts disagreed about whether Bejaoui had the

11   capacity to assist in his own defense.  First opined that Dr.

12   Bejaoui's "ability to work with his attorneys in any reasonable

13   way is compromised due to his paranoia, his depression, and his

14   personality."  August 14th at 141.  That is, his mental state

15   prevents him from communicating with his lawyers as clearly and

16   as cogently as he obviously communicates with his wife.  I

17   should also mention that the telephone calls reflect a very

18   loving relationship between Mr. Bejaoui and his wife, which is

19   all to the good.

20         By contrast, Dr. Cochrane hypothesizes that Bejaoui's

21   difficult relationship with his attorneys, which this Court has

22   observed first-hand, especially early on in the litigation, in

23   regard to his prior attorneys and the difficulties he was

24   having with them, some of those difficulties set forth in

25   apparent disagreements in open court with his attorney,

1    reflects his "histrionic personality" which "could make

2    interactions difficult with counsel, but it is thought to be to

3    a large extent volitional and within one's control."  That's

4    Cochrane explaining the histrionic personality, and that is on

5    August 13th at 167.

6            As I said before, both experts conclude that the

7    defendant is a difficult personality.  They disagree over the

8    voluntariness of his behavior.

9            I cannot conclude that the defendant is unable to

10   assist in his defense.

11           Again I turn to the telephone calls, especially the

12   one where he coordinated with his wife about granting her power

13   of attorney, government Exhibit 8, which is the transcript,

14   page 3/lines 10 to 27, and the fact that he subsequently

15   educated his wife on the effect of the power of attorney.  I

16   have already referred to that.  Transcript and Government

17   Exhibit 14 at page 2/lines 14 to 16.

18           On yet another occasion he instructed his wife to

19   contact his lawyer, whom he identifies by name, to inform that

20   lawyer that he had been mistreated.  The transcript that is

21   Government Exhibit 22 at page 4/line 33, and page 5/line 2 and

22   page 7/lines 17 to 14.  Yet later he asked his wife to tell one

23   of his attorneys to take the statement of an intern whom

24   Bejaoui believe witnessed the psychologist threatening him.

25   Government Exhibit 23 at page 528 to 31.

1          Again, this reflects the certain degree of paranoia

2     the man has, but it also shows his higher order of being able

3     to communicate and deal with legal matters and to communicate

4     what he is thinking and what he wants.

5          On one of the calls his wife asked whether he had ever

6     received a dismissal notice for his prior state case.  When he

7     said no, he told her to go to Brooklyn court to get it.  That's

8     Exhibit 14 at page 4.  This line of conduct over a series of

9     phonecalls reveals that the defendant has a significant ability

10    to strategize in protecting and advancing his own interests

11    even in a legal context and, when motivated, can effectively

12    communicate his thinking and directions to others.

13         The Court accepts what his attorneys state, namely,

14    that the defendant has not been assisting them in their efforts

15    to defend him.  They are quite insistent on that, and I have no

16    reason to deny it.  I further acknowledge that Bejaoui says

17    things to them from time to time that can be characterized as

18    fanciful.  See Dr. First's report at page 12 recounting

19    Bejaoui's express fear that his attorney is attempting to trick

20    him into signing a confession.  Nonetheless, I am unable to

21    conclude that the defendant is unable to assist his attorneys

22    due to depression-induced paranoia, which is the First

23    conclusion.

24         I certainly hope it is clear that when I have been

25    referring to the First conclusions, I am talking about Dr.

1   First throughout this.  That is the transcript of August 14th

2   at 146 to 47.

3          In that regard, I'm persuaded by the defendant's own

4   words to his wife in a telephone call from Butner, and this is

5   the transcript.

6          "Maria:  You know, so now when the lawyer came to see

7   you, what did he say?"  That is what his wife is saying

8          The defendant responds:  "Nothing, absolutely nothing,

9   sweetheart.  I swear to God, he didn't tell me nothing.  All he

10  was concerned about:  Do I understand, do I understand.  I

11  don't have to understand anything.  Are you doing the job for

12  me or not?  Then I said, you know, it's not worth it to speak

13  to you, and then I left.

14         "It's not worth it, because all they have to do,

15  Maria, is trying to get me to a hospital in Brooklyn or

16  Manhattan so I can be close to my family.  The further you

17  getting me, the more you getting me not willing to work with

18  him or even talk to him.  That's why I prefer you talk to him."

19  That is the transcript at Government Exhibit 7 page 5/lines 5

20  to 23.

21         From that conversation the Court concludes that the

22  defendant himself considers his noncooperative behavior to be a

23  method of influencing his attorneys.  That accords directly

24  with Cochrane's theory of Bejaoui's obstinacy, more than Dr.

25  First's theory of depression with psychotic features.

 1              Accordingly, I cannot conclude by a preponderance of

 2    the evidence that the defendant is unable to assist properly in

 3    his defense.  I credit Dr. Cochrane's conclusion that Bejaoui

 4    is able to assist in his defense but refuses to do so, and I so

 5    find by a preponderance of the evidence.

 6              In sum, I find by a preponderance of the evidence that

 7    the defendant is able to understand the proceedings against him

 8    and is able to assist his attorneys pursuant to 4241(d).  The

 9    proceedings in this action shall move forward.

10              I don't know if the parties now want to discuss how to

11    go forward.  There are no other motions in the case as set

12    forth by Mr. Dratel in a letter dated January 18, 2011.  There

13    is part of a pending motion that still exists, and it is to

14    suppress a certain statement to the FBI, I think on the basis

15    that no Miranda warnings were given.

16              Mr. Dratel, do you want to think about whether you

17    still want to press that?  I think it may have been made by a

18    prior attorney.  If you do want to press it, I'll set a date

19    for a fact hearing and we'll set a trial date.  Parties, talk

20    to me.

21              MR. DRATEL:  Certainly, your Honor.  It makes sense to

22    set a date so I can review and then determine whether we are

23    going to proceed with that motion, and then to set a trial date

24    as soon as we can, essentially, with proper preparation.  It's

25    been a long time since we looked at the merits of the case.

1          THE COURT:  Of course.  You tell me, sir.  You're the

2     defense.  What would you like?  I will accommodate you to the

3     extent possible.  You know I have said throughout that the

4     concern of the Court is the amount of time this defendant has

5     spent both in state custody, after which the charges were

6     dropped I think on speedy trial grounds, plus this period of

7     time which was necessitated because of the competency issues.

8     I'd like to move this forward now that that issue has been

9     decided.  It's whatever you want, essentially.

10          MR. DRATEL:  Your Honor, I'm curious.  If I could be

11     reminded by the government in terms of how long the government

12     anticipates its case to be?

13          THE COURT:  Talk to me, please, because I can't hear

14     you when you turn around.

15          MS. KOVNER:  I'm sorry.  I think we can present our

16     case within a week, your Honor.

17          THE COURT:  Do you want to do it at the beginning of

18     the year?

19          MR. DRATEL:  That's a little late because of something

20     that I have coming up.  I have a trial in January.  I have

21     something out of town on the 11th, a sentencing that I must do,

22     that has been delayed already, and the Court has stated she

23     does not wish to adjourn it any further.  If we could start

24     maybe December 12th, if we could get another week, that would

25     be good.

1          THE COURT:  For the trial?

2          MR. DRATEL:  Yes.

3          MR. WILSON:  Your Honor, the government will proceed

4     whenever is convenient for the Court.  I will note that I have

5     another trial starting December 10th, which we expect to go

6     that day.  Obviously, we are somewhat fungible, and I believe

7     Ms. Kovner is available.  So your Honor is aware.

8          THE COURT:  Thank you.  I have always viewed the

9     Assistant U.S. Attorneys as totally fungible.  I don't know if

10    that is good news for you or not, but that is the Court's view.

11         All right.  December 12.  Let's keep it a little

12    flexible because I want to talk with the jury people.  I know

13    it is a little difficult to get people in around Christmas.

14    But we may be talking about December 11 instead of December 12

15    because the panels come in on Monday.

16         MR. DRATEL:  The sentencing I have is the 11th,

17    unfortunately, in Chicago.  I would be back the afternoon of

18    the 11th.

19         THE COURT:  Let's keep it within a day or two.

20         MR. DRATEL:  We can pick it on Monday and I can come

21    back on Wednesday.

22         THE COURT:  That's exactly what I was thinking.  But

23    let's keep it flexible.  Right now we will say December 12th.

24    As we get closer, if I think it will be easier to get a jury on

25    the 10th, I'll notify the parties.  All right?

1        MR. DRATEL:  Yes.

2        THE COURT:  December 12 trial, 9:30 a.m.  Can the

3   parties live with any motions in limine on November 12th?  It's

4   farther in advance than I normally would do, but I think it is

5   appropriate.  November 12th any motions in limine, proposed

6   jury charges and, if the parties wish, proposed voir dire.  I

7   think all of you know that I essentially do my own voir dire,

8   but I'll look at anything you want to send me.  If I think it

9   is appropriate, I'll add it to my own voir dire.  If you wish,

10  voir dire.  But I do want proposed jury charges and I want any

11  motions in limine by November 12.

12        I would like responses to the motions in limine, if

13  any, on November 19th.  Trial December 12, 9:30 a.m.  And I'll

14  set aside that week and the other week, the 12th through the

15  21st, if need be.

16        MR. DRATEL:  For a hearing date, if necessary, for the

17  motion, that week of the 19th is good for me, those three days

18  before Thanksgiving, if you wanted to set aside a morning or an

19  afternoon.

20        THE COURT:  I'd rather do that earlier, if you can.

21  That can be done in October also.

22        MR. DRATEL:  I have something that I am trying to

23  schedule for the 29th through the 31st where I have to go to

24  the government to interview a witness.  The 2nd of November

25  would be fine.  That's a Friday, if that's OK.  The problem is

 1   also have a Rule 15 trip out of the country from about November

 2   5 through the following week, so it's logistically difficult.

 3          THE COURT:  Let's do it on October 30 -- you're going

 4   to be working with the government on that other trip -- if it

 5   doesn't, and I take it it may not, happen.

 6          MR. DRATEL:  It may not happen on those days, but it

 7   will happen.

 8          THE COURT:  Let's set this for October 30.

 9          MR. DRATEL:  This may not happen at all anyway.

10          THE COURT:  Can I assume half a day or less,

11   government?

12          MS. KOVNER:  Yes, your Honor.

13          THE COURT:  Let's set it for 2 p.m.  Far enough in

14   advance so that the government can coordinate with its

15   witnesses, let them know and let the Court know whether you

16   need a change of that date.

17          MR. DRATEL:  Certainly, your Honor.

18          THE COURT:  October 30th, half a day, 2 p.m.

19          Anything else?

20          MS. KOVNER:  Your Honor, we would ask that time be

21   excluded from now until the trial date to allow preparation of

22   the motion and preparation for trial.

23          MR. DRATEL:  No objection, your Honor, because we have

24   the motion possibly pending.

25          THE COURT:  Let me put the exclusion on the record,

1    sir.  On motion of the government, with the defense stating it

2    has no objection, I hereby exclude time from today until

3    December 12th from calculation pursuant to the Speedy Trial

4    Act.  The exclusion is made pursuant to 18 U.S.C. section

5    3161(h)(7)(A).

6            I do make the finding that the ends of justice

7    outweigh the interests of the public and Mr. Bejaoui in a

8    speedy trial.  The purpose is to allow the parties to prepare

9    for a suppression hearing and for the defense to determine

10   whether it wishes to press that issue.  I take it, sir, you

11   will let me know when you decide, if you decide not to.

12           MR. DRATEL:  Probably within a week or ten days.

13           THE COURT:  Good.  And also to prepare for trial.  The

14   exclusion is from today until December 12th.  That is an

15   interests of justice exclusion.  There also is an automatic

16   exclusion because there is a pending motion in existence.

17           MS. KOVNER:  Your Honor, if I recall correctly, in

18   connection with the suppression motion there was a controversy

19   about whether Mr. Bejaoui had in fact adopted the motion,

20   wanted the motion to go forward.  The hearing was triggered by

21   his filing an affidavit, which I think he then disputed whether

22   he had in fact intended to sign.  I would ask that Mr. Dratel

23   clarify in his letter to the Court whether Mr. Bejaoui was in

24   fact adopting that motion.

25           THE COURT:  Adopting the affidavit.  I take it your

 1   position is there is no fact underpinning sufficient to bring

 2   on a fact hearing?

 3           MS. KOVNER:  That's right, your Honor.

 4           THE COURT:  I forgot that, but now I do remember

 5   something about that.  Mr. Dratel will be in communication with

 6   you and the Court.

 7           MR. DRATEL:  Yes.  Thank you, your Honor.  Also, just

 8   as a matter of preservation, I am formally objecting to the

 9   Court's decision, since we are doing it in open court, in other

10   words, the Court's decision on the competency motion.

11           THE COURT:  You are preserving your right to appeal.

12           MR. DRATEL:  Right.

13           THE COURT:  Of course.  That is one of the reasons I

14   thought it best to set my thinking out in writing and to read

15   it so that it's clear, as clear as I can make it.  You have

16   four corners, so you will be able to effectuate your appeal

17   rights should you believe it to be necessary.

18           MR. DRATEL:  Thank you.

19           THE COURT:  Anything else?  Defense?

20           MR. DRATEL:  No, your Honor.

21           THE COURT:  Government?

22           MS. KOVNER:  No, your Honor.

23           THE COURT:  Thank you all.

24           (Adjourned)

25