D49ABEJ1ps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        10 CR 553 (SHS)

5    MONDHER BEJAOUI,

6              Defendant.

7    ------------------------------x

8                                   New York, N.Y.
                                    April 9, 2013
9                                   10:05 a.m.

10
     Before:
11
                         HON. SIDNEY H. STEIN
12
                                    District Judge
13                                  – and a jury –

14
                              APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  RACHEL KOVNER, ESQ.
          KAN MIN NAWADAY, ESQ.
18        Assistant United States Attorneys

19   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
          Attorneys for Defendant
20   BY:  JOSHUA L. DRATEL, ESQ.
          LINDSAY LEWIS, ESQ.

21

22   Also Present:  Michael Birley
                    Special Agent, Federal Bureau of Investigation
23
                    Ummi Ansari
24                  Paralegal Specialist, U.S. Attorney's Office

25

D49ABEJ1ps

1              (In open court; jury panel not present)

2              THE COURT:  All right.  Everyone is assembled.  The

3      attorneys are here and Mr. Bejaoui is here.  We don't have all

4      of the grand jurors.

5              Sir.

6              MR. DRATEL:  Your Honor, Mr. Bejaoui has informed me,

7      your Honor, that he would like to change his plea from not

8      guilty to guilty.

9              THE COURT:  All right.  Without -- is there a plea

10     agreement?

11             MR. DRATEL:  There is no plea agreement that

12     Mr. Bejaoui has executed, certainly.  There is still the

13     outstanding offer.  But I'm not sure if he's doing it pursuant

14     to that agreement or not.  But I wanted to alert the Court.

15             THE COURT:  All right.  Is there a *Pimentel* letter?

16             MR. DRATEL:  There was, I think.

17             MS. KOVNER:  I think we did do a *Pimentel* letter.  I'm

18     not sure we have it here.  We could go get the *Pimentel* letter,

19     your Honor.

20             MR. DRATEL:  I think the *Pimentel* letter, your Honor,

21     is from, I want to say either mid December or mid January, from

22     one of the times when we had the -- I think one of the

23     government's files, actually.

24             THE COURT:  Mid December or mid January whatever year,

25     sir?

D49ABEJ1ps

           MR. DRATEL:  Oh, I'm sorry, your Honor, I'm sorry.  It was one of the two times that we were scheduled for trial.  We were scheduled for trial December 10th, and then January 16th, and in advance of one of those dates, the government sent a *Pimentel* letter, I believe, or at least a revised plea agreement.  And I'm thinking it was before the December 10th -- it was after the Court's decision on competency, is my recollection, but I'm not completely firm on that.

           THE COURT:  Mr. Bejaoui, you've heard your attorney tell me that you wish to pled guilty to the charges against you.  Is that true, sir?

           THE DEFENDANT:  Yes.

           THE COURT:  Mr. Bejaoui, have you talked with Mr. Dratel about this, sir?

           THE DEFENDANT:  Yes.

           THE COURT:  This is a very important decision by you, sir.  I think -- I'm going to give you some additional time to speak with Mr. Dratel.

           THE DEFENDANT:  I don't need additional time.

           THE COURT:  I'm also going to give --

           THE DEFENDANT:  If I choose to plead guilty and waive my rights to counsel, would that be possible?  So we can have this guilty plea with me instead of going back and forth with Mr. Dratel.  You know that, me and Mr. Dratel, we don't have the greatest relationship.  I felt that it's tenuous, this

D49ABEJ1ps

1     relationship.

2             THE COURT:  Tenuous, yes.

3             THE DEFENDANT:  It is clear that me and him are not

4     really in a good position to discuss whether I -- the plea or

5     what to --

6             THE COURT:  I understand.  But he can advise you.

7             THE DEFENDANT:  I'm saving the Court lots of time and

8     lots of energy.  I'm going to plead guilty directly to the

9     Judge, not to make an agreement with the government.  I'm

10    pleaing guilty with the indictment.  Can you take that plea?

11    Would you accept it?  What pleases you to accept the plea?

12            THE COURT:  There is a very formal proceeding that I

13    need to go through to make --

14            THE DEFENDANT:  You have it now.

15            THE COURT:  Pardon me?

16            THE DEFENDANT:  You can have that proceeding available

17    now.  You have those two, three pages of questions that you

18    will ask me.

19            THE COURT:  It's actually seven pages.  I do have a

20    form allocution.

21            THE DEFENDANT:  OK.

22            THE COURT:  But part of it is, I have to make

23    absolutely certain that you understand the impact of what

24    you're doing by pleading guilty, and that you understand all of

25    the rights that you'd be giving up by pleading guilty.  And I

D49ABEJ1ps

1   also need to understand what the nature of your relationship

2   with Mr. Dratel is.

3           THE DEFENDANT:  He's the boss.

4           THE COURT:  Your relationship with Mr. Dratel is

5   identical to that of each of the prior attorneys you've had.

6   In other words, you've become dissatisfied with each of them.

7   And I don't have to remind you of the history of your wanting

8   to go pro se and I allowed that.  You wanted to have Mr. Dratel

9   back as your attorney and I allowed that.

10           THE DEFENDANT:  That's not true.  That part is not

11   true.  I did not want to go back to Mr. Dratel.  You forced me

12   to do that.

13           THE COURT:  All right.  I understand your position.

14   And then you've made applications both to have a new attorney,

15   after Mr. Dratel, and applications to go pro se.  And I've

16   denied those requests.  But I need to feel comfortable, sir,

17   that you are pleading guilty knowingly and voluntarily, that

18   you don't feel forced to plead guilty by anyone or anything,

19   that you're doing it voluntarily.  And we'll go through the

20   allocution, that is, all the questions I have to ask you.  And

21   if I'm satisfied, I'll accept the guilty plea.  But if I

22   believe that you're doing it under compulsion, what you believe

23   is compulsion, then I can't accept it.  It has to be voluntary

24   and knowing.  And if anyone has forced you to plead guilty, for

25   example, if you feel that in some way I forced you, if anyone

D49ABEJ1ps

1    has forced you to plead guilty, I can't accept that guilty

2    plea.  Do you understand?

3                 THE DEFENDANT:  Yes, yes.

4                 THE COURT:  All right.  We have to take some time here

5    now.  And I'm going to ask the government to have somebody

6    obtain that *Pimentel* letter.  I'm going to, if the plea offer

7    is still open, I'm going to ask Mr. Dratel to discuss that plea

8    offer.

9                 THE DEFENDANT:  He, he the one telling me, Judge.  I'm

10   not agreeing with them.  I'm pleading here.  You not accepting

11   the plea?  I'm not talking to the government.  I'm talking to

12   the Court.

13                THE COURT:  Yes.

14                THE DEFENDANT:  I'm pleading guilty to you.  Would you

15   take that?

16                THE COURT:  Well, I don't know.  I have to ask you a

17   series of questions.

18                THE DEFENDANT:  OK.  Can you ask me the series of

19   questions and try to eliminate the government?  Because I'm not

20   agreeing with the government.

21                THE COURT:  I'm not asking you to agree with the

22   government.  Is the plea offer still open?

23                MS. KOVNER:  No, your Honor.

24                THE COURT:  All right.  Get the *Pimentel* letter over

25   here.  Mr. Dratel, I want you to discuss the plea with

D49ABEJ1ps

1   Mr. Bejaoui and the *Pimentel* letter, and I'll go over the

2   *Pimentel* letter with you, sir, as well, in open court, so --

3          THE DEFENDANT:  I'm not discussing anything with

4   Joshua Dratel.  I'm waiving my rights to an attorney.  I don't

5   want him to be my attorney.  How easy is it to plead guilty?

6   Just plead guilty, say yes.  And I said that.  What pleases

7   you?

8          THE COURT:  It's much more complicated than saying "I

9   plead guilty."  I have to make absolutely certain that --

10         THE DEFENDANT:  That's what I said, but I don't need

11  him.  How is it so complicated for me to just answer five

12  questions of seven pages?  What is it?

13         THE COURT:  I want you to --

14         THE DEFENDANT:  Let me see when did I --

15         THE COURT:  I want you to listen to him.

16         THE DEFENDANT:  I'm not listening.  I won't listen to

17  him.

18         THE COURT:  OK.  Get the *Pimentel* letter here.

19         We're going to keep the jury, all the venire, all

20  50-some-odd people waiting there, all right, because I don't

21  know if I'm going to be able to accept your plea.  I have to

22  believe that it's knowing and voluntary.

23         THE DEFENDANT:  Unequivocal.  I'm telling you it's

24  knowing and voluntary.  What else do you want?

25         THE COURT:  You're telling me what, sir?

D49ABEJ1ps

1          THE DEFENDANT:  That it's a voluntary plea.

2          THE COURT:  All right, sir.

3          THE DEFENDANT:  Unequivocal decision.  That doesn't

4    please the government?

5          THE COURT:  We'll take -- the question is not whether

6    the government is pleased.

7          THE DEFENDANT:  I mean like you.  You are the

8    government.  I don't want to be back here.  It's frustrating.

9          THE COURT:  But, sir, you have the right to go to

10   trial before 12 jurors.

11         THE DEFENDANT:  Go to trial in a circus?  Go to trial

12   where I don't have the choice to make decisions on who is going

13   to sit to listen to my case?  Jury trial knowing that he

14   doesn't have a defense?

15         THE COURT:  Well, I know there's going to be a defense

16   asserted based on --

17         THE DEFENDANT:  Based on what?

18         THE COURT:  -- based on the trial preparation, the

19   motions that have been made, the subpoenas that have been

20   issued.

21         THE DEFENDANT:  Let's cut the bullshit, man.  Let's

22   get it done.  I'm pleading guilty.  Let's move.  You want me to

23   use my sweet language terms?  I think that would be fair

24   enough.

25         (Pause)

D49ABEJ1ps

1          THE COURT:  Mr. Bejaoui, we have to wait for the

2     government to come back with that *Pimentel* letter.

3          THE DEFENDANT:  I never had a chance to read that

4     *Pimentel* letter.

5          THE COURT:  All right.  Well, you'll read it.  We'll

6     give you a full opportunity to read it.  Do you want to stay in

7     court or do you want to go back into the holding cells?

8     Whatever you wish.

9          THE DEFENDANT:  I will remain.

10          THE COURT:  OK.

11          (Pause)

12          THE COURT:  All right.  With the permission of the

13     parties, although the government is not here, what I'd like to

14     do is tell the jurors who are waiting, the venire that is

15     waiting, that it's going to be a while and they should be

16     patient.

17          All right.  I won't.  I'll stay right here.

18          (Pause)

19          THE COURT:  Mr. Bejaoui, please listen to what

20     Mr. Dratel has to say.

21          THE DEFENDANT:  I'm not listening to either you or

22     him.

23          (Defense counsel and defendant confer)

24          MS. KOVNER:  There was not previously a *Pimentel*

25     prepared, but we have prepared one.

D49ABEJ1ps

1          THE COURT:  All right.  Give it to Mr. Bejaoui.

2          (Pause)

3          THE COURT:  All right.  We're on the record.

4   Mr. Dratel, the government has produced a *Pimentel* letter.  I'm

5   directing you to speak with Mr. Bejaoui, or perhaps you already

6   have, to explain that *Pimentel* letter and its limitations and

7   content, and also to discuss with him the issue of deportation

8   if you haven't already done so.  All right?  And explain to him

9   as well the nature of the allocution which I'm going to

10  undertake.

11          (Defense counsel confers with defendant)

12          THE COURT:  Mr. Bejaoui, listen to Mr. Dratel.  I'm

13  asking him to do that.

14          THE DEFENDANT:  He wants to do that.  I don't want to

15  do that.  And also, I would like to waive my rights to be

16  present at trial.  If you will like to issue an order to take

17  me back to prison, then do whatever the fuck you want to do

18  here and I'd sooner be back in prison.  Call me back at

19  sentencing.

20          THE COURT:  Sir, you have to be present at any plea.

21          THE DEFENDANT:  There's no plea.  There is no plea

22  discussion.  I'm tired.  This, it, this is ridiculous.

23          THE COURT:  Do you wish to take a plea?  Do you wish

24  to plead guilty?

25          THE DEFENDANT:  No.

D49ABEJ1ps

1          THE COURT:  You do not wish to plead guilty.

2          THE DEFENDANT:  No.

3          THE COURT:  All right.  Then we will proceed with the

4     trial.

5          THE DEFENDANT:  Good.  I'm waiving the right to be

6     present at trial.  MDC.  That's where I prefer to be.  You want

7     it in writing?

8          THE COURT:  No.  What I would want you to do, sir, is,

9     we will set up in the holding cell --

10         THE DEFENDANT:  I don't want to be in the holding

11    cell.

12         THE COURT:  Well, you have the right to be present

13    during trial.

14         THE DEFENDANT:  I don't want it.  I'm waiving,

15    w-a-i-v-e.  I'm waiving to you.

16         THE COURT:  All right.  But I still would want you to

17    have the ability to listen to the trial.

18         THE DEFENDANT:  I don't want to listen.

19         THE COURT:  You have the right --

20         THE DEFENDANT:  Look how intelligent is that decision.

21    I don't want to listen to the trial proceeding.

22         THE COURT:  Well, I would have you kept in the holding

23    cell, in order to -- for Mr. Dratel to be able to speak with

24    you.

25         THE DEFENDANT:  Why would you want to do that if I'm

D49ABEJ1ps

1   telling you I'm waiving that right?  That's a right.  You got

2   it?  Look at your textbook and see if you can find anything to

3   take me back to prison.

4              (Defense counsel and defendant confer)

5              THE COURT:  Mr. Bejaoui, Mr. Bejaoui --

6              THE DEFENDANT:  I don't want to be present.

7              THE COURT:  You don't have to be --

8              THE DEFENDANT:  Don't aggravate me.  I do have a

9   fucking medical condition.  Please don't let me just lose my --

10  just let's take me to MDC.  I'm waiving that right.  You wanted

11  a right and I signed it for you.  You want to make an

12  intelligent, bring the physician and he can determine if that

13  decision is an intelligent decision.  I can't read you.  I hate

14  you, Judge.  I really do.  I don't believe that you are an

15  honest man.  I don't.  And I don't want to be here.  I don't

16  want to insult you.  I do, to a certain level, believe that you

17  earn that position.  But my personal opinion about you is not

18  going to change.  I disagree with your ruling.  And I believe

19  that you are going to hurt me.  I don't want to be here.  I

20  want to be back in prison.

21             THE COURT:  All right.  You do have the right to waive

22  your appearance at trial.  There's no question about that.

23  That is correct.  I want to do some research to see if you have

24  the ability to simply go back to the MDC.  I would much -- I'm

25  going to allow you to waive your right not to be present.  But

D49ABEJ1ps

```
1    I would much prefer that you watch and listen to the trial from
2    another location.
3              THE DEFENDANT:  I don't want to hear.
4              THE COURT:  That you have the ability to consult with
5    Mr. Dratel.
6              THE DEFENDANT:  I don't want to consult.  I don't want
7    to hear.  I don't want to hear.  This is the most unfair
8    proceeding I ever witness in my 39 years of living on this
9    green earth.
10             THE COURT:  All right.  I'm going to have to do some
11   research.  I'm going to ask the marshals to take you back to
12   the holding cell while all the parties undertake that research.
13             (Recess)
14             (Jury selection continues)
15
16
17
18
19
20
21
22
23
24
25
```

D49ABEJ1ps

1              (A jury of 12 and 2 alternates was selected and sworn)

2              THE COURT:  Ladies and gentlemen of the jury of the

3      jury, now that you've been sworn, I want to take a few moments

4      to tell you something about the trial you're going to see and

5      how you should comport yourself during the trial itself.  We

6      will break for lunch a little earlier than usual, so I will

7      give you an opportunity to have lunch.  Then we'll come back

8      and we'll have the opening statements of the lawyers.  At the

9      end of the trial, ladies and gentlemen, you're going to have to

10     decide from the evidence what the facts are and whether the

11     government has proved beyond a reasonable doubt that the

12     defendant committed the crimes that are charged in the

13     indictment.  You are the judges of the facts.  You're going to

14     hear the evidence, decide what the facts are, and then apply

15     those facts to the law, and I will give you the law, as I told

16     you yesterday.  That's how you're going to reach your verdict.

17     And you must follow the law as I give it to you.

18             Don't take anything I say or do during the trial as

19     indicating what your verdict should be.  I may be taking notes.

20     Don't be influenced by my taking notes.  Periodically I'll be

21     speaking to my deputy or my clerks.  Don't be concerned with

22     that.  It may have to do with this case.  It may not.  I have

23     other matters that I may have to attend to.  Emergencies arise.

24     And what I'm writing down or saying may have absolutely nothing

25     to do with this trial.

1           The evidence will consist of the testimony of

2     witnesses who will take the witness stand.  You're used to

3     seeing that in, certainly, movies and television.  It also will

4     consist of documents that are going to be introduced into

5     trial.  And there may be other things besides documents.  And

6     evidence also will consist of stipulations by the parties, if

7     there are any in this case.  I happen not to know whether there

8     are any stipulations.  But stipulations are simply agreements

9     by the parties that certain facts are true and they stipulate

10    to those facts.  If there are stipulations of facts here,

11    you'll know about it because one of the attorneys will stand up

12    and tell you that the parties have stipulated that a certain

13    fact is true and therefore you must accept that fact as true.

14          So those are the three ways evidence comes in:

15    Witness, documents, and stipulations.

16          There are two types of evidence, direct evidence and

17    circumstantial evidence.  Direct evidence is testimony by a

18    witness about what that witness personally saw, heard, or did.

19    Circumstantial evidence is simply indirect evidence, that is,

20    proof of certain facts from which you infer that another fact

21    is true.  The example that's usually given in this courtroom of

22    circumstantial evidence is one that I like, and it makes sense

23    to me.  I want you to assume you can't look outside, which is

24    true, because the blinds are drawn.  I want you to assume that

25    somebody walks into the back of the courtroom carrying a wet

D49ABEJ1ps

umbrella.  You have direct evidence that there's a wet

umbrella.  And you can use that directly observed fact to infer

the existence of another fact, namely, that it's raining

outside.  That's all there is to circumstantial evidence:  The

wet umbrella is circumstantial evidence that it's raining

outside.  And you're inferring from a direct fact to another

fact that you don't have direct proof of.  That's all.  That's

all there is to it.  But I want you to be aware that in fact it

may not be raining outside.  The person may have stuck the

umbrella under a faucet here.  But it certainly is a logical

and reasonable conclusion, inference for you to draw from the

fact of a wet umbrella to the fact that it's raining outside.

          Now, you can use both direct evidence and

circumstantial evidence in deciding this case.  The law does

not put any particular weight on any particular piece of

evidence.  In fact, it's for you, the jury, to decide what

pieces of evidence to believe and what pieces not to believe.

You can completely discard a piece of evidence if you don't

find it believable.  And then among those pieces of evidence

that you decide to credit, it's entirely up to you how much

weight to put on that evidence.  You decide whether a piece of

evidence is very important or not so important or should be

discarded entirely.  That's what you do.  You can give equal

weight or unequal weight or no weight at all to either direct

or indirect -- or circumstantial evidence.  That's a decision

D49ABEJ1ps

1    for you, the jury, to make.  You determine which of the

2    witnesses to believe, what part of their testimony to believe,

3    and how much weight to put on testimony that you do believe.

4           Now, you know that during trial there may be

5    objections raised by the lawyers.  You've all seen that on

6    television and in movies.  One lawyer stands up and asks a

7    question.  The other lawyer says, I object.  At this point I am

8    called upon to do my job.  I have to decide whether the

9    question is a legally permissible question.  And if I believe

10   it's a legally permissible question, I will say Objection

11   overruled, which means the witness can answer the question.

12   And if I believe it's an impermissible question under the law,

13   I then say Objection sustained, which means the witness is not

14   to answer the question and the lawyer should ask another

15   question.  You don't have to memorize that.  You'll see it play

16   out in court.  You'll get a sense of it as it happens.

17          Don't hold it against either of the -- or any of the

18   lawyers that they are making an objection.  They're obligated

19   to make an objection if they any an improper question has been

20   asked.  And the likelihood is sometimes, a lawyer will ask a

21   question, the lawyer for the other side will object, and I will

22   sustain the objection, meaning it's an impermissible question.

23   And the lawyer will answer anyway.  Because sometimes things

24   move quickly or sometimes witnesses don't understand the rules

25   of the Court and the witness will answer, even though I have

sustained an objection.  In that case I most likely will direct

you to disregard the answer, and you must do so in your

consideration of the evidence.  That cannot be part of the

evidence.

The law requires that your decision be made solely

upon the evidence in this trial, or lack of evidence.  And what

that means is, I don't want you doing any research on this case

outside of this courtroom.  I don't want you doing any research

in this case, period.  Just listen to the evidence in the

courtroom.  The Internet is wonderful, and social media are

wonderful.  But not at trial.  Don't go onto the Internet.

Don't Google anything.  Don't tweet a message or things like

that.  Just listen to the evidence here.  The defendant is

entitled to have a jury of fair people rule on the issues here

as to whether the government has proven its case beyond a

reasonable doubt or not based solely on the evidence in this

courtroom, nothing else.

Don't speak to anyone about this case.  I know that's

a little surprising.  But it's for the same reason.  If you

speak to your spouse or members of your household, or each

other for that matter, about the case, that person may give you

that person's views or knowledge of insurance, of taxicabs, or

anything that are not part of the evidence here.  And I don't

want you to be influenced or even hear those views or facts or

nonfacts.  So, please, when you go home, just say that your

D49ABEJ1ps

1    case is a criminal case, and you'll say whatever you want to

2    tell them when the case is over.  But during the pendency of

3    the case, don't discuss this case with anyone else.  And even

4    don't talk about it amongst yourselves, because I want you all

5    to be listening to the evidence.  And at the end of the case

6    you'll start deliberating.  And then you must exchange your

7    views with your fellow jurors.  But until then I don't want you

8    to be influenced by what any other juror is thinking or to

9    reach conclusions before all of the evidence.  Don't talk to

10   anybody about the evidence here.

11           Now, how do you evaluate the testimony and the

12   exhibits?  There's no magic formula I can give you.  The story

13   I always tell -- it's getting old now -- is about 15 years or

14   so ago, the Federal Judicial Center, which is an educational

15   arm of the federal court system, had a seminar.  They give us

16   seminars from time to time.  And it was about how to judge the

17   credibility of witnesses, because sometimes I have to decide

18   the facts of the case.  Sometimes there are no juries.  Here

19   there's a jury, so you're deciding the facts.  But because

20   there are instances where I have to decide the facts, the

21   Federal Judicial Center gave a seminar for federal judges on

22   how to determine credibility.  And it took two or three days

23   and they have psychologists talk to us and they have lawyers

24   talk to us and law professors.  And we even did some electronic

25   tests, I guess, procedures.  They had various people on stage

D49ABEJ1ps

1    and they would tell a story, and we had to determine who was

2    telling the truth and who wasn't, tell the truth and we would

3    click our buzzers to say truth and untruth, and so forth.  And

4    I can tell you at the end of those two or three days, I learned

5    absolutely nothing.  There's no formula I can give you.

6          But what I can tell you is that whatever you use in

7    ordinary everyday life to decide who's credible and who's not,

8    use that.  Use your judgment.  Use your experience.  Use your

9    common sense.  That's the best thing to use, because every day

10   you're dealing with your spouse, your children, or you shop,

11   they're telling you what they want to buy or what you want to

12   buy, you're buying a newspaper or a breakfast roll, you have to

13   decide who's telling you the truth and who isn't.  You decide

14   who's credible and who isn't.  And in business you certainly

15   do.  In your professions you certainly do.  So whatever tests

16   you use in everyday life, use them here.  No formula.  It's

17   life.  It's judgment.  It's common sense.  Use that, and you

18   won't be going wrong.

19         Now, I've told you what is evidence.  I want to tell

20   you what is not evidence.  Anything the lawyers say here is not

21   evidence.  After lunch we're going to have the opening

22   statements by the lawyers.  They're going to tell you what they

23   think the evidence is going to show.  That doesn't mean the

24   evidence is going to show that.  You're going to decide at the

25   end of the case what the evidence shows.  When they make

D49ABEJ1ps

1    objections or respond to objections, respond to me if I have

2    questions, anything they say is not evidence.  All right.  What

3    the lawyers say is not evidence.  What I say is not evidence.

4    Anything you see or hear when the Court is not in session, even

5    if it's said or done by one of the parties here or one of the

6    witnesses, is not evidence.  All right.  If you run into

7    somebody in the elevator and they're a witness here, they say

8    something to somebody else in the elevator, that's not

9    evidence.

10          By the way, if you do have any contact whatsoever with

11   any of the witnesses or the parties, the defendant or the --

12   the defense lawyers or the government lawyers or the paralegal

13   specialist or the FBI agent or the assistant, if you hear

14   anything or have any contact with them, I need to know that, so

15   tell Ms. Blakely, my deputy, and then we'll take it from there.

16   I want you to have no contact with the lawyers or the parties

17   here.  So I'm asking the lawyers and the parties not to greet

18   the jurors.  And I'm asking you not to greet them.

19          Now, you nod hello or they nod hello because you look

20   familiar but you're not quite sure who they are, that I

21   understand.  But no substantive contact.  And if there is any,

22   you need to tell Ms. Blakely about it.  And they're not being

23   impolite, by the way, then they don't greet you.  I'm telling

24   them not to greet you.

25          Now, there's a reason for the rules.  The reason for

D49ABEJ1ps

the rules is to make sure that the defendant has a jury that's
totally unbiased and will make an independent evaluation of the
evidence based upon the evidence here and the jury's
deliberations and nothing else.

          Now, I've told you it's a criminal case.  And you know
that Mr. Bejaoui is charged with six counts of mail fraud.  And
you know that the indictment, which contains the charges, is
not evidence at all.  It's simply a charge.  You can't use it
as evidence of anything.  You also know that Mr. Bejaoui has
pled not guilty to those charges.  He denies committing the
offenses that the grand jury set forth in the indictment.  As a
result of that, Mr. Bejaoui is presumed to be innocent.  The
burden is therefore on the government to prove him guilty
beyond a reasonable doubt on every element of each of the six
charges in the indictment.  If the government does not prove
him guilty beyond a reasonable doubt, then I'm going to
instruct you that you have to acquit Mr. Bejaoui of the charge
that you're considering.  That's a heavy burden and it's on the
government at all times.  It never shifts to the defendant
until such time, if ever, that you decide the government has
met its burden of proving him guilty beyond a reasonable doubt.

          Now let me tell you about the stages of the trial.
There's going to be an opening statement by the lawyers.  The
order of the opening statement is set by law.  The government
goes first, then the defense goes.  And then the government

D49ABEJ1ps

will put its case on and the defense will cross-examine those

witnesses if it chooses to do so.  At the close of the

government's case, the defense will have an opportunity to put

a case on of its own, but it is under no obligation to do so,

because, as I told you, the burden is always on the government.

The defense does not have to prove anything.  The defendant is

presumed to be innocent.

Then, after the defense rests, if it puts a case on,

the attorneys are going to make their closing arguments.  And,

remember, what they say is not evidence.  They probably will

tell you what they think the evidence showed and what

conclusion they want you to draw.  Listen to what they have to

say and evaluate it as you see fit, but it's not evidence.  You

decide what the evidence is.

Then I will instruct you on the law.  I'll tell you

what the law is.  And you'll have a verdict sheet to fill out,

which will help guide your deliberations.  And then I will ask

you to retire to begin your deliberations, and you will

deliberate, and at the end of that, by a unanimous vote, you

will reach your verdict.  Please don't make up your mind about

what the verdict should be until after I have instructed you on

the law at the end of the case and you've gone to the jury room

and you've talked with your fellow jurors.  Keep an open mind

until then.  All the parties deserve and the law requires that

you give them an opportunity to be fully heard.

D49ABEJ1ps

1        Now, I believe at least one of you are making notes.
2   Is that true?

3        JUROR NO. 2:  Yes.  I just -- just to remember what
4   you're telling us.

5        THE COURT:  No, no, I understand.  Sometimes that's
6   OK.  That's sometimes it's not.  I'll discuss that with the
7   attorneys when you go to lunch.  But what I'm going to ask you
8   to do is just right now keep those notes to yourself.  Don't
9   discuss them with anyone.  Then when you come back we'll either
10  ask you not to take notes or we'll say everyone can take notes,
11  and if so, we'll certainly pass out pads for you.  Nobody has
12  to take notes.  So we'll see.

13       Enjoy lunch.  It's now a quarter to 1.  Be back by 1.
14  OK.  Be back by 1 -- I'm sorry.  Be back by 2.  That's why
15  everyone was quizzical.  It was a combination of being
16  quizzical and being angry.  2 o'clock.

17       Yes, ma'am.

18       JUROR NO. 2:  One question.  Two actually.  The
19  stipulations, that means both sets of attorneys have agreed to
20  a fact?

21       THE COURT:  If there are stipulations, they will tell
22  you that they have both agreed that a certain fact is true.

23       JUROR NO. 2:  OK.

24       THE COURT:  And they will read that fact to you.  I'll
25  explain it if and when it happens.

D49ABEJ1ps

1          JUROR NO. 2:  OK.  And then if the case does happen

2     where a witness does offer an answer when you've sustained an

3     objection --

4          THE COURT:  I probably will direct you to disregard

5     that answer.  And it will be really clear.

6          Oh, yes.  I will say Jury, you must disregard that

7     answer.

8          JUROR NO. 2:  That's the kind of thing I like to make

9     notes on because that's the kind of thing I get mixed up on.

10          THE COURT:  OK.  Trials in my courtroom usually are

11     run efficiently and fairly and I will explain everything that's

12     happening.

13          JUROR NO. 2:  All right.

14          THE COURT:  All right.  Enjoy your lunch.  When you

15     come back, when you always file out, file out from the front

16     here, follow Ms. Blakely.  When you come back, don't assemble

17     here.  Assemble in the jury deliberation room.  Thank you.  And

18     there will be far fewer delays going forward.

19          (The jury left the courtroom)

20          THE COURT:  Please be seated.

21          What's the position of the parties on notes?  I saw

22     that she was taking notes.  Do the parties have a preference?

23     If you have a joint preference, then I'll listen.

24          MR. DRATEL:  It has evolved from notes -- I mean from

25     no notes to then, you know -- I don't know that jurors are

D49ABEJ1ps

1   permitted to take notes, so I don't really have a position.

2   I'm not a big fan of it.  But I have no problem.

3           THE COURT:  All right.  Any objection from the

4   government?

5           MS. KOVNER:  We have no objection to the jury taking

6   notes.

7           THE COURT:  Normally I say no notes, but clearly at

8   least one of them wants to.  I'm inclined to say they can take

9   notes.  I will tell them that if they do they must keep them to

10  themselves and not discuss them with others and hand them in at

11  the end of each day.

12          MR. DRATEL:  Thank you.

13          THE COURT:  All right.  Now, Mr. Dratel, would you

14  speak now, speak to your client, and see if he agrees to have

15  no further outbursts, and if so, then he will rejoin the trial.

16  And if so, I'll want to question him on that.  But if he

17  says -- well, I don't know what he'll say, but if you would

18  speak to your client now.

19          MR. DRATEL:  OK.  Thank you, your Honor.

20          THE COURT:  We'll wait.

21          And let him know he's invited and encouraged to attend

22  and be present at this at this trial.

23          (Pause)

24          THE COURT:  Mr. Dratel?

25          MR. DRATEL:  Mr. Bejaoui wants to go back to MDC.

D49ABEJ1ps

```
 1              THE COURT:  All right.  Bring in the defendant.

 2              Mr. Bejaoui, we have chosen a jury.  I want you to

 3    know that you are encouraged to participate fully in this trial

 4    and to be present during the trial.  But to do so, you must

 5    tell me that there are going to be no further outbursts.  Are

 6    you able to do that?

 7              THE DEFENDANT:  No.

 8              THE COURT:  All right.  What do you wish to do?

 9              THE DEFENDANT:  There won't be no outbursts, because I

10    wasn't doing any outbursts.  I was participating.  What you

11    consider outbursts was participation.

12              THE COURT:  All right.  Will you behave yourself,

13    behave yourself during the trial?

14              THE DEFENDANT:  I wasn't behaving in any way.

15              THE COURT:  Pardon me?

16              THE DEFENDANT:  I wasn't behaving in an abnormal way.

17    I was behaving normally.

18              THE COURT:  Will you not try to speak to the jury and

19    will you allow Mr. Dratel to ask questions without

20    interruption?  You'll have the right to talk with him.

21              THE DEFENDANT:  I already spoke with him.  I addressed

22    it.  I simply voiced my opinion because he wanted to guide me.

23    He was dismissive, so I had to speak to him with a higher

24    voice.

25              THE COURT:  Well, I think flipping me the bird
```

D49ABEJ1ps

1    certainly was disruptive, sir.

2            THE DEFENDANT:  That's not -- let's say you put it on,

3    perhaps was the -- whatever.  I can't even think of about words

4    anymore.  That's how much this --

5            THE COURT:  I don't hear you, sir.

6            THE DEFENDANT:  He diminished my mental ability.  He

7    did.

8            THE COURT:  All right.  This is what I'm going to do.

9    I am going to permit you to come back here.  But you must

10   behave yourself.  All right.  There cannot be outbursts.  You

11   cannot argue loudly.  You can talk with Mr. Dratel.  And you

12   must listen during the opening arguments, the opening

13   statements of the lawyers, without speaking to the jury.  All

14   right?  Can you do that?

15           THE DEFENDANT:  I don't know, Judge.  I can't,

16   seriously.  My, I'm having trouble dealing with all of it.

17           THE COURT:  I don't hear you.

18           THE DEFENDANT:  I say, I'm having difficulty dealing

19   with this gentleman.  Let me waive that right and go to MDC.  I

20   think it would be better for everyone.

21           THE COURT:  Don't worry about us.

22           THE DEFENDANT:  I'm worrying about you.  You're the

23   man who's going to sentence me.  So let the judge feel better.

24           THE COURT:  If you wish to have a good relationship

25   with the Court, then what you'll do is come here and talk with

D49ABEJ1ps

<pre>
 1   Mr. Dratel and Ms. Lewis and discuss with them what's
 2   happening, but not have outbursts.
 3           THE DEFENDANT:  It's not an outbursts.  It's things
 4   that I -- I'm -- well, I didn't phrase the word I said.
 5           THE COURT:  Let's see if it works.  All right?
 6           THE DEFENDANT:  Let me put it in a way that will
 7   sound -- I think that he overpowering me.  Things are in my
 8   head.  So it's no way to stop it.  Despite the fact that you --
 9   you might be a nice person.  I don't know.  Then seconds later
10   I have my -- start talking about the Knicks and Miami.  I
11   really don't want to focus.  Take me back to MDC.  Believe me,
12   that would be best, your Honor.
13           THE COURT:  All right.  I'm holding that you're
14   waiving the right to be present.
15           THE DEFENDANT:  Yes, your Honor.
16           THE COURT:  Again, you are urged to come back at any
17   time.  If you want to, as I say, you can continue to watch the
18   trial.  That's what I would prefer.  My first preference is
19   that you be here and not be disruptive.  Next is that you stay
20   in the holding cell and watch the trial.  And then thirdly, if
21   you insist, you can be taken back to the MDC.  What do you
22   want?
23           THE DEFENDANT:  MDC.
24           THE COURT:  All right.  I'm going to send you back to
25   the MDC, holding that you waive the right to be present at the
</pre>

D49ABEJ1ps

1    trial.  You can rejoin any time you think you can not be

2    disruptive.  I'm going to have Mr. Dratel make sure that you

3    get the transcript of the trial each day.  Thank you, sir.  You

4    can be taken back.

5         THE DEFENDANT:  Do I have to be forced tomorrow to be

6    to come back because --

7         THE COURT:  No, you wouldn't be forced if you don't

8    want to.

9         THE DEFENDANT:  No, I will not be produced.

10        THE COURT:  You don't have to come here.  But I would

11   urge you to want to.  All right?

12        And Mr. Dratel, make contact with the defendant each

13   day to see if he wants to come back to court.  All right?

14        MR. DRATEL:  Thank you, Judge.

15        THE COURT:  Thank you, sir.  Marshals, you can take

16   the defendant back.

17        And Mr. Dratel, I'm going to direct you to consult

18   with Mr. Bejaoui each day, to make sure that he still does not

19   want to be present and that the consultation will be assisting

20   in his right to counsel.

21        MR. DRATEL:  OK, your Honor.

22        THE COURT:  And I'll want a representation from you

23   each day if it's true that he still does not want to return to

24   Court.

25        MR. DRATEL:  It will probably be from the evening

D49ABEJ1ps

```
 1   before, your Honor.

 2              THE COURT:  Pardon me?

 3              MR. DRATEL:  It will probably be from the evening

 4   before.

 5              THE COURT:  Yes, I understand that.  Let's do the best

 6   you can and stay in as close contact as you can.

 7              MR. DRATEL:  Yes.  Going in the morning is not a

 8   viable -- ensuring he will be here on time.

 9              THE COURT:  Stay in as close contact as you can.  And,

10   government, make sure that the marshals or whoever has custody

11   of him at the MDC knows if he wants to come to court they are

12   to bring him to court.  They don't have to wait for the next

13   day's transport.

14              All right.  2 o'clock.  Thank you.

15              How long is the opening going to be, government?

16              MS. KOVNER:  12 minutes.

17              THE COURT:  Mr. Dratel?

18              MR. DRATEL:  Ten, 12, 15.

19              THE COURT:  I'm not holding you to -- all right.

20   Thank you.

21              (Luncheon recess)

22              (Continued on next page)

23

24

25
```

D49ABEJ1ps

AFTERNOON SESSION

2:00 p.m.

1
2
3    (In open court; jury not present)

4    THE COURT:  Please be seated.  We're missing a juror.

5    All counsel are present.  Mr. Bejaoui is not, since he

6    has elected to waive his ability to be here, and I have

7    directed that he not be here until he can comport himself

8    appropriately.

9    I have received a copy of a pro se motion by

10   Mr. Bejaoui.  It states that it was served on March 30 on the

11   Assistant United States Attorney and the clerk of the court,

12   and in it he moves to relieve Mr. Dratel.  He wishes to

13   represent himself.  He wants the reinstatement of the motion to

14   suppress and a hearing on that, and he wants the trial date

15   adjourned.  I'm denying that motion.

16   First of all, he has an attorney, and, as I've written

17   before on prior pro se motions, he doesn't have the right to

18   make motions separately.  I'm not going to relieve Mr. Dratel,

19   for all the reasons that have been set forth on the record.

20   The problems he's having with Mr. Dratel are the exact same

21   problems he's had with each of his prior counsel, in terms of

22   his insistence on making his own motions and not listening to

23   his counsel.  I'm not allowing him to represent himself.  He's

24   waived that right.  I gave it to him, and then he opted to have

25   Mr. Dratel represent him again.  He's always back and forth on

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

1   these things, so I'm not permitting him to represent himself.

2          With respect to the suppression hearing, that motion

3   was withdrawn by Mr. Dratel.  There's no motion to suppress

4   pending.  And, of course, he wants an adjournment of the trial,

5   which I'm denying.  I do think that a lot of this behavior,

6   including the behavior today -- on a single day, he said he

7   wanted to plead guilty, then he wanted to waive his right to be

8   present; then he became disruptive; then he said he wanted to

9   waive his right to a jury and wanted to be tried by me; then I

10  believe he went back to wanting a jury, and then he wanted to

11  be here, and then he didn't want to be here.  I think these are

12  all attempts at manipulating the Court and making sure the case

13  doesn't go to trial.

14         The adjournment of the trial date that he seeks is

15  because he's apparently filed a disciplinary action with the

16  disciplinary committee for the First Department.  And he wants

17  that to go forward and he says that's a conflict with

18  Mr. Dratel.  Again, you can't create a conflict simply by

19  complaining about your attorney, or everybody who didn't want a

20  trial would complain about their attorney.  And then he wants

21  the trial date adjourned not only because of his complaint

22  against Mr. Dratel, but he's filed an appeal from my bail

23  determination.  If I recall my bail determination, I granted

24  him bail.  I just set certain conditions.  I'm not certain what

25  the basis of that appeal is.  Maybe he says the conditions are

D49ABEJ1ps

1    unfair.  That I don't know.  But I'm certainly not going to

2    delay this trial while that appeal wends its way through the

3    system.  So I'm going to endorse this motion denied, for all

4    the reasons set forth on the record today.

5              I also have received a letter to me from the legal

6    bureau of the police department, which shows a CC to Mr. Dratel

7    and to the office of the United States Attorneys.  It purports

8    to be the results of the New York Police Department search for

9    records responsive to defendant's subpoena.

10             Mr. Dratel, have you received that?

11             MR. DRATEL:  Not to my knowledge.

12             THE COURT:  All right.  I'll hand this down.

13             MR. DRATEL:  Thank you, your Honor.

14             THE COURT:  We'll do this later.  The jury is

15   entering.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

D49ABEJ1ps

1                (In open court; jury present)

2                THE COURT:  You may be seated in the courtroom.

3                Good afternoon, ladies and gentlemen of the jury.  We

4      cannot begin any proceedings in the courtroom until all 14 of

5      you are present, so it's important that everybody be on time.

6      I realize there have been delays.  Sometimes legal matters just

7      have to be taken care of, things that don't concern the jury.

8      Those are inevitable.  There were more delays than normal just

9      in picking the jury, but, as I said, sometimes those things

10     happen.  Now that the trial has started with the swearing in of

11     the jury, I certainly hope there will be fewer delays, and

12     perhaps none, but I would like you to do your part and be here

13     in a timely fashion because we simply can't do anything

14     involving testimony if all 14 of you are not here.

15               As I think I mentioned before, tomorrow we're going to

16     have to take a longer-than-usual lunch break.  I want you to

17     know that we're going to break about 12:15 and probably won't

18     be able to reconvene until about two.  You may want to bring a

19     book, or something like that.  But it's even more important to

20     be able to utilize the remaining time as efficiently as

21     possible.  In that regard, I'd like us to start tomorrow at

22     nine.

23               Can we do that?

24               Nine.  That means you're going to have to be here

25     about a quarter to nine to pass through security, just to allow

D49ABEJ1ps

1    enough time to again assemble in the jury deliberation room.

2    We will try to get more than three hours of testimony in in the

3    morning alone and three in the afternoon.  We'll start tomorrow

4    at nine a.m.

5         Now, you saw there are pads on your chairs.  We've

6    decided -- sometimes it's okay, sometimes judges decide not to

7    allow juries to take notes.  You have pads on your chairs.  You

8    can take notes if you wish.  You certainly don't have to take

9    notes.  It's entirely up to you.  But if you do take notes,

10   remember they're just for you.  Don't share the notes with

11   others.  Also, put your name on the outside, or your juror

12   number, whatever you wish, and then leave them at the end of

13   the day, and Ms. Blakely will collect them.  As a matter of

14   fact, when you file out at the end of the day, you can give

15   them to Ms. Blakely.  Neither she nor anyone else is going to

16   read your notes, and we'll return them to you in the morning.

17   Again, they're just for you to help you remember.

18        Also, remember that just because you've written a note

19   doesn't necessarily mean it's accurate.  Sometimes people take

20   notes that are wrong.  But these notes are for you alone, each

21   of you alone.

22        Again, don't feel obligated to take notes.  It's just

23   a courtesy that the attorneys and the parties and I extended;

24   if you want to, you can.

25        The opening statement for the government.  Ms. Kovner.

1          MS. KOVNER:  Thank you, your Honor.

2          This is a case about lying and cheating.  It's a case

3     about how the defendant, Mondher Bejaoui, stole hundreds of

4     thousands of dollars from insurance companies by lying to them.

5     And you'll learn over the course of this trial that the lies

6     the defendant told were part of a business the defendant ran,

7     selling insurance to car drivers in New York City, and the lies

8     the defendant told in his business were simple.  The defendant

9     lied to the insurance companies about where the cars he was

10    insuring were being driven.  He lied, and he said the cars he

11    was insuring were not being driven in New York City.  He lied

12    so that he could get a much, much cheaper rate on the insurance

13    from the insurance companies.  And he told these lies over and

14    over again.

15         After that, the defendant told more lies to cover up

16    the fraud.  He stole other people's identities and he used

17    those identities on the documents he was filing with the

18    insurance companies in order to cover his tracks.

19         Now, the fraud the defendant is charged with in this

20    case is really that simple.  Those were the lies.  But let me

21    back up and tell you a little bit more about how the

22    defendant's fraud worked.

23         You're going to learn during this trial that the

24    defendant ran an accounting and car insurance business from an

25    office in Brooklyn, New York.  And from that office, he did two

1    things.  He prepared tax returns for his accounting customers,

2    and he sold insurance to drivers in New York City.  And many of

3    these drivers were limo drivers and livery cab drivers in New

4    York City.  The defendant wasn't an insurance company who would

5    actually pay for the damage if you got into a car accident.

6    Instead, he was acting as an insurance broker.  He set up

7    policies with insurance companies by submitting applications to

8    those insurance companies, and the drivers who came to him

9    would pay the defendant money to be on those policies.  So the

10   process had several steps.

11        First, the defendant created companies and these were

12   companies with names you'll hear about during this trial, like

13   Bejaoui Express and Hamton Luxury Cars and Pedro Limousine.

14   And then the defendant submitted applications to insurance

15   companies so he could get insurance for those companies.  Those

16   applications contained statements about the cars he wanted to

17   insure.  They contained information about what the cars were

18   and where those cars were being driven.  And drivers would come

19   to the defendant and give him money, and, in return, he would

20   add them to the insurance policies that he was setting up.

21        So what did the defendant do so he could make as much

22   money as possible for this business?  As I mentioned, what he

23   did was he lied.  He lied to insurance companies on the

24   applications he submitted.  And let me explain a little about

25   how those lies worked.

D49Wbej2                        Opening - Ms. Kovner

1          The first lies the defendant told were about where

2     these cars were being driven.  As I mentioned, the defendant's

3     business was in Brooklyn, and his customers were drivers who

4     were also in New York City.  But you'll learn that because of

5     the high rate of accidents in New York City, insurance

6     companies charge much higher rates for cars that are operated

7     and garaged in New York City.  In fact, it can cost three times

8     more to insure a car in Manhattan or Brooklyn compared to

9     upstate New York or Long Island.

10         So in order to line his own pockets, the defendant

11    lied about where the cars he was insuring were being operated

12    and garaged.  Even though his business was in Brooklyn and his

13    customers were also in New York City, he claimed that the

14    nearly 100 cars he was insuring were actually based in Long

15    Island or in upstate New York where the rates were much, much

16    cheaper.  In fact, you're going to see in this case that the

17    defendant claimed on document after document that every single

18    car he was insuring was being garaged or operated in upstate

19    New York or Long Island, even though his own business was in

20    Brooklyn and that's where the customers came to see him.

21         The defendant also did a number of things to cover up

22    this fraud.  To make it seem like he really had businesses in

23    upstate New York and Long Island, he opened mailboxes in towns

24    in those areas.  You'll learn the defendant didn't have any

25    office or business in those towns and the mail that was sent to

D49Wbej2                       Opening - Ms. Kovner

1    those addresses was often forwarded right back to his address

2    in Brooklyn.  The evidence will show these mailboxes were just

3    a way of hiding where the defendant really was from the

4    insurance companies.  And you'll see the defendant told other

5    lies to cover up his tracks as well.

6         While the defendant put his own name on some of the

7    applications he submitted, you'll see that as the fraud went

8    on, he began to steal identities to cover up his tracks.

9    You'll see, for example, how he stole identities from some of

10   those customers who came to see him in his accounting business,

11   some of those customers who came to see him for help filling

12   out their taxes.  You'll see how after those customers gave him

13   their personal information and their identity documents, their

14   identities were used without their knowledge on the defendant's

15   fraudulent applications.

16        Now, I expect you'll learn at this trial that by lying

17   about the cars he was insuring, the defendant cheated insurance

18   companies out of hundreds of thousands of dollars.  And I

19   expect that the evidence will show along the way that other

20   victims were hurt as well.  These included the people whose

21   identities the defendant stole.  And I expect you'll learn that

22   the victims also sometimes included the drivers who paid the

23   defendant for help getting insurance.  I expect you'll learn

24   that sometimes those drivers found out too late that they

25   weren't covered by insurance at all because their policies were

1    cancelled after insurance companies began investigating where

2    these cars really were.

3           Because of the lies that the defendant told on

4    insurance applications, he's been charged with six counts of

5    what's called mail fraud.  And you'll get detailed instructions

6    about the law from Judge Stein at the end of the trial.  But,

7    for now, let me say that mail fraud is a kind of fraud that

8    uses the mails in some way, and you'll see in this trial many

9    ways in which the mail was used, such as to mail the fraudulent

10   application documents to the insurance companies and to get

11   documents back.  The defendant's been charged with one count of

12   mail fraud for each of the six insurance policies that he set

13   up through telling lies.

14          So now that you've heard how the defendant's fraud

15   worked and what the crime charged in this case is, let me tell

16   you a little bit about how the government will prove its case

17   to you.

18          The first way we will prove it is this.  I expect that

19   during this trial, you'll hear from more than 25 witnesses who

20   will provide evidence of the defendant's fraud.  First, you'll

21   hear from representatives of insurance companies.  They'll walk

22   you through the fraudulent applications that the defendant

23   submitted.  And they'll explain how the lies the defendant told

24   on those applications meant the insurance companies lost

25   hundreds of thousands of dollars.

1            Second, you'll hear from car owners and drivers who

2    bought insurance from the defendant.  These witnesses will tell

3    you the defendant sold them insurance from his office in New

4    York City and they'll tell you they didn't drive cars in

5    upstate New York or Long Island and they didn't tell the

6    defendant anything like that.  They all drove in New York City.

7    In fact, several of the drivers will tell you the defendant

8    even helped them get livery taxicab licenses to operate in New

9    York City.  That's a license you only need to drive as a livery

10   cab in New York City.  It's a license you don't need to operate

11   outside New York City.

12           The third group of witnesses will be people whose

13   identities the defendant stole for the fraudulent applications

14   he was filing.  For example, I expect you'll hear from several

15   witnesses who will tell you about going to see the defendant

16   for help with their taxes, giving him their personal

17   identifying information, giving him their ID documents, and

18   you'll see and hear how, without those witnesses' knowledge,

19   their personal information was used in the fraudulent

20   applications that the defendant filed.

21           In addition to hearing from witnesses --

22           THE COURT:  Now, ladies and gentlemen, you've heard

23   the government tell you that "the third group of witnesses will

24   be people whose identities the defendant stole for the

25   fraudulent applications he was filing."  That's the evidence

1    that Ms. Kovner believes the government will be able to show.

2          I wish to inform you that this defendant is not on

3    trial for the crime of identity theft.  The only crimes that he

4    is on trial here for are the six counts of mail fraud in

5    connection with this alleged scheme to file false insurance

6    applications.  Do you understand that?  He's not on trial for

7    identity theft.  I think what Ms. Kovner is trying to say is in

8    the course of that scheme to obtain insurance based on false

9    statements that she thinks the evidence will show that he stole

10   some identities, but that's not the crime that's charged here,

11   nor can you consider it.

12          Proceed.

13          MS. KOVNER:  Yes.  Thank you, your Honor.

14          In addition to the witnesses that you'll hear from in

15   this case, you're going to see documents.  You're going to see

16   hundreds of documents in this case, a long paper trail tying

17   the defendant to the crime he was committing.  Let me just

18   mention a few of the kinds of documents you'll see.

19          First, you're going to see many types of documents

20   that will prove, just as the drivers will tell you, that it was

21   the defendant who was selling insurance under these fraudulent

22   policies.  You'll see corporate filing records.  You'll see

23   bank records.  You'll see phone records.  And you'll see mail

24   records, all of which will show it was the defendant who set up

25   and ran these policies.

D49Wbej2                        Opening - Ms. Kovner

1          Second, you're going to see the insurance documents at

2     the heart of the fraud.  You're going to see the actual

3     fraudulent applications that the defendant submitted to

4     insurance companies, and you'll see how these applications

5     falsely stated that every single car the defendant was insuring

6     from his office in Brooklyn was actually being driven and

7     garaged in upstate New York and Long Island, where the

8     insurance was much cheaper.

9          Third, you'll see mailbox company documents which will

10    show you the defendant never had an office upstate.  They'll

11    show you the addresses the defendant listed on these

12    applications as garaging locations or as in business locations

13    were just mailboxes.  They were places like the UPS Store or

14    Mailboxes, Etc.  In some case, you'll see papers showing it was

15    the defendant who set up the mailboxes and showing the mail was

16    being forwarded right back to his office in Brooklyn.

17         What are some of the other documents you'll see?

18    You're going to see how car after car on the defendant's

19    policies was registered as a New York City livery cab, with

20    that special license that you only need to operate as a cab in

21    New York City.  And you'll see how these cars the defendant

22    insured racked up literally tens of thousands of dollars in

23    parking tickets in New York City and how the defendant used his

24    account to pay these New York City parking tickets.

25         So those are a few of the categories of documents that

D49Wbej2                        Opening - Ms. Kovner

1   you'll see that, along with the witness testimony, will make

2   clear to you that the defendant told lie after lie to insurance

3   companies in order to make money.

4           Before I sit down, let me ask you to do three things

5   during this trial.  First, please listen closely to the

6   evidence.  This isn't going to be a very long trial, but

7   there's going to be a lot of evidence.  It's going to come in

8   through different witnesses and it's going to come in in

9   pieces, but it's all going to be important.

10          Second, please follow Judge Stein's instructions on

11  the law.  That way, you'll follow your oath and decide the case

12  according to the law and according to the evidence.  And,

13  finally, when you review the documents and listen to the

14  witnesses in this case, please use your common sense, the same

15  common sense that you use every day in your lives as New

16  Yorkers.  If you do these three things -- if you listen to the

17  evidence, if you follow the judge's instructions, and if you

18  use your common sense -- the government will get a fair trial

19  and the defendant will get a fair trial.  And if you do these

20  three things, you'll come to the only conclusion that's

21  consistent with the evidence in this case, which is that the

22  defendant, Mondher Bejaoui, is guilty as charged.

23          THE COURT:  Thank you.

24          Mr. Dratel, for the defense.

25          MR. DRATEL:  Thank you, your Honor.

1          Good afternoon.  My name is Joshua Dratel and I

2    represent Mondher Bejaoui, who is the defendant in this case.

3          As Judge Stein has informed you and will inform you

4    again at the close of the case, the government bears the burden

5    of proof, in every criminal trial, and this one as well, which

6    is to prove its case, every element of its case, of the

7    charges, beyond a reasonable doubt.  And the judge will define

8    for you the term "beyond a reasonable doubt" at the end of the

9    case.  But it's a very important term because it's a special

10   burden for criminal cases.  And the government bears that

11   burden from now through the entire case.  So please keep an

12   open mind, and the judge will remind you of that as well, to

13   keep an open mind throughout the course of the case, not to

14   draw a conclusion just from direct examination.  There's also

15   cross-examination.  There are subsequent witnesses.  There are

16   subsequent documents.  Everything, taken as a whole, in

17   context, the evidence, or the lack of evidence, can be

18   important and material in making your decision at the end of

19   the case when you deliberate.

20         This is a case about insurance and insurance policies,

21   insurance regulations and rules.  You'll see a lot of thick,

22   dense documents that describe these rules and regulations.  And

23   you'll hear that Mr. Bejaoui is a layperson, not a lawyer, not

24   someone who has experience working for an insurance company, or

25   anything like that.  And you'll see these documents that have

1    sections and subsections and subsections of subsections.  And

2    it's important to remember when you hear the evidence that it's

3    not a crime to make a mistake.  It's not a crime to

4    misinterpret a rule or regulation or a document.  It's not a

5    crime to make a wrong decision.  It's only a crime -- only --

6    if it's done intentionally and willfully, with an intent to

7    defraud.

8            So even, and I'm not saying this is going to be

9    proven, but even if it were proven at the end of the day that

10   there was a rate that Mr. Bejaoui claimed that was not the

11   actual rate that the insurance company executive might claim

12   today on the witness stand, that unless the government proves

13   to you beyond a reasonable doubt that he, when he did his

14   conduct, that he did it intentionally, willfully, with an

15   intent to defraud, unless you find that beyond a reasonable

16   doubt, it's not a crime.

17           So please keep an open mind.  Remember that burden.

18   It's an important burden that protects all of us, as well as

19   Mr. Bejaoui in this case, and I submit that when you've heard

20   all the evidence, at the end of the trial, when you deliberate,

21   you'll reach your decision using your common sense and your

22   life experience in evaluating the evidence, and you'll find

23   that the government has not met its burden and that you'll find

24   Mr. Bejaoui not guilty on all the counts.

25           Thank you.

56|alphanum"left header} center header

```
 1                 THE COURT:  Thank you, Mr. Dratel.

 2                 Ladies and gentlemen, you have not heard a word of

 3      evidence yet.  Remember that.  What the attorneys say is not

 4      evidence.  Now that's going to change because we're about to

 5      hear the first witness for the government.

 6                 I do wish to remind you again of something I've told

 7      you before.  You can see that Mr. Bejaoui is not present.  You

 8      are to draw no inference whatsoever from the fact that he is

 9      not present.

10                 Government, call your first witness.

11                 MS. KOVNER:  Your Honor, the government calls Desiree

12      Bennett-Howell.

13       DESIREE BENNETT-HOWELL,

14           called as a witness by the Government,

15           having been duly sworn, testified as follows:

16      DIRECT EXAMINATION

17      BY MS. KOVNER:

18      Q.  Ms. Bennett-Howell, where do you work?

19      A.  For the New York Automobile Insurance Plan.

20      Q.  How long have you worked for the New York Automobile

21      Insurance Plan?

22      A.  21 years.

23      Q.  What's your current title there?

24      A.  Insurance coordinator.

25      Q.  I want to begin by asking you a few questions about what
```

1   the New York Automobile Insurance Plan does.  Okay?

2   A.  Okay.

3   Q.  Through your work as insurance coordinator, have you become

4   familiar with what the plan is and how it's structured?

5   A.  Yes.

6   Q.  What is the New York Automobile Insurance Plan?

7   A.  The New York Automobile Insurance Plan was established by

8   Insurance Law 5301 in 1974 to provide insurance for, automobile

9   insurance for insureds who cannot find insurance in the

10  voluntary market.

11  Q.  You referred to a law that created the New York Automobile

12  Insurance Plan.  Is that a state law?

13  A.  Yes.

14  Q.  You indicated it was created to get insurance for people

15  who can't get insurance on the voluntary market.  Can you just

16  explain what that means?

17  A.  Okay.  The voluntary market is insureds who will go

18  directly to insurance companies that are license by the State

19  of New York to get insurance.  They developed the New York Auto

20  Insurance Plan for those who, those individuals who cannot get

21  insurance through the voluntary market.  The insurance

22  carriers, all insurance carriers that are licensed with the

23  state are mandated to participate in the New York Auto

24  Insurance Plan.

25  Q.  In your experience, what would be some examples of people

D49Wbej2                        Bennett-Howell - direct

1    who would not be able to get insurance through the voluntary

2    market?

3    A.   Inexperienced people, people with bad driving records, new

4    drivers.   Anyone that's just not eligible through the voluntary

5    market.

6    Q.   What type of property is insured through the New York

7    Automobile Insurance Plan?

8    A.   Automobile property and casualty.

9    Q.   You mentioned that companies are required to participate in

10   the New York Automobile Insurance Plan.   Can you just explain

11   how that process works?

12   A.   Companies who are licensed by the state, they have to

13   participate in the plan.   We're a nonprofit organization.

14   We're governed by -- well, all insurance carriers and public

15   members which are licensed brokers or agents make up our

16   governing body, and the car -- insurance carriers have to fund

17   us, in a sense.   That's a general --

18   Q.   When a person applies for coverage through the New York

19   Automobile Insurance Plan, does the government itself provide

20   the coverage, or is the coverage provided by private insurers?

21   A.   It's provided by insurance carriers.

22   Q.   Those are the carriers you were saying were required by law

23   to participate?

24   A.   Yes.

25   Q.   Can those companies charge whatever rates they want to

1    people who apply for coverage?

2    A.  No, they can't.

3    Q.  Do the rates come from a schedule that's approved by the

4    state government?

5    A.  Yes.

6    Q.  Is there one rate under that schedule for all cars in the

7    state, or do the rates vary?

8    A.  The rates vary by territory.

9    Q.  What do you mean by territory?

10   A.  There's a territory schedule.  It's a definition.  It's a

11   definition of a territory division of the state, so the state

12   is broken down by cities, villages, towns, and they each have a

13   two-digit code that's supplied to them.

14   Q.  What parts of the state have the highest rate for car

15   insurance; what territories?

16   A.  Brooklyn, territory 17.  Brooklyn.

17   Q.  Compared to upstate New York or Long Island, how about

18   Manhattan?  Is Manhattan higher or lower than upstate New York

19   or Long Island?

20   A.  Manhattan is higher than upstate.

21   Q.  Why is it that there are different rates depending on what

22   territory a vehicle is based in?

23   A.  Well, it depends on where the risk is.  The more claims

24   submitted, the more accidents happen, you know, that area or

25   that territory gets the highest rate.

D49Wbej2                    Bennett-Howell - direct

1   Q.  Are you familiar with the term "garaging location," as it's

2   used by the New York Automobile Insurance Plan?

3   A.  Yes.

4   Q.  What does that mean?

5   A.  Garaging location is the area where the vehicle is parked.

6   Q.  How is the garaging location used in setting the rate to be

7   charged for insurance?

8   A.  Usually, where, if you're -- the garaging location sets the

9   rate, the territory in which it is.  But your vehicle, it's

10  where the vehicle is operated gets the highest rate.

11  Q.  Let's break that down a little bit.

12  A.  Okay.

13  Q.  If a vehicle is driven in two different territories, is the

14  vehicle generally assigned the rate for the higher territory or

15  the rate for the lower territory?

16  A.  The highest rated territory.

17  Q.  So if a car is operating both in New York City and in

18  upstate New York, which rate would you ordinarily use?

19  A.  New York City.

20  Q.  And why is that?

21  A.  Because it's the area which has the highest claims.

22          THE COURT:  Let's say a car is garaged in Brooklyn,

23  but it operates throughout New York City.  Is it the territory

24  where it's operated in that governs the insurance rate, or is

25  it the territory that it's garaged in?

D49Wbej2                    Bennett-Howell - direct

1          Actually, forget my example.  Let me just use the

2     hypothetical.  Is it the territory that it's garaged in that is

3     the rate it's charged or the territory that it operates in that

4     is the rate that's charged?

5          THE WITNESS:  The territory it operates in, the

6     highest rated territory it's operated in.

7          THE COURT:  So if it's garaged in a low-rate area and

8     operates in a high-rate area, it's charged the high rate, is

9     that correct?

10          THE WITNESS:  Yes.

11          THE COURT:  And, in this hypothetical, I'm garaging it

12     in a low-rate area -- no.  I'm sorry.  I'm garaging it in a

13     high-rate area but operating in a low rate.  What is it

14     charged?

15          THE WITNESS:  The garaging location because it's the

16     highest rating.

17          THE COURT:  Okay.  Whichever is the highest rated

18     territory is the rate that's applied?

19          THE WITNESS:  Correct.

20          THE COURT:  Thank you.

21     BY MS. KOVNER:

22     Q.  Does the plan produce a manual that contains its rules for

23     insurance?

24     A.  Yes.

25     Q.  Does that manual include a table of the rates depending on

1    their territory, the territory it's given?

2    A.  Yes, it does.

3    Q.  I'm showing you now what's marked as Government Exhibit 1

4    for identification.  What is Government Exhibit 1?

5    A.  It's the New York Automobile Insurance Plan manual.

6    Q.  Can you tell me what year this particular version of the

7    manual was issued?

8    A.  2005.

9              MS. KOVNER:  Your Honor, the government offers Exhibit

10   1.

11             MR. DRATEL:  No objection.

12             THE COURT:  Admitted.

13             (Government's Exhibit 1 received in evidence)

14             THE COURT:  Let me ask another question.  Is what

15   you've been talking about applicable to private cars?  I take

16   it it is.  In other words, a car I may own.  Do the rates apply

17   to a private vehicle?

18             THE WITNESS:  Yes.

19             THE COURT:  What does it mean to where my car

20   operates?  If I'm going to Delaware, it operates between

21   Manhattan and Delaware.  If I'm going to Schenectady, I take it

22   it operates between this courthouse and Schenectady.  So how do

23   you decide?  How does the automobile plan decide where an

24   automobile is operated?

25             THE WITNESS:  Okay.  I'll have to get deeper than what

1    you said.

2              THE COURT:  All right.

3              THE WITNESS:  So there's private passenger.  There's

4    commercial.  There are publics.  They're garaged.  Private

5    passenger, it's garaged at your home.  If you're driving it out

6    of state, driving at a time or let's say you live in New York,

7    but you go to Georgia or one of the other lower states and live

8    there 40 percent of the time, you have to let us know because

9    then you have to get assigned to a company that can write in

10   both states because now there's risk in both states.  If you're

11   talking about public auto, which public auto transports members

12   of the public --

13             THE COURT:  Give me an example.  What's a public auto?

14             THE WITNESS:  It's all taxis, limousines.

15             THE COURT:  Go ahead.

16             THE WITNESS:  School buses, urban buses.  Those carry

17   the public.  It's to where the vehicle is the highest rated

18   territory.  So if you're --

19             THE COURT:  In other words, of the territory it

20   operates in, whichever has the highest insurance rate?

21             THE WITNESS:  Yes.

22             THE COURT:  It has to pay that highest insurance rate?

23             THE WITNESS:  Correct.

24             THE COURT:  All right.  Thank you.

25             MS. KOVNER:  Ms. Ansari, if we could publish first the

D49Wbej2                        Bennett-Howell - direct

1    first page of Exhibit 1.

2              THE COURT:  Published, ladies and gentlemen, is a

3    lawyer's fancy way of saying show to the jury.  Okay?

4              MS. KOVNER:  Is that coming up?

5              THE COURT:  And the witness.  She's showing it to the

6    witness, and we should be showing it to the jury in a minute.

7              JUROR:  I got it.

8    BY MS. KOVNER:

9    Q.  So this is the manual that I just showed you a moment ago?

10   A.  Yes.

11   Q.  Let's go to page Bates stamped 6329.

12             THE COURT:  Members of the jury, do you see it on your

13   screens?  Yes?

14             JUROR:  We can't.

15             JUROR:  This is black.

16             THE COURT:  All right.  It's black.  I'd like the

17   government to take care of that.

18             All right.  Can everyone now see?

19             JUROR:  Yes.

20             THE COURT:  All right.  Thank you.

21             Madam witness, can you see?

22             THE WITNESS:  Yes.

23             THE COURT:  All right.  Proceed.

24   BY MS. KOVNER:

25   Q.  What are we looking at here on the page that's stamped in

D49Wbej2                          Bennett-Howell - direct

1     the corner 6329?

2     A.   It's Rule 140, the territory schedules that tells you what

3     territory it is.

4             MS. KOVNER:   Can you go forward one page, Ms. Ansari.

5     Q.   Then what are we looking at here on the page after that?

6     A.   You're looking at territories and their codes, different

7     counties.

8     Q.   So each county is assigned a different numerical code?

9     A.   Yes.

10    Q.   Can we take as an example Binghamton, New York?  Can you

11    show us using this chart what the rating territory for

12    Binghamton, New York, is?

13    A.   Binghamton is 28.

14    Q.   If we could go forward just one more page, can you show us

15    on this page what Kings County is?

16    A.   Kings County is 17.

17    Q.   And can you show us on this page also what Manhattan is?

18    A.   18.

19    Q.   Now, does this manual allow you to determine how the rates

20    of insurance vary among the counties we've just looked at?

21    A.   Yes.

22            MS. KOVNER:   If you could go forward, Ms. Ansari, to

23    the page that's Bates stamped 6784.

24    Q.   Can you use this table to determine what the insurance rate

25    would be for a limousine operating in the three territories

D49Wbej2                     Bennett-Howell - direct

1   we've just described?

2   A.  Yes.

3   Q.  Before we look at what the numerical rates are, can you

4   just explain the columns at the top, bodily injury, property

5   damage, full coverage, and deductible?

6   A.  Those are liability insurance.  Bodily injury and the

7   property damage and PIP, those are all minimum required limits.

8   Q.  Those are all types of insurance that you're required to

9   carry?

10  A.  Yes.

11  Q.  Let's look at bodily injury as an example.  Can you show us

12  for Binghamton, rating territory 28, what the annual premium

13  would be for that?

14  A.  Well, the bodily injury would be $2,491.  The property

15  damage would be 753, and if you choose full or 200 deductible,

16  either 984 or 787.

17  Q.  Can you show us now what the rate would be for the same car

18  if it were insured in Manhattan, which is territory 18?

19  A.  In Manhattan, the territory is 8,543.  Property damage,

20  3,008.  And full and PIP, either 4,792 or 3,034.

21  Q.  How about if that same car were in Brooklyn, which is

22  territory 17?

23  A.  Property damage would be $8,806.  3,099 for property

24  damage.

25          THE COURT:  Just highlight 17 and 18.  Not 16.

D49Wbej2                        Bennett-Howell - direct

1    A.  And full or 200 will be 3,058 or 2,446.

2    Q.  So it would be more than three times as expensive to insure

3    the car in Brooklyn or Manhattan compared to Binghamton?

4    A.  Yes.

5    Q.  I want to turn to how it is that you apply for insurance

6    under the New York Automobile Insurance Plan.  Okay?

7            MS. KOVNER:  And we can take down that exhibit.  Thank

8    you, Ms. Ansari.

9    Q.  Who is permitted by law to submit an application to the New

10   York Automobile Insurance Plan?

11   A.  Any licensed agent or broker that's licensed to doing

12   property, casualty insurance with the New York State can, is

13   eligible for certification with the plan.

14   Q.  So if a company wants to get insurance, they would have to

15   go to a licensed broker?

16   A.  Correct.

17   Q.  I want to walk through some of the application documents.

18   Okay?  I'm showing you first what's been marked as Government

19   Exhibit 4 for identification.  What is Government Exhibit 4?

20   A.  It's an application for public, public coverage.

21   Q.  Is that a New York Automobile Insurance Plan document?

22   A.  Yes, it is.

23   Q.  Is that a blank version of the form that a broker would

24   submit to the plan?

25   A.  Yes, it is.

D49Wbej2                     Bennett-Howell - direct

1              MS. KOVNER:  Your Honor, the government offers Exhibit

2      4.

3              MR. DRATEL:  No objection, your Honor.

4              THE COURT:  Admitted.

5              (Government's Exhibit 4 received in evidence)

6              MS. KOVNER:  Ms. Ansari, can you publish Exhibit 4.

7      Q.  Now, at the top of this document, it says public.  Can you

8      explain what that means?

9      A.  Public means that any registration or -- it's used to

10     transport members of the public.  Taxis, limousines.

11     Q.  And this is an application for those kinds of cars that are

12     used to transport members of the public?

13     A.  Yes.

14     Q.  Directing your attention to the first section of the form,

15     marked producer, on top, what information goes there?

16     A.  The producer's name, address, telephone number, tax ID,

17     license number.

18     Q.  Is the producer the broker, the licensed agent?

19     A.  Yes.

20     Q.  Directing your attention to the second section, marked

21     applicant, do you see that?

22     A.  Yes.

23     Q.  What information goes there?

24     A.  Applicant's name, address, telephone number, Social

25     Security, if they have.

1    Q.  Can a company be an applicant on a policy application like

2    this?

3    A.  Yes.

4    Q.  If the company is an applicant, are there any corporate

5    documents that have to be submitted along with this

6    application?

7    A.  Yes.  These are required to submit a certificate of

8    business.

9    Q.  A certificate of incorporation?

10   A.  Yes.

11   Q.  Is a company allowed to list multiple cars on a single

12   insurance policy?

13   A.  Yes.

14   Q.  Let's turn to the next section, the ownership and control

15   of the applicant's organization, and zoom in on that.  What

16   goes in this section for the applicant's organization?

17   A.  The incorporated, owner and applicant's organization, state

18   of incorporation, the president, you list all the president --

19   the general managers.

20   Q.  And next let's go to section four.  Do you see the numbers

21   on the far left-hand side of section four?

22   A.  Yes.

23   Q.  What goes next to each of those numbers?

24   A.  The vehicle, the vehicle identification number, of the

25   vehicle, the garaging location where the vehicle's being

1    garaged, the name of the title owner of vehicle.  You also have

2    to put the rating territory and the seating capacity.

3    Q.  So is each of these numbers, one, two, three, a place where

4    you put information about one particular car?

5    A.  Yes, you can put three vehicles on this particular

6    application.

7    Q.  Directing your attention to line C, garaging location --

8    A.  Yes.

9    Q.  -- county and state, what goes there?

10   A.  The garaging location.

11   Q.  Looking over on the right, to the line that says "territory

12   or territories in which or through which vehicle is customarily

13   operated," what information goes on that line?

14   A.  The territories, the highest rated territory.

15   Q.  And if you list multiple territories, which one will be

16   used by the insurer in determining what the rate is?

17   A.  The highest rated territory.

18   Q.  Let's turn to page two of this application.  Do you see the

19   section marked operator information, No. 7, on this form?

20   A.  Yes.

21   Q.  What information goes there?

22   A.  Person or persons who will be operating the vehicle.

23   Q.  The drivers?

24   A.  The drivers.

25   Q.  Can drivers be listed who aren't company officials?

1   A.  Yes.

2   Q.  And do the drivers themselves have to sign these

3   applications?

4   A.  No.

5   Q.  Let's turn now to the last page of that application form.

6           MS. KOVNER:  I want to zoom in, Ms. Ansari, on the

7   section that's marked applicant statement.

8   Q.  Could you read paragraph three of the applicant statement,

9   Ms. Bennett-Howell?

10  A.  "To the best of the applicant's knowledge and belief that

11  all statements contained in this information are true and that

12  these statements are offered as an inducement to issue the

13  policy for which the applicant is applying."

14  Q.  Can you also read the last paragraph of this statement,

15  right above the signature line?

16  A.  "Any person who knowingly, and with intent to defraud any

17  insurance company or other person, files an application for

18  insurance containing any materially false information, or

19  conceals, for the purpose of misleading, information concerning

20  any facts material thereto, and any person who knowingly makes

21  or knowingly assists, abets, solicits or conspires with another

22  to make a false report of the theft, destruction, damage, or

23  conversion of any motor vehicle to a law enforcement agency,

24  the Department of Motor Vehicles or an insurance company,

25  commits a fraudulent insurance act, which is a crime, and shall

D49Wbej2                    Bennett-Howell - direct

1    also be subject to a civil penalty not to exceed $5,000 and the

2    value of the subject motor vehicle or stated value of the claim

3    for each such violation."

4    Q.  Who is required to sign below the applicant's statement?

5    A.  The applicant.

6    Q.  Is the applicant the broker, or is the applicant the person

7    who is associated with the company submitting the application?

8    A.  The applicant is the person associated with the company

9    applying.

10   Q.  So it's the person actually seeking coverage for their

11   business?

12   A.  Yes.

13           MS. KOVNER:  Let's scroll down a little bit on this

14   form.

15   Q.  And who signs on the last two lines of the form?

16   A.  The applicant signs under fair credit and the producer

17   signs the following.

18   Q.  I want to show you now what's been marked for

19   identification as Government Exhibit 5 for identification.

20   What is Government Exhibit 5?

21   A.  A New York Automobile Insurance Plan application for

22   commercial.

23   Q.  Is that different from the public application that we just

24   saw a moment ago?

25   A.  Yes.

```
 1   Q.   How is it different?

 2   A.   Commercial is vehicles over 10,000 pounds that's not

 3   eligible for public risk.  So if you have a pizza service or,

 4   you know, you're using it in the business, regular business,

 5   commercially, that would be considered commercial.

 6            MS. KOVNER:  Your Honor, the government offers Exhibit

 7   5.

 8            MR. DRATEL:  No objection.

 9            THE COURT:  Admitted.

10            (Government's Exhibit 5 received in evidence)

11            MS. KOVNER:  Ms. Ansari, can you publish page one of

12   that exhibit.

13   Q.   Does the commercial application call for generally the same

14   information about the producer, the applicant, and the vehicles

15   as the public application we just looked at a moment ago?

16   A.   Yes.

17   Q.   Turning to the last page of this exhibit, does it require

18   the applicant to sign the same type of sworn acknowledgement?

19   A.   Yes.

20   Q.   Now, once an insured signs an application for insurance

21   coverage, where does the broker send the completed insurance

22   application?

23   A.   The broker will send it to the New York office; to the

24   plan.

25   Q.   That's the New York Automobile Insurance Plan?
```

1    A.  Yes.

2    Q.  Where are the plan's offices?

3    A.  In New York, New York.

4    Q.  So the broker sends the application to the office in New

5    York, New York?

6    A.  Yes.

7    Q.  In preparation for your testimony in this case, have you

8    reviewed certain applications for insurance that were submitted

9    to the New York Automobile Insurance Plan?

10   A.  Yes.

11   Q.  I'm showing you now what have been marked as Government

12   Exhibits 200, 250, 300, 350, 351, 400, 500, and 600.  What are

13   these exhibits?

14   A.  These are commercial applications that list insureds that

15   were submitted to the plan for processing.

16   Q.  Based on reviewing the markings on that exhibit, were you

17   able to determine whether each of them was submitted to and

18   received by the New York Automobile Insurance Plan?

19   A.  Yes.

20   Q.  How are you able to determine that?

21   A.  When applications are mailed in to the plan, we have, we

22   stamp the application with a perforation of the date received,

23   and it has the markings of the dates, consistent with the

24   marking.

25           MS. KOVNER:  Your Honor, at this time, subject to

D49Wbej2                         Bennett-Howell - direct

1    connection, we would offer 200, 250, 300, 350, 351, 400, 500,

2    and 600.

3              MR. DRATEL:  Your Honor, I assume, I don't know if

4    subject to connection means resolving a hearsay problem.  Right

5    now, they're hearsay.

6              THE COURT:  The objection is hearsay.

7              MS. KOVNER:  Your Honor, these are -- let me lay

8    additional foundation that may help.

9              THE COURT:  All right.

10   BY MS. KOVNER:

11   Q.  Did the New York Automobile Insurance Plan maintain copies

12   of these applications as part of the ordinary course of its

13   business?

14   A.  Yes.

15             MR. DRATEL:  Still.

16             THE COURT:  Look at 803(6) and go through the

17   requirements of 803(6).

18   BY MS. KOVNER:

19   Q.  Is it the regular practice of the New York Automobile

20   Insurance Plan to keep copies of the applications submitted to

21   it?

22   A.  Yes.

23   Q.  Are the applications placed in AIP's files at or near the

24   time they're received by the New York Automobile Insurance

25   Plan?

 1   A.  Yes.

 2            THE COURT:  You're renewing your application?

 3            MR. DRATEL:  I'm sorry.  No objection.

 4            THE COURT:  All right.  No objection.

 5            (Government's Exhibits 200, 250, 300, 350, 351, 400,

 6   500, and 600 received in evidence)

 7   BY MS. KOVNER:

 8   Q.  Let's look briefly at these applications, if we can, and

 9   start by publishing Government Exhibit 200.

10       What's the applicant that this was an insurance application

11   for?

12   A.  Bejaoui Express, Inc.

13   Q.  And scrolling a little bit further down, who is listed as

14   the president of that company?

15   A.  I can't make out the first letter, but it's Ondher Bejaoui.

16   Q.  If we could turn to the last page of this application --

17            MS. KOVNER:  Sorry.  The last page.  Yes.  If you

18   could zoom in on the applicant's, the first applicant's

19   signature line, Ms. Ansari.

20   Q.  Could you read the name that appears on the first

21   applicant's signature line?

22   A.  M. Bejaoui.

23            MS. KOVNER:  Publish next Government Exhibit 250.

24   Q.  What was the company named as the applicant on this

25   application for insurance?

 1   A.  Vestal Limousine Corp.

 2   Q.  If we could scroll down, who is listed as the president of

 3   Vestal Limousine Corp.?

 4   A.  Sadok Mejri.

 5   Q.  If we could turn to the last page and look at the signature

 6   line, I may not ask you to read that one.

 7            MS. KOVNER:  Could we publish Government Exhibit 300,

 8   please, and zoom in on the applicant here.

 9   Q.  Who is listed as the applicant on this application for

10   insurance?

11   A.  Hamton Luxury Cars, Inc.

12   Q.  By the way, I notice on this application that information

13   is in a slightly different position.  Has the automobile

14   insurance plan issued different versions of this form over the

15   years?

16   A.  Yes.

17   Q.  Does each version call for the same basic information about

18   the applicant and where the vehicle is located?

19   A.  Yes.

20   Q.  Who is listed as president of Hamton Luxury Cars, Inc., on

21   this form?

22   A.  Mike.

23   Q.  If we could go to the last page of the application --

24            MS. KOVNER:  And zoom in on the applicant's signature

25   line, the first one on the top, Ms. Ansari.

D49Wbej2                          Bennett-Howell - direct

1   Q.  -- could you read the name that appears on the signature

2   line here?

3   A.  M. Bejaoui.

4   Q.  By the way, once an application is received by New York

5   Automobile Insurance Plan, is the information on the

6   application placed into a computer database?

7   A.  Yes.

8   Q.  Can the insurance plan generate computer printouts of the

9   application after that?

10  A.  Yes.

11  Q.  Let me show you now what has been marked as Government

12  Exhibit 301 for identification.  What is Government Exhibit

13  301?

14  A.  It's a reprint of the application for Hamton Luxury Cars,

15  Inc.

16  Q.  Is that the application or a reprint of the application we

17  just looked at?

18  A.  Yes.

19  Q.  Is that information inputted into the New York Automobile

20  Insurance Plan at or near the time the application --

21  A.  I couldn't hear that.

22  Q.  I'm sorry.

23      Was that information entered into the New York Automobile

24  Insurance Plan's records at or near the time the application

25  was received?

1   A.  Yes.

2   Q.  Was it relied on by the Automobile Insurance Plan in its

3   ordinary business?

4   A.  Yes.

5           MS. KOVNER:  The government offers 301.

6           MR. DRATEL:  No objection, your Honor.

7           THE COURT:  Admitted.

8           (Government's Exhibit 301 received in evidence)

9   BY MS. KOVNER:

10  Q.  Let's look next at 350.  Who is the applicant listed on

11  this application for insurance?

12  A.  Pedro Limousine Corp.

13  Q.  Who is listed as the president of Pedro Limousine Corp.?

14  A.  Mohamed Houas.

15  Q.  If we could now look at 351, is this also an application

16  for Pedro Limousine Corp.?

17  A.  Yes.

18  Q.  How does it differ from that application we just looked at

19  for Pedro Limousine Corp.?

20  A.  350 is a printed application, and 351, if you can scroll up

21  a little --

22          MS. KOVNER:  If you scroll up to the headers, that

23  would help, Ms. Ansari.

24          THE WITNESS:  More.

25          MS. KOVNER:  Scroll up more.  It's the title section

D49Wbej2                          Bennett-Howell - direct

1   on the form.

2   A.  And 351 has the past reference number of the application.

3   Q.  Is this a commercial application or a public application in

4   351?

5   A.  This is a commercial application.

6           MS. KOVNER:  Can you go back to 350.

7   Q.  Is this a commercial or a public application?

8   A.  This is a public application.

9   Q.  These are both applications that were submitted for Pedro

10  Limousine?

11  A.  Yes.

12  Q.  What's the difference between the two, the two kinds of

13  insurance?

14  A.  Commercial application, this is, was submitted for -- it's

15  a limousine put on a commercial application, which is an

16  incorrect app.  If it's a limousine company, it should have

17  been put on a public application.

18          MS. KOVNER:  Ms. Ansari, could we scroll up.

19  Q.  So 350 is the correct form that should have been submitted?

20  A.  Yes.

21  Q.  If we could go next to Government Exhibit 400, can you read

22  the applicant on Government Exhibit 400?

23  A.  Bejaoui Express, Inc.

24  Q.  Who is the person listed as the president on this

25  application?

1    A.  Mondher Bejaoui.

2    Q.  And turning now to the last page, who signed the form?

3    A.  M. Bejaoui.

4            MS. KOVNER:  If we could just go to that last page,

5    Ms. Ansari, and zoom in on the applicant.

6    Q.  Let's just look at two more applications.  The next one is

7    500.  Who is the applicant?

8    A.  Hampton Luxury Cars.

9    Q.  Who is listed as the president of Hampton Luxury Cars?

10   A.  Mondher M. Bejaoui.

11   Q.  Turning to the last page --

12           THE COURT:  Can't hear you.

13           MS. KOVNER:  Ms. Ansari, if you could go back to the

14   page we were just on, and zoom in on the applicant's signature.

15   A.  M. Bejaoui.

16   Q.  Thank you.  And if we could look, finally, at Exhibit 600,

17   please, who is the applicant on this one?

18   A.  Heather Limo Corp.

19   Q.  Who is listed as president?

20   A.  Jimmy T. Reyes.

21   Q.  If you could look at the signature line on the last page,

22   were you able to determine by examining each of the

23   applications we looked at what method was used to submit these

24   applications to the New York Automobile Insurance Plan?

25   A.  Yes.

D49Wbej2                    Bennett-Howell - direct

1  Q.  Can you explain how you were able to do that by looking at

2  the applications?

3  A.  Well, when the application is received by the plan, it has

4  a stamped perforation of the date.  If the application was

5  mailed in to the plan, it gets perforated on the sides of the

6  application.  If the application was hand delivered to the

7  plan, it gets stamped on the bottom of the application.

8  Q.  Did you create a chart summarizing the methods through

9  which each of the applications was received?

10  A.  Yes.

11  Q.  I'm showing you now what's been marked as Government

12  Exhibit 7 for identification.  Is that the chart that you

13  created?

14  A.  Yes.

15  Q.  Were each of the entries in that chart created using the

16  information contained in the application documents at

17  Government Exhibits 200, 250, 300, 301, 350, 400, 500, and 600?

18  A.  Yes.

19          MS. KOVNER:  Your Honor, the government offers Exhibit

20  7 as a summary chart.

21          MR. DRATEL:  No objection, your Honor.

22          THE COURT:  Admitted.

23          (Government's Exhibit 7 received in evidence)

24          MS. KOVNER:  Ms. Ansari, if you could, publish Exhibit

25  7.

D49Wbej2                          Bennett-Howell - direct

1    Q.  Can you explain generally what you wrote in that first

2    column, the application column?

3    A.  I put the applicant's information and the date it was

4    received by the plan.

5    Q.  And what information did you put in the second column

6    marked method of submission?

7    A.  Where it was received and when.

8    Q.  Could you please tell the jury for each of the policies in

9    the chart what's the name of the policy and how it came to the

10   NYAIP?

11   A.  Bejaoui Express, the application dated 3/2, 2005, was

12   received by mail to the plan on 3/3/05.

13        Vestal Limousine Corp., the application dated 11/15, 2005,

14   was hand delivered to the New York office, in Manhattan, on

15   11/18, 2005.

16        Pedro Limousine Corp., the application dated 5/12, 2006,

17   the commercial application form received, was received by mail

18   at the New York office on 5/16/06.  And then a public

19   application form was hand delivered on 5/23/06.

20            Hamton Luxury Cars, Inc., the application date is

21   6/27, 2005, was received by mail by the plan at 6/28/05, in the

22   Manhattan office.

23        Bejaoui Express, application dated 5/13, 2006, was received

24   by mail at the New York office on 5/16/06.

25        Hampton Luxury Cars, a/k/a Hamton Luxury Cars, Inc., the

D49Wbej2                       Bennett-Howell - direct

1  application dated 3/22, 2006, was received by mail at the New

2  York office on 3/23/06.

3      And Heather Limo Corp.  NYAIP application dated 7/25, 2006,

4  was received by mail at the New York office on 7/26/06.

5  Q.  After the plan receives each of these applications in its

6  New York office, who does it send the applications to?

7  A.  It mails, sends the application to the assigned carrier,

8  once it's processed.

9  Q.  Based on NYAIP's procedures in 2005 and 2006, do you know

10  what methods were used to do that?

11  A.  I don't understand.

12  Q.  How did NYAIP mail -- I'm sorry.  How did NYAIP get the

13  applications to the --

14           MR. DRATEL:  Objection.  Foundation.

15           THE COURT:  If she knows.

16  A.  We mailed the application --

17           MR. DRATEL:  How she knows, your Honor.

18           THE COURT:  All right.  You may answer.

19  A.  We mail the applications to the carriers once they're

20  assigned.

21           THE COURT:  Do you do the mailing?

22           THE WITNESS:  I -- personally?

23           THE COURT:  Yes.

24           THE WITNESS:  Not now, no.

25           THE COURT:  Did you in 2005 and 2006?

1           THE WITNESS:  Possibly.  We have a mail room

2    processer.

3           THE COURT:  So did these come through you?

4           THE WITNESS:  Personally, no.

5           THE COURT:  Somebody under your supervision?

6           THE WITNESS:  No.

7           THE COURT:  Somebody else in the organization?

8           THE WITNESS:  Yes.

9           THE COURT:  Was it the procedure of the office to have

10   them bring them to the mail room?

11          THE WITNESS:  Yes.

12          THE COURT:  All right.  Proceed.

13   BY MS. KOVNER:

14   Q.  Were there any insurance companies in 2005 and 2006 who

15   received their application through a different method?

16   A.  Yes.  American Transit had a courier pickup.

17   Q.  And was American Transit the only insurance company that

18   used that procedure?

19   A.  Yes.

20   Q.  Where was American Transit based?

21   A.  In the New York, New York.

22   Q.  So for every insurance company other than American Transit,

23   the applications were transmitted by mail?

24   A.  Yes.

25   Q.  Now, after the insurance company itself receives the

D49Wbej2                    Bennett-Howell - direct

1   applications, are they required to send out any mailings

2   themselves?

3   A.  Yes, they are.

4   Q.  What are they required to send out after they're assigned

5   the policy?

6   A.  Policy declaration page to the insured and to the producer.

7   Q.  What's a policy declaration page?

8   A.  It's, it provides you with your coverage, what limits, what

9   coverage is being covered by the insurance company.

10  Q.  So it tells you your limits?

11  A.  Yes.

12  Q.  Who is this document required to be sent to?

13  A.  The producer, which is the licensed agent or broker, and

14  the insured.

15  Q.  And does that requirement apply to each of the policies for

16  which we just reviewed applications?

17  A.  Yes.

18  Q.  After a policy is assigned to a particular insurance

19  company, does NYAIP set rules for how quickly the company has

20  to start providing coverage?

21  A.  Within 30 days.

22  Q.  If an application is sent to NYAIP by regular mail, how

23  does that affect when they have to provide coverage?

24  A.  If the application comes in by regular mail, it gets the

25  effective date of the date received.

D49Wbej2                     Bennett-Howell - direct

1   Q.  So the date the NYAIP receives the application is the date

2   that the coverage has to start?

3   A.  Yes.

4   Q.  What if the policy is hand delivered?

5   A.  It gets the next business day.

6   Q.  So that's the date the insurance policy has to become

7   effective?

8   A.  Yes.

9          MS. KOVNER:  We can take down this chart.

10  Q.  Does NYAIP have rules that limit when the insurer can

11  cancel a policy?

12  A.  Yes.

13  Q.  Can an insurer cancel a policy just because it's losing

14  money on a policy?

15  A.  No.

16  Q.  Can an applicant add new cars to a policy once the policy

17  takes effect?

18  A.  Yes.

19  Q.  Is there a particular form that's used to do that?

20  A.  Yes.  They have to use a policy change request form,

21  endorsement.

22  Q.  Let me show you now what's been marked as Government

23  Exhibit 6 for identification.  What is Government Exhibit 6?

24  A.  It's the New York Automobile Insurance Plan commercial

25  policy change request.

D49ABEJ3ps                    Bennett-Howell - direct

1   Q.  And this is the form that you used to add a car to the

2   policy?

3   A.  Yes.

4   Q.  This is the blank form?

5   A.  Yes.

6           MS. KOVNER:  Your Honor, the government offers the

7   exhibit.

8           MR. DRATEL:  No objection.

9           THE COURT:  Admitted.

10          MS. KOVNER:  Ms. Ansari, could we publish this.  Zoom

11  in on the top part of the form.

12  Q.  Whose name goes in the insurance company box?

13  A.  The company that the applicant was assigned to.

14  Q.  That's the insurance company providing the coverage?

15  A.  Yes.

16  Q.  And whose name goes in that producer box?

17  A.  It lists the producer, the producer of record.

18  Q.  The broker or agent?

19  A.  Yes.

20  Q.  And what about the Name of Insured box, four lines down?

21  A.  The applicant.

22  Q.  This is the company that's actually getting the coverage?

23  A.  Yes.

24  Q.  Directing your attention to section 2 of the vehicle

25  addition form, what information goes there?

1    A.  The information on the vehicle that's being added or

2    replaced, year, make, model, vehicle identification number,

3    purchase date, the principal place of garaging, state

4    registered.

5    Q.  Is the principal place of garaging going to be one of the

6    territories in that chart we just looked at?

7    A.  Yes.

8    Q.  And in the territory box, what's there?

9    A.  The territory in which it is being operated.

10   Q.  Who is allowed to submit a commercial policy change form

11   like this for the insurance?

12   A.  The agent or the broker, producer.

13   Q.  Is the actual applicant required to sign this form or is it

14   signed just by the broker?

15   A.  It could just be signed by the broker.

16   Q.  Now, in 2005 and 2006, does a form like this have to be

17   submitted to your office, to the plan, or could it go directly

18   to the insurance company?

19   A.  It could go directly to the insurance company.

20   Q.  If a change is made to a policy, like a vehicle is added or

21   taken off the policy, are there additional mailings that the

22   insurance company has to send out?

23   A.  Yes.

24              MR. DRATEL:  Objection, your Honor.

25              THE COURT:  Sustained.  The jury will disregard the

1    answer.

2    Q.  Does NYAIP have a requirement for an additional document to

3    have to be sent if a vehicle is added to the policy?

4    A.  Yes.

5    Q.  What document is the company required to send?

6    A.  An amended declaration page.

7            MS. KOVNER:  Nothing further.

8            THE COURT:  All right.  Thank you.

9            Is there any cross-examination of this witness?

10           MR. DRATEL:  Yes, your Honor.

11           THE COURT:  Proceed.

12   CROSS EXAMINATION

13   BY MR. DRATEL:

14   Q.  Good afternoon, Ms. Bennett-Howell.

15   A.  Good afternoon.

16   Q.  The purpose of plan, NYAIP, essentially it's a high-risk

17   pool, right?

18   A.  Yes.

19   Q.  And for drivers who, for whatever reason you described some

20   of them, have difficulty or cannot get insurance on the open

21   market, right?

22   A.  Yes.

23   Q.  But, as you said, you're a not-for-profit organization.

24   A.  Yes.

25   Q.  But the insurance companies don't operate as a

1    not-for-profit in these policies, correct?  They don't operate

2    as a not-for-profit institution with these policies.  The rates

3    that are set are designed to attempt to do business.  Right?

4    A.  Correct.

5    Q.  And not necessarily to break even.  Like Ms. Kovner asked

6    you, if they are losing money they can't cancel.  Just because

7    they're losing money on a policy doesn't mean they can cancel.

8    Right?  You were asked that question?  Do you recall?

9    A.  Yes.  I was asked that.

10   Q.  But generally they are trying to make money on these

11   policies, right?

12   A.  I did -- I -- I guess.

13   Q.  That's why they're in business, right?

14   A.  I don't know about the insurance companies.  They have

15   rules that they have to follow and rates that they have to

16   follow.

17   Q.  But the rates aren't set, though.  They just break even or

18   lose money.  Right?

19   A.  I can't answer that.  I don't know.

20          THE COURT:  Do you know how rates are set?

21          THE WITNESS:  I can't get into the technicalities of

22   how it's set.  I have an understanding of how it's done.

23          MR. DRATEL:  Your Honor, I can't hear.

24          THE COURT:  She said, "I can't get into the

25   technicalities of how it's set.  I have an understanding of how

D49ABEJ3ps                    Bennett-Howell - cross

1    it's done."

2              Proceed, Mr. Dratel.

3              MR. DRATEL:  Thank you, your Honor.

4    Q.  Now, you're familiar with the New York Automobile Insurance

5    Plan, correct?

6    A.  Yes.

7    Q.  That's different than the manual, right?

8    A.  I don't understand.

9    Q.  Well, you were asked questions about the manual.  The

10   manual was put in evidence --

11   A.  Yes.

12   Q.  -- as Government Exhibit 2.  Those are for New York

13   Automobile Insurance Plan, right?  There's a plan itself.

14   A.  Yes.

15             MR. DRATEL:  If I may approach, your Honor.

16             THE COURT:  Yes.

17             MR. DRATEL:  Defense 1, your Honor.

18   Q.  And is this, if you could tell me what that is.  Do you

19   recognize it?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a New York Automobile Insurance Plan manual pages for

23   2006.

24   Q.  So that's something that would have been in effect in 2006

25   for the plan, correct?

1    A.   Yes.  January of 2006.

2    Q.   Right.

3              MR. DRATEL:  I move it in evidence, your Honor.

4              MS. KOVNER:  No objection.

5              THE COURT:  Admitted.

6              (Defendant's Exhibit 1 received in evidence)

7              MR. DRATEL:  Thank you.

8    Q.   Now, if you can look at the bottom, there are some

9    Bates-stamped numbers at the bottom there.  Right?

10   A.   Yes.

11   Q.   If you go to page 6171, please.  Is that eligibility,

12   right?  There's a section that says eligibility?

13   A.   Yes.

14   Q.   And it will just say, "An applicant shall be considered in

15   good faith if he reports all information of a material nature

16   and does not willfully make incorrect or misleading

17   statements."  Right?

18   A.   Yes.

19   Q.   And so that basically means that an applicant is also of a

20   good-faith standing, right, in making statements on the

21   application?

22   A.   Yes.

23   Q.   Now if we could turn to 6183, please.  Let me know when

24   you're there.

25   A.   I'm here.

D49ABEJ3ps                    Bennett-Howell - cross

1  Q.  Now, it talks about supporting documentation, the types of

2  documents that have to be submitted with an application,

3  correct?

4  A.  Yes.

5  Q.  And there's a copy of the operator's license, right?

6  That's 10-A, section 10-A?

7  A.  Mm-hmm.

8  Q.  Right?

9  A.  Yes.

10  Q.  And 10-C, for for-hire vehicles, a current certificate of

11  incorporation, right?

12  A.  Yes.

13  Q.  And it says that the insurance will not be issued or

14  approval will not be issued without such documentation, right?

15  A.  Yes.

16  Q.  And 10-D, a copy of the registration?

17  A.  Yes.

18  Q.  So on these applications that we've seen, that you've

19  discussed, for those to be approved, they would have to have

20  all of that information attached, right?

21  A.  If they all require the FH-1.

22  Q.  Yes, if they're for for-hire vehicles, right?

23  A.  Yes.

24  Q.  Now, if you look at 6195, please.

25  A.  I'm there.

D49ABEJ3ps                    Bennett-Howell - cross

1   Q.  And this is a notice to the applicant, right?

2   A.  Correct.

3   Q.  And ultimately -- well, it says AIP will, at 14-A-1,

4   Section 14-A-1, it says "AIP will issue a policy or binder with

5   all information necessary for the insurer to fix the proper

6   rate that's contained in the application form."  Right?

7   A.  Yes.

8   Q.  And ultimately it's the insurer who fixes the rate for the

9   particular policy.  Right?

10  A.  Yes.

11  Q.  Now, if you look at 6199, please in Section 15, subsection

12  2, it's the company's obligation to get sufficient information

13  if it's not provided initially.  Right?

14  A.  You said section what?

15  Q.  15.  Subsection 2.

16  A.  You mean 16?

17  Q.  Well, first start with 15-2.  Does it say that it has an

18  obligation to get sufficient information if not provided?

19  A.  It's -- you're looking at the wrong --

20  Q.  OK.  We'll look at 16, then.  16-2.  16 -- well, A-2.

21  Sorry.  16-A-2, on that same page, the companies must establish

22  a procedure for timely verification of policyholders' and

23  operators' driving records and for obtaining such other

24  information as may be necessary for the proper classification

25  and rating of plan applicant.  Right?

1    A.  Yes.

2    Q.  And by "rating," you're talking about the rate, you're

3    talking about territory, right?

4    A.  Yes.

5    Q.  Classification is something different, correct?

6    A.  Yes.

7    Q.  Classification is about what the use is for.

8    A.  Correct.

9    Q.  What the vehicle is being used for.  But rating is about

10   territory.

11   A.  Rating is about territory.  Territories also include

12   surcharges, accidents, credits.

13   Q.  But it's up to the company to get the information necessary

14   to make a determination, right?  It says, "The company has to

15   establish a procedure for timely verification."  Right?

16   A.  Yes.

17   Q.  And if you look at C, 16-C, the company is also obligated

18   to conduct an underwriting review of each taxi/limousine risk

19   in New York City and, within 75 miles from the outer borders of

20   New York City, to confirm usage, location, and driving.  Right?

21   A.  Yes.

22   Q.  Look at 6201, please, section 15-A-1-A-1, like four

23   subsections down.  Right?

24   A.  Yes.

25   Q.  It says, "Producer must include the necessary information

1   to rate and write a policy," right?

2   A.   Correct.

3   Q.   That's an obligation on the producers.

4   A.   Yes.

5   Q.   6202.

6        MS. KOVNER:  Objection, your Honor.  Speaks for

7   itself.

8        THE COURT:  I don't have a question yet.  Go ahead.

9   Ask the question.

10  Q.   6202, Section 15-A-1-E, "All statements of fact submitted

11  to the plan or an assigned company must be to the best of the

12  producer's knowledge."  Right?

13  A.   Yes.

14       MS. KOVNER:  Objection.

15       THE COURT:  Yes.  If you're just reading what it says,

16  Mr. Dratel, it's in evidence.  There's no need to do that.

17       MR. DRATEL:  Your Honor, the government read from the

18  application that was in evidence too.  I'm just trying to parse

19  it out so it's not --

20       THE COURT:  How long do you have on this?

21       MR. DRATEL:  Not much.  Not much, your Honor.

22       THE COURT:  A couple more.

23       MR. DRATEL:  A couple more for this document.  Then I

24  want to go back to the manual to ask some questions about the

25  manual.

1     THE COURT:  All right.  But you don't have to read

2   what's in evidence.

3   Q.  Look at 6209, please, Section 18-2-7.  "The company has the

4   right to cancel upon notice if there has been a -- if an

5   applicant has, in executing such application, willfully made

6   incorrect or misleading statements therein," and then in

7   capital letters it says, "provided a premium remedy is not

8   possible."  Right?

9   A.  Yes.

10  Q.  And what is a premium remedy?

11  A.  I'm not sure.

12  Q.  Doesn't that mean that if you re-rate it and there's a

13  different premium, the applicant can then continue the coverage

14  as long as they pay that rate?

15          (Ms. Kovner rose)

16          THE COURT:  Sustained.  The government is standing to

17  object.

18  Q.  So you don't know what that means in the manual -- in the

19  plan, rather.  An alternative to cancellation for a premium

20  remedy, you don't know what that means?

21  A.  I don't know the term, no.

22  Q.  Now, companies are indemnified, right, up the program, as

23  long as their actions are not willful, correct?

24  A.  Yes.

25  Q.  And the plan requires a compliance program, right, by the

1    company?

2    A.   Yes.

3    Q.   Including audits?

4    A.   Yes.

5    Q.   Now, let's go back to Rule 46C1, which you read from on

6    direct in the manual, from Government Exhibit 1.  Page 6285,

7    please.  Do you see where it says "determine the territory from

8    the territory definition based on the highest rated territory

9    where the public automobile is operating," right?

10   A.   Yes.

11   Q.   And is "operated" defined in the manual?

12   A.   I don't know if it's specifically defined.

13            MR. DRATEL:  Let the record reflect there was a long

14   pause there, your Honor.

15            THE COURT:  Proceed.

16   Q.   Now, does that mean that if I operate a taxi, a car

17   service, and I operate in Westchester County and one time out

18   of a hundred I get a call to bring someone into Manhattan, I

19   have to pay Manhattan rates?

20   A.   Who determines that you provide the highest rated territory

21   for which you operated?

22   Q.   I'm asking you a specific question?

23            THE COURT:  You may not be able to.

24            THE WITNESS:  I can't answer that.

25            THE COURT:  I don't know whether you can or not.  If

1    you have the knowledge to answer Mr. Dratel, you should.  His

2    hypothetical was that he operated the taxi, the car service, in

3    Westchester County, and one time out of a hundred he received a

4    call to bring someone into Manhattan.  Do you know whether or

5    not he is supposed to pay the Manhattan rates?

6              THE WITNESS:  I can't answer that.

7              THE COURT:  You can't answer that because you don't

8    know?

9              THE WITNESS:  Because I don't know and it's supposed

10   to be in the highest rated territory.  So if he knows he

11   operates in the higher-rated territory, then he's required to

12   use it.

13   Q.  But "operate" is not defined otherwise in the manual.

14             Do you give training courses?

15   A.  No, I don't.

16   Q.  But does the NYAIP give training courses to drivers or

17   owners of car services as to what these terms mean?

18   A.  No.

19   Q.  You talked about garages.  In fact that section, 4061, for

20   rating, has nothing to do with garaging, right?  You talked

21   about rating based on the highest territory in which you

22   operate.

23   A.  Correct.

24   Q.  If you look a little bit higher on 46, garaging is really

25   about which rules apply, right, whether it's the zone rate or

1   another type, or territory rating, right?

2   A.  Right.

3   Q.  So garaging is not about rating, in terms of territory

4   rating, right?

5              In the plan?

6              THE WITNESS:  I'm trying to understand.  I'm trying --

7              THE COURT:  Ms. Bennett-Howell, if you don't

8   understand the question, just tell Mr. Dratel that, I don't

9   understand.  Then he'll have the choice, he can either rephrase

10  it, or he can move on.  But I don't want you to, and Mr. Dratel

11  doesn't want you to, and the government doesn't want you to,

12  answer any question you don't understand.  OK?

13             THE WITNESS:  I don't understand.

14             THE COURT:  Be sure you understand the question before

15  you undertake to answer it.

16             Mr. Dratel, next question, or any question you want.

17  Q.  Is the term "principally garaged" defined anywhere else in

18  the manual or anywhere?

19             THE COURT:  You mean is it defined anywhere in the

20  manual?

21             MR. DRATEL:  Yes, anywhere in the manual.

22             THE COURT:  Do you know the answer to that?

23             THE WITNESS:  No.

24             THE COURT:  All right.  She doesn't know the answer to

25  that.

1              Now, I don't -- I certainly don't intend to put words

2      in your mouth.  I didn't mean to.  Do you mean to say that you

3      know it's not defined in the manual, or do you mean to say you

4      don't know whether or not it is defined in the manual?

5              THE WITNESS:  I don't know whether or not it is

6      defined.

7              THE COURT:  All right.  Thank you.

8      Q.  Now, do you remember Government's Exhibit 350 and 351?  You

9      were talking about one that was done incorrectly because it was

10     filed as a commercial application and not as a public

11     application, right?

12     A.  You have to --

13     Q.  I can show it to you.  No problem.  If you know it from

14     memory.  Otherwise I'll show you.

15             Now, do you remember that one was filed as a public

16     application and the other was filed as a commercial?  Right?

17     A.  Yes.

18     Q.  And the commercial one was incorrect because, as you noted

19     before, it does it for vehicles over 10,000 pounds?

20     A.  It's a limousine corp.

21     Q.  Right.  That's what I'm saying.  So it's incorrect here

22     because it's supposed to be limited, the commercial is supposed

23     to be limited to vehicles over 10,000, right?  10,000 pounds?

24     A.  Not just specifically 10,000 pounds.

25     Q.  What else is it for?  I mean, what else would the

1   commercial be for?

2   A.  For service use, for pizza delivery, for regular business

3   that's not public, like all taxis, limousines, they're all

4   public applications, not commercial.

5   Q.  So do you know whether that application, the one that was

6   for the commercial -- is that 350 or 351?  I just don't have

7   it.  I'm sorry.  It would be 351.  Right?  Is it the commercial

8   one?  Is that correct?

9   A.  I don't understand.

10  Q.  Which one is the commercial -- it's 350, Government Exhibit

11  351?

12  A.  351 is the commercial.

13  Q.  Right.  And that's the one that's incorrect, right?

14  A.  Because it's a -- yes.

15  Q.  Was that rejected?

16  A.  We do not reject applications.

17  Q.  So was there any checking to determine whether or not -- so

18  someone could get insurance for that even though it's a clearly

19  incorrect application?

20  A.  Yes.

21  Q.  There is nowhere along the chain where that could be

22  checked or verified?  Aren't the companies supposed to verify

23  the information?  Withdrawn.

24          Aren't the companies supposed to verify that the

25  information is correct that they're submitting?

D49ABEJ3ps                    Bennett-Howell - cross

1   A.  The --

2   Q.  Withdrawn.

3   A.  I don't -- I don't --

4   Q.  The producer, isn't the producer suppose to verify, it's

5   the producer's obligation to verify that they're providing the

6   correct information.

7   A.  Correct.

8   Q.  And wouldn't the company, looking at this application, have

9   questions about why a taxi or limousine service is trying to

10  get a commercial line of insurance?

11          MS. KOVNER:  Objection.

12          THE COURT:  Sustained.

13  Q.  Do you deal with the insurance companies?

14  A.  Not directly.  We assign to insurance companies.

15  Q.  Right.  You assign.  And so the plan would sign a policy,

16  or an insured to get a policy, not a policy, but it's assigned

17  a risk, right?  Is that how you describe it, essentially?  The

18  policy, you're assigning the policyholder to an insurance

19  company, for coverage.

20  A.  We signed the application.

21  Q.  For the policyholder?

22  A.  For the policy over to the company.

23  Q.  So you assign it without doing any checking or verification

24  as to whether or not the information on it is accurate.

25  A.  Correct.

1    Q.  Do you know whether the insurance company rejected that

2    application?

3    A.  No, I don't.

4    Q.  What would happen if it did?  Would they come back to you?

5    Or would they go directly to the producer?

6            MS. KOVNER:  Objection.  Ambiguous.

7            THE COURT:  If she knows.  Rephrase it.

8            MR. DRATEL:  Sure, your Honor.

9    Q.  If an insurance company looked at this application and

10   said, this is the incorrect form, would they send it back to

11   AIP, or would they go directly back to the producer?

12           THE COURT:  If you know.

13   Q.  If you know.

14           THE WITNESS:  I can answer.

15           MR. DRATEL:  I'm sorry?

16           THE COURT:  She said "I can answer that."

17   A.  They would not send it back to the plan.  If it's a risk

18   because it's on the wrong application, a commercial

19   application, if it's a risk that the insurance company cannot

20   write, they have within 30 days to return it to the plan for

21   reassignment to a company that it can go to.  If it's after the

22   30 days, then they have to start cancellation proceedings or

23   start with the producer.

24   Q.  And do you know what occurred with this particular

25   application?

1    A.  No, I don't.

2    Q.  So you have no idea whether it was returned to the plan or

3    not, for reassignment.

4    A.  No.

5    Q.  Now, you read Mr. Bejaoui's name, Mondher Bejaoui, right?

6    A.  Yes.

7    Q.  Mondher Bejaoui.  Do you have any knowledge of him other

8    than reading those applications?

9    A.  No.

10   Q.  Do you know what instructions if any he received about

11   territories?

12   A.  No.

13   Q.  Do you know whether he was ever provided this plan?

14   A.  I don't --

15   Q.  The plan manual.  Do you know if he ever was provided the

16   plan manual?

17   A.  No, I don't know.

18   Q.  Do you know if he ever read the plan manual?

19            MS. KOVNER:  Objection.

20            THE COURT:  Do you know?

21            THE WITNESS:  I don't know.

22            MR. DRATEL:  Nothing further.  Thank you, your Honor.

23   Thank you, Ms. Bennett-Howell.

24            THE COURT:  Any redirect?

25            MS. KOVNER:  No, your Honor.

1          THE COURT:  All right.  You may step down,

2     Ms. Bennett-Howell.  Thank you.  You are excused.  And why

3     don't you take all those papers and just give them to whichever

4     attorney you wish to burden them with.

5          (Witness excused)

6          THE COURT:  Ladies and gentlemen, I normally try to

7     give the jury a break in midmorning and midafternoon to refresh

8     yourselves.  Why don't you do that.  Just take ten minutes.

9     And, also, because evidence is now coming in, I would like to

10    be as efficient as possible, talk among yourselves and see if

11    you can stay tonight until maybe even 5:30.  If you can't, if

12    somebody can't, it's not worth arguing among yourselves.  If

13    somebody says, no, I'm sorry, I have to be home, fine.  But if

14    you can stay till 5:15 or 5:30, fine.  If you can't, we'll end

15    at 5 o'clock.

16         Take ten minutes.  Thank you.

17         (The jury left the courtroom)

18         THE COURT:  Ten minutes.

19         MR. DRATEL:  Your Honor --

20         THE COURT:  Sorry?

21         MR. DRATEL:  I'm just saying, now matter how we go, I

22    just have to get back to MDC, etc.

23         THE COURT:  We'll see.  But I would like you to go to

24    the MDC each night.  Talk to your client.  You probably won't

25    have the daily transcript at that time.  But get it to him as

1    soon as you can.  Tell him basically what's happened.  See what

2    he wants to say.  I do want to give him the opportunity to

3    return.  I want him to know that, as long as he will not engage

4    in outbursts.  And I want to give him every opportunity to come

5    here and to be in the holding cell if he doesn't want to return

6    to court so that he can see the trial.  That is going to be

7    made available to him whenever he wants.  And you can tell him,

8    I would much prefer that he be in the courtroom on condition

9    that he can behave himself.  If not I would prefer that he be

10   able to see the trial from the holding cell.  Thank you.

11           MR. DRATEL:  Thank you, your Honor.

12           THE COURT:  The jurors have told my deputy that they

13   have a problem with leaving after 5 o'clock.  We'll end at 5

14   o'clock.

15           MR. DRATEL:  Thank you, your Honor.

16           (Recess)

17           THE COURT:  Please be seated in the courtroom.  Next

18   witness for the government.  We'll end at 5 o'clock tonight.

19   No problem with that, ladies and gentlemen.  Everyone

20   appreciates your fulfilling your duty as jurors, and it is not

21   meant to be an extraordinarily difficult exercise in terms of

22   time.  We'll certainly respect the need you have to do things

23   on the outside.

24           MS. KOVNER:  Your Honor, the government calls Karen

25   Costello.

1    KAREN COSTELLO,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Welcome, Ms. Costello.  Please be seated.

5    Move your chair close to the microphone, and speak loudly,

6    slowly, and clearly.

7    your witness, Ms. Kovner.

8              THE WITNESS:  Thank you.

9              MS. KOVNER:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MS. KOVNER:

12   Q.  Mrs. Costello, U where do you work?

13   A.  I work for 21st Century Insurance.

14   Q.  What is your title with 21st Century Insurance?

15   A.  I'm the assigned risk underwriting manager.

16   Q.  How long did you work at 21st Century Insurance company?

17   A.  We have been bought throughout the years, so I have

18   actually, in total, been there for 26 years.

19   Q.  And that company has had different names over that time?

20   A.  We had different owners, who then sold us to new owners.

21   And 21st Century is our newest.

22   Q.  What are your duties and responsibilities at 21st Century

23   Insurance?

24   A.  I handle the records of past policies.  We handle the

25   underwriting of new business, endorsements, renewals,

1   non-renewals.  And we process correspondence and handle

2   incoming phone calls, claim verifications.

3   Q.  When you refer to underwriting, what does "underwriting"

4   mean?

5   A.  Underwriting is when you take a look at a policy to make

6   sure that the risk, which would be the policy, is appropriately

7   rated.  So you want to verify that the rating factors, such as

8   the territory, which is the garage and location, the driver,

9   the points from the motor vehicle records, the way the vehicle

10  is used, we want to make sure that that is all accurate for

11  that specific risk so that we have the policy priced

12  appropriately.

13  Q.  Are you familiar with a company called AIU?

14  A.  Yes.

15  Q.  What was AIU?

16  A.  AIU was part of AIG.  It was America Insurance Underwriting

17  Company.  That was the underwriting company's name.  And they

18  handled regular insurance along with assigned risk.

19  Q.  Did AIU, are the policies that were insured through AIU now

20  part of 21st Century Insurance?

21  A.  Yes, past and present, yes.

22  Q.  Does 21st Century Insurance currently maintain the records

23  that used to be records at AIU?

24  A.  Yes, we do.

25  Q.  I'm handing you now what have been marked as Government

D49ABEJ3ps                    Costello - direct

1   Exhibits 300 to 301 in evidence and 302 to 317 for

2   identification.  Had you had the opportunity to review these

3   documents in preparation for your testimony in this case?

4   A.  I did.

5   Q.  Were all of these documents records that were kept in the

6   regular course of AIU's business and since then in the regular

7   course of 21st century's business?

8   A.  Yes.

9   Q.  Were those documents created at or near the time of the

10  events reported in the document?

11  A.  Yes.

12  Q.  And was it the regular practice of AIU to maintain those

13  records?

14  A.  Yes.

15  Q.  And since AIU became part of 21st Century, has it been a

16  regular part of 21st Century's business to maintain those

17  records?

18  A.  Yes.

19          MS. KOVNER:  Your Honor, the government offers 302 to

20  317.

21          MS. LEWIS:  No objection.

22          THE COURT:  Admitted.

23          (Government's Exhibits 302 to 317 received in

24  evidence).

25          MS. KOVNER:  Let me first publish Government Exhibit

D49ABEJ3ps                    Costello - direct

1    300 for a minute, 300.

2    Q.  Is this a policy that was assigned to AIU?

3    A.  This is an application, a policy application.

4    Q.  And this is an application for Hamton Luxury Cars?

5    A.  Yes, it is.

6    Q.  Who assigned this policy to AIU?

7    A.  The New York plan.

8    Q.  And did AIU then issue an insurance policy to Hamton Luxury

9    Cars based on this application?

10   A.  Yes.

11   Q.  What's the address of Hamton Luxury Cars?

12   A.  15 Mygatt the Street, Binghamton, New York, 13905.

13   Q.  If we could scroll down a little bit to the vehicle

14   section, do you see the section marked "TERR," T-E-R-R?

15   A.  Right.  That's the territory.  That's what we would use to

16   determine, as part of the rating, to determine the premium for

17   that policy.

18   Q.  Does the insurer -- I'm sorry.  And a little further down

19   on this, it says garaging.  What's written there?

20   A.  That's 15 Mygatt Street, Binghamton, New York.

21   Q.  Is the insurer relying on the information for the territory

22   in determining what rate to charge for insurance?

23   A.  Yes.

24   Q.  And how does principal place of garaging?  Is the insurer

25   relying on that information in determining the rate?

D49ABEJ3ps                   Costello – direct

1  A.  Yes.  What we do is, the address at the top of the

2  application, that's usually the mailing address where all the

3  documents go to, all the output goes to.  And then the

4  principal place of garaging, that's what we would use to take

5  that territory to rate the policy.

6  Q.  Let's turn to the third page of the application.

7          Can you read the date that this was signed and the

8  name of the person who signed it.

9  A.  It was signed on 6/27/2005, by the last name of Bejaoui.

10  Q.  Let's look now, could we publish Government's Exhibit 302

11  in evidence.  And if you wouldn't mind turning to the second

12  page of this exhibit, I'm going to ask you if you can tell me

13  based on this record when AIU started providing insurance

14  coverage to Hamton Luxury Cars.

15  A.  This is the assignment of coverage.  So this is the

16  coverage sheet that accompanies the application when it's

17  mailed from the New York plan to the assigned company.  So the

18  New York plan tells us it was assigned, which means it was sent

19  to us on July 22nd, and it should have an effective date of

20  June 28, 2005.

21  Q.  And that's one day after the date you described, you just

22  told us, that's when the application was submitted?

23  A.  Correct.

24  Q.  Under the rules of the plan, could you have waited until

25  after the 28th to have started your coverage of the company?

D49ABEJ3ps                         Costello - direct

1    A.  No.

2    Q.  After AIU began insuring Hamton Luxury Cars, were there any

3    changes made to the policy?

4    A.  Yes, there were changes made to this policy.

5    Q.  And if you could look at Government Exhibits 304 to 310 in

6    front of you and just tell us what those documents are.

7    A.  These were change of vehicles.  They were change of

8    vehicles and add cars.  One was on 8/4, 8/25, and 8/30.

9    Q.  So those are all forms to make changes to the policy?

10   A.  Right.  There's no changes -- with these policies, no

11   changes can be made over the phone.  Everything has to be

12   submitted to us in writing.

13   Q.  Let's look at an example, if you could publish, at 305.

14   What change is being made in the middle section of the form?

15   A.  This is to add, this is to add a 1999 Lincoln Town Car to

16   the policy.

17   Q.  And what is the principal place of garaging?

18   A.  Binghamton, New York.

19   Q.  Does the insurance company rely on the principal place of

20   garaging, on an amendment to the policy in determining the rate

21   to charge for the policy?

22   A.  Yes.

23   Q.  And the rating territory, is that the same rate as on the

24   initial application?

25   A.  Yes, territory 28, yes.

1   Q.  Does the insurance company rely on that information as well

2   in setting the rate?

3   A.  Yes.

4   Q.  If we could turn to the last page of this exhibit.  What do

5   we see there on the last page of the exhibit?

6   A.  This is a mailing label.

7   Q.  And it's a mailing label associated with what document?

8   A.  With this change of vehicle.  We call these policy change

9   request forms, so it was associated with a policy change

10  request form.

11  Q.  So you kept proof of mailing in your files, in AIU's files?

12  A.  We do.  Normally we have to keep the, if we have it, we

13  have to keep the envelope attached to the application.  I mean,

14  not attached to the application -- attached to the policy

15  change request form.

16  Q.  Let's look now at Government Exhibit 908.  If we could

17  publish that.  I'm sorry.  309.  What is Government Exhibit

18  309?

19  A.  This is a change request from the agent to change things

20  for its mailing address.  Remember, a mailing address can be

21  different from a principal place of garaging address.  The

22  mailing address is where the documents go.

23  Q.  Can we turn to the second page of the exhibit.  Who was it

24  that this letter was from?

25  A.  This is from the president of Hampton Luxury Cars, Mondher

 1   Bejaoui.

 2   Q.  And what was the new town listed for Hamton Luxury Cars?

 3   A.  The new address for them was Vestal, New York.

 4   Q.  If you could look now at Exhibits 310 to 315, in front of

 5   you.  Tell us what those forms are.

 6   A.  These are policy declaration forms, and these are basically

 7   declaration pages that go out.  It goes out for a new business,

 8   when a policy is originally issued, and then it will go out

 9   when there's a change made to the policy.  And it will also go

10   out for renewals as well.  And basically it gives all the

11   information about the insured, the agent, the policy period,

12   the coverages, the vehicles, the drivers, and the premiums.

13   Q.  Who creates the form that provides all that information?

14   A.  Who creates it?  How is it generated?

15   Q.  Is it a form -- what company creates it?

16   A.  This, this was created, I believe, by AIU.

17   Q.  Who does AIU send the form to?

18   A.  They send them to the insured and the agent.  If there is a

19   lien holder, we would send it to the lien holder too.  Anybody

20   who needs to receive a copy of the policy would receive it.

21   Q.  Let's look at an example.  If you could look at Government

22   Exhibit 310 for identification.  You mentioned that one of the

23   things that's on the declaration says premium for the policy.

24   A.  Correct.

25   Q.  What was the premium?

D49ABEJ3ps                    Costello - direct

A.   The term -- the annual premium, which means the policy was

in effect for a full year, so if this policy had been in effect

from 3/1/05 to 3/1/06, the annual premium would have been 2359,

2,359.  The term premium is 1595, which is the term which is

from 6/28/05, which was the effective date of the new business,

to the expiration date of the policy, which would have been

3/1/06, if this policy had stayed in force for this time

period.

Q.   And can you just explain what a premium is?

A.   A premium is, a premium is basically the money we're

charging for these specific coverages for the risk, for the

specific risks.  So they were basically being rated, for

Binghamton, the type of vehicles and how many vehicles they

had, whether there were accidents or violation, and the type of

coverages.  You take all those factors into consideration and

you figure out what the premium is.

Q.   Go forward to the seventh page of this exhibit, marked

Bates 275.  What do you see listed on this page of the policy

declaration?

A.   This has the vehicle as being, at this time, we're only

providing coverage for one vehicle, which is a '97 Mercury.  It

has the class code 426999.  And then it has your territory as

being territory 28.  And again, the territory is the garaging

address of the vehicle.  And then at the bottom are the

coverages and the premiums associated with it.

1    Q.  And do the declarations always include a list like this if

2    the vehicle is being covered under the policy?

3    A.  Yes.

4    Q.  Let's go forward four pages to Bates 279, in this exhibit.

5    What do we see here on Bates 279?

6    A.  This is the name of the driver, the only listed driver at

7    the time, with his date of birth, license number, and name.

8    Now, if he would have had anything on his motor vehicle record,

9    if he would have had anything on his driving record, that would

10   have been pointed out down here as part of the points, which

11   also applies to premium.

12   Q.  Does the declaration sheet for a policy always include a

13   listing of drivers as well?

14   A.  Yes.  The only time it doesn't is if there's too many

15   drivers -- like if there was a cap, a maximum number of

16   operators that can appear here, and if that happens, it will

17   only print the maximum number of operators, but there could be

18   additional operators.

19   Q.  If a driver is added or a car is added to the policies, is

20   a new declaration sheet printed --

21   A.  Yes.

22   Q.  -- and sent to the customer?

23   A.  Yes.

24   Q.  How is it sent?

25   A.  It's sent by mail to the insured and the producer.

1   Q.  During the period that you were working for AIU, were there

2   occasions when AIU tried to perform inspections related to

3   Hamton Luxury Cars?

4   A.  Yes.  According to the New York manual, the New York

5   Automobile Insurance Plan manual, for taxis and limousines,

6   they require you to do an underwriting review to confirm the

7   location, usage, and drivers of that particular company,

8   vehicles, and operators.

9   Q.  Let me direct your attention to Government Exhibit 317, if

10  we could publish that.  Can you explain the correspondence in

11  Exhibit 317.

12  A.  Yes.  This is a letter that was sent to Hamton Luxury Cars

13  to tell them that we needed to speak with them, basically to do

14  our underwriting inspections, to send out an investigator to

15  confirm, literally, the garaging location, the usage, and the

16  drivers.

17  Q.  And according to this record, when did AIU make requests of

18  the policy holder to do an inspection?

19  A.  They sent a letter out on July 29th and also on August

20  16th.

21  Q.  What's the purpose of doing an inspection?

22  A.  To make sure that the policy is appropriately rated for the

23  risk.

24  Q.  Let's look at Government Exhibit 303 for identification --

25  303 in evidence.  What is Exhibit 303?

1   A.   These are -- this is basically, on our system, on the

2   system, whenever a change or anything was done, we call them

3   notes or comments or a memo to the policy, and this is

4   basically memos to this particular policy about different

5   things that were processed or conducted on the policy.

6   Q.   If we can go to the second sheet, can you tell me by

7   looking at the case history what action AIU ultimately took

8   after the policyholder was sent this letter?

9   A.   After they sent a second note to locate the insured, then

10  they sent a request to cancel it.

11  Q.   What date was this policy canceled?

12  A.   The policy was canceled effective September 24, 2005.

13  Q.   Can you tell us how long the policy had been effective by

14  then?

15  A.   The policy was effective June 28th through September 24th.

16  Almost three months.  Three months.

17  Q.   During the period that the policy was in effect, were any

18  of the cars on this policy ever involved in an accident that

19  generated a claim with the AIU?

20  A.   Yes, September 4th, 2005.

21  Q.   And in what part of New York -- I'm sorry.  Where did that

22  accident occur?

23  A.   According to the claims notes, it occurred in Bronx, New

24  York.

25  Q.   In your jobs at AIU and 21st Century, have your

D49ABEJ3ps                    Costello - direct

1  responsibilities included rating policies?

2  A.  Yes.

3  Q.  And what does that mean?

4  A.  That means, with these policies there's a New York plan

5  manual, and everything, all your rules, rates, and regulations,

6  are in that manual.  So basically you can read your rules, you

7  determine your risk factors, and then you go to the territories

8  and there's your premiums for that specific territory.  Then

9  you apply your factors to those rates in that territory, and

10  that gives you the premium.

11  Q.  Did the U.S. Attorney's Office ask you to make certain

12  calculations of insurance premium in this case?

13  A.  Yes.

14  Q.  I'm going to show you what's been marked as Government

15  Exhibit 3001-A for identification.  I show you what's been

16  marked as 3001-A for identification.  What is that?

17  A.  These are my calculations.  Basically what I did was, I

18  knew what the calculations were based on territory 28, which

19  was where the policy was issued.  So then I recalculated the

20  premiums based on territory 17 and territory 18, which is

21  Brooklyn and Manhattan.  The way I calculated it was just like

22  the declaration page does.  The annual premium, if it was in

23  force for a full year, the term premium, which would have been

24  from June 28th to the expiration date of March 1st, and it was

25  called an in-force premium, which is truly the premium from

1    when the policy was issued until the policy canceled.  So it's

2    a premium for that specific time period, the time the policy

3    was in force.

4    Q.  Are the documents that you used to make these calculations

5    the insurance documents that are in evidence as 300 to 317 and

6    the New York Automobile Insurance Plan manual?

7    A.  Yes.

8              MS. KOVNER:  Your Honor, the government offers 3001A.

9              MS. LEWIS:  No objection.

10             THE COURT:  Admitted.

11             (Government's Exhibit 3001A received in evidence)

12             MS. KOVNER:  Ms. Ansari, would you publish 3001A.

13   Q.  Let's look first at this section at the top of the page,

14   "calculations based on territory 28."  Is territory 28 the

15   application that -- I'm sorry -- the code that was on the

16   application document that we just looked at?

17   A.  Yes.

18   Q.  And when AIU issued its insurance policy for this company,

19   Hamton Luxury Cars, did it use that rate to set the --

20   A.  Territory 28, yes, the territory 28.

21   Q.  The next four lines begin with, the first one is '97 Merc.

22   Can you explain what that is.

23   A.  Sure.  Sure.  It says '97 Mercury.  We have the different

24   coverages and we know that the '97 Mercury was the original

25   vehicle in the policy when it was issued.  So if you look at it

1    for the annual term, which would have been, again, if it had

2    been in effect for one full year, it would have been 2359.

3    Then we added the 99 Lincoln on August 4th.  But again we're

4    talking about on the manual premium for a manual year, it would

5    have been 2127.  The '98 Cadillac would have been 2127.  And

6    then the '97 Lincoln would have been 2149.  So for all four

7    vehicles on an annual basis, the total premium would have been

8    $8,762.

9           MS. KOVNER:  Ms. Ansari, if you could just zoom out a

10   little bit so we can see that bottom row.

11   Q.  So under the policy as rated, what does -- under the policy

12   based on the representations in the application, what was the

13   annual premium for all the cars on the policy?

14   A.  8,762.

15   Q.  Let's look down now at the next calculations based on

16   territory code 17.

17   A.  Right.  So I took those same four vehicles, the same rating

18   factors -- I mean, not the same rating factors.  I changed the

19   one rating factor to reflect territory 17.  But all the other

20   rating factors stayed the same, except obviously for the base

21   rate premiums, because you have to go to a different territory

22   for that.  You went to 17.  And that annual premium came to be

23   $30,661.

24   Q.  What change had you made from the chart at the top of the

25   page to the second chart that we're looking at?

1    A.   Rather than using the base rates for territory 28, I used

2    the base rates for territory 17.

3    Q.   And the result was that the premium went from 8762 to

4    30,661?

5    A.   Correct.

6    Q.   Let's look down at the third section.

7    A.   So this would have, again, been used in the same rating

8    factor.   Instead of using territory 289, like it originally had

9    been rated for, I used territory 189.   And this annual premium

10   came to be 31,437.

11   Q.   So, again, about three times as expensive as the rate on

12   the initial application?

13   A.   Correct.

14   Q.   If we could just zoom out for a moment.   Can you just

15   explain what the policy term and in-force premium are.

16   A.   Right.   A policy term would have been the premium from the

17   effective date of the policy of 6/28 to the expiration date of

18   the policy, which would have been 3/1/06, if it had gone

19   through that full term.   And again, all these were prorated

20   based on when they were added to the vehicle.   So the --

21   when -- based on when they were added to the policy.   So the

22   19'97 Mercury, that was the original one.   And then the other

23   three vehicles, one was added 8/4, one was added 8/25, and one

24   was added 8/30.   So I prorated that out from those dates until

25   through 1/06.   So the policy term for all these -- for these

 1   cars, for that term, would be $5,003.

 2   Q.  And that's if the cars were rated based on the

 3   representations in the application document?

 4   A.  Yes.

 5   Q.  And is that information that AIU actually used to rate its

 6   policies?

 7   A.  Correct.

 8   Q.  How much were the term premiums used if the policy --

 9   vehicles were insured as though they were operating in

10   Brooklyn?

11   A.  $17,455.

12   Q.  How about if the same cars were operating in Manhattan?

13   A.  $17,896.

14          MS. KOVNER:  Nothing further.

15          THE COURT:  Any cross-examination of this witness?

16   CROSS EXAMINATION

17   BY MS. LEWIS:

18   Q.  Good afternoon, Ms. Costello.

19   A.  Hi.

20   Q.  Computer companies do business or license to write

21   automobile plans for people to get insurance through the NYAIP,

22   right?

23   A.  Correct.

24   Q.  And as an assigned risk underwriting manager, you're one of

25   the underwriters who writes those plans, right?

1   A.  Correct.

2   Q.  So then I'm assuming you're familiar with the NYAIP and

3   also the plan manual.

4   A.  Yes.

5   Q.  OK.  So if I may approach, your Honor --

6          THE COURT:  Yes.

7   Q.  -- and provide you with a copy of the plan manual, which is

8   already marked in evidence as Defense Exhibit 1.  Do the

9   underwriters at your company rely on the plan manual when

10  they're determining rates and writing the insurance policies?

11  A.  Yes.

12  Q.  And so if you're looking at the manual there under Section

13  9, 9A of the NYAIP, is it 6171, an applicant is considered for

14  assignment to insure upon making an application in good faith.

15  Correct?

16  A.  Wait a second.  Let me find it.  Yes.

17  Q.  OK.  And as it's defined there, under Section 9A, "in good

18  faith" means an applicant reports all information of a material

19  nature and does not willfully make incorrect or misleading

20  statements in the prescribed application form or does not come

21  within any of the prohibitions or exclusions listed, correct?

22  A.  Mm-hmm, yes.

23  Q.  So, then, when you receive an application to underwrite,

24  someone has already determined that that application was made

25  in good faith.  Is that right?

1           MS. KOVNER:  Objection.

2           THE COURT:  Sustained as to form.  Just rephrase.

3  Q.  Do you assume the applications you make are received in

4  good faith based on the manual, then?

5  A.  Well, I think good faith and underwriting review are two

6  different things.

7  Q.  OK.  But based on what the manual says, if an application

8  is made, it must be in good faith to get to you, does that mean

9  to you to say that the application, you can assume, is made in

10 good faith?

11 A.  I don't know if I can agree with that.

12 Q.  OK.  I'll move on.

13          THE COURT:  When you receive an application, do you

14 presume or assume or believe that the application was made in

15 good faith, or do you have no belief in that regard?

16          THE WITNESS:  I would say we have no belief in that

17 regard.

18          THE COURT:  All right.

19 Q.  Are you familiar with the reporting documentation that an

20 application is required to provide to the plan along with their

21 application, which is under Section 11-A-10?  This is 6183.

22 A.  OK.

23          THE COURT:  Are you familiar with that underlying

24 documentation?

25          THE WITNESS:  I'm familiar with the rule, yes.

1   Q.  And so there are four things there, right, that an

2   application has to provide, along with their application?

3   A.  Right.  But the application will still be accepted without

4   that, without these four things.  The plan won't reject an

5   application based on that.  They'll just send out a deficiency

6   notice to the producer.

7   Q.  So if these four things aren't provided, which is the

8   driver's license, for foreign license holders a copy of their

9   driver's license, the for-hire vehicles, that they have to

10  provide a copy of their current certificate of incorporation,

11  and also they have to provide the registration information, if

12  that stuff all isn't provided, the plan, the insurer will still

13  take on that application, will still look at that application,

14  without that?

15  A.  Right.  It will still be assigned to an insurer, yes.

16  Q.  Yes.  It just keeps moving?

17  A.  Correct.

18  Q.  So now turning to the role of the underwriter, you're held

19  to certain standards, correct, under the NYAIP, when you're

20  drawing up the policies, right?

21  A.  Yes.

22  Q.  These standards as you know them to be set forth, are they

23  in section 15 of the NYAIP in part?  That's at 61499 if you

24  want to take a look.

25  A.  61499.

D49ABEJ3ps                    Costello - cross

1    Q.  And in particular Sections A and C of Section 15.  6199.

2    A.  Sorry.

3    Q.  And I'll just direct you to sub 1.

4    A.  What page am I on?

5    Q.  This is 6199.

6    A.  All right.

7    Q.  Section 15A.

8    A.  OK.

9    Q.  Sub1.  So one of your -- one of the standards, one of the

10   things that you're required to do is to properly place all

11   policies in accordance with approved rules, rates, and rating

12   plans contained in the NYAIP manual, correct?

13   A.  Correct.

14   Q.  And so then based on this section, you're responsible for

15   determining the premium rates that the applicant will pay,

16   right?

17   A.  Correct.

18   Q.  That's your determination, not the policyholder -- I'm

19   sorry -- not the insured's, not the producer's.  That's yours.

20   A.  Right.  The agent will give them a quote but we actually

21   issue the policy.

22   Q.  OK.  And then under subsection 2615A, you're also

23   responsible for establishing a procedure for timely

24   verification of the policyholder's acknowledgment of your

25   records, right?

D49ABEJ3ps                    Costello - cross

1   A.  Correct.

2   Q.  But perhaps more importantly in that section, as you say,

3   under sub 2, it also states that you're responsible for

4   obtaining any such other information as may be necessary for

5   the proper classification and rating of plan applicants, right?

6   A.  Correct.

7   Q.  And we know that classification is different from rating

8   there.  Rating refers to the territory, correct?

9   A.  No.  Rating includes classification and territories.

10  Q.  OK.  But here it does mention a separate category, correct?

11  A.  You need the two of them to get a proper premium.

12  Q.  So when it says here that there's not enough information --

13  or if it says here there is not enough information for you to

14  determine the premium rate for a particular vehicle or group of

15  vehicles to be insured, there are class factors that you need

16  to weigh in determining the classification rate and you're not

17  sure you're getting the whole history, it's your responsibility

18  to go back to the applicant and get this information, right?

19  A.  Correct.

20  Q.  And so before, when you said that you rely on the

21  applicant's territory info and the principal place of garaging,

22  you actually have the right, based on the standards here, to go

23  back and obtain more information.  You don't have to rely on

24  that, correct?

25  A.  Correct.

D49ABEJ3ps                    Costello - cross

1    Q.  And if there was anything suspicious at this particular

2    stage, you wouldn't go forward, right?

3    A.  No.  You still have to issue the policy.

4    Q.  You still have to issue --

5    A.  The policy still has to be issued.

6    Q.  OK.

7    A.  Yeah.  You can't reject the policy.  It still has to be

8    issued.

9    Q.  OK.  And so under 15C, you have another obligation, right?

10   And this one is, as an underwriter -- not the producer, not the

11   applicant -- you're responsible for conducting an underwriting

12   review of each taxi or limousine risk in New York City and

13   within 75 miles of the outer borders of New York, correct?

14   A.  Correct.

15   Q.  And that's to confirm usage, location, and driver, correct?

16   A.  Correct.

17   Q.  And that's all used for determining the ultimate charge and

18   rate, right?

19   A.  Correct.

20   Q.  Now, here, if there's anything suspicious, do you still

21   have to move forward, or you can -- or you would not move

22   forward, upon looking at said information, if you ever saw

23   something was awry?

24   A.  No, we would still -- well, we would still move to -- so

25   let's say, so you're saying if they would have responded to the

1   letter and allowed somebody to come out to verify their

2   information, we could then take action on that policy as well.

3   Q.  OK.  And there are also certain standards that you have

4   that are specific to public automobiles, like livery vehicles

5   that we're talking about here, right?  OK.  And those are the

6   standards that are set forth under Section 24F of the NYAIP,

7   that's at 6220?

8   A.  24F?

9   Q.  Yes.  This is in reference to the New York public

10  automobile pool.

11  A.  I see 24.  I don't see F.

12  Q.  OK.  Do you see -- I don't have it in front of me, but

13  where it's discussing the obligations of a servicing carrier?

14  24F84A?  Do you see that?

15  A.  I'm sorry.  No.

16          MS. LEWIS:  May I approach, your Honor?

17          THE COURT:  Yes.

18  A.  6200?

19  Q.  24, right?  6220.

20  A.  OK.

21  Q.  OK.  So now you're looking at page 6220, correct?

22  A.  Yes, thank.

23  Q.  You so turning to Section 24, do you see this deals with

24  New York public automobile pool?

25  A.  Right.

D49ABEJ3ps                     Costello - cross

1    Q.  An obligation to service the cars, right?

2    A.  Correct.

3    Q.  And the servicing carrier is really the same thing as an

4    underwriter but with some additional requirement such as that

5    you have to have been licensed to voluntarily rate automobile

6    plans for an additional five years and some other things?

7    A.  A servicing carrier is an insurance company.

8    Q.  Right.  So the main thing -- it's the same kind of

9    obligation as an underwriter would have then, right, under

10   Section 15, which is specific to the use of public automobiles?

11   A.  I'm not sure how you're correlating an underwriter with the

12   servicing carrier.  The servicing carrier would have been AIU.

13   And then the underwriter is the person who's issuing and

14   underwriting the policy.

15   Q.  So you're not subject, then, to these standards?

16   A.  The company is.

17   Q.  Yes, the company.

18   A.  Yes.

19   Q.  Which is who you're speaking on behalf of here, right?

20   A.  No, but you were saying "underwriter."  It's the company's

21   responsibility.

22   Q.  OK.  I'm sorry.  So under Section 24FB, in addition to

23   responsibilities under Section 15, you're responsible for

24   properly pricing all policies in accordance with approved

25   rules, rates, and rating plans, under the New York public

1   automobile pool manual, right?

2   A.  Correct.

3   Q.  And under sub2 here, you're also responsible for obtaining

4   other information as may be necessary for determining

5   classification and rating, correct?

6   A.  Correct.

7   Q.  So this is, on top of your other obligations under 15,

8   additional obligations to investigate, correct?  OK.  And to

9   determine a rating.

10  A.  I don't know if I understand your question.  I mean, if

11  it -- how does this differs from Section 15C?  It's an

12  underwriting review.  An underwriting review is to determine

13  the proper risk, which is the garaging, the usage, the

14  location, the motor vehicle record information, the driver

15  information.  That's all part of underwriting the whole risk.

16  Q.  Right.  And what I'm saying to you, all I'm asking you is,

17  both Section 15 and Section 24, which we just looked at here,

18  requires you to properly price everything.

19  A.  Correct.

20  Q.  Right?  So it's just another place where you're being asked

21  to do the same test.  But here --

22          THE COURT:  Is that --

23          THE WITNESS:  Yes.  Yes.  I'm sorry.  That's yes.

24  Q.  But here, distinguishing because it's specific to the

25  public automobile pool, correct?  Whereas 15 is a more general

D49ABEJ3ps                    Costello - cross

1   obligation?  Is that right?

2   A.  No.  15 is -- 15, 16, or C was specific to taxi and

3   limousines, which is part of the public auto policy, the past

4   policy.

5   Q.  Did you ever provide a copy to Mr. Bejaoui of the plan

6   manual, or the of the NYAIP that you're holding right there?

7   A.  No.  But the agents would have it.  Is that -- the agent

8   would have had this manual.

9   Q.  But did Mr. Bejaoui have it?

10  A.  No.  But the agent represents him.  The agent was the one

11  who, you know, came up with the calculations.

12  Q.  But you don't --

13  A.  No, we don't distribute that.

14          THE COURT:  Only one of you at a time.

15  Q.  Now, before you talked about re-rating calculations, but at

16  the time that Mr. Bejaoui was insured by you, did your company

17  ever go back and re-rate the premiums then?

18  A.  No, because we sent out the letter to them to have them

19  write -- for him to contact us to get the underwriting review

20  done.

21  Q.  And as an underwriter, do you ever worry that you'll get in

22  trouble with the law if you incorrectly determine an insurance

23  rate?

24  A.  No, because we wouldn't -- we wouldn't incorrectly

25  determine an insurance rate without adequate proof.

1  Q.  And part of the reason that you feel unconcerned about that

2  is that often you are indemnified under the New York State

3  Automobile Insurance Plan?

4  A.  No.

5  Q.  Are your familiar with Section 22.1, that's at 6213?

6  A.  No.  No, I'm not familiar with it.

7  Q.  Could you turn to that, please.

8  A.  6213?

9  Q.  Yes, please.  And do you see that under this section you're

10  absolved as an underwriter of any responsibility for

11  incorrectly determining a plan as long as you did so in good

12  faith and didn't engage in any willful misconduct?

13  A.  No, I'm not familiar with that section.

14  Q.  OK.  But do you see that there on the page?

15  A.  Yes, I do.

16  Q.  And do you believe, based on that, then, that if you made a

17  mistake in determining an insurance rate, that as long as that

18  was a good-faith innocent mistake, you would not be liable,

19  correct?

20  A.  According to this.

21  Q.  And this is the same standard, to operate in good faith and

22  not to engage in willful misconduct, that Mr. Bejaoui is held

23  to as the applicant, correct?

24          MS. KOVNER:  Objection.

25  Q.  Is it a similar standard?

1          THE COURT:  If you know.

2          THE WITNESS:  I don't know.  I don't know that.

3          MS. LEWIS:  No further questions.

4          THE COURT:  All right.  Thank you.  Anything?

5          MS. KOVNER:  Briefly, your Honor.

6          THE COURT:  Yes, please.

7    REDIRECT EXAMINATION

8    BY MS. KOVNER:

9    Q.  You were asked a number of questions on cross-examination

10   about the insurance company's ability to do checks on where a

11   company is actually operating.  Do you recall that?

12   A.  Yes.

13   Q.  If a company isn't able to immediately verify where the

14   vehicles or the policy actually are, can it refrain from

15   issuing the policy?

16   A.  No.

17   Q.  Why is that?

18   A.  Because according to the claim manual you have a specific

19   number of days to issue that policy.

20   Q.  If the policy carrier believes that the rating information

21   on an application might be false, can it decline to issue the

22   policy for that reason?

23   A.  No.

24   Q.  If AIU is assigned a policy by the insurance plan, when

25   does the policy have to go into effect in relation to when that

D49ABEJ3ps                    Costello - redirect

1   application was first submitted to the NYAIP?

2   A.   The application based -- the application becomes effective

3   based on the effective date on the assignment sheet.

4   Q.   And is that -- when is the effective date in relation to

5   when the NYAIP received the claim -- or received the

6   application?

7   A.   It's usually -- I believe the application has to be

8   postmarked within a certain number of business days from when

9   it's signed.  And then it's made 24 hours after the date that

10  it's signed.

11  Q.   24 hours after the day the applicant signs the application?

12  A.   Yes.

13  Q.   Now, you were asked a number of questions about how the --

14  about the verification of the territory information by the

15  insured.  Do you recall that?

16  A.   Yes.

17  Q.   Is that something you typically do through inspections?

18  A.   Yes.

19  Q.   If the insured's company sends out a letter to the insured

20  trying to set up an inspection and they don't get a response

21  back, can they immediately cancel the policy?

22  A.   They have to send two written requests.

23  Q.   And they can only cancel the policy after receiving no

24  response to those two requests?

25  A.   Correct.  Then they will send out a cancellation notice

```
 1    that has a future cancel date, and the insured still has time,

 2    for that cancellation date, to get back this contact with the

 3    company to set up that.  So the policy can still be -- that

 4    cancellation can be rescinded as long as that -- the insured

 5    contacts us and sets the inspection tine up before the

 6    cancellation.

 7  Q.  So only after that period elapses can you cancel a policy.

 8  A.  Right.  Or the policy be effective, or the cancellation be

 9    effective.  Yes.

10          MS. KOVNER:  Nothing further.

11          THE COURT:  Anything, defense?

12          MS. LEWIS:  Nothing further, your Honor.

13          THE COURT:  All right.  Thank you.

14          THE WITNESS:  Thank you.

15          THE COURT:  You are excused, Ms. Costello.  You may

16    step down.

17          THE WITNESS:  Thank you.

18          THE COURT:  And just give those documents to one of

19    the attorneys, please.

20          THE WITNESS:  OK.

21          (Witness excused)

22          THE COURT:  All right, ladies and gentlemen, we're

23    going to end for the evening.  Enjoy the evening.  Keep an open

24    mind.  Give your books to Ms. Blakely.  Put on the outside your

25    name and your juror number.  Do not discuss this case with
```

D49ABEJ3ps

1    anyone else.  And we'll start tomorrow promptly at 9 a.m.,

2    Assuming all of you can be here -- assuming all of are you

3    here.  As I said, we need all 14 of you to be here before we

4    can begin.  So leave a little time to get through security.

5    Thank you.  Enjoy the evening.  I'll see you tomorrow.

6              (The jury left the courtroom)

7              THE COURT:  You may be seated.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D49Wbej4

1          THE COURT:  You may be seated.

2          We have the government's motion in limine to preclude

3    cross-examination regarding certain convictions and prior acts.

4    We started to discuss that yesterday.  The government had moved

5    to preclude cross-examination of certain prospective witnesses,

6    and Mr. Dratel put on the record that he agreed with the

7    government position that there would be no cross-examination on

8    the listed crimes and other acts for Mr. Rubio, Ms. O'Neil,

9    Mr. Reyes, and Mr. Nunez, and we were going to discuss Ms.

10   Black, Jay Lin, Gregorio Cherie, and Sadok Mejri.

11          Mr. Dratel, do you agree with the government on any of

12   those four?  If not, I'll hear argument.

13          MR. DRATEL:  No.  Although with respect to Mr. Cherie,

14   start with him, Gregorio Cherie.

15          THE COURT:  Yes.

16          MR. DRATEL:  My question is I'm not interested in the

17   bankruptcy, which is 11 years ago.  I'm just interested about

18   the 2009 driving under the influence.  It says that offense was

19   subsequently expunged from his record.  I just want to know

20   whether or not it has anything to do with his being a witness

21   in this case in terms of any of the disposition or resolution

22   of that particular case.

23          THE COURT:  All right.  Government.

24          MS. KOVNER:  No, and also with respect to none of the

25   witnesses.

1              THE COURT:  All right.

2              MR. DRATEL:  Okay.  We can eliminate that as well.

3              THE COURT:  Then there will be no cross-examination on

4    those incidents permitted of Gregorio Cherie.

5              MR. DRATEL:  With respect to Ms. Black, these are more

6    current.  These are all within the ten-year period.  They're

7    all about driving, and this is a case with respect to people's,

8    it's a case about automobiles and driving and driving, so I

9    think it's relevant.  I also think it's relevant that it wasn't

10   cleared up until October 2012, when she had to know that the

11   government was going to use her as a witness or that she'd

12   already been contacted about this case.  So I think that part

13   of that --

14             THE COURT:  I'm sorry.  What would that line of

15   cross-examination be?

16             MR. DRATEL:  The only reason she paid her fines, she

17   waited five years to pay her fines because she knew that the

18   government was looking at her in this case.

19             THE COURT:  I see.  She wanted to curry favor with the

20   government, is that the idea?

21             MR. DRATEL:  No.  I think more she wanted to avoid

22   getting in trouble for not having resolved those at a time when

23   she knew she was probably going to be testifying.

24             THE COURT:  All right.  Let me just look at something.

25             Yes, government.

1          MS. KOVNER:  Your Honor, I'm not entirely sure I

2     understand this argument.  I understand that Mr. Dratel is

3     suggesting maybe Ms. Black paid her fines because she believed

4     she'd be called as a witness and thought if she hadn't paid her

5     fines she might be questioned about them.  But that does not

6     bear on her truthfulness, her ability to perceive, or anything

7     else relating to these proceedings.  Perhaps she did want to

8     avoid embarrassment about being asked about unpaid traffic

9     fines, but the fact that she decided as a result I'm going to

10    pay my fines, if Mr. Dratel had thought this is true, it would

11    still be irrelevant to this case.  I mean, but, your Honor, to

12    address the underlying rule, somebody having unpaid traffic or

13    car-related fines is not desirable, but it's not something that

14    goes to that witness' credibility.  It's not an offense of

15    dishonesty.  It's a relatively common infraction.

16         THE COURT:  So then cross-examination isn't a major

17    deal.

18         MS. KOVNER:  I think it's less embarrassing than some

19    cross-examinations, but I do think it's going to waste time and

20    embarrass a lay witness.

21         THE COURT:  Mr. Dratel.

22         MR. DRATEL:  Your Honor, she's going to testify about

23    her interactions, she's someone who will testify about her

24    personal interactions with Mr. Bejaoui during the time period

25    that the case involves, and at the same time she's got all

D49Wbej4

```
 1   these other infractions going on.  I think that it reflects on
 2   her credibility at the time in terms of what she's laying on
 3   him and what her only responsibility is, and here's someone who
 4   let these lapse for five years and then paid them off --
 5            THE COURT:  I understand.
 6            MR. DRATEL:  -- when she realized it was going to be
 7   an issue.
 8            THE COURT:  I understand.  I'm going to allow limited
 9   cross-examination.  It does involve the subject matter here
10   insofar as it has to do with license suspensions.  I don't
11   think there's a 403 issue.  Obviously, Mr. Dratel, make that a
12   limited exam if you do intend to go into it.  I think it's
13   relatively harmless.  I'll give you some leeway on Black.
14            Go ahead.
15            MR. DRATEL:  Thank you, your Honor.
16            On Lin, this is someone who has three alcohol-related
17   offenses in a three-year period.  Cognitive ability, cognitive
18   recollection, that's all affected by that.
19            THE COURT:  2008 and 2009, is that right?
20            MR. DRATEL:  2010.
21            THE COURT:  No.  2008 to what.
22            MR. DRATEL:  2008, 2009, and another one in 2010,
23   three straight years.
24            THE COURT:  Government.
25            MS. KOVNER:  Your Honor, Mr. Lin is pretty different
```

D49Wbej4

1    from Ms. Black in that Mr. Lin is not somebody who obtained

2    insurance from the defendant.

3            THE COURT:  He was a translator for his father and

4    others.

5            MS. KOVNER:  That's right.  So I think to the extent

6    that it's their argument that vehicle-related misconduct is

7    probative, it's not that he was getting car insurance for

8    himself here.  These are three, as your Honor's identified,

9    alcohol-related incidents several years in the past, and I

10   think to suggest that he has diminished ability to perceive or

11   to testify as he sits on the stand today, three years later,

12   because of a DUI most recently in 2010 --

13           THE COURT:  When were the acts that he did in

14   connection with this trial?

15           MR. DRATEL:  2007.

16           THE COURT:  I'm sorry.  The charges.

17           MR. DRATEL:  I think 2007, your Honor.

18           MS. KOVNER:  I think 2006 would be the last possible

19   time.

20           THE COURT:  Only one of us at a time.

21           MR. DRATEL:  I'm sorry.

22           THE COURT:  Not three of us.  You can talk to each

23   other, if you want.  What I'm asking is when were the events

24   that are at issue here he was involved with.  Speak to each

25   other.

D49Wbej4

1          MR. DRATEL:  I'm just looking for his 3500 material,

2     which I have here.

3               There are affidavits.

4               THE COURT:  Just talk to each other.

5               MR. DRATEL:  Oh.  I'm sorry.

6               THE COURT:  All right.  When are the translations that

7     he's involved with here?  When did they take place?

8               MS. KOVNER:  Your Honor, the witness met with

9     Mr. Bejaoui, I believe, in 2006.  Mr. Dratel points out that

10    there was later a submission to the DMV, some affidavits were

11    faxed.  These are affidavits signed by drivers.  Mr. Lin sent

12    the fax, and that fax was sent in 2007.  His interactions with

13    Mr. Bejaoui were in 2006.

14              THE COURT:  Mr. Dratel, it seems to me driving while

15    impaired seems to be later than that, 2008 through 2010.

16              MR. DRATEL:  But it's a good faith basis for inquiring

17    about his cognitive abilities before that.  That wasn't the

18    first time he had a drink, I'm sure, was 2008.  I think I can

19    explore that, and if I get a no, I get a no.

20              THE COURT:  All right.  Again, I'll give the defense

21    some leeway here.  Don't spend a lot of time on it.  But I

22    don't think it goes very far.  I want to give you the

23    opportunity to impeach the government witnesses --

24              MR. DRATEL:  Thank you, your Honor.

25              THE COURT:  -- to the extent that there's a basis.

D49Wbej4

```
1              MR. DRATEL:  Thank you, your Honor.

2              MS. KOVNER:  Your Honor, if I may ask for just a

3    little bit of clarification on this.

4              THE COURT:  Yes.

5              MS. KOVNER:  Is your Honor permitting Mr. Dratel to

6    inquire as to whether the witness was an alcoholic or otherwise

7    impaired by alcohol in the period he met with the defendant?

8              THE COURT:  Yes.

9              MS. KOVNER:  Or does that also permit Mr. Dratel to

10   ask, Well, isn't it true that three years later you were

11   convicted of a DUI?

12             THE COURT:  No.

13             You understood that, Mr. Dratel?

14             MR. DRATEL:  I do.

15             THE COURT:  We're concerned about when he was dealing

16   with Mr. Lin.  And if the man says I wasn't drinking at that

17   time, it's not a proper line under my ruling for Mr. Dratel to

18   say, Weren't you convicted of DWI in 2010 or DWI -- they both

19   seem to be DWI -- in 2008.  No, he cannot.

20             MS. KOVNER:  Thank you, your Honor.

21             THE COURT:  Sadok Mejri.

22             MR. DRATEL:  Yes.

23             THE COURT:  Overstaying of the entry visa.

24             MR. DRATEL:  Doesn't say when it was resolved and when

25   he got his green card.  It could have been again a couple
```

D49Wbej4

1     months ago, could have been in the course of this case.

2                 THE COURT:: We'll see if it was.

3                 Government.

4                 MS. KOVNER:  It was not.  It was well before he ever

5     met with the government in connection with this case and

6     unrelated to this case.

7                 THE COURT:  All right.  Mr. Dratel.

8                 MR. DRATEL:  Was it in any way related to the prior

9     insurance investigation, because that predates the government's

10    investigation?

11                MS. KOVNER:  No.  He separately went to a lawyer on

12    his own.

13                MR. DRATEL:  That's fine, your Honor.

14                THE COURT:  Then I'm precluding cross-examination of

15    Sadok Mejri on his overstaying his visa.

16                I think that's it.  Have we done everybody?  Yes, I

17    think we have.

18                MR. DRATEL:  Yes, we have, your Honor.

19                THE COURT:  Let me put on the record the following

20    explication of my ruling yesterday; that is, in denying

21    Mr. Bejaoui's motion that I received on April 8, in which he

22    wanted to represent himself.  I put the reasoning on the record

23    then, but I'll do it in a fuller manner now, perhaps even a

24    fulsome manner.  Obviously, a great deal has happened today in

25    connection with the defendant's changing positions and changing

1  requests, but this is the basis for my determination yesterday

2  denying his motion to represent himself.

3          On April 8, I received a letter from the defendant,

4  which was dated March 26, and showed that it was filed in the

5  Southern District of New York on April 5, in which he claimed

6  he wanted to represent himself.  He said that Mr. Dratel had

7  committed professional misconduct based upon various strategic

8  decisions Mr. Dratel made in connection with this case.  The

9  venire had already been assembled by the time I saw that on the

10  morning of yesterday, April 8.

11          Defendants do have a Sixth Amendment right to

12  represent themselves, under Faretta.  I said that in my earlier

13  written opinion here and from the bench as well.  But in order

14  to exercise the right to self-representation, a defendant must

15  make a clear and unequivocal assertion that he wishes to do so.

16  That's Faretta, 422 U.S. 835.  "When a defendant changes his

17  mind repeatedly at any stage, a court may find that the conduct

18  is manipulative, abusive, or a vacillation, and a trial judge

19  may find the request equivocal."  Williams v. Bartlett, 44 F.3d

20  95, 101 (2d Cir. 1994).

21          The timing and frequency of these multiple and varying

22  requests for him to either represent himself or change counsel

23  are consistent with his history of attempting to manipulate

24  these proceedings.  For those reasons, I denied yesterday his

25  request to once again represent himself.  He had made those

1    requests before, and indeed at one point I allowed him to

2    represent himself, but he then said he wanted Mr. Dratel and

3    Bejaoui withdrew his right to represent himself.

4            At the beginning of the case, in June 2010, Steven

5    Kartagener was appointed to represent the defendant pursuant to

6    the Criminal Justice Act, and, two and a half months later, the

7    defendant requested new counsel.  The defendant, in open court,

8    on September 17, 2010, explained that his request for new

9    counsel was based on the fact that Mr. Kartagener had not filed

10   a number of motions that the defendant had insisted be filed,

11   and, on the record, Mr. Kartagener said that he did not have an

12   obligation to file frivolous motions; in fact, he had an

13   obligation not to file frivolous motions that had no real

14   possibility of success.

15           I think I put on the record also that with both Mr.

16   Kartagener and successor counsel, there were vigorous disputes

17   in open court, nothing that interfered with proceedings, but

18   the Court could observe that the discussions between Kartagener

19   and Bejaoui and then later Barrett and Bejaoui were heated and

20   they obviously were disagreeing with each other; that is,

21   Kartagener and Bejaoui were disagreeing with each other and

22   then later Barrett and Bejaoui were disagreeing with each

23   other.

24           At the request of Bejaoui, I did relieve Mr.

25   Kartagener and appointed new CJA attorney, Jean Barrett, and,

three months after she was appointed in December of 2010,

Ms. Barrett explained in a letter, dated December 22, that a

breakdown in communication had occurred and that Bejaoui wanted

new counsel.  Ms. Barrett explained she had conferred with Mr.

Bejaoui for "almost ten hours" over the course of two days, and

during that time the exchanges between the two of them had

become "increasingly unproductive" and ended with Mr. Bejaoui

"hurling accusations of incompetence" at Barrett and asking to

have her replaced.

I'd point out what was obvious, that that's exactly

what was occurring today, as in the past, when Mr. Dratel has

been the attorney.  He was hurling accusations of incompetence

at Mr. Dratel and, in fact, has filed a disciplinary proceeding

against Mr. Dratel and has been seeking to have him replaced,

just as he was doing with Ms. Barrett.

I've always tried to, as it were, bend over backwards

to assist the defendant, and, at his request, I again relieved

his then counsel, Ms. Barrett, and appointed Mr. Dratel to

represent Bejaoui.

At the December 23, 2010, hearing, when I appointed

Mr. Dratel, I did say that I would "be surprised if I were to

grant Bejaoui another attorney because each of the prior two

attorneys Mr. Bejaoui had problems with are experienced

criminal defense attorneys who had difficulty working with the

defendant," and I explicitly stated, "Mr. Dratel is going to be

1       the defendant's last attorney unless there are very unusual

2       circumstances."

3               Beginning in January of 2011, as everyone here knows,

4       questions arose concerning the defendant's competency to stand

5       trial.  His behavior had changed dramatically from active

6       participation in his defense to either refusing or being unable

7       to assist counsel in his defense.  I directed that there be

8       various psychological evaluations, and I appointed both defense

9       and government experts and ultimately conducted a two-day fact

10      hearing on the issue of Bejaoui's competency to stand trial.

11              In October of 2012, I concluded, at the conclusion of

12      that fact hearing, that the defendant was competent to stand

13      trial; he could understand the nature and consequences of the

14      proceedings against him, and he had the ability to assist

15      properly in his defense.

16              Shortly after I made that determination, Mr. Bejaoui's

17      affect changed dramatically -- I've put this on the record

18      before -- from being almost catatonic in court to once again

19      becoming extremely actively involved in his defense, again, as

20      we saw certainly today and yesterday, and he's been quite

21      animated with his counsel, and recently that has degenerated

22      into loud and angry discussions.

23              In November of 2012, the defendant again expressed

24      dissatisfaction with his attorney, and, on November 8, 2012, at

25      a hearing, he said he wanted new counsel, and I denied that,

D49Wbej4

1   finding that he had not stated an appropriate basis for his

2   request for new counsel.

3          A few weeks later, he applied to represent himself at

4   trial.  I held an extensive hearing -- the parties will

5   remember it -- and I questioned him extensively, and I

6   determined that his request to represent himself was knowing

7   and voluntary and explicit and he was competent to proceed pro

8   se.  I allowed him to represent himself.  I appointed

9   Mr. Dratel as standby counsel and because that was the actual

10  date of trial at that point -- my recollection is the venire

11  had been assembled then as well, I adjourned the trial.

12         No.  I'm sorry.  The venire was not assembled at that

13  time when I appointed Mr. Dratel.  When I allowed Mr. Bejaoui

14  to represent himself, I appointed Mr. Dratel as standby

15  counsel, the trial was set to begin on December 12, and

16  Mr. Bejaoui asked for an adjournment, which I granted because

17  Mr. Bejaoui said since he's now representing himself he needed

18  time to prepare.  I granted that and I adjourned the trial date

19  from December 12 to January 16.

20         The day before the January 16 trial date, Mr. Dratel

21  wrote me on behalf of Bejaoui stating that Bejaoui was

22  "uncertain whether he wanted to continue to represent himself

23  at trial."  Then on the trial date itself, January 16, when the

24  venire had already been called to court and were assembled to

25  appear here, Mr. Bejaoui made the determination to waive his

D49Wbej4

right to represent himself.  I accepted that determination and
I reappointed Mr. Dratel as his attorney, and I explicitly told
the defendant:  "If you decide you want Mr. Dratel to represent
you, you will not be able to change your mind.  You will not
get another lawyer.  You didn't want the previous lawyers
because they wouldn't agree with what you wanted."

Defendant stated on the record that he understood, and
because up until then, at the prior time, Mr. Dratel had been
simply standby counsel and he was unable to conduct the trial
starting that date, due to another previously arranged trial
date, I adjourned the trial to April 8.

On March 14, less than three weeks before the trial
date, Mr. Bejaoui again sought removal of Mr. Dratel, who just
two months before he had specifically said he wanted to
represent him.  Noting the record which demonstrates
defendant's contentious and dilatory behavior and the Court's
repeated warnings that any additional requests to change
attorneys would not be granted, I denied Mr. Bejaoui's motion
to relieve Mr. Dratel as counsel, in a written opinion on March
20.

Now, once again, waiting until the eve of trial,
Mr. Bejaoui again -- as I say, it was filed on April 5; I
received it on April 8 -- has sought to renew his right to
self-representation and proceed to trial pro se.  The record
clearly demonstrates that his behavior has been extraordinarily

D49Wbej4

1    equivocal.  That certainly was borne out today when he went

2    through a series of positions: that he wanted to plead guilty;

3    that he wanted to waive his right to be present?  That he

4    wanted to waive his right to a jury trial; that he wanted to go

5    to the MDC, a variety of different back-and-forth positions.

6    His behavior has certainly been equivocal and I have concluded

7    is motivated by an interest in manipulating the Court in

8    delaying the trial.  So for all of these reasons, yesterday, I

9    denied Bejaoui's motion to represent himself.  I'm quoting what

10   happened today as an example of the consistent and equivocal

11   and manipulative behavior.

12          That's my decision.  I'll see everybody by nine a.m.

13   tomorrow.  Thank you.

14          MR. DRATEL:  Thank you, your Honor.

15          MS. KOVNER:  Thank you, your Honor.

16          (Adjourned to April 10, 2013, at 9:00 a.m.)

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    DESIREE BENNETT-HOWELL

4    Direct By Ms. Kovner . . . . . . . . . . . .56

5    Cross By Mr. Dratel  . . . . . . . . . . . .90

6    KAREN COSTELLO

7    Direct By Ms. Kovner . . . . . . . . . . . 109

8    Cross By Ms. Lewis . . . . . . . . . . . . 125

9    Redirect By Ms. Kovner . . . . . . . . . . 137

10                   GOVERNMENT EXHIBITS

11   Exhibit No.                           Received

12    1    . . . . . . . . . . . . . . . . . . .62
      4    . . . . . . . . . . . . . . . . . . .68
13    5    . . . . . . . . . . . . . . . . . . .73
      200, 250, 300, 350, 351, 400, 500, and  . . . .76
14          600
      301  . . . . . . . . . . . . . . . . . . .79
15    7    . . . . . . . . . . . . . . . . . . .82
      302 to 317 . . . . . . . . . . . . . . . 111
16    3001A  . . . . . . . . . . . . . . . . . 122

17                   DEFENDANT EXHIBITS

18   Exhibit No.                           Received

19    1    . . . . . . . . . . . . . . . . . . .93

20

21

22

23

24

25
```