D4AABEJ1ps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4           v.               10 CR 553 (SHS)

5    MONDHER BEJAOUI,

6            Defendant.

7    ------------------------------x

8                          New York, N.Y.
                         April 10, 2013
9                         9:15 a.m.

10

11   Before:

12              HON. SIDNEY H. STEIN

13                       District Judge
                       - and a jury -

14

15               APPEARANCES

16   PREET BHARARA
        United States Attorney for the
        Southern District of New York
17   BY:  RACHEL KOVNER, ESQ.
        KAN MIN NAWADAY, ESQ.
18       Assistant United States Attorneys

19   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
        Attorneys for Defendant
20   BY:  JOSHUA L. DRATEL, ESQ.
        LINDSAY LEWIS, ESQ.

21

22   Also Present:  Michael Birley
                Special Agent, Federal Bureau of Investigation
23

                Ummi Ansari
24              Paralegal Specialist, U.S. Attorney's Office

25

D4AABEJ1ps

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning.  Everyone is here except the

3    defendant.  The jury is now complete.  We were waiting for

4    them.  I should tell you that my deputy informed me this

5    morning that the marshals told her that the defendant refused

6    to come to court this morning when they wanted to take him out

7    of the MDC.  I don't know why they would have wanted to take

8    him out of the MDC.  But the point is, it certainly reinforces

9    his position that he does not want to be present in court.

10             MR. NAWADAY:  Your Honor, if I can explain, Mr. Dratel

11   e-mailed me last night.  We had a system where he would e-mail

12   me whether the defendant would want to come or not.  He

13   e-mailed me last night, Mr. Dratel did, and informed us that he

14   did not want to come.

15             THE COURT:  "He" meaning?

16             MR. NAWADAY:  Mr. Dratel.

17             THE COURT:  "He" meaning Mr. Bejaoui?

18             MR. NAWADAY:  Oh, yes.

19             THE COURT:  I don't know Mr. Dratel's position, but I

20   take it you're saying that Mr. Bejaoui -- are you saying

21   Mr. Dratel told you last night that Mr. Bejaoui restated to

22   Mr. Dratel Mr. Bejaoui's decision that he did not want to

23   appear in court?

24             MR. NAWADAY:  Yes, your Honor.  And what I did was, I

25   e-mailed the marshals to inform them that Mr. Bejaoui did not

D4AABEJ1ps

1    want to come to court this morning, but I asked the marshals to

2    confirm in the morning, to keep Mr. Bejaoui on the list and

3    confirm in the morning with Mr. Bejaoui again.

4            THE COURT:  And have them do that, it's a good idea to

5    have them do that each morning.

6            MR. NAWADAY:  And that is the reason, probably, for

7    the marshals...

8            THE COURT:  I understand.  Have them do that each

9    morning.  Mr. Dratel, I take it you have no objection to that.

10           MR. DRATEL:  No, your Honor.

11           THE COURT:  Bring in the jury.

12           (Jury present)

13           THE COURT:  Please be seated.  Good morning, ladies

14   and gentlemen.  As you know, we cannot begin until all of you

15   are here.  Now all of are you here.

16           Next witness for the government.

17           MS. KOVNER:  Your Honor, the government calls Thomas

18   Canastar.

19    THOMAS CANASTAR,

20       called as a witness by the government,

21       having been duly sworn, testified as follows:

22           THE COURT:  Good morning, Mr. Canastar.  Welcome.

23   Please move your chair close to the mike and speak loudly and

24   clearly into the microphone.

25           THE WITNESS:  Thank you.

D4AABEJ1ps

| | |
|---|---|
| 1 | THE COURT:  Your witness, Ms. Kovner. |
| 2 | MS. KOVNER:  Thank you, your Honor. |
| 3 | DIRECT EXAMINATION |
| 4 | BY MS. KOVNER: |
| 5 | Q.  Mr. Canastar, how are you employed now? |
| 6 | A.  I'm retired. |
| 7 | Q.  From 2004 to early 2006, what were you doing then? |
| 8 | A.  I was employed by Robert Plan Corporation as an |
| 9 | investigator. |
| 10 | Q.  Before you joined Robert Plan, did you have any training in |
| 11 | investigation? |
| 12 | A.  Yes, I did.  I was employed by New York State Police as an |
| 13 | investigator. |
| 14 | Q.  For how long did you do that? |
| 15 | A.  20 years. |
| 16 | Q.  You mentioned you worked for the Robert Plan as an |
| 17 | investigator.  What is the Robert Plan? |
| 18 | A.  It's an insurance company that does underwriting for other |
| 19 | companies, for commercial risk policies. |
| 20 | Q.  What were your responsibilities as an investigator for the |
| 21 | Robert Plan? |
| 22 | A.  To conduct investigations on policies that were assigned |
| 23 | risks. |
| 24 | Q.  And what steps would you typically take as part of an |
| 25 | investigation of a policy? |

1   A.  To inspect the insured drivers and vehicles, to ensure that

2   they were currently of valid registration and current valid

3   driver's license for the drivers.

4   Q.  Would you take any steps to investigate if the territory of

5   the declared vehicle was the correct territory?

6   A.  I'm sorry.

7          THE COURT:  Yes.  I couldn't hear that either.

8   Q.  Would you take any steps to investigate whether the

9   territory for which the vehicles was insured was correct?

10  A.  Yes.

11  Q.  What steps would you typically take to do that?

12  A.  We would physically go to the location, listed on the

13  policy, and inspect the vehicles by taking photographs and

14  ensuring that the vehicle was the same that was registered.

15  Q.  You mentioned that The Robert Plan handled policies for

16  other insurance companies.  Is one of the companies that the

17  Robert Plan handled policies for a company known as AIU?

18  A.  Yes.

19  Q.  And in 2005 as part of your work as an investigator, did

20  you conduct an investigator of a car policy issued by AIU to a

21  company called Hampton Luxury Cars?

22  A.  Yes.

23  Q.  If we could publish -- as part of your investigation, did

24  you go through the application documents, the file for that

25  policy?

D4AABEJ1ps                    Canastar - direct

1   A.  Yes.  Upon receiving the electronic case, I would review it

2   and conduct various databases, generally the ISO claim search,

3   to verify whether the insured policyholder vehicles or drivers

4   had any claims against them.

5            MS. KOVNER:  If we could publish Government Exhibit

6   300, in evidence.

7   Q.  Mr. Canastar, if I may approach, I'm handing you now what

8   has been marked as Government Exhibits 300 and 309 for

9   identification.  Can you tell us, looking at the application of

10  Government Exhibit 300 in evidence, what the address was on the

11  application for Hampton Luxury Cars.

12  A.  15 Mygatt Street, Binghamton, New York.

13  Q.  Directing your attention now to Government Exhibit 309,

14  also in front of you, can you turn to the second page of that

15  exhibit.  Did the policyholder subsequently provide a new

16  address for that policy?

17  A.  Yes.

18  Q.  What was the new address?

19  A.  It was 2520 Vestal Parkway East, Private Mailbox No. 387,

20  Vestal, New York.

21  Q.  As part of your investigation, did you go to both of the

22  addresses that the policyholder had provided?

23  A.  Yes, I did.

24  Q.  Which one did you go to first?

25  A.  The Vestal Parkway address.

1   Q.  And when did you go to the Vestal Parkway address the

2   policyholder gave?

3   A.  On September 20th of 2005.

4   Q.  What did you find at that address?

5   A.  I found a small strip store in the Nextel plaza which

6   housed a UPS mailbox store.

7   Q.  Were you able to locate any of the insured cars at that

8   location?

9   A.  No, I was not.

10   Q.  Did you find any evidence that there was a livery cab

11   company based at that address?

12   A.  No, I did not.

13   Q.  Did you take photos when you went to 2520 Vestal Parkway?

14   A.  Yes, I did.

15   Q.  I'm showing you now what has been marked as Government

16   Exhibit 318A for identification.  Who took at the photos in

17   Government Exhibit 318A?

18   A.  Pardon?

19   Q.  Who took the photos in Government Exhibit 318A?

20   A.  I did.

21   Q.  And did you take them on the day that you did that

22   inspection?

23   A.  Yes, on September 20th.

24   Q.  What generally is shown in that page of photos?

25   A.  The first photograph in the upper left-hand corner is the

D4AABEJ1ps                    Canastar - direct

1    sign for the Nextel plaza, which lists the UPS store.

2    Q.  And just are all those photos, we'll go through them one by

3    one, but are all those photos photos of the 25 Vestal Parkway?

4    A.  Yes.

5            MS. KOVNER:  Your Honor, we would offer 318A.

6            MR. DRATEL:  No objection, your Honor.

7            THE COURT:  Admitted.

8            (Government's Exhibit 318A received in evidence)

9            MS. KOVNER:  Could we publish 318A.

10           THE COURT:  Ladies and gentlemen, you remember

11   yesterday when I was describing some of the things that would

12   happen in trial, I said evidence comes in by way of witnesses

13   testifying -- you obviously have seen that -- and also by way

14   of documents and other things being admitted into evidence.

15   Well, we had documents being admitted into evidence.  And now

16   there's something else, the photograph that's coming into

17   evidence.  You haven't had a stipulation yet.

18           Proceed.

19           MS. KOVNER:  Ms. Ansari, if we could publish 318A.

20   318A.

21   Q.  Mr. Canastar, can you explain to us, just starting in the

22   top left-hand corner, what each of those photos shows.

23   A.  All right.  The top left-hand corner is the sign at 2520

24   Vestal Parkway that shows the, in the lower right-hand -- or

25   lower left-hand corner the UPS store.

D4AABEJ1ps                    Canastar - direct

1   Q.  And the next one that's on the right, to the right of that.

2   A.  That's the front of the building.

3   Q.  The next, the bottom left.

4   A.  That's the rear of the building.

5   Q.  And then the next one.

6   A.  That's the rear part of the parking lot at the rear of the

7   building.

8   Q.  Where did you go after you went to this location, 2520

9   Vestal Parkway?

10  A.  15 Mygatt Street, Binghamton, New York.

11  Q.  And that's the address that the policyholder had listed on

12  the initial application?

13  A.  Yes.

14  Q.  Can you describe what you saw at 15 Mygatt Street in

15  Binghamton, New York.

16  A.  It's a white three-story frame building --

17          THE COURT:  When you say that's the address that the

18  policyholder listed on the initial application, the address the

19  policyholder had listed as what on the initial application?

20          THE WITNESS:  15 Mygatt Street.

21          THE COURT:  No, I'm sorry.  What was requested of the

22  policyholder?

23          THE WITNESS:  I --

24          THE COURT:  In other words, you say "the address the

25  policyholder had listed."  Do you know whether it was supposed

D4AABEJ1ps                    Canastar - direct

1    to be where the policyholder lived, where the cars were

2    garaged...

3              THE WITNESS:  Where the cars were garaged.

4              THE COURT:  Thank you.

5    Q.  What did you see at 15 Mygatt Street?

6    A.  Again, a three-story white-frame wooden building

7    containing, I believe it was eight apartments.

8    Q.  Did you find any evidence of a livery car business at 15

9    Mygatt Street?

10   A.  No.  None of the vehicles were found at that address.

11   Q.  And did you see any evidence of a livery cab business, like

12   an office for a business in the livery cab industry?

13   A.  No.  I checked the mailboxes within the building, and none

14   of them were listed to Hampton Luxury, the listed policyholder.

15   Q.  Were you able to find anybody at that location associated

16   with Hampton Luxury Cars?

17   A.  I interviewed a couple of the residents who were home at

18   the time.  And none of them were aware of the Hampton Luxury or

19   the vehicles' ever being there.

20   Q.  The Court asked you a few questions a moment ago about what

21   the Mygatt Street address was listed as on the application.  IF

22   we could just publish for a moment Government Exhibit 300.

23   Zoom in first on the top.  There are two places first we will

24   look at the very top.  What's the address listed for the

25   applicant here?  Can you just read.

D4AABEJ1ps                    Canastar - direct

1    A.  15 Mygat Street, Binghamton, New York.

2    Q.  And then if we could scroll down to the vehicle section of

3    the form, sort of in the middle of the form.  What's the

4    address that's listed as the principal place of garaging for

5    the vehicle on this form?

6    A.  The same address, 15 Mygat Street, Binghamton, New York.

7    Q.  Did you take photos when you went to 15 Mygatt Street in

8    Binghamton?

9    A.  Yes, I did.

10   Q.  Let me show you now what's been marked as Government

11   Exhibit 318B for identification.  Are those the photos that you

12   took at 15 Mygatt Street?

13   A.  Yes.

14           MS. KOVNER:  Your Honor, the government offers 318B.

15           MR. DRATEL:  No objection, your Honor.

16           THE COURT:  Do those cars accurate -- do those cars,

17   sorry.  Do those photographs accurately represent what you saw

18   that day?

19           THE WITNESS:  Yes.

20           THE COURT:  All right.  Admitted.

21           (Government's Exhibit 318B received in evidence)

22           MS. KOVNER:  Ms. Ansari, would you publish 318B.

23   Q.  Starting with the photo on the left, can you tell us with a

24   the photo shows.

25   A.  That's the front of 15 Mygatt Street, Binghamton, New York.

D4AABEJ1ps                          Canastar - direct

1   Q.  And the photo on the right.

2   A.  That's the rear of the building.

3   Q.  Did you search the phone books of Vestal in Binghamton to

4   determine if there was a listing for Hampton Luxury Cars?

5   A.  Yes.  I accessed the yellow pages for Vestal, New York, and

6   Binghamton for the Hampton Luxury company, but no listings

7   existed at that time.

8   Q.  Did you do searches of the DMV's records pertaining to the

9   drivers on the policies?

10  A.  Yes, I did.

11  Q.  What did you determine through those searches?

12  A.  That the drivers listed on the policy all had driver's

13  licenses and the addresses of the drivers included Bronx and

14  Manhattan.

15  Q.  Were you ever able to obtain an additional address for

16  Hampton Luxury Cars other than the two places where you did

17  inspections?

18  A.  No, I did not.

19  Q.  Were you ever able --

20          THE COURT:  Did you go on the Internet and put in

21  "Hamton Luxury Cars"?

22          THE WITNESS:  Yes.

23          THE COURT:  What did it show if anything?

24          THE WITNESS:  I don't recall at this time.

25          THE COURT:  Did you put in "15 Mygat Street,

D4AABEJ1ps                         Canastar - direct

1    Binghamton"?

2                    THE WITNESS:  Yes.

3                    THE COURT:  What did it show?

4                    THE WITNESS:  Just a residential listing for several

5    people.

6                    THE COURT:  All right.  Thank you.

7    Q.  Were you ever able to inspect the vehicles that were

8    insured under this policy?

9    A.  No.  We were unable to locate them.

10   Q.  Did you recommend, after visiting those addresses, that the

11   investigation be closed?

12   A.  Yes.

13   Q.  Did you know what happened to the policy after that?

14                   MR. DRATEL:  Objection, your Honor.  Foundation.

15                   THE COURT:  Well, you can lay a foundation.

16                   MS. KOVNER:  Your Honor, the question I'm asking is

17   simply whether he knew.

18                   THE COURT:  We don't know that he in the normal course

19   would know.

20                   MS. KOVNER:  I anticipate that the answer may resolve

21   Mr. Dratel's objection.

22                   THE COURT:  All right.  Go ahead.  Ask it again.

23   Q.  Do you know ultimately what happened with the policy?

24   A.  Yes.  It was --

25                   MR. DRATEL:  Objection.

D4AABEJ1ps                          Canastar - direct

1          THE COURT:  Just a moment.

2    Q.  How do you know what happened with the policy?

3    A.  On the --

4          THE COURT:  Is it, sir, in the normal course of your

5    investigation, do you learn what happens to policies after your

6    investigation is closed, after you close your investigation?

7          THE WITNESS:  No.

8    Q.  Did you make a recommendation at the close of your

9    investigation?

10         MR. DRATEL:  Asked and answered.

11         THE COURT:  I'll allow it.  Did you make a

12   recommendation at the time you closed your investigation?

13         THE WITNESS:  Yes, as a --

14         THE COURT:  Just a moment.  Yes.

15   Q.  And who makes the final decision about what to do with a

16   policy after that?

17   A.  It would be the underwriter of the company.

18         MS. KOVNER:  Nothing further, your Honor.

19         THE COURT:  All right.  Cross.  Thank you.

20         MR. DRATEL:  Thank you, your Honor.

21         THE COURT:  It's important just to listen to the

22   question and answer only the question that's being asked.

23         THE WITNESS:  All right.

24   CROSS EXAMINATION

25   BY MR. DRATEL:

1   Q.  Good morning, Mr. Canastar.

2   A.  Good morning.

3   Q.  Now, when you did your investigation, you memorialized what

4   you did in the investigation, right?

5   A.  Are you saying that I filed a report?

6   Q.  Yes.

7   A.  Yes, I did.

8   Q.  And obviously this was going on almost, about seven and a

9   half years ago now, right?

10  A.  Yes.  Yes, sir.

11  Q.  One of the reasons you file reports is obviously to write

12  down important things so that when you have to testify six,

13  seven, eight years later, perhaps, you don't have to try to

14  remember it all from your head.

15  A.  Correct.

16  Q.  Now, when you did the investigation at 15 Mygatt Street,

17  you also learned of the -- someone named Ziad Ksouri, is that

18  correct, K-s-o-u-r-i?

19  A.  Yes.

20  Q.  And in fact, someone at the UPS store told you that --

21          MS. KOVNER:  Objection.

22          MR. DRATEL:  It's part of the investigation, your

23  Honor.

24          THE COURT:  I'll allow it not for the truth but simply

25  for the fact that it was said.

D4AABEJ1ps                    Canastar - cross

1    Q.  -- that Mr. Ksouri came in every other day to pick up the

2    mail from that UPS mailbox for Hampton Luxury Cars, right?

3    A.  Yes.  The employee stated that.

4            THE COURT:  Ladies and gentlemen, I allowed that in

5    for a limited purpose, not for you to determine whether or not

6    the statement that was made to him was true, but simply for the

7    fact that the testimony is the statement was made to him.

8    That's all, for a limited purpose.

9            Proceed.

10           MR. DRATEL:  Thank you, your Honor.

11   Q.  Now, if you look at -- do you still have Government's

12   Exhibit 300 in front of you, the application?

13   A.  Yes.

14   Q.  If you look in the upper left-hand corner, it says "the

15   producer."

16   A.  Yes.

17   Q.  Gheith Insurance Agency, 323 Ninth Street, Brooklyn?

18   A.  Correct.

19   Q.  The telephone number?  Right?

20   A.  Yes.

21   Q.  Did you ever contact Gheith Insurance Agency?

22   A.  No.

23   Q.  Did you call them to ask them whether they knew where

24   Hampton Luxury Cars was, where you could find the owners?

25   A.  No.

D4AABEJ1ps                    Canastar - cross

1    Q.  You never called them.

2    A.  No.

3    Q.  Now, if you look underneath there, there's a business

4    telephone box.  Do you see?  Right?

5    A.  Correct.

6    Q.  With a phone number.  (917) 217-1933.

7    A.  Correct.

8    Q.  You never called that either, right?

9    A.  Uh, I don't recall.

10   Q.  It's not in your report.  Do you want to see your report?

11   A.  Yes, please.

12   Q.  OK.  I have to give you your entire -- if you just want to

13   leaf through there.

14   A.  (Pause)  This appears to be the electronic file that was

15   presented to me at the time I was assigned the case.

16   Q.  All right.  But you also see, if you look at page 3, you

17   also see something called investigation history, right?  That's

18   you review, right?

19   A.  Yes.

20   Q.  Two-page document --

21   A.  Yes.

22   Q.  -- setting forth what you did.  At the bottom you say the

23   investigation should be closed, right?

24   A.  Yes.

25   Q.  Never called that 917 number, right?

D4AABEJ1ps                    Canastar - cross

1   A.  No, I did not.

2   Q.  If you look at page 2 of the application -- I'm sorry --

3   page 3 of the application -- there's a signature, right?  There

4   are two signatures, right?

5   A.  Yes.

6   Q.  And it says "M. Bejaoui"?  Is that legible?  You can read

7   that?  It says B-e-g -- I'm sorry -- B-e-j-a-o-u-i, right?

8   A.  Yes.

9   Q.  Did you ever look for that person?

10  A.  No, I did not.

11  Q.  You never called up Gheith Insurance Agency and said, do

12  you know where I can find Mr. Bejaoui --

13  A.  No, I did not.

14  Q.  -- the signatory?

15          Now, you went once to each location, correct?

16  A.  Correct.

17  Q.  What time of day?  During the day?

18  A.  Yes.

19          MR. DRATEL:  Nothing further, your Honor.

20          THE COURT:  All right.  Thank you.

21          MS. KOVNER:  Nothing further, your Honor.  Thank you.

22          THE COURT:  You are excused, Mr. Canastar.  Thank you

23  very much.

24          THE WITNESS:  Thank you.

25          THE COURT:  If you would give those documents to

D4AABEJ1ps                    Canastar - cross

1   whoever gave them to you.

2              (Witness excused)

3              THE COURT:  Next witness for the government.

4              MR. NAWADAY:  The government calls Scott Schuster.

5    SCOTT SCHUSTER,

6         called as a witness by the government,

7         having been duly sworn, testified as follows:

8              THE COURT:  Good morning, sir.  Please be seated.  You

9    are your witness, Mr. Nawaday.

10   DIRECT EXAMINATION

11   BY MR. NAWADAY:

12   Q.  Good morning.

13   A.  Good morning.

14   Q.  What do you do for a living?

15   A.  I am the president of a company called Servico.

16   Q.  Sir, if I could ask you to just speak a little closer to

17   the microphone.

18   A.  I am the president of a company called Servico.

19   Q.  What does Servico do?

20   A.  Servico assists people with the formation of business

21   entities and changing the names of corporations and amendments,

22   and various paralegal services.

23   Q.  Where is Servico located?

24   A.  We're located in Albany, New York.

25   Q.  How long has Servico been in business?  Approximately.

1   A.  Close to 90 years.

2   Q.  And how long have you been with Servico?

3   A.  30-plus years.

4   Q.  Are you familiar, as the president of Servico, with

5   Servico's practices in assisting the preparation of corporate

6   files?

7   A.  Yes, I am.

8   Q.  Please tell us just generally what a person has to do to

9   start a corporation in New York State.

10  A.  To start a business corporation in New York State, the

11  process is, we would send them a worksheet.  In most cases they

12  would fill out the worksheet with the name of the corporation,

13  the number of shares, the address for service of process, the

14  principal county it's located in, and then the client's billing

15  and information.  And the first thing that happens when you're

16  forming a corp. is, we would check for the availability of the

17  corporate name.  If the name is available, we would prepare the

18  certificate of incorporation using --

19  Q.  What -- I'm sorry.  What is the certificate of

20  incorporation?

21  A.  A certificate of incorporation is a document that gets

22  filed with the New York Secretary of State Office.  It's the

23  tool that you use to establish a corporation in New York State.

24  Q.  You mentioned the New York State, Secretary of New York

25  State.  Is that a government agency?

1    A.  It is.

2    Q.  Approximately how many certificates of incorporation does

3    Servico assist customers in filing annually?

4    A.  I could guesstimate between 5 and 10 thousand a year.

5    Q.  What information if any does Servico need to file a

6    certificate of incorporation?

7    A.  We would need the name of the corporation, the number of

8    shares, the address for service of process, the principal

9    county the business is located in, some --

10   Q.  What's the difference between the address for service of

11   process and the principal place of business?

12   A.  The principal place of business is the county that the

13   state requires on the document.  The address for service of

14   process is the address that a corporation can use for the state

15   to forward any legal papers they may be receiving and also tax

16   forms from the tax department, various documents from the

17   government.

18   Q.  Sir, are you familiar with the recordkeeping practices of

19   Servico?

20   A.  I am.

21   Q.  I'm going to hand you what have been marked for

22   identification as Government Exhibits 110 through 134.  Sir,

23   please take a look at those and tell me if you recognize those

24   documents.

25   A.  (Pause)  Yes, I do.

1   Q.  What are they generally?

2   A.  They're invoices and our office workpapers and worksheets

3   that we use in the office.

4   Q.  Are those records of Servico?

5   A.  Yes, they are.

6   Q.  Are the materials in front of you records that are kept in

7   the course of regularly conducted business of Servico?

8   A.  Yes, they are.

9   Q.  Are they made in and relied upon in Servico's regular

10  business activity?

11  A.  Yes, they are.

12          MR. NAWADAY:  Your Honor, the government offers

13  Government 110 through 134.

14          MR. DRATEL:  No objection, your Honor.

15          THE COURT:  Admitted.

16          (Government's Exhibits 110 through 134 received in

17  evidence)

18  Q.  Mr. Schuster, I'd like to walk through some of the

19  documents in front of you.  First, if we could turn to

20  Government Exhibit 113.

21          MR. NAWADAY:  Ms. Ansari, if you can put up 113,

22  please.

23  Q.  Mr. Schuster, do you recognize this document?

24  A.  I do.

25  Q.  What is it?

1    A.   That's a fax cover sheet from Brooklyn Village Accounting &

2    Insurance to a lady in our corporate department at Servico.

3    Q.   Who is that person at Servico?  Linda?

4    A.   Linda.

5    Q.   Looking at the phone number, the fax number under Linda's

6    name, do you recognize that number?

7    A.   Yes, I do.

8    Q.   What number is that?

9    A.   That's one of our fax numbers.

10   Q.   Turning to the second page of this document, Government

11   Exhibit 113, can you explain what we're looking at here.

12   A.   We are looking at a worksheet that Servico sent to this

13   person for the preparation and filing of a certificate of

14   dissolution.

15   Q.   What is a certificate of dissolution?

16   A.   A certificate of dissolution is a document that gets filed

17   with the secretary of state to dissolve a company.

18   Q.   And just focusing on the top portion of this document, what

19   information is set forth on the top portion of this worksheet?

20   A.   The name of the corporation, the date it was incorporated

21   in New York State, the dates of all the -- the names and the

22   addresses of all the officers of the company, the name of the

23   officer that's authorizing the dissolution, and then there's a

24   place to put in the client's information and credit card

25   information and phone number, etc.

D4AABEJ1ps                          Schuster - direct

1    Q.   Where did Servico obtain all this information?

2    A.   That information comes from the client.

3    Q.   Is there anything attached, else attached to Government

4    Exhibit 113?

5    A.   There is.

6              MR. NAWADAY:  Ms. Ansari, if we can turn to the next

7    page, please.

8    Q.   What are we looking at here?

9    A.   We are looking at a copy of the filing receipt that's

10   generated by the Division of Corporations from the State of New

11   York, which is showing an amendment for a company by the name

12   of -- can you make that a little bigger, please.

13   Q.   Can you focus on the name.

14   A.   Yes.  Hamton Luxury Cars, Inc.

15   Q.   Who generates this document?

16   A.   The document, the filing receipt that we're looking at is

17   filed by the Secretary of State Office in Albany.

18   Q.   There is a county designation on the right side of this

19   document.  Do you know what that county is designated as?

20   A.   Yes.  That's the code for Broome County.

21   Q.   There's also an address for a servicing process.  What's

22   the address that's set forth there?

23             THE COURT:  Do you mean where it says "address for

24   process"?

25             MR. NAWADAY:  Yes.  Address for process.  Thank you.

D4AABEJ1ps                    Schuster - direct

1   A.  The address for process on the filing receipt is 2520

2   Vestal Parkway East, Suite 2, Vestal, New York, 13850.

3            THE COURT:  When it says "the corporation," what is

4   that?

5            THE WITNESS:  The corporation, Hamton Luxury Cars.

6            THE COURT:  What is an address for process?

7            THE WITNESS:  An address for process is the address

8   that the client wants to use for a business to accept any

9   service of process, any tax forms, any government documents

10  should be sent to that address.

11           THE COURT:  And what is process?

12           THE WITNESS:  What is process?

13           THE COURT:  Yes.

14           THE WITNESS:  Process is, there may be legal actions

15  against the company so they'll -- summonses or subpoenas would

16  go to that address.

17           THE COURT:  In this case who's the client?

18           THE WITNESS:  Who is the client?

19           THE COURT:  You said "the client."  Who is the client?

20           THE WITNESS:  The client is the person that ordered

21  the dissolution.

22  Q.  And turning back to the page prior to this last page,

23  Ms. Ansari, can you tell from this document who the client who

24  requested the dissolution is, Mr. Schuster?

25  A.  The client's name is, I believe the first name is Mondher

D4AABEJ1ps                    Schuster - direct

1  Bejaoui.

2  Q.  I'd like to turn to Government Exhibit 110.  It should be

3  in front of you.

4  A.  Yes.

5  Q.  Do you recognize this document?

6  A.  I do.

7  Q.  What is it?

8  A.  This is a copy of our invoice for services for the articles

9  of dissolution, preparing the articles of dissolution.

10  Q.  For which company were the articles of dissolution

11  prepared?

12  A.  Can you blow that up for me?

13          MR. NAWADAY:  Ms. Ansari, if you can focus on the

14  middle of the document.

15  A.  Hamton Luxury Cars, Inc.

16  Q.  And Mr. Schuster, if you can describe where on this invoice

17  you were getting that information?

18  A.  In the middle of the invoice it has the work, it says

19  "Prepare and attempt to file articles of dissolution, Hamton

20  Luxury Cars, Incorporated."

21  Q.  Are you able to tell for whom the articles of dissolution

22  were filed, from this document?

23  A.  Excuse me?

24  Q.  Are you able to tell for whom the articles of dissolution

25  the client was?

1   A.  Yes.

2   Q.  I'll direct your attention to the "sold to" column.

3   A.  Mondher Bejaoui, Brooklyn Village Accounting & Insurance.

4   Q.  What's the address that's given there?

5   A.  Looks like 99 Smith Street, Brooklyn.

6   Q.  I'd like to turn to Government Exhibit 116.  Is this the

7   certificate of dissolution that was prepared by Servico for

8   Hamton Luxury Cars?

9   A.  Yes, it was.

10  Q.  On the bottom it lists the president of Hamton Luxury Cars.

11  Who is listed there?

12  A.  Mondher Bejaoui.

13  Q.  I'd like to turn to Government Exhibit 115.  What is this

14  document?

15  A.  This is a fax cover sheet from the client -- from Linda to

16  the client -- Linda of my office to the client -- asking for

17  some additional information.

18  Q.  And who is the client here after the "to," colon?

19  A.  Mondher.

20  Q.  What if anything is attached to this fax cover sheet?

21  A.  The worksheet for preparation.

22  Q.  Of what?

23  A.  Preparation and filing of the New York certificate of

24  dissolution.

25  Q.  What is the consideration that the client is seeking to

D4AABEJ1ps                    Schuster - direct

1   dissolve?

2   A.  Vestal Limousine Corp.

3   Q.  There's also a listing for the officers and directors.  Who

4   is listed as the officers and directors for Vestal?

5   A.  Sadok Mejri.

6   Q.  There's also billing information?

7   A.  There is.

8   Q.  Who is billing information is set forth at the bottom?

9   A.  Mondher Bejaoui, Brooklyn Village Agency.

10  Q.  I'd like to turn to Government 118.  What are we looking at

11  here?

12  A.  We are looking at a worksheet that was sent from Servico

13  for the preparation and filing of a certificate of

14  incorporation for a new business.

15  Q.  Can you tell from this what the new business that's being

16  incorporated is?

17  A.  Bejaoui Express, Incorporated.

18  Q.  Is there an address provided for the service of process?

19  A.  There is.

20  Q.  What is that?

21  A.  5 Brewster Street, No. 119, Glen Cove, New York 11542.

22  Q.  There's also a person requesting this to be done on the

23  bottom.  Who is the person listed there?

24  A.  Ihab Tartir.

25  Q.  Does the customer -- and I mean the person requesting the

1   incorporation or dissolution -- have to be someone affiliated

2   with the company?

3   A.  No.

4   Q.  Who is the customer typically?

5   A.  Either -- it's typically the client directly or an attorney

6   or an accountant that they're working with.  That's the typical

7   way.

8   Q.  Does the client or customer have to be an officer or board

9   member?

10  A.  No, they don't.

11  Q.  If I could turn to Government Exhibit 120, is that a copy

12  of the filing receipt for Bejaoui Express?

13  A.  It is.

14  Q.  Now I'd like to turn to 121.  And what is this?

15  A.  This is an actual copy of the original certificate of

16  incorporation that was prepared by Servico and filed with the

17  secretary of state's office.

18  Q.  I'd like you to turn to the second page of the certificate

19  of incorporation.  At the bottom there's a signature.  Do you

20  recognize that signature?

21  A.  Yes.

22  Q.  Whose signature is it?

23  A.  That's my electronic signature.

24  Q.  It shows that you're signing as an incorporator.

25  A.  Right.

D4AABEJ1ps                    Schuster - direct

1    Q.  What is an incorporator?

2    A.  An incorporator is a person over the age of 18 that acts as

3    an agent for the request for the document to process it

4    quickly, because we have an office in Albany and we're their

5    resource.

6    Q.  Do you have any affiliation with a company for whom you act

7    as an agent to incorporate after it's incorporated as a

8    shareholder?

9    A.  No, we don't.  No, I don't.

10   Q.  And do you have any such affiliation with the company as a

11   president or officer?

12   A.  No.

13   Q.  I'd like to turn to Government Exhibit 123.  What is that?

14   A.  That is a worksheet for preparation and filing of a

15   certificate of incorporation to establish a new business.

16   Q.  What's the new business?

17   A.  Pedro Limousine Corp.

18   Q.  Can you tell from this document who is requesting the

19   creation of Pedro Limousine?

20   A.  Mondher Bejaoui.

21   Q.  And what is the address given on Government Exhibit 123 for

22   the service of process?

23   A.  The address for service of process that they listed was 99

24   Smith Street, Brooklyn, 11201.

25   Q.  Let's turn to Government Exhibit 124.  Am I right that this

1   is a corporate receipt for the incorporation of Pedro

2   Limousine?

3   A.   Correct.

4   Q.   What's the county listed on this document?

5   A.   Kings County, Brooklyn.

6   Q.   Where are you looking again on that?

7   A.   I'm looking to the right side of the page under the "Pedro

8   Limousine" to the right, under where it says "entity name:

9   Pedro Limousine," to the right of it it says "King."  That's

10  the abbreviation New York State uses at the secretary of

11  state's office for Kings County.

12  Q.   And the address for process is listed where?

13  A.   Yes.  99 Smith Street, Brooklyn, New York, 11201.

14  Q.   I'd like to turn to Government Exhibit 125.  What are we

15  looking at here?

16  A.   This is a worksheet of -- a Servico employee took

17  information over the phone from Merci Account -- Mondher

18  Bejaoui at Merci Accounting.

19  Q.   Can you tell what the request was from this worksheet?

20  A.   For a corporation by the name of Pedro Limousine Corp.,

21  they want to change the address from the current address to a

22  new address.

23  Q.   What is the new address?

24  A.   518 Hooper Road, No. 292, Endwell, New York 13760.

25  Q.   Is there credit card information set forth on this

1    document?

2    A.  There is.

3    Q.  Where is that located?

4    A.  It's under where it's "Mondher Bejaoui, Merci Accounting."

5    To right of it there's a little notation that says "c/c," which

6    means credit car number.

7    Q.  So after the "c/c#," is that the credit card number?

8    A.  It is.

9    Q.  Is that the number to charge for the service?

10   A.  That's correct.

11   Q.  I'd like to turn to Government Exhibit 126.  What is that

12   document?

13   A.  That is a worksheet for the preparation and filing of a

14   certificate of change for the corporation of Pedro Limousine to

15   change an address.

16   Q.  It's the address that it's being changed to.

17   A.  The new address that it was changed to is 518 Hooper Road,

18   No. 292, Endwell, New York 13760.

19   Q.  Do you recognize the handwriting on the right side of this

20   page?

21   A.  Yes, I do.

22   Q.  Where it says "to:  Mr. Bejaoui," whose handwriting is

23   that?

24   A.  That is Jodie Crowley from my office.

25   Q.  Could you please look at Government Exhibit 127.  I'm

D4AABEJ1ps                    Schuster - direct

1   sorry.  Could you blow that up.  Thank you.  This is a

2   corporate receipt for Pedro Limousine?

3   A.  Yes, it is.

4   Q.  What does it show the county as now?

5   A.  It now has Broome County.

6   Q.  And what's the address for service of process now?

7   A.  518 Hooper Road, No. 292, Endwell, New York, 13760.

8   Q.  Mr. Schuster, I apologize, you may have already answered

9   this, but what is the difference between the county designation

10  and the address for process?

11  A.  The county designation, county they call the principal

12  office where the business is located, is the county

13  designation, where the business is going to principally

14  operate.

15  Q.  I'd like to turn to Government Exhibit 129.  What is that

16  worksheet for?

17  A.  That is a worksheet for the preparation and filing of a

18  limited liability company.

19  Q.  What is the limited liability company that's being created?

20  A.  Brooklyn Village Realty & Business Advisors LLC.

21  Q.  What is the county of principal office and the service of

22  process address?

23  A.  99 Smith Street, Brooklyn, 11201, Kings County.

24  Q.  Can you tell from this document who the customer requesting

25  this creation of an LLC is?

D4AABEJ1ps                    Schuster - direct

```
 1  A.  Mondher Bejaoui, Merci Income, I think it says?

 2           (Pause)

 3           THE COURT:  Sir, be careful of the top.  Open the top

 4  first.

 5           THE WITNESS:  Open it up?

 6           THE COURT:  Yes, a little.  It's a trick.  It spills

 7  water on my witnesses.

 8           THE WITNESS:  OK.  Thanks for the heads up.

 9           THE COURT:  Not my witnesses, the parties' witnesses.

10           Go ahead.

11  Q.  Mr. Schuster, I'd like you to turn to Exhibit 134.

12  Ms. Ansari, if you could pull that up.

13  A.  OK.

14  Q.  What is this document?

15  A.  That's a fax cover sheet sent to Jodie of my office from

16  Mondher of Brooklyn Village, LLC.

17  Q.  Now, are there documents attached to this fax cover sheet?

18  A.  There are.

19  Q.  Are there minutes of organization attached to this

20  document?  I'll direct your attention to, if you look in the

21  lower right-hand corner, there's a number 7159.

22  A.  There is.

23  Q.  This is, I'm sorry, the fourth page.  What are we looking

24  at here?

25  A.  Minutes of organization meeting, Merci Income Tax Services,
```

1   Inc.

2   Q.  It shows you -- it shows a sole incorporator there.

3   A.  It does.

4   Q.  Do you recognize that signature?

5   A.  Yes.  That's my signature, electronic.

6   Q.  Were you actually a participant in this meeting?

7   A.  No.

8   Q.  What is this document?

9   A.  This is a waiver that describes that we have no affiliation

10  with the company, that we just incorporate as a convenience and

11  everything gets handed over to the client.

12  Q.  Who gets this document?

13  A.  Part of it is by us, and then it's filled in by the client.

14  Q.  And there is a director name and signature below your

15  signature, under the words, "the undersigned accept their

16  nomination as directors."  Who is listed there?

17  A.  Mondher Bejaoui.

18  Q.  I'd like to turn to Government Exhibit 133.

19  A.  OK.

20  Q.  What are we looking at?

21  A.  We are looking at a certificate of amendment of the

22  certificate of incorporation for Merci Income Tax Services,

23  Inc.

24  Q.  And what is the name being changed to?

25  A.  Brooklyn Village Accounting & Insurance Agency, Inc.

1    Q.   Is there a person listed as the person authorizing the name

2    change?

3    A.   There is.

4    Q.   Who is that?

5    A.   Mondher Bejaoui.

6    Q.   Mr. Schuster, after a client asks for a company to be

7    incorporated or dissolved, who receives the actual corporate

8    documents once they are filed by you?

9    A.   They get sent back to the requester that ordered the order.

10   Q.   Do you receive them?

11   A.   First they come to our office, the certificate of

12   incorporation.  We attach the filing receipt that we receive

13   from the secretary of state.  We package it up.  And it gets

14   shipped to the client.

15   Q.   Mr. Schuster, I'm going to hand you what's been marked for

16   identification as 603.  It's not in front of you yet.  Please

17   take a look at that, and I'm actually going to direct your

18   attention to a particular page.  First on the second page, what

19   are you looking at there?

20   A.   A waiver of notice of organization meeting of Heather Limo

21   Corp.

22   Q.   There's a signature there.  Is that your signature?

23   A.   That's my electronic signature.

24   Q.   Just looking at these documents in Government Exhibit 603

25   marked for identification, what company do these documents

D4AABEJ1ps                      Schuster - direct

1    relate to?

2    A.   A company by the name of Heather Limo Corp.

3    Q.   Does that appear to be your signature as the incorporator

4    on that page?

5    A.   It does.

6    Q.   Mr. Schuster, did there come a time when you were asked by

7    the government to have the files of Servico reviewed to see if

8    Servico had ever assisted a client in filing incorporation

9    documents for a company called Heather Limo?

10   A.   Yes.

11   Q.   What were the results of that review?

12   A.   We couldn't find a record of Servico ever doing any work

13   for a company called Heather Limo Corp.

14   Q.   I'd like you to look at the last page of this document.

15   A.   Yes.

16   Q.   There's a customer reference number.

17   A.   Yes.

18   Q.   Do you know what a customer reference number is?

19   A.   I do.

20   Q.   What is it?

21   A.   It's a number that gets assigned automatically from our

22   system so we have a reference link to the secretary of state

23   where we can put that number in our system and it will call up

24   the document for us.

25   Q.   Is it a unique number?

D4AABEJ1ps                    Schuster – direct

1   A.   It is.  It's a unique number.

2   Q.   Does the customer reference number only relate to one

3   particular client of Servico?

4   A.   Correct.

5   Q.   Can more than one company for Servico -- withdrawn.

6            Can more than one company for which you file the

7   corporate documents have the same customer number?

8   A.   No.  It's a unique number.

9            MR. NAWADAY:  Your Honor, the government offers

10  Government Exhibit 603 subject to connection.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4aWbej2                          Schuster - direct

1              MR. DRATEL:  Your Honor, I'm going to object based on

2       the lack of foundation.  I don't know what connection --

3              THE COURT:  I can't hear you.

4              MR. DRATEL:  I don't know what connection there's

5       going to be.  So I'm going to object.

6              THE COURT:  You can explain to Mr. Dratel what the

7       connection you propose is.

8              MR. DRATEL:  Your Honor, obviously pending the

9       subsequent witness' effective identification and admission of

10      the document, I don't object in terms of that, but obviously I

11      wanted to not to --

12             THE COURT:  It's admitted subject to connection.

13             MR. DRATEL:  Right.

14             THE COURT:  If no connection is made, bring it to my

15      attention and I'll give an appropriate instruction to the jury.

16             MR. DRATEL:  Thank you.

17             THE COURT:  Admitted as limited by my statement.

18             (Government's Exhibit 603 received in evidence)

19             MR. NAWADAY:  Your Honor, may I have permission to

20      publish the document.

21             THE COURT:  Yes.

22             MR. NAWADAY:  Thank you.

23             THE COURT:  Ladies and gentlemen, that was a legal

24      issue.  For your purposes right now, you can listen to the

25      testimony and look at the exhibit.

D4aWbej2                    Schuster - direct

1   BY MR. NAWADAY:

2   Q.  Mr. Schuster, turning to the second page of Government

3   Exhibit 603, is that your signature there?

4   A.  That looks like my electronic signature.

5   Q.  Turning to the page after that, does that appear to be your

6   signature as well?

7   A.  Yes, it does.

8   Q.  Then at the last page, can you please point out the

9   customer reference number we were talking about?

10  A.  The customer reference number is 7209.

11  Q.  Did there come a time when you --

12          MR. DRATEL:  Your Honor, may we approach for a moment.

13          THE COURT:  Yes.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D4aWbej2                         Schuster - direct

1           (At the side bar)

2           MR. DRATEL:  I think we're in an area again of an

3    uncharged offense, and this is one that we were never really on

4    notice of, that they would have a witness come in and say

5    essentially Mr. Bejaoui forged this document.  That's what I'm

6    getting from him.  It's not their document, it's from an

7    insurance company.  I think what they're going to allege is

8    that he created this document by cutting and pasting from prior

9    documents that he had, and, first of all, the proffer as to how

10   it's relevant to the charges and then, second, if it is

11   relevant in some way, in other words, what's the basis for

12   putting it in at all, whether it's 403, whether 403 applies,

13   and then an instruction if, obviously, I fail to keep it out.

14          MR. NAWADAY:  Your Honor, if I may, first, as to the

15   notice portion, this is in the to wit clause of this particular

16   count relating to Heather.  In that to wit clause of the

17   indictment, it does say --

18          THE COURT:  Let me take a look.  Where is it?

19          MR. NAWADAY:  This is Heather Limousine.

20          THE COURT:  Count six, purported location.  Just a

21   moment.  It's in count six on the chart under the to wit clause

22   under false matters and application mailings for Heather

23   Limousine.  It says purported location of garaging and/or

24   operation in Endwell, New York; forged or fraudulent Department

25   of State filings.

D4aWbej2                         Schuster – direct

1           Go ahead.

2           MR. NAWADAY:  We have put them on notice of this

3   particular conduct.  In addition, it is relevant because it

4   will go to knowledge.  I expect Mr. Schuster is going to say

5   that he ran that customer reference number and it came back to

6   Bejaoui Express.  So the customer reference number on the

7   forged document actually comes back to Bejaoui Express,

8   according to his records.

9           THE COURT:  Sir.

10          MR. DRATEL:  All right.

11          THE COURT:  Let's proceed.

12          MR. DRATEL:  Okay.

13          THE COURT:  All right.  Let's proceed.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Proceed.

3    BY MR. NAWADAY:

4    Q.  Mr. Schuster, did there come a time when you reviewed

5    Servico's records to see who the Servico client was who is

6    associated with the customer reference number you see here, No.

7    7209?

8    A.  We did.

9    Q.  And what did you learn, if anything?

10   A.  We couldn't find a client associated with it.

11   Q.  I'm going to ask you to look at Government Exhibit 121,

12   which I believe is in front of you.  I think that is the

13   Bejaoui --

14   A.  Oh, right.

15   Q.  Is that the Bejaoui Express certificate of incorporation

16   that's already in evidence?

17   A.  It is.

18   Q.  Please turn to the last page of this document.

19   A.  Okay.

20   Q.  Is there a customer reference number?

21   A.  There is.  7209.

22             MR. NAWADAY:  Nothing further.

23             THE COURT:  Thank you.  Cross-examination.

24             MR. DRATEL:  Thank you, your Honor.

25   CROSS-EXAMINATION

D4aWbej2                          Schuster - cross

1   BY MR. DRATEL:

2   Q.  Good morning, Mr. Schuster.

3   A.  Good morning.

4   Q.  I just want to talk about address of service of process for

5   a moment.  That could be a lawyer's address, right?

6   A.  Correct.

7   Q.  Some other person involved with the corporation who is

8   designated by the corporation to receive the mail, or whatever

9   else, for purposes of an official address?

10  A.  It could be, yes.

11  Q.  And it doesn't have to be necessarily the place where the

12  corporation does its principal business?

13  A.  Correct.

14  Q.  And, in fact, companies from out of state or that have a

15  principal office out of state use the Secretary of State as the

16  agent for this process, right?

17  A.  They use the Secretary of State?

18  Q.  Yes, essentially as an agent for process.

19  A.  The Secretary of State's office?

20  Q.  Yes.

21  A.  You have to give the Secretary of State an address.  You

22  can't use the Secretary of State's office as an address for the

23  service of process.

24  Q.  But it could be the agent, though, for a corporation from

25  out of state for purposes of process itself?

D4aWbej2                         Schuster - cross

1   A.  Well, the Secretary of State can accept service of process,

2   but you have to give them the address that it's going to be

3   sent to.

4   Q.  Right.  But it could be out of sent to is what I'm saying

5   if it's an out-of-state corporation with a principal place of

6   business somewhere else?

7   A.  Sure.

8   Q.  Now, apart from what --

9           THE COURT:  Just a moment.  Is this what you're

10  saying, sir -- and don't let me put words in your mouth; I'm

11  just trying to understand your testimony -- that the Secretary

12  of State can be designated as the entity which a corporation

13  wishes to be served with service of process?  Is that correct?

14          THE WITNESS:  The Secretary of State is the state

15  agency that will accept the papers for the corporation, but you

16  must --

17          THE COURT:  All right.  I just want to take it slowly.

18  So you're saying the Secretary of State can agree to accept

19  subpoenas, complaints, things of that nature, for a

20  corporation?

21          THE WITNESS:  Correct.

22          THE COURT:  All right.  Then what, if anything?

23          THE WITNESS:  After they accept it, they will pass it

24  on, by certified return receipt mail or registered mail, to the

25  address that was given in the certificate of incorporation.

D4aWbej2                          Schuster - cross

1          THE COURT:  In other words -- again, I'm just trying

2     to understand it; if I'm incorrect, tell me; I'm not trying to

3     put words in your mouth -- when a corporation files its

4     certificate of incorporation with the Secretary of State, I

5     think you're telling me it designates a place where the

6     Secretary of State can serve the corporation with any legal

7     papers the Secretary of State has received --

8          THE WITNESS:  Correct.

9          THE COURT:  -- that are due to the corporation?

10         THE WITNESS:  Correct.

11         THE COURT:  Okay.  And I think Mr. Dratel's question

12    was, is this true even if the corporation puts down, We,

13    corporation, want you, Secretary of State, to serve us in

14    Bemidji, Minnesota, at 17 Green Drive, as opposed to someplace

15    in New York.  Is that right?

16         THE WITNESS:  That's true.

17         THE COURT:  Thank you.

18    BY MR. DRATEL:

19    Q.  Part of what Servico does is to assist clients in filing --

20    when I say assist, the worksheets are designed to give advice

21    to people on what information is necessary and how to be

22    successful in filing papers with the state?

23    A.  Well, we don't give advice.  We give them the worksheet,

24    and they complete it.

25    Q.  But what I'm saying is that you give them a worksheet that

1    says what information they need to provide?

2    A.  Right.  They fill in what we ask for.

3    Q.  If you don't get that, you can't file the papers, if you

4    don't get the information you seek?

5    A.  We have to have the information from the client.

6    Q.  I just want to go through -- do you still have the

7    exhibits?

8    A.  I do.

9    Q.  If we could go to Government Exhibit 116, that's the

10   dissolution for Hamton Luxury Cars?

11   A.  Right.

12   Q.  The date of that is January 11, 2007, right?

13   A.  Correct.

14   Q.  And go back to 115, which is the fax cover sheet.  Right?

15   A.  Right.

16   Q.  And a worksheet.  Do you have that, 115?

17   A.  I do.

18   Q.  If you look at the top left, there's a fax legend, right?

19   It's November 4 of '06, right?

20   A.  Correct.

21   Q.  And there's also a date on the fax cover sheet of 11/4/06,

22   right?

23   A.  Right.

24   Q.  Go to 118, please.  Now, that's a worksheet for Bejaoui

25   Express, correct?

1    A.  Correct.

2    Q.  And do you see the name?  It has Ihab Tartir?

3    A.  I do.

4    Q.  Do you know Ihab Tartir?

5    A.  I don't know him.  I know the name.

6    Q.  And there's nothing unusual about a name that's not

7    necessarily reflected in the name of the corporation, right --

8    A.  Right.

9    Q.  -- to be involved.

10          And he's also the person who paid, correct, at the

11   bottom?

12   A.  Yes.  If that was his credit card that he submitted.

13   Q.  Yes.  But it says name of card holder, Ihab Tartir?

14   A.  Right.

15   Q.  Go to 120, please.  And the date on that is January 12,

16   2005, right?

17   A.  The filing date, yes.

18   Q.  Right.  And that's for Bejaoui Express, right?

19   A.  Correct.

20   Q.  The incorporation?

21   A.  Right.

22   Q.  Go to 123, please.  And that's Pedro Limousine?

23   A.  It's a worksheet for Pedro Limousine Corp.

24   Q.  If we look at the top left, the fax legend is March 15,

25   2006?

1   A.  Yes.

2   Q.  Go to 125, please.  That's the address change?

3   A.  Correct.

4   Q.  And that's March 20, 2006?

5   A.  That's the date the lady in my office took the order.

6   Q.  Right.  That's five days after the incorporation, right?

7   A.  Right.

8   Q.  I'm sorry?

9   A.  Correct.

10  Q.  Yes.  Now let's go to 134, please.  On that second page,

11  the one right after the fax cover sheet, and this is for

12  Brooklyn Village, right, Brooklyn Village Accounting &

13  Insurance Agency?

14  A.  That's what's on the fax cover sheet, right.

15  Q.  If you see the second page, it's a document that says State

16  of New York Insurance Department?

17  A.  Right.

18  Q.  And it says Hossam Eldin, last name Alged?

19  A.  Right.

20  Q.  Right?  What is that?

21  A.  That looks like a license for somebody by that name.

22  Q.  To do what?  To sell insurance, right?  To be a broker?

23  A.  It says it's a, he's a producer.  The producer is licensed

24  as an insurance broker for a property and casualty company.

25  Q.  And his address is at 99 Smith Street, Brooklyn?

D4aWbej2                              Schuster - cross

1   A.  It is.

2   Q.  Do you know why that document is included in these papers?

3   A.  It looks like the client sent that to us.

4   Q.  Is it fair to say if it has to do with insurance business

5   that he's a licensed insurance broker?

6             MR. NAWADAY:  Objection.

7             THE COURT:  Sustained.

8   BY MR. DRATEL:

9   Q.  If you know whether a company that holds itself out as an

10  insurance agency needs a licensed broker to do that.

11  A.  I'm not sure.

12  Q.  Now, you obviously reviewed Government Exhibits 110 through

13  134 in preparation for your testimony?

14  A.  I did.

15  Q.  And those are all Servico documents, right?

16  A.  They are.

17  Q.  And there's nothing illegal about them, right, from your

18  point of view?

19            MR. NAWADAY:  Objection.

20  BY MR. DRATEL:

21  Q.  From Servico's point of view?

22            MR. NAWADAY:  Objection.

23            THE COURT:  Sustained.

24            MR. DRATEL:  I'll withdraw it.

25            THE COURT:  Sustained.  Rephrase.

D4aWbej2                    Schuster - cross

1   BY MR. DRATEL:

2   Q.  The documents are not unusual in the sense of what you do

3   in business every day at Servico in terms of filing either

4   dissolution applications or incorporation applications?

5              MR. NAWADAY:  Objection.

6              THE COURT:  I'll allow it.

7              You see documents of this nature all the time, right?

8              THE WITNESS:  I do.  That's what we do.

9              THE COURT:  With items filled out, on its face, there

10  doesn't appear to be anything unusual about these documents,

11  right?

12             THE WITNESS:  They look like our documents, yes.

13             THE COURT:  Right.

14  BY MR. DRATEL:

15  Q.  If there was something suspicious about it, you wouldn't

16  have filed these in the first place, right?  If your office had

17  suspicions about the legitimacy of these transactions, you

18  would not have filed them, your office would not have filed

19  them?

20             MR. NAWADAY:  Objection.

21             THE COURT:  Lay a foundation.

22  BY MR. DRATEL:

23  Q.  You trained your personnel on the rules and regulations of

24  corporate filings in the State of New York?

25  A.  Well, the information comes from the client, so if it's

D4aWbej2                         Schuster - cross

1    that way, we file it, we attempt to file it.

2    Q.  Right.

3              THE COURT:  In other words, am I correct that if the

4    proper boxes are all filled out, you file it?

5              THE WITNESS:  Correct.

6    BY MR. DRATEL:

7    Q.  And there's nothing in the documents themselves or the

8    information you got from the clients in this respect that would

9    raise a red flag that something is going on that Servico

10   shouldn't be part of?

11   A.  Correct.

12   Q.  Is that fair to say?

13   A.  Right.

14   Q.  You certainly wouldn't sign your name to anything like

15   that, right?

16   A.  No.

17             MR. DRATEL:  Nothing further, your Honor.  Thank you.

18             THE COURT:  Thank you.  Anything on redirect?

19             MR. NAWADAY:  No, your Honor.

20             THE COURT:  Thank you, Mr. Schuster.  You may step

21   down.

22             (Witness excused)

23             THE COURT:  Ladies and gentlemen, I think it's

24   appropriate for a break.  Would you like a break at this time?

25             All right.  Let's take ten minutes.  I'll stay up

D4aWbej2

            here.  We'll make it short.  And if the attorneys would get the

            documents from up here.

                      (Recess)

                      THE COURT:  Please be seated in the courtroom.

                      Next witness for the government.

                      MS. KOVNER:  Your Honor, the government would like to

            read in a stipulation between the parties.

                      THE COURT:  Now we have a stipulation.

                      MS. KOVNER:  The stipulation is marked Exhibit 2505

            for identification, and it read:

                      "It is hereby stipulated and agreed, by and between

            the United States of America, by Preet Bharara, United States

            Attorney for the Southern District of New York, Rachel Kovner,

            and Kan Nawaday, Assistant United States Attorneys, of counsel,

            and Mondher Bejaoui, the defendant, by and with the consent of

            his attorneys, Joshua Dratel and Lindsay Lewis, Esq., that:

                      "1.  If called to testify, a custodian of records of

            the New York Department of State Division of Corporations

            ('Division of Corporations') would testify as follows:

                      "A.  He or she is familiar with the record-keeping

            practices of the Division of Corporations;

                      "B.  Government Exhibit 100 consists of a true and

            correct copy of the certificate of incorporation of Bejaoui

            Express, Inc., which was filed with the Division of

            Corporations on January 12, 2005;

D4aWbej2

1          "C.  Government Exhibit 101A consists of a true and

2     correct copy of the certificate of incorporation of M&R General

3     Contractors, which was filed with the Division of Corporations

4     on May 18, 2005;

5          "D.  Government Exhibit 101B consists of a true and

6     correct copy of the certificate of amendment of M&R General

7     Contractors Corp., which was filed with the Division of

8     Corporations on May 31, 2005;

9          "E.  Government Exhibit 102 consists of a true and

10     correct copy of a certification of the Division of

11     Corporations, dated January 29, 2013, certifying that upon an

12     examination of the records of the Division of Corporations, no

13     certificate of incorporation for Heather Limo Corp. was found

14     on file with the Division of Corporations;

15          "F.  Government Exhibit 103A consists of a true and

16     correct copy of the certificate of change of the certificate of

17     incorporation of Pedro Limo Corp., which was filed with the

18     Division of Corporations on May 21, 2006;

19          "G.  Government Exhibit 103B consists of a true and

20     correct copy of the certificate of incorporation of Pedro

21     Limousine Corp., which was filed with the Division of

22     Corporations on March 16, 2006;

23          "H.  Government Exhibit 104A consists of a true and

24     correct copy of the certificate of incorporation of Merci

25     Income Tax Services, Inc., which was filed with the Division of

D4aWbej2

Corporations on January 12, 2005;

"I.   Government Exhibit 104B consists of a true and correct copy of the certificate of amendment of a certificate of incorporation of Merci Income Tax Services, Inc., which was filed with the Division of Corporations, on April 26, 2006;

"J.   Government Exhibit 105 consists of a true and correct copy of the certificate of incorporation of Vestal Limousine Corp., which was filed with the department of corporations on September 14, 2005;

"K.   The information contained in Government Exhibits 100, 101A, 101B, 102, 103A, 103B, 104A, 104B, and 105 was recorded by the Division of Corporations at or near the time the activity took place, was kept in the regular course of the Division of Corporations' regular business activity, and was relied on as a regular practice of the Division of Corporations.

"3.   The parties further stipulate and agree that Government Exhibits 100, 101A, 101B, 102, 103A, 103B, 104A, 104B, and 105, and this stipulation, may be received into evidence as Government Exhibits at trial."

Your Honor, that concludes the stipulation, and may we briefly publish the documents we referenced in the stipulation.

THE COURT:  Yes, but move the documents you intend to move into evidence as well as the stipulation.

MS. KOVNER:  Your Honor, the government offers

D4aWbej2

1    Government Exhibit 2505, the stipulation, and Exhibits 100,

2    101A, 101B, 102, 103A, 103B, 104A, 104B, and 105.

3              THE COURT:  Admitted.

4              (Government's Exhibits 2505, 100, 101A, 101B, 102,

5    103A, 103B, 104A, 104B, and 105 received in evidence)

6              MS. KOVNER:  May we publish first Government Exhibit

7    100.

8              THE COURT:  What do you intend to do with these on the

9    screen?

10             MS. KOVNER:  We just intend to briefly show what the

11   documents were.

12             THE COURT:  Go ahead.

13             MS. KOVNER:  We'll just pause to look at Government

14   Exhibit 100 first.

15             THE COURT:  Next.

16             MS. KOVNER:  If we could look at one of the changes

17   then, which is 103A.  And that's fine, your Honor.

18             THE COURT:  All right.  Next witness for the

19   government.

20             MR. NAWADAY:  The government calls Laura Hussein.

21             THE COURT:  Approximately how long do you think her

22   direct is going to be, sir?

23             MR. NAWADAY:  Approximately a half hour to 40 minutes,

24   your Honor.

25             THE COURT:  All right.  We're going to take our two

D4aWbej2

 1    hour lunch break today at 12:15 and be back by 2:15.

 2     LAURA HUSSEIN,

 3         called as a witness by the Government,

 4         having been duly sworn, testified as follows:

 5    DIRECT EXAMINATION

 6    BY MR. NAWADAY:

 7    Q.  Good morning.  What do you do for a living?

 8    A.  I'm a full-time grad student.

 9    Q.  I want to direct your attention, Ms. Hussein, to the time

10    period of 2005.  Were you employed then?

11    A.  Yes.

12    Q.  Who were you employed by?

13    A.  At the time I was employed by Ihab Tartir Law Office, and

14    then towards the end of the year, I was employed by Mondher

15    Bejaoui at Merci Income.

16    Q.  I want to start with the person you mentioned as Ihab

17    Tartir.  Who was that?

18    A.  He's an immigration attorney.

19    Q.  Where was Mr. Tartir's office located?

20    A.  305 Atlantic Avenue.

21             THE COURT:  305 what?

22             THE WITNESS:  Atlantic Avenue.

23             THE COURT:  In Brooklyn?

24             THE WITNESS:  Yes.

25    BY MR. NAWADAY:

D4aWbej2                          Hussein - direct

1    Q.   What was your title?

2    A.   Secretary.

3    Q.   Did any other people share the office at 305 Atlantic

4    Avenue at that time?

5    A.   Yes.  There were two other people.

6    Q.   Who were they?

7    A.   Mondher Bejaoui and Iman, who is a real estate broker.

8    Q.   What did Mondher Bejaoui do?

9    A.   He was an accountant.

10   Q.   Did there come a time when you stopped working for

11   Mr. Tartir?

12   A.   Yes.

13   Q.   Around when was that?

14   A.   Around November.

15              THE COURT:   November --

16              THE WITNESS:   2005.

17              THE COURT:   -- 2005?

18              THE WITNESS:   Yes.

19   BY MR. NAWADAY:

20   Q.   Ms. Hussein, if you could just pull yourself up a little

21   more.

22   A.   Oh, okay.

23   Q.   Thank you.

24              When you first started working for Mr. Bejaoui, where

25   was his office?

1   A.   He was located at the first door, on your left, inside the

2   office.

3   Q.   At 305 Atlantic Avenue?

4   A.   At 305 Atlantic Avenue.

5   Q.   Just generally, what did you do for Mr. Bejaoui at that

6   time?

7   A.   Just took care of paperwork, any miscellaneous things that

8   needed to be done in the office.

9   Q.   What business was Mr. Bejaoui in at that time?

10  A.   Accounting.

11  Q.   Did there come a time when he provided other services?

12  A.   Yes.  When we moved into our new office in January of 2006.

13  Q.   Where was that new office you moved to?

14  A.   99 Smith Street, Brooklyn, New York.

15  Q.   Approximately how far was the 99 Smith Street office from

16  305 Atlantic Avenue?

17  A.   Right across the street and around the corner.

18  Q.   You said that Mr. Bejaoui started providing another

19  service?

20  A.   Yes.  He provided TLC insurance.

21  Q.   What do you mean by TLC insurance?

22  A.   He provided insurance for livery cab drivers at the time.

23          THE COURT:  TLC stands for Taxi and Limousine

24  Commission?

25          THE WITNESS:  Yes.  Oh.  I'm sorry.  Yes.

D4aWbej2                          Hussein - direct

1    BY MR. NAWADAY:

2    Q.  Do you know how Mr. Bejaoui obtained cab insurance for

3    drivers?

4    A.  I don't know the exact process.  All I know was if anyone

5    needed insurance, they came and they spoke to Mondher and he

6    did paperwork for them, and they were on a policy.

7    Q.  Do you remember any of the names of the policies?

8    A.  Bejaoui Express and Hamton Luxury.

9    Q.  Did there come a time when you actually went to an

10   insurance company office with Mr. Bejaoui?

11   A.  Yes.  That was just right before we moved to the new

12   office.  I was told to take a money order and some paperwork

13   and just go upstairs to the office and hand them in.  That's

14   all.

15   Q.  Where did you go?

16   A.  All I could remember was it was on 34th between Eighth and

17   Ninth, I think.

18   Q.  How did you get there?

19   A.  He drove me.

20   Q.  Who is he?

21          THE COURT:  In Manhattan?

22   A.  Mondher Bejaoui.

23          THE COURT:  In Manhattan?

24          THE WITNESS:  In Manhattan, yes.

25   BY MR. NAWADAY:

D4aWbej2                           Hussein - direct

1   Q.  Do you remember the name of the company you went to in

2   Manhattan?

3   A.  I think it was American -- it was American Transit or

4   American insurance, something like that.

5   Q.  What was the name of Mr. Bejaoui's business?

6   A.  At the beginning, when we first moved in, it was Merci

7   Income, and then we changed it to Brooklyn Village.

8           THE COURT:  When you moved, when you first moved in to

9   the new location, in January of '06?

10          THE WITNESS:  Yeah, it was Merci Income Taxes, and

11  then not so long, we moved, we changed it to Brooklyn Village.

12  BY MR. NAWADAY:

13  Q.  Who decided to change it to Brooklyn Village?

14  A.  Mondher did.

15  Q.  Mr. Bejaoui?

16  A.  Yes.

17  Q.  Let's change gears and talk about the office at 99 Smith

18  Street.  Can you provide a physical description of that office?

19  A.  Sure.  It was a main floor, street level.  You walked in.

20  It was like about mahogany, parquet floors.  There were four

21  desks once you walked in, and half a level up were three

22  stairs, which was Mondher's office, the bathroom, and then

23  stairs that would take you downstairs to the basement.

24  Q.  When you first walked in, you said there were four desks?

25  A.  Yes.

1    Q.   Who sat at those desks?

2    A.   Me and Hossam Alged at the time, when we first started, and

3    then we had two new employees.

4    Q.   Were there any partitions between those desks?

5    A.   No.

6    Q.   You mentioned that there were half-steps.  Where were those

7    half-steps?

8    A.   Right behind my desk.  It was about three steps, you go up,

9    and it was Mondher's office, Mr. Bejaoui's office.

10   Q.   Were there any partitions between Mr. Bejaoui's office and

11   the rest of the office?

12   A.   Yeah.  It was enclosed with glass.

13   Q.   Did anyone else have an office that was separate from the

14   rest of the office?

15   A.   No.  No one.

16   Q.   You mentioned a Hossam Alged?

17   A.   Yes.

18   Q.   What was his job?

19   A.   When, at the beginning, when they first started working

20   together, he was just basic, taking care of other, you know,

21   documents and stuff, and eventually he got his insurance

22   broker's license.

23   Q.   And we'll get back to that.

24        Who else besides Hossam worked at the office?

25   A.   Another employee named Kawsar Mansey and another employee.

1  I don't remember her name though.

2  Q.  What was Kawsar Mansey's job?

3  A.  Just basic office duties, filing, answering phones.  She

4  was in the process of getting her travelers license, but it

5  never fell through.

6          THE COURT:  What's a travelers license?

7          THE WITNESS:  For, to book flights.  I don't know how

8  you would put it.

9          THE COURT:  Oh, a travel agent?

10          THE WITNESS:  Travel agent.

11          THE COURT:  A license to be a travel agent?

12          THE WITNESS:  Yes.

13          THE COURT:  Okay.

14  BY MR. NAWADAY:

15  Q.  Who did you, Kawsar, and Hossam work for?

16  A.  Mondher Bejaoui.

17  Q.  I'd like to talk about the livery insurance side of the

18  business.  What kinds of people were the customers of that

19  business?

20  A.  95 percent of our customers were TLC drivers or owners of

21  car service or TLC-based vehicles.

22  Q.  Do you remember any specific owners?

23  A.  We had one specific owner who was right across the street

24  from us.  She owned the car service.  And two other clients

25  that were just basic owners of a couple of vehicles that were

1    on certain policies.

2    Q.  Do you remember the names of those people?

3    A.  I don't remember the lady's name who owned the business

4    across the street.  But I remember one, Olivia was one.  I

5    don't remember some of the other ones.

6    Q.  Do you know approximately how many vehicles were owned by

7    Mr. Bejaoui?

8    A.  He owned a couple.  Probably about ten vehicles.

9    Q.  I'd like to talk about when a new customer for livery

10   insurance came in.  What did you do when a new customer came

11   in?

12   A.  When they came in and they spoke that they needed

13   insurance, I would direct them to Mr. Bejaoui's office.  If, at

14   the time, he wasn't there, then Mr. Alged would, you know,

15   conduct whatever it is that needed to be conducted.

16   Q.  What were your duties at the office?

17   A.  I was basic office manager.  I took care of all the bills.

18   Anything that pertained to the office, any paperwork that

19   needed to be taken care of, any money transactions that needed

20   to be deposited into the accounts, but that was it.

21   Q.  Do you know how the customers of the livery insurance paid?

22   A.  They paid by cash.

23   Q.  Who collected the money?

24   A.  The majority of the time it was me.  If I wasn't there,

25   then Mr. Alged.  If not, then Mr. Bejaoui.

D4aWbej2                          Hussein - direct

1   Q.  When you collected the money, what did you do with it?

2   A.  At the end of the day, once the money was collected, it was

3   deposited into a bank account.

4   Q.  Do you know which bank account?

5   A.  Yeah, it was a Citibank account, which belonged to

6   Mr. Bejaoui.

7   Q.  Who directed you to make the deposits?

8   A.  Mr. Bejaoui.

9   Q.  Did you have to contact drivers when payments were due?

10  A.  Yes.

11  Q.  And how did that happen?

12  A.  Normally, when a driver was due for a payment, it would be

13  looked up.  I would call each driver when the payment was due,

14  and they would have to come in at that time and date that I had

15  spoke to them about.  If not, then I would constantly call them

16  until they came and paid their payments.

17  Q.  Who directed you to do that?

18  A.  Mr. Bejaoui.

19  Q.  About how many drivers, approximately, did you collect

20  money from during your time at that office?

21  A.  Roughly between 15 to 35.

22  Q.  Were you ever asked to pay parking tickets?

23  A.  Yes.

24  Q.  Who gave you instructions to pay parking tickets?

25  A.  Mr. Bejaoui.

1    Q.  And how did you do that?

2    A.  I would pay by debit card that belonged to Mr. Bejaoui.  I

3    would look up the vehicles, and if there was, if it was on

4    there, I paid it.  If a customer would call and tell us that

5    their cars were towed, then I would go online and pay them off.

6    Q.  Which vehicles did these parking tickets relate to?

7    A.  A lot of the TLC drivers who were on certain policies, and

8    Mr. Bejaoui's personal vehicle.

9    Q.  Do you know what kind of parking tickets these were?

10   A.  They were cleaning.  Cleaning, meter, fire hydrant.

11   Q.  What city was issuing the parking tickets?

12   A.  The majority were Brooklyn.

13           THE COURT:  I don't understand.  What's a cleaning

14   parking ticket?

15           THE WITNESS:  Oh.  When there was cleaning for the

16   streets at certain times.

17           THE COURT:  In other words, when it says no parking

18   9:30 to 11?

19           THE WITNESS:  Yeah.

20           THE COURT:  It doesn't say it, but because there's

21   cleaning going on?

22           THE WITNESS:  Because there's cleaning, yes.

23           THE COURT:  Okay.

24   BY MR. NAWADAY:

25   Q.  You said you used a debit card to pay the tickets?

1    A.  Yes.

2    Q.  Whose card?

3    A.  Mr. Bejaoui's.

4    Q.  How did you pay the tickets?  Did you write a check --

5    withdrawn.

6          Did you go to a Web site to pay the tickets?

7    A.  Yes.  I used the New York City pay-parking-tickets Web

8    site.

9    Q.  Do you know if Mr. Bejaoui also assisted drivers with

10   filing TLC paperwork?

11   A.  Yes, but he had runners who would do all the paperwork at

12   the DMV and the TLC commission.

13   Q.  What do you mean runners?

14   A.  There were one or two people that were appointed this

15   position.  Once Mr. Bejaoui would finish a transaction with the

16   drivers, after he's collected money, make copies of their

17   driver's license, the runners would come, take the paperwork,

18   go to the DMV or the TLC commission, and were able to obtain

19   license plates and registrations for these vehicles.

20   Q.  Do you remember the names of any of these runners?

21   A.  One was Jimmy.  The other one was Mohammed.  And Jose.

22   Q.  Do you remember somebody named Bakry?

23   A.  And Bakry, yes.  He was, he maintained a lot of the Bay

24   Ridge vehicles, a lot of the people who had car service offices

25   in Bay Ridge, and he would cause to get on policies, he would

1  do it.

2  Q.  Did he act as a runner, too, for Mr. Bejaoui?

3  A.  Yes.  Most of his things were at the TLC commission itself.

4  None of them were really at the DMV.

5  Q.  You mentioned a person named Jimmy?

6  A.  Yeah.

7  Q.  What did he look like?

8  A.  He was about five ten, five seven, skinny, black hair.

9  That's all I can remember.

10  Q.  Did you know someone named Sadok who was affiliated with

11  the office?

12  A.  Yes, but I barely remember what it was.

13  Q.  Do you know what Sadok's role was, if any, at the office?

14  A.  All I remember was that he had to do with vehicles being

15  brought in and some drivers, but exactly what it was, I don't

16  know.

17  Q.  Do you remember a person named Ziad?

18  A.  Yes.

19  Q.  Did he work at the office?

20  A.  He was Ihab Tartir's paralegal, so he wasn't at the office.

21  I mean, he never worked there and he was frightened of

22  Mr. Bejaoui, but that's all.

23  Q.  I just want to make sure.  So Zyad did not work at

24  Mr. Bejaoui's office?

25  A.  No.  No, he did not.

D4aWbej2                          Hussein - direct

1    Q.  When you worked at the office, Mr. Bejaoui's office, were

2    you ever present when license plates were distributed?

3    A.  Yes.

4    Q.  Who typically distributed those license plates?

5    A.  Mr. Bejaoui.

6    Q.  Was there anything distinctive about those license plates?

7    A.  Yeah.  They were all -- they had the basic TLC numbers.

8    Some of them that did come from the DMV were basic DMV, basic

9    car -- how do I put it?  They weren't TLC-directed type of

10   license plates.

11   Q.  How could you tell?

12   A.  The numbers were different.

13   Q.  So how can you tell if a license plate was a TLC license

14   plate?

15   A.  The normal ones we had, there was four -- there are three

16   letters and four numbers for a regular vehicle.  A TLC had the

17   TLC letters, and I don't remember the -- but they were more

18   numbers on the license plate.  They were distinguished from

19   each other in character.

20   Q.  Why don't we focus on the TLC plates.

21   A.  Okay.

22   Q.  What is it about the license plates you saw that made you

23   believe they were TLC plates?

24   A.  TLC letters.  They were the letters with the numbers.

25   Q.  Was there a T?

D4aWbej2                          Hussein - direct

1   A.  Yes.  Oh.  Okay.

2   Q.  Did there come a time when the business expanded to offer

3   insurance?

4   A.  Yes.

5   Q.  Around when was that?

6   A.  This was towards the end of March.

7           THE COURT:  What year?

8           THE WITNESS:  2006.

9   BY MR. NAWADAY:

10  Q.  How did you learn that the business was going to expand to

11  include providing insurance?

12  A.  Mr. Alged obtained insurance broker's license.

13  Q.  Whose idea was it for Mr. Alged to obtain a brokerage

14  license?

15          MR. DRATEL:  Objection.

16  A.  Mr. --

17          THE COURT:  Wait just a moment.

18          THE WITNESS:  Okay.

19          THE COURT:  If you know?  Do you know whose idea it

20  was for Mr. Alged to obtain a broker's license.

21          THE WITNESS:  Yes.

22          THE COURT:  Who?

23          THE WITNESS:  Mr. Bejaoui and Mr. Alged.

24          THE COURT:  Your objection is noted for the record.

25          How do you know that?

1          THE WITNESS:  Because they spoke about it in the

2     office while we were there, to go --

3          THE COURT:  Who?  Did Mr. Bejaoui say something?

4          THE WITNESS:  Yes.

5          THE COURT:  Do you know what he said?

6          THE WITNESS:  I don't remember the exact details, but

7     all I remember is he said he's going to pay for it.

8          THE COURT:  Mr. Bejaoui said he would pay for what?

9          THE WITNESS:  For Mr. Alged to go for classes in order

10    to obtain an insurance license in order to be able to provide

11    insurance in the office.

12    BY MR. NAWADAY:

13    Q.  Do you know if cars always stayed on the same policy?

14    A.  No, because there were times where Mr. Alged and Mr. --

15          MR. DRATEL:  I object to form, your Honor.

16          THE COURT:  Yes.  Sustained as to form.

17          The jury will disregard the answer, partial answer.

18    BY MR. NAWADAY:

19    Q.  Did you ever hear conversations in the office between

20    Mr. Bejaoui and Mr. Hossam?

21    A.  Yes.

22    Q.  Were those conversations ever concerning the vehicles that

23    were being insured?

24    A.  Yes.

25    Q.  What were some of the conversations you remember hearing?

D4aWbej2                          Hussein – direct

1              THE COURT:  Just from the standpoint of what

2       Mr. Bejaoui said.

3              Sir.

4              MR. DRATEL:  Also, if we could get a time frame, your

5       Honor.

6              THE COURT:  Yes.  When were these conversations?

7              THE WITNESS:  They were all the time.  I mean --

8              THE COURT:  In March of 2006?

9              THE WITNESS:  Yes.  After he, Mr. Alged obtained his

10      license, that's when a lot of the things started happening in

11      the office.

12             THE COURT:  Around March, did you hear a conversation

13      by Mr. Bejaoui concerning the vehicles that were being insured?

14             THE WITNESS:  Yes.

15      BY MR. NAWADAY:

16      Q.  What do you remember Mr. Bejaoui saying about the vehicles

17      that were being insured?

18      A.  I -- I don't understand exactly what you want me to --

19      Q.  You just said that you remember conversations between

20      Mr. Bejaoui and Mr. Alged?

21      A.  Yes.

22      Q.  And what do you remember Mr. Bejaoui saying during that

23      conversation?

24      A.  Conversations --

25      Q.  About insurance policies.

D4aWbej2                          Hussein - direct

1    A.   Conversations about where some vehicles needed to be

2    removed off search policies and put on to other policies.  That

3    was the majority of their conversations.

4    Q.   Who was saying that the cars needed to be removed from one

5    policy and put on another policy?

6    A.   Mr. Bejaoui.

7    Q.   Do you know if any of the cars during your time in the

8    office were ever subject to inspection?

9    A.   Yes.  There was --

10              MR. DRATEL:  Objection as to form, your Honor.

11              THE COURT:  No.  I'll allow it.  The answer is yes.

12   Next question.

13   BY MR. NAWADAY:

14   Q.   How do you know that?

15   A.   There came a time where Mr. Bejaoui required some vehicles

16   to go upstate because there was an inspector coming, so he

17   called and he made me call a couple of the owners to prepare

18   themselves that they would have to go upstate New York for an

19   inspection.

20              THE COURT:  You mean a Motor Vehicle Department

21   inspection?  Is that what you mean?

22              THE WITNESS:  No, it wasn't a Motor Vehicle Department

23   inspection.  There was an inspector coming from one of the

24   insurance companies.

25              THE COURT:  Oh.  All right.

1          THE WITNESS:  Yes.

2   BY MR. NAWADAY:

3   Q.  You said you handled the paperwork, some of the mailings,

4   for the office, is that right?

5   A.  Yes.

6   Q.  Do you know if any of Mr. Bejaoui's companies had addresses

7   in upstate New York or Long Island?

8   A.  The only one that I remember was one that had a Binghamton

9   address.  I don't remember the exact address, but that's the

10  only one.

11  Q.  We've spoken about Mr. Hossam Alged a little bit.  Did you

12  have a personal relationship at any time with him?

13  A.  Yes.  This was after I left Mr. Bejaoui's business.

14  Q.  Around when did you leave Mr. Bejaoui's business?

15  A.  Like the end of August 2006.  And me and Mr. Alged were

16  engaged in May of 2007.

17  Q.  Did you ever get married to him?

18  A.  No.

19  Q.  When was the last time you spoke with him?

20  A.  October 2007.

21  Q.  If a driver or customer had a problem or complaint about

22  their insurance, what did you do?

23  A.  I directed them to Mr. Bejaoui.

24  Q.  At the time you worked for Mr. Bejaoui, did you ever have

25  any role in filling out the insurance documents?

D4aWbej2                          Hussein – direct

1    A.  No.

2    Q.  Do you know what statements were being made in those

3    documents?

4    A.  No.

5              MR. NAWADAY:  May I have one moment, your Honor.

6              THE COURT:  Yes.

7              MR. NAWADAY:  No further questions.

8              THE COURT:  Thank you.

9              Any cross-examination?

10             MR. DRATEL:  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MR. DRATEL:

13   Q.  Good morning, Ms. Hussein.

14   A.  Good morning.

15   Q.  Now, initially, you worked for Mr. Tartir?

16   A.  Yes.

17   Q.  And he's an immigration -- is he still an attorney?

18   A.  No.

19   Q.  He was arrested, right?

20   A.  Yes, he was.

21   Q.  For immigration fraud?

22   A.  Correct.

23   Q.  Convicted?

24   A.  Correct.

25   Q.  And, initially, Mr. Bejaoui rented space from Mr. Tartir?

D4aWbej2                          Hussein - cross

 1    A.  Correct.

 2    Q.  And Mr. Tartir and Mr. Alged were brothers-in-law?

 3    A.  Yes.

 4    Q.  And Mr. Alged himself has been arrested several times in

 5    the United States?

 6    A.  Correct.

 7    Q.  Now, you were asked about conversations between Mr. Bejaoui

 8    and Mr. Alged with respect to vehicles that were insured,

 9    right?  Do you remember that, just a few minutes ago?

10    A.  Yes.

11    Q.  In fact, many of those conversations were arguments, right?

12    A.  Correct.

13    Q.  And they argued over money?

14    A.  Yes.

15    Q.  Right?

16    A.  Correct.

17    Q.  And they argued over certain issues with respect to the

18    cars themselves?

19    A.  Yes.

20    Q.  In fact, the police were called at one point?

21    A.  But that was on a personal matter.

22    Q.  Now, the account that you said that they were, the account

23    that money you deposited was a company account, correct?

24    A.  No.  It was a personal account.

25              THE COURT:  Were there company accounts, to your

D4aWbej2                              Hussein – cross

1    knowledge?

2              THE WITNESS:  Yes, there was.

3              THE COURT:  All right.  That's all.  I just asked

4    whether there were.

5              THE WITNESS:  Okay.

6              THE COURT:  Next.

7    BY MR. DRATEL:

8    Q.  You've been interviewed a few times by the government,

9    correct?

10   A.  Correct.

11   Q.  In preparation for your testimony?

12   A.  Yes.

13   Q.  And, do you recall being interviewed in early December of

14   2012?

15   A.  Yes.

16   Q.  Did you tell the government at that time that the money was

17   deposited in the company accounts?

18             THE COURT:  Do you remember what you told the

19   government?

20             THE WITNESS:  I honestly don't remember.

21             THE COURT:  All right.  Mr. Dratel, the witness does

22   not honestly remember.

23             MR. DRATEL:  Your Honor, if you would just give me one

24   second.

25             THE COURT:  Yes, of course.

D4aWbej2                        Hussein - cross

1              MR. DRATEL:  Thank you.

2    Q.  Let me show you what's marked as 3507B, 3507-B, and I'm

3    going to highlight a portion for you and ask you to look at it.

4    If you could just look at page two of that document, please,

5    and read the highlighted portion to yourself.  And I'll ask you

6    whether that refreshes your recollection as to whether you told

7    the government, December 1, 2012, in an interview, that you

8    deposited the cash and money and checks into a company account

9    at Citibank for which Mr. Bejaoui was the signatory.

10             THE COURT:  Now, Ms. Hussein, the question is simply

11   whether looking at whatever he showed you refreshes your

12   recollection.  It's not what's written there.

13             THE WITNESS:  Right.

14             THE COURT:  Okay?

15             THE WITNESS:  Okay.

16             THE COURT:  Does looking at that document refresh your

17   recollection?  Either yes or no.

18             THE WITNESS:  Yes.

19             THE COURT:  What is your refreshed recollection in

20   regard to what you told the government?

21             THE WITNESS:  That it was Mr. Bejaoui's company

22   account but with his name on it.

23   BY MR. DRATEL:

24   Q.  Thank you.

25             Now, Mr. Alged, when he got his broker's license, made

D4aWbej2                           Hussein - cross

1    Mr. Bejaoui open an account for him and add him as a signatory,

2    correct?

3    A.  Yes.

4    Q.  Now, Mr. Alged ultimately stole equipment from Mr. Bejaoui?

5    A.  I don't know.

6    Q.  Did you not act as a witness for a criminal complaint

7    against Mr. Alged for the stealing of a computer from

8    Mr. Bejaoui's office?

9    A.  No, I didn't.

10   Q.  I'm going to show you what I'll mark as defendant's 2 and

11   just direct your attention to two parts of this document.

12            MR. DRATEL:  If I may, your Honor.

13            MR. NAWADAY:  Your Honor, if we can see the document

14   too.

15            MR. DRATEL:  Oh.  I'm sorry.  Sure.

16   Q.  I show you what's marked as Defendant's Exhibit 2 for

17   identification and just focus you on two parts here, if I may.

18   One is this part here.  You can read that to yourself.  And

19   then also just note that part there on the second page, if you

20   could, please.

21   A.  Obviously, it wasn't me.

22   Q.  Well, does that refresh your recollection?

23   A.  No, I don't remember.

24   Q.  Do you remember telling the government that you, that

25   Mr. Alged stole a computer from Mr. Bejaoui at the end of their

D4aWbej2                        Hussein - cross

1   relationship?  Did you ever tell the government that?

2   A.  No, I don't remember that.

3   Q.  Mr. Alged left the United States, correct?  Right?  Went to

4   Egypt?

5   A.  Correct.

6   Q.  And when you broke off your engagement with him, it was

7   because you learned, in part, because he was operating an

8   insurance scam against your family, is that correct?

9   A.  Correct.

10  Q.  He had unlawfully opened up and collected on an insurance

11  policy in your father's name?

12  A.  Correct.

13  Q.  And you reported that to the police, right?

14  A.  Yes.

15  Q.  And then he fled the country?

16  A.  Correct.  Yes.

17  Q.  I'm sorry.  And also he made a false accusation against

18  you, correct?

19  A.  Correct.

20  Q.  With the police?

21  A.  Correct.

22  Q.  And that case was dismissed?

23  A.  Yes.

24  Q.  It was completely false?

25  A.  Correct.

 1   Q.  Now, you testified this morning about cars going upstate,

 2   Mr. Bejaoui directing you to contact drivers to go upstate,

 3   correct?

 4   A.  Correct.

 5   Q.  And so there were, in the course of your interviews with

 6   the government, didn't you tell the government -- withdrawn.

 7          In addition to that December 1 interview with the

 8   government, you also were interviewed by the government in late

 9   December, correct?

10   A.  Correct.

11   Q.  Would December 21 sound right?

12   A.  Yes.

13   Q.  And during that interview, didn't you tell the government

14   that you don't think it ever happened, that the drivers went

15   upstate?

16   A.  I don't -- I don't think they ever went up there.  No.

17          MR. DRATEL:  Nothing further, your Honor.  Thank you.

18          THE COURT:  Anything?

19          MR. NAWADAY:  May I have one moment.

20          THE COURT:  Yes.

21          MR. NAWADAY:  No, your Honor.

22          THE COURT:  Thank you, Ms. Hussein.  You're excused.

23   You may step down.

24          THE WITNESS:  Thank you.

25          (Witness excused)

D4aWbej2

1          THE COURT:  Next witness for the government, please.

2          MR. NAWADAY:  Your Honor, the government has another

3   stip to read in.

4          THE COURT:  All right.  Another stipulation.

5          MR. NAWADAY:  This is a stipulation.

6          "It is hereby stipulated and agreed, by and between

7   United States of America, by Preet Bharara, United States

8   Attorney for the Southern District of New York, Rachel Kovner,

9   and Kan Nawaday, Assistant United States Attorneys, of counsel,

10  and Mondher Bejaoui, the defendant, by and through consent of

11  his attorneys, Joshua Dratel and Lindsay Lewis that:

12         "1.  Government Exhibit 2000 fairly and accurately

13  depicts the location of 15 Mygatt Street, Binghamton, New York,

14  on the date the photograph was taken in 2012.

15         "Government Exhibit 2001 fairly and accurately depicts

16  the location of 50 Hill Street, Southampton, New York, on the

17  date the photograph was taken in 2012.

18         "Government Exhibit 2002 fairly and accurately depicts

19  the appearance of a mailbox inside the location of 50 Hill

20  Street, Southampton, New York, on the date the photograph was

21  taken in 2012.

22         "Government Exhibit 2003 fairly and accurately depicts

23  the location of 5 Brewster Street, Glen Cove, New York, on the

24  date the photograph was taken in 2012.

25         "Government Exhibit 2004 fairly and accurately depicts

D4aWbej2

1    the location 15 Mygatt Street, Binghamton, New York, on the

2    date the photograph was taken in 2012.

3            "And it is further stipulated and agreed that

4    Government Exhibits 2000 to 2006, and this stipulation, which

5    is Government Exhibit 2504, may be received in evidence at

6    trial.

7            The government moves Government Exhibit 2504 and

8    Government Exhibits 2000 through 2006 into evidence.

9            THE COURT:  Admitted.

10           (Government's Exhibits 2504, 2000-2006 received in

11   evidence)

12           MR. NAWADAY:  The government calls Allen Johnson.

13           THE COURT:  How long do you think this witness is

14   going to be, sir?

15           MR. NAWADAY:  15 minutes.

16           THE COURT:  All right.  And the next witness?

17           MR. NAWADAY:  15 minutes.  Maybe less.

18           Your Honor, while we're waiting, to move things along,

19   we'd like to read another stipulation.

20           THE COURT:  Of course.  Three stipulations.

21           MR. NAWADAY:  This is a stipulation.  It's marked for

22   identification as Government Exhibit 2502.  It reads:

23           "It is hereby stipulated and agreed, by and between

24   the United States of America, by Preet Bharara, United States

25   Attorney for the Southern District of New York, Rachel Kovner

and Kan Nawaday, Assistant United States Attorneys, of counsel,

and Mondher Bejaoui, the defendant, by and through the consent

of his attorneys, Joshua Dratel and Lindsay Lewis, that if

called to testify, a custodian of records of Sprint/Nextel

would testify as follows:

"1.  He or she is familiar with the record-keeping

practices of Sprint/Nextel.

"2.  Government Exhibits 1700 and 1701A consist of

true and correct records, including call records and subscriber

information, for the cellular telephone assigned telephone

number 917-217-1933, which was assigned to 'Bejaoui Express,

Inc.,' from August 12, 2005, through September 23, 2006.

"3.  Personal identifying information of the previous

subscriber has been redacted from Government Exhibit 1701A.

"4.  The information contained on Government Exhibits

1700 and 1701A was recorded by Sprint/Nextel at or near the

time that the telephone activity took place, was kept in the

regular course of Sprint/Nextel's business activity, and was

relied on as a regular practice of Sprint/Nextel.

"5.  The parties further stipulate and agree that

Government Exhibits 1700 and 1701A and this stipulation may be

received into evidence as Government Exhibits at trial."  And

this stipulation, marked for identification as Government

Exhibit 2502, has been signed by both parties.

The government moves Government Exhibit 2502 and

D4aWbej2

```
 1    Government Exhibits 1700 and 1701 into evidence.

 2              THE COURT:  Admitted.

 3              (Government's Exhibits 2502, 1700, and 1701A received

 4    in evidence)

 5              MR. NAWADAY:  The government calls Allen Johnson.

 6     ALLEN JOHNSON,

 7         called as a witness by the Government,

 8         having been duly sworn, testified as follows:

 9    DIRECT EXAMINATION

10    BY MR. NAWADAY:

11    Q.  What do you do for a living?

12    A.  I'm retired.

13    Q.  Before you retired, what were you doing?

14    A.  We owned the mailing, mail and parcel center in Endwell,

15    New York, called Pack & Mail.

16              THE COURT:  When you say we, who do you mean?

17              THE WITNESS:  My wife and me.

18    BY MR. NAWADAY:

19    Q.  What was the name of that?

20    A.  Pack & Mail.

21    Q.  Where was that store located?

22    A.  518 Hooper Road, Endwell, New York.

23    Q.  Back from 2005 through 2007, did you own that Pack & Mail?

24    A.  Yes, I did.

25              THE COURT:  Where is Endwell, what county?
```

1          THE WITNESS:  Broome County.

2    BY MR. NAWADAY:

3    Q.  What town in Broome County was your Pack & Mail?

4    A.  It's in Endwell.

5    Q.  About how far is Endwell from New York City?

6    A.  About 190 miles.

7    Q.  How did you get to New York City from Endwell?

8    A.  We drove down.

9    Q.  About how long did that take?

10   A.  About three and a half hours.

11         THE COURT:  Was your question about today?

12   BY MR. NAWADAY:

13   Q.  When did you arrive in New York City?

14   A.  Yesterday.

15   Q.  And about how long did it take you?

16   A.  It took us three and a half hours.

17   Q.  How did you get here?

18   A.  With -- we drove down with an automobile.

19         THE COURT:  That's about 60 miles an hour, sir.

20         Next question.

21         THE WITNESS:  Speed limit's 65.

22   BY MR. NAWADAY:

23   Q.  Mr. Johnson, I'm going to hand you what's been marked for

24   identification as Government Exhibits 161 through 163, 2006 and

25   2011.  First, starting with 2011, which is in evidence now, by

D4aWbej2                          Johnson - direct

 1   stipulation --

 2                MR. NAWADAY:  Ms. Ansari, can we please publish 2011.

 3   Q.  Mr. Johnson, if you look at your screen there, it shows

 4   Government Exhibit 2011.

 5   A.  Yes.

 6   Q.  What does that appear to you to be?

 7   A.  It's a Google map.

 8   Q.  And there's a dot at the upper left-hand corner of that

 9   Google map, right?

10   A.  Yes.

11   Q.  Does that dot in the upper left corner of the map

12   accurately reflect about where Endwell, New York, is located?

13   A.  Yes, it does.

14   Q.  Then there's a dot in the lower right-hand corner of

15   Government Exhibit 2011.  Does that dot accurately reflect

16   about where New York City is located?

17   A.  Yes, it does.

18   Q.  I'd like you to now look at Government Exhibits 161, 162,

19   and 163.  Are you familiar with the Pack & Mail record-keeping

20   procedures?

21   A.  Yes, I am.

22   Q.  Do you recognize Government Exhibits 161 through 163?

23   A.  Yes.

24   Q.  What are they, generally?

25   A.  They're generally documents that we require for renting a

D4aWbej2                          Johnson - direct

1    private mailbox at our store.

2    Q.  Are those documents kept in the course of regularly

3    conducted business --

4    A.  Yes, they are.

5    Q.  -- of the Pack & Mail?

6    A.  Yes.

7    Q.  Sorry.  I just ask you to wait until I finish my question.

8    Thank you.

9          Are those documents made and relied upon in the

10   regular practice of Pack & Mail business activity?

11   A.  Yes.

12         MR. NAWADAY:  The government offers Government

13   Exhibits 161 through 163.

14         MR. DRATEL:  No objection.

15         THE COURT:  Admitted.

16         (Government's Exhibits 161-163 received in evidence)

17         MR. NAWADAY:  Ms. Ansari, if we can just pull up

18   Government Exhibit 161.

19   Q.  What are we looking at here?

20   A.  That is a fax cover sheet.

21   Q.  It says "to:  Sue" in the left-hand corner?

22   A.  Yes.

23   Q.  Do you know a Sue?

24   A.  Yes, I do.

25   Q.  Does a Sue work at the Pack & Mail?

D4aWbej2                              Johnson - direct

1    A.  Yes.

2    Q.  And looking at the fax number below the phone number, do

3    you recognize that number?

4    A.  Yes.

5    Q.  How do you recognize that phone number?

6    A.  That is our fax number at our Endwell location.

7    Q.  And there are some documents attached?

8            THE COURT:  Are you talking about on the left-hand

9    side of that document or the right-hand side of that document?

10           THE WITNESS:  Left-hand side.

11           MR. NAWADAY:  Left-hand side.

12           THE COURT:  No.  I was asking the witness.

13           THE WITNESS:  The left-hand side, your Honor.

14           THE COURT:  All right.

15   BY MR. NAWADAY:

16   Q.  And there are documents attached to this fax?

17   A.  Yes.

18   Q.  And just the first document that's attached, the first

19   page --

20   A.  Yes.

21           MR. NAWADAY:  Ms. Ansari, please go to the first page

22   of 161.

23   Q.  The handwriting in boxes two through 11, is that your

24   handwriting?

25   A.  No.

D4aWbej2                          Johnson - direct

1   Q.  I'm going to ask the same question about the next page.  Is

2   that your handwriting?

3   A.  No.

4   Q.  And looking at 162 and 163, are those also fax cover

5   sheets?

6   A.  Yes, they are.

7   Q.  Addressed to Sue?

8   A.  Yes.

9   Q.  And the first page of 162 -- second page, I apologize, is

10  that your handwriting on that document?

11  A.  No.

12  Q.  And, similarly, the second page of 163, is that your

13  handwriting?

14  A.  No.

15          MR. NAWADAY:  No further questions of this witness.

16          THE COURT:  Thank you.

17          Any cross-examination of this witness?

18  CROSS-EXAMINATION

19  BY MS. LEWIS:

20  Q.  Good afternoon, Mr. Johnson.

21  A.  Good afternoon.

22          MS. LEWIS:  Could you put 2011 back on the map, back

23  on the system, please.

24  Q.  I'll just direct your attention to 2011, if you have that

25  there.

1   A.  Yes.

2   Q.  Can I ask you just how far is Vestal from Endwell on that

3   map there, to your knowledge?

4   A.  It's about ten miles.

5   Q.  And how far is Endwell from Binghamton?

6   A.  About ten miles.

7           MS. LEWIS:  Thank you.  No further questions.

8           THE COURT:  Thank you.  You're excused sir, and you

9   may step down.

10           Oh, I'm sorry.  Any redirect?

11           MR. NAWADAY:  Yes, your Honor.

12  REDIRECT EXAMINATION

13  BY MR. NAWADAY:

14  Q.  Mr. Johnson, looking at 2011, does that map fairly and

15  accurately reflect the portions of New York State that are set

16  forth there?

17  A.  Yes, it does.

18           MR. NAWADAY:  The government offers 2011.

19           MR. DRATEL:  No objection.

20           THE COURT:  Admitted, 2011.

21           (Government's Exhibit 2011 received in evidence)

22           MR. NAWADAY:  No further questions.

23           THE COURT:  Any recross?

24           MS. LEWIS:  No objection, your Honor.

25           THE COURT:  You're excused.  You may step down.  Thank

D4aWbej2                        Johnson - redirect

1   you.

2              (Witness excused)

3              THE COURT:  Next witness for the government.

4              MR. NAWADAY:  The government calls Susan Sorochman.

5   SUSAN SOROCHMAN,

6        called as a witness by the Government,

7        having been duly sworn, testified as follows:

8   DIRECT EXAMINATION

9   BY MR. NAWADAY:

10  Q.  Good morning, ma'am.  What do you do for a living?

11  A.  I work at Pack & Mail.

12  Q.  Where is that Pack & Mail?

13  A.  In Endwell, New York.

14  Q.  I'll ask you to wait until I finish my questions.

15  A.  Oh.  Sorry.

16  Q.  What's the address of the Pack & Mail in Endwell?

17  A.  518 Hooper Road.

18  Q.  How long have you worked at that Pack & Mail?

19             THE WITNESS:  Nine and a half years.

20             THE COURT:  Do most people call you Susan or Sue, or

21  something else?

22             THE WITNESS:  Sue.

23             THE COURT:  Sue, that's what you go by?

24  BY MR. NAWADAY:

25  Q.  Were you working at that Pack & Mail during the years 2005

D4aWbej2                          Sorochman - direct

1   through 2007?

2   A.  Yes.

3   Q.  I'd like you to describe the immediate area where this Pack

4   & Mail store was located.

5   A.  As far as --

6   Q.  The physical description of the immediate area of the Pack

7   & Mail store.

8   A.  It's like a business area.  There are some residential

9   houses there.  But it's in a -- area where it has -- it's a,

10  one big building, and there's three different businesses there.

11  Q.  Ms. Sorochman, I'm going to hand you what's already in

12  evidence as Government Exhibits 161 to 163, 2006 and 2011.  And

13  I'd like you to look at Government Exhibit 2006.

14          MR. NAWADAY:  And I'd ask to please publish 2006.

15  Q.  Do you recognize that?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's the Pack & Mail where I work.

19  Q.  There are two other stores on that photograph.  Looking at

20  the two other stores, can you tell about when those stores were

21  at the Pack & Mail?

22  A.  Oh, it's Christmastime.

23  Q.  How can you tell that?

24  A.  We have the stockings in the windows.

25  Q.  Maybe I'll ask the question.  Are those two stores still

D4aWbej2                        Sorochman - direct

1   there?

2   A.  Yes.

3   Q.  Back in 2005 through 2007, were those two stores there next

4   to the Pack & Mail?

5   A.  Curves was there, but the Spartan Diner was a Chinese

6   restaurant at the time.

7   Q.  Was there ever a taxi or cab company located in that little

8   business area?

9   A.  No.

10  Q.  Now I want to turn to Government Exhibits 161 and 163 that

11  are in front of you.  Actually, before you get there, can you

12  just give a brief description of the interior of the Pack &

13  Mail store?

14  A.  When you walk in the door, we have our retail area first.

15  On the side of the store, on the right-hand side when you walk

16  in, there are, all of our mailboxes are right there, would be

17  like up along the side of the outside wall there that you see,

18  and then towards the back is our counter where people would

19  come in, and we pack and ship items that they would bring in,

20  and behind all that is our packing area.

21  Q.  You said that there were mailboxes.  What are those?

22  A.  Mailboxes that people would come and rent.  They look like

23  the little boxes that you would see at a post office.

24  Q.  Was that one of the services Pack & Mail provided?

25  A.  Yes.

D4aWbej2                          Sorochman - direct

1   Q.  And what service was that?

2   A.  They could have mailboxes there also, if they wanted.

3   Q.  I'd now like to look at Government Exhibit 161.  Do you

4   recognize that document?

5   A.  Yes.

6   Q.  What is it?

7   A.  It's a fax cover sheet from, it would be Jose.  I don't

8   know how to pronounce his last name.

9   Q.  And looking on the left side of the document, who is this

10  fax addressed to?

11  A.  To Sue.

12  Q.  Can you tell if that's you?

13  A.  Yes.

14  Q.  How can you tell it's you?

15  A.  Because I'm the only Sue there.

16  Q.  There's also handwriting on this fax cover sheet.  Do you

17  recognize it?

18  A.  No.

19  Q.  I'd like to turn to the second page of this document.

20  Please explain what this document is, if you know.

21  A.  This is a Form 1583 for the post office.

22  Q.  What is a Form 1583?

23  A.  It allows us to receive mail from him.  We send this to the

24  post office.  That way they know that we have a mailbox for

25  that person.

D4aWbej2                    Sorochman - direct

1   Q.  The information set forth in the boxes two through 11, what

2   is that information from?

3   A.  From the box holder.

4   Q.  Do you recognize that handwriting?

5   A.  Yes.

6   Q.  Whose is it?

7   A.  It's mine.

8   Q.  And where did you get this information from that's in boxes

9   two through 11?

10  A.  From the box holder.  They would have to give me that

11  information.

12  Q.  How can a box holder provide this information to you?

13  A.  They could call us on the phone.  We could do it over the

14  phone, or they come in in person and do it.

15  Q.  Is there any way to tell from looking at this document

16  whether this customer came in personally or did this over the

17  phone?

18  A.  I can tell, because on the very bottom -- they have to have

19  it notarized, so, and this isn't one of the people that we work

20  with.  I opened up the mailbox, so I would have been the person

21  to sign the bottom.  And if I didn't sign the bottom, then if

22  they do it outside of Pack & Mail, they have to have it

23  notarized to send back to us.

24  Q.  I just want to make sure I understand.  Did this person

25  come in in person?

1    A.  No.  No.

2    Q.  How do you know they didn't come in in person?

3    A.  Because I filled out everything, and then I faxed it to

4    him, and then he got it notarized and faxed it back to us.

5    Q.  I see.  So am I right that if you had notarized the

6    document, that would mean that the person came in?

7    A.  Yes.

8    Q.  Personally?

9    A.  Yes.

10   Q.  What is the name of the company that's renting this box?

11   A.  Heather Limo Corp.

12   Q.  Where are you getting that information from?

13   A.  From the actual person that wants to open up the mailbox.

14   Q.  Where on this document?

15   A.  Oh.  Where?  Is it line nine?  I can't make it out.

16          THE COURT:  Where it says name of firm or corporation.

17          THE WITNESS:  Name of -- address to be used for

18   delivery.  Oh, name of firm or corporation.  Line nine, yes.

19   BY MR. NAWADAY:

20   Q.  What business address is given as Heather Limo Corp.'s

21   business address?

22   A.  15 Mygatt Street in Binghamton.

23   Q.  What type of business is it listed as?

24   A.  A limo service.

25   Q.  I'd like you to look at box 3A.  What address is set forth

1   there?

2   A.  It's to Heather Limo Corporation, 518 Hooper Road, PMB No.

3   292, in Endwell.

4   Q.  Why is 518 Hooper Road the address there?

5   A.  That's the address of Pack & Mail.

6   Q.  That's where the mail would be received.

7   A.  Yes.

8   Q.  What does PMB stand for?

9   A.  It means private mailbox.

10  Q.  What does that correspond to, if anything?

11  A.  It's just their own personal -- that's their mailbox.

12  Q.  It's the mailbox they're assigned at the Pack & Mail?

13  A.  Yes.

14  Q.  And there's a number there?

15  A.  Yes.

16  Q.  What's the number?

17  A.  292.

18  Q.  What types of documents are required by Pack & Mail if

19  someone wants to open up a post office box there?

20  A.  They need a valid government-issued photo ID, such as a

21  driver's license, and another form of ID that has the same

22  address on it as their driver's license.

23  Q.  Are any of those types of documents attached to Government

24  Exhibit 161?

25  A.  I see his driver's license.

D4aWbej2                          Sorochman - direct

1   Q.  Which document is that?  Which page?

2   A.  I can't -- is it 827?  I can't see the bottom of it.

3            MR. NAWADAY:  Ms. Ansari, could you go to the last

4   page of Government Exhibit 161, please.

5   A.  That's it.

6   Q.  Now I'd like to look at Government Exhibit 162.

7   A.  Whoops.

8   Q.  What are we looking at here?

9   A.  This would be another fax cover sheet.

10  Q.  Who is this fax addressed to?

11  A.  To Sue.

12  Q.  Can you tell if that's you?

13  A.  Yes.

14  Q.  What is this fax asking you to do?

15  A.  The comments on the bottom, he's asking me to forward his

16  mail to 99 Smith Street in Brooklyn and to use a UPS account

17  number.

18  Q.  Do you know whose UPS account number that is?

19  A.  No, I do not.

20  Q.  Is it Pack & Mail's UPS account number?

21  A.  No.

22  Q.  I'd like to turn to the third page of this document.  Are

23  we looking at another 1583?

24  A.  Yes.

25  Q.  Directing your attention to the name of the corporation,

1    which is box nine, what's the name of the firm or corporation

2    that's listed there?

3    A.  Hamton Luxury Cars.

4    Q.  Do you know if this particular client had multiple

5    companies associated with the same mailbox?

6    A.  Yes.  If he wanted to add another, you know, name on to the

7    box, he could do that.

8             THE COURT:  No.  The question was do you know if this

9    particular client, in fact, had multiple companies associated

10   with PMB292.

11            THE WITNESS:  Yes.

12            THE COURT:  And did he?

13            THE WITNESS:  Yes.

14            THE COURT:  All right.

15            THE WITNESS:  Sorry.

16   BY MR. NAWADAY:

17   Q.  And how can you tell that?

18   A.  Because I'm the one that opened up the mailboxes, and it

19   would be in our system, on our computer.

20   Q.  Now I'd like to look at Government Exhibit 163 and at the

21   second page.  What are we looking at here?

22   A.  Another 1583.

23   Q.  To which mailbox does this 1583 relate?

24   A.  292.

25   Q.  What is the name of firm or corporation?

D4aWbej2                          Sorochman - direct

1    A.  Pedro Limousine.

2    Q.  Ms. Sorochman, how can a customer who rents a mailbox

3    obtain the mail that arrives at the mailbox?

4    A.  They can either come in in person and pick it up, or they

5    can have us forward their mail to them.

6    Q.  Do you know what this particular customer for mailbox 292

7    had done?

8    A.  Yes.  He had me forward his mail to him.

9    Q.  Do you ever remember while you were at the Pack & Mail

10   during this time period seeing this customer come in to pick up

11   mail?

12   A.  No.

13   Q.  Do you remember the types of mail this particular customer

14   of mailbox 292 received at that time?

15   A.  The only thing I can remember was E-ZPass bills, stuff like

16   that, and seemed like tickets, like tickets from -- New York

17   City tickets.  That's all I can remember.

18              MR. NAWADAY:  No further questions.

19              THE COURT:  Thank you.

20              Is there any cross-examination?

21   CROSS-EXAMINATION

22   BY MS. LEWIS:

23   Q.  So people don't use Pack & Mail as a place of business,

24   right?

25   A.  Pardon me?

D4aWbej2                          Sorochman - cross

1    Q.  People don't use Pack & Mail as a place of business, right?

2    A.  I don't quite understand what you mean.

3    Q.  What I'm asking you is it's just a place that they get

4    their mail delivered.

5    A.  Right.

6    Q.  Correct?

7    A.  Yes.

8    Q.  If you look again at Exhibit 161, that application there,

9    you can see that the address is just for mail delivery, right?

10   There is a mail delivery address that's your address, correct?

11   A.  Yes.

12   Q.  And then there's another address that's listed as the place

13   of business address, right?

14   A.  Yes.

15   Q.  And also, just looking at the first page of that, that was

16   sent by fax, right?

17   A.  Yes.

18   Q.  Correct?  Right?  Okay.

19       And on the last page of 161, can you look at that and tell

20   me the name of the notary who notarized that?  It's down at the

21   bottom of the page, if you look there.

22   A.  I actually can't make out the name, from what I could see.

23   I can't make it out.

24   Q.  On the last page, you can't make out the name?  There's a

25   stamp there as well you should be able to see, on the last page

1   of 161, Exhibit 161.

2   A.  Oh.  I'm sorry.  I can't pronounce it.  I'm sorry.

3   Q.  Do you want to try to spell it for us?

4   A.  The last name --

5   Q.  Take a shot.

6   A.  T-A-R-T-I-R.

7   Q.  What was the first name there?

8   A.  I can't make out the first letter.  It's either an I,

9   maybe.

10  Q.  Okay.

11  A.  H-A-B.

12  Q.  Okay.

13  A.  I can't.

14  Q.  Going to the first and second pages, the application there,

15  which I think would actually be two and three of the exhibit,

16  is that the same notary there?  The same number?  There should

17  be a notary number there as well.

18  A.  Yeah.  That's what I'm comparing because I can't see the

19  name.  It looks like the same person.

20          MS. LEWIS:  No further questions.

21          THE COURT:  Anything?

22          MR. NAWADAY:  Short redirect, your Honor.

23  REDIRECT EXAMINATION

24  BY MR. NAWADAY:

25  Q.  Ma'am, you were asked on cross-examination about how the

D4aWbej2                          Sorochman - redirect

1    Pack & Mail address is just to receive mail.  Do you remember

2    those questions?

3    A.  Yes.

4    Q.  I'd like to look at first Government Exhibit 161, the

5    second page.  Directing your attention to box 3A, where it says

6    address to be used for delivery, what address is there?

7    A.  518 Hooper Road.

8    Q.  That's the Pack & Mail address, right?

9    A.  Yes.

10   Q.  There's also another address at the bottom, am I right?

11   A.  Yes.

12   Q.  And that's the address, the business address of the company

13   that wants to rent the box, right?

14   A.  Yes.

15   Q.  What address is there?

16   A.  15 Mygatt Street, in Binghamton.

17   Q.  I'd like to ask the same set of questions with Government

18   Exhibit 162.  Turning to the second page, what's the business

19   address of Heather Limo Corp. that's set forth on that

20   document?

21   A.  15 Mygatt Street in Binghamton.

22   Q.  Then with Government Exhibit 163, the second page of that

23   document, what's the business address set forth for Pedro

24   Limousine?

25   A.  This one says 2520 Vestal Parkway East in Vestal.

D4aWbej2                        Sorochman - redirect

1    Q.  There's another 1583 attached to this document.  What's the

2    business address given for Poland Express?

3    A.  5 Brewster Street in Glen Cove, New York.

4              MR. NAWADAY:  No further questions.

5              THE COURT:  Anything on recross?

6              MS. LEWIS:  No further questions, your Honor.

7              THE COURT:  Thank you, Ms. Sorochman.  You may step

8    down.  You are excused.

9              (Witness excused)

10             THE COURT:  Ladies and gentlemen, enjoy the lunch.

11   Keep an open mind.  You have not heard all of the testimony.

12   It's a beautiful day outside.  We'll see you back here -- that

13   is, in the jury deliberation room -- by 2:15.  We'll start at

14   2:15.  Thank you.

15             (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

D4AABEJ3ps

1                    A F T E R N O O N   S E S S I O N

2                              2:15 p.m.

3           (Jury not present)

4           THE COURT:  Bring the jury in.  The defendant

5    continues to be absent.

6           (Jury present)

7           THE COURT:  Ladies and gentlemen, I can tell you that

8    your tax dollars are safe with the court system.  I normally

9    take trial notes in a bound notebook, and about once a year I

10   have to get a new notebook, and the old one ran out, and so I

11   asked my deputy to speak to the procurement people for a new

12   book, and they told me that during the sequester they're only

13   permitted to give out paper and toner.  So I'm not going to be

14   recording anything in a book.  I'm just using paper.

15          Proceed.  Next witness.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1           MR. NAWADAY:  The government calls Charles Flender.

2    CHARLES GALLAGHER FLENDER,

3         called as a witness by the government,

4         having been duly sworn, testified as follows:

5           THE COURT:  Good afternoon, sir.  Welcome.

6           THE WITNESS:  Thank you.

7           THE COURT:  Your witness, Mr. Nawaday.

8    DIRECT EXAMINATION

9    BY MR. NAWADAY:

10   Q.  Good afternoon.  What do you do for a living?

11   A.  Currently I'm retired, but for the last ten years I've

12   owned and operated the USP store in Southampton.

13   Q.  What was the address of that UPS store in Southampton?

14   A.  The address was 50 Hill Street, Southampton, New York,

15   11968.

16   Q.  What county of New York, if you know, is Southampton in?

17   A.  Suffolk County.

18   Q.  About how long did you own and operate that UPS store?

19   A.  Ten years.

20   Q.  Were you operating that UPS store during the years of 2005

21   through 2007?

22   A.  Yes.

23   Q.  About how far is Southampton from New York City?

24   A.  Approximately a hundred miles.

25   Q.  When did you get to New York City, most recently?

D4AABEJ3ps                    Flender - direct

1    A.  This morning I came in on the bus and was here

2    approximately 10 a.m.

3    Q.  About how long did to take?

4    A.  About two hours.

5    Q.  Mr. Flender, in front of you is a document marked for

6    identification as Government 2013.  Do you see that?

7    A.  Yes, I do.

8    Q.  Do you recognize it?

9    A.  Yes.  This is a map of Long Island, and the two points

10   pointed on this clearly indicate Southampton as well as New

11   York City.

12   Q.  Is that a fair and accurate map that includes Southampton

13   and New York City?

14   A.  Yes.

15            MR. NAWADAY:  The government offers Government Exhibit

16   2013.

17            MS. LEWIS:  No objection.

18            THE COURT:  Admitted.

19            (Government's Exhibit 2013 received in evidence)

20            MR. NAWADAY:  Ms. Ansari, if you can please put up

21   Government Exhibit 2013.

22   Q.  Mr. Flender, there is a dot on the right-hand side of

23   Government Exhibit 2013.  Do you see that?

24   A.  Yes, I do.

25   Q.  Is that dot about where Southampton is located?

D4AABEJ3ps                     Flender - direct

1   A.   Yes.

2   Q.   And there's another dot on the left-hand side of Government

3   Exhibit 2013.  Is that dot about where New York City is

4   located?

5   A.   Yes.

6   Q.   I'd like you to describe the immediate physical location of

7   your UPS store.

8   A.   The UPS store that I own and operate is approximately a

9   thousand square feet.  I believe the first two thirds of it are

10  dedicated to the retail section, where you would find our

11  copiers, our cash registers, our counters, and our mailboxes.

12  Last third would probably be the packing and shipping and the

13  bathroom facility.

14  Q.   Are there any other businesses near the UPS store?

15  A.   There are.  The UPS store was located in a little shopping

16  complex.  In that business there was a bank.  Cable vision had

17  a retail store there.  There was a surf shop there.  And I also

18  want to say that there was a salon there, a nail and hair salon

19  there.

20  Q.   What time period were those other businesses near your UPS

21  store?

22  A.   They were pretty much there the entire time that I was

23  there and probably are still there now.

24  Q.   Were they there during the years of 2005 through 2007?

25  A.   Yes.

1           MR. NAWADAY:  Ms. Ansari, if you could put up

2   Government Exhibit 2001, which is already in evidence.

3   Q.  Mr. Flender, do you recognize that?

4   A.  Yes.  That's my -- that's my UPS store, or was.

5   Q.  Please describe the services the UPS store provided during

6   the years 2005 to 2007?

7   A.  The services that we provided were predominantly packing

8   and shipping, mailbox service, copy service, and some other

9   small services like binding and laminating.

10          THE COURT:  Other small services like?

11          THE WITNESS:  Binding and laminating.  Mostly just

12  business services.

13  Q.  Mr. Flender, if you can keep your voice up.

14  A.  Certainly.

15  Q.  Thank you.  You said mailbox service.  What do you mean by

16  that?

17  A.  We have mailboxes that we rented to customers who needed an

18  address for whatever reason at our store.

19  Q.  Please describe physically what those mailboxes look like.

20  A.  Not unlike what you would find at the post office, they

21  have a little door.  The door probably measures probably about

22  5, 3 inches and the box itself probably about 10 to 12 inches

23  long, where we would put their mail.

24  Q.  Did you rent suites?

25  A.  I'm sorry?

D4AABEJ3ps                    Flender - direct

1   Q.   Suites.

2   A.   No.

3   Q.   Please look at what's been marked for identification as

4   Government Exhibit 164 and 165, which are in those file folders

5   that are in front of you, sir.  And first I'll ask you whether

6   you're familiar with the UPS store in Southampton's

7   recordkeeping procedures.

8   A.   Yes, I am.

9   Q.   And what are, just generally, Government Exhibits marked

10  for identification 164 and 165?

11  A.   164 is the standard application that is required by the

12  post office, the 1583.  This is a form that authorizes us to

13  receive mail for individuals at our location.

14  Q.   And 165?

15  A.   165 is the application that we would normally have just

16  between us and the customer, just again kind of stating the

17  rules and stipulations about having a mailbox with us.

18  Q.   Are those two documents kept in the course of regularly

19  conducted business of the UPS store?

20  A.   Yes, they are.

21  Q.   Are those documents made and relied upon in the regular

22  practice of your UPS store --

23  A.   Yes, they are.

24  Q.   -- businesses activity?

25  A.   I'm sorry?

D4AABEJ3ps                    Flender - direct

1    Q.   Your UPS store's business activity.

2    A.   Yes.

3         MR. NAWADAY:  The government offers Government

4    Exhibits 164 and 165.

5         MS. LEWIS:  No objection.

6         THE COURT:  Admitted.

7         (Government's Exhibits 164 and 165 received in

8    evidence)

9    Q.   Mr. Flender, I'd like to quickly just look at these

10   documents, starting with Government Exhibit 164.  Is that the

11   1583 you were talking about?

12   A.   Yes, that is.

13   Q.   And who is the customer who's renting out the mailbox,

14   according to this form?

15   A.   The person that signed down there at the bottom on the

16   right-hand side of it, Bejaoumin, if I'm pronouncing that

17   correctly.

18   Q.   Looking at this document, can you tell whether the customer

19   came in person to open up the mailbox or if they did this over

20   the phone or by fax?

21   A.   They did this over the phone.  It was faxed to us.  In

22   order to receive an application faxed to us, they had to have

23   it notarized, which it was done on the bottom left-hand side.

24   Q.   And what is the address set forth in box 3A, which is on

25   the right-hand side?

1   A.  You mean his address at the UPS store?

2   Q.  Yes.

3   A.  It was 50 Hill Street.  Then it would be the pound sign,

4   529, which is his box number, Southampton, New York, 11968.

5   Q.  The 529 is the box number?

6   A.  Yes.

7   Q.  And what is the business address provided by the client?

8   A.  Well, the business address was 5 Brewster Street in Glen

9   Cove, New York, 11542.

10  Q.  Where are you getting that information from?

11  A.  Would have been supplied by him and/or the documents that

12  he provided as proof of his ID.

13  Q.  What are the documents that you typically require to open

14  up a mailbox at your store?

15  A.  The first and primary document would be a driver's license.

16  The second form of ID can be a lot of different things, vehicle

17  registration card, any number of things, but what it cannot be

18  is a Social Security card or a credit card.

19  Q.  Looking at Government Exhibit 165, what is that document?

20  A.  This is simply the mailbox service agreement that we have

21  between ourselves and customers, kind of stating the rules and

22  stipulations of receiving mail at our particular location.

23  Q.  Are any of the documents you just described as to this

24  particular service agreement?

25  A.  I'm sorry.  What was the question again?  I'm sorry.

1    Q.  If you actually look at the file-folder version that's in

2    front of you of Government Exhibit 165, are there any of the

3    types of identification documents attached?

4    A.  Yes.  He has his driver's license, it looks like an

5    employment card, as well as his vehicle registration.

6    Q.  Do you know if this particular customer picked up or had --

7    or had their mail forwarded?

8    A.  They had their mail forwarded.  As far as I know, they did

9    not pick up any mail.  They never came into the store.

10   Q.  Do you remember the types of mail received by this

11   customer?

12   A.  Yes, pretty much the only mail that he ever received was a

13   number of letters from something called the New York Taxi and

14   Limousine Commission.

15   Q.  Do you remember where the mail was forwarded to?

16   A.  I want to say somewhere in Brooklyn, but I, I -- to be

17   honest with you, I'm not a hundred percent sure on that.

18          MR. NAWADAY:  No further questions.

19          THE COURT:  Any cross-examination?

20   CROSS EXAMINATION

21   BY MS. LEWIS:

22   Q.  Good afternoon.

23   A.  Hi.

24   Q.  Is it possible that people who come up to pick up their

25   mail from the store don't have to actually come to you, right?

1   They can just go to their mailbox?

2   A.  So long as they have a key, yes.

3   Q.  You might not know if somebody did or didn't come to pick

4   up mail from you?

5   A.  That's entirely possible.  They could walk in if they had

6   the key and gotten the mail and left.

7   Q.  There are no suites there.  People don't use the office for

8   a place of business.  Right?

9   A.  I'm sorry, what was --

10  Q.  There are no suites in your office as a place of business?

11  A.  Yes, that is correct, there are no suites there.

12  Q.  It's just a place to receive mail?

13  A.  Just to receive mail only.

14  Q.  If you can just look at 164.  The address for the place of

15  business is separate from the address for stores, correct?

16  A.  Yes.

17  Q.  In Glen Cove, New York?

18  A.  I'm sorry?

19  Q.  It's in Glen Cove, New York?

20  A.  His business, he's claiming it was in Glen Cove, New York.

21  Q.  Do you know where Glen Cove, New York is?

22  A.  I want to say it's on Long Island, probably down maybe

23  about halfway on the North shore, I believe.  But I'm -- I

24  don't know for a hundred percent.

25  Q.  Do you know how far it is from New York approximately?

1    A.  From New York City?

2    Q.  Yes.

3    A.  20 miles maybe?

4    Q.  OK.  And can you just look down at the bottom of that

5    document there, to see who it was notarized by.  Do you see

6    that there?

7    A.  Yeah, I see where it's notarized, yes.

8    Q.  Can you tell me who it is notarized by, that document?

9    A.  On the copy I have I'm finding it very difficult to make

10   out who notarized that.  I don't see -- I mean, I see the stamp

11   and everything.

12   Q.  And I know it has a little bit of writing over the name,

13   but if you can see who the name is there.

14   A.  Oh, it looks like I-h-a-b with a middle name of H and, if

15   I'm reading this correctly, T-a-r-u-r.  Again, it's a little

16   hard to read.

17   Q.  Tartir, is that what you said?

18   A.  Yeah, Tahur or something.  It's a little hard to read on

19   the form.  Oh, yeah, there it is, on the screen.

20           MS. LEWIS:  Nothing further.

21           THE COURT:  Any redirect?

22           MR. NAWADAY:  No, your Honor.

23           THE COURT:  Thank you, sir.  You're excused.  You may

24   step down.

25           (Witness excused)

1          MR. NAWADAY:  The government calls Dale Hoppough.

2    DALE HOPPOUGH,

3         called as a witness by the government,

4         having been duly sworn, testified as follows:

5          THE COURT:  Good afternoon, Mr. Hoppough.

6          Your witness, Mr. Nawaday.

7    DIRECT EXAMINATION

8    BY MR. NAWADAY:

9    Q.  Good afternoon.  What do you do for a living?

10   A.  I'm a manager of a UPS store in Vestal, New York.

11   Q.  What county is Vestal, New York in?

12   A.  Broome County.

13   Q.  About how long have you worked at that store?

14   A.  Four years.

15   Q.  About how far is Vestal, New York, from New York City?

16   A.  About 190 miles.

17   Q.  When did you arrive in New York City most recently?

18   A.  When did I arrive?  Yesterday afternoon.

19   Q.  How did you get here?

20   A.  Drove.

21   Q.  About how long did to take?

22   A.  A little over three hours.

23   Q.  Mr. Hoppough, I'm going to hand you Government Exhibits 155

24   through 160, which have been marked for identification,

25   Government Exhibits 2004 and 2005, which are in evidence, and

1    Government Exhibit 2009, which is marked for identification.

2    And starting with Government Exhibit 2009, do you recognize

3    that document?

4    A.  Yes.

5    Q.  Is that a fair and accurate map of New York State which

6    includes New York City and Vestal, New York?

7    A.  Yes.

8            MR. NAWADAY:  The government offers Government Exhibit

9    2009.

10           MS. LEWIS:  No objection.

11           THE COURT:  Admitted.

12           (Government's Exhibit 2009 received in evidence)

13           MR. NAWADAY:  Ms. Ansari, if you can put that exhibit

14   up, Government Exhibit 2009.

15   Q.  Mr. Hoppough, does the dot on the left-hand side of

16   Government Exhibit 2009, is that about where Vestal, New York

17   is?

18   A.  Yes.

19   Q.  And the dot on the lower right-hand side of Government

20   Exhibit 2009, is that about where New York City is?

21   A.  Yes.

22   Q.  And please look at Government Exhibit 2004, which is in

23   evidence.  That should be in one of the file folders in front

24   of you.  Do you recognize that?

25   A.  Yes.  It's my UPS store, where I worked.

D4AABEJ3ps                    Hoppough - direct

1   Q.  What other stores if any are located now near that UPS

2   store?

3   A.  A nail salon, Sprint, and the Hertz Rental Car.

4   Q.  Does the UPS store -- well, first, what are your duties at

5   the UPS store?

6   A.  I manage pretty much everything -- customer service, paying

7   the bills, QuickBooks, opening mailboxes, copying --

8   everything.

9   Q.  Am I right that the UPS store provides mailbox services?

10  A.  Yes.

11  Q.  And that's so that people can rent mailboxes there.

12  A.  Absolutely.

13  Q.  Are there any suites that the mailbox UPS store rents?

14  A.  No.

15  Q.  Now please look at Government Exhibits 155 through 160.  Do

16  you recognize those documents?

17  A.  Mm-hmm, mailbox agreement.

18  Q.  Are you familiar with the recordkeeping procedures of the

19  UPS store in Vestal, New York?

20  A.  Yes.

21  Q.  Are these documents marked for identification which are

22  Government Exhibits 155 through 160 records of the UPS store in

23  Vestal?

24  A.  Yes.

25  Q.  Are those documents kept in the course of regularly

1    conducted business of the UPS store in Vestal?

2    A.  Yes.

3    Q.  Are they made in the regular practice of the UPS store's

4    activity?

5    A.  Yes.

6           MR. NAWADAY:  The government offers Government

7    Exhibits 155 through 160.

8           MS. LEWIS:  No objection.

9           THE COURT:  Admitted.

10          (Government's Exhibits 155-160 received in evidence)

11   Q.  Mr. Hoppough, I just want to ask about a couple of these

12   documents.  First, Government Exhibit 155.  Ms. Ansari, if you

13   can pull that up, please.  Mr. Hoppough, what is this document?

14   A.  It's the mailbox service agreement, customer's name,

15   address, phone number.

16   Q.  And who is the customer listed?

17   A.  Ziad Ksouri.

18   Q.  Is there a work phone listed?

19   A.  Yes, under the work phone, it says (917) 217-1933.

20   Q.  Then if you can turn to Government Exhibit 156.  And

21   there's a better copy of the second page of this document.  Is

22   this a 1583?

23   A.  Yes.  It's a form 1583 that's filed with the local post

24   office that will deliver Ziad Ksouri's mail to our business for

25   his mailbox.

1    Q.  And in box 13, and box 5, is there a name besides Ziad

2    Ksouri on this document?

3    A.  It is.

4    Q.  What is that name?

5    A.  I'm sorry.  I didn't hear you.

6    Q.  What is the name that's there, that's there in addition to

7    Ziad Ksouri?

8    A.  Bejaoui Modor, Mondher.

9    Q.  What is the name of the firm, corporation that's set forth

10   in box 9 of this document?

11   A.  Hamton Luxury Cars.

12   Q.  What's the business address that's set forth?

13   A.  15 Mygatt Street, Binghamton, New York, 13905.

14   Q.  Is there a business telephone number set forth there?

15   A.  (917) 217-1933.

16   Q.  Going back to Government Exhibit 155, can you tell what the

17   assigned mailbox was for this company, Hamton Luxury Cars,

18   Inc.?

19   A.  Yes.  Mailbox no. 387.

20   Q.  And then looking at Government Exhibit 159, what are those

21   documents?

22   A.  This is a copy of a New York State driver's license.

23          MR. NAWADAY:  Ms. Ansari, can you put up --

24   Q.  Is it just one license?

25   A.  Yes.

1          MR. NAWADAY:  Ms. Ansari, if you can just go to the

2   next page of 159.

3   A.  And a copy of another driver's license for both people that

4   opened the mailbox.

5          MR. NAWADAY:  No further questions, your Honor.

6          THE COURT:  Anything on cross.

7   CROSS EXAMINATION

8   BY MS. LEWIS:

9   Q.  Good afternoon.  You mentioned that there's a Hertz rental

10  car company in the same lot as your store, correct?

11  A.  I'm sorry, I didn't hear you.

12  Q.  You mentioned that there was a Hertz rental car company in

13  the same lot as your store, correct?

14  A.  Yes.

15  Q.  And were the cars for that Hertz rental car company present

16  there, or was that just a store front?

17  A.  There are cars present for Hertz, yes.

18         MS. LEWIS:  No further questions.

19         MR. NAWADAY:  If I may ask some redirect.

20         THE COURT:  Yes.

21  REDIRECT EXAMINATION

22  BY MR. NAWADAY:

23  Q.  Mr. Hoppough, do you know if there was a taxi service that

24  was there during the time that you were working at the UPS

25  store in Vestal, New York?

```
 1    A.  No.  There's never been a taxi service.  And Hertz moved in
 2    in April of '08.
 3              MR. NAWADAY:  No further questions.
 4              MS. LEWIS:  Flow further questions.
 5              THE COURT:  Thank you.  You are excused, sir.  You may
 6    step down.  Thank you.  Drive carefully on the way home.
 7              (Witness excused)
 8              THE COURT:  Next witness, government?
 9              MR. NAWADAY:  Yes.  The government calls Gregorio
10    Cherie.
11     GREGORIO CHERIE,
12         called as a witness by the government,
13         having been duly sworn, testified as follows:
14              THE COURT:  Good afternoon, sir.  Please be seated.
15    Pull the microphone to you, pull it down or up, make it close
16    to your mouth.
17              Your witness, Mr. Nawaday.
18    DIRECT EXAMINATION
19    BY MR. NAWADAY:
20    Q.  What do you do for a living?
21    A.  I am a business development supervisor for American Transit
22    Insurance Company.
23    Q.  How long have you been with American Transit?
24    A.  Five and a half years.
25    Q.  Generally what are your current duties at American Transit?
```

1   A.  I'm a client representative.  I visit brokers.  I do

2   marketing.  I advertise the credit company.

3   Q.  Do you know what underwriting is?

4   A.  Yes.

5   Q.  What is it?

6   A.  Underwriting is the process of analyzing risks for purposes

7   of insurance and to provide pricing on insurance for a client.

8   Q.  During your career, have you ever done underwriting?

9   A.  Yes.

10  Q.  Where is American Transit currently located?

11  A.  Currently we are located at One Metro Tech Center,

12  Brooklyn, New York, 11201.

13  Q.  Do you know where American Transit was located in 2005,

14  2007?

15  A.  Yes.  We were at 330 West 34th Street, Manhattan, New York,

16  New York.

17  Q.  Please describe generally American Transit's business.

18  A.  American Transit is a domestic carrier that provides public

19  livery, public transportation, vehicles for hire, taxis, black

20  car, medallion.  That's our nature business.

21  Q.  And you mean provides insurance for those types of

22  businesses?

23  A.  That's correct.

24  Q.  You mentioned public auto insurance.  What is that?

25  A.  It's the vehicles for hire, taxicabs, pretty much.

D4AABEJ3ps                    Cherie - direct

1   Q.  Does it include insurance for livery cabs?

2   A.  That's correct.

3   Q.  Are you familiar with the New York Automobile Insurance

4   Plan?

5   A.  Yes.

6   Q.  Just generally what is that?

7   A.  It's a pool.  It's a nonprofit organization created by the

8   state to provide insurance for folks that cannot get insurance

9   in the voluntary market.

10  Q.  Do you know if American Transit during the period of 2005,

11  2007, whether American Transit was a participant in that?

12  A.  Yes.

13  Q.  Mr. Cherie, are you familiar with American Transit's

14  recordkeeping procedures?

15  A.  Yes.

16  Q.  I'm going to bring up to you a stack of documents.  I'm

17  going to hand you what have been marked for -- well, first,

18  documents that are already in evidence, which are Government

19  Exhibits 200, 250, 350, and 351.  And then I'm going to hand

20  you documents which include Government Exhibits 201 through

21  244, 251 through 282, 352, and 353.  Sir, I'd ask you to go

22  through these and first tell me if you've seen them before in

23  preparing for your testimony today.  Take your time.

24  A.  (Pause)

25  Q.  Sir, have you had an opportunity to look through Government

D4AABEJ3ps                    Cherie - direct

1   Exhibits 200 through 244, 250 through 282, 350 through 352?

2   A.  Yes.

3   Q.  Are those records of American Transit?

4   A.  Yes.

5   Q.  Are those records that were made overseas in the regular

6   practice of American Transit's business activity?

7   A.  Yes.

8   Q.  Are those records kept in the course of American Transit's

9   regularly conducted business?

10  A.  Yes.

11          MR. NAWADAY:  The government offers Government

12  Exhibits 201 through 244, 251 through 282, and 352.

13          MR. DRATEL:  No objection, your Honor.

14          THE COURT:  Admitted.

15          (Government's Exhibits 201 through 244, 251 through

16  282, and 352 received in evidence)

17  Q.  Mr. Cherie, I'd like to first focus on the exhibits that

18  are marked and in evidence now as Government Exhibits 200

19  through 244.  Who is the insured on those particular records?

20  A.  The insured is Bejaoui Express, Inc.

21          MR. NAWADAY:  And Ms. Ansari, if you can pull up

22  Government Exhibit 200.

23  Q.  Do you recognize that document?

24  A.  Yes.

25  Q.  What is it?

1    A.  It's a change request -- no, I'm sorry.  It's an

2    application from the plan.

3    Q.  Who's the insured?

4    A.  The insured is Bejaoui Express, Inc.

5    Q.  And who is the producer?

6    A.  The producer is Gheith Insurance Agency, Inc.

7    Q.  What is an applicant?

8    A.  An applicant is a prospective client requesting insurance.

9    Q.  What is the applicant's address as set forth on this

10   application?

11   A.  It's 5 Brewster Street, 118, Glen Cove, Nassau, New York

12   11542.

13   Q.  Are there any documents attached to this particular

14   application?  And I'll ask you to look at the actual physical

15   exhibit in front of you, no. 200.

16   A.  Yes.

17   Q.  What kinds of documents are they?

18   A.  There's license.  There is abstract, motor vehicles report.

19   There is supporting documentation.

20   Q.  I would like to turn back to the first page of Government

21   Exhibit 200.  Do you see there in Section 4 the vehicles

22   listed?  Do you see that, sir?

23   A.  Yes.

24   Q.  There is also a column for rating territory?

25   A.  That's correct.

1    Q.  And the number?  What is the rating territory?

2    A.  The rating territory is the location of where the vehicle

3    is going to be rated.

4    Q.  What does that mean?

5    A.  That means that according to the territory, the vehicle

6    will be priced at that location.

7    Q.  Am I right that the territory --

8              MR. DRATEL:  Objection.  Leading.

9              THE COURT:  Yes, sustained.

10   Q.  What is the territory that's set forth on the first page of

11   Government Exhibit 200, both vehicles listed?

12   A.  The territory is the garaging location of the vehicle and

13   where the manual tells you what the pricing is going to be for

14   this particular vehicle.

15   Q.  Is there a territory code listed there?

16   A.  That's -- yes.

17   Q.  And what is that code?

18   A.  22.

19   Q.  Do you know what that code corresponds to?

20   A.  Nassau County.

21   Q.  How does one figure that out?

22   A.  The manual, the NYAIP provides a manual where you have

23   territories listed according to the county and it gives you a

24   code.  Based on that, you know that the territory is 22.

25   Q.  Does the territory rating affect the cost of the insurance?

1   A.  Yes.

2   Q.  How is that?

3   A.  According to the territory, the location, the territory,

4   the insurance will be priced.

5   Q.  Who sets what the price of a particular rating territory

6   is?

7   A.  The state does.

8   Q.  And where do you find that provision?

9   A.  You find it in an NYAIP manual.

10  Q.  Do you know if American Transit relies on the rating

11  territory in determining the insurance charge?

12  A.  Yes.

13  Q.  I'd like you to turn to Government Exhibit 201.  Do you

14  recognize that document?

15  A.  Yes.

16  Q.  What is it?

17  A.  It's a declaration page.

18  Q.  What is a declaration page?

19  A.  It is, once a policy is issued, the output is a declaration

20  page that indicates the pricing, indicates the name and the

21  description of what limits the policy will have.

22  Q.  Who generates a declaration?

23  A.  American Transit generates the declaration.

24  Q.  And what if anything triggers the creation of a

25  declaration?

D4AABEJ3ps                      Cherie - direct

1    A.  The issuance of a policy triggers the declaration.

2    Q.  Is there anything else that can trigger a declaration?

3    A.  No.

4    Q.  What happens if someone wants to change a policy by adding

5    a vehicle?

6    A.  A mandatory declaration will be produced based on the

7    change request.

8    Q.  And which policy does this declaration apply to?

9    A.  The policy number ARC738305.  The insured is Bejaoui

10   Express Inc.

11   Q.  After American Transit generates the declaration, is it

12   sent to anyone?

13   A.  It's send to the insured, the broker, and a copy will be

14   kept with the company.

15   Q.  I'd like to walk through the types of information on the

16   declaration.  Is there anything indicating the vehicles that

17   are covered at the time on the declaration?

18   A.  Yes.

19   Q.  Where is that?

20   A.  That will be on schedule 2 of the declaration.

21        MR. NAWADAY:  Ms. Ansari, if you can advance to

22   page 3.

23   Q.  Is that the statement you are you're talking about?

24   A.  That's correct.

25            (Continued on next page)

D4aWbej4                    Cherie - direct

1    Q.  Is that the schedule two you're talking about?

2    A.  That's correct.

3    Q.  How are the vehicles described?

4    A.  The year, make, VIN number.

5    Q.  Is the territory also designated for each of the vehicles?

6    A.  Yes.

7    Q.  What's the territory code that's set forth for these two

8    vehicles?

9    A.  Territory 22.

10   Q.  I'd like to look at the policy change request form.

11          MR. NAWADAY:  Ms. Ansari, if you could pull up

12   Government Exhibit 237.

13   Q.  Mr. Cherie, if you could also go to that exhibit as well,

14   Government Exhibit 237.

15          MR. NAWADAY:  I apologize, your Honor.  It's still

16   loading.

17          THE COURT:  That's all right.

18   BY MR. NAWADAY:

19   Q.  So what are we looking at on 237?  What is this document?

20   A.  This is a change request from the New York Automobile plan

21   form.

22   Q.  What is a change request form?

23   A.  It is a request from the broker to make a change on the

24   policy.

25   Q.  Who is the insured for this particular change request?

1     A.   Bejaoui Express, Inc.

2     Q.   Where are you looking?

3     A.   On the change request.

4     Q.   Where on the document do you see the name of the insured?

5     I'll direct you to the upper left-hand corner.

6     A.   Upper left-hand corner.

7     Q.   What is the change that's being requested through this

8     document?

9     A.   They're requesting to add a vehicle to the policy.

10    Q.   How can you tell that?  Where are you looking?

11    A.   If you go to section two, vehicle addition, it has a year,

12    make, VIN number, and it has the box checked "added," meaning

13    that they want to add a vehicle.

14    Q.   Is this document signed?

15    A.   Yes.

16    Q.   What is the title of the person who signed on the lower

17    left-hand side?

18    A.   President.

19    Q.   On the lower left hand, is there a signature of a producer

20    on this document?

21    A.   Yes.

22    Q.   Is the insured's signature on this document?

23    A.   Yes.

24    Q.   I'd like to go back to Government Exhibit 214.  What is

25    that document?

1    A.  It's an amendatory endorsement.  It's a change request of

2    output from American Transit Insurance Company.

3    Q.  What is this document memorializing?

4    A.  Repeat that?

5    Q.  What does this document memorialize?

6    A.  It represents additional vehicle endorsement.  It shows

7    that a vehicle has been added to the policy.

8    Q.  Is that in the remarks section on the bottom portion of the

9    first page of Government Exhibit 214?

10   A.  Yes.  It shows that it added a vehicle, 1999 Chevy, and

11   they deleted a '96 Lincoln.

12   Q.  Can you tell by comparing Government Exhibit 214 and 237

13   whether they're related in any way?

14   A.  Yes.

15   Q.  How are they related?

16   A.  They're adding the vehicle, and you could check by the VIN

17   number that the vehicle that was requested was added as of this

18   date.

19   Q.  What vehicle was that?

20   A.  That's the 1999 Chevy.

21   Q.  Going back to Government Exhibit 214, does that amended

22   endorsement also contain a schedule of the covered vehicles on

23   this policy at that time?

24   A.  Yes.

25            MR. NAWADAY:  Ms. Ansari, could you advance, please,

D4aWbej4                           Cherie – direct

1    to the fourth page of Government Exhibit 214.

2    Q.  Is that the schedule of covered automobiles at that time?

3    A.  Yes.

4    Q.  How many vehicles are covered at this time, under this

5    policy?

6    A.  31.

7    Q.  Is there a rating territory for the vehicles set forth on

8    this schedule?

9    A.  Yes.

10   Q.  What is the rating territory?

11   A.  22.

12   Q.  Having reviewed Government Exhibits 200 through 244, are

13   there other amendatory endorsements contained among those

14   documents?

15   A.  Yes.

16   Q.  I'd like to turn to Government Exhibit 243.  What is this

17   document?

18   A.  This is a correspondence from Bejaoui Express, Inc.

19   Q.  Besides this piece of correspondence -- withdrawn.

20          Is there a telephone number provided in the fax cover

21   sheet next to the cc?

22   A.  Yes.

23   Q.  What is that telephone number?

24   A.  917-217-1933.

25   Q.  I'd like to move to Government Exhibit 244.  Do you

1  recognize that document?

2  A.  Yes.

3  Q.  What is it?

4  A.  It's a notice of reinstatement for, from American Transit

5  Insurance Company.

6  Q.  What is a notice of reinstatement?

7  A.  If a policy is put on notice of cancellation, if the

8  payment is made, correspondence or letter will be sent out as a

9  reinstatement saying that the policy's been reinstated and it's

10  now -- there's no lapse in coverage and it's valid.

11  Q.  What's the effective date of the policy reinstatement?

12  A.  January 3, 2006.

13  Q.  I'd like to move to Government Exhibits 250 through 282.

14  Who is the insured for those documents?

15  A.  Vestal Limousine Corp.

16  Q.  First I'd like to look at Government Exhibit 250.  What is

17  that?

18  A.  This is application from NYAIP, from the plan.

19  Q.  Who is the applicant?

20  A.  The applicant is Vestal Limousine Corp.

21  Q.  Is there a home telephone number provided for the

22  applicant?

23  A.  Yes.

24  Q.  What is that?

25  A.  917-217-1933.

1  Q.  Who is listed as the president on this application?  And

2  I'll direct your attention to the section three, ownership and

3  control of applicant's organization.

4  A.  It's Sadok Mejri.

5  Q.  There's also a vehicle listed in section four.

6  A.  Yes.

7  Q.  What is the rating territory set forth there?

8  A.  Rating territory is 28.

9  Q.  Do you know what rating territory 28 corresponds to?

10  A.  I believe it's Broome County.

11  Q.  Again, does American Transit rely on the rating territory

12  in determining the insurance rate to charge?

13  A.  Yes.

14  Q.  What is the applicant's address that's provided?  And I

15  direct your attention to section two of the first page of

16  Government Exhibit 250.

17  A.  The address is 2520 Vestal Parkway East, suite two.  City,

18  Vestal.  County, Broome.  State, New York.  Zip code, 13850.

19  Q.  Among the Vestal insurance documents in front of you, are

20  there also policy change request forms like the ones we saw for

21  the Bejaoui Express policy?

22  A.  Yes.

23  Q.  I'd like to turn to just one of those, Government Exhibit

24  269.

25          MR. NAWADAY:  Actually, I misspoke.  273.  I

1   apologize, your Honor.  Could I have one moment.

2            THE COURT:  Yes.

3            MR. NAWADAY:  I apologize.  268.

4   Q.  What is that?

5   A.  This is a correspondence.

6   Q.  Is there a policy change request attached to that fax cover

7   sheet?  Just turn to the second page.

8   A.  Yes.

9   Q.  What is this policy change request requesting?

10  A.  It's the addition of a vehicle, a 2006 GMC.

11  Q.  Is the rating territory provided for the 2006 GMC?

12  A.  Yes.

13  Q.  Are there any other documents in support of this change

14  request attached?

15  A.  Yes.

16  Q.  What is that?

17  A.  The title.  It's the title of the vehicle requested to add.

18  Q.  Is there anything else attached to that, on this document,

19  268?

20           MR. NAWADAY:  That's it?  Thank you.

21  Q.  I'd like to turn to 269.  Comparing 268 and 269, do these

22  appear to be related in any way?  And you should probably look

23  at the actual documents in front of you instead of the screen,

24  sir.  Thank you.

25  A.  The vehicles added are the same.

D4aWbej4                        Cherie - direct

1    Q.   Does one of the exhibits in front of you have an envelope

2    attached, a copy of an envelope?

3    A.   Yes.

4    Q.   Which Government Exhibit is that?

5    A.   It is from Gheith Insurance Agency.

6    Q.   Which exhibit are you looking at, sir?

7    A.   269.

8    Q.   I'd like to look at Government Exhibit 273.  Is that a fax

9    cover sheet attaching another change request form?

10   A.   Yes.

11   Q.   Is there any supporting documentation attached to

12   Government Exhibit 273?

13   A.   Yes.  There's a title attached to the exhibit.

14   Q.   What is the name on that title, if you can tell?

15        MR. NAWADAY:  Ms. Ansari, if you could, advance to the

16   last page of Government Exhibit 273.  Thank you.

17   A.   I think it's Souman Aboubacar.

18   Q.   Now I'd like to turn to Government Exhibits 350 to 353.

19   Starting with 350, what is that?

20   A.   It is an application from the plan.

21   Q.   Who is the applicant?

22   A.   Pedro Limousine Corporation.

23   Q.   What is the address given for the applicant?

24   A.   518 Hopper -- Hooper Road, 292, Endwell, Broome, New York,

25   13760.

1   Q.  Is that application signed?

2   A.  Yes.

3   Q.  Can you tell from this application what the rating

4   territory is on this policy application?

5   A.  Rating territory is 28.

6   Q.  Do you know what rerating is?

7   A.  Yes.

8   Q.  What is that?  What is rerating?

9   A.  Rerating?

10  Q.  Yes.

11  A.  Oh, when the, when you rate the policy or the application

12  with another, with another territory number.

13          MR. NAWADAY:  Ms. Ansari, we can take the exhibit

14  down.  Thank you.

15  Q.  In your review of these policy documents, were any of the

16  cars ever rerated because the territory was changed at the

17  initiative of American Transit?

18  A.  No.

19  Q.  Mr. Cherie, did there come a time when you were asked to

20  run a report of insurance claims that were filed in connection

21  with these three policies we've been talking about?

22  A.  Yes.

23  Q.  I'm going to hand to you what's been marked for

24  identification as Government Exhibit 3000A.

25  A.  Yes.

D4aWbej4                         Cherie - direct

1    Q.  Please look at that and tell me if you recognize that

2    document.

3    A.  Yes.

4    Q.  What is it?

5    A.  It's a claim detail report of the policies, Bejaoui

6    Express, Vestal Limousine Corp., and Pedro Limousine Corp.

7    Q.  How did you create that chart?  Let me back up.

8        Did you create that chart?

9    A.  This is a report from our system, data provided from our

10   system, to give us the claims for these three policies.

11   Q.  Are the records which are contained in that database from

12   which this chart was created kept in the course of the

13   regularly conducted business of American Transit?

14   A.  Yes.

15   Q.  Are the records in that database made or received in the

16   regular practice of American Transit's business?

17   A.  Yes.

18           MR. NAWADAY:  The government offers Government Exhibit

19   3000A.

20           MR. DRATEL:  No objection, your Honor.

21           THE COURT:  Admitted.

22           (Government's Exhibit 3000A received in evidence)

23           MR. NAWADAY:  Ms. Ansari, could you put 3000A up.

24   Thank you.

25   Q.  Mr. Cherie, I'd like to just walk through quickly what's on

1   Government Exhibit 3000A.  What does this document set forth?

2   A.   This document is claims by location.  It basically tells

3   you the date of the accident, who the policy belongs to and who

4   the name insured is.  You know, the claim number, which is

5   unique to the, that occurrence or that loss, or in location of

6   that accident, the city and what territory was, is attached to

7   that actual location where the accident occurred.

8   Q.   So the territory on the right-hand side, what does that

9   correspond to?

10  A.   That correspond to the city and the location of the

11  accident.

12  Q.   And then which policies are set forth on this chart?

13  A.   Policy ARC738305, which is Bejaoui Express.  Policy

14  ARC740797, which is Vestal Limo Corp.  And policy ARC741860,

15  which is Pedro Limousine Corp.

16  Q.   What does claim mean?

17  A.   Claim, claim, claim number here definite, just means a

18  unique number given by the company for an accident that

19  happened.  In order for the company to be able to search for

20  that particular accident for that policy, we give it a number

21  that's happened to be the claim.

22  Q.   I guess I'm trying to get at more generally what a claim

23  is.

24  A.   It's an accident.  It's -- a claim is an occurrence, it's

25  when an accident happen, and you have a loss.

D4aWbej4                         Cherie - direct

```
 1   Q.  Am I right that at some point somebody put in a claim?

 2   A.  That's correct.

 3   Q.  With the insurance company?

 4   A.  That's correct.

 5   Q.  Under these policies?

 6   A.  That's correct.

 7   Q.  Did there come a time when you were asked to conduct an

 8   analysis of the policies we've been talking about?

 9   A.  Yes.

10   Q.  What were you asked to do?

11              MR. DRATEL:  Objection.

12   BY MR. NAWADAY:

13   Q.  What did you do?

14   A.  I looked at the territories, in terms of where the policies

15   were rated, and I looked at the contrast or comparison where

16   territory, territory of Brooklyn, Manhattan and contrasted the

17   rates to find out if there was any discrepancies.

18   Q.  What do you mean contrasted the rates?

19   A.  Well, there's a difference in premium for a policy that was

20   rated in Nassau County with a policy that was rated in

21   Brooklyn, Queens, or the Bronx, for example.  Once the analysis

22   was completed and we used Brooklyn and Manhattan in comparison

23   to Nassau County, we found out that the discrepancy in premium

24   was higher in the boroughs than it was in Nassau County or

25   Broome County, in terms of these policies.
```

D4aWbej4                        Cherie - direct

1    Q.  What documents did you use to do that analysis?

2    A.  We used the current documents provided for the policies.

3    And the manual for the NYAIP.

4    Q.  When you say current, do you mean the policy documents in

5    front of you?

6    A.  That's correct.

7    Q.  I'm going to hand you what's been marked for identification

8    as Government Exhibit 3000.  Do you recognize that?

9    A.  Yes.

10   Q.  What is it?

11   A.  This is an analysis of loss calculation basically saying if

12   these documents with these vehicles were rated in territory 17

13   or territory 18, which is correspondingly Brooklyn and

14   Manhattan, in comparison with where they were rated with the

15   documents provided, what the difference in premiums would have

16   been.

17   Q.  What documents did you use to create this chart?

18   A.  The documents used to create this chart was the documents I

19   was provided for the policy that was provided in 2005, the

20   documents that we have in front of us, and the manual pages at

21   the date of -- that these policies were issued.

22   Q.  Which manual are you talking about?

23   A.  The NYAIP manual.

24           MR. NAWADAY:  The government offers Government Exhibit

25   3000.

1           MR. DRATEL:  No objection, your Honor.

2           THE COURT:  Admitted without objection.

3           (Government's Exhibit 3000 received in evidence)

4           MR. NAWADAY:  Ms. Ansari, put up Government Exhibit

5      3000.

6      Q.  Mr. Cherie, I'd like you to walk us through what's on this

7      chart.

8      A.  All right.

9      Q.  First, starting in the left-hand side, there's a notation,

10     calculation based on territories 17 and 18, Brooklyn and

11     Manhattan.  And then just going across, please explain

12     according to column the information on each column.

13     A.  Not a problem.  The first, top portion of this spread sheet

14     depicts the territory, the policy date, the effective date, and

15     the name of the insured.  Give you the policy number, the

16     effective dates of the period, of the term.  Subsequent column

17     give you the territory and the city or county the territory is

18     in.  In this case, 17 for Brooklyn, 18 for Manhattan, 22 for

19     Nassau County.

20          Then we have schedule of vehicles, corresponding to the

21     documentation that American Transit had at the time was 25

22     vehicles and five vehicles with two different classifications.

23     Then we have rate, which is BI rate for those, those vehicles,

24     the PD rate for those vehicles, the additional PIP for those

25     vehicles, and the UM for those vehicles.

D4aWbej4                          Cherie - direct

1        All these numbers were provided or gotten from the NYAIP

2   manual 2005 rates.

3   Q.   Okay.  I want to just go back through everything you've

4   just said in a little more detail.

5   A.   All right.

6   Q.   On the schedule of vehicles, the first row says 25 vehicles

7   at 4289.  What does that mean?

8   A.   That simply means that 25 vehicles in the classification of

9   4289, which is a limousine classification.

10  Q.   Then it says five vehicles at 5703.

11  A.   That simply means five vehicles at taxi/all other

12  classification.

13  Q.   How did you determine that there were 25 vehicles at

14  classification 4289 and five vehicles at classification 5703?

15  A.   These are corresponding numbers from the dec pages of

16  American Transit documentation.

17  Q.   Relating to which policy?

18  A.   Related to Bejaoui Express, Inc., ARC738305.

19  Q.   Moving to the next column, which is titled BI rate, what

20  does that mean?

21  A.   That means bodily injury rate.  That simply means the total

22  compilation of each vehicle rate was a total of $110,075 for

23  that classification, 4289.  And for the five vehicles at

24  classification 5703, a total for the bodily injury rate was

25  $56,715.

1   Q.   What does PD mean?

2   A.   PD means property damage rate.

3   Q.   How did you determine property damage rate set forth next

4   to the row for the 25 vehicles in the taxi and limousine

5   classification?

6   A.   The determination was based on 25 vehicles at a property

7   damage rate, that's the total cumulative number, 38,737.50.

8   And for five vehicles at 5703, which is the taxi/all other, the

9   total for each vehicle would be 10,575.

10  Q.   What does the next column's heading mean, additional PIP?

11  A.   Additional personal injury protection.  That is the same

12  calculation.  25 vehicles at the additional personal injury

13  protection rate will be $25.  And five vehicles at the

14  additional personal injury protection rate will be $5.

15  Q.   The next column, UM, what does that stand for?

16  A.   Uninsured motorist.  25 vehicles at uninsured motorist rate

17  will be $650.  Five vehicles at the uninsured motorist rate

18  will be 130 vehicles -- $130.

19  Q.   And then the next column, PIP/200 DED, what does that stand

20  for?

21  A.   Personal injury protection 200 deductible is either 200

22  deductible or full.  In this case, the insured chose 200

23  deductible.  The detail of it is 25 vehicles at the personal

24  injury protection with a 200 deductible is 30,575 on an annual

25  basis.  And for five vehicles, the personal injury protection

1    would be 200 deductible, 18,475 in territory 17, which is

2    Brooklyn.

3    Q.  What about total rate for these vehicles on the Bejaoui

4    Express policy at territory 17?

5    A.  $265,962.50.

6    Q.  Does this chart set forth similar calculations for the rate

7    had the vehicles been rated in Manhattan?

8    A.  That --

9    Q.  And I'll direct you to the first page, territory column.

10   A.  Yes.

11   Q.  And what was the total rate had these vehicles been rated

12   in Manhattan?

13   A.  $268,887.50.

14   Q.  Going down to the next section, which I believe is titled

15   calculation based on territory 22, Nassau County, listed on

16   application --

17   A.  That's correct.

18   Q.  -- what does that section set forth?

19   A.  This section just basically gives you the policy number,

20   the effective date, the territory, which is Nassau County,

21   territory 22, as is listed in the documents provided to

22   American Transit.  The bodily injury rate or the schedule of

23   vehicles are the same amount as on the prior territories, 25

24   vehicles at 4289, which is the limousine rate, five vehicles at

25   5703, which is a taxi/all other classification.

D4aWbej4                         Cherie - direct

1    Q.  And --

2    A.  The bottom --

3    Q.  I'm sorry.  What was the total rate on the policies as set

4    forth with the rating territory of 22?

5    A.  $185,217.50.

6    Q.  Did you also do on this chart a calculation of the

7    difference in premium from Nassau County versus Brooklyn?

8    A.  Yes.

9    Q.  Where is that listed, at the middle of the chart?

10   A.  In the middle of the chart, the difference in premium for

11   Nassau versus Brooklyn is 80,745.

12   Q.  Was there a difference in premium from Nassau County versus

13   New York City?

14   A.  83,670.

15   Q.  Is this annual or term?

16   A.  Annual.

17   Q.  Now, at the bottom of the chart, what policy does the

18   bottom of the chart relate to, looking at ARC738305-1?

19   A.  This is related to Bejaoui Express, the renewal policy.

20   Q.  I see that there's a dash one for the policy set forth on

21   the bottom of the chart.

22   A.  That simply means the preceding year of the policy.  Our

23   policies are annualized, so the renewal policy will be dash

24   one.

25   Q.  This is the same policy?

1   A.  Same policy.

2   Q.  Just a different year?

3   A.  Just a different year, that's correct.

4   Q.  Did you do the same calculations for the policy on the

5   second year of the policy?

6   A.  Yes.

7   Q.  What, if any, was the difference in premium from Nassau

8   versus Brooklyn on an annual basis?

9   A.  $80,745.

10  Q.  What was the difference in premium from Nassau versus New

11  York City?

12  A.  $83,670.

13  Q.  Does this chart also set forth calculations for the other

14  two policies we've been talking about, Pedro Limo and Vestal?

15  A.  Yes.

16  Q.  Please turn to the second page of Government Exhibit 3000.

17  Which policy does this chart relate to?

18  A.  This was for Pedro Limousine Service, ARC741860.

19  Q.  Did you determine whether there was a difference in premium

20  from the rating territory listed on the applications and policy

21  documents?

22  A.  Yes.

23  Q.  And what was the difference?

24  A.  From --

25  Q.  The premium from the policy documents versus a rating

D4aWbej4                         Cherie - direct

1    territory at the rating territory in Brooklyn.

2    A.  7,315.

3    Q.  What is the difference in premium from what's listed on the

4    applications as the rating territory at New York City?

5    A.  7,350.

6    Q.  I'd like to turn to the last page of Government Exhibit

7    3000.  Which policy does this relate to?

8    A.  This is Vestal Limousine Corporation.

9    Q.  Did you do the same type of analysis with the Vestal

10   Limousine policy documents that you did with Bejaoui Express

11   and Pedro Limousine?

12   A.  That's correct.  Yes.

13   Q.  And for the first year of the policy, what, if any, was the

14   difference in premium between what was listed as the territory

15   and Brooklyn?

16   A.  56,760.

17   Q.  What's the difference in premium between what was listed on

18   the application and New York City for the first year?

19   A.  58,047.

20   Q.  And the same questions for the second year of this

21   particular policy.

22   A.  89,795 for Brooklyn.  91,082 for Manhattan, NYC.

23            MR. NAWADAY:  No further questions, your Honor.

24            THE COURT:  Any cross?

25            MR. DRATEL:  Yes, your Honor.

1    CROSS-EXAMINATION

2    BY MR. DRATEL:

3    Q.   Good afternoon, Mr. Cherie.

4    A.   Good afternoon.

5    Q.   Let's go back to government's 3000, the chart that you were

6    just looking at.  Were those policies in effect for the entire

7    period that you evaluated?

8    A.   No.

9    Q.   How long were the policies in effect for?

10   A.   I don't know.  I think they're for -- the first policy that

11   we have Bejaoui Express, I believe that the, we had an

12   annualized policy and a portion of the second year.  I don't

13   know exactly what the time period was.

14   Q.   And the others you're not sure, or you don't know?

15   A.   All three policies were renewed, but the second period of

16   the policy, I don't know exactly when they terminated.  But

17   they were not full term.

18   Q.   Thank you.

19          If you want to look at -- do you have 3000A still with

20   you, the chart of claims?

21          MR. DRATEL:  May I approach, your Honor.

22          THE COURT:  Yes.

23          MR. DRATEL:  Thank you.

24   Q.   You also have it on the screen, if you want to look at it

25   that way.

 1        Do you see about halfway down, November 21, 2005?
 2   A.  Yes.
 3   Q.  Go across all the way to the right, that's Fulton County,
 4   where that accident occurred, correct?
 5   A.  Yes.
 6   Q.  And Fulton County is somewhere north of Albany?
 7   A.  Yes.
 8   Q.  Correct?
 9   A.  Yes.
10   Q.  And, in fact, it's rated at 29, right?
11   A.  That's correct.
12   Q.  Which is less expensive than 28, than the Vestal one,
13   right, than Vestal would be?
14   A.  I am not sure about that.  I would have to look that up.
15   I'm not sure.
16   Q.  Do you want to look at it and see what Vestal is rated?
17   You can look at, you want to look at Government Exhibit 350, if
18   you have that there.  That's Endwell, but it's the same, right,
19   Broome County?  See the 28?  I'll put it up on the Elmo for
20   you.  Do you see it?
21   A.  No.
22   Q.  Oh.  You don't have Government Exhibit 250 up there?  200,
23   rather.  Sorry.  250.  Government's 350, flipping over to the
24   Elmo, government's 350.  And Endwell New York, Broome County,
25   28?

1   A.   Yeah, I have that.

2   Q.   Okay.  Going back to 3000-A, the chart of claims --

3   A.   Yes.

4   Q.   -- one of the reasons that places like Brooklyn and

5   Manhattan and New York City area are rated, when I say higher,

6   I mean there's higher risk than other places, is because there

7   are more accidents, correct?

8   A.   That's correct.

9   Q.   And that's why insurance rates are higher in those areas,

10  right?

11  A.   That's correct.

12  Q.   So it wouldn't be unusual for Brooklyn to have more

13  accidents than, say, Fulton County or Broome County, right, for

14  the same number of cars?  Correct?

15  A.   That's possible, yes.

16  Q.   Well, that's why it's rated that way, right?

17  A.   That's correct.

18  Q.   In fact, there are fewer cars in those counties all

19  together, right?

20  A.   That's correct.

21  Q.   That's what the rating system is all about, is assessing

22  the risk to the insurance company of having to essentially pay

23  out a claim?

24  A.   That's correct.

25  Q.   So the frequency of accidents is one of the determining

1    factors on how it's priced, on how it's rated?

2    A.   Yes.

3    Q.   And in the for hire, in like a taxi and limousine service,

4    for that industry it's even higher, correct?

5    A.   That's correct.

6    Q.   And that's why they're in the assigned risk pool in the

7    first place?

8             MR. NAWADAY:   Objection.

9             THE COURT:   I'll allow it.

10   BY MR. DRATEL:

11   Q.   Right?

12   A.   Yeah.

13   Q.   And there are more taxis and private cars in Brooklyn and

14   Manhattan than anywhere else, right?

15   A.   That's correct.

16   Q.   Now I want to talk a little bit about rating in general,

17   and you're familiar, you said, with the manual.  Right?  New

18   York Automobile Insurance Plan manual, call it the AIP manual,

19   or just the manual.  Okay?

20   A.   Okay.

21   Q.   You talked about garaging, right, as a factor in rating?

22   Right?

23   A.   That's correct.

24   Q.   But, in fact, and Rule 46 is a rule that addresses rating,

25   right?

1    A.  I don't know.  I don't have that in front of me.

2    Q.  Okay.  I'll put it on the Elmo.  So you see where it says

3    premium development other than zone-rated automobiles?

4    A.  Yes.

5    Q.  Go down to C1, liability and basic no fault coverages.

6    A.  Yes.

7    Q.  Right?

8    A.  Yes.

9    Q.  It says, "Determine the territory from the territory

10   definitions based on the highest rated territory where the

11   public automobile is operated."  Right?

12   A.  That's correct.

13   Q.  Nothing about garaging there, right?

14   A.  No.

15   Q.  So I'm looking at that and I'm thinking territories; I'm

16   not told anything about garaging.  Right?

17   A.  Okay.

18   Q.  And if we go up to the top, to A2, it says, "All other

19   public automobiles" -- I'm sorry.  "This rule applies to all

20   other public automobiles which regularly operate within a

21   200-mile radius from the street address of principal garaging.

22   For those automobiles regularly operated beyond a 200-mile

23   radius, refer to the premium development zone-rated automobiles

24   rule," which is Rule 48.

25       So that talks about garaging, right?

1   A.   Yeah.

2   Q.   But that doesn't tell you how to rate based on garaging; it

3   just tells you whether this rule applies or some other rule

4   applies, right?

5           MR. NAWADAY:   Objection.   The document speaks for

6   itself.

7           THE COURT:   I'll allow that.   You can rephrase it.

8           MR. DRATEL:   Okay.

9   Q.   This section that I just read, A2, doesn't say that rating

10  is based on garaging; it just says whether Rule 46 applies or

11  not, right?

12  A.   You know, the interpretation of this document as far as,

13  you know, the manual is concerned is pretty clear.   I'm not

14  sure if we could, you know, interpret it.   I mean, all other

15  policies, but reading it, I --

16  Q.   Well --

17  A.   I'm trying to figure out what exactly --

18  Q.   I appreciate that.

19  A.   It's pretty cut and dried.

20  Q.   How is it cut and dried in terms of garaging?   Tell me

21  where in the manual it says garaging determines rating.

22  A.   "All other public automobiles regularly operated within a

23  200-mile radius" --

24          THE COURT:   Sir, this is being recorded, so you have

25  to slow down.

1            THE WITNESS:  I got to slow down.

2    A.  Well, again, the manual, the NYAIP does not allow for

3    interpretation.  So I don't -- I'm not legally or I can't say

4    that this is, you know, is an interpretation to it whatsoever.

5    Q.  I'm not asking for an interpretation.

6    A.  Okay.

7    Q.  I'm asking you does that section say that you rate an

8    automobile based on where it's garaged.

9    A.  When we receive --

10   Q.  No.  I'm asking a question.  Does that --

11   A.  Yes.

12   Q.  It does?

13   A.  Yes.

14   Q.  How does it say that in that section?  Please explain to me

15   and the jury how that says rate based on garaging locations.

16   A.  "All other public automobiles which regularly operate

17   within a 200-mile radius from the street address of principal

18   garaging."

19       Now, premium computation, "Determine the territory from the

20   territory definitions based on the highest rated territory

21   where the public" --

22            THE COURT:  What are you reading from, sir?

23   BY MR. DRATEL:

24   Q.  Which section are you reading now?

25   A.  Premium computation, C, Rule 46.

 1              THE COURT:  C?

 2              THE WITNESS:  Rule 46.

 3              THE COURT:  When you read from a document, when anyone

 4    reads from a document, they tend to speed up.  Try not to,

 5    because the court reporter must record everything you say.  So

 6    when you're reading, read it slowly.

 7              THE WITNESS:  Okay.

 8    A.  "Determine the territory from the territory definitions

 9    based on the highest rated territory where the public

10    automobile is operated."

11    Q.  Okay.  Let me stop you there.  Does that say anything about

12    garaging?

13    A.  No.

14    Q.  About operating, right?

15    A.  It mentions operations, yes.

16    Q.  Can you, from your knowledge of the manual, point to any

17    other section that says rate based on garaging location?

18    A.  No.

19    Q.  And these manuals, are they distributed to applicants?

20    A.  No.

21    Q.  Are they distributed to producers?

22    A.  I believe so.

23    Q.  So is it the responsibility of the producer to determine a

24    rate based on consultation or discussion with the applicant?

25    A.  I, I don't know that.

D4aWbej4                         Cherie - cross

1   Q.   Now an insurer who participates in the assigned risk

2   program --

3   A.   Yes.

4   Q.   -- like American Transit is responsible for verification

5   programs, right, and compliance programs, in terms of the

6   policy information?  Right?

7   A.   Yes.

8   Q.   And responsible for sometimes auditing, right?

9   A.   That's correct.

10   Q.   And responsible for -- withdrawn.

11          Does American Transit do any training for

12   applicants --

13   A.   No.

14   Q.   -- on how to rate or how to apply?

15   A.   No.

16   Q.   Do they do training for producers?

17   A.   No.

18   Q.   Do they test the producers' knowledge at any time as to

19   whether or not they know how to rate automobile policies?

20   A.   No.

21   Q.   Now let's look at Government Exhibit 200, please.  I'll put

22   it up on the Elmo for you.  Now, this, let me show you the

23   bottom right, 200.  But I'm interested first, it says this is a

24   commercial application, right?

25   A.   That's correct.

D4aWbej4                    Cherie - cross

1    Q.   And if it's for a private car or for-hire vehicle, down

2    here, Lincoln Town Car, wrong application, right?

3            MR. DRATEL:  I'm sorry.  Let me withdraw that.

4    Q.   That is not a correct application, is it?

5            MR. NAWADAY:  Objection.  Vague.

6            MR. DRATEL:  I'll withdraw it and rephrase it.

7    Q.   Isn't it supposed to be a public application as opposed to

8    a commercial application if it's for a for-hire vehicle like a

9    limousine service?

10   A.   That, that answer I can't give you because -- the reason

11   why I can't do that is because this was received by the NY --

12   sent to us by the NYAIP.  Whatever reason why we received this

13   application different to another application, I wouldn't be

14   able to tell you that.  Or is it even incorrect at the time.

15   This is -- based on when this came in, I don't know what the

16   regulation was at that time.

17   Q.   So if someone sends you an application, if New York AIP

18   sends you an application for 18-wheel tractor truck as a

19   private passenger vehicle, you have to write the policy; you

20   don't send it back saying, Reassign this to someone who can

21   provide the correct coverage?

22   A.   Yes.

23   Q.   You have to write it or you send it back?

24   A.   We send it back.

25   Q.   That's right.  So this is not correct.  I don't care what

D4aWbej4                          Cherie – cross

1    happened to it.  I just want to say you cannot get a commercial

2    policy for a private car.  Right?

3              THE COURT:  Sustained.

4              Forget for the moment whether the application is

5    correct or not.  Just answer this, if you know the answer.  If

6    you don't, you don't.  Can you obtain a commercial policy for a

7    livery cab?

8              THE WITNESS:  No, depend --

9              THE COURT:  All right.  Can you obtain a commercial

10   policy for a normal taxicab?

11             THE WITNESS:  No.

12             THE COURT:  All right.  Thank you.  Next question.

13   BY MR. DRATEL:

14   Q.  But you can for a public, right?

15   A.  That's correct.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1    Q.  And it's the producer's responsibility to make sure that

2    this application is correct in the sense of, if he's applying

3    for a livery cab, that it should be a public policy as opposed

4    to a commercial policy?

5    A.  The way I've learned it and the way how I learn assigned

6    risk, the producer is the professional.  He guides the

7    applicant.

8    Q.  Let's look at Government's 237.

9          MR. DRATEL:  If Ms. Ansari could put up 237, please.

10   Q.  I will just show you the first page of it Government 237.

11   And this is page 2.

12         So look at the, it says here, the one on the left is

13   producer's signature, right, it says?

14   A.  I don't know what that says.

15   Q.  That's what it says underneath that signature?

16   A.  It says "producer's signature."

17   Q.  Yes.  And then next to that it says "insured's signature,"

18   right?

19   A.  That's correct.

20   Q.  The one on the left looks like a signature, right?

21   A.  That's correct.

22   Q.  And the one in the middle looks just like a printed name,

23   to a certain extent, right?

24         MR. NAWADAY:  Objection.

25         THE COURT:  Well, let me rephrase it.  Does that look

1    to you as if it's a signature or a block print, in other words,

2    in the middle?

3              THE WITNESS:  No, I --

4              THE COURT:  The name in the middle, is that signed or

5    printed?

6              THE WITNESS:  I don't want to make a determination on

7    how somebody signs their name.  I can't tell.

8    Q.  But you can't tell.

9    A.  I can't tell.  I can't tell.

10             THE COURT:  But I take it your answer is you don't

11   know.

12             THE WITNESS:  I don't know.

13   Q.  Do you know the term "premium remedy"?  Is that familiar to

14   you?

15   A.  No.

16   Q.  Now, you said, at one point you mentioned that NYAIP is a

17   not-for-profit organization, right?

18   A.  That's correct.

19   Q.  American Transit is not a not-for-profit organization?

20   A.  No, we're not.

21   Q.  Right.  And these policies are designed to make American

22   Transit a profit from these policies, right?

23   A.  I will assume so.

24   Q.  So, in other words, you're not pricing these to break even.

25   You're pricing these to make money.  That's the goal of the

1   corporation.  Right?

2   A.  I will not be able to say that.

3   Q.  Well, insurance is in many ways a volume business, right?

4   A.  That's correct.

5   Q.  The more policies you get the more money you can make.

6   Right?

7   A.  That's correct.  That's correct.

8   Q.  And the same is true for brokers, right?

9   A.  That's correct.

10  Q.  The more policies they write the more commissions they get.

11  A.  That's correct.

12  Q.  And they're not not-for-profit --

13  A.  No.

14  Q.  -- operations either, are they?

15  A.  No, they're not.

16          MR. DRATEL:  Nothing further, your Honor.  Thank you.

17          THE COURT:  Any redirect?

18          MR. NAWADAY:  Yes, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. NAWADAY:

21  Q.  Mr. Cherie, do you remember the questions you had on

22  cross-examination relating to the effective date for the

23  policies you looked at?

24  A.  Yes.

25          MR. NAWADAY:  Could we bring up Government Exhibit

1    3000 again.

2    Q.   This is your chart that you created.

3    A.   Yes.

4    Q.   Are there effective dates set forth on your chart --

5    A.   That's correct.

6    Q.   -- for these policies?

7    A.   Yes.

8    Q.   What was the effective date for the Bejaoui Express policy?

9    A.   03/03/2005, 03/01/2006.

10   Q.   Was there a second year term for this policy?

11   A.   03/01/2006, 03/01/2007.

12   Q.   Are the effective dates set forth for the other policies as

13   well on Government Exhibit 3000?

14   A.   Yes.

15   Q.   Please turn to page 2 of Government Exhibit 3000.  What are

16   the effective dates set forth in the Pedro Limousine column?

17   A.   05/16/2006 to 03/01/2007.

18   Q.   Could you please turn to the last page of Government

19   Exhibit 3000.  What are the effective dates set forth for the

20   Vestal Limo policy?

21   A.   11/19/2005 to 03/01/2006.

22   Q.   And for the second-year term?

23   A.   03/01/2006 to 03/01/2007.

24   Q.   You were asked questions, Mr. Cherie, on cross-examination

25   about whether, as an underwriter, you used the principal place

1    of garaging in determining rating territory.  Do you remember

2    those questions?

3    A.  Yes.

4    Q.  Do you use principal place of garaging in determining the

5    rate?

6    A.  When we receive the application from the NYAIP, all we have

7    is the garaging location to write -- to put territory.  We

8    don't have anything else to rate the policy.

9    Q.  How do you use the principal place of garaging to rate the

10   territory -- to rate the policy?

11   A.  We go the manual, the NYAIP manual, we look in the

12   territory pages.  We look for the application and the territory

13   they're using in the application.  We go in the manual and we

14   price it accordingly.

15   Q.  Do you know if American Transit does inspections of the

16   policies it receives?

17   A.  When we receive an application from the plan, usually we

18   don't do inspections of that application.  We write it.  And in

19   the course of that policy, there might be some issue or

20   something that the plan call us on, and then we'll do

21   inspection.  But it's not a practice of ours to do inspection

22   on every single application.

23   Q.  Why not?

24   A.  It -- um, we, number one, it come from the plan and we

25   cannot reject any application that come from the plan.

1   Q.  Why can't you reject any applications that come from the

2   plan?

3   A.  We don't reject applications that come from the plan

4   because it's a pool and we are obligated by the state, are

5   mandated, to write what we told the plan, agreed to write.  The

6   only way we will reject an application is based on the

7   classification, because we cannot write it, or because of

8   limits on the type of business there is.

9   Q.  Is American Transit required to participate in the plan?

10  A.  No, we are not required.

11  Q.  But if American Transit does participate in the plan, are

12  you allowed to reject any applications that are forwarded to

13  American Transit from the plan?

14  A.  No.  No.

15          MR. DRATEL:  Asked and answered, your Honor.

16          THE COURT:  I'll allow it.

17  A.  No.  No.

18  Q.  What happens if there's any loss associated with a policy

19  from the plan relating to fraud about the rating territory on

20  the plan?

21  A.  There's two things that happen, and it has to do with our

22  special investigation unit and how they want to handle it.

23  Sometimes they re-rate it.  Sometimes they say just cancel the

24  policy.

25          MR. NAWADAY:  No further questions.

1          MR. DRATEL:  Briefly, your Honor.

2   RECROSS EXAMINATION

3   BY MR. DRATEL:

4   Q.  You did tell us earlier that if you received an application

5   that was classified incorrectly, so, for example, if someone

6   wanted to put an 18-wheeler on a private car or even a public

7   application, you could reject it, right?

8   A.  Yes.  Yes, yes.

9   Q.  So you don't accept everything that comes in.

10  A.  Not everything, no.

11  Q.  And you were asked about garaging and what you get in terms

12  of information.  I will put Government Exhibit 250 up again for

13  you, and if you could just -- do you see -- it may be a little

14  difficult to read, but if you see there are boxes on the right

15  towards the bottom, right?  And there is one that says, just to

16  the left of where there are a couple little boxes with the loss

17  payer and just to the left of that, under description and use

18  to the right?  Actually, description and use, no. 4,

19  description and use, right?

20  A.  Yes.

21  Q.  And what it says there is "list territories in which

22  vehicles operate."  Right?  It doesn't say where they're

23  garaged.  It says "operate."  Right?

24  A.  That's correct.

25  Q.  And in the large box to the right, the small box to the

1    right of that, it says "territories," and then "ies" in

2    parentheses, "in which or through which vehicle is customarily

3    operated."  Right?

4    A.  That's correct.

5    Q.  Are there any materials that American Transit provides to

6    applicants so that they can navigate this and understand what

7    that means?

8    A.  No.

9            MR. DRATEL:  Nothing further, your Honor.  Thank you.

10   REDIRECT EXAMINATION

11   BY MR. NAWADAY:

12   Q.  Mr. Cherie, you were just asked about Government Exhibit

13   250 --

14   A.  Mm-hmm, yes.

15   Q.  -- up on the screen.  If there's no information as it

16   appears in this application setting forth the territories in

17   which the vehicle is customarily operated, what territory

18   designation do you use to create the rate?

19   A.  We would use the territory definition that was represented

20   here, which is, in this case is 28, and we will use the address

21   of the applicant.

22   Q.  Which is what?

23   A.  Which is 2520 Vestal Parkway, Suite 2, Vestal, Broome, New

24   York, 13650.

25           MR. NAWADAY:  No further questions.

1          MR. DRATEL:  No further questions, your Honor.

2          THE COURT:  Thank you.  You are excused, sir.  You may

3   step down.

4          (Witness excused)

5          THE COURT:  Mr. Nawaday, if you would take the

6   documents back and let me know who the next witness for the

7   government is.

8          MS. KOVNER:  Your Honor, the government's next witness

9   is Sadok Mejri.

10          THE COURT:  Just step up here to the witness box, sir.

11   SADOK MEJRI,

12       called as a witness by the government,

13       having been duly sworn, testified as follows:

14          THE COURT:  Welcome.  Please be seated, sir.

15          Your witness.

16   DIRECT EXAMINATION

17   BY MS. KOVNER:

18   Q.  Thank you, your Honor.  And Mr. Mejri, if you would just

19   get as close to the microphone as you can.

20          Mr. Mejri, what city and state do you live in?

21   A.  I live in Queens, New York, the state of New York.

22   Q.  How long have you lived in Queens, New York?

23   A.  I've lived there since 2001 or 2002.

24   Q.  Have you ever lived in upstate New York?

25   A.  No, I've never lived in upstate New York, no.

D4AABEJ5ps                    Mejri - direct

1    Q.  Have you ever worked for a company in upstate New York?

2    A.  No, ma'am.

3    Q.  Directing your attention to the year 2005, did you see an

4    accountant about your taxes that year?

5    A.  Yes, ma'am.

6    Q.  Who referred you to that accountant?

7    A.  It was a paralegal in Mr. Tartir's office, law office.

8    Q.  What was the name of the accountant that that paralegal

9    referred you to?

10   A.  It was Mr. Mondher Bejaoui.

11   Q.  After the paralegal referred you to Mr. Mondher Bejaoui,

12   did you meet with Mr. Bejaoui to do your taxes?

13   A.  Yes, ma'am.

14   Q.  Where did those meetings take place?

15   A.  In the same location as the law office, in Brooklyn.

16   Q.  I'm not sure I made out all your answer.  You said the law

17   office of Mr. Tartir in --

18   A.  In Brooklyn.

19   Q.  Can you describe generally what happened at your meetings

20   with Mr. Bejaoui to do your taxes.

21   A.  Well, initially I did my taxes in the beginning of March.

22   Then something showed up about one of my W-2.  So I was

23   doing -- I was in Mr. Tartir office to pick up a form to renew

24   my work authorization back then.  And Mister -- so I spoke

25   about it to the paralegal of Mr. Tartir and he referred me to

1    Mr. Bejaoui as being an accountant in his -- in the office

2    there.  So I spoke to him and he proposed at that time that I

3    had to do an amendment, tax amendment.

4    Q.  Did you give Mr. Bejaoui documents over the course of

5    preparing your taxes with him?

6    A.  Yes, ma'am.

7    Q.  And what kinds of documents?

8    A.  Well, the government ID, my New York State driver's

9    license, my Social Security, and two W-2s and one 1040, and

10   some of them.

11   Q.  Did he make copies of those documents?

12   A.  Yes, he did.

13   Q.  Did he ultimately prepare your tax returns for you?

14   A.  Yes, he did.

15   Q.  Did he provide with you copies of those returns?

16   A.  That's correct.  He did.

17   Q.  And did you save copies of the returns that Mr. Bejaoui

18   prepared for you?

19   A.  Yes, I did.

20   Q.  I'm going to show you now what has been marked as

21   Government Exhibit 2101 for identification and 2102 for

22   identification.  Let's look first at 2101.  What is Government

23   Exhibit 2101?

24   A.  It's a letter reminding me of my rights in dealing with

25   Mister -- with this tax company.

1   Q.  Who gave you that letter?

2   A.  Mr. Mondher Bejaoui.

3            MS. KOVNER:  Your Honor, the government offers 2101.

4            MR. DRATEL:  Foundation, your Honor.  Hearsay.

5            THE COURT:  Lay a foundation.

6   Q.  Who is that document from?

7   A.  Mondher, Merci Income Tax Service, Inc.

8   Q.  And who gave it to you?

9   A.  Yes.

10  Q.  Mr. Bejaoui gave it to you?

11  A.  Yes, Mr. Bejaoui gave me the document.

12           STPHRAO:  Your Honor, the government offers Government

13  Exhibit 2101.

14           MR. DRATEL:  Still, your Honor, objection.

15           THE COURT:  Let me take a look at the exhibit.

16  (Pause)  All right.  Sidebar.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  You've established that this document was

3     given to him by Mr. Bejaoui, sir.

4           MR. DRATEL:  It's a hearsay document.  The testimony

5     is valid but not the testimony.  He could say, I got a letter

6     from him.

7           THE COURT:  This is just as a privacy policy.  What do

8     you intend to make of it?

9           MS. KOVNER:  Just to establish the identity of the

10    person that he was dealing with.  It is a critical fact in this

11    case that the defendant -- I'm sorry -- that Mr. Mejri went to

12    the defendant, he had him prepare his taxes.  That was the

13    nature of their business, not an insurance relationship.  So

14    the fact that defendant made the statement, it is the

15    defendant's statement.  Therefore it is outside of the hearsay

16    rule.

17          THE COURT:  You're saying this is a statement of a

18    party opponent?

19          MS. KOVNER:  Yes.

20          THE COURT:  He has testified that it came from

21    Bejaoui.  A party opponent.

22          MR. DRATEL:  Just give me a second to look at the

23    rule.  (Pause)

24          THE COURT:  Sir.  Statement of a party opponent.

25          MR. DRATEL:  Yes.

1              THE COURT:  So it comes in that way.

2              MR. DRATEL:  But that's just it.  A statement of a

3    party opponent.

4              THE COURT:  Oh, you wanted the rule?  I'm sorry.  I

5    thought your magic little thing found the rule.

6              MR. DRATEL:  The corporate book is actually easier

7    that way than scrolling through it.

8              THE COURT:  Let me see, what rule?

9              MR. DRATEL:  It's probably, it's 804 something, right?

10             MR. NAWADAY:  No, it's 801.

11             MR. DRATEL:  Oh, 801, then it's, right, not hearsay.

12             MR. NAWADAY:  801(d)(2).

13             THE COURT:  It's offered against an opposing party and

14   was made by the party in an individual or representative

15   capacity.

16             MR. DRATEL:  OK.

17             THE COURT:  All right.  Objection overruled.

18             (Continued on next page)

19

20

21

22

23

24

25

1          (Jury present)

2              MS. KOVNER:  Your Honor, the government offers 2101.

3              THE COURT:  Admitted.

4          (Government's Exhibit 2101 received in evidence)

5              MS. KOVNER:  Ms. Ansari, would you publish 2101.

6    Q.   What is the date of this letter?

7    A.   It was March 12, 2005.

8    Q.   And who are the people who are listed as the recipients of

9    this letter?

10   A.   Sadok and Dawn Mejri.

11   Q.   Is dawn Mejri your wife?

12   A.   My ex-wife.

13   Q.   And who signed the letter at the bottom?

14   A.   Mondher, Merci Income Tax Service, Inc.

15   Q.   I'm handing you now -- I'm sorry.  You have also in front

16   of you what's been marked for identification as Government

17   Exhibit 2102?

18   A.   Yes.

19   Q.   Who prepared that document?

20   A.   Mr. Bejaoui.

21   Q.   Who gave it to you?

22   A.   Mr. Bejaoui.

23   Q.   What is it?

24   A.   Your individual income tax return, 2004.

25   Q.   Is that the return prepared for you?

1    A.  Yes, ma'am.

2              MS. KOVNER:  The government offers 2102.

3              MR. DRATEL:  No objection.

4              THE COURT:  2102 admitted without objection.

5              (Government's Exhibit 2102 received in evidence)

6    Q.  Did you receive these documents from Mr. Bejaoui at the

7    same time you received this letter, the letter we just looked

8    at?

9    A.  Yes, that's correct.

10   Q.  If we could look at the first page first and then if we

11   could go on from there to the second page.  And if we could

12   zoom into the section at the bottom.  Is that address where you

13   went to have your taxes done?

14   A.  305 Atlantic Avenue, yes.

15             MS. KOVNER:  You can take that exhibit down.

16   Q.  So, Mr. Mejri, now I'd like to show you some other papers

17   which are in evidence.  If we could publish Government Exhibit

18   115 in evidence.  And let's turn to the second page of this

19   exhibit.  And let's just zoom in below the header, perhaps, on

20   that document.  Mr. Mejri, who is identified as the president

21   of Vestal Limousine Corp. on this document?

22   A.  Sadok, Mejri.

23   Q.  And who is listed as the name, title of officer authorizing

24   dissolution on this document?

25   A.  Sadok, Mejri.

1    Q.  Were you in fact the president of Vestal Limousine Corp.?

2    A.  No, ma'am.

3    Q.  Have you ever been the president of a livery company?

4    A.  No, ma'am.

5    Q.  Have you ever created or dissolved a corporation in New

6    York State?

7    A.  No, ma'am.

8    Q.  Let me turn to the bottom of this page.  Can you read the

9    name of the person whose credit card was used to pay for this

10   filing.

11   A.  Mondher Bejaoui.

12   Q.  Did you ever authorize Mr. Bejaoui to prepare corporation

13   documents identifying you as the president of a limo company?

14   A.  No, ma'am.

15   Q.  Before you met with the government to prepare for your

16   testimony at trial, had you ever seen this document?

17   A.  No, ma'am.

18   Q.  If we could publish now what's in evidence --

19           THE COURT:  Let me see the top of that document.

20           All right.  Thank you.  Go ahead.

21           STPHRAO:  If we could publish now what's in evidence

22   as Government Exhibit 250.  And if we could zoom in so that we

23   show the second section, section no. -- section no. 3.  If we

24   could scroll up also so that we see the section that he filled

25   out.  That's perfect.  Thank you.

1  Q.  Who is listed as the president of Vestal Limousine Corp. on

2  this application?

3  A.  Sadok Mejri.

4  Q.  Did you ever provide information to an insurance agent or

5  broker in connection with a livery cap company insurance

6  application?

7  A.  No, ma'am.

8          MS. KOVNER:  Let's turn to the second-to-last page of

9  this document.  I'm sorry.  There's a signature page.  If we

10  could zoom in on the applicant's signature line.

11  Q.  Did you in fact sign on any of these lines?

12  A.  No, ma'am.

13  Q.  Can you read the date that this application was signed by

14  the applicant?

15  A.  11/15/2005.

16  Q.  Where were you employed in November of 2005?

17  A.  I was working for the trucking company located in Cedar

18  Rapids, Iowa.

19  Q.  What were you doing for the trucking company located in

20  Cedar Rapids, Iowa?

21  A.  I was driving an 18-wheeler tractor-trailer.

22  Q.  Did the company that you worked for provide with you

23  records of where it was that you drove for them?

24  A.  The company send us the spreadsheet of detailed statement

25  of my trips with the company.

D4AABEJ5ps                    Mejri - direct

1   Q.  I'm showing you now what's been marked as Government

2   Exhibit 2103 for identification.  What is Government Exhibit

3   2103?

4   A.  It's CRST Inc. payroll statement.

5   Q.  And is CRST Inc. the company you worked for driving a

6   tractor-trailer?

7   A.  That's correct, yes, ma'am.

8   Q.  Does that sheet reflect trips that you made in November

9   2005?

10  A.  That's correct.

11          MS. KOVNER:  The government offers 2103.

12          MR. DRATEL:  Objection, your Honor.

13          THE COURT:  830(6), sustained.  I take it that was the

14  objection.

15          MR. DRATEL:  Yes, sir.

16          THE COURT:  Ladies and gentlemen, it's just a legal

17  issue.  I've given them a legal reference, which they both

18  understand.  It saves having to go to sidebar.  But don't take

19  anything from this discussion.  It's a legal discussion.

20  Q.  Mr. Mejri, where were you in November or mid November of

21  2005 when the insurance documents we just looked at were filed?

22  A.  Was driving a tractor-trailer in New Mexico, going to

23  California.

24  Q.  Were you in -- and the insurance document that we just

25  showed you, the application for Vestal, when was the first time

1    that you saw that insurance application?

2    A.  First time I saw it.  It was in the prosecutor office.

3    Q.  Was that in connection with preparing for your testimony

4    for this trial?

5    A.  That's correct, yes.

6            THE COURT:  May I see 2103, sir.  Thank you.

7            Here you are.

8    Q.  Mr. Mejri, was your profession at the time that you

9    received that statement, were you a professional trucker?

10   A.  Excuse me?

11   Q.  Were you a professional driver for a trucking company when

12   you received the CRST document that I showed you a moment ago?

13   A.  That's correct, yes.

14   Q.  Did you maintain records of your trucking activity for

15   CRST?

16   A.  That's correct, yes.

17   Q.  Did you keep that, keep those records, as part of your

18   regular practice as a trucker for CRST?

19   A.  That's correct, yes.

20   Q.  Did you rely on the records that you kept as part of your

21   business as a trucker?

22   A.  I'm sorry.  I didn't understand the question.

23   Q.  Sure.  So the CRST document, the trip sheet in front of

24   you, did you rely on records like that in doing business that

25   you did as a trucker?

1   A.  In doing business as a trucker?

2   Q.  Yes.

3   A.  Oh, no, I haven't been doing business as a trucker after

4   this.

5   Q.  During the period when you were working as a driver for

6   CRST, did you use those trip sheets as part of your business as

7   a driver?

8   A.  Yes.  That's correct, yes.

9          MS. KOVNER:  Your Honor, government offers 2103.

10         MR. DRATEL:  Objection, your Honor.

11         THE COURT:  Sustained.  Let me see.

12         This document was created by CRST Van Expedited, Inc.

13  Is that correct?

14         THE WITNESS:  Yes, that's correct.

15         THE COURT:  Is it your copy of the payroll statement

16  that they generated, correct?

17         THE WITNESS:  That's correct.

18         THE COURT:  Do you know from what they generated it?

19         THE WITNESS:  From what?  I don't know what you mean.

20  I'm sorry.

21         THE COURT:  What information did they use in making

22  this?

23         THE WITNESS:  Well, that's my communication with the

24  trucking company.

25         THE COURT:  Did you have anything do with making this

D4AABEJ5ps                    Mejri - direct

1    document?

2              THE WITNESS:  No, no.  I just wrote this up.  I send a

3    message when I make a pickup, and when I make the delivery too,

4    I send them the message to let them know.

5              THE COURT:  I understand.  Sustained.

6              MS. KOVNER:  Your Honor, may we have a brief sidebar?

7              THE COURT:  Yes.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Yes, ma'am.  This is a CRST Van Expedited,

3    Inc., document.  You can have somebody come in who is a

4    custodian of these or who generated the information here or it

5    was done under his or her supervision and have them testify.

6    But he's the recipient of this.  He can't -- he hasn't so

7    far -- testified as to the requirements of 803(6).

8          I take it, sir, that's what you were about to say.

9          MR. DRATEL:  Yes.  Correct.  Correct.  In addition to

10   the fact that, not only not a qualified witness, but also, it's

11   not a regular practice of his business.  He's not a business.

12         THE COURT:  He's a trucker.  And is he an employee of

13   CRST Van Expedited?

14         MS. KOVNER:  Yes.

15         THE COURT:  OK.  Go ahead.

16         MS. KOVNER:  So he obviously isn't the author of these

17   documents, but as part of his regular -- I direct your Honor to

18   the part of the rule that indicates "the term business used in

19   this paragraph includes business as used".

20         THE COURT:  Are you reading the rule or the

21   commentary?  You know what, you're looking -- you have

22   something different than I do.  What is this?  Do I not have

23   the right one?

24         MS. KOVNER:  No, you probably have the right one and I

25   probably --

1          THE COURT:  Here, we can, assuming this is the current

2     rule that I have here -- it's the 2013 version.

3          MS. KOVNER:  Sure, right.

4          THE COURT:  Make your argument based on this.

5          MS. KOVNER:  Sure.  Here we go.  Right.  "The record

6     was kept in the course of a regularly conducted activity of a

7     business, occupation, or calling, whether or not for profit."

8     So that was part of his regular occupation as a truck driver,

9     He kept records of his trips that he was provided by the

10    government.  It's certainly true that he was not the creator of

11    these documents, but this is true for essentially all business

12    records.  You just rely on them as part of your regular course

13    of activity.  And he certainly relied on the trip sheets that

14    he received in doing his work as a driver.

15         THE COURT:  But he can't testify that the record was

16    at or near the time by, or from information transmitted by

17    someone with knowledge, because he wasn't making --

18         MS. KOVNER:  Well, your Honor, he received these

19    records of trips at or near the time he took these trips.  Just

20    like, for instance, the witnesses from an insurance company

21    can't testify that any particular -- as to when a particular

22    document was received by the insurance company, they just say

23    it was my practice to receive these documents whenever I took a

24    trip, at or near the time of the trip.

25         THE COURT:  I'm going to require somebody from the

D4AABEJ5ps                    Mejri - direct

1    company who made these from information that he or she

2    received, or it would have been under the person's supervision,

3    or I think now you can do it as an alternative by a

4    certification.  But he can't get these in under 803(6), on the

5    record so far.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Proceed.

3    BY MS. KOVNER:

4    Q.  Mr. Mejri, did you ever meet with Mondher Bejaoui about

5    anything other than preparing your taxes?

6    A.  No.

7          MS. KOVNER:  Nothing further.

8          THE COURT:  Cross-examination.

9          MR. DRATEL:  Thank you, your Honor.

10         THE COURT:  About how long do you have, do you know?

11         MR. DRATEL:  Five minutes.

12         THE COURT:  All right.

13   CROSS EXAMINATION

14   BY MR. DRATEL:

15   Q.  Good afternoon, Mr. Mejri.  Now, you said that you met

16   Mr. Bejaoui through Mr. Tartir, right?

17   A.  In his office.

18   Q.  And did Mr. Tartir do work for you as well?

19   A.  Yes, he did.

20   Q.  And you provided documents to him as well?

21   A.  That's correct, yes, sir.

22   Q.  Certification documents?

23   A.  That's correct, yes, sir.

24   Q.  Did you ever meet someone by the name of Saed Gheith?

25   A.  Saed Gheith.

1    Q.  Yes.

2    A.  No, sir.

3    Q.  And did you ever meet with him and supply address

4    information for an insurance application?

5            Did you ever -- I'm sorry.  Withdrawn.  You never met

6    him, right?  So you never gave him any information.  You never

7    signed any documents in his presence.

8    A.  No, sir.

9    Q.  OK.

10           MR. DRATEL:  Nothing further.  Thank you.

11           MS. KOVNER:  No redirect.

12           THE COURT:  You are excused.  You may step down, sir.

13   Thank you.  No, give that to whatever lawyer, whichever lawyer

14   gave that to you.

15           (Witness excused)

16           THE COURT:  All right, ladies and gentlemen.  I think

17   we should end.  It's 5 o'clock.  You can see the evidence is

18   coming in at quite a pace.  We are making good progress.  We

19   haven't heard all of the evidence.  Keep an open mind.  Don't

20   decide the case yet because you haven't heard everything.

21   Don't discuss this with anyone else.  We were relatively

22   successful this morning in starting early.  Can I ask you to

23   start tomorrow at 9?  All right.  Let's start tomorrow at 9.

24   So you really should be here by ten of, so forth.  Around 9

25   o'clock there's a fair amount of traffic downstairs, so you

1    have to build in time to get through security.  And we won't

2    have -- we'll just do an hour lunch, all right, or even

3    shorter.  But I think I owe it to you to give you at least an

4    hour.  We'll start tomorrow at 9 o'clock.  Enjoy the evening.

5    And give your booklets to Ms. Blakely.

6              (The jury left the courtroom)

7              THE COURT:  All right.  You may be seated in the

8    courtroom.  Government, where do we stand now on when you think

9    the government case will be concluded?

10             MS. KOVNER:  Your Honor, I think we are optimistic

11   that we might be able to rest on Friday.  We are not certain.

12   It's cutting it close Friday afternoon.  That's our hope.

13             THE COURT:  All right.  Mr. Dratel, you now have heard

14   that.  Make sure Mr. Bejaoui knows that he is encouraged to

15   attend.  You should speak with him tonight so that you can

16   answer any of his questions.  He has a right to be informed of

17   what's happening.  And I'll see everybody tomorrow at 9 a.m.

18             MR. DRATEL:  And, your Honor, just so we're clear, I

19   will also -- I have in the past, but I will alert him that if

20   he plans on testifying, that he may do it as early as Friday.

21             THE COURT:  Is that true?  Is it possible that you

22   will conclude before the -- sometime in the morning?

23             MS. KOVNER:  Possible.

24             THE COURT:  All right.  You should tell him that.  And

25   you can tell him also that I am going to want him here -- I

D4AABEJ5ps                     Mejri - cross

1    want him here during the trial.  I'm going to insist that he be

2    here at the conclusion of the government's case because I can

3    make sure he understands that it is his choice, not yours, as

4    to whether or not he testifies.  I believe he understands that

5    because when I kept on reciting the four things that are his, I

6    think he at one point even repeated it back to me.  So he

7    understands it.  But I am going to need to tell him in person,

8    to make sure that he understands in person, it is his decision

9    as to whether or not to testify, not his lawyer's.

10            And you can also, if you think it's appropriate -- if

11   not you don't have to -- tell him that I will authorize the

12   marshals to use any appropriate force necessary to bring him

13   here if he does not want to come.

14            Actually, I don't think you need to tell him that.

15            MR. DRATEL:  Either tonight or tomorrow I will inform

16   him that he's going to be produced Friday one way or the other

17   if, after tomorrow, it appears that the government will indeed

18   rest Friday.

19            THE COURT:  I think that's correct.  All right.  And

20   that's fine.  I'll see everybody at 9 o'clock tomorrow.

21            MR. DRATEL:  Thank you, your Honor.

22            THE COURT:  Make sure he understands that he is

23   encouraged to come tomorrow.

24            All right.  Thank you.  I have another case.

25            (Adjourned to 9:00 a.m., April 11, 2013)

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     THOMAS CANASTAR

4     Direct By Ms. Kovner . . . . . . . . . . . . 160

5     Cross By Mr. Dratel  . . . . . . . . . . . . 170

6     SCOTT SCHUSTER

7     Direct By Mr. Nawaday  . . . . . . . . . . . 175

8     Cross By Mr. Dratel  . . . . . . . . . . . . 200

9     LAURA HUSSEIN

10    Direct By Mr. Nawaday  . . . . . . . . . . . 213

11    Cross By Mr. Dratel  . . . . . . . . . . . . 231

12    ALLEN JOHNSON

13    Direct By Mr. Nawaday  . . . . . . . . . . . 241

14    Cross By Ms. Lewis . . . . . . . . . . . . . 246

15    Redirect By Mr. Nawaday  . . . . . . . . . . 247

16    SUSAN SOROCHMAN

17    Direct By Mr. Nawaday  . . . . . . . . . . . 248

18    Cross By Ms. Lewis . . . . . . . . . . . . . 257

19    Redirect By Mr. Nawaday  . . . . . . . . . . 259

20    CHARLES GALLAGHER FLENDER

21    Direct By Mr. Nawaday  . . . . . . . . . . . 263

22    Cross By Ms. Lewis . . . . . . . . . . . . . 270

23

24

25

```
1   DALE HOPPOUGH

2   Direct By Mr. Nawaday  . . . . . . . . . . . 273

3   Cross By Ms. Lewis . . . . . . . . . . . . . 278

4   Redirect By Mr. Nawaday  . . . . . . . . . . 278

5   GREGORIO CHERIE

6   Direct By Mr. Nawaday  . . . . . . . . . . . 279

7   Cross By Mr. Dratel  . . . . . . . . . . . . 307

8   Redirect By Mr. Nawaday  . . . . . . . . . . 320

9   Recross By Mr. Dratel  . . . . . . . . . . . 324

10  Redirect By Mr. Nawaday  . . . . . . . . . . 325

11  SADOK MEJRI

12  Direct By Ms. Kovner . . . . . . . . . . . . 326

13  Cross By Mr. Dratel  . . . . . . . . . . . . 343
```

14                   GOVERNMENT EXHIBITS

```
15  Exhibit No.                                Received

16   318A    . . . . . . . . . . . . . . . . . 164
     318B    . . . . . . . . . . . . . . . . . 167
17   110 through 134  . . . . . . . . . . . . . 178
     603   . . . . . . . . . . . . . . . . . . 195
18   2505, 100, 101A, 101B, 102, 103A, 103B, . . . 212
         104A, 104B, and 105
19   2504, 2000-2006  . . . . . . . . . . . . . 239
     2502, 1700, and 1701A  . . . . . . . . . . 241
20   161-163  . . . . . . . . . . . . . . . . . 244
     2011   . . . . . . . . . . . . . . . . . . 247
21   2013   . . . . . . . . . . . . . . . . . . 264
     164 and 165  . . . . . . . . . . . . . . . 268
22   2009   . . . . . . . . . . . . . . . . . . 274
     155-160  . . . . . . . . . . . . . . . . . 276
23   201 through 244, 251 through 282, and . . . . 282
         352
24   3000A   . . . . . . . . . . . . . . . . . . 296
     3000   . . . . . . . . . . . . . . . . . . 300
25   2101   . . . . . . . . . . . . . . . . . . 332
     2102   . . . . . . . . . . . . . . . . . . 333
```